**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| SUSAN SOTO PALMER, et al.<br><br>Plaintiffs,<br><br>v.<br><br>Secretary of State STEVEN HOBBS, in his official capacity as Secretary of State of Washington; et al.<br><br>Defendants. | Case No. 3:22-cv-05035-RSL<br><br>PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSES TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>The Honorable Robert S. Lasnik<br><br>NOTE ON MOTION CALENDAR: March 25, 2022 |

**INTRODUCTION**

Plaintiffs have demonstrated that they are entitled to preliminary relief. Plaintiffs are substantially likely to succeed on their claim that Legislative District 15 ("LD 15") in the Enacted Plan has the result of diluting the strength of Latino voters in the Yakima Valley region in violation of Section 2 of the Voting Rights Act ("VRA"). Furthermore, the balance of the equities weighs in Plaintiffs' favor because Defendants agree that the state can implement Plaintiffs' requested relief if a remedial plan is in place by March 28, 2022, *see* Hobbs Resp. at 10, thus relieving any irreparable harm to Plaintiffs. Plaintiffs here provide such a plan, which makes limited changes to the Enacted Plan, complies with traditional redistricting criteria and the federal Voting Rights Act ("VRA"), and provides Latino voters an equal opportunity to elect candidates of their choice in LD 14 in the Yakima Valley. Accordingly, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for preliminary relief, enjoin Defendants' use of the Enacted Plan, and order the implementation of Plaintiffs' Proposed Plan starting with the 2022 elections.

# ARGUMENT

**I.  Plaintiffs Are Substantially Likely to Succeed in their Claim that LD 15 Dilutes the Voting Strength of Latino Voters and Will Suffer Irreparable Harm.**

**A.  There is No Dispute That Plaintiffs Have Established the *Gingles* Preconditions and Totality of the Circumstances for Latino Voters in the Yakima Valley.**

Plaintiffs have satisfied the *Gingles* preconditions and demonstrated that, under the totality of the circumstances, Latino voters in the Yakima Valley have less opportunity to participate in the electoral process and elect candidates of choice to the Washington legislature in LD 15 of the Enacted Plan. *See* Compl., ECF 1; Mot. for Preliminary Inj., ECF 38. Defendants do not contest this yet they intent to continue enforcing the Enacted Plan. *See* Defendant Hobbs Resp. at 1; Jinkins & Billig Resp. at 3.

First, it is undisputed that Latino voters in the Yakima Valley region are sufficiently large and geographically compact to form the majority in a state legislative district. *See* ECF 38 at 3-4, 8; *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009). Defendants concede that there has been population growth in the region, *see* ECF 49 at 19, and LD 15 in the Enacted Plan itself contains a majority-Hispanic Citizen Voting Age Population ("HCVAP").[1] Further, *five separate maps* with a majority-HCVAP district in the Yakima Valley that balance traditional redistricting criteria were drawn by Commissioners or presented to the Commission during the map-drawing process. ECF 38 at 8; ECF Nos. 38-9, 38-10 (Sims and Walkinshaw maps); ECF 38-26 (Barreto Dec.) at 52-53; ECF 38-22 (Email chain re: coalition demonstrative). Plaintiffs have also drawn another demonstrative map, Plaintiffs' Proposed Plan, which integrates a majority-HCVAP district (LD 14) into the Enacted Plan. Ex. 1 (Plaintiffs' Proposed Plan); Ex. 2 (Second Collingwood Dec.) ¶ 13 (concluding Plaintiffs' Proposed Plan contains 52.41% HCVAP). Plaintiffs' Proposed LD 14 provides Latino voters with an equal opportunity to elect a candidate of choice while complying

---

[1] Plaintiffs uploaded the shapefile provided by the Commission for the Final Enacted Legislative Plan to Dave's Redistricting, a widely-used mapping platform, to view LD 15's demographics. This map is available at https://davesredistricting.org/maps#viewmap::45bd8e19-f2b2-4063-8418-498a44509e06.

with traditional redistricting criteria and having only a limited impact on the Enacted Plan. *See infra* Part II; Ex. 2 (Second Collingwood Dec.) ¶¶ 13-19. Considering this evidence, there can be no dispute that the first *Gingles* prong has been met here.

