Chad W. Dunn*
Sonni Waknin*
Bernadette Reyes*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019

Edwardo Morfin
WSBA No. 47831
Morfin Law Firm, PLLC
2602 N. Proctor Street, Ste. 205
Tacoma, WA 98407
Telephone: 509-380-9999

Mark P. Gaber*
Simone Leeper*
Aseem Mulji*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org
sleeper@campaignlegal.org
amulji@campaignlegal.org

Annabelle Harless*
Campaign Legal Center
55 W. Monroe St., Ste. 1925
Chicago, IL 60603
aharless@campaignlegal.org

Thomas A. Saenz*
Ernest Herrera *
Leticia M. Saucedo *
Deylin Thrift-Viveros*
Mexican American Legal Defense and Educational Fund
643 S. Spring St., 11th Fl.
Los Angeles, CA 90014
Telephone: (213) 629-2512
tsaenz@maldef.org
eherrera@maldef.org
lsaucedo@maldef.org
dthrift-viveros@maldef.org

*Counsel for Plaintiffs*

*Admitted pro hac vice

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SUSAN SOTO PALMER, ALBERTO MACIAS, BRENDA RODRIGUEZ GARCIA, FABIOLA LOPEZ, CATY PADILLA, EVANGELINA AGUILAR, LIZETTE PARRA, HELIODORA | Case No.:  3:22-cv-05035-RSL<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

MORFIN, and SOUTHCENTRAL
COALITION OF PEOPLE OF COLOR
FOR REDISTRICTING
                    Plaintiffs,
        v.
Secretary of State STEVEN HOBBS, in his
official capacity as Secretary of State of
Washington and the STATE OF
WASHINGTON;
                    Defendants.

Judge: Robert S. Lasnik

Date Action filed: January 19, 2022
Date set for trial:

Under 42 U.S.C. § 1983 and 52 U.S.C. § 10301, Plaintiffs allege as follows:

## INTRODUCTION

1.      The Washington State Redistricting Commission (the "Commission") intentionally selected redistricting plans for Washington's state legislative districts that dilute Hispanic and/or Latino[1] voters' ability to elect candidates of choice.

2.      The Commission did so by configuring District 15, which includes parts of the Yakima Valley and Pasco, to be a *façade* of a Latino opportunity district.

3.      Election results show that the approved map's District 15 is unlikely to afford Latino voters an equal opportunity to elect their candidates of choice in violation of the Voting Rights Act.

4.      The district's Hispanic citizen voting age population ("HCVAP") is just 50.02%.

5.      This number is needlessly depressed because the Commission excluded a number of adjacent, heavily Latino communities in Yakima County—including parts of the City of Yakima

---

[1] This complaint uses the terms "Latino" and "Hispanic" interchangeably to refer to individuals who self-identify as Latino or Hispanic. Additionally, the terms "Latino" and "Hispanic" mean persons of Hispanic Origin as defined by the United States Census Bureau and U.S. Office of Management and Budget (OMB).

**AMENDED COMPLAINT FOR DECLARATORY**   2
**AND INJUNCTIVE RELIEF**

and the cities of Toppenish, Wapato, Mabton, and their surrounding areas—and instead included

an expanse of rural, white communities in Benton, Grant, and Franklin Counties.

6.      The election data shows that these rural white voters participate at much higher

rates than the district's Latino population and exhibit stark racially polarized voting patterns

against Latino-preferred candidates.

7.      At the northeastern end of that swath of rural, white voters, the Commission

included the City of Othello in Adams County in District 15. Othello and areas to its immediate

west are majority HCVAP, but to a lesser degree than the Yakima Valley Hispanic communities

that the Commission excluded from District 15.

8.      The map below shows how the Commission cracked apart Yakima County's Latino

population between Districts 14 and 15. Census blocks with Latino CVAP exceeding 35% are

shown in gradations of blue.

### District View



**AMENDED COMPLAINT FOR DECLARATORY**    3
**AND INJUNCTIVE RELIEF**

9.      The map below shows the cracking of the Latino population in the City of Yakima.

**City of Yakima View**



10.      The Commission's design of District 15 dilutes Latinos' voting strength in four ways.

11.      First, reaching for Othello rather than including adjacent Yakima County Latino voters unnecessarily increases the number of bloc-voting white voters in the district, who must be included in order to extend the lines to Adams County.

12.      Alternative configurations would have resulted in the district's HCVAP being higher and providing a real opportunity for Latino voters to elect their candidates of choice.

13.      Second, the Commissioners included a large number of rural white voters that vote against Latino-preferred candidates.

14.      Third, the election data show that Othello's Latino voters are less politically active than those the Commission excluded from the district in Yakima County.

**AMENDED COMPLAINT FOR DECLARATORY     4
AND INJUNCTIVE RELIEF**

15.     Indeed, in the Adams County portion of District 15 (where Othello is located), former President Donald Trump—who is not the candidate of choice for Yakima County and Franklin County Latinos—received 60.7% of the vote.

16.     Adams County Latinos exhibit low voting turnout in elections.

17.     The Commission's decision to extend District 15's lines to Othello in order to include low-propensity Latino voters created a district that has *just* a bare minority Hispanic citizen voting age population while not improving the electoral prospects of Latino-preferred candidates.

18.      The approved map's District 15 worsened the electoral prospects of Latino-preferred candidates.

19.     Fourth, the election data show that Latino voters turn out to vote at greater numbers in presidential election years (when even-numbered legislative district elections are held) than in non-presidential election years (when odd-numbered legislative district elections are held).

20.     By assigning the district an odd number, the Commission has ensured even lower Latino voter turnout in the district.

21.     These choices—(1) excluding adjacent, politically cohesive Latino voters, (2) including a large number of rural white voters,  (3) extending the district to reach non-politically active Latino voters, and (4) placing the district on a non-presidential election year cycle—result in a district that is a façade of Latino opportunity district.

22.     The Supreme Court has held that these precise maneuvers—cracking apart politically-cohesive Latino populations and instead including less politically active Latinos "to create the façade of a Latino district"—violates Section 2 of the Voting Rights Act. *LULAC v. Perry*, 548 U.S. 399, 441 (2006).

23.     The election data confirm this.

**AMENDED COMPLAINT FOR DECLARATORY   5
AND INJUNCTIVE RELIEF**

24.     Reconstituted election results show that the Latino-preferred candidates would have lost almost all recent statewide elections in District 15: 2020 President, 2020 Governor, 2020 Attorney General, 2018 Senate, 2016 President, and 2016 Governor. In only the 2016 Senate election would the Latino-preferred candidate have carried the district.

25.     The situation is even worse than that for Latino voters and candidates. In all of the above statewide elections, the Latino-preferred candidates were white and were running well-funded, statewide races. The election data show that when Latino candidates run for state legislative office in the area, they perform below these white candidates.

26.     The current District 15 includes the eastern half of Yakima County and has an HCVAP of 39.3%.

27.     Maria Cantwell, a white woman who was the Latino candidate of choice for U.S. Senate in 2018, received 43.3% of the vote. Meanwhile, Plaintiff Evangelina Aguilar—who was a candidate for state senate in District 15 that year and the Latino candidate of choice—received just 39.4%.

28.     The Commission could have avoided creating a façade Latino opportunity district; alternative configurations are possible that have a higher HCVAP percentage, and reconstituted election results demonstrate that Latino-preferred candidates would have a real opportunity to elect their candidates of choice in those configurations.

29.     Every member of the Commission was made aware of the adverse effect that the adopted maps would have on Latino voters in the Yakima Valley region.