Turning to the second *Gingles* precondition, the record indisputably shows that "a significant number of [Latino voters] usually vote for the same candidates" and are politically cohesive. *Thornburg v. Gingles*, 478 U.S. 30, 56 (1986). Plaintiffs' expert Dr. Loren Collingwood conducted a statistical analysis of election results to determine the level of cohesion among Latino voters. *See, e.g.,* ECF 38-25 (Collingwood Dec.) ¶¶ 9-14. In analyzing twelve elections in the Yakima Valley area, Dr. Collingwood found that "the results clearly show the presence of racially polarized voting, with Latinos consistently voting at rates often as high as two to one in support of one set of candidates, and non-Hispanic whites supporting a different set of candidates at rates higher than two to one." *Id*. ¶¶ 12-13. This stark pattern is repeated in endogenous elections (those elections held in LD 15) involving at least one Latino candidate, including all four LD 15 elections Dr. Collingwood analyzed. *Id*. ¶ 14.[2] (concluding that "Latino candidates won a majority of the vote in heavily Latino precincts across the 15th Legislative District but received extremely little support in majority-white precincts"). Dr. Matt Barreto also presented an analysis to the Commission of 12 statewide elections from 2012-2020. He found a "clear pattern of racially polarized voting" in the region. ECF 38-26 ¶¶ 4-10 ("there is a strong finding of racially polarized voting in the 5-County region that comprises the Yakima Valley. Latino voters are cohesive and provide strong support for their candidates of choice"); *id.* at 29-47 (presenting detailed findings showing large gaps between Latino and white voters in twelve elections); ECF 38-8 at 9-16.

Other federal courts have recently made similar findings. *See, e.g., Montes v. City of Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014) ("Plaintiffs have made a strong showing that Latino voters in Yakima have 'clear political preferences that are distinct from those of the

---

[2] Dr. Collingwood analyzed all the elections in LD15 over the past decade that involved at least one Latino candidate.

PLAINTIFFS' REPLY TO DEFENDANTS'
RESPONSES TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION                3

majority.'"); *Glatt v. City of Pasco*, No. 4:16-CV-05108-LRS, (E.D. Wash. Jan. 27, 2017); *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019 (Kittitas Cty. Sup. Ct. July 13, 2020) (approving a settlement finding that the conditions for a violation of the Washington Voting Rights Act, including a showing of racially polarized voting, had been met for Yakima County).

Plaintiffs have also demonstrated that white voters in the region vote sufficiently as a bloc usually to defeat Latino voters' candidates of choice, satisfying *Gingles* prong 3. *See Montes*, 40 F. Supp. 3d at 1405. Despite numerous candidates running for state legislative seats in the Yakima Valley region, no Latino candidate has *ever* been elected, which is "powerful evidence" of white bloc voting. *Id.* at 1405. Dr. Collingwood examined the levels of white bloc voting in twelve elections (eight statewide elections and four state legislative elections in LD 15 involving Latino candidates). ECF 38-25 ¶ 13-16. He found that white voters bloc voted against the Latino-preferred candidate in 11 of the 12 elections, or an astounding *91.6%* of the time. *Id*. ¶¶ 14-16. Dr. Barreto reached a similar conclusion in his analysis of elections in the region. ECF No. 28-26 ¶ 10 (finding that "Non-Hispanic white voters bloc-vote against Latino candidates of choice at high rates which has the effect of controlling electoral outcomes").

Despite this overwhelming evidence, the state failed to draw a legislative district that provides Latino voters an equal opportunity to vote. Plaintiffs have shown that although the enacted LD 15 contains a bare majority HCVAP, it was not drawn to perform (nor does it perform) for Latino voters, given local election conditions. Indeed, Dr. Collingwood conducted a performance analysis of eight recent past statewide elections to examine how Latino-preferred candidates would fare in the enacted LD 15 and found that high levels of bloc voting in LD 15 makes it extremely difficult for Latino voters to elect a preferred candidate. ECF 38-25 (Collingwood Dec.) ¶¶ 16-18. Dr. Collingwood's analysis unambiguously shows that LD 15 does not allow Latino voters an opportunity to elect candidates of choice, as the Latino-preferred candidate *loses in seven of eight elections* under the enacted LD 15. *Id*. ¶ 13. Defendants do not

PLAINTIFFS' REPLY TO DEFENDANTS'
RESPONSES TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION                   4

contest this finding, and it stands in stark contrast to LD 14 in Plaintiffs Proposed Plan, which provides Latino voters a real opportunity to elect candidates of choice. *See infra* Part II.