30.     This information was widely reported on in Washington before the Commission is alleged to have approved the plan. *See* Jim Brunner, *Washington's Redistricting Commissioners Confident They'll Meet Deadline, But Face Pushback Over South Seattle Plans,* SEATTLE TIMES

(Nov. 10, 2021), https://www.seattletimes.com/seattle-news/politics/washingtons-redistricting-commissioners-confident-theyll-meet-deadline-but-face-pushback-over-south-seattle-plans/; Melissa Santos, *Proposed WA Redistricting Maps May Violate Voting Rights Act,* CROSSCUT (Oct. 21, 2021), https://crosscut.com/politics/2021/10/proposed-wa-redistricting-maps-may-violate-voting-rights-act.

31.     One of the Commissioners, Commissioner Graves, has stated in relation to District 15, that the Federal Voting Rights Act "forbids districts where members of a racial group 'have less opportunity than other members of the electorate to participate in the political process and to elect representative of their choice'" while also stating that District 15 "using recent election results … leans Republican rather than Democrat."

32.     In races that require political affiliation, Latinos in the Yakima Valley region prefer Democratic candidates and Latino-preferred candidates have run as Democrats.

33.     By drawing District 15 in such a manner, Latinos in District 15 will be unable to elect candidates of choice.

34.     The Commission's decision to create the façade of a Latino opportunity district that they knew would not perform to elect Latino-preferred candidates has the intent and effect of diluting the voting power of Latino voters in violation of the Voting Rights Act.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1357, and 52 U.S.C. § 10301 *et seq.* to hear the claims for legal and equitable relief arising under the Voting Rights Act. It also has general jurisdiction under 28 U.S.C. §§ 2201 and 2202, the Declaratory Judgments Act, and Federal Rules of Civil Procedure 57 and 65 to grant the declaratory and injunctive relief requested by Plaintiffs.

**AMENDED COMPLAINT FOR DECLARATORY**    7
**AND INJUNCTIVE RELIEF**

36.     Jurisdiction for Plaintiffs' claim for costs and attorneys' fees is based upon Federal Rule of Civil Procedure 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e).

37.     This Court has personal jurisdiction over all Defendants. Defendant Steve Hobbs is a state official who resides in Washington and performs official duties in Olympia, Washington. Defendant State of Washington is a sovereign state of the United States of America.

38.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and will occur in this judicial district. In addition, Defendant Hobbs is a state official performing official duties in the Western District of Washington.

**PARTIES**

39.     Plaintiff Susan Soto Palmer is a United States citizen, Latina, over the age of eighteen, and a registered voter in the State of Washington.

40.     Plaintiff Soto Palmer resides in Yakima, Washington, and under the Commission-approved map, resides in Legislative District 15.  She intends to vote in future elections.

41.     Plaintiff Alberto Isaac Macias is a United States citizen, Latino, over the age of eighteen, and a registered voter in the State of Washington.

42.     Plaintiff Macias resides in Yakima, Washington, and under the Commission-approved map, resides in Legislative District 15.  He intends to vote in future elections.

43.     Plaintiff Brenda Rodriguez Garcia is a United States citizen, Latina, over the age of eighteen, and a registered voter in the State of Washington.

44.     Plaintiff Rodriguez Garcia resides in Yakima, Washington, and under the Commission-approved map, resides in Legislative District 14. She intends to vote in future elections.

AMENDED COMPLAINT FOR DECLARATORY   8
AND INJUNCTIVE RELIEF

45.     Plaintiff Fabiola Lopez is a United States citizen, Latina, over the age of eighteen, and a registered voter in the State of Washington.

46.     Plaintiff Lopez resides in Wapato, Washington in Yakima County, and under the Commission-approved map, resides in Legislative District 14. She intends to vote in future elections.

47.     Plaintiff Caty Padilla is a United States citizen, Latina, over the age of eighteen, and a registered voter in the State of Washington.

48.     Plaintiff Padilla resides in Toppenish, Washington in Yakima County, and under the Commission-approved map, resides in Legislative District 14.  She intends to vote in future elections.

49.     Plaintiff Evangelina Aguilar is a United States citizen, Latina, over the age of eighteen, and a registered voter in the State of Washington.

50.     Plaintiff Aguilar resides in Sunnyside, Washington and under the Commission-approved map, resides in Legislative District 15. She intends to vote in future elections.

51.     Plaintiff Lizette Parra is a United States citizen, Latina, over the age of eighteen, and a registered voter in the State of Washington.

52.     Plaintiff Parra resides in Pasco, Washington in Franklin County, and under the Commission-approved map, resides in Legislative District 15. She intends to vote in future elections.

53.     Plaintiffs Heliodora Morfin is a United States citizen, Latina, over the age of eighteen, and a registered voter in the State of Washington.

54.     Plaintiff Morfin resides in Pasco, Washington, and under the Commission-approved map, resides in Legislative District 15. She intends to vote in future elections.

**AMENDED COMPLAINT FOR DECLARATORY   9**
**AND INJUNCTIVE RELIEF**

55.     The Individual Plaintiffs are Latino voters whose votes are diluted in violation of Section 2 of the Voting Rights Act by being placed in state legislative districts that crack them from other Latino voters and where their voting power will be overwhelmed by a white bloc voting in opposition to their candidate of choice.

56.     Plaintiff Southcentral Coalition of People of Color for Redistricting is a Washington non-profit organization whose members include Latino registered voters who reside in the Yakima Valley region and Yakima County.

57.     Plaintiff Southcentral Coalition of People of Color for Redistricting's mission of "[p]romoting public awareness of voting rights and representation in southcentral Washington" is directly related to securing fair representation of the Latino community in the Yakima Valley region.

58.     Plaintiff Southcentral Coalition of People of Color for Redistricting will bear the additional burden of expending resources to ensure that Latinos are able to elect candidates of choice under the current Commission-approved map.

59.     Defendant Steve Hobbs is being sued in his official capacity as the Secretary of State of Washington. Hobbs, as Secretary of State, "shall be the chief election officer for all federal, state, county, city, town, and district elections."  RCW 29A.04.230. The Secretary of State shall accept and file documents including declarations of candidacy. RCW 29A.04.255. The Secretary of State oversees and implements elections that take place once adopted redistricting plans take effect and ensures that elections are conducted in accordance with those plans.

60.     Defendant State of Washington is being sued pursuant to the Court's Order of Joinder, Dkt. No. 68, ordering Plaintiffs to add the State of Washington as a Defendant. The State

**AMENDED COMPLAINT FOR DECLARATORY**   10
**AND INJUNCTIVE RELIEF**

of Washington includes the respective governmental arms responsible for adopting redistricting plans and ensuring that elections are conducted in accordance with those plans in the State.

## LEGAL BACKGROUND

61.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [a racial minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b).

62.     The dilution of Latino voter strength "may be caused by the dispersal of [Latino voters] into districts in which they constitute an ineffective minority of voters or from the concentration of [Latino voters] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

63.     In *Gingles*, the Supreme Court identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

64.     The second and third preconditions refer to the existence of racially polarized voting. "This legal concept 'incorporates neither causation nor intent' regarding voter preferences, for '[i]t is the <u>difference</u> between the choices made by [minorities] and whites—not the reasons

AMENDED COMPLAINT FOR DECLARATORY   11
AND INJUNCTIVE RELIEF

for that difference—that results' in the opportunity for discriminatory laws to have their intended political effect." *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (citing *Gingles*, 478 U.S. at 62-63).

65.     In addition to the preconditions, the statute directs courts to assess whether, under the totality of the circumstances, members of the racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Supreme Court has directed courts to consider the non-exhaustive list of factors found in the Senate Report on the 1982 amendments to the Voting Rights Act in determining whether, under the totality of the circumstances, the challenged electoral device results in a violation of Section 2.