Furthermore, it is undisputed that state legislative elections in odd-numbered districts are held in non-presidential election years in Washington, Wash. Const. Art. II, § 6, and that Latino voter turnout is lower in non-presidential election years. Indeed, Dr. Barreto found that "the Latino voter turnout rate . . . is significantly higher in presidential election years than turnout in non-presidential election years. Specifically, over the past decade, a clear pattern emerged where Latino turnout was higher in 2012, 2016, and 2020, while Latino turnout was considerably lower in 2014 and 2018." ECF 38-26 ¶ 12. Thus, the assignment of an odd number to LD 15, instead of an even number, increased the difficulty for Latino voters in electing candidates of choice.

Lastly, Plaintiffs presented uncontested evidence demonstrating that the totality of the circumstances analysis confirm the VRA violation. Although the Supreme Court identified nine Senate Factors relevant to the analysis, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or another." *Gingles*, 478 U.S. at 45. Here, Plaintiffs have shown that seven relevant factors point decidedly toward a violation, ECF 38 at 12-20, and Defendants do not challenge this evidence. Plaintiffs have proven that there is a history of official voting-related discrimination against Latinos in the Yakima Valley (Factor 1) and high levels of racially polarized voting (Factor 2). *Id.* at 12-13. Their evidence shows that that assigning LD 15 an odd number resulting in elections in non-presidential years depresses Latino turnout, enhancing the dilutive effects of the district and making it harder for Latinos to elect candidates of choice (Factor 4).[3] *See* ECF 38-26 (Barreto Dec.) ¶ 12. Plaintiffs also presented data indicating clear and significant socioeconomic disparities that bear on the ability of Latinos in the Yakima Valley to participate effectively in the political process (Factor 5), ECF 38 at 14-15, as well as several public and sworn statements proving the existence of overt and subtle racial appeals

---

[3] Whether the Court prefers to consider this evidence in Factor 4, or another Senate Factor (as Defendants suggest) does not change that this evidence weighs in Plaintiffs' favor.

PLAINTIFFS' REPLY TO DEFENDANTS'
RESPONSES TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION                5

in campaigns (Factor 6), ECF 38 at 17-19. Plaintiffs further showed that very few Latinos are ever elected to legislative or countywide office in the region (Factor 7), and that the Enacted Plan is not proportional to the share of Latino voters in the region. *Id.* at 18-19.

In short, the uncontested evidence in the record shows that "based on the totality of the circumstances . . . the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by [Latino voters] in that [Latino voters] have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." 52 U.S.C. §10301(b). Plaintiffs are likely to succeed on their claim that LD 15 dilutes Latino voting power in violation of the VRA.

**B.  There is No Dispute That Plaintiffs Will Suffer Irreparable Harm Absent Relief.**

Defendants do not deny that Plaintiffs, Latino voters in the Yakima Valley, will suffer irreparable harm if they are denied the ability to elect candidates of their choice for the 2022 state House and Senate elections. Absent preliminary relief, Plaintiffs cannot obtain relief until the 2024 (House) or 2026 (Senate) elections. *See, e.g.*, *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986) (holding that discriminatory voting procedures "constitute the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief"). The legacy of vote dilution in the Yakima Valley region exacerbates potential harm to Plaintiffs. *See, e.g., Garza v. Cty. of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990) (finding that Latinos in Los Angeles County suffered an injury of vote dilution that "has been getting progressively worse, because each election has deprived Hispanics of more and more of the power accumulated through increased population"). Indeed, Defendants concede that "[i]f [Plaintiffs'] allegations are true, the situation is entirely unacceptable." Jinkins & Billig Resp. at 1-2. The dilution of Plaintiffs' votes is irreparable and must be swiftly remedied.