66.     The Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which members of the minority group bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

67.     Courts also consider whether there is a lack of responsiveness on the part of elected officials to the particularized needs of the minority community, *see Luna v. Cty. of Kern*, 291 F. Supp. 3d 1088, 1139 (E.D. Cal. 2018), and whether the policy underlying the state or political

**AMENDED COMPLAINT FOR DECLARATORY**   12
**AND INJUNCTIVE RELIEF**

subdivision's use of the challenged standard, practice, or procedure is tenuous, *see Hall v. Louisiana*, 108 F. Supp. 3d 419, 427 (M.D. La. 2015).

68.     "There is no requirement that any particular number of factors be proved, or that a majority of them point one way or other." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id*. ("The statute explicitly calls for a 'totality of the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

69.     Section 2 of the Voting Rights Act also prohibits intentional discrimination.

70.     A court, when evaluating whether discriminatory intent motivated a redistricting plan, undertakes a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). "Challengers need not show that discriminatory purpose was the 'sole[]' or even a 'primary' motive for the legislation, just that it was '*a* motivating factor.'" *McCrory*, 831 F.3d at 220 (4th Cir. 2016) (quoting *Arlington Heights*, 429 U.S. at 265-66) (emphasis in original).

71.     In making such an evaluation, the court utilizes a non-exhaustive list of factors, including "the historical background of the challenged decision; the specific sequences of events leading up to the challenged decision; the legislative history of the decision; and [] the disproportionate impact of the official action -- whether it bears more heavily on one race than another." *Id.* at 220-21 (internal citations and brackets omitted).

72.     "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

**AMENDED COMPLAINT FOR DECLARATORY**   13
**AND INJUNCTIVE RELIEF**

73.     Courts have found Section 2 violations where the district drawn was majority-minority citizen voting age population or voting age population, but the minority group still did not have the ability to elect candidates of choice. *See, e.g.*, *Thomas v. Bryant*, 366 F. Supp. 3d 786, 809 (S.D. Miss. 2019), *aff'd*, 938 F.3d 134 (5th Cir. 2019) (rejecting the defense's argument that a majority-minority district cannot be found to be dilutive in violation of Section 2) (citing *Monroe v. City of Woodville*, 881 F.2d 1327 (5th Cir. 1989)); *Mo. State Conf. of the NAACP v. Ferguson–Florissant Sch. Dist.*, 894 F.3d 924, 933 (8th Cir. 2018)).

74.     The Supreme Court has stated that "it may be possible for citizen voting-age majority to lack a real electoral opportunity" in a district. *LULAC*, 548 U.S. at 428.

75.     A redistricting plan that intentionally draws a district that has a majority of a minority group but minimizes voter registration and turnout such that the district does not elect the minority group's candidate of choice is a violation of Section 2. *See Perez v. Abbott*, 250 F. Supp. 3d 123, 148 (W.D. Tex. 2017).

76.     Where the data show that the State has used race to create a nominal Latino majority district that will not functionally perform for Latino voters—where alternative options that would perform are possible—it has unlawfully diluted Latinos' voting strength "to create the façade of a Latino district." *LULAC*, 548 U.S. at 441; *Perez*, 250 F. Supp. 3d at 884-85 (finding intentional racial discrimination where race was used "not . . .to provide or protect Latino voter opportunity but rather to create the façade of a Latino district." (internal quotation marks omitted)).

## FACTUAL ALLEGATIONS

### A.  2020 Demographic Changes in Washington State

77.     Washington State's Latino population surpassed one million in 2020 according to the 2020 United States Decennial Census.

**AMENDED COMPLAINT FOR DECLARATORY   14
AND INJUNCTIVE RELIEF**

78.     Washington now has the twelfth largest Latino population out of the fifty states.

79.     Under 13 U.S.C. § 141(c), commonly referred to as Public Law 94-171 ("P.L. 94-171"), the Secretary of Commerce must complete, report, and transmit to each state the detailed tabulations of population for specific geographic areas within each state. States ordinarily use the P.L. 94-171 data to redraw district lines.

80.     Washington received P.L. 94-171 data on August 12, 2021.

81.     Under RCW 44.05.140, the Commission is required to adjust the 2020 census redistricting data (PL 94-171) by relocating specified incarcerated or involuntarily committed populations from their location of confinement to their last known place of residence.

82.     According to P.L. 94-171 data, Washington State's population grew by 980,741 residents from 2010 to 2020, a growth rate of 14.5%.

83.     Washington's overall population growth was driven by the growth of its Latino population, which grew at a rate 3.5 times greater than that of non-Latinos.

84.     The Latino population in Washington grew by 303,423 for a growth rate of 40.1%, compared to a growth rate of 11.3% for non-Latinos.

85.     The growth of the Latino population has been especially large in the Yakima Valley region and is concentrated in that region.

86.     The Yakima Valley region consists of Yakima, Benton, and Franklin Counties, and includes Latino population centers in the City of Yakima, Toppenish, Sunnyside, Grandview, and the Tri-Cities.

87.     Yakima County added more than 20,000 Latinos over the decade.

88.     The total population of Yakima County in 2020 was 256,728.

**AMENDED COMPLAINT FOR DECLARATORY**   15
**AND INJUNCTIVE RELIEF**

89.     The Latino population of Yakima County in 2020 was 130,049, with Latinos growing from 45% to 51% of the County's total population.

90.     Franklin County added more than 12,000 Latinos over the decade.

91.     Franklin County's total Latino population is now 54% of the total population or 52,445.

92.     Benton County added 16,645 Latinos, a growth of 51% in 10 years, and reported a total of 49,339 Latinos in 2020.

93.     According to the Census Bureau's 2019 1-Year American Community Survey ("ACS") estimates, in 2019, Yakima County's HCVAP was 46,611.

94.     According to the Census Bureau's 2019 1-year ACS estimates, in 2019, Franklin County's HCVAP was 16,931.

95.     According to the Census Bureau's 2019 1-year ACS estimates, in 2019, Benton County's HCVAP was 17,526.

96.     Combined, the three-county Yakima Valley region had a total Latino population of 223,027 (2019 ACS) and 231,833 (2020 Census) and a total HCVAP of 81,068 (2019 ACS).

97.     The Latino population in the Yakima Valley region is sufficiently large and geographically compact to constitute the majority in a legislative district.

**B. The Washington State Redistricting Commission**

98.     Article II, Section 43 of the Washington Constitution mandates the creation of a bipartisan Washington State Redistricting Commission every decade to complete redistricting in Washington for both congressional and state legislative districts.

99.     The Commission is composed of five members; including four voting members and one non-voting member who acts as a chairperson. *See* WASH. CONST. Art II, § 43(2).

**AMENDED COMPLAINT FOR DECLARATORY   16
AND INJUNCTIVE RELIEF**

100.     Four members of the Commission are appointed by the legislative leaders of the two largest political parties in each house of the legislature. *Id.* The fifth member is selected by the four appointed members by an affirmative vote of at least three. *Id.*

101.     Article II, Section 43(6) states that the Commission "shall complete redistricting as soon as possible following the federal decennial census, but no later than November 15th of each year ending in one. At least three of the voting members shall approve such a redistricting plan. If three of the voting members of the commission fail to approve a plan within the time limitations provided in this subsection, the supreme court shall adopt a plan by April 30th of the year ending in two in conformance with the standards set forth in subsection (5) of this section."

102.     Under RCW 44.05.100, "[i]f three of the voting members of the commission fail to approve and submit a plan within the time limitations provided in subsection (1) of this section, the supreme court shall adopt a plan by April 30th of the year ending in two. Any such plan approved by the court is final and constitutes the districting law applicable to this state for legislative and congressional elections, beginning with the next election held in the year ending in two. This plan shall be in force until the effective date of the plan based on the next succeeding federal decennial census or until a modified plan takes effect as provided in RCW 44.05.120(6)."