### C. Plaintiffs Have Sued the Proper Defendants to Redress their Harm.

In lieu of disputing Plaintiffs' entitlement to relief, Defendants Jinkins's and Billig's response brief predominately restates arguments from their motion to dismiss. Plaintiffs previously filed a response to that motion, and do not repeat all their arguments here. *See* ECF 44. It is simply not accurate that "the current structure of this case . . . will not lead to a full and fair adjudication on the merits." Jinkins & Billig Resp. at 2. Both Secretary Hobbs and Defendants Jinkins and Billig are proper parties to this case and in their official roles represent the relevant state authorities necessary for this Court to grant relief. ECF 44. While Defendants Jinkins and Billig claim that they were not "involved in the drawing of Legislative District 15, or in the debate and discussion that led to its drawing," *id*. at 14, the public record is clear that at least Senator Billig was aware of the issues with Legislative District 15 when voting to approve it.[4] Defendants Jinkins and Billig are appropriate Defendants as the leaders of the Washington Legislature. RCW 44.05.120. The Washington Redistricting Commission *explicitly declined* to intervene in this case.[5]

Even if this Court were to dismiss Defendants Jinkins and Billig from the case, there is no dispute that Defendant Secretary Hobbs is a proper party. Defendant Hobbs is the "chief election officer" in Washington. RCW 19A.04.20. By his own admission, he oversees and administers elections in the State in accordance with the state's redistricting plan, keeps records of elections, and coordinates and monitors county precinct mapping, among other relevant duties. Hobbs Resp. at 4, *see also* RCW 29A.76.040. Defendant Hobbs also states that "[i]f this Court is satisfied that Plaintiffs have made a clear showing of an entitlement to relief and promptly issues an order, the

---

[4] Ethan Rice, *Washington enacts new legislative districts*, Ballotpedia (Feb. 11, 2022) (quoting Senator Billig: "I continue to have significant concern that the Yakima Valley legislative district may not be compliant with the federal Voting Rights Act.").

[5] Washington State Redistricting Commission, March 7th Special Business Meeting, at 15:58 (Mar. 7, 2022), https://tvw.org/video/washington-state-redistricting-commission-2022031203/?eventID=2022031203; *see also* Joanna Markell, *WA Redistricting Commission Won't Intervene In Voting Rights Lawsuit; Chair Resigns*, Yakima Herald Republic (Mar. 7, 2022), https://www.yakimaherald.com/news/local/wa-redistricting-commission-wont-intervene-in-voting-rights-lawsuit-chair-resigns/article_20827ca1-24cc-539b-9015-395796869a9a.html

Secretary is committed to working with its county partners to implement a court order." Hobbs Resp. at 10. This demonstrates that the necessary defendants to effectuate relief are already parties to this matter. Simply put, Defendants' *choice* not to defend the enacted LD 15 does not change their status as proper parties, nor does it put a burden on Plaintiffs to search for other Defendants.

Indeed, the Secretary does not deny he intends to enforce the Enacted Plan but nevertheless argues the Court cannot grant relief because the Secretary will not defend the plan. This is wrong. The Secretary has not demonstrated any other state actor with authority to enforce the plan, and the Commissioners lacks any present authority over the plan. At least two circuits have ruled that Plaintiffs are prohibited from suing any state actor that does not actually enforce the plan. *See Jacobson v. Fla. Sec. of State,* 974 F.3d 1236 (11th Cir. 2020) ("A plaintiff's injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."); *Tx. All. for Retired Americans v. Scott*, __ F.4d __, 2022 WL 795862 (5th Cir. Mar. 16, 2022). The Secretary's refusal to defend an indefensible plan does not limit the court's ability to order necessary relief in this case. It is the Secretary's admitted intent to continue enforcing the unlawful plan that is the harm these Plaintiffs seek to enjoin.[6]

## II. The Balance of the Equities Favors Plaintiffs, As This Court Can Order Relief and Allow the State Ample Time to Administer the 2022 Elections.