103.     State legislative redistricting plans in Washington State must adhere to the requirements set out in RCW 44.05.090. Districts shall have a population as nearly equal as is practicable, excluding nonresident military personnel, based on the population reported in the federal decennial census as adjusted by RCW 44.05.140. And to the extent consistent with the equal-population requirement, insofar as practical: (a) District lines should be drawn so as to coincide with the boundaries of local political subdivisions and areas recognized as communities of interest. The number of counties and municipalities divided among more than one district should

**AMENDED COMPLAINT FOR DECLARATORY   17
AND INJUNCTIVE RELIEF**

be as small as possible; (b) Districts should be composed of convenient, contiguous, and compact territory. Land areas may be deemed contiguous if they share a common land border or are connected by a ferry, highway, bridge, or tunnel. Areas separated by geographical boundaries or artificial barriers that prevent transportation within a district should not be deemed contiguous; (c) Whenever practicable, a precinct shall be wholly within a single legislative district. RCW 44.05.090.

104.    After the approval of a redistricting plan by three of the voting members of the Commission, the Commission submits its plan to the legislature. RCW 44.05.110.

105.    Once a plan is submitted, the legislature has thirty days during any regular or special session to amend the Commission's plan by an affirmative vote of two-thirds of the members in each house. *Id.*

106.    The amended edits by the legislature "may not include more than two percent of the population of any legislative or congressional district." *Id.*

107.    "If a commission has ceased to exist, the legislature may, upon an affirmative vote in each house of two-thirds of the members elected or appointed thereto, adopt legislation reconvening the commission for the purpose of modifying the redistricting plan." RCW 44.05.120.

108.    All districting plans must comply with the VRA and the United States Constitution.

**C. 2021 Washington State Redistricting Commission's Official Actions and Approval of Final Maps.**

109.    Commissioners Brady Piñero Walkinshaw and April Sims were appointed to the Washington Redistricting Commission on December 10, 2020, as the two Democratic Party representatives.

**AMENDED COMPLAINT FOR DECLARATORY   18
AND INJUNCTIVE RELIEF**

110.    On January 15, 2021, Paul Graves and Joe Fain were appointed to the Washington Redistricting Commission as the two Republican Party representatives.

111.    The four voting members, Brady Piñero Walkinshaw, April Sims, Paul Graves, and Joe Fain, voted unanimously to appoint Sarah Augustine as Chair of the 2021 Washington Redistricting Commission on January 30, 2021.

112.    Between February 2021 and November 16, 2021, the Commission had Regular Business Meetings, Special Business Meetings, and Public Outreach Meetings to develop districting plans.

113.     On September 21, 2021, all four voting Commissioners each submitted publicly proposed legislative maps.

114.    None of the four state legislative maps proposed by any of the Defendant Commissioners included a Latino-majority CVAP district in the Yakima Valley region.

115.    Commissioner Graves's map split the Latino population in the Yakima Valley into three districts: districts 14, 15, and 16.

116.    None of these three proposed districts in Commissioner Grave's map had a Latino CVAP of over 34%.

117.    Commissioner Fain's map split the Latino population in the Yakima Valley into four districts: districts 13, 14, 15, and 16.

118.    None of these four proposed districts in Commissioner Fain's map had a Latino CVAP of over 34%.

119.    Commissioner Sims's map split the Latino population in the Yakima Valley into two districts: districts 14 and 15.

120.    Neither of these proposed districts in Commissioner Sims's map had a Latino CVAP of over 47.6%.

121.    Commissioner Sim's original proposed map does not include the Latino population of Pasco, which was put into district 16.

122.    Commissioner Piñero Walkinshaw's original proposed map also split the Latino population in the Yakima Valley into two districts: districts 14 and 15.

123.    Commissioner Piñero Walkinshaw's original proposed map does not include the Latino population of Pasco, which was put into district 16.

124.    None of the districts in Commissioner Piñero Walkinshaw's original map had a Latino CVAP of over 43.2%.

125.    On October 19, 2021, Dr. Matt A. Barreto, UCLA Political Science & Chicana/o Studies Professor and Faculty Director of the UCLA Voting Rights Project, released a research presentation analyzing the geographic size and location of Latino voters and the existence of racially polarized voting in the Yakima Valley Region. Matt A. Barreto, Assessment of Voting Patterns in Central/Eastern Washington and Review of the Federal Voting Rights Act, Section 2 Issues, (Oct. 19, 2021), https://senatedemocrats.wa.gov/wp-content/uploads/2021/10/Barreto-WA-Redistricting-Public-Version.pdf.

126.    Dr. Barreto was hired to provide analysis on voting patterns and compliance with the Federal Voting Rights Act to the Washington Senate Democrat Caucus.

127.    Dr. Barreto's analysis determined that Latino voters in the Yakima Valley region are sufficiently large and geographically compact to form a performing majority-minority district.

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    20

128.    Using ecological inference methodology, Dr. Barreto also determined that elections in the Yakima Valley region demonstrate racially polarized voting between Latino and White voters.

129.    Dr. Barreto evaluated the four maps and concluded that the maps proposed by Defendant Commissioners Graves and Fain displayed "[t]extbook cracking of [the] Latino population" in the Yakima Valley. He further concluded that the original maps proposed by Commissioners Sims and Piñero Walkinshaw fell short of the necessary Latino CVAP to establish a performing VRA-compliance district.

130.    Dr. Barreto, and the methods he used in his analysis, have been accepted and relied upon by state and federal courts throughout the country. *See e.g.*, *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2nd Cir. 2020).

131.    Dr. Barreto presented his report and analysis to the Washington State Redistricting Commission.

132.    News outlets in Washington wrote articles about his analysis and quoted Dr. Barreto stating that there was a clear finding of racially polarized voting. *See, e.g.*, Melissa Santos, *Proposed WA Redistricting Maps May Violate Voting Rights Act*, CROSSCUT (Oct. 21, 2021), https://crosscut.com/politics/2021/10/proposed-wa-redistricting-maps-may-violate-voting-rights-act.

133.    Dr. Barreto's research presentation was publicly available for over three weeks before the Commission's November 15 deadline.

134.    The Commissioners were aware of Dr. Barreto's presentation, had access to it, and reviewed it.

**AMENDED COMPLAINT FOR DECLARATORY**   21
**AND INJUNCTIVE RELIEF**

135.    On October 25, 2021, Commissioner Graves texted Washington House Representatives Jeremie Dufault and Chris Corry to "take a look at slides 22 and 23 in [Dr. Barreto's] presentation and then give me a call."

136.    Slides 22 and 23 of Dr. Barreto's presentation proposed two options for a performing VRA-compliant legislative district in the Yakima Valley. *See* Barreto, *supra* ¶ 126.

137.    On slide 22 there is a VRA-compliant legislative district that follows the Yakima-Columbia River Valley and has a Latino CVAP of 60%. *See id.* at 22.

138.    On slide 23 there is a VRA-complaint legislative district that grouped together the City of Yakima and the Yakama Nation and that has a Latino CVAP of 52%. *See id.* at 23.

139.    Both map options were presented to the Commission.

140.    On October 21, 2021, Commissioner Piñero Walkinshaw stated publicly, "I think for me, as the first ever Latino commissioner, it has been extremely important for me to lift up and elevate Hispanic voters, and undo patterns of racially polarized voting, particularly in the Yakima Valley. This is something that, under federal law, has to be done." Santos, *supra* ¶ 133.

141.    On October 25, 2021, Commissioners Piñero Walkinshaw and Sims submitted revised maps for public comment six days after Dr. Barreto released his research presentation.