Defendants agree that it is possible to implement relief in time for the 2022 elections. Indeed, Defendants Jinkins and Billig invite this Court to order "an appropriate remedy" if it finds Plaintiffs' claim meritorious, Jinkins & Billig Resp. at 19, and Secretary Hobbs concedes that it is possible to implement relief if the Court orders a new legislative district plan on or before March 28, 2022. Hobbs Resp. at 10, 16. Although that date is soon, the Court can and should order the use of a remedial plan by March 28 because Plaintiffs' claim merits relief, irreparable harm would

---

[6] If it were true that a state official may simply take the position that they will not defend alleged actions but continue to implement unlawful actions, then all federally unlawful acts by state actors could continue as long as the state actor at issue makes representations to the court that they will not defend the state action while continuing to implement such action. This position is untenable.

PLAINTIFFS' REPLY TO DEFENDANTS'
RESPONSES TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION                    8

otherwise occur, *see supra*, and they propose a lawful remedial plan. Even if the Court were to order use of Plaintiffs' Proposed Plan shortly after March 28, the state has ample time to administer the 2022 elections according to current deadlines. *See Wisconsin Legislature v. Wisconsin Elections Comm'n,* 522 U.S. ___ (2022) (per curiam) (holding enough time for the Wisconsin Supreme Court to select an entirely new legislative map for a primary election on August 9).

### A. Plaintiffs' Remedy Map Does Not Impose Implementation Burdens

The legislative map that Plaintiffs respectfully request this Court order the Secretary of State to administer in the upcoming elections is attached as Exhibit 1. Plaintiffs have provided the shapefile for this map to Secretary Hobbs. Plaintiffs' Proposed Plan remedies the harm to Latino voters in the Yakima Valley while respecting traditional redistricting criteria codified in state law. *See* Ex. 2 (Second Collingwood Dec.) ¶¶ 12-19. RCW 44.05.080 requires legislative districts to be as nearly equal in population as practicable, and to have boundaries that: are contiguous and compact; minimize splitting precincts, counties, and cities between more than one district; and respect areas recognized as communities of interest.

As summarized in the table below, Plaintiffs' Proposed Plan has the same low population deviation as the Enacted Plan and is contiguous. *Id.* ¶ 16. The changes to LD 14 and neighboring districts in Plaintiffs' Proposed Plan have virtually no impact on the overall compactness scores, as reflected in the plans' Reock and Polsby-Popper scores, commonly used metrics for measuring compactness. *Id.* ¶ 17. The Plan also splits fewer precincts than the Enacted Plan, *id.* ¶ 19, and minimizes changes to surrounding non-remedial districts and counties, impacting only five districts (9, 13, 14, 15, and 16) and removing county splits in Yakima, Grant, and Adams counties. The Plan thus minimizes the burden on the Secretary to implement the new map.

Plaintiffs' Proposed Plan also respects communities of interest. The Proposed LD 14 ensures that majority-Latino communities in the cities of Wapato, Toppenish, and Granger in the Yakima Valley are no longer cut off from other politically active majority-Latino communities like East Yakima, Sunnyside, Grandview, and Pasco in the same region. As explained above, these

communities share a common history of struggle against past and present-day discrimination, socioeconomic disparities, and racial tension.[7] *See supra* I.A. The Proposed LD 14 also keeps the nearby reservation lands of the Yakama Nation whole. *See* Ex. 1.

|  | **Enacted Plan** | **Plaintiffs' Proposed Plan** |
|---|---|---|
| **Population Deviation** | 0.25% | 0.25% |
| **Contiguous (Y/N)** | Y | Y |
| **Plan Compactness - Reock** | 0.39 | 0.39 |
| **Plan Compactness - Polsby-Popper** | 0.32 | 0.31 |
| **Precinct Splits** | 287 | 280 |
| **County Splits** | 18 counties split, 59 times | 20 counties split, 58 times |
| **HCVAP %** | 50.02% (LD 15) | 52.41% (LD 14) |