142.    The maps proposed by Commissioner Piñero Walkinshaw included legislative districts in the Yakima Valley region that would perform for Latino-preferred candidates.

143.    The Commission was required to approve and vote on final redistricting maps for both congressional and state legislative districts on November 15, 2021.

144.    The Commission, however, failed to adopt maps on this date.

**AMENDED COMPLAINT FOR DECLARATORY**   22
**AND INJUNCTIVE RELIEF**

145.    During their chaotic meetings spanning November 15, 2021 and November 16, 2021, the Commissioners spent much of the time in closed-door negotiations discussing matters in private.

146.    The Commission did not approve maps for transmittal to the state legislature until the morning of November 16, 2021.

147.    Over the course of the 2021 redistricting process, multiple versions of state legislative maps compliant with Section 2 of the Voting Rights Act were presented to the Commission.

148.    On December 3, 2021, the Washington Supreme Court declined to exercise authority to adopt a state legislative or congressional redistricting plan, finding that the state legislative and congressional plans adopted by the Commission met the constitutional adoption deadline. *See Order Regarding the Washington State Redistricting Commission's Letter to the Supreme Court on November 16, 2021 and the Commission Chair's November 21, 2021, Declaration*, Order No. 25700-B-676 (Dec. 3, 2021).

149.    The Washington Supreme Court did not consider or rule on the compliance of the districting plans with respect to Section 2 of the VRA. *Id.* at 4 ("The court has not evaluated and does not render any opinion on the plan's compliance with any statutory and constitutional requirement other than the November 15 deadline.").

**D.  Elections in the Yakima Valley Region Exhibit Racially Polarized Voting.**

150.    Voting in the Yakima Valley region is racially polarized.

151.    Dr. Barreto's report, which the Commission reviewed, demonstrated the existence of racially polarized voting in the Yakima Valley Region. *See* Barreto, *supra* ¶ 126.

**AMENDED COMPLAINT FOR DECLARATORY   23
AND INJUNCTIVE RELIEF**

152.    Dr. Barreto employed ecological inference methodology to analyze candidate elections from 2012 to 2020 for offices that were consistent across a 5-county region of Yakima, Benton, Grant, Franklin, and Adams counties. Contests included races for President, U.S. Senate, U.S. House, Governor, and Attorney General in each relevant year. *Id.*

153.    Clear and consistent patterns emerged from more than a dozen elections.

154.    Latino voters in the Yakima Valley region are politically cohesive and vote together for candidates of choice.

155.    Latino voters in the Yakima Valley region prefer the same candidates at margins of 2-to-1 or even 3-to-1.

156.    This is well above the bar for what courts have relied on in finding cohesiveness.

157.    Spanish-surnamed candidates have consistently run in and lost elections for the state legislature in Legislative District 15 for more than 10 years.

158.    Latino-preferred candidates have consistently run in and lost elections for the state legislature in Legislative District 15 for more than 10 years.

159.    According to ecological inference analysis of precinct results for Legislative District 15 under the 2011 state legislative district map, Latino voters preferred Pablo Gonzalez in 2012 for State Representative, but he lost to David Taylor, who was greatly preferred by White voters.

160.    In the 2014 State Senate election for Legislative District 15, Gabriel Muñoz was preferred by Latino voters but lost to Jim Honeyford, who was greatly preferred by White voters.

161.    In the 2014 State Representative election for Legislative District 15, Teodora Martinez-Chavez was preferred by Latino voters but lost to David Taylor, who was greatly preferred by White voters.

**AMENDED COMPLAINT FOR DECLARATORY**   24
**AND INJUNCTIVE RELIEF**

162.     In the 2018 State Senate election for Legislative District 15, Plaintiff Aguilar was preferred by Latino voters but lost to Jim Honeyford, who was greatly preferred by White voters.

163.     The most recent Latino candidate to run for state legislature was Plaintiff Aguilar in 2018.

164.     Aguilar received an estimated 73% support from Latinos, but only 15% support from White voters.

165.     In Yakima County Precinct 104, which is majority Latino, Aguilar won 72.6% of the vote.

166.     In Yakima County Precinct 501 which is majority Latino, Aguilar won 70% of the vote.

167.     The pattern of Aguilar, a Latino candidate winning over 70% of support in Latino-dense precincts but garnering little support in White dense precincts, is clear across the 11 precincts in Legislative District 15 that were majority Latino.

168.     All 11 Latino-majority precincts in the Legislative District 15 race under the 2011 map voted majority support for Aguilar.

169.     White voters in the Yakima Valley region are also politically cohesive.

170.     In the 2018 Legislative District 15 race under the 2011 map, White voters voted together as a bloc against Latino candidates of choice.

171.     In Yakima County Precinct 4616, which is majority White, Aguilar won only 21.5% of the vote.

172.     In Yakima County Precinct 4106, which is majority White, Aguilar won just 22% of the vote. This pattern is clear across the 21 precincts that are majority white, all of which voted against Aguilar.

**AMENDED COMPLAINT FOR DECLARATORY**   25
**AND INJUNCTIVE RELIEF**

173.     Elections for the Washington state legislature are partisan and regularly feature a Republican-declared and Democratic-declared candidate vying for office.

174.     Latino voters in the Yakima Valley region consistently prefer the Democratic candidates for state legislature and other political offices.

175.     Latinos vote cohesively in favor of Democratic candidates by over a 2-to-1 margin.

176.     Due to historical advantages and higher socioeconomic status, White voters in the Yakima Valley region have higher voter registration and turnout rates than Latinos.

177.     In the Legislative District 15 approved by the 2021 Commission, White voters have greater voting strength than Latinos and will consistently be able to elect their Republican candidates of choice.

178.     White voters in the Yakima region overwhelmingly prefer different candidates and vote as a bloc to usually defeat Latino voters' candidates of choice.

179.     In many races, Latino voters vote close to 75-25 in favor of their candidates of choice, while whites vote 75-25 in favor of different candidates, in complete opposite voting blocs.

180.     As precincts increase in Latino population and voting strength, support for Latino candidates of choice increases.

181.     This split, in which candidates who win a majority of the vote in high-density Latino voting precincts receive low support in high-density non-Latino precincts, is emblematic of racially polarized voting.

182.     A federal court recently held that racially polarized voting exists in the Yakima region and ordered, in 2014, the City of Yakima to create two majority-Latino districts for City Council elections. *See Montes v. City of Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014).

183.    Likewise, in the first ever lawsuit filed under the Washington Voting Rights Act (WVRA), Latino plaintiffs challenged the election system in place for the Yakima County Board of Commissioners and alleged that racially polarized voting exists in Yakima County elections and that the County's election system diluted Latino voting strength in violation of the WVRA. The parties in that case agreed to and a state court accepted a settlement, leading to the creation of a majority-Latino district for Yakima County Board of Commissioner elections. *See Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019 (Kittitas Cty. Sup. Ct. July 13, 2020),

184.    In the *Aguilar* case, Plaintiffs' expert Dr. Grumbach analyzed several state legislative elections in the Yakima Valley area for racially polarized voting, including the 2012 Legislative District 15 primary and general elections, the 2016 Legislative District 14 primary and general elections, and the 2018 Legislative District 15 primary and general elections, which all featured Latino candidates running against white candidates. He found that voting was racially polarized in all of these elections.

185.    A federal court also found that racially polarized voting exists in elections in Pasco, Washington, *see Glatt v. City of Pasco*, Case No. 4:16-CV-05108-LRS, (E.D. Wash. Jan. 27, 2017), and similarly, a state court found that racially polarized voting exists in elections in Franklin County as a whole.