LD 14 in Plaintiffs' Proposed Plan provides Latino voters with an equal opportunity to elect candidates of their choice to the state legislature in the Yakima Valley. Plaintiffs' expert Dr. Loren Collingwood conducted a performance analysis of Plaintiffs' Proposed LD 14. Analyzing the same eight elections as he did for the Enacted Plan, he found that Latino-preferred candidates would win in all eight elections in Plaintiffs' Proposed LD 14 (as compared to losing seven of eight elections in the Enacted LD 15). Ex. 2 ¶ 13; ECF 38-25 ¶ 15. In addition, the Proposed Plan renumbers the Latino opportunity district in the region to LD 14, thus allowing elections to take place in presidential election years, where Latino voter turnout tends to be higher. ECF 38-26 (Barreto Dec). Together, this evidence demonstrates that Plaintiffs' Proposed LD 14 provides Latino voters with an equal opportunity to elect candidates of choice. Plaintiffs have provided the Court with a map that remedies the VRA violation, complies with all the state's neutral redistricting criteria, and can be implemented by Defendant Hobbs in time for the 2022 elections.

---

[7] These communities also share a growing ability to exercise their political strength, as evidenced by the election of Latino local officials in these cities. *See, e.g.*, City of Granger, Mayor & City Council, https://www.grangerwashington.org/mayor-city-council/; City of Wapato, City Council, https://wapato-city.org/city-council/; City of Toppenish, City Council, http://cityoftoppenish.us/council/

PLAINTIFFS' REPLY TO DEFENDANTS'
RESPONSES TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION          10

### B. Even if the Court Orders a Remedy After March 28, the State Will Have Ample Time to Administer the 2022 Elections Under Plaintiffs' Proposed Plan.

Should the Court order preliminary relief shortly after the Secretary's asserted deadline of March 28, it is still possible for the state to prepare for and administer elections under Plaintiffs' Proposed Plan. Although the Secretary thoroughly describes a series of tasks to be completed to administer the August 2 primary, he concedes that if the *first* of those tasks—precinct revision—can be completed by the statutory deadline of May 2, then the 2022 primary and general elections can feasibly be conducted under new remedial legislative maps. His March 28 deadline is wholly premised on an assumption that five weeks are needed to revise precincts to conform with a new legislative district plan: three weeks for counties to do the technical process of redrawing precinct boundaries, and 1-2 weeks for county legislative approval of those boundaries. *Id.* at 11. These assumptions are speculative, and the Secretary's own proffered evidence suggests that precinct revisions can be done in less time, especially if the Court were to adopt Plaintiffs' Proposed Plan.

The Secretary's assumption that it will take the affected counties three weeks to revise precinct boundaries is unfounded. That estimate applies, by the Secretary's admission, only to "some counties" and is based on a statement by a single election official noting that she *alone* spent three weeks reviewing Yakima County's precincts "one-by-one" after the Enacted Plan became final on February 8. *See id.* at 11; ECF 51. The Secretary provides no evidence showing why such time is necessary to identify the relatively few precincts that would require amendment should the Court order Plaintiffs' Proposed Plan. The Plan splits far fewer precincts than the Enacted Plan.[8] In all, the Plan only requires review of precincts within six affected counties: Yakima, Klickitat, Kittitas, Benton, Franklin, and Walla Walla.[9] Walla Walla has yet to finalize

---

[8] Plaintiffs' Plan splits only four precincts in Yakima County, many fewer than the near dozen in the Enacted Plan. The Plan also splits three fewer precincts in Franklin County than the Enacted Plan. The Plan splits 8 precincts in Klickitat County to account for the boundary of the Yakama Nation Reservation, 3 more precincts than the Enacted Plan in Benton County, a single precinct in Kittitas County, and no precincts in Walla Walla County.

[9] Plaintiffs' Plan would not require any precinct boundary changes in Grant or Adams County because the Plan simply removes county splits in these places. In other words, the Counties would need only reassign those precincts to a new district without moving their boundaries. *See* Ex. 1.