186.    There is also qualitative evidence of racially polarized voting in elections in the Yakima Valley region. *See, e.g.*, *Luna v. County of Kern*, 291 F. Supp. 3d 1088, 1126 (E.D. Cal. 2018) (stating that in addition to quantitative evidence, courts often "look to [non-statistical] evidence…since '[t]he experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive.'").

**AMENDED COMPLAINT FOR DECLARATORY**   27
**AND INJUNCTIVE RELIEF**

187.    Latino candidates for public office in the region encounter hostility from white voters.

188.    For example, Plaintiff Susan Soto Palmer received such a hostile reception in predominantly white areas while campaigning for a seat on the Yakima County Board of Commissioners that she had to replace herself with white surrogates out of concern for her personal safety.

189.    It is clear that there is racially polarized voting in the Yakima Valley Region and in the region's main Latino-population centers of Yakima City and Pasco, Washington.

**E. The Washington Redistricting Commission's Approved State Legislative Map Dilutes the Strength of Latino Voters in the Yakima Valley Region.**

190.    The Commission's approved state legislative district map cracks Latino voters in the Yakima Valley region, diluting their voting strength by placing them in several legislative districts with white voting majorities.

191.    Under the Commission's approved state legislative district map, Latino voters in the Yakima Valley region will not be able to elect candidates of their choice and the map does not create a district in the Yakima Valley area that complies with the Voting Rights Act.

192.    District 15 in the Commission's approved map has a Latino CVAP of 50.02%.

193.    Legislative District 15 was crafted to ensure it would not elect Latino voters' candidates of choice.

194.    This was an intentional decision by the Commission.

195.    In a text message exchange between Commissioner Graves and Commissioner Fain, Fain stated that "[w]e will need to draw a dem leaning Latino district in Yakima that doesn't include any Yakima."

**AMENDED COMPLAINT FOR DECLARATORY**   28
**AND INJUNCTIVE RELIEF**

196.   They did not do so.

197.   The Commission's version of Legislative District 15 also excludes majority-Latino areas such as areas of the City of Yakima and the cities of Wapato, Toppenish, and Mabton, intentionally cracking apart these adjacent Latino communities.

198.   Latinos in areas excluded from the Commission's Legislative District 15, such as Wapato, Toppenish, and Mabton, are politically active and regularly elect Latino candidates of choice to local office.

199.   The Commission's approved District 15 contains large pockets of rural voting precincts that are heavily White and vote against Latino voters' candidates of choice.

200.   Moreover, District 15 reaches across large swaths of rural white areas to include at its northeastern tip the city of Othello in Adams County.

201.   The inclusion of Othello—a majority HCVAP community—is what gets District 15 *just* above 50% HCVAP (50.02%).

202.   Election data reveal that Othello Latinos are far less politically active than the Yakima County Latinos whom the Commission excluded from District 15.

203.   The Commission included 16,147 Adams County voters in and around Othello, with a CVAP of 50.8%.

204.   Regression analysis of voter turnout rates across the region finds that Latino voters in Adams County turnout at a statistically significant lower rate than Latino voters in both Yakima County and Franklin County.

205.   Regression analysis of voter turnout rates across the region finds that Latino voters in Adams County turnout at a statistically significant lower rates than White voters in Adams

County.  While the Latino population is large in Adams, Latino voting strength has historically been muted.

206.    Republican candidates carry the included area (in Adams?), with Trump receiving 60.7% of the vote among these voters in 2020. Of the Adams County precincts included in District 15, Biden carried only three—those with HCVAPs of 74.5%, 72.2%, and 60.0%.

207.    Election results from the 2020 election reveal that voters who reside in the new District 15 as adopted in the 2021 plan voted to elect Republican Donald Trump for President, Republican Culp for Governor, and Republican Larkin for Attorney General.  In 2018, voters in the new District 15 voted to elect Republican Newhouse for U.S. Congress and Republican Hutchison for U.S. Senate.  In 2016, voters in the new District 15 voted to elect Republican Donald Trump President and Republican Bryant Governor.

208.    As drawn and adopted, the new District 15 does not perform for Latino candidates of choice and was deliberately drawn in such a manner.

209.    The strategy of drawing a district to appear compliant with the Voting Rights Act, but which in practice does not functionally allow Latino voters to elect their candidates of choice, is unlawful. *See e.g.*, *Perez v. Abbott*, 250 F. Supp.3d 123 (W.D. Tex. April 20, 2017) (three-judge court).

210.    The Latino CVAP in the Yakima Valley region is sufficiently large and geographically compact to constitute a majority in a newly configured District 15 that would provide Latino voters with an equal opportunity to elect their candidates of choice.

**F.  The Totality of the Circumstances Demonstrates That Latino Voters in the Yakima Valley Region Have Less Opportunity Than Others to Participate in the Political Process and Elect Candidates of Choice.**

211.     The totality of the circumstances demonstrates that Latino voters have less opportunity than other members of the electorate to participate in the political process and to elect representatives of choice. *See* 52 U.S.C. § 10301(b).

212.     There is a history of official voting-related discrimination in the Yakima Valley region. *See Montes v. City of Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014); *see also Glatt v. City of Pasco*, No. 4:16-CV-05108 (E.D. Wash. Jan. 27, 2017).

213.     In 2004, Yakima County entered into a consent decree with the United States Department of Justice after being sued for failing to provide Spanish-language voting materials and voter assistance as required by Section 203 of the federal Voting Rights Act. *See U.S. v. Yakima County,* No. 04-cv-3072 (E.D. Wash. Sept. 3, 2004).

214.     As explained above, voting in the Yakima Valley region is substantially racially polarized.

215.     Latino voters in the Yakima Valley region also bear the effects of discrimination in education, employment, health, and other areas of life, which hinders their ability to participate effectively in the political process. *See Luna*, 291 F. Supp. 3d at 1137. "Under this [] factor, plaintiffs must demonstrate both depressed political participation and socioeconomic inequality, but need not prove any causal nexus between the two." *Id.*

216.     Racial tensions between white and Latino communities in the region persist today.

217.     According to a report from Dr. Luis Fraga in the *Montes* case, "[t]he Yakima Valley has a long history of racial animus and hostile responses by Whites to minority groups seeking to gain more power or better position."

218.     A 2015 report by the Yakima Herald-Republic explained that the "cultural conflict" between Latino and white communities in Yakima is "apparent in public where Latinos and non-

**AMENDED COMPLAINT FOR DECLARATORY** 31
**AND INJUNCTIVE RELIEF**

Latinos gather at different parks and many businesses, and on the Internet, where forums and comment boards for local audiences can often be loaded with xenophobic vitriol." *See* Mike Faulk, *Yakima's Cultural Divide*, Yakima Herald (Oct. 16, 2015) https://www.yakimaherald.com/news/elections/yakima_city_council/yakimas-cultural-divide/article_590c92b4-7416-11e5-949e-dbfb62c94960.html.

219.    Latinos in the Yakima Valley also bear the impacts of discriminatory policing.

220.    On February 10, 2015, local Pasco police, themselves not racially reflective of the community, shot Antonio Zambrano-Montes seventeen times and killed him after he was allegedly throwing rocks at cars. Weeks of demonstrations calling for justice and more scrutiny over Pasco's policing of the Latino community followed.

221.    Officials in Yakima and Franklin Counties have expressed anti-immigrant sentiment against the area's immigrant population—an overwhelming majority of which is Latino.

222.    U.S. Census statistics reveal a number of disparities between the white and Latino communities in the Yakima Valley area.

223.    Latino residents in Franklin County are much less likely to have a high school diploma than white Franklin residents.

224.    Only 7.1% of Latinos in Franklin County have a bachelor's degree or higher, compared to 29.9% of whites.

225.    7.5% of Franklin County's white population lives below the poverty line, but more than one out of five Latinos in the County live below the poverty line.