PLAINTIFFS' REPLY TO DEFENDANTS'
RESPONSES TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION                                11

any district or precinct maps.[10] In counties that have adopted precinct maps, the process to amend them is likely less intensive than the process required to initially adopt them. For example, Kittitas County may alter their adopted map by resolution with no requirement for a public hearing.[11]

Moreover, none of these counties need undertake this routine technical task alone: the Secretary's declarant Stuart Holmes, Acting Director of Elections, notes that his office can provide "technical assistance" to these counties "as needed" by offering staff with necessary subject matter expertise in Geographic Information Systems (GIS) software to complete necessary precinct revisions. ECF 52 ¶ 15. Mr. Holmes cites no timing, budgetary, or staffing limits on this support. Indeed, with his office's support and technical expertise, a handful of affected counties could certainly identify necessary changes to precinct lines, if any, in less than 3 weeks.

Nothing in the record establishes March 28 as a firm deadline. The Secretary's evidence instead indicates that his office already has the necessary resources to ensure speedy precinct revisions by the May 2 statutory deadline whether the Court orders a remedial map and other appropriate relief on March 28 or shortly thereafter.

## CONCLUSION

Plaintiffs have established that they are entitled to preliminary relief and have provided a legislative map that would remedy Plaintiffs' vote dilution in the Yakima Valley region that can be implemented in time for the primary election deadlines. Accordingly, Plaintiffs respectfully request that this Court grant their motion for preliminary relief, enjoin Defendants from utilizing the Enacted Plan in any elections, and order the implementation of Plaintiffs' Proposed Plan for use starting with the 2022 elections.

---

[10] Emry Dinman, *Walla Walla County redistricting draws unexpected attention, calls for public input*, Union-Bulletin (Mar. 21, 2022). In Walla Walla, the redistricting process is very much still ongoing as the County Commission, on March, 14, 2022, just formed a nonpartisan committee to advise the Commission on its maps. *Id*.
[11] See Kittitas County Commissioners' Minutes at 2, Feb. 15, 2022, available at https://www.co.kittitas.wa.us/uploads/bocc/minutes/2022/2022-02-15-minutes-2pm-public-hearing.pdf.

PLAINTIFFS' REPLY TO DEFENDANTS'
RESPONSES TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION                           12

Dated: March 25, 2022

By: */s/ Edwardo Morfin*

| | |
|---|---|
| Chad W. Dunn* | Edwardo Morfin |
| Sonni Waknin* | WSBA No. 47831 |
| UCLA Voting Rights Project | Morfin Law Firm, PLLC |
| 3250 Public Affairs Building | 2602 N. Proctor Street, Suite 205 |
| Los Angeles, CA 90095 | Tacoma, WA 98407 |
| Telephone: 310-400-6019 | Telephone: 509-380-9999 |
| Chad@uclavrp.org | |
| Sonni@uclavrp.org | Annabelle Harless* |
| | Campaign Legal Center |
| Mark P. Gaber* | 55 W. Monroe St., Ste. 1925 |
| Simone Leeper* | Chicago, IL 60603 |
| Aseem Mulji* | aharless@campaignlegal.org |
| Campaign Legal Center | |
| 1101 14th St. NW, Ste. 400 | Thomas A. Saenz** |
| Washington, DC 20005 | Ernest Herrera* |
| mgaber@campaignlegal.org | Leticia M. Saucedo* |
| sleeper@campaignlegal.org | Deylin Thrift-Viveros* |
| amulji@campaignlegal.org | Mexican American Legal Defense and Educational Fund |
| | 643 S. Spring St., 11th Fl. |
| | Los Angeles, CA 90014 |
| | Telephone: (213) 629-2512 |
| | tsaenz@maldef.org |
| | eherrera@maldef.org |
| | lsaucedo@maldef.org |
| | dthrift-viveros@maldef.org |

*Admitted pro hac vice

*Counsel for Plaintiffs*

PLAINTIFFS' REPLY TO DEFENDANTS'
RESPONSES TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION            13

**CERTIFICATE OF SERVICE**

I certify that all counsel of record were served a copy of the foregoing this 25th day of March, 2022 via the Court's CM/ECF system.

*/s/ Ernest Herrera*
643 S. Spring St., 11th Fl.
Los Angeles, CA 90014
Telephone: (213) 629-2512

PLAINTIFFS' REPLY TO DEFENDANTS'
RESPONSES TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION                    14