226.    Socioeconomic indicators show clear and significant disparities between Latino and white residents in Yakima County.

**AMENDED COMPLAINT FOR DECLARATORY   32**
**AND INJUNCTIVE RELIEF**

227.    21.9% of Latino residents had an income below poverty level, a rate almost double that of white residents (11.4%).

228.    Of all persons in Yakima County with an income below the poverty level, 62.3% were Latino, while only 28.2% were white.

229.    While the median income for households in Yakima County is $51,637, the median household income for white residents is higher, at $57,398, while the median household income for Latino residents is lower, at $45,880.

230.    Over half—51.6%—of the Latino population over the age of 25 in Yakima County does not have a high school diploma or its equivalent, compared to only 9.6% of white residents.

231.    This trend continues for higher education, where only 5.7% of Yakima County's Latino residents over the age of 25 have a bachelor's degree, compared to 24.1% of white residents.

232.    The unemployment rate for the Latino population in Yakima County is 7.8%, almost double the rate of unemployment among white residents, which is only 4.2%.

233.    Latino residents of Yakima County also face major disadvantages in housing compared to white residents.

234.    There are an estimated 30,687 occupied housing units in Yakima County with a Latino householder, compared to 46,921 housing units with white residents. Of the units with a Latino householder, only 31.3% are owner-occupied, compared to 63.3% for whites.

235.    A report prepared by the Homeless Network of Yakima County found that "Hispanics are twice as likely as non-Hispanics to be denied financing when applying for conventional loans to purchase housing and to obtain refinancing of existing mortgages thereby limiting their housing choices."

**AMENDED COMPLAINT FOR DECLARATORY   33**
**AND INJUNCTIVE RELIEF**

236.    Latino residents in Yakima County also bear the effects of past discrimination with respect to health and healthcare access.

237.    19.6% of Yakima County's Latino population does not have health insurance, compared to only 5.9% of white residents.

238.     The Latino community in Yakima County has been disparately impacted by the COVID-19 pandemic.

239.    As of December 2, 2021, the County's own public website reported that 38% of COVID-19 positive individuals in the County are Hispanic or Latino, compared to 16.3% that are white.[2]

240.    Latinos in Yakima County have also been disproportionately impacted by other serious health issues like water contamination, including high nitrate levels and fecal matter in wells.

241.    Voter registration and turnout levels in Yakima County are substantially lower among Latino residents than white residents.

242.     January 2021 data from the Yakima County Elections Office demonstrates there are 127,512 registered voters countywide, but only 35,150 of those are "Spanish surnamed registered voters."

243.    According to the County's own publicly available and regularly collected data, there is a clear disparity in political participation between Latino and white voters.

244.    Statistics collected by the Yakima County Auditor show that for the 2020 general election, ballots were issued to 37,978 voters with a Spanish surname, but only 21,281 (56%) of

---

[2] *See* Yakima Health District, *Race and Ethnicity Breakdown of COVID-19 Positive Individuals*, https://www.yakimacounty.us/2440/Confirmed-Cases-Race-Ethnicity (last updated Dec. 2, 2021).

those ballots were returned. By comparison, of the 89,713 ballots issued to voters with a non-Spanish surname, 75,704 (84%) of those ballots were returned.[3]

245.     Latino voters in Eastern Washington, including both Yakima County and Franklin County, have their ballots challenged and rejected at higher rates than white voters.

246.     According to an investigation, Latino voters in Yakima County had their ballots rejected for signature mismatch at 7.5 times the rate of non-Latino voters in the November 2020 election. *See* Joy Borkholder, *Investigation Finds Latino Ballots in WA More Likely to Be Rejected,* CROSSCUT (Feb. 15, 2021), https://crosscut.com/politics/2021/02/investigation-finds-latino-ballots-wa-more-likely-be-rejected.

247.     Latino voters in Franklin County had their ballots rejected for signature mismatch at 3.9 times the rate of non-Latino voters in the November 2020 election. *Id.*

248.     On May 7, 2021, an individual Latino voter, along with the Latino Community Fund and League of United Latin American Citizens, filed suit in federal court against Yakima County and two other counties alleging that the County's system for verifying ballot signatures discriminates against Latino voters. *See, e.g.*, *Reyes v. Chilton,* No. 4:21-cv-05075 (E.D. Wash. 2021).

249.     Campaigns in the Yakima Valley region have also featured overt and subtle racial appeals.

250.     In 2014, when Plaintiff Soto Palmer campaigned on behalf of Gabriel Muñoz, a Latino candidate for State Senate in Legislative District 15, she knocked on doors in the

---

[3]   *2020 General Election Voter Participation by Surname*, Yakima County, https://www.yakimacounty.us/ArchiveCenter/ViewFile/Item/1130 (last visited Dec. 9, 2021).

**AMENDED COMPLAINT FOR DECLARATORY   35
AND INJUNCTIVE RELIEF**

predominantly white town of Union Gap. At one home, a white resident who saw the campaign literature for Mr. Muñoz immediately said: "I'm not gonna vote for him, I'm racist."

251.    In the 2016 election for Yakima County Board of Commissioners, in a campaign that covered all of Yakima County, candidate Ron Anderson shared a public Facebook post stating that "Illegals are being seduced into America by Democrats to steal our elections. Act of Treason, Arrest all involved!"

252.    In a campaign for a seat on the Yakima City Council, Latina candidate Dulce Gutierrez was told by a white resident to "Go back to Mexico" while she was handing out campaign flyers, and had another individual ask her why they "had to vote for a Mexican" while she was campaigning.

253.    Jose Trevino, the Mayor of Granger—a city in the Lower Valley which has a total population of 3,756, of whom 88.4% are Latino—experienced multiple incidents while campaigning for various offices in Yakima County. For example, Mr. Trevino attributed his 2015 loss in the Granger mayoral race to a rumor spread during the campaign that he "was going to fire all the white people in the city."

254.    Mr. Trevino also attributed his loss in the 2014 race for Yakima County Clerk, 2018 race for Yakima County Commissioner District 3, and his pulling out of the 2020 appointment process for a vacant Yakima County Board seat to negative coverage in the Yakima Herald-Republic, and commented that his opponents in those races, all but one of whom were white, did not receive similar treatment, and that he was the "only [candidate] they picked on'" because "it was easier to pick on the Republican Mexican than anyone else."

255.    Further, county officials and elected officials have made overt and subtle racial appeals while in office.

**AMENDED COMPLAINT FOR DECLARATORY   36
AND INJUNCTIVE RELIEF**

256.     During a September 21, 2021, Franklin County Commissioners' meeting, Commissioner Mullen stated, in reference to the discussion of Latino citizen voting age population in the current commissioner districts, that he "believes that there are non-citizens that are voting in the elections." *See* Franklin County Commissioners Meeting (Sept. 21, 2021), https://media.avcaptureall.cloud/meeting/e3e60dfb-87e0-4b8f-bb49-14dbe5167045  at 1:12:00-1:12:30.

257.     In 2016, a Franklin County official shared an image of a white farmer with the caption, "When is white history month?" and on the corner of the image, there was a white raised fist used by white supremacists with the words "100% White, 100% Proud."

258.     Few Latino candidates have been elected to public office in the Yakima Valley region except to hyperlocal offices in areas and districts with high majority Latino CVAP.

259.     Latino candidates for public office are routinely defeated.

260.     Although several Latino candidates have run for election in Legislative District 15 in the last decade for both state house and senate, including at least Pablo Gonzalez, Teodora Martinez-Chavez, and Bengie Aguilar, none have won.

261.     Legislative District 15 is currently represented by two white men in the state house, Bruce Chandler and Jeremie Dufault, and a white man in the state senate, Jim Honeyford.

262.     Jim Honeyford has made racial appeals during his tenure as a Washington Representative.

**AMENDED COMPLAINT FOR DECLARATORY   37
AND INJUNCTIVE RELIEF**

263.    At a 2015 legislative hearing, Jim Honeyford twice referred Latinos and other people of color as "coloreds" and said that they are "commit more crimes."[4]

264.    Latino candidates have also run for Legislative District 14, including Susan Soto Palmer in 2016, but were not elected to office.

265.    Legislative District 14 is currently represented by two white representatives in the state house, Chris Corry and Gina Mosbrucker, and a white man in the state senate, Curtis King.

266.    Latino voters lack representation at the County level in the Yakima Valley region.

267.    Only one Latino candidate, Jesse Palacios, has *ever* been elected to the Yakima County Board of Commissioners, and he was last elected almost 20 years ago, in 2002.

268.    No Latino-preferred candidates have been elected to the Franklin County Board of Commissioners.

269.    Elected officials in the Yakima Valley region are not responsive to the particularized needs of Latinos in the region.

270.    The policy underlying the Commission's crafting of a district that does not give Latinos the opportunity to elect their candidates of choice is tenuous.

271.    These and other factors demonstrate that the totality of the circumstances show that Latino voters have less opportunity than other voters to participate in the political process and elect their candidates of choice.

---

[4] *Sen. Honeyford sorry for calling minorities 'coloreds,'* The Columbian (Mar. 6, 2015), https://www.columbian.com/news/2015/mar/06/sen-honeyford-sorry-calling-minorities-coloreds/; Ansel Herz, *Republican State Senator: Poor, "Colored" People Are More Likely to Commit Crimes*, The Stranger (Mar. 2, 2015), https://www.thestranger.com/blogs/slog/2015/03/02/21799665/washington-republican-poor-colored-people-are-more-likely-to-commit-crimes.

AMENDED COMPLAINT FOR DECLARATORY   38
AND INJUNCTIVE RELIEF

## CLAIMS FOR RELIEF

### Count 1
### Race and Language Minority Discrimination,
### Discriminatory Results in Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301

272.    Plaintiffs repeat, replead, and incorporate by reference, as though fully set forth in this paragraph, all allegations in this Complaint.

273.    Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a).

274.    The district boundaries of state legislative districts in the Commission's approved map crack Latino voters in the Yakima Valley region across multiple state legislative districts, resulting in dilution of the strength of the area's Latino voters, in violation of Section 2 of the Voting Rights Act.

275.    Under Section 2 of the Voting Rights Act, the Commission was required to create a majority-Latino state legislative district in the Yakima Valley region in which Latino voters have the opportunity to elect their candidates of choice.

276.    Latino voters in the Yakima Valley region are sufficiently large and geographically compact to constitute a majority in a legislative district.

277.    Latino voters in the Yakima Valley region are politically cohesive, and elections in the area demonstrate a pattern of racially polarized voting that allows a bloc of white voters usually to defeat Latino voters' preferred candidates, including in the version of Legislative District 15 included in the Commission's approved map.

**AMENDED COMPLAINT FOR DECLARATORY**   39
**AND INJUNCTIVE RELIEF**

278.    The totality of circumstances show that the Commission's approved map has the effect of denying Latino voters in the Yakima Valley region an equal opportunity to participate in the political process and to elect their candidates of choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

279.    Absent relief from this Court, Defendants will continue to engage in the denial of Plaintiffs' Section 2 rights.

280.    Latino voters are thus entitled, under Section 2 of the Voting Rights Act, to a majority-Latino district that would provide them with an effective opportunity to elect the candidate of their choice to the Washington State Legislature.

**Count 2**
**Race and Language Minority Discrimination,**
**Discriminatory Intent in Violation of Section 2 of the Voting Rights Act**
**52 U.S.C. § 10301**

281.    Plaintiffs repeat, replead, and incorporate by reference, as though fully set forth in this paragraph, all allegations in this Complaint.

282.    The state legislative map approved by the Commission was adopted with the intent to discriminate on the basis of race, national origin, and/or language minority group status and has a discriminatory effect on that basis, by intentionally cracking Latino voters to ensure that Latino voters in the region are unable to elect candidates of choice.

**PRAYER FOR RELIEF**

Plaintiffs request that the Court:

a) Declare that the Washington State Redistricting Commission's Approved Final State Legislative Map results in vote dilution in violation of Section 2 of the Voting Rights Act by failing to draw an effective Latino-majority state legislative district in which Latino

voters would have an equal opportunity to elect their candidate of choice to the Washington Legislature;

b)  Declare that the Washington State Redistricting Commission's Approved Final State Legislative Map was drawn to intentionally dilute Latino voting strength in the Yakima Valley region in violation of Section 2 of the Voting Rights Act;

c)  Preliminarily and permanently enjoin Defendants from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the Washington State Legislature from the illegal state legislative districts under the Washington State Redistricting Commission's Approved Final State Legislative Map. Plaintiffs have no adequate remedy at law other than judicial relief sought herein, and unless Defendants are enjoined from using the Commission's Approved Final State Legislative Map. Plaintiffs will be irreparably injured by the continued violation of their statutory rights;

d)  Order the implementation and use of a valid state legislative plan that includes a majority-Latino state legislative district in the Yakima Valley region that does not dilute, cancel out, or minimize the voting strength of Latino voters;

e)  Award Plaintiffs their costs, expenses, disbursements, and reasonable attorneys' fees pursuant to Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e);

f)  Retain jurisdiction and render any and further orders that the Court may find necessary to cure the violation; and

g)  Grant any and all further relief to which Plaintiffs may show themselves to be entitled or that the Court deems proper.

Dated this the 13th day of May, 2022.

**AMENDED COMPLAINT FOR DECLARATORY**  41
**AND INJUNCTIVE RELIEF**

Respectfully submitted,

By:  /s/   Edwardo Morfin

Chad W. Dunn*                              Edwardo Morfin
Sonni Waknin*                              WSBA No. 47831
Bernadette Reyes*                          Morfin Law Firm, PLLC
UCLA Voting Rights Project                 2602 N. Proctor Street, Ste. 205
3250 Public Affairs Building               Tacoma, WA 98407
Los Angeles, CA 90095                      Telephone: 509-380-9999
Telephone: 310-400-6019

Mark P. Gaber*                             Annabelle Harless*
Simone Leeper*                             Campaign Legal Center
Aseem Mulji*                               55 W. Monroe St., Ste. 1925
Campaign Legal Center                      Chicago, IL 60603
1101 14th St. NW, Ste. 400                 aharless@campaignlegal.org
Washington, DC 20005
mgaber@campaignlegal.org
sleeper@campaignlegal.org
amulji@campaignlegal.org

Thomas A. Saenz*
Ernest Herrera *
Leticia M. Saucedo *
Deylin Thrift-Viveros*
Mexican American Legal Defense and Educational Fund
643 S. Spring St., 11th Fl.
Los Angeles, CA 90014
Telephone: (213) 629-2512
tsaenz@maldef.org
eherrera@maldef.org
lsaucedo@maldef.org
dthrift-viveros@maldef.org

*Counsel for Plaintiffs*

*Admitted pro hac vice

**AMENDED COMPLAINT FOR DECLARATORY**   42
**AND INJUNCTIVE RELIEF**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I certify that all counsel of record were served a copy of the foregoing this 13th day of May, 2022, via the Court's CM/ECF system.

*/s/ Edwardo Morfin*

*Counsel for Plaintiffs*

**AMENDED COMPLAINT FOR DECLARATORY**   43
**AND INJUNCTIVE RELIEF**