**Totality of the Circumstances Analysis Under Section 2 of the Voting Rights Act**

**Soto Palmer, et al., v. Hobbs, et al. No.: 3:22-cv-5035** (U.S. District Court for the Western

District of Washington)

Josué Q. Estrada, Ph.D.

Central Washington University

July 27, 2022

# Table of Contents

List of Tables…………………………………………………………………………………...3

Background and Qualifications……………………………………………………………………4

Summary of Findings………………………………………………………………………………...7

Note on Terminology…………………………………………………………………………...8

Methodology…………………………………………………………………………………..10

Shared History of Latinos in Central Washington……………….……………………………11

Senate Factor 1: History of Official Voting-Related Discrimination……………………………21

Senate Factor 3: Voting Practices or Procedures That Tend to Enhance the Opportunity for Discrimination……………………………………………………………………………………43

Senate Factor 5: Latinos Bear the Effects of Discrimination in Ways That Hinder Their Ability to Participate Effectively in the Political Process……………………………………………………46

Senate Factor 6: Use of Overt or Subtle Racial Appeals in Political Campaigns………………63

Senate Factor 7: Extent to Which Latino Candidates Have Been Elected to Public Office in the Jurisdiction……………………………………………………………………………………69

Senate Factor 8: Lack of Responsiveness of Elected Officials to Needs of Latino Community……………………………………………………………………………………71

Conclusion……………………………………………………………………………………77

## List of Tables

1.  Latino Population in Washington, 1970-1990……………………………………………...20
2.  Yakima County Voter Turnout Rates (General Election Results Only)…………………44
3.  Reported Voting and Registration Between Latinos and Whites in the Elections of November 2014, 2016, 2018, and 2020 in Washington…………………………...………44
4.  White and Latino Educational Inequalities in Adams, Benton, Franklin, Grant, and Yakima Counties, 2020…………………………………………………………………51
5.  Latino Population in Washington, 2000-2020……………………………………………...52
6.  White and Latino Median House Incomes and Poverty Rates in Adams, Benton, Franklin, Grant, and Yakima Counties, …………………………………………………………....55
7.  White and Latino Unemployment Rates in Adams, Benton, Franklin, Grant, and Yakima Counties, 2020……………………………….……………………………………………...57
8.  White and Latino Homeownership Rates in Adams, Benton, Franklin, Grant, and Yakima Counties, 2020…………………………………………………………………………...58
9.  White and Latino Uninsured Healthcare Rates in Adams, Benton, Franklin, Grant, and Yakima Counties, 2020…………………………………………………………………59
10. Latino Rate of Incarceration in Select Counties, 2009…………………………….......61
11. Voting Record of Elected Officials on Bills Supported by Latino Leaders in Washington, 2021-2022……...………………………………………………………………………...75

### Background and Qualifications

I am an Assistant Professor in the Department of History at Central Washington University (CWU) in Ellensburg, Washington. At CWU, I teach and develop courses on voting rights, citizenship, race, Latino people, and the Pacific Northwest. With respect to my research, I investigate the history of Latino voter suppression and race in the United States.

I received my doctoral degree in history from the University of Washington (UW) in Seattle, Washington in 2021, with a focus on 20th century U.S. history and voting rights. I hold a Master's in History from the UW and a Master's in American Studies from Washington State University in Pullman, Washington. I received a Bachelor's in American Ethnic Studies from the UW in 2005. Throughout my academic training, I have methodically studied, researched, and written extensively about the history of Latinos in the United States with an emphasis on the Pacific Northwest.

At the UW, I completed a dissertation titled, "'We Can't Be Ignored Anymore': A History of the Latinx Voting Rights Movement, 1960-1975."[1] This research investigates how Puerto Ricans and Mexican Americans have used distinct organizational and political tactics to win voting rights, specifically to expand the coverage of the Voting Rights Act. To explore this history, I conducted extensive archival research in five states including Washington State, studied the congressional debates on voting rights from the 1960s and 1970s, reviewed Spanish and English newspapers, examined government records, and consulted hundreds of secondary works related to voting rights.

While working on my dissertation, I published an article titled, "Democratizing Washington State's Yakima County: A History of Latina/o Voter Suppression since 1967" in *We*

---

[1] Josué Q. Estrada, "*'We Can't Be Ignored Anymore': A History of the Latinx Voting Rights Movement, 1960-1975,*" (PhD diss., University of Washington, 2021).

*are Aztlan: Chicanx Histories in the Northern Borderlands.*[2] I found that suppression of Mexican American voters by way of English literacy tests, including in Yakima County, was sustained due to national, state, and local factors. Even though the State of Washington's literacy test was ultimately removed, Latino voters remained marginalized as a result of racial discrimination, at-large election systems, and county officials who had no interest in increasing Latino political involvement. Starting in the 1970s, Latino candidates more frequently ran for elected office, but were largely defeated by white candidates.

Additionally, I have delivered conference papers related to Latino voter suppression at local, regional, and national academic conferences such as: the Pacific Northwest History Conference, the Western History Association Conference, and the Labor and Working-Class History Association.[3] I have also published book reviews in my areas of specialization and served as an associated editor for the *Pacific Northwest Quarterly* journal. A true, accurate and detailed copy of my curriculum vitae is attached. My rate of compensation for work on this case is $250.00 per hour.

Given my background, attorneys for Plaintiffs in this litigation asked me to conduct an analysis of the "totality of the circumstances," or Senate Factors, relevant under Section 2 of the Voting Rights Act and outlined in a 1982 report by the U.S. Senate Committee on the Judiciary ("Senate Report").[4] As outlined by the Senate Report, the Senate Factors include: (1) "the history

---

[2] Josué Q. Estrada, "Democratizing Washington State's Yakima County: A History of Latina/o Voter Suppression since 1967" in *We Are Aztlán: Chicanx Histories in the Northern Borderlands*, edited by Jerry Garcia (Washington State University Press, 2017).
[3] "Citizens with Foreign Tongues: A History of Latinx Voter Suppression in Washington State," Presented at *What Happens in the West Doesn't Stay in the West*, Western History Association, Las Vegas, NV, October 2019; "Democratizing Washington State's Yakima County: A History of Latino/a Voter Suppression since 1967" Presented at *Scales of Struggle: Communities, Movements, and Global Connections*, Labor and Working-Class History Association, Seattle, WA, June 2017.
[4] "Section 2 of the Voting Rights Act," The United States Department of Justice, https://www.justice.gov/crt/section-2-voting-rights-act.

of official voting-related discrimination in the state or political subdivision;" (2) "the extent to which voting in the elections of the state or political subdivision is racially polarized;" (3) "the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet voting;" (4) "the exclusion of members of the minority group from candidate slating processes;" (5) "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;" (6) "the use of overt or subtle racial appeals in political campaigns;" (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction."[5] The Senate Report included two additional factors: (8) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;" and (9) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."[6] As the Senate Report states, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."[7]

---

[5] S. Rep. No. 97-417, at 29 (1982); *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).
[6] *Id.*
[7] *Id.*

## Summary of Findings

My report examines whether Senate Factors 1, 3, 5, 6, 7, and 8 are present in the Central Washington region, particularly in the Yakima Valley and Pasco areas. In conducting this analysis, I also examined the shared history of Latino communities throughout the region. I offer the following opinions:

1. Shared History of Latinos: There are numerous similarities and shared interests among Latino communities in the Yakima Valley and Pasco areas. In addition to sharing a common language and cultural traditions such as Cinco de Mayo celebrations, many of the regions' Latinos reside in rural, agricultural communities where their labor is vital to the economy.[8] Latinos' presence in the region has been continuous for decades and, in both rural and urban communities, their experiences have been marked by racial discrimination in the areas of politics, labor, education, and health care, among other areas.

2. Senate Factor 1: Latinos in Washington, especially in the Yakima Valley and Pasco areas, have been and continue to be burdened by a long history of official racial discrimination in voting.

3. Senate Factor 3: Washington State and the political subdivisions in the Yakima Valley and Pasco areas have historically used voting practices and procedures, including off-year elections, signature matching, at-large elections, and English literacy tests, that tend to enhance the opportunity for discrimination against Latinos.

4. Senate Factor 5: The lingering effects of discrimination in the Yakima Valley and Pasco

---

[8] "Almost 51.3 percent of Adams, Yakima, Chelan, Douglas, Grant, Walla Walla, and Franklin County households speak Spanish." See, "The History of Language in Washington State," Language Network, November 5, 2019, https://www.languagenetworkusa.com/blog/the-history-of-language-in-washington-state.

areas are reflected in significant present-day disparities with regard to income, unemployment, poverty, education, housing, health, and criminal justice. These socio-economic disparities bear directly on the ability of minorities to participate in the electoral process.

5. <u>Senate Factor 6:</u> Political campaigns in the Yakima Valley and Pasco areas have been marked by direct and indirect racial appeals.

6. <u>Senate Factor 7:</u> Both the Yakima Valley and Pasco areas have a weak record of electing Latino candidates to public office.

7. <u>Senate Factor 8:</u> Elected officials in the Yakima Valley and Pasco region, particularly in state legislative districts 14 and 15, are not responsive to the needs of the Latino community.

In light of this evidence, and the analysis I provide below, I conclude that the totality of the circumstances shows that the current configuration of state legislative districts hinders the equal opportunity of Latino voters in the Yakima Valley and Pasco areas to fully and effectively participate in the political process.

**Note on Terminology**

In this report, I use the terms "Latino/Latinx" and "Hispanic" as an umbrella term for all individuals from Spanish-speaking nations from Latin America and the Caribbean. Persons who identify as "Latino/Latinx" and "Hispanic," according to the U.S. Census Bureau, "are those who classify themselves in one of the specific Hispanic or Latino categories listed on the decennial census questionnaire and various Census Bureau survey questionnaires – 'Mexican, Mexican Am., Chicano' or 'Puerto Rican' or 'Cuban' – as well as those who indicate that they are

'another Hispanic, Latino, or Spanish origin.'"[9] I apply the national-origin terms whenever possible. Specifically, for persons of Mexican descent, I use several terms to indicate differences in identities and citizenships, including "ethnic Mexicans," "Mexican nationals," "Mexican Americans," and "Chicanas/os." "Ethnic Mexicans" describes people of Mexican ancestry living in the United States, regardless of their citizenship. "Mexican national" refers to a person with Mexican citizenship residing in the United States. "Mexican American" describes a person of Mexican descent born in the United States. The term "Chicana/o/x" is also used to describe a person of Mexican ancestry who was born in the United States but is used when the historical actors or community specifically used this term to identify themselves and their community. Beginning in the late 1960s, "Chicano" was a term embraced by youth to gain political power while rejecting racism, assimilationism, and colonialism in the United States. Lastly, I use "undocumented" to describe Latino migrants without official permission to reside or work in the United States.

In the Yakima Valley and Pasco region, a large portion of the Latino community is composed of persons of Mexican ancestry, but they have a shared history and common interests with other Latino groups creating a collective identity and consciousness.[10] Here, and across the U.S., Latino people tend to see themselves as part of a large whole because of issues related to immigration, legal status, a history of colonialism, race, class, and language.[11]

---

[9] "About the Hispanic Population and its Origin," *United States Census Bureau*, https://www.census.gov/topics/population/hispanic-origin/about.html.

[10] *Id.*

[11] On Latinos and Hispanics identifying as a cohesive group with specific political priorities, opinions, and behaviors, see Rodolfo Espino, et al., *Latino Politics: Identity, Mobilization, and Representation* (Charlottesville: University of Virginia Press, 2007), Luis Ricardo Fraga, *Latinos in the New Millennium: An Almanac of Opinion, Behavior, and Policy Preferences* (New York: Cambridge University Press, 2012), John A. García, *Latino Politics in America: Community, Culture, and Interests* (Lanham: Rowman & Littlefield Publisher, 2012, 2021), F. Chris Garcia and Gabriel Sanchez, *Hispanics and the US Political System: Moving into the Mainstream* (Taylor and Francis, 2015), Armando Navarro, *Mexicano and Latino Politics and the Quest for Self-determination: What Needs*

## Methodology

I employ the standard methodology used by historians to research the long history of racial discrimination and its effect on Latino political representation and participation in Washington State. My historical research and writing process is, in part, based on Busha and Harter's six-step formula: "(a) The recognition of a historical problem or the identification of a need for certain historical knowledge; (b) The gathering of as much relevant information about the problem or topic as possible; (c) If appropriate, the forming of hypotheses that tentatively explain relationships between historical factors; (d) The rigorous collection and organization of evidence, and the verification of the authenticity and veracity of information and its sources; (e) The selection, organization, and analysis of the most pertinent collected evidence, and the drawing of conclusions; (f) The recording of conclusions in a meaningful narrative."[12] The application of this method allows historians to work systematically to gather, authenticate, and analyze a wide range of sources to produce a historical account that is most accurate.

To write and interpret the history of Latino people in Washington, I analyzed both primary and secondary sources. Primary sources are created during the time period of study. For this report, I used the following primary documents: archival records, government documents, court records, newspapers, transcripts of legal records, demographic and socio-economic reports, and U.S. Census records. Secondary sources are interpretations of primary sources. In drawing conclusions for this study, I used the following secondary sources: scholarly books, dissertations, theses, peer-reviewed journal articles, newspaper editorial/opinion pieces, court case expert reports, and digital history projects, such as the *Seattle Civil Rights and Labor History Project*.

---

*to Be Done* (Lanham: Lexington Books, 2015), and Lisa Garcia Bedolla, *Latino Politics* (Malden: Polity Press, 2015, 2021).

[12] Charles H. Busha and Stephen P. Harter, *Research Methods in Librarianship: Techniques and Interpretation* (New York: Academic Press, 1980), 91.

## Shared History of Latinos in Central Washington

Latino residents in the state and the Yakima Valley and Pasco region have a common history of immigration to the state and shared experiences once they arrived. Starting in the late eighteenth century, Spanish-speaking people established settlements in Washington's Olympic Peninsula. From 1774 to 1797, Spanish ships explored the coastline of the Pacific Northwest. Historical records demonstrate that most of the sailors were of Mexican ancestry since the number of Spaniards living in colonial Mexico was minimal. On Washington's Neah Bay, in 1792, the first Spanish settlement was called Nuñez Gaona and its crew of mostly Mexican nationals were the state's earliest settlers.[13]

Fleeing the unrest created by the Mexican American War (1846-1848), Mexican nationals arrived in Washington and established businesses that contributed to the state's economic development. Decades before the American Civil War, Mexican mule packers and ranch hands contributed to transforming the Washington territory into a state, by providing the necessary goods and equipment to the forts and later burgeoning towns.[14] The expertise of Mexican mule packers was necessary to reach remote parts of the territory where freight wagons were not dependable or practical. Moreover, in the 1860s, Mexican nationals in the state were important entrepreneurs. For example, Rosario Romero relocated from Sonora, Mexico to Yakima, Washington. Romero has been "credited with starting the region's sheep-herding industry."[15] In the same period, the Galina family, also from Sonora, settled in Walla Walla,

---

[13] On Spanish explorations, see: José Mariano Moziño and Iris Wilson Engstrand, *Noticias De Nutka: An Account of Nootka Sound in 1792* (Seattle: University of Washington Press, 1991), and Erasmo Gamboa, "Washington's Mexican Heritage: A View into Spanish Explorations, 1774-1797," *Columbia Magazine* (Fall 1989), 40-45.

[14] On Mexican mule packers in the Pacific Northwest, see Erasmo Gamboa, "Mexican Mule Packers and Oregon's Second Regiment Mounted Volunteers, 1855-1856," *Oregon Historical Quarterly* 92: 1 (1991): 41-59, and Erasmo Gamboa, "The Mexican Mule Pack System of Transportation in the Pacific Northwest and British Columbia," *Journal of the West* 29:1 (1990): 16-27.

[15] Vicki L. Ruiz and Virginia Sánchez Korrol, *Latinas in the United States*, (Bloomington: Indiana University Press, 2006), 25.

Washington. The family operated a mule-pack train that facilitated the transportation of goods to mining districts throughout the region.[16]

Between 1900 and 1930, Mexican nationals and Mexican Americans along with their families were drawn to Washington State to labor primarily in agriculture. A major force contributing to their movements was the growth of the U.S. agriculture industry and the Mexican Revolution (1910-1917), which contributed to a surplus of workers in the Southwest.[17] This forced people of Mexican descent to travel further north to find employment. Once the U.S. entered World War I, a labor shortage prompted growers in the Northwest to recruit ethnic Mexican workers. While the Immigration Act of 1917 required that Mexican people pass a literacy test and pay a head tax, it was waived for those who worked for the western sugar beet growers.[18] In 1924, the Johnson-Reed Act created, for the first time, numerical limits and quotas on immigration. However, the Western Hemisphere was exempt, which moved labor agencies to recruit Mexican nationals and Mexican Americans to Washington. The "immigration laws during the 1920s did not assign numerical quotas to Mexicans, but the enforcement provisions of restriction—notably visa requirements and border-control policies—profoundly affected Mexicans, making them the single largest group of illegal aliens by the late 1920s."[19] By the 1920s, Washington was an established migratory route for workers of Mexican descent.[20]

During the Great Depression, Washington's ethnic Mexican population, much like in the Southwest, was rounded up and forced to return to Mexico. The 1930s repatriation of Mexican

---

[16] Korrol, *Latinas in the United States*, 25.
[17] Neil Foley, *Mexicans in the Making of America* (Harvard University Press, 2014), 43-48.
[18] Erasmo Gamboa, *Mexican Labor and World War II: Braceros in the Pacific Northwest, 1942-1947* (Seattle: University of Washington Press, 2000), 8.
[19] Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern American* (New Jersey: Princeton University Press, 2004), 7.
[20] Erasmo Gamboa, *Mexican Labor and World War II*, 9.

nationals and their U.S.-born children is estimated to have impacted about one million people.[21] In Spokane, Washington, city officials identified a group of Mexican nationals and had them deported.[22] The 1930 census recorded 562 persons of Mexican ancestry living in the state with 33 residing in Spokane County.[23] And at McNeil Federal Penitentiary, in 1932, about 90 Mexican nationals were sent to Mexico to reduce prison costs and likely as a consequence of racial discrimination and nativism.[24]

World War II (WWII) created conditions that brought a significant number of ethnic Mexican people to Washington State. As white migrant workers found employment in higher paying wartime industries, agricultural growers desperately needed workers. Beginning in 1942, a bilateral agreement between the U.S. and Mexico called the Bracero Program permitted Mexican nationals, also referred to as braceros (one who works using their arms), to enter the country as contract laborers. From 1943 to 1947, approximately 47,000 braceros came to the Pacific Northwest.[25] The number of braceros employed in Washington was around 15,000.[26] Unlike braceros living in the Southwest, braceros living in Northwestern communities experienced harsh racism, worked in freezing temperatures, and had their complaints ignored by U.S. and Mexican government officials. Braceros went on strike, and with the high cost of

---

[21] On the approximate number of Mexican people repatriated, see Raymond Rodriguez and Francisco E. Balderrama, *Decade of Betrayal: Mexican Repatriation in the 1930s* (University of New Mexico Press, 2006), 151.
[22] Jerry Garcia, "History of Latinos in the Northwest," *Washington State Latino/Hispanic Assessment Report, 2009-2010*, Commission on Hispanic Affairs Website, 12, https://static1.squarespace.com/static/5915f65ed482e94b3f60b25f/t/5bef266df950b73a0a722bf5/1542399602953/2009-2010+CHA+Assessment+Report+-+English.pdf.
[23] U.S. Bureau of the Census, Department of Commerce, *Fifteenth Census of the United States: 1930*: *Population*, Vol. 3, Pt. 2: Montana-Wyoming (Washington D.C.: GPO, 1932), https://www2.census.gov/library/publications/decennial/1930/population-volume-3/10612982v3p2ch10.pdf, 1231.
[24] Jerry Garcia, "History of Latinos in the Northwest," 12.
[25] Erasmo Gamboa, "Braceros in the Pacific Northwest: Laborers on the Domestic Front, 1942-1947," *Pacific Northwest Historical Review* 53:3 (1987), 378.
[26] Erasmo Gamboa, "Mexican Migration into Washington State, 1940-1950," *Pacific Northwest Quarterly* 72:3 (1981), 124.

transporting workers to the state, growers decided to stop using braceros after the war ended in 1947.[27]

Bracero workers of Mexican ancestry experienced racial animosity in Washington State. In Stanwood, Washington, the local marshal and high school students tried to prevent braceros from congregating in town. The resulting altercation was so intense that it was referred to as a "near race riot."[28] The marshal declared, "We don't need these Mexicans here anyway, the town would be much better off with them."[29] In addition to threats of racial violence and exclusion, braceros in the Northwest were prohibited from entering businesses where signs read "No Japs or Mexicans Allowed" and some were attacked "without provocation."[30] In the Yakima Valley, Kara Kondo writes that after WWII, the Japanese were not welcomed and "'No Japs Wanted' signs appeared in almost every store and business establishment in Wapato."[31] This anti-Mexican and anti-Japanese sentiment was widespread in Washington.

In addition to agricultural workers, WWII brought Mexican American soldiers to Washington State. As Mexican Americans joined the armed forces in the Southwest, some were transferred to the area for training and later stationed at Fort Lewis (Tacoma, Washington), Fort Larsen (Moses Lake, Washington), Ephrata Air Terminal (Ephrata, Washington), Fairchild Air Force Base (near Spokane, Washington), and Hanford Nuclear Site (Hanford, Washington). For those who relocated and settled in urban centers such as Tacoma and Spokane, they helped to establish ethnic Mexican communities and worked in non-agricultural industries.[32]

---

[27] Erasmo Gamboa, *Mexican Labor and World War* II, xx.
[28] *Id*. at 113.
[29] *Id.*
[30] Gamboa, *Mexican Labor and World War II*, 112.
[31] Kara Kondo, ed., *Profile: Yakima Valley Japanese Community, 1973* (Yakima Valley Japanese Community, 1974), 9. On the Japanese community in the Yakima Valley, see Thomas H. Heuterman, *The Burning Horse: Japanese-American Experience in the Yakima Valley, 1920-1942* (Cheney: Eastern Washington University, 1995).
[32] Carlos Maldonado, "Mexicanos in Spokane: 1930-1992," *Revista Apple* 3:1-2 (Spring 1992), 118-125.

Although ethnic Mexican labor was crucial to the state's economy, the white majority discriminated against Mexican laborers and racialized them as a separate and inferior race. During the construction of the Hanford Nuclear Site, the U.S. Army Corp of Engineers built off-site housing facilities in Pasco, Washington to segregate Mexican Americans from white workers.[33] The City of Pasco, located in Franklin County, became "darker and poorer than Kennewick and Richland" because of Washington's Jim Crow laws.[34] During the 1940s and 1950s, Jim Crow practices in the Tri-Cities area (Kennewick, Pasco, and Kennewick) forced people of color into the City of Pasco.[35] "White only" signs were also posted in Pasco and ethnic Mexican people who settled in other parts of the state recalled reading signs on storefronts that read, "No Mexicans Allowed."[36] Kennewick leaders established a curfew banning African Americans after dark (also referred to as Sundown towns) and, while Richland had no curfew, the high cost of homes made it practically impossible for people of color to purchase one in the city.[37] Additionally, due to racist attitudes and social pressures, selling a home in the Tri-cities area to non-white residents could have undesirable consequences. "Let me tell you, if anybody in this town sells property to a nigger, he's liable to be run out of town," stated a Kennewick sheriff.[38]

---

[33] Bruce Hevly and John M Findlay, *Atomic Frontier Days: Hanford and the American West* (Seattle: University of Washington Press, 2011), 27.

[34] Kate Brown, *Plutopia: Nuclear Families, Atomic Cities, and the Great Soviet and American Plutonium Disasters* (United Kingdom: Oxford University Press, 2013), 154.

[35] Robert Bauman, "Jim Crow in the Tri-Cities, 1943-1950," *Pacific Northwest Quarterly* 96:3 (Summer 2005), 124-131.

[36] Josué Q. Estrada, "Tejano Diaspora into Washington State," (Master's Thesis, Washington State University, 2007), 113.

[37] Kate Brown, *Plutopia*, 151. On Sundown towns, see James W. Loewen, *Sundown Towns: A Hidden Dimension of American Racism* (New Press, 2006).

[38] Kate Brown, *Plutopia*, 154.

Prior to the Fair Housing Act of 1968, the use of racially restrictive covenants prohibited the sale or rental of real estate property to certain racial and religious groups.[39] In Washington State, racially restrict covenants were widespread throughout the state.[40] The covenants facilitated "patterns of residential racial segregation that long outlived these once technically legal devices."[41] The language of the covenants typically stated that "no person of any race other than the white race shall use or occupy…" said property.[42] In some cases, the covenants read that persons of Asian, Jewish, Turkish, or Black races could not occupy the residence unless they were acting as a "domestic servant."[43] Racially restrictive covenants were pervasive in Western Washington, and, currently, researchers from Eastern Washington University are examining "the records in 20 Washington counties on the east side of the mountains" to uncover the extent to which they were used in Eastern Washington.[44] Preliminary findings indicate that racially restrictive covenants were also "pretty widespread" in Eastern Washington including in places like "Pullman, Wenatchee, and Ritzville."[45]

After Washington growers decided to no longer import braceros after WWII, they recruited ethnic Mexican people including undocumented workers from the Southwest, who

---

[39] Fair Housing Act, Public Law No. 90-284, 82 Stat. 81 (1968).

[40] Rajeev Majumdar, "Racially Restrictive Covenants in the State of Washington: A Primer for Practitioners," 30 *Seattle University Law Review* 1095 (2007), https://digitalcommons.law.seattleu.edu/cgi/viewcontent.cgi?article=1917&context=sulr.

[41] Richard R. W. Brooks, *Saving the Neighborhood: Racially Restrictive Covenants, Law, and Social Norms* (Harvard University Press, 2013), 2.

[42] "Racial Restrictive Covenants Project-Washington State," *Civil Rights and Labor History Consortium*, University of Washington, http://depts.washington.edu/covenants/about.shtml.

[43] *Id.*

[44] Feliks Banel, "Project Aims to daylight 'restrictive covenants' on real estate in all Washington counties," *KIRO News Radio* (2021), https://mynorthwest.com/3273345/project-daylight-restrictive-covenants-real-estate-washington/.  In 2021, the Washington State Legislature passed House Bill 1335 that provides funding for the University of Washington and Eastern Washington University to "review existing deeds and covenants for unlawful or other discriminatory restrictions, and provides property buyers a method to remove them. "House Bill Report, E2SHB 1335," Washington State Legislature, https://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bill%20Reports/House/1335-S2.E%20HBR%20PL%2021.pdf?q=20220722221007.

[45] Feliks Banel, "Project Aims to daylight 'restrictive covenants' on real estate in all Washington counties."

were supposedly more controllable and docile than Mexican contract laborers. Beginning in the 1950s, ethnic Mexicans and their families began to permanently settle in mostly rural communities in Washington, abandoning the migratory lifestyle. The expansion of irrigation projects in Eastern and Central Washington provided for year-round work, contributing to the formation of communities in Adams, Benton, Franklin, Grant, and Yakima County.[46]

While Mexican undocumented workers in Washington were thousands of miles away from the U.S.-Mexico border, they were still arrested and deported back to Mexico. From 1953 to 1954, the U.S. government conducted a large-scale paramilitary campaign to deport undocumented workers that went by the derogatory name of "Operation Wetback."[47] Washington's agricultural growers desperately needed workers, so they hired undocumented persons and faced no legal penalties, but the workers themselves were not insulated from the deportation campaign. The military operation concentrated its efforts in California and Texas, but it was expanded to states such as Washington.[48] In total, "Operation Wetback" expelled more than 3.8 million Mexican nationals. The deportation campaign targeted all people of Mexican descent and scripted the whole community as "illegal aliens," deepening white people's mistrust and alienation towards ethnic Mexicans in the state.

Inspired by the civil rights struggle, Latinos organized a movement of their own to attempt to topple a wide range of barriers, including those that stifled Latino political participation and farm worker rights. Toward the close of the 1960s, Latinos in Washington,

---

[46] Gina Bloodworth and James White, "The Columbia Basin Project: Seventy-Five Years Later," *Yearbook of the Association of Pacific Coast Geographers* 70 (2008): 96–111, and Kelsey Doncaster, "Columbia Basin Project," HistoryLink.org, https://www.historylink.org/file/21312.

[47] On Operation Wetback see, Juan Ramon García, *Operation Wetback: The Mass Deportation of Mexican Undocumented Workers in 1954* (United Kingdom: Greenwood Press, 1980).

[48] Joan W. Moore and Harry Pachon, *Hispanics in the United States* (Englewood Cliffs, N.J.: Prentice-Hall, 1985), 140. Also, see Sylvia Cavazos, *The Disposable Mexican: Operation Wetback 1954, the Deportation of Undocumented Workers in California and Texas* (University of Texas--Pan American, 1997).

mostly of Mexican ancestry, were about two percent of the state's population. In 1967, the Mexican American Federation (MAF) was created because white residents and elected officials refused to take on their issues. Samuel Martinez of Yakima was named president and Antonio Daniel of Pasco was elected as a regional president.[49] Martinez and Daniel led the MAF, which was a state-wide organization with a presence in Yakima County but also the Puget Sound, Moses Lake, Tri-Cities, and Bellingham-Lynden areas.[50] The MAF wanted to encourage Mexican Americans to vote, run for elected office, and take a stand on political issues to influence local and state governments. The MAF also wanted to "dispel forever the apathy of the Mexican-American voters of Washington and of the nation."[51] In the same year, the United Farm Workers Cooperative (a precursor to the United Farm Workers Union) emerged to push for farm worker rights. During the 1970s, the union began mobilizing workers in Yakima County to demand higher wages, better treatment, and improved working conditions, but in response the growers brandished weapons, threatened union leaders, refused to hire those who participated in union activities, and filed litigation against the union for purportedly harassing workers.[52] White growers racialized Mexican laborers as inferior, uneducated, and replaceable, and therefore deserving of low wages and poor treatment.[53] The anti-union strategies used by the white

---

[49] "Daniel to Head Federation," *Tri-City Herald* (Pasco, Kennewick, and Richland, WA), November 13, 1967.
[50] Mexican-American Federation Puget Sound Newsletter, 1968-1970. Box 7, Folder 11. Tomás Ybarra-Frausto Papers, Accession No. 4339-001, University of Washington Libraries, Seattle, Washington.
[51] Mexican-American Federation Puget Sound Newsletter, University of Washington Libraries, Seattle, Washington.
[52] Jesus Lemos, *A History of the Chicano Political Involvement and the Organizational Efforts of the United Farm Workers Union in the Yakima Valley, Washington*, Master's thesis, University of Washington, 1974, 65-90; Oscar Rosales Castañeda, "UFWOC Yakima Valley Hop Strikes," *Seattle Civil Rights and Labor History Project*, University of Washington, https://depts.washington.edu/civilr/farmwk_ch7.htm; and Dixie Koenig, "Growers Defendants: Hops-labor Trail under Way," *Yakima Herald-Republic* (Yakima, WA), January 21, 1971.
[53] Like in the Southwest, the relationship between white growers and workers of Mexican descent produced a racial hierarchy, scripting the latter as non-white, cheap wage laborers. See Neil Foley, *The White Scourge: Mexicans, Blacks, and Poor Whites in Texas Cotton Culture* (University of California Press, 1998).

growers punished those who threatened the racial structure, and ensured that growers remained at the top of the racial hierarchy.

Despite efforts to stifle farm workers from organizing, the United Farm Workers Union (UFW) continued to support Washington's Latino workers. For example, the UFW has helped to secure labor contracts, file a lawsuit against Ruby Ridge Dairy (in Pasco, Washington), and advocate for comprehensive immigration reform.[54] In 1995, the UFW unionized workers at the Chateau Saint Michelle Winery in the Yakima Valley, and the winery remains under a UFW contract.[55] In 2009, four former employees of Ruby Ridge Dairy and the UFW sued the owners for not providing drinkable water, meal breaks, and for threatening to fire them for trying to unionize.[56] In 2022, the UFW and about 50 of its members organized a "Day Without Immigrants" rally in Pasco, calling for a "…fix [for] America's immigration system."[57]

Due to persistent organizing in the 1970s, ethnic Mexicans in Washington started to be recognized as an important constituency, and Latino people created institutions that were vital to community building. In 1971, Governor Daniel Evans formed the Commission on Mexican American Affairs and appointed eleven individuals to serve on the commission.[58] The commissioners were from across the state and charged with making policy recommendations that

---

[54] For more information on Washington's United Farm Workers Union, see "Farm workers in Central Washington found the United Farmworkers of Washington State on September 21, 1986," HistoryLink.org, https://www.historylink.org/file/8302.

[55] Pascal Zachary, "Winery Field Workers Break New Ground in Union Election," *The Wall Street Journal*, June 7, 1995; "UFW Labels," United Farm Workers, https://ufw.org/organizing/ufw-labels/.

[56] Pratik Joshi, "Ministry gives checks to fired Pasco dairy workers," *Tri-City Herald* (Pasco, Kennewick, and Richland, WA), September 17, 2009, https://www.tri-cityherald.com/news/business/article31755897.html. In 2019, the UFW and dairy owners "agreed to walk away from the legal battle." Mathew Weaver, "After 10 years, dairy, UFW settle lawsuit," *Capital Press*, May 8, 2019, https://www.capitalpress.com/ag_sectors/dairy/after-10-years-dairy-ufw-settle-lawsuit/article_5ca4bda2-71b0-11e9-9a93-5bf9a8dcd558.html.

[57] Cameron Probert, "'Yes we can.' Tri-Cities immigrants call for reform during rally," *Tri-City Herald* (Pasco, Kennewick, and Richland, WA), February 2022, 2022, https://www.tri-cityherald.com/news/local/article258397168.html.

[58] The commission was renamed to be the Washington State Commission on Hispanic Affairs. "*About Us*," The Washington State Commission on Hispanic Affairs, https://www.cha.wa.gov/our-mission.

would benefit ethnic Mexicans. In 1972, El Centro de La Raza was founded to serve the needs of Seattle's Latino population.[59] And in 1979, Radio Cadena (also known as Radio KDNA) and the Sea Mar Community Health Center (Sea-Mar) were formed as community-based organizations. In the Yakima Valley, Radio Cadena provided Spanish-language programming that became "a tool for community building, advocacy, and entertainment that was especially leveraged by the women who lead it," writes historian Monica De La Torre.[60] Sea-Mar was opened to deliver health services to Seattle's low-income Latino, Asian, and Black population. To provide healthcare to farm workers in the Yakima Valley, labor activist Tomás Villanueva helped to establish the Yakima Valley Farm Workers Clinic in 1978.[61] The clinic is the "largest community health care provider in the northwest, operating clinics in Washington and Oregon," including the Miramar Health Centers that serve Pasco, Kennewick, and Richland residents.[62] The establishment of the Commission on Mexican American Affairs and community-based organizations was in response to Washington's Chicano Movement that demanded greater political, social, and economic equality.

During the 1980s and 1990s, the ethnic Mexican and Latino population in Washington State significantly increased, and the total number of Latinos doubled every decade after 1970 (see Table 1).

**Table 1. Latino Population in Washington, 1970-1990[63]**

[59] "History and Evolution," El Centro de la Raza, https://www.elcentrodelaraza.org/history-evolution/.

[60] Monica De La Torre, *Feminista Frequencies: Community Building Through Radio in the Yakima Valley* (University of Washington Press, 2022), 4.

[61] Carlos S. Maldonado and Gilberto García, *The Chicano Experience in the Northwest* (Kendall/Hunt Publishing Company, 1995), 102. On Villanueva's contribution to founding the Yakima Valley Farm Workers Clinic see, "Tomás Villanueva: Founder, United Farmworkers of Washington State," *Seattle Civil Rights and Labor History Project*, University of Washington, https://depts.washington.edu/civilr/villanueva.htm.

[62] Annette Clay, "Nonprofit opens new Tri-Cities medical and dental clinic. No insurance needed," *Tri-City Herald* (Pasco, Kennewick, and Richland, WA), May 10, 2021, https://www.tri-cityherald.com/news/local/article251221114.html.

[63] "Washington Data and Research," Washington's Office of Financial Management Website, https://ofm.wa.gov/washington-data-research/statewide-data/washington-trends/population-changes/population-hispaniclatino-origin. For 1970, the Latino population is based on "Spanish language." See Cambell Gibson and Kay

|  | 1970 | 1980 | 1990 |
|---|---|---|---|
| Total Population | 70,734 | 120,016 | 214,570 |
| % of State Population | 2.1% | 2.9% | 4.4% |

Racial discrimination against Washington's Latino farmworkers has persisted. In 2013, workers would go on strike against Sakuma Brothers Farms in Burlington, Washington.[64] Many of these farm workers who identified as Mexican and Indigenous people of Mexico reported that supervisors regularly used racist slurs and treated them as subhuman.[65] When workers complained about harassment and demanded a higher piece rate wage for picking berries, they were fired. Latino farm workers, like in the past, had no choice but to use collective organizing and the courts to fight for labor rights and against racism. Workers went on strike and filed lawsuits against the growers, leading to "multiple victories over issues of workers' rights, housing and hiring practices; [and]…[winning] hundreds of dollars in back wages…".[66]

Therefore, Latinos in Washington, and in particular in the Yakima Valley and Pasco region, have not just a common history of immigration and discrimination, but also the common present-day experience of continuing to combat that discrimination.

**Senate Factor 1: History of Official Voting-Related Discrimination**

According to the Senate Report, Senate Factor 1 requires an analysis of "the extent of any history of official discrimination in the state or political subdivision that touched on the right of

---

Jung, "Historical Census Statistics on Population Totals by Race, 1790 to 1990, and Hispanic Origin, 1970 to 1990, For the United States, Regions, Divisions, States," U.S. Census Bureau, Washington D.C. (September 2002), https://www.census.gov/content/dam/Census/library/working-papers/2002/demo/POP-twps0056.pdf.

[64] David Bacon, "Why These Farm Workers Went on Strike—and Why it Matters," *The Nation*, October 3, 2016, https://www.thenation.com/article/archive/why-these-farm-workers-went-on-strike-and-why-it-matters/.

[65] Ian Alexander, "The Struggle for Fairness at Sakuma Brothers," *Fair Work* 10 (2015), https://fairworldproject.org/the-struggle-for-fairness-at-sakuma-brothers/.

[66] *Id.*

the members of the minority group…to participate in the democratic process."[67] The State of Washington has a long history of discrimination against Latinos in the voting arena, both statewide and in the Yakima Valley and Pasco region.

### A. English Literacy Tests

A combination of national, state, and local forces led to the denial of Latino voters' ability to exercise their voting rights before 1970. During this period, Latinos' participation in Washington elections was primarily blocked by the state's official literacy test, which required that voters speak and read English. Although the language exam would be suspended in the South under the Voting Rights Act (VRA) of 1965, literacy tests continued to be enforced in states like Washington past this date. When the VRA was extended in 1970, the English language requirement to vote was banned in Washington and throughout the country.

### i.    The Adoption of Washington's English Literacy Test

Literacy tests were first established as an effective means to deny the franchise to marginalized groups during the early 1850s when the Know-Nothing Party mobilized them to suppress the voting rights of Irish immigrants in the Northeast.[68] In Connecticut and Massachusetts, English literacy tests were adopted to purportedly encourage immigrants to learn English and assimilate, but lawmakers understood that it would have the effect of disenfranchising Irish voters.[69] According to the Know-Nothing Party, the language exams "would keep the 'ignorant, imbrute Irish' from the polls."[70] Once literacy tests were passed, they effectively narrowed the franchise for Irish immigrants.

---

[67] S. Rep. No. 97-417, at 28 (1982); *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).
[68] Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States (*New York: Basic Books, 2000, 82-84.
[69] *Id*. at 86.
[70] *Id.*

After the Fifteenth Amendment was passed in 1870, requiring that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," English literacy tests were an effective tool utilized by southern states to keep African Americans from the ballot box while not explicitly disenfranchising voters on account of race.[71]

In 1896, following the example set by northeastern and southern states and on the heels of intense racial violence against Chinese nationals, Washington passed legislation requiring English language knowledge to register to vote.[72] The legislation included a grandfather clause that exempted those already registered to vote.[73] The language exam would go on to be used to disenfranchise non-English speaking immigrants, Asians, Native Americans, illiterate whites, and Mexican Americans.[74]

## ii.    The Impact of Washington's Literacy Test on Latino Voters

Beginning in at least the 1950s, literacy tests in Washington State and, in particular, in the Yakima Valley, were administered inconsistently and sporadically, but in a racially discriminatory manner to suppress Latino votes. Prior to 1970, Latino voter registration data in Washington is lacking because the U.S. Census did not enumerate Latinos as a single group, but

---

[71] *U.S. Constitution*, Amendment 15, Section 1. On the state statues and constitutional amendments related to literacy tests, see "Appendix: State Suffrage Laws," Table A. 13 in Alexander Keyssar, *The Right to Vote*, 325-402.
[72] *House Journal of the State of Washington* (Olympia, Washington, 1895), 297, and Chapter XXXVII [House Bill No. 57]. Amendment to the Constitution, Qualification of Voters. *Session Laws of the State of Washington* (Olympia, Washington: Published by authority, 1890), 60.
[73] *Id.*
[74] Before Washington's literacy test was passed in 1896, the state's legislature attempted to pass a proposal "that no native of China…shall ever exercise the privileges of an elector of this state." See Beverly P. Rosenow and Quentin S. Smith, *The Journal of the Washington State Constitutional Convention, 1889* (Seattle: Book Pub. Co, 1962), 61. On Washington's state literacy test and Latinos, see James Thomas Tucker, *The Battle Over Bilingual Ballots: Language Minorities and Political Access Under the Voting Rights Act* (United Kingdom: Taylor & Francis, 2016), 23-24. On the impact of the state's language requirement on Native Americans, see Hilda Bryant, "New Voters May Change Yakima Area," *Seattle Post-Intelligencer* (Seattle, WA), August 21, 1970.

there is other evidence from the time that demonstrates the impact of the literacy tests on Latino voters.

For example, Rodolfo Alaniz of Yakima County stated in a 1968 sworn and signed affidavit that he had been administered a literacy test on several occasions. Mr. Alaniz was one of thirteen individuals who submitted sworn testimony for a court case led by Mexican Americans in the Yakima Valley, with legal support from the American Civil Liberties Union (ACLU), opposing the state's literacy test (see *Mexican-American Federation v. Eugene Naff, Yakima County Auditor et al.*, 299 F. Supp. 597 (E.D. Wash. 1969)). Alaniz recalled that,

> [A]round 1954, I attempted to register to vote in Sunnyside, Washington but my application was refused because I couldn't satisfy the registrar that I could read and speak the English language. In 1957, I took and passed the Washington Driver's License test; the examiner read the questions to me and I answered the questions in English. In 1960, when John F. Kennedy was running for president, I again tried to register to vote and this time was told that I had to know how to write English, and was not allowed to register to vote. On or about, the middle of July 1969, I again attempted to be registered to vote and was registered by the Sunnyside City Clerk's Office.[75]

Alaniz's testimony reveals much about the administration of the state's literacy tests. First, Latino people were disenfranchised by the state's English language requirement to vote as early as the 1950s. For Mexican Americans in Washington, the inability to read and speak the English language stemmed largely from attending segregated schools in the Southwest, which were inferior to white schools.[76] Even by 1970, almost 65 percent of Chicanos residing in the Northwest migrated from the Southwest.[77] Second, city clerks and deputy registrars had the

---

[75] "Affidavit of Rodolfo Alaniz," August 16, 1968, American Civil Liberties Union (ACLU) of Washington 1942-1996. Accession No. 1177-005. Special Collections, University of Washington Libraries, Seattle, WA.
[76] For instance, Antonia Castañeda writes that her family regularly migrated from Texas to Washington. In Texas, Castañeda and many other migrant families attended segregated schools that were inferior to their white counterparts. See Antonia I. Casteñeda, "'Que Se Pudieran Defender (So You can Defend Yourselves)': Chicanas, Regional History, and National Discourses," *Frontiers: A Journal of Women Studies*, 2001, 22:3 (2001), 116-1142. On the history of Chicano students and segregation, see Gilbert G. Gonzalez, *Chicano Education in the Era of Segregation* (UNT Press, 2013).
[77] See Ricard W. Slatta, "Chicanos in the Pacific Northwest: A Demographic and Socioeconomic Portrait," *Pacific Northwest Quarterly* 70:4 (1979), 157.

power to determine if a person had adequately satisfied the language test. According to a 1933 state voting law, these officials could "interrogate" prospective voters to demonstrate whether they could "read and speak English," and if they were "not satisfied in that regard, he may require the applicant to read aloud and explain the meaning of some ordinary English prose."[78] Affidavits and deposition statements clearly confirm that registrars used their tremendous latitude to enforce these exams more regularly and more stringently for Mexican American people, especially when English was not their dominant language.[79] Third, while English literacy tests targeted Latinos, sometimes they were allowed to register without incident, demonstrating the arbitrariness and inconsistency of the test's administration.[80] And lastly, registrars at times said that people needed to read and *write* to register to vote, but the state law only required people to read and *speak* English.[81] Ultimately, a panel of three judges ruled against the Plaintiffs and MAF. The judges collectively agreed that "A simple inquiry by the registrar of the applicant in this form, 'Can you speak and read English?' is not a test and could not conceivably result in discriminatory practices."[82] Despite the fact that that the literacy test was being administered inconsistently, targeted Latinos, and that election officials had asked a Latino applicant to "read

---

[78] "Laws of Washington Passed at the Twenty-Third Regular Session, 1933," Washington State Legislature, https://leg.wa.gov/CodeReviser/documents/sessionlaw/1933c1.pdf.

[79] See affidavits for *Mexican American Federation v. Eugene Naff, Yakima County Auditor et al.*, Box 3, American Civil Liberties Union (ACLU) of Washington 1942-1996. Accession No. 1177-005. Special Collections, University of Washington Libraries, Seattle, WA.

[80] "Affidavit of Rodolfo Alaniz," August 16, 1968, American Civil Liberties Union (ACLU) of Washington 1942-1996. Accession No. 1177-005. Special Collections, University of Washington Libraries, Seattle, WA. In a sworn affidavit by John Velez, he states that he was "promptly registered without being required to read anything out loud to the registrar or asked if [he] could read or speak the English language." However, Felipa R. Cantu's affidavit states that she was "immediately" asked by the clerk, "[d]o you know how to read and speak English." See "Affidavit of John Velez," August 19, 1968, American Civil Liberties Union (ACLU) of Washington 1942-1996. Accession No. 1177-005. Special Collections, University of Washington Libraries, Seattle, WA, and "Affidavit of Felipa R. Cantu, August 19, 1968, American Civil Liberties Union (ACLU) of Washington 1942-1996. Accession No. 1177-005. Special Collections, University of Washington Libraries, Seattle, WA.

[81] Constitution of the State of Washington, Article VI, as amended by 2, Section 1 (1896), 59, https://leg.wa.gov/CodeReviser/Documents/WAConstitution.pdf.

[82] Opinion of the Court, *Mexican-American Federation v. Eugene Naff, Yakima County Auditor et al.*, U.S. District Courts, Eastern District of Washington, Yakima, Civ. Ac. No. 2457, 299 F. Supp. 587 (1969), 592-593.

the names of the list of candidates," among other evidence, the court ruled the registration

process had no "discriminatory overtones."[83]

The disenfranchisement of the Mexican American electorate in Washington and Yakima

County received little attention. The U.S. Commission on Civil Rights, an agency created in 1957

and charged with investigating allegations of voter suppression based on race, placed its emphasis

on the African American electorate residing in the South.[84] Since the commission received no

"evidence of racial discrimination in voting in any of the other 37 States," this meant that

Washington's literacy test was not contested when the Commission released their report in 1961.[85]

The U.S. Commission on Civil Rights was instrumental in pressuring Congress to pass the

VRA of 1965. It was one of the most significant pieces of civil rights legislation with far-reaching

power that transformed the nation's political system. The law suspended literacy tests in primarily

six southern states, authorized the appointment of federal voting examiners to replace

noncompliant registrars, deployed federal observers to monitor all elections, allowed the U.S.

Attorney General to file suit against states that administered the poll tax, and required covered

areas to submit electoral changes to the federal government to determine that they would not have

a discriminatory effect.[86]

For African Americans in the South, the VRA of 1965 immediately increased their number

of registered voters. With no literacy tests or other restrictive devices, historian Alexander Keyssar

explains that the registration of African Americans in Mississippi "went from less than 10 percent

in 1964 to almost 60 percent in 1968; in Alabama, the figure rose from 24 percent to 57."[87] In the

---

[83] *Id.*
[84] *Commission on Civil Rights Report*, 1961, United States Commission on Civil Rights (Washington: U.S. Govt., 1961) 21.
[85] *Id.*
[86] Voting Rights Act, Public Law 89-110, 89th Congress, S. 1564, August 6, 1965.
[87] Keyssar, *The Right to* Vote, 212.

South, the overall registration of African Americans reached a high mark of 62 percent.[88] The VRA was not a panacea, especially for Washington's Latino voters.

In Washington, the VRA had no effect on the administration of literacy tests, and literacy tests continued to be used to disenfranchise Mexican American citizens. In 1966, Washington's Secretary of State, A. Ludlow Kramer, asked the Attorney General of Washington, John J. O'Connell, about the impact of the VRA on the state's English literacy tests, and in particular, Section 4(e).[89] This section read that no person who had completed a sixth grade education "in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall be denied the right to vote in any Federal, State, or local elections because of his inability to read, write, understand, or interpret any matter the English language."[90] In other words, American citizens with limited English skills, such as Puerto Rican people, were exempt from English literacy tests. O'Connell replied that Section 4(e) had a "limited area" and the state laws needed to be revised to read, "[Electors] shall be able to read and speak the English language *unless* they can demonstrate that they have successfully completed a sixth grade primary education…in which the predominate language was other than English."[91] O'Connell argued that the state did not need to ban the test, but only amend the law.

The Washington State Board Against Discrimination, however, was concerned that the state's English literacy test was in violation of the VRA. On June 15, 1967, O'Connell responded, "Except for persons who come within the Puerto Rico provision, the Washington

---

[88] *Id.*
[89] Letter from John J. O'Connell to A. Ludlow Kramer, September 20, 1966, Box 3, Folder "MAF v. Naff," American Civil Liberties Union (ACLU) of Washington 1942-1996. Accession No. 1177-005. Special Collections, University of Washington Libraries, Seattle, WA.
[90] Voting Rights Act, Section 4(e), Public Law 89-110, 89th Congress, S. 1564, August 6, 1965.
[91] Letter from John J. O'Connell to A. Ludlow Kramer.

State literacy requirement remains in effect. However, the manner of testing for literacy is now

controlled by federal law, as will be hereinafter."[92] O'Connell wrote that literacy tests in the

State of Washington had not "been prohibited outright by federal legislation" and made a case

that if the state had a test, it was appropriate. English literacy exams, O'Connell insisted, had

been suspended in states where fewer than 50 percent of the voting age residents were registered,

which did not include Washington State. Therefore, he argued that the test could still be

enforced. And federal standards required that everyone be given a test in writing. In Washington,

O'Connell insisted that not all persons were tested but only in cases where "the registration

officer 'is not satisfied' with the applicant's sworn statement" and of a person's ability to read

and speak English.[93]

Washington's Attorney General also cited *Louisiana v. United States* (1965) in his effort

to defend the state's language requirement.[94] While the State of Louisiana had adopted a literacy

test to "purposely disenfranchise Negroes, it being understood that the registration officers would

use their discretion for that purpose," O'Connell declared that Washington had no "tradition of

discrimination against minorities in voting" and would prohibit literacy tests in accordance with

the new Federal law.[95] But he maintained that Washington did not have a literacy test, rather it

had a literacy "requirement."

By emphasizing that literacy was a requirement versus a test, claiming that Washington's

test was non-discriminatory, and proclaiming that Washington was unlike the South,

O'Connell's opinion cleared the way for local officials and registrars to continue to use the test

to suppress the Mexican American vote. And in Eastern Washington, a place with a growing

---

[92] Washington Attorney General's Office, John. J. O'Connell, *Opinions* (1957-1968), No. 21 (June 15, 1967).
[93] *Id.*
[94] *Louisiana v. United States*, 380 U.S. 145 (1965).
[95] Washington Attorney General's Office, John. J. O'Connell, *Opinions* (1957-1968), No. 21 (June 15, 1967).

ethnic Mexican population, the English literacy test would be used almost exclusively to disenfranchise the Latino community.[96]

    *iii.  Advocacy by Yakima County Latinos for an End to Literacy Tests*

   During the late 1960s, when the Mexican-American Federation (MAF) started to encourage their community throughout the state to register to vote, they witnessed that the literacy test was being administered more regularly and more carefully to Mexican Americans.[97] Because the degree that a person's ability to "read and speak English" was up to the registrars, MAF leaders, Samuel Martinez and Ricardo Garcia, believed that Eugene Naff, Yakima County Auditor, should appoint Spanish-speaking deputy registrars to assist prospective voters with limited English skills.[98] In Yakima County's rural precincts, Naff had appointed 35 white deputy registrars even though Mexican Americans numbered around 12,000.[99]

   The MAF provided names of potential people Naff could appoint but he refused to do so. Naff told Martinez and Garcia that it was ridiculous to appoint "Mexican registrars…if this was the case we probably should have Negro, Indian, Filipino, and Japanese registrars if we were to go by ethnic group."[100] Naff acknowledged that he was aware of the 1965 VRA but stated, "I still don't see, however, how anyone who can't read English can figure out how to vote on a

---

[96] See affidavits for *Mexican-American Federation v. Eugene Naff, Yakima County Auditor et al.*, Box 3, American Civil Liberties Union (ACLU) of Washington 1942-1996. Accession No. 1177-005. Special Collections, University of Washington Libraries, Seattle, Washington.

[97] "Mexican-Americans Seek Spanish-Speaking Registrars," *Yakima Herald-Republic* (Yakima, WA), March 8, 1968.

[98] "Spanish-Speaking Elections Registrars? No, Says Naff," *Yakima Herald-Republic* (Yakima, WA), March 16, 1968.

[99] Complaint for Declaratory and Injunctive Relief, *Mexican-American Federation v. Eugene Naff, Yakima County Auditor et al.*, September 11, 1968, Records of the United States District Courts, Eastern District of Washington, Yakima, Box 361, Civil Case Files, 1967-1970, National Archives, Seattle, Washington.

[100] "Mexican-Americans Seek Spanish-Speaking Registrars," *Yakima Herald-Republic* (Yakima, WA), March 8, 1968.

ballot…I believe it is privilege to register to vote."[101] He told the MAF leaders that they should help register voters, but their assistance would later be prohibited.[102]

After the first meeting with Naff, the situation intensified as deputy registrars began to administer literacy tests exclusively to Mexican Americans in Yakima County.[103] As a result, on September 11, 1968, four Mexican Americans, the MAF, and the United Farm Workers Co-op, with legal support provided by ACLU, filed a class action lawsuit against the county claiming that Washington's literacy tests violated the VRA of 1965.[104]

The Plaintiffs in their deposition statements and responses to the defendants' interrogatories vociferously expressed that they were citizens deserving an equal opportunity to exercise the franchise. For example, Simon Ramos, a resident of Toppenish, Washington, since 1946 stated, "I am a citizen and I have the right to vote. The first time I try to act like a citizen, they throw me back. I don't feel too good."[105] Expressing a similar feeling was Jennie Marin, a resident of Toppenish since 1957, who said, "I feel bad about not being able to vote. Not quite a citizen. Maybe even cheated a little. I have a son who served four years in the Navy and I'm proud of him. I feel I have a right to be a full citizen."[106]

Despite these individuals' appeals to be permitted to exercise their right to vote in Yakima County and the ACLU's argument of targeted racial discrimination against Mexican

---

[101] "Spanish-Speaking Elections Registrars? No, Says Naff," *Yakima Herald-Republic* (Yakima, WA), March 16, 1968.
[102] *Id.*
[103] *Id.*
[104] *Mexican-American Federation v. Eugene Naff, Yakima County Auditor et al.*, U.S. District Courts, Eastern District of Washington, Yakima, Civil Case Files 1967-1970, 2454-2457, Box 361, National Archives and Records Administration, Seattle, WA.
[105] Plaintiffs Simon Ramos' Answers to Defendants Interrogatories, *Mexican-American Federation v. Eugene Naff, Yakima County Auditor et al.*, January 31, 1969, Records of the United States District Courts, Eastern District of Washington, Yakima, Box 361, Civil Case Files, 1967-1970, National Archives, Seattle, Washington.
[106] Deposition Statement for Jennie Marin, *Mexican-American Federation v. Eugene Naff, Yakima County Auditor et al.*, April 1, 1969, Records of the United States District Courts, Eastern District of Washington, Yakima, Box 361, Civil Case Files, 1967-1970, National Archives, Seattle, Washington.

American voters, on May 2, 1969, a panel of three judges ruled against the Plaintiffs and MAF.[107] Although the *Mexican-American Federation v. Eugene Naff, Yakima County Auditor et al.* (1968) case did not officially end literacy tests in Washington, the MAF's activism was crucial to their eventual elimination. The organization called attention to the language and racial barriers confronted by Mexican Americans in Yakima County. When the VRA was extended in 1970, the English language requirement to vote was banned in Washington and throughout the country.

## B.  At-Large Elections

In addition to the above, the state's at-large elections systems continued to suppress Mexican Americans' ability to fully exercise their right to vote. Political scientist Luis R. Fraga found that at-large elections "characterized by substantial ethnic and racial vote polarization and differences for first-choice candidates…severely limited the effective exercise of political influence by minority communities."[108] At-large elections in Washington's Yakima Valley and Pasco areas have historically and through the present day limited the effective exercise of political influence of the Latino community.

   *i.   Origins of At-Large Elections & Adoption in the Yakima Valley and Pasco Areas*

At-large election systems are a method proven to dilute the voting strength of minority voters.[109] By the mid-1960s, at least 20 Washington cities had adopted the council-manager form

---

[107] Opinion of the Court, *Mexican-American Federation v. Eugene Naff, Yakima County Auditor et al.*, U.S. District Courts, Eastern District of Washington, Yakima, Civ. Ac. No. 2457, 299 F. Supp. 587 (1969).
[108] Luis Ricardo Fraga, "Domination Through Democratic Means: Nonpartisan Slating Groups in City Electoral Politics," *Urban Affairs Quarterly* 23:4 (1988), 544.
[109] Edward C. Banfield and James Q. Wilson, *City Politics* (Harvard University Press, 1966); Chandler Davidson and George Korbel, "At-Large Elections and Minority-Group Representation: A Re-Examination of the Historical and Contemporary Evidence," *The Journal of Politics* 43:4 (November 1981), 982-1005; and Chandler Davidson and Bernard Grofman, eds., *Quiet Revolution in the South: The Impact of Voting Rights, 1965-1990* (Princeton University Press, 1994).

of government including the City of Yakima (1957) and City of Pasco (1964).[110] In both of these cities, seven council members would be elected using at-large elections and the council would elect a mayor from the group.[111] In 1976, voters in the City of Yakima passed a resolution that created four council posts elected from residency districts in the primary and three council posts elected at-large.[112] In actuality, all of the council posts were elected at-large in the general election. According to the U.S. Census, in 1970, the city's "Spanish origin" population was about 2 percent, and by 1980, it was 6.42 percent.[113] The approved resolution by the city's voters stated that:

> Candidates for 'district positions' shall file their candidacy for nomination by the electors of the district wherein each candidate, respectively, resides. At the primary election, each qualified voter of each district may cast only one vote for a candidate. The names of the two candidates for each district for whom the largest number of votes are cast at the primary election shall appear on the citywide general election ballot, and **one candidate from each district receives the highest number of votes, as cast by the citywide electorate at the general election**, shall thereby be declared as duly elected to represent 'district position' as a member of the City Council.[114]

Pasco adopted a similar hybrid election system. In May of 1978, the Pasco City Council passed an ordinance that modified its previous format that had five voting districts and two at-large

---

[110] "Cities Use Council-Manager," *Tri-Cities Herald* (Pasco, Kennewick, and Richland, WA), May 3, 1964, and "Council to be Elected: City Manager OK'd In Pasco by 2-1 Vote," *Tri-Cities Herald* (Pasco, Kennewick, and Richland, WA) May 6, 1964.

[111] *Id*.

[112] Resolution No. D 3585, City of Yakima, September 13, 1976, https://www.digitalarchives.wa.gov/DigitalObject/Download/23e9049e-c8e8-4690-b802-d03cad9acfcb.

[113] Characteristics of the Population, Washington, Vol. 41, Part 49, Table 102, U.S. Census Bureau (U.S. Department of Commerce, 1973), 49.249, https://www.google.com/books/edition/1970_Census_of_Population/UkEYAAAAYAAJ?hl=en&gbpv=0, and General and Social Economic Characteristics, Washington, Vol. 1, Part 49, Table 59, U.S. Census Bureau ( (U.S. Department of Commerce, 1983), 49.29, https://www.google.com/books/edition/1980_census_of_population/6DRrK0sak6wC?hl=en&gbpv=0.

[114] Resolution No. D 3585, City of Yakima, September 13, 1976, https://www.digitalarchives.wa.gov/DigitalObject/Download/23e9049e-c8e8-4690-b802-d03cad9acfcb.

positions.[115] In 1970, the City of Pasco's "Spanish origin" percent was 8.3 percent and a decade

later it was 20.8 percent.[116] The city council voted to amend its election rules to read:

> The qualified electors of each voting district, and they only, shall nominate from among
> their number candidates from the office of councilman of such voting districts to be voted
> for at the following general election…In addition, two councilmen, designated council-
> men at-large, shall be nominated in a similar manner….**Councilmen shall be elected by
> all of the qualified voters of the city** and the person receiving the highest number of votes
> for the office of the councilman for the position for which he is a candidate shall be declared
> duly elected.[117]

Therefore, "district" candidates for Pasco's city council, like in Yakima, would have to be

elected in citywide races.

 At-large elections have worked to systematically and persistently place Latino voters and

candidates at a disadvantage in the Yakima Valley and Pasco areas. In the last decade, Latinos in

the Yakima Valley and Pasco have continuously resorted to using the courts to bring an end to

at-large systems of election.

### ii.    *Montes v. City of Yakima (2014)*

While the at-large system of election was in place in the largest city of Yakima County—

Yakima, Washington—no Latino candidate was ever elected to the city council.[118] In 2012,

Latinos in the City of Yakima argued that racial discrimination and the city's at-large election

system prevented the Latino community (of nearly 40 percent) from electing a candidate who

---

[115] "Ordinance No. 1955," May 1, 1978, Ordinances (1970-1979), City of Pasco.
[116] Characteristics of the Population, Washington, Vol. 41, Part 49, Table 102, U.S. Census Bureau (U.S.
Department of Commerce, 1973), 49.248,
https://www.google.com/books/edition/1970_Census_of_Population/UkEYAAAAYAAJ?hl=en&gbpv=0, and
General and Social Economic Characteristics, Washington, Vol. 1, Part 49, Table 59, U.S. Census Bureau ( (U.S.
Department of Commerce, 1983), 49.33,
https://www.google.com/books/edition/1980_census_of_population/6DRrK0sak6wC?hl=en&gbpv=0.
[117] *Id.*
[118] Nicholas K. Geranios, "Latinos win Yakima council seats for first time in city's history," *Seattle Times* (Seattle,
WA), November 4, 2015, https://www.seattletimes.com/seattle-news/politics/in-wake-of-lawsuit-latinos-win-
yakima-city-council-seats/.

best represented their interests.[119] From 2009 to 2011, three Latino candidates ran for the city's council and were defeated.[120] In all races, there was evidence of racial polarization—when white and Latino voters exhibit polar opposite candidate preferences in an election.[121] In addition, in 2011, Yakima residents voted against Proposition 1 that "would have changed the city charter to make all seven Yakima City Council seats be divided among districts."[122] Therefore, Latinos used the courts to resist the dilution of their vote. The court found a violation of Section 2 of the VRA at the summary judgment stage, and ultimately the remedial plan created a system of seven single-member voting districts, including one majority-Latino district and a second opportunity district.[123]

### iii.    Glatt v. City of Pasco (2017)

Likewise, the at-large system of election in Pasco was effective at preventing the Latino community from electing their candidates of choice. In 2016, Plaintiffs filed a complaint against Pasco challenging the City's at-large election scheme under Section 2 of the VRA.[124] While Latinos made up about 32 percent of the city's voting-age population, and approximately 56 percent of the city's total population, no Latino had "ever won a contested election to the Pasco

---

[119] Venice Buhain, "Yakima set to elect first Latino city councilmember," *The Seattle Globalist*, May 29, 2015, https://seattleglobalist.com/2015/05/29/yakima-voting-rights-act/37312.  For demographic data, see U.S. Census Bureau, *American Community Survey 2014-2018 5-Year Estimates* (2019), https://data.census.gov/cedsci/.
[120] "Yakima Valley Latinos getting a voice, with court's help," *Los Angeles Times* (Los Angeles, CA), September 25, 2014, https://www.latimes.com/nation/la-na-c1-yakima-latinos-elections-20140925-story.html.
[121] Luis Ricardo Fraga, "Expert Report Submitted on Behalf of Plaintiffs in Montes v. City of Yakima," *Rogelio Montes and Mateo Arteaga et al. v. City of Yakima et al.*, No. 12-CV-3108-TOR, United States District Court, E.D. Washington, 2014, 4.
[122] "ACLU threatens to sue Yakima after voters kills Prop. 1," *Yakima Herald-Republic* (Yakima, WA), August 18, 2011, https://www.yakimaherald.com/aclu-threatens-to-sue-yakima-after-voters-kill-prop-1/article_d2a516e4-e99-11e4-8188-a3976a0a6afc.html.
[123] Plaintiffs' Motion for Summary Judgment, *Rogelio Montes and Mateo Arteaga et al. v. City of Yakima et al.*, No. 12-CV-3108-TOR, United States District Court, E.D. Washington, 2014, 7.
[124] Complaint for Declaratory and Injunctive Relief, *Bertha Arana Glatt et al. v. City of Pasco et al.,* No. 4:16-CV-05108, United States District Court, E.D. Washington, 2016.

City Council."[125] A single Latino had twice been elected to the council, but they ran

unopposed.[126] It is important to note that the election of one minority candidate does not

guarantee that the community is able to exercise meaningful political power, or that their

representation is substantive.[127] Because of the evidence presented, Pasco city officials "admitted

liability and consented to the court's finding that the City's existing at-large method of electing

all its members to the Pasco City Council violated Section 2 of the VRA by diluting the electoral

power of Pasco's Latino voters" and agreed "to file a consent decree with the federal court" to

modify the City's election system.[128] In 2017, as a remedy to this finding of Latino vote dilution,

the city created six-member voting districts and one at-large position, including three majority-

Latino districts.[129]

iv.     *Aguilar v. Yakima County (2020)*

By 2020, the Latino community comprised nearly half of Yakima County's total

population (49.3 percent) and one-third of the voting age population (31.4 percent), but only one

Latino candidate had ever been elected to the Board of Yakima County Commissioners, almost

---

[125] Kristin M. Kraemer, "ACLU sue Pasco, saying election system violates federal Voting Rights Act," *Tri-Cities Herald* (Pasco, Kennewick, and Richland, WA), August 4, 2016, https://www.tri-cityherald.com/article93813632.html. For demographic data, see U.S. Census Bureau, *American Community Survey 2014-2018 5-Year Estimates* (2019), https://data.census.gov/cedsci/.

[126] Gene Johnson, "Pasco's voting system weakens Latino voice, ACLU suit charges," *Seattle Times* (Seattle, WA), August 7, 2016, https://www.seattletimes.com/seattle-news/pascos-voting-system-weakens-latino-voice-aclu-suit-charges/.

[127] Lani Guinier, "The Triumph of Tokenism: The Voting Rights Act and the Theory of Black Electoral Success," *Michigan Law Review* 89:5 (1991), 1077-1154, Jason P. Casellas, "Latino Representation in U.S. Congress: To What Extent Are Latinos Substantively Represented," Presented at the 2002 Meeting of the Southern Political Science Association, Savannah, Georgia, November 6-8 2002), Sophia J. Wallace, "Examining Latino Support for Descriptive Representation: The Role of Identity and Discrimination," *Social Science Quarterly* 95:2 (2014), 311-327, and Nicholas O. Stephanopoulous, "Race, Place, and Power," *Stanford Law Review* 68 (2016), 1323-1408.

[128] *Glatt v. City of Pasco*, Case No. 4:16-CV-05108 (E.D. Wash. Jan. 27, 2017); Kristin M. Kraemer, "Pasco approves first step in getting federal fix for voting-rights issue," *Tri-Cities Herald* (Pasco, Kennewick, and Richland, WA), August 17, 2016, https://www.tri-cityherald.com/news/local/article96327547.html.

[129] Memorandum Opinion and Order, *Bertha Arana Glatt et al. v. City of Pasco et al.*, No. 4:16-CV-05108, United States District Court, E.D. Washington, 2016.

twenty years earlier.[130] In 2020, a group of Latino residents of Yakima County and the group OneAmerica filed a complaint under Washington's Voting Rights Act (WVRA) to challenge the at-large election system used to elect the three County commissioners, which denied Latino voters from electing a candidate of their choice to the board.[131]

The Latino voters argued that Latinos lived in "heavier concentrations in Yakima City and Sunnyside," representing an identifiable bloc of voters.[132] Moreover, they alleged that the at-large elections in Yakima County exhibited racially polarized voting, wherein Latino voters preferred Latino candidates while white voters preferred white candidates.[133] For example, in a couple of recent elections, Latino-preferred candidates won their primary races but were defeated

---

[130] Enrique Perez De La Rosa, "Déjà Vu All Over Again: Suit Alleges Latinx Voters Disenfranchised By Yakima County Election System," Northwest Public Broadcasting, July 13, 2020, https://www.nwpb.org/2020/07/13/deja-vu-all-over-again-suit-alleges-latinx-voters-disenfranchised-by-yakima-county-election-system/, and Jessica Perez, "Latino voters have a fighting chance for representation with changes coming to Yakima County's voting system," NBC Rights Now, September 1, 2021, https://www.nbcrightnow.com/news/latino-voters-have-a-fighting-chance-for-representation-with-changes-coming-to-yakima-countys-voting/article_f7633c6a-0b7d-11ec-89a2-5fe11b592346.html. For demographic data, see U.S. Census Bureau, *American Community Survey 2014-2018 5-Year Estimates* (2019), https://data.census.gov/cedsci/.

[131] Complaint for Injunctive Relief Under the Washington Voting Rights Act, *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019, Superior Court of Washington for Kittitas County, 2020. The Voting Rights Act of Washington reads, "The legislature finds that electoral systems that deny race, color, or language minority groups an equal opportunity to elect candidates of their choice are inconsistent with the right to free and equal elections as provided by Article I, section 19 and Article VI, section 1 of the Washington state Constitution as well as protections found in the Fourteenth and Fifteenth amendments to the United States Constitution. The well-established principle of 'one person, one vote' and the prohibition on vote dilution have been consistently upheld in federal and state courts for more than fifty years. The legislature also finds that local government subdivisions are often prohibited from addressing these challenges because of Washington laws that narrowly prescribe the methods by which they may elect members of their legislative bodies. The legislature finds that in some cases, this has resulted in an improper dilution of voting power for these minority groups. The legislature intends to modify existing prohibitions in state laws so that these jurisdictions may voluntarily adopt changes on their own, in collaboration with affected community members, to remedy potential electoral issues so that minority groups have an equal opportunity to elect candidates of their choice or influence the outcome of an election. The legislature intends for this chapter to be consistent with federal protections that may provide a similar remedy for minority groups. Remedies shall also be available where the drawing of crossover and coalition districts is able to address both vote dilution and racial polarization." See Voting Rights Act, RCW 29A.92, Washington State Legislature, https://app.leg.wa.gov/RCW/default.aspx?cite=29A.92.

[132] Complaint for Injunctive Relief Under the Washington Voting Rights Act, *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019, Superior Court of Washington for Kittitas County, 2020, 5.

[133] *Id.* at 6.

in the general elections.[134] Debra Manjarrez in 2016, "won the four-way primary for District 2 with 36% of the votes, while Commissioner Ron Anderson followed with 30% of votes."[135] Then, in 2018, Susan Soto Palmer "won the seven-way primary with 26% of the votes while Commissioner Norm Childress followed with 18%."[136] However, both Anderson and Childress went on to win the general elections, defeating Latino-preferred candidates Manjarrez and Soto Palmer.[137] Plaintiffs also presented evidence demonstrating the "probative factors" relevant under the WVRA, including but not limited to a history of discrimination, voting procedures that enhance discrimination, effects of past discrimination and disparities in voter registration and turnout, racial appeals, and a lack of responsiveness by county officials.[138]

   In August 2021, prior to the scheduled trial for the case, the parties settled with the Yakima County Board of Commissioners, stipulating that there was "sufficient evidence from which the Court could find a violation of the Washington Voting Rights Act" and agreed to replace its at-large election system with single-member districts, including one majority-Latino district.[139]

### v.   Portugal v. Franklin County (2022)

   In Franklin County, the Latino population had increased to almost 54 percent of the County's total  population in 2020 and 34 percent of eligible voters.[140] Yet Latino residents such

---

[134] Phil Ferolito, "One America sues Yakima County, saying voting system disenfranchises Latinos," *Yakima Herald-Republic* (Yakima, WA), July 13, 2020, https://www.yakimaherald.com/news/local/oneamerica-sues-yakima-county-saying-voting-system-disenfranchises-latinos/article_89d36911-eb29-51fe-9812-f8527aa3256a.html.
[135] *Id.*
[136] *Id.*
[137] *Id.*
[138] Plaintiffs' Motion for Summary Judgment, *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019, Superior Court of Washington for Kittitas County, 2021.
[139] Motion to Approve Settlement and Enter Final Judgment, October 21, 2021, *Aguilar et al. v. Yakima County*, No. 20-2-00180-19, Superior Court of Washington for Kittitas County, 2.
[140] U.S. Census Bureau, *American Community Survey 2014-2018 5-Year Estimates* (2019), https://data.census.gov/cedsci/.

as Ana Ruiz Peralta, who was in the top two vote-getters in the primary election and advanced to, but lost the general election for a commissioner seat, stated that the county's Latino population (who predominantly live in Pasco) "didn't see any representation" on the Board of Commissioners.[141] To challenge the dilution of their voting strength, a group of Latinos sued Franklin County.[142] One of the Plaintiffs argued that the "districts and election process [made] it impossible for Latinos in the county to elect a candidate" of choice.[143]

Moreover, Latino Plaintiffs in their lawsuit alleged that Franklin County's "hybrid district and at-large election models [diluted] the voting power of the Latino community" and cracked the Latino community into three districts.[144] Although the Latino community was "large enough and sufficiently geographically compact to comprise a majority-minority district," it was split and as a result, the system of election diluted their voting strength. Additionally, the Plaintiffs alleged that Franklin County Commissioner elections exhibited racially polarized voting between 2008 and 2020.[145]

In 2022, Franklin County and the Latino Plaintiffs settled, reaching an agreement that would keep "most of east Pasco, which is heavily Latino, inside a single district rather than being divided among all three districts."[146] The agreement also stated that starting in 2024, all future elections for Franklin County's commissioners will be conducted using single-member districts

---

[141] Nina Shapiro, "Voting-rights battle in Washington state raised allegations of diluting Latino votes," *Seattle Times* (Seattle, WA), May 16, 2021, https://www.seattletimes.com/seattle-news/politics/voting-rights-battle-in-washington-state-raises-allegations-of-diluting-latino-votes/.

[142] Cameron Probert, "Franklin County sued for elections that discriminate against Latino voters," *Tri-Cities Herald* (Pasco, Kennewick, and Richland, WA), May 4, 2021, https://www.tri-cityherald.com/news/politics-government/article250897179.html.

[143] Cameron Probert, "Franklin County lawsuit settlement looks to give voters more of a voice," *Tri-Cities Herald* (Pasco, Kennewick, and Richland, WA), May 12, 2022, https://www.tri-cityherald.com/news/politics-government/election/article261301917.html.

[144] Amended Complaint for Injunctive Relief Under the Washington Voting Rights Act, *Portugal et al. v. Franklin County et al.,* No. 21-2-50210-11, Superior Court of Washington for Franklin County, 2021, 2.

[145] *Id.* at 8.

[146] Cameron Probert, "Franklin County lawsuit settlement looks to give voters more of a voice."

for both the primary and general elections.[147] The County also agreed to a draw a district map

that does not crack the Latino vote.[148]

### C.  Lack of Bilingual Ballots and Assistance Despite VRA of 1975

Additionally, the state's and local jurisdictions' historical failure to provide information

and election materials to voters with limited English skills, including Latinos, has hampered their

opportunities to fully participate in elections.[149] Language accommodation is crucial for

"democratic participation and political empowerment for all citizens."[150] After the state's English

literacy test was banned under the amended Voting Rights Act of 1970, Latino voters in Central

Washington were not provided with language accommodations.[151] For example, during the

United Farm Worker Cooperative's 1972 voter registration drive, organizers realized that many

were unaware that literacy tests were no longer allowed or that the residency requirement had

changed from ninety to sixty days.[152] While voters whose primary language was English

benefitted from being aware of registration changes, residency requirement changes, pertinent

voting issues, voting locations, candidate filing information, and/or election results, Latino voters

---

[147] Cameron Probert, "Franklin County agrees to settle voting rights lawsuit. Elections will change," *Tri-Cities Herald* (Pasco, Kennewick, and Richland, WA), May 4, 2022, https://www.tri-cityherald.com/news/politics-government/article261045947.html. Joint Order Approving Settlement and Order of Dismissal, *Portugal et al. v. Franklin County et al.,* No. 21-2-50210-11, Superior Court of Washington for Franklin County, 2021.
[148] *Id.*
[149] In 1975, when the Voting Rights Act was expanded to include coverage for language minorities, Congress determined that the nation's education system had failed to properly educate racial minorities. In certain jurisdictions, it was evident that language minorities had higher illiteracy rates than the national average. See, "The Voting Rights Act, Ten Years After: A Report of the United States Commission on Civil Rights," United States Commission on Civil Rights (Washington D.C., 1975).
[150] Angelo N. Ancheta, "Language Accommodation and the Voting Rights Act," *California Law Review-Berkeley Law* (2007), https://www.law.berkeley.edu/files/ch_11_ancheta_3-9-07.pdf.
[151] Voting Rights Act of 1965, Public Law 89-110, codified as amended at 42 U.S.C. (1970).
[152] Jesus Lemos, "A History of the Chicano Political Involvement" (Master's Thesis, University of Washington, 1974), 101.

whose dominant language was not English were unaware of this information and therefore unable to exercise the right to vote equally.[153]

In January of 1975, the U.S. Commission on Civil Rights published a report called "The Voting Rights Act: Ten Years After." Their findings acknowledged that the "registration of Spanish-speaking voters throughout the United States [lagged] behind that of blacks and well behind that of whites."[154] To address the cultural challenges facing citizens with limited English proficiency, Congress in 1975 extended the VRA of 1965 and included Section 203, which required counties with more than 10,000 residents or over 5 percent of the population with limited English skills to provide bilingual "registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots" to bring these citizens into the voting process.[155]

In 1976, Yakima County was "designated by the Director of the Census as a jurisdiction subject to the requirement of Section 203 for persons of Spanish heritage."[156] And according to former Yakima County Auditor Bettie Ingram, Yakima County provided voting ballots in Spanish from 1976 to 1982.[157] Although the county provided bilingual ballots for six years, it failed to fully comply with Section 203 by not proving bilingual assistance at county offices and polling places.[158] Despite the availability of Spanish ballots, with no bilingual personnel to act as

---

[153] The archived state's voters' pamphlets from the 1914-2002 all appear to be published in English only. Starting in 2003, the pamphlets include a reference that the information was available in languages other than English. See "Elections: Archived Voters' Pamphlets since 1914," Washington Secretary of State, https://www.sos.wa.gov/elections/voters-pamphlets.aspx.

[154] United States Commission on Civil Rights, *1975 Commission on Civil Rights Report*, Washington: U.S. Government Printing Office, 1975, 57.

[155] Voting Rights Act Amendments of 1975, Voting Rights Act, Section 203, Public Law No. 94-73.

[156] *United States of America v. Yakima County, Corky Mattingly, Yakima County Auditor, et al*., CV-04-3072-LRS, Eastern District of Washington, Yakima Division, 2004.

[157] Tom Roeder, "Yakima County Had English, Spanish Ballots 20 Years Ago," *Yakima Herald-Republic* (Yakima, WA), August11, 2002.

[158] Tom Roeder, "Yakima County Had English, Spanish Ballots 20 Years Ago," *Yakima Herald-Republic* (Yakima, WA), August 11, 2002, and Luis Ricardo Fraga, "Expert Report Submitted on Behalf of Plaintiffs in Montes v. City

mediators in the registration process, Latinos in Yakima County were less likely to turn out to vote. In Yakima, Washington, the county's largest city, a full-time bilingual coordinator would be hired only in 2004.[159] Prior to that hiring, Latinos with limited English skills had no help to effectively participate in electoral politics.

After decades of Washington and, in particular, Yakima County, doing little to nothing to enable Latino registration and voting, the Department of Justice (DOJ) intervened in 2002.[160] The DOJ observed that the County's Latino population from 1990 to 2000 grew by 77 percent, and "over the same period, the number of people who said they didn't speak English well doubled from 8 to 16 percent of the population."[161] Therefore, in 2002, county officials were formally notified by the DOJ that Yakima County had to provide bilingual materials to voters with limited English skills under Section 203.[162] Subsequently, Yakima County officials were "mandated" to provide bilingual ballots and hire bilingual registrars to assist Latino voters.[163]

In 2004, the Justice Department released a report stating that the county had made progress but found that "hostility to bilingual election workers and Spanish-speaking voters continues to be an issue in Yakima County."[164] The DOJ filed a complaint against Yakima for violating Section 203 of the Voting Rights Act and outlined the County's deficiencies.[165] Prior to the case's adjudication, the county reached an agreement with the DOJ that it did "not admit to

---

of Yakima," *Rogelio Montes and Mateo Arteaga et al. v. City of Yakima et al.*, No. 12-CV-3108-TOR, United States District Court, E.D. Washington, 2014, 41-42.

[159] Lázaro Cárrion, "Voting Rights of Latinos in Yakima and Enforcement by the State," *The State of the State for Washington Latinos*, Whitman College, 2008, walatinos.org.

[160] Tom Roeder, "Bilingual Election Ballots Mandated: Demographic Changes in Yakima County Trigger Change Under Voting Rights Act," *Yakima Herald-Republic* (Yakima, WA), August 3, 2002.

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] "County Makes Progress in Helping Spanish-Speaking," *Seattle Post-Intelligencer* (Seattle, WA), October 25, 2004.

[165] Complaint, *United States of America v. Yakima County, Corky Mattingly, Yakima County Auditor, et al*., Civic No. CV-04-3072-LRS, United States District Court for Eastern District Yakima Division, July 6, 2004.

the allegations of the complaint" but agreed to comply with the recommendations of the Justice Department in a consent decree.[166]

Presently, King, Adams, Franklin, and Yakima counties are required to provide bilingual materials and assistance to Latino voters under Section 203.[167] Latino voters in Washington, particularly those with limited English skills, continue to face language barriers to register and vote. The percent of Spanish speakers with limited English proficiency (LEP) is 38.1.[168] And studies have shown that LEP voters have much lower participation rates than non-LEP voters.[169] To increase their registration and turnout rate, residents in Franklin County have argued that city council meetings (especially related to redistricting) need to be translated from English to Spanish.[170] Israel Delamor stated, "I keep hearing that people are not getting information. So, if I am somebody speaking Spanish, how can I get this information that needs to be provided. If we are trying to reach the Latino community, how can I access that? Is it being accessible in Spanish too?" Unfortunately, in places like Yakima County and Franklin County, city meetings will continue to be conducted in English only, to the detriment of its LEP constituents.

Over the last several decades, there have been multiple court cases in Washington's Yakima Valley and Pasco areas challenging English literacy tests, at-large elections systems, and

---

[166] Consent Decree, *United States of America v. Yakima County, Corky Mattingly, Yakima County Auditor, et al.*, CV-04-3072-LRS, United States District Court for Eastern District Yakima Division, September 3, 2004, 4.

[167] U.S. Census Bureau, Determinations Under Section 203, Federal Register Notice (Dec. 8, 2021, https://www.govinfo.gov/content/pkg/FR-2021-12-08/pdf/2021-26547.pdf; Joy Borkholder, "Investigation finds Latino ballots in WA more likely to be rejected," *Crosscut*, February 15, 2021, https://crosscut.com/politics/2021/02/investigation-finds-latino-ballots-wa-more-likely-be-rejected.

[168] State Immigration Data Profiles: Washington (2019) and United States (2019), Migration Policy Institute, https://www.migrationpolicy.org/data/state-profiles/state/language/WA/US.

[169] Terin M Barbas, "We Count Too-Ending the Disenfranchisement of Limited English Proficiency Voters," *Florida State University Law Rev.* 37 (2009): 189, and Jocelyn Benson Friedrichs. "Su Voto es su Voz-Incorporating Voters of Limited English Proficiency into American Democracy," *Boston College Law Review* 48 (2007): 251.

[170] Johanna Bejarano, "Franklin County Latino Population Wants More Redistricting Information in Spanish," Northwest Public Broadcasting, October 15, 2021, https://www.nwpb.org/2021/10/15/franklin-county-latino-population-wants-more-redistricting-information-in-spanish/.

the lack of bilingual materials and assistance. These cases and the circumstances surrounding

them provide evidence of the extensive history of voting-related discrimination against Latinos

in Washington and, in particular, in the cities of Yakima and Pasco.

**Senate Factor 3: Voting Practices or Procedures That Tend to Enhance the Opportunity for Discrimination**

There is evidence of historical and contemporary voter suppression tactics that obstruct

Latino voters' ability to fully and effectively cast a ballot, such as off-year elections and

disproportionate signature rejections.

**A.  Off-Year Elections**

Voter registration and turnout statistics in Yakima and Franklin Counties demonstrate

that Latino voting power in the 15th legislative district is weakened because more state legislative

elections occur during non-presidential years, when the voter turnout including that of Latino

voters is lowest. Even in presidential years, where voter turnout rates tend to be higher for Latino

and white voters, turnout rates of Latino voters in Yakima County are lower when compared

with white voters (see Table 2). In Yakima County, where election turnout data is available by

Spanish surname, there is clear evidence that the voter turnout rate is much lower for Latinos in

non-presidential election years than in presidential election years.[171] According to the County's

own data, in elections from 2016 to 2020, voters with non-Spanish surnames voted at twice the

rate or higher than Spanish surname voters.[172] And overall in the state, Table 3 illustrates that

voter registration among Latinos is lower than white voters.[173]

---

[171] "Turnout Statistics" and "Voting by Surname," Yakima County Webpage, https://www.yakimacounty.us/1120/Turnout-Statistics.
[172] *Id.*
[173] "Voting and Registration in the Election of 2020," U.S. Census Data, April 2021, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html.

Off-year elections therefore act to enhance the opportunity for discrimination against Latinos, as there continues to be "a very low amount of Latino or specifically Spanish surname voter turnout in the Yakima Valley."[174] Because Latinos register at lower rates than whites and their turnout is lower especially in non-presidential election years, their chance of electing a preferred candidate is drastically reduced.

**Table 2: Yakima County Voter Turnout Rates (General Election Results Only)[175]**

|  | Presidential Election Year (Y or N) | Registered Voters | Total Ballots Cast | County Turnout Rate | Non-Spanish Surname Turnout | Spanish Surname Turnout Rate |
|---|---|---|---|---|---|---|
| **Yakima County** |  |  |  |  |  |  |
| 2020 | Yes | 127,692 | 96,985 | 75.95% | 84% | 56% |
| 2019 | No | 119,198 | 13,026 | 27.65% | 40% | 16% |
| 2018 | No | 115,873 | 71,585 | 61.78% | 70% | 41% |
| 2017 | No | 114,669 | 32,207 | 28.09% | 34% | 13% |
| 2016 | Yes | 114,075 | 80,912 | 70.93% | 76% | 56% |

**Table 3: Reported Voting and Registration Between Latinos and Whites in the Elections of November 2014, 2016, 2018, and 2020 in Washington[176]**

|  | Percent Registered (citizen) | Percent Voted (citizen) |
|---|---|---|

[174] Johanna Bejarano, "Concerns About Low Voter Turnout Amongst Latinos in Washington," Northwest Public Broadcasting, https://www.nwpb.org/2022/03/29/concerns-about-low-voter-turnout-amongst-latinos-in-washington-state/.

[175] "Turnout Statistics" and "Voting by Surname," Yakima County Webpage, https://www.yakimacounty.us/1120/Turnout-Statistics, and "Election Results," Frank County Auditor's Office Webpage, http://www.co.franklin.wa.us/auditor/elections/electionresults.php.

[176] "Voting and Registration in Election of 2014, U.S. Census Data, July 2015, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html, Voting and Registration in the Election of 2016," U.S. Census Data, May 2017, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html, "Voting and Registration in Election of 2018, "U.S. Census Data, April 2019, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html, and "Voting and Registration in the Election of 2020," U.S. Census Data, April 2021, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html.

| 2020 | | |
|---|---|---|
| White | 78.2% | 75.0% |
| Latino | 61.0% | 53.7% |
| 2018 | | |
| White | 74.6% | 63.4% |
| Latino | 57.2% | 43.7% |
| 2016 | | |
| White | 78.2% | 69.5% |
| Latino | 62.9% | 47.2% |
| 2014 | | |
| White | 71.6% | 53.0% |
| Latino | 44.8% | 25.1% |

## B.  Disproportionate Signature Rejection

A non-profit agency recently uncovered that Latino voters in Washington have a higher than average ballot signature rejection rate, and it is especially high in the Yakima Valley and Pasco region.[177] For the November 2020 election, Latinos had their ballots rejected for signature mismatch at "four times the rate of other voters" and in "eight counties, Latino voters contributed 17% of accepted ballots…but 46% of ballot rejection."[178] In Yakima County, Latino voters' ballots were rejected 7.5 times more than other voters and in Franklin County, the rejection rate was 3.9 times greater for Latino voters.[179] Because the ballots of people with Spanish surnames

---

[177] Joy Borkholder, "Investigation finds Latino ballots in WA more likely to be rejected."
[178] Id.
[179] The rejection rate for the other six counties is: Adams, 4.2 percent, Benton, 3.4 percent, Chelan, 6.3 percent, Douglas, 10.4 percent, Grant, 5.1 percent, and Walla Walla, 3.8 percent. Joy Borkholder, "Investigation finds Latino ballots in WA more likely to be rejected."

(i.e. Latinos) are rejected at a higher rate than white people in the Yakima Valley and Pasco region, the use of verification of signatures places these voters at a disadvantage.[180] Latino voters in Benton, Yakima, and Chelan Counties have filed a lawsuit claiming that the "ballot signature matching provisions and processes" have a "discriminatory application," denying the voting rights of over 4,500 Latino voters in the November 2020 elections.[181]

### Senate Factor 5: Latinos Bear the Effects of Discrimination in Ways That Hinder Their Ability to Participate Effectively in the Political Process

There is a long history of discrimination in Central Washington, including the Yakima County and Pasco region, that has led to significant disparities between whites and Latinos that still exist today. As demonstrated below, Latinos in this region are at a disadvantage relative to whites in education, housing, socioeconomic status and employment, health, and criminal justice. These disparities hinder and limit the ability of Latino people to participate fully in the electoral process.

In the region assessed, I include statistical data for Adams, Benton, and Grant Counties (in addition to Yakima and Franklin Counties) because those counties are joined with the Yakima Valley and Pasco region in the enacted legislative districts 14 and 15. Much of the data gathered and analyzed comes from the American Community Survey, which annually produces statistical information.[182]

### A.  Education

---

[180] Mike Baker, "Rejected Mail Ballots Are Showing Racial Disparities," *New York Times* (New York, New York), February 2, 2022, https://www.nytimes.com/2022/02/02/us/mail-voting-black-latino.html.

[181] Kristine M. Kraemer, "Benton County officials sued for rejecting Latino voter ballots 3+ times more often," *Tri-City Herald* (Pasco, Kennewick, and Richland, WA), May 24, 2021, https://www.tri-cityherald.com/news/politics-government/election/article251484873.html, and Amended Complaint for Declaratory and Injunctive Relief, *Reyes, et al. v. Chilton, et al.*, No. 4:21-CV-5075, United States District Court, E.D. Washington, May 7, 2021.

[182] "Design and Methodology Report," American Community Survey, U.S. Census Bureau, https://www.census.gov/programs-surveys/acs/methodology/design-and-methodology.html.

Washington has a history of segregation and discrimination in its education system, the impact of which continues today. Although *Brown v. Board of Education* (1954) outlawed segregation, ethnic Mexicans in K-12 schooling have and continue to be "linguistically segregated" as school officials in Washington (and other states) label these students as "English language learners" (ELL), many of whom come from migrant farm worker backgrounds.[183] This has resulted in the segregation of ELL in schools, limiting their "exposure to English of their non-ELL counterparts."[184] For example, in June 1970, the Washington State Board Against Discrimination (WSBAD) conducted an investigation into the North Franklin and Kahlotus School Districts located in Franklin County.[185] The report stated that the North Franklin School District seemed unwilling to accept Latino migrant students unless they were placed in a segregated school. The school district identified a building for ELL but insisted that the state had to provide the district with $41,000 to re-open the facility. According to the report by WSBAD, a labor leader commented that placing these students in a different school "would be against the law since this would be a segregated school."[186] State officials declined the proposal by the Franklin School District. Instead, the migrant children were accepted at the Kahlotus School District where they fared no better. Hebert Valdez, Director of the Kahlotus Migrant Program,

---

[183] Beatriz Arias, "School Desegregation, Linguistic Segregation, and Access to English for Latino Students," *Journal of Educational Controversy* 2:1 (2007), https://cedar.wwu.edu/cgi/viewcontent.cgi?article=1034&context=jec. On Chicanos and school segregation, see David G. García, *Strategies of Segregation: Race, Residence, and the Struggle for Educational Equality* (University of California Press, 2018); and Richard R. Valencia, *Chicano Students and the Courts: The Mexican American Legal Struggle for Educational Equality* (United Kingdom: NYU Press, 2010). Brown v. Board of Education (1954) prohibited the segregation of schools based on race. See, *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954).

[184] Beatriz Arias, "School Desegregation, Linguistic Segregation, and Access to English for Latino Students," 9.

[185] "The Kahlotus School District's Migrant Program, March 2 to June 2, 1970, A Report of an Investigation Conducted by the Washington State Board Against Discrimination from May 28 to June 18, 1970," Theresa Aragon de Shepro papers, Box 2, Folder 8, Record Group No. 19.16.2913. Special Collections, University of Washington Libraries, Seattle, Washington.

[186] The Kahlotus School District's Migrant Program, March 2 to June 2, 1970, A Report of an Investigation Conducted by the Washington State Board Against Discrimination from May 28 to June 18, 1970," Theresa Aragon de Shepro papers.

would write to Washington's Superintendent that the students were segregated, provided with limited instructional materials, district staff had no training related to the needs of migrant students, and no certificated teacher was hired to instruct the students.[187] After Valdez raised the issue of segregation, he was immediately terminated by the Kahlotus School District's superintendent.[188]

  With a keen understanding that Chicano youth faced numerous barriers in Washington's K-12 education system including segregation, Chicano college and university students have demanded that school administrators recruit, retain, and graduate more Chicano students. At institutions of higher education, including the University of Washington, Washington State University, and Yakima Valley College (formerly Yakima Valley Community College), students have protested and occupied buildings to bring attention to their issues.[189]

  Gaps in educational opportunities and attainment between Latino and white students are not relics of the twentieth century. In 2018, Latino students had a four-year high school graduation rate of 75.2 percent, which was lower than their white counterparts who graduated at a rate of almost 83 percent.[190] And of the 12,858 Latino students who received a diploma, only 99 graduated with their associate degree (0.77 percent).[191] Of the 39,549 white students who

---

[187] Letter from Hebert Valdez to Dr. Louis Bruno, Superintendent, Theresa Aragon de Shepro papers, Box 2, Folder 8, Record Group No. 19.16.2913. Special Collections, University of Washington Libraries, Seattle, Washington.
[188] "Migrant School Head Suspended," *Tri-City Herald* (Pasco, Kennewick, Richland, WA), May 25, 1970.
[189] On the Chicano Student Movement in Washington State see: Oscar Rosales Casteñeda, "El Movimiento in Washington State: Activism in the Yakima Valley and Puget Sound regions," in *We Are Aztlán: Chicanx Histories in the Northern Borderlands*, edited by Jerry Garcia (Washington State University Press, 2017), and Oscar Rosales Casteñeda, "The Chicano Movement in Washington State, 1967-2006," *The Seattle Civil Rights and Labor History Project*, University of Washington, https://depts.washington.edu/civilr/Chicanomovement_part1.htm; and Daniel Estrada and Richard Santillan, "Chicanos in the Northwest and the Midwest United States: A History of Cultural and Political Commonality," *Perspectives in Mexican American Studies* 6 (1997): 194-227.
[190] Deb Came, "Report to the Legislature: Graduation and Dropout Statistics," Office of Superintendent of Public Instruction, 2019, https://www.k12.wa.us/sites/default/files/public/communications/2019-01-GraduationDropoutStatistics.pdf, 6.
[191] *Id.*

received a diploma, 678 (1.71 percent) received their associate degree.[192] With respect to dropout rates, an estimated 15 percent of Latinos left school early, in comparison with 9.9 percent of whites.[193]

Racial discrimination and a lack of resources have contributed to the gaps in educational opportunities for Latino students. Latino parents encounter significant communication barriers with school staff and teachers because bilingual services are not always available.[194] In response to Latino parents' grievances, the state has only recently passed a "new law [that] requires school districts to create plans for helping families access interpretation services for parents when they must speak with school officials."[195]

Moreover, Latino students in the K-12 education system face racial discrimination that hinders their academic potential. In 2005, Latino parents litigated against the Brewster School District in Brewster, Washington. Their case argued that "Offensive comments, name-calling, graffiti and derogatory jokes about Latinos are tolerated and accepted by district administrators and employees; The school district implemented a curriculum that demeans Latino students; Teachers have inappropriately used racially demeaning language in class; [and] No meaningful racial harassment or diversity training has been provided."[196] The case was settled and the

---

[192] *Id.*
[193] Deb Came, "Report to the Legislature: Graduation and Dropout Statistics," 11.
[194] Francis Contreras, "Education," *Washington State Latino/Hispanic Assessment Report, 2009-2010*, Washington State Commission on Hispanic Affairs, https://static1.squarespace.com/static/5915f65ed482e94b3f60b25f/t/5bef266df950b73a0a722bf5/1542399602953/2009-2010+CHA+Assessment+Report+-+English.pdf, 24.
[195] Venice Buhain, "Family access to interpreters in schools expands under new WA laws," *Crosscut*, April 26, 2022, https://crosscut.com/news/2022/04/family-access-interpreters-schools-expands-under-new-wa-laws.
[196] "Parents sue district over treatment of Latinos," *Seattle Times* (Seattle, WA), November 2, 2005.

district was required to take effective steps to prevent discrimination against its Latino student body.[197]

In Adams, Benton, Franklin, Grant, and Yakima Counties, there remain stark educational attainment differences between Latino and white residents (see Table 4). An estimated 45 percent of Latinos in Adams County have a high school diploma versus 90 percent of white residents. And while 90 percent of white people have a bachelor's degree or higher, a much smaller percentage of Latinos (26.2 percent) have received the same degree. In Benton County, only about 72 percent of Latino people have a high school diploma, compared to nearly 94 percent of white residents (a difference of 22 percent). A comparable disparity exists in the percentage of residents who have a bachelor's degree or higher, with the rate for white residents (32 percent) being more than double that of Latino residents (14 percent). In Franklin County, 56 percent of Latinos had a high school diploma, compared to 95 percent of whites. And only seven percent of Latinos have a bachelor's degree, which is more than three times lower than the rate for white residents (28 percent). An estimated 52 percent of Latinos in Grant County have a high school diploma in comparison to 88 percent of white residents. And while 21 percent of white people have a bachelor's degree or higher, a smaller percentage of Latinos (7.9 percent) have received the same degree. Similar trends appear in Yakima County, where the percentage of Latino people who have graduated from high school is 50 percent versus 77 percent for whites. And only six percent of Latino people in Yakima County possess a bachelor's degree or higher, a rate which is less than a third than that of whites (19.5 percent).

---

[197] "Discrimination lawsuit settled in Brewster," *Wenatchee World* (Wenatchee, WA), October 16, 2006. Opinion of the Court, *Anna Mendoza et at. v. Brewster School District*, No. CV-05-327-RHW, United States District Court, E.D. Washington, December 27, 2006.

**Table 4. White and Latino Educational Inequalities in Adams, Benton, Franklin, Grant, and Yakima Counties, 2020[198]**

|  | Latino | White |
|---|---|---|
| **Adams County** |  |  |
| High School Graduate | 45.8% | 90.7% |
| Bachelor's Degree or Higher | 3.6% | 26.2% |
| **Benton County** |  |  |
| High School Graduate | 72.3% | 93.4% |
| Bachelor's Degree or Higher | 14.3% | 32.8% |
| **Franklin County** |  |  |
| High School Graduate | 55.8% | 95.0% |
| Bachelor's Degree or Higher | 7.0% | 28.2% |
| **Grant County** |  |  |
| High School Graduate | 51.9% | 88.0% |
| Bachelor's Degree or Higher | 7.9% | 21.3% |
| **Yakima County** |  |  |
| High School Graduate | 50.0% | 77% |
| Bachelor's Degree or Higher | 6.5% | 19.5% |

## B.  Housing

As discussed above on pages 11-20, historically and continuing into present day,

Washington's multi-billion-dollar agricultural industry, including food processing, has relied on

Latino workers including a sizeable migrant and seasonal labor force. The state ranks first in

---

[198] U.S. Census Bureau, *American Community Survey 5-Year Estimates Subject Tables*, 2020

U.S. production of eleven commodities, including apples, sweet cherries, pears, hops, and red raspberries.[199] These labor-intensive crops depend on farm workers because some cannot be harvested by machines. The dependence of the agricultural industry on Latino workers has contributed to the overall growth of Latino people in Washington (see Table 5).

**Table 5. Latino Population in Washington, 2000-2020[200]**

|  | 2000 | 2010 | 2020 |
|---|---|---|---|
| Total Population | 441,510 | 755,790 | 1,022,667 |
| % of State Population | 7.5% | 11.2% | 13.7% |

Although agriculture is a cornerstone of the state's economy, housing for Latino farm workers has been and continues to be scarce, inadequate, overcrowded, substandard, and sometimes entirely lacking. According to Washington's Department of Community, Trade, and Economic Development (CTED), rural communities are unable to provide sufficient housing for Latino migrant and seasonal workers. "During the peak harvest seasons [July-October], a critical shortage of housing forces hundreds of migrant workers and their families to live in substandard and overcrowded housing, or to camp illegally, posing health and safety hazards to themselves and to the community," stated the CTED.[201] The CTED's report titled, "Farmworker Housing in Washington State: Safe, Decent, and Affordable," explained that "for many years" the state had been aware of the housing crisis but had failed to provide a solution. In fact, in 1997, the *Seattle Post-Intelligencer*, one of the state's largest newspapers, used its front page to highlight the

---

[199] "Agriculture: A Cornerstone of Washington's Economy," Washington State Department of Agriculture, https://agr.wa.gov/washington-agriculture.

[200] "Washington Data and Research," Washington's Office of Financial Management Website https://ofm.wa.gov/washington-data-research/statewide-data/washington-trends/population-changes/population-hispaniclatino-origin.

[201] Janet Abbett, "Farmworker Housing in Washington State: Safe, Decent, and Affordable," Department of Community, Trade, and Economic Development, State of Washington, https://www.commerce.wa.gov/wp-content/uploads/2018/06/HTF-Reports-Farm-Worker-Housing-Report.pdf.

horrible housing conditions in Mattawa, Washington (in Grant County). The photographs

showed Latino farm workers and their families living outdoors along the Columbia River in

"makeshift plastic tents" and "cobbled-together cardboard walls" with no roof.[202]

Despite the severe need for Latino farm worker housing, the local white community has

been strongly opposed to the development of housing projects. In 2007, the Washington State

Human Rights Commission (WSHRC) announced that the agency was "increasingly concerned

about race and national origin discrimination against farmworkers in the area of housing."[203] The

WSHRC collected statements that demonstrated white people's opposition to building farm

worker housing.

> The Office of Rural and Farmworker Housing, a non-profit advocacy
> organization, filed two complaints with the WSHRC in 2002.  The
> complaints were referred to the US Department of Justice due to their
> adverse impact on Hispanic farmworkers. Elements in both Pasco and
> Benton City attempted to prevent the construction of farmworker
> housing in their communities.  In the Benton City case, some
> members of the community itself voiced loud opposition to the
> housing and were on record as stating that they did not want Benton
> City to become like Mabton, a mostly Latino community.

> In May 2007, the WSHRC hosted a Commission forum in Shelton,
> WA.  A number of these attendees also spoke out about national
> origin discrimination in the area of housing.

> In July 2006, it was reported at a WSHRC forum that a contractor
> was renting a two bedroom house to 25 men at $200 a person in
> Sunnyside.

> In Wenatchee a trailer park was closed.  The owner generously offered
> to relocate the residents.  The community opposed it.  The owner was
> unable to relocate the trailer park.

> In Royal City in 2001, 22 farmworker housing complaints were filed
> with HUD.  The owner was charging inconsistent rents, giving fines

---

[202] "Their Homes Are Not Castles," *Seattle Post-Intelligencer* (Seattle, WA), November 23, 1997.
[203] "Farm Worker Housing and the Washington Law Against Discrimination," Briefing Paper, 2007, Washington State Human Rights Commission,
https://www.digitalarchives.wa.gov/do/9DCE950092FFF83BFAC8FF3CDB39E522.pdf,1.

for city ordinance violations, charging for children that worked in the fields. Nothing was done.

In Mattawa, singlewide trailer houses are divided into apartments and rented to farmworkers. There were reports of raw sewage on the ground.

In response to issues in Wenatchee, the WSHRC hosted a community forum in September 2007. Forum attendees spoke about many of the same issues, including lack of running water and electricity, unhealthy living conditions, shortage of housing, families forced to live in the orchards, and a neighborhood lawsuit to stop the construction of temporary migrant farmworkers in a neighborhood.[204]

The white community claimed that farm worker housing would create a high-density area of low-income housing and often used zoning rules and other regulations to prevent the construction of new housing.[205] Their actions, however, were not without a racial effect. It ensured that their communities would remain exclusively white neighborhoods.

In Yakima County, affordable housing for Latinos continues to be a challenge. Construction came to a standstill during the 2008 housing crisis and, "combined with a growing population and a small tax base with which to develop roads and infrastructure for new development, meant demand for housing outstripped supply," the county never fully recovered, stated the county's human services director.[206] The lack of housing units has contributed to Yakima County's homeless population, which doubled between 2019 to 2020.[207] Furthermore, in the City of Yakima, its city council is looking into how "a housing repair program funded by federal dollars" disproportionally helped white families.[208] "Of the 87 families assisted by the

---

[204] *Id.* at 3-4.
[205] *Id.* at 4.
[206] Sydney Brownston, "Washington State's Rise in Homelessness Outpaced the Nation's, According to Report," *Seattle Times* (Seattle, WA), March 20, 2021.
[207] *Id.*
[208] Kate Smith, "Yakima City Council directs committee to review housing program after reported ethnic disparity," *Yakima Herald-Republic* (Yakima, WA), May 4, 2022, https://www.yakimaherald.com/news/local/yakima-city-council-directs-committee-to-review-housing-program-after-reported-ethnic-disparity/article_d9b4cbc7-e1ce-51a0-bc0b-95cfab5a5218.html.

program in 2021, about 96 percent of the families were white and about 25 percent of the families were Hispanic," according to U.S. Office of Housing and Urban Development.[209]

Given these and other factors, there are substantial inequalities in homeownership rates between Latinos and whites in the five selected counties (see Table 6). The white homeownership rate is 72 percent in Adams County, but its only 44 percent for Latinos. In Benton County, the white ownership rate is 87 percent while the Latino rate is drastically low at 12 percent. The homeownership percentage for whites in Franklin is 76 percent but only 35 percent for Latinos. The white homeownership is 79 percent versus 25 percent for Latinos in Grant County. And in Yakima County, 81 percent of whites reported owning their home, whereas the ownership rate for Latinos was 30 percent. The disparity in percentage of points in homeownership between whites and Latinos was almost 28 (Adams), 75 (Benton), 40 (Franklin), 54 (Grant) and 51 (Yakima).

**Table 6. White and Latino Homeownership Rates in Adams, Benton, Franklin, Grant, and Yakima Counties, 2020[210]**

|  | Latino | White |
|---|---|---|
| **Adams County** |  |  |
| Homeownership Rate | 44.9% | 72.6% |
| **Benton County** |  |  |
| Homeownership Rate | 12.2% | 87.1% |
| **Franklin County** |  |  |
| Homeownership Rate | 35.4% | 76.2% |
| **Grant County** |  |  |
| Homeownership Rate | 24.8% | 79.3% |

---

[209] *Id.*
[210] U.S. Census Bureau, *American Community Survey 5-Year Estimates Subject Tables*, 2020

| Yakima County | | |
|---|---|---|
| Homeownership Rate | 30.6% | 81.8% |

## C.  Socioeconomic Status and Employment

Latinos in Adams, Benton, Franklin, Grant, and Yakima Counties also experience adverse outcomes when it comes to socioeconomic status and employment. There are significant disparities in median household income and poverty levels in those counties (see Table 7). In Adams County, the median income for Latinos was $47,889 compared to $55,460 for whites with a difference of $7,571. On average, 29.9 percent of Latino people in Adams County live below the poverty line compared to only 18.7 percent of whites. Whites have a median income of $74,706 in Benton County, while for Latinos it is much lower at $51,590. The disparity is $23,116. Additionally, in this county, only 8.6 percent of whites live below the poverty line, whereas 21.6 percent of Latinos do. In Franklin County, the median income for Latinos was $56,321 compared to $71,882 for whites with a difference of $15,562. On average, 18.8 percent of Latino people in Franklin County live below the poverty line compared to only 10.9 percent of whites. Similar patterns are observable in Grant County where the median household income is $64,530 for whites versus $50,143 for Latinos. In Grant County, 21 percent of Latinos have incomes below the poverty level compared with just 12.4 percent of whites. For Yakima County, whites had a median household income of $56,287 whereas Latinos had an income of only $49,523. Further, 20.5 percent of Latino people in Yakima County live below the poverty level, compared to 14.3 percent of whites.

**Table 7. White and Latino Median House Incomes and Poverty Rates in Adams, Benton, Franklin, Grant, and Yakima Counties, 2020[211]**

|  | Latino | White |
|---|---|---|
| **Adams County** |  |  |
| Median Household Income | $47,889 | $55,360 |
| Below Poverty Level | 29.9% | 18.7% |
| **Benton County** |  |  |
| Median Household Income | $51,859 | $74,706 |
| Below Poverty Level | 21.6% | 8.6% |
| **Franklin County** |  |  |
| Median Household Income | $56,321 | $71,882 |
| Below Poverty Level | 18.8% | 10.9% |
| **Grant County** |  |  |
| Median Household Income | $50,143 | $64,530 |
| Below Poverty Level | 21.0% | 12.4% |
| **Yakima County** |  |  |
| Median Household Income | $49,523 | $56,287 |
| Below Poverty Level | 20.5% | 14.3% |

There are also noticeable socio-demographic disparities in relation to rates of unemployment in Adams, Benton, Franklin, Grant, and Yakima Counties (see Table 8). Across all five counties, Latino people on average had higher unemployment rates than whites.

---

[211] U.S. Census Bureau, American Community Survey, *5-Year Estimates Subject Tables*, 2020

**Table 8. White and Latino Unemployment Rates in Adams, Benton, Franklin, Grant, and Yakima Counties, 2020**[212]

| | Latino | White |
|---|---|---|
| **Adams County** | | |
| Unemployment Rate | 6.5% | 5.9% |
| **Benton County** | | |
| Unemployment Rate | 6.9% | 4.9% |
| **Franklin County** | | |
| Unemployment Rate | 6.5% | 5.3% |
| **Grant County** | | |
| Unemployment Rate | 6.4% | 5.0% |
| **Yakima County** | | |
| Unemployment Rate | 8.3% | 5.2% |

### D.  Health

Although health care coverage and access to care among Latinos has improved since the passage of the Affordable Care Act in 2010, "the uninsured rate among Latinos [in the U.S.] is still more than double that among non-Latino Whites (20 vs. 8 percent in 2019)."[213] Similar to this nationwide trend, Latino people in Washington are uninsured at much higher rates compared to whites (see Table 9). The health care disparity was greatest in Grant County with a 13 percentage point difference, followed by a twelve percent difference in Adams, nine percent in Grant, eight percent in Franklin, and seven percent in Yakima. At least in part because of this lack of access, Latino health care providers such as the Yakima Valley Farm Workers Clinic and

---

[212] U.S. Census Bureau, *American Community Survey 5-Year Estimates Subject Tables*, 2020
[213] "Health Insurance Coverage and Access to Care Among Latins: Recent Trends and Key Challenges," Office of Health Policy, Issue Brief, October 8, 2021, https://aspe.hhs.gov/sites/default/files/documents/68c78e2fb15209dd191cf9b0b1380fb8/ASPE_Latino_Health_Coverage_IB.pdf.

Sear-Mar Community Health Center reported that Latinos sought health care mostly in emergency situations instead of using preventative health.[214]

**Table 9. White and Latino Uninsured Healthcare Rates in Adams, Benton, Franklin, Grant, and Yakima Counties, 2020[215]**

|  | Latino | White |
|---|---|---|
| **Adams** |  |  |
| Uninsured Healthcare Rate | 21.9% | 8.8% |
| **Benton County** |  |  |
| Uninsured Healthcare Rate | 15.4% | 6.0% |
| **Franklin County** |  |  |
| Uninsured Healthcare Rate | 20.2% | 11.3% |
| **Grant County** |  |  |
| Uninsured Healthcare Rate | 20.6% | 7.0% |
| **Yakima County** |  |  |
| Uninsured Healthcare Rate | 18.6% | 10.8% |

Latinos, especially farm workers, were also disproportionally impacted by COVID-19. Although Latinos were only 13 percent of the population, they were almost half of the state's COVID-19 cases.[216] Some Latino farm workers were hesitant to get tested because "they were under the impression they would have to pay to get tested for COVID-19."[217] Latino leaders

---

[214] Monica Maria Becerril Ugade, "Health," *Washington State Latino/Hispanic Assessment Report, 2009-2010*, Washington State Commission on Hispanic Affairs, 26-28, https://static1.squarespace.com/static/5915f65ed482e94b3f60b25f/t/5bef266df950b73a0a722bf5/1542399602953/2009-2010+CHA+Assessment+Report+-+English.pdf, 26-28.

[215] U.S. Census Bureau, *American Community Survey 5-Year Estimates Subject Tables*, 2020

[216] Lex Talamo, "Just 13% of the Washington is Hispanic, but they're nearly half of the state's COVID-19 cases. Community leaders say more needs to be done," *Yakima Herald-Republic* (Yakima, WA), July 24, 2020, https://www.yakimaherald.com/news/local/just-13-of-washington-is-hispanic-but-theyre-nearly-half-the-states-covid-19-cases/article_3edca57f-34c5-573a-ac19-86f3c61ddbcd.html. On the spread of COVID-19 in Washington State, see Barbara Baquero et al., "Understanding and Addressing Latinx COVID-19 Disparities in Washington state, *Health Education Behavior* 47:6 (December 2020), 845-849.

[217] *Id.*

expressed that county health districts had not worked closely enough with Latinos and that there was "misinformation and gaps in communication."[218] For example, the Latino Community Fund stated that the "lack of accurate information in Spanish that is easily accessible about coronavirus vaccines" contributed to higher COVID-19 rates, because there was "a lot of misinformation" in the Latino community.[219]

Contributing to the high rate of COVID-19 cases among the Latino population were large agricultural employers that did not want on-site testing.[220] Health officers stated that employers "either declined our one-site support and/or refused testing when recommended," because positive results would potentially force them to "lose a large percentage of their workforce if wide-scale testing found more employees with COVID-19."[221] Due to employers' unwillingness to provide testing, COVID-19 outbreaks were reported in fruit and meat packing facilities in Yakima and Franklin Counties, some of which led to protests by Latino workers.[222]

### E. Criminal Justice

Limited economic opportunities, stereotyping, ineffective legal representation, lack of representation on juries, and unequal sentencing have created an inequitable criminal justice system for Latino people in Washington.[223] For example, Latino youth were incarcerated at a

---

[218] *Id.*

[219] Margaux Maxwell, "Yakima County health forum combats vaccine misinformation in the Latino community," *Yakima Herald-Republic* (Yakima, WA), February 11, 2021, https://www.yakimaherald.com/news/local/lower_valley/yakima-county-health-forum-combats-vaccine-misinformation-in-the-latino-community/article_aa9e246f-7b1e-5261-bf91-fe621c246e82.html.

[220] Enrique Pérez De La Rosa, "How Yakima County Became the West Coast's COVID-19 Hot Spot," Northwest Public Broadcasting, June 14, 2020.

[221] *Id.*

[222] Mai Hoang, "Protests underway at 3 Yakima Valley fruit packing houses," *Yakima Herald-Republic* (Yakima, WA), May 12, 2020, https://www.yakimaherald.com/news/local/protests-underway-at-3-yakima-valley-fruit-packing-houses/article_a2438dd7-5314-52a8-b2b6-f72747ec8760.html and Annette Cary, "All Tyson workers at plant near Tri-Cities to be tested for coronavirus. Cases reach 100," *Tri-City Herald* (Pasco, Kennewick, Richland, WA), April 22, 2020, https://www.tri-cityherald.com/news/coronavirus/article242186636.html.

[223] On scholarship related to the discriminatory treatment of Latinos in the criminal justice system, see Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (New Press, 2020), and Martin Guevara Urbina and Sofia Espinoza Alvarez, eds., *Hispanics in the U.S. Criminal Justice System: Ethnicity,*

disproportionate rate in counties where Latino people were more than twenty-five percent of the population (see Table 10).

**Table 10. Latino Rate of Incarceration in Select Counties, 2009[224]**

|  | Rate of Incarceration | Latino County Population |
|---|---|---|
| Adams County | 66.4% | 54.1% |
| Franklin County | 62.2% | 59.3% |
| Grant County | 47.1% | 36.6% |
| Yakima County | 55.3% | 42.5% |

A 2021 report on the state's criminal justice system documented key findings on "race disproportionality and disparity" in the system.[225] The study, which was submitted to the Washington State Supreme Court, uncovered that racial minorities disproportionately tended to be stopped, searched, arrested, convicted, sentenced to legal financial obligations, receive longer sentences, incarcerated, and "are more likely to be victims of police use of force."[226] Regarding Latinos specifically, the report found that they "are more likely to receive a standard sentence than any of the five sentencing alternatives."[227] In addition, Latinos are "statistically more likely to be subject to high discretion searches" than whites.[228] Latino youth represent only 22 percent of the state's youth population, but make up 28.3 percent of the juvenile detention population.[229]

---

*Ideology, and Social Control* (United States: Charles C Thomas, Publisher, 2018), Lupe S. Salinas, *U.S. Latinos and Criminal Injustice* (Michigan State University Press, 2015), and José Luis Morín, *Latino/a Rights and Justice in the United States: Perspectives and Approaches* (Carolina Academic Press, 2009),

[224] Adapted from the *Washington State Latino/Hispanic Assessment Report, 2009-2010*, Washington State Commission on Hispanic Affairs, 32, https://static1.squarespace.com/static/5915f65ed482e94b3f60b25f/t/5bef266df950b73a0a722bf5/1542399602953/2009-2010+CHA+Assessment+Report+-+English.pdf.

[225] Race and the Criminal Justice System, Task Force 2.0, "Race and Washington's Criminal Justice System: 2021 Report to the Washington Supreme Court" (2021), https://digitalcommons.law.seattleu.edu/cgi/viewcontent.cgi?article=1116&context=korematsu_center.

[226] *Id*. at 2-4.
[227] *Id*. at H-3.
[228] *Id*. at K-4.
[229] *Id*. at M-7.

Another study found that Washington's Latinx youth are "at least 50% more likely to be held in a placement [facility] as are white youth."[230] Ultimately, the state's "Hispanic/Latino population is reported at 13% and prisons report a Hispanic population of 15.45%."[231] Therefore, Latinos' rate of incarceration is currently higher than their population.

Based on the findings of the 2021 "Race and Washington's Criminal Justice System" report, it is evident that Latinos bear the impacts of unequal policing. Latinos in Washington are 1.3 times more likely to be killed by law enforcement than whites. These numbers are even starker in Benton and Franklin Counties where Latinos are 1.9 times more likely to be killed by law enforcement and in Yakima County where Latinos are 2.5 times more likely to be killed by law enforcement.[232] This reality influences the community to challenge police brutality. For instance, in 2015, Antonio Zambrano-Montes was fatally shot by Pasco police for attempting to throw a rock at an officer, sparking "waves of protests" in the city.[233] The three officers involved in Zambrano-Montes' death would only be interviewed by investigators almost three months after the shooting.[234]

The socio-demographic disparities among Latino and white residents in education, housing, employment and socioeconomic status, health, and criminal justice are a direct result of a long history of racial discrimination that hinder this community from effectively participating in the electoral process. In Yakima County, the Latino voter registration and turnout rates are significantly lower than for whites (see Table 2, page 44). And in the state, the November 2016

---

[230] Josh Rovner, "Latinx Disparities in Youth Incarceration," The Sentencing Project, July 15, 2021, https://www.sentencingproject.org/publications/latino-disparities-youth-incarceration/.
[231] Race and the Criminal Justice System, Task Force 2.0, "Race and Washington's Criminal Justice System: 2021 Report to the Washington Supreme Court," M-6.
[232] Id. at A-3.
[233] "Pasco police officers who shot Antonio Zambrano-Montes not questioned for months," The Guardian News, July 1, 2015, https://www.theguardian.com/us-news/2015/jul/02/pasco-police-officers-who-shot-antonio-zambrano-montes-not-questioned-for-months.
[234] Id.

and 2020 elections show that Latino voter registration and turnout percentages were well below whites (see Table 3, page 44).

### Senate Factor 6: Use of Overt or Subtle Racial Appeals in Political Campaigns

In the Yakima Valley and Pasco region, candidates and elected government officials have made both overt and subtle racial appeals. Below are some examples of direct and indirect racial appeals.[235]

Ahead of the November 2021 elections in Franklin County, Commissioner Rocky Mullen, in a discussion about Latino voting issues, stated that apparently "non-citizens are voting in elections."[236] Mullen also declared that he was against redrawing the county's boundaries because, "I don't want to disenfranchise anyone in North Franklin County."[237] In these statements, Mullen was putting forth a myth that "non-citizens" were participating in elections and that by modifying the district boundaries, these voters would ostensibly disenfranchise white voters in the county.

In another racial appeal that non-citizens were allegedly voting, in 2016, Ron Anderson, candidate for the Board of Yakima County Commissioners, shared a post on his publicly-accessible Facebook page claiming that "illegals" were stealing our elections.[238] The post included an article titled, "Napolitano: California To Allow Illegal Immigrants to Vote for the Next President," with a caption reading, "Illegals being seduced into America by Democrats to Steal our Election. Act of Treason, Arrest all involved!"

---

[235] On racial appeals, see Ian Haney-López, *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class* (Oxford University Press, 2014) and L. Stephens-Dougan, *Race to the Bottom: How Racial Appeals Work in American Politics* (University of Chicago Press, 2020).
[236] Franklin County Commission Meetings, September 21, 2021, 1:17:00.
[237] Franklin County Commission Meetings, September 21, 2021, 3:03:00-3:07.
[238] Exhibit 6 to the Deposition of Ron Anderson, *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019, Superior Court of Washington for Kittitas County, 2020.



Also in 2016, Ron Anderson shared an article with the headline "IRS Commissioner: Illegal Aliens can use Stolen SSNs to File Tax Returns"[239] and another article with the headline "ICE Director to Congress: We Follow Obama's Policies, Not Law."[240] These articles were shared from February 2016 to July 2016, when Ron Anderson was engaged in a campaign against Debra Manjarrez, a candidate with a Spanish surname.

---

[239] Exhibit 7 to the Deposition of Ron Anderson, *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019, Superior Court of Washington for Kittitas County, 2020.
[240] Exhibit 8 to the Deposition of Ron Anderson, *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019, Superior Court of Washington for Kittitas County, 2020.




"Illegals" and "illegal aliens" are derogatory terms used to refer to undocumented immigrants and are frequently levied as slurs against Latinos regardless of knowledge of their immigration status. Anderson would go on to defeat Debra Manjarrez in very close election. In the 2016 November General Election, Manjarrez received 32,146 votes while Anderson received 34,521.[241]

And in 2014, Franklin County Commissioner Clint Didier campaigned for Congress and released a video that said, "hundreds of illegals have already crossed our porous borders from a multitude of countries including many associated with Jihad and terrorism."[242] In 2010, as he

---

[241] See, General and Special Elections in Yakima County, November 8, 2016, General Election, "Election Results 1974-current," Yakima County Webpage, https://www.yakimacounty.us/DocumentCenter/View/30743/2016-General-Election-Results?bidId=.

[242] "Clint Didier for Congress Release Video on Borders and Illegal Immigration," Cision PR Newswire, October 6, 2014, https://www.prnewswire.com/news-releases/clint-didier-for-congress-releases-video-on-borders--illegal-immigration-278317771.html.

campaigned for the U.S. Senate, Didier also stated that "the country should stop giving citizenship to the children of illegal immigrants even if they're born here."[243]

While investigations have unearthed virtually no evidence of "non-citizens" voting, the rhetoric has proven costly to Latino candidates and voters in Washington State.[244] By using racist terms like "illegals" and spreading the disproven allegation that there is widespread voting by non-citizens in American elections, elected officials and candidates embrace and perpetuate a message that "denies Latino voters the presumed legitimacy other citizens enjoy, creates an unwelcoming climate, and discredits" their participation in electoral politics.[245] They stoke fears among white voters and politicians that stigmatize and discriminate against Latino citizen voters.[246]

In Yakima County, in 2019, while then Yakima City Council candidate Dulce Gutierrez was campaigning and passing out leaflets, she was verbally disparaged by a white woman.[247] As Gutierrez "was speaking to a group of students who had volunteered" with her city council campaign, the woman shouted at her and the students, "Go back to Mexico!"[248] Other voters she interacted with questioned why they should "vote for a Mexican."[249]

Other Latino candidates in the Yakima Valley have also expressed that they have experienced racial animosity while campaigning. Susan Soto Palmer, a volunteer for Gabriel

---

[243] Nina Shapiro, "Didier's Machine Politics: It's easy to be anti-immigrant when wheat farming is mechanized," *Seattle Weekly* (Seattle, WA), June 15, 2010, https://www.seattleweekly.com/news/didiers-machine-politics/.

[244] Robert Courtney Smith, "'Don't Let the Illegals Vote!': The Myths of Illegal Latino Voters and Voter Fraud in Contested Local Immigration Integration," *RSF: The Russel Sage Foundation Journal of Social Sciences* 3:4 (July 2017), 167.

[245] *Id*. at 148.

[246] *Id.*

[247] Dionne Searcey and Robert Gebeloff, "The Divide in Yakima is the Divide in America: What the changing demographics of this county look like up close," *New York Times* (New York, New York), November 19, 2019, https://www.nytimes.com/2019/11/19/us/politics/yakima-washington-racial-differences-2020-elections.html.

[248] *Id.*

[249] Affidavit of Candy Gutierrez in Support of Plaintiffs' Motion for Summary Judgement, *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019, Superior Court of Washington for Kittitas County, 2020.

Muñoz's 2014 campaign for Washington State Senate in legislative district 15, reported that a man in Union Gap told her that he was not voting for Muñoz because, in his words, "I'm racist."[250] Because of this and other experiences, when Ms. Soto Palmer was campaigning for her own 2018 race for Yakima County Board, she "had white campaign volunteers be [her] surrogates so that [she] would not fear for [her] safety" as "Latino supporters did not feel safe" in some "predominantly white towns."[251] And in 2005, Evangelina Aguilar, in her re-election campaign for the Sunnyside City council was "verbally threatened on several occasions."[252]

Elected officials have also made racial appeals between campaigns while in office. In 2015, Senator Jim Honeyford, the senator for Legislative District 15, referred to racial minorities as "colored" and "coloreds."[253] Honeyford remarked that "the poor people are most likely to commit crimes, and, uh, colored [sic] most likely to be poor."[254] Honeyford used this language in a "hearing on a bill that would require future legislation to have impact statements identifying potentially disparate consequences for minorities."[255] The term "colored" was used from the mid- to late nineteenth century in the context of Jim Crow segregation[256] It was a racial label, or stamp, signaling that African Americans were supposedly inferior.[257] African Americans have rejected the term due to its racist connotations and instead embraced new terms for their racial

---

[250] Affidavit of Susan Soto Palmer in Support of Plaintiffs' Motion for Summary Judgement, *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019, Superior Court of Washington for Kittitas County, 2020.
[251] *Id.*
[252] Affidavit of Evangelina Aguilar in Support of Plaintiffs' Motion for Summary Judgement, *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019, Superior Court of Washington for Kittitas County, 2020.
[253] "Senator Honeyford sorry for calling minorities 'coloreds,'" *The Columbian*, https://www.columbian.com/news/2015/mar/06/sen-honeyford-sorry-calling-minorities-coloreds/.
[254] Ansel Herz, "Republican State Senator: Poor, 'Colored' People Are More Likely to Commit Crimes," *The Stranger*, https://www.thestranger.com/news/2015/03/02/21799665/washington-republican-poor-colored-people-are-more-likely-to-commit-crimes.
[255] *Id.*
[256] Tom W. Smith, "Changing Racial Labels: From 'Colored' to 'Negro' to 'Black' to 'African American,'" *The Public Opinion Quarterly*, 56:5 (1992), 496-514.
[257] Ibram X. Kendi, *Stamped from the Beginning: The Definitive History of Racist Ideas in America*," (New York: Bold Type Books, 2016), 1-11.

identity.[258] In using the terms "colored" and "coloreds," Honeyford employed coded language

that appears racially innocuous but is loaded with racist history. While Honeyford issued an

apology for using "hurtful" language, he did not apologize for the message underlying his

statements.[259]

      And in 2016, another elected official shared a racist image on social media.[260]



---

[258] Tom W. Smith, "Changing Racial Labels: From 'Colored' to 'Negro' to 'Black' to 'African American,'" *The Public Opinion Quarterly*, 56:5 (1992), 496-514.

[259] Venice Buhain, "State Sen. Jim Honeyford apologizes for 'hurtful' words on minorities," *The Seattle Globalist*, https://seattleglobalist.com/2015/03/06/jim-honeyford-apologize-hurtful-words-on-minorities/34485.

[260] Jake Dorsey, "Franklin County corner posted a 'white power' meme. Some say his apology isn't enough," *Yakima Herald-Republic* (Yakima, WA), https://www.yakimaherald.com/news/local/franklin-county-coroner-posted-a-white-power-meme-some-say-his-apology-isn-t-enough/article_3b232aa8-2871-11e8-8f6b-03319b4b7e81.html.

Franklin County Coroner, Dan Blasdel, shared a photograph (above) of a white farmer with the caption, "When is white history month?" and which included another image with a white fist, reading "100% white, 100% proud."[261]

These examples of direct and indirect racial appeals are not isolated events but have occurred over the course of many years in the Yakima Valley and Pasco region, exhibiting a pattern of racial appeals in campaigns and by elected officials.

**Senate Factor 7: Extent to Which Latino Candidates Have Been Elected to Public Office in the Jurisdiction**

The increase in the number of Latinos in Washington in the twenty-first century did not translate into political power. Currently in the state of Washington, there are 5 legislators with Spanish surnames, only 2 more than in 2012.[262] And only two Latinos have ever been elected to state public offices from the Central Washington region including the Yakima Valley and Pasco areas.[263]

From 1995 to 2008, Mary Skinner was the single Latina elected to office representing District 14 (which includes parts of Clark, Klickitat, Skamania, and Yakima Counties).[264] Since the end of Skinner's tenure, Latino candidates including Susan Soto Palmer (2016) and Noah Ramirez (2018) have run but were defeated by white candidates.[265] For almost 15 years, a Latino candidate has not been elected to Legislative District 14. Since 2019, Alejandro "Alex" Ybarra

---

[261] *Id.*

[262] Regina Graham, "Washington state's Latinos find 'politics has not changed with population," *The Guardian*, October 7, 2012, https://www.theguardian.com/world/2012/oct/07/washington-state-latino-politics-population. Legislators with Spanish surnames: Bill Ramos (5th District), Monica Jurado Stonier (49th District), Javier Valdez (46th District), Alex Ybarra (13th District), and Rebecca Saldaña (37th Legislative District).

[263] Mai Hong, "What the fight for a Latino voting district means for Centra WA politics," *Crosscut*, April 13, 2022, https://crosscut.com/politics/2022/04/what-fight-latino-voting-district-means-central-wa-politics.

[264] *Id.*

[265] "Meet the Candidate: Susan Soto Palmer," *Yakima Herald-Republic* (Yakima, WA), October 8, 2016, and Donald W. Meyers, "Noah Ramirez, Eisenhower graduate, 19, to run against Rep. Gina McCabe," *Yakima Herald-Republic* (Yakima, WA), March 19, 2018.

has been serving as representative for Legislative District 13 (which includes parts of Lincoln, Grant, and Kittitas Counties).[266] Ybarra was first appointed in 2019, and then elected as an incumbent in 2020.[267]

In Legislative District 15 (which includes parts of Adams, Benton, Franklin, Grant, and Yakima Counties), not a single Latino candidate has been elected even though several have run to represent the district.[268] Although Latino candidates have received overwhelming support from Latino residents in Yakima County, all were defeated including Pablo Gonzalez (2012), Teodora Martinez Chavez (2014), Gabriel Muñoz (2014), and Evangelina Aguilar (2018).[269] Without political representation in the 15th district, Latinos have less chances to resolve their issues and concerns through the political process.

In county election races, Latino candidates have also struggled to get elected. For instance, in Yakima County where Latinos account for 51 percent of the population, only one Latino has ever been elected to the Board of Yakima County Commissioners, which is the three-member commission "responsible for the overall executive administration of Yakima County government."[270] The single Latino commissioner served on the board from 1998 to 2006.[271]

---

[266] *Id.*
[267] Mai Hoang, "Alex Ybarra says he's reading to represent 13th District in Olympia," *Yakima Herald-Republic* (Yakima, WA), January 21, 2019, https://www.yakimaherald.com/news/local/alex-ybarra-says-hes-ready-to-represent-13th-district-in-olympia/article_5e588896-1e0d-11e9-a98a-a392a72440bd.html.
[268] Mai Hoang, "What the fight for a Latino voting district means for Central WA politics," *Crosscut*, April 13, 2022, https://crosscut.com/politics/2022/04/what-fight-latino-voting-district-means-central-wa-politics.
[269] *Id.*
[270] In 1998, Jesse Palacios was elected to the Yakima Board of Commissioners, District No. 3. See, Official Returns of the State General Election held in Yakima County, November 3, 1998, General Election, "Election results 1974-current," Yakima County Webpage, https://www.yakimacounty.us/DocumentCenter/View/30723/1998-General-Election-Results?bidId=. "Responsibilities," Board of Yakima Commissioners, Yakima County Webpage, https://www.yakimacounty.us/766/County-Commissioners-Office. For demographic data, see U.S. Census Bureau, *American Community Survey 2018 1-Year Estimates* (2019), https://data.census.gov/cedsci/.
[271] Phil Ferolito, "Latinos rally behind settlement that forces new Yakima County Commission districts in 2022 election," *Yakima Herald-Republic* (Yakima, WA), September 1, 2021.

A similar trend is evident in Franklin County where Latino voters have never been able to elect their preferred candidate to the Franklin County Board of Commissioners.[272] According to the 2020 U.S. Census, Latinos accounted for 54.1 percent of the population in Franklin County.[273] Latinos comprise 56 percent of the population in Pasco, Washington, a city in Franklin County.[274] In 2020, Ana Ruiz Peralta, a Latina woman, ran for a seat on the Franklin County Board of Commissioners. She received endorsements from a former Pasco city mayor and the current Latino mayor, Saul Martinez.[275] Peralta handily won "majority-Latino precincts" in the primary election but lost to a white candidate, Rocky Mullen, in the general race.[276] Ruiz received 12,786 votes while Mullen received 18,513 votes.[277]

An examination of state and county elections demonstrates that while Latinos are a significant percentage of the population, they enjoy limited to no representation in legislative and county positions.

### Senate Factor 8: Lack of Responsiveness of Elected Officials to Needs of Latino Community

In reviewing the top legislative priorities of Washington's Latino community, there is clear evidence that state legislators representing the Yakima Valley and Pasco region have been unresponsive to the needs and priorities of the community. Legislators from districts 14, 15, and 16 have regularly voted in opposition to bills supported by Latinos. The Latino Civic Alliance

---

[272] Martín Meráz García, "Political Retaliation and Intimidation in Franklin County, Washington," Expert Report Submitted on Behalf of *Plaintiffs Gabriel Portugal, et al. v. Franklin County Board of Commissioner*," October 25, 2021; and Complaint for Injunctive Relief under the Washington State Voting Rights Act, *Portugal et al. v. Franklin County et al.*, No. 21-2-50210-11, Superior Court of Washington for Franklin County, 2021.
[273] U.S. Census Bureau, QuickFacts, https://www.census.gov/quickfacts.
[274] *Id.*
[275] Cameron Probert, "COVID-19 is shaping Franklin County's open commissioner race. Meet the 4 candidates," *Tri-City Herald* (Pasco, Kennewick, Richland, WA), October 2, 2020, https://www.tri-cityherald.com/article244421062.html.
[276] Nina Shapiro, "Voting-rights battle in Washington state raised allegations of diluting Latino votes."
[277] General Elections, November 3, 2020, "Election Results," Franklin County Auditor's Office, https://results.vote.wa.gov/results/20201103/franklin/.

was founded in 2005 and its mission "is to promote advocacy and civic engagement in Washington state by encouraging social responsivity and public service through collaboration with community partners."[278] The non-profit organization sponsors an event called Latino Legislative Day, where thousands of Latinos meet with legislators to discuss issues and bills that are priorities for the community such as health care, support for small businesses, apprenticeship programs, and voting rights. Ahead of the 2022 Legislative Day in February, the Latino Civic Alliance sent a list of bills that the community supported. The bills from that list that ultimately went up for a vote are:

- SB 5597 (2021-22)—Concerning Washington's Voting Rights Act. The bill, which did not pass, would establish a protocol for individuals to recover costs for investigating voting rights violations and require certain jurisdictions to obtain preclearance to modify voting election practices.[279] The bill would protect Latinos from discriminatory voting practices.

- HB 1616 (2021-22)—Concerning the Charity Care Act. The house bill, which passed, "increases the existing income threshold for patients to receive charity care for the full amount of their charges, as well as the threshold to receive a discount on their charges."[280] The Charity Act could address health care gaps, especially for low-income Latino families.

- SB 5600 (2021-22)—Concerning the sustainability and expansion of the state registered apprenticeship programs. The senate bill, which passed, requires the

---

[278] "LCA's Mission, Vision, & Values," Latino Civic Alliance Webpage, https://latinocivicalliance.org/mission.
[279] "Senate Bill Report, SB 5597," Washington State Legislature, https://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bill%20Reports/Senate/5597%20SBR%20WM%20OC%2022.pdf?q=20220718120639.
[280] "House Bill Report, HB 1616," Washington State Legislature, https://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bill%20Reports/House/1616%20HBR%20HCW%2022.pdf?q=20220718122117.

Washington State Apprenticeship and Apprenticeship Council to develop and review new programs which are sustainable and help graduates earn "a living wage."[281] Apprenticeship programs could help to reduce Latinos' unemployment rates in the state.

- HB 1746 (2021-22)—Updating the 2015 report and recommendations for supporting student success through measuring and mitigating community risk and protective predictors since the emergence of the COVID-19 pandemic. The house bill, which did not pass, would create reports summarizing the "educational services and supports offered since the beginning of the COVID-19 pandemic" including the impact of social-emotional learning.[282] The bill could produce data on how COVID-19 affected Latinos student and offer guidance on how to close the equity gap in education.

- HB 1736 (2021-22)—Establishing a state student loan program. The bill, which passed, establishes a student loan program "with 1 percent interest rates" to undergraduates in need of financial assistance and certain "high-demand graduate programs."[283]  The law could reduce the financial barriers for Latino students to pursue a higher education.

- SB 5122 (2021-22)—Concerning the jurisdiction of juvenile court. The bill, which did not pass, would increase the juvenile court's jurisdiction to 19 years and create the "presumed incapacity to commit a crime to children under age

---

[281] "Senate Bill Report, SB 5600," Washington State Legislature, https://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bill%20Reports/Senate/5600%20SBR%20WM%20OC%2022.pdf?q=20220718123026.

[282] "House Bill Report, HB 1746," Washington State Legislature, https://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bill%20Reports/House/1746%20HBR%20APP%2022.pdf?q=20220718123732.

[283] "House Bill Report, HB 1736," Washington State Legislature, https://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bill%20Reports/House/1736%20HBR%20APP%2022.pdf?q=20220718124707.

13."[284] It would allow youth to remain in a juvenile rehabilitation center through the age of 22, and in some cases, until 23. SB 5122 could help to create a criminal system that is less racially disparate for Latino youth, and improve the system for the Latino youth in it.

- SB 5051 (2021-22)—Concerning state oversight and accountability of peace officers and corrections officers. SB 5051, which passed, will require that peace officers, reserve officers, and corrections officers undergo more rigorous background checks, and requires that "employing agencies report all separation and disciplinary matters regarding a certified officer to the CJTC (Criminal Justice Training Commission)."[285] The bill could help to reduce racial bias among peace and corrections officers, including potentially decreasing the disproportionate rate at which Latinos are pulled over compared to whites.

Legislators representing districts 14, 15, and 16 tended to vote against these bills (see Table 11). On several legislative bills, such as HB 1616, HB 1736, and SB 5051, both the senators and representatives voted in opposition to these bills. And in some cases, bills were voted upon only in the Senate and were unanimously rejected by senators representing the Yakima and Pasco areas. One such bill, SB 5597, was a proposed update to the WVRA which, according to Latina legislative leader Rebecca Saldaña, "would expand access to fair representation for underrepresented communities in Washington, including in Yakima County where Latinos make up more than half of the population."[286] Although SB 5597 had the backing

---

[284] "Senate Bill Report, SB 5122, Washington State Legislature, https://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bill%20Reports/Senate/5122%20SBR%20HSRR%20OC%2021.pdf?q=20220718125318.

[285] "Senate Bill Report, SB 5051," Washington State Legislature, https://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bill%20Reports/Senate/5051%20SBR%20WM%20OC%2021.pdf?q=20220718130355.

[286] Kate Smith, "Yakima Valley senators vote no on WA voting rights law changes," *Yakima Herald-Republic* (Yakima, WA), February 20, 2022.

of 93 organizations across 20 counties including Casa Latina, Commission on Hispanic Affairs, El Centro de la Raza, Radio KDNA, and Tri-Cities League of United Latin American Citizens, it was opposed by the senators from legislative districts 14, 15, and 16.

**Table 11. Voting Record of Elected Officials on Bills Supported by Latino Leaders in Washington, 2021-2022**[287]

| | SB 5597 (2021-22)—Concerning Washington's Voting Rights Act. (Latinos For Bill; Bill did not pass) | HB 1616 (2021-22)—Concerning the Charity Care Act. (Latinos For Bill; Passed in Senate and House) | SB 5600 (2021-22)—Concerning the sustainability and expansion of the state registered apprenticeship programs. (Latinos For Bill; Passed in Senate and House) |
|---|---|---|---|
| Sen. Curtis King (Legislative Dist. 14) | **NAY** | **NAY** | YEA |
| Rep. Chris Corry (Legislative Dist. 14) | - | **NAY** | YEA |
| Rep. Gina Mosbrucker (Legislative Dist. 14) | - | **NAY** | YEA |
| Sen. Jim Honeyford (Legislative Dist. 15) | **NAY** | **NAY** | **NAY** |
| Rep. Bruce Chandler (Legislative Dist. 15) | - | **NAY** | YEA |
| Rep. Jeremie Dufault (Legislative Dist. 15) | | **NAY** | **NAY** |
| Sen. Perry Dozier (Legislative Dist. 16) | **NAY** | **NAY** | **NAY** |
| Rep. Mark Klicker (Legislative Dist. 16) | - | **NAY** | YEA |
| Rep. Skyler Rude (Legislative Dist. 16) | - | **NAY** | YEA |

---

[287] "Bill Information," Washington State Legislature, https://app.leg.wa.gov/billinfo/.

| | HB 1746 (2021-22)—Updating the 2015 report & recommendations for supporting student success through measuring & mitigating community risk & protective predictors since the emergence of the COVID-19 pandemic. (Latinos For Bill; Bill did not pass) | HB 1736 (2021-22)—Establishing a state student loan program. (Latinos For Bill; Passed in House and Senate) | SB 5122 (2021-22)—Concerning the jurisdiction of juvenile court. (Latinos For Bill; Bill did not pass) | SB 5051 (2021-22)—Concerning state oversight and accountability of peace officers and corrections officers. (Latinos For Bill; Passed in House and Senate) |
|---|---|---|---|---|
| Sen. Curtis King (Legislative Dist. 14) | - | **NAY** | **NAY** | **NAY** |
| Rep. Chris Corry (Legislative Dist. 14) | **NAY** | **NAY** | - | **NAY** |
| Rep. Gina Mosbrucker (Legislative Dist. 14) | **NAY** | **NAY** | - | **NAY** |
| Sen. Jim Honeyford (Legislative Dist. 15) | - | **NAY** | **NAY** | **NAY** |
| Rep. Bruce Chandler (Legislative Dist. 15) | **NAY** | **NAY** | - | **NAY** |
| Rep. Jeremie Dufault (Legislative Dist. 15) | **NAY** | **NAY** | - | **NAY** |
| Sen. Perry Dozier (Legislative Dist. 16) | - | **NAY** | **NAY** | **NAY** |
| Rep. Mark Klicker (Legislative Dist. 16) | **NAY** | **NAY** | - | **NAY** |
| Rep. Skyler Rude (Legislative Dist. 16) | YEA | YEA | - | **NAY** |

Despite attempts by the Latino community to clearly communicate their top issues and legislative priorities, elected officials have failed to support legislative bills that the Latino people in the Yakima Valley and Pasco areas support. Additionally, they have been reluctant to

sponsor bills of interest to the Latino community such as the Washington's Voting Rights Act. It is therefore evident that elected officials in districts 14, 15, and 16 are on the whole not responding to the concerns of the Latino community.

**Conclusion**

In this report, I have provided evidence and analysis that Latinos in the Yakima and Pasco areas are not able to fully and effectively participate in the electoral process. The historical discrimination against Latinos in Central Washington along with contemporary forms of inequalities, have limited their opportunities to exercise their voting rights.

Pursuant to 28 U.S.C. §1746, I, Josué Q. Estrada, declare that the following is true and correct.

_____

Dr. Josué Q. Estrada
Dated: July 27, 2022

# Josué Q. Estrada, Ph.D.

509-305-1489 ǀ Josue.Estrada@gmail.com

## EDUCATION

| | |
|---|---|
| 2021 | **Ph.D.**, History, University of Washington, "'We Can't Be Ignored Anymore': A History of the Latinx Voting Rights Movement, 1960-1975" |
| 2014 | **M.A.**, History, University of Washington |
| 2007 | **M.A.**, American Studies, Washington State University |
| 2005 | **B.A.**, American Ethnic Studies-Chicana/o Studies, University of Washington |

## CURRENT POSITION

2021-Present    Assistant Professor, Department of History, Central Washington University

## PUBLICATIONS
### Article

2017    "Democratizing Washington State's Yakima County: A History of Latino/a Voter Suppression since 1967" in *We Are Aztlan: Chicanx Histories in the Northern Borderlands,* ed. Jerry Garcia (Pullman: Washington State University Press, 2017).

### Book Reviews

2022    Review of *Race and Partisanship in California Redistricting: From the 1965 Voting Rights Act to Present*, Oliver Richomne, *Journal of American Ethnic History* (accepted for publication).

2017    Review of *Of Forests and Fields: Mexican Labor in the Pacific Northwest*, Mario Jimenez Sifuentez, *Pacific Northwest Quarterly*, Vol. 105, No. 4. (2017): 199.

### Online Article

2016    "Chicano Movements: A Geographic History," in *Mapping American Social Movements Through the 20th Century*, Chicano/Latino Movements, https://depts.washington.edu/moves/Chicano_geography.shtml

## TEACHING EXPERIENCE
### Courses Taught at Central Washington University

2021-2022    Historical Methods (HIST 302)
History of American Citizenship (HIST 450/550)
History of the Pacific Northwest (HIST 301)
Transnational History of Latinx People in the U.S. (HIST 449/559)
U.S. History since 1865 (HIST 144)

### Instructor of Record

2018, 2017    The Peoples of the United States, Instructor, University of Washington
This course, of my own design, offered a survey of US history and how conquest, migration, and imperialism have shaped the American nation and its diversity.

2006-2007    Introduction to Ethnic Studies, Instructor, Washington State University
This course, of my own design, examined how the intersectionality of ethnicity, race, and gender have shaped US society.

# Josué Q. Estrada, Ph.D.

509-305-1489 ǀ Josue.Estrada@gmail.com

**Teaching Assistantships**

| | |
|---|---|
| 2017, 2015 | Race, Gender, and Class in Latin America and the Caribbean, University of Washington |
| 2016, 2015 | History of American Citizenship, University of Washington |
| 2016, 2015 | The Peoples of the United States, University of Washington |
| 2016 | Asian American History, University of Washington |
| 2015 | The Holocaust: History and Memory, University of Washington |

**Adjunct Faculty**

| | |
|---|---|
| 2007-2009 | Department of Ethnic Studies, Yakima Community College, Yakima, Washington |
| | I taught introduction to ethnic studies courses, of my own design, which explored the central themes and concepts of the discipline using an interdisciplinary approach. |

**AWARDS AND FELLOWSHIPS**

| | |
|---|---|
| 2022 | President's Diversity Award, Central Washington University |
| 2022 | Nominated for Honor Our Professor's Excellence Award (HOPE), Central Washington University |
| 2021 | Hanauer Dissertation Scholarship, Department of History, University of Washington |
| 2020 | **Employee of the Month, Central Washington University** |
| 2018 | Outstanding Student Leader Prize, University of Washington |
| 2018 | Dissertation Scholarship, Daughters of the Pioneers of Washington |
| 2018 | Hanauer Fellowship, Department of History, University of Washington |
| 2017 | Research Grant, Washington Institute for the Study of Inequality and Race, University of Washington |
| 2017 | **Outstanding Teaching Assistant**, Department of History, University of Washington |
| 2017 | Research Award, Harry Bridges Center for Labor Studies, University of Washington |
| 2017 | Latino/a Scholars Fellowship, Graduate School, University of Washington |
| 2017 | Mangels Endowed Fellowship, Department of History, University of Washington |
| 2016 | Digital History Fellowship, Department of History, University of Washington |
| 2015 | Burke Prize for Outstanding Scholarship, Department of History, University of Washington |
| 2015 | Graduate Opportunities and Minority Achievement Program Travel Award, University of Washington |
| 2014 | Andy Studebaker Travel Award, Department of History, University of Washington |
| 2014 | Harry Bridges Center for Labor Studies Fellowship, University of Washington |
| 2013 | Graduate Opportunities and Minority Achievement Program Fellowship, University of Washington |
| 2013 | Phil and Norma Duran Alumni Spotlight Award, Washington State University |
| 2013 | Academic Fellowship, Harry Bridges Center for Labor Studies, University of Washington |
| 2007 | Graduate Student Scholarship, Pacific Northwest FOCO National Association of Chicana and Chicano Studies |
| 2005 | First Year Fellowship, Graduate School, Washington State University |

# Josué Q. Estrada, Ph.D.

509-305-1489 ǀ Josue.Estrada@gmail.com

**CONFERENCE PRESENTATIONS**

| | |
|---|---|
| April 2020 | "A History of Latina/o Voting Rights in the Pacific Northwest"<br>Presented at *Sal Castro Memorial Conference on the Emerging Historiography of the Chicano Movement*, University of California, Santa Barbara, CA. |
| October 2019 | "Citizens with Foreign Tongues: A History of Latinx Voter Suppression in Washington State"<br>Presented at *What Happens in the West Doesn't Stay in the West*, Western History Association, Las Vegas, NV. |
| October 2019 | "Putting Chicanxs on the Map: A Digital Geographic History Project"<br>Presented at *What Happens in the West Doesn't Stay in the West*, Western History Association, Las Vegas, NV. |
| June 2017 | "Democratizing Washington State's Yakima County: A History of Latino/a Voter Suppression since 1967"<br>Presented at *Scales of Struggle: Communities, Movements, and Global Connections*, Labor and Working-Class History Association, Seattle, WA. |
| June 2017 | "Mapping the Chicano/a Movements: A History and its Geography"<br>Presented at *Scales of Struggle: Communities, Movements, and Global Connections*, Labor and Working-Class History Association, Seattle, WA. |
| March 2017 | "Mapping *El Movimiento*: A Digital Geographic Project"<br>Presented at *Chicana/o Studies in the Era of Globalization, War and Mass Expulsions*, National Association of Chicana and Chicano Studies, Irvine, CA. |
| June 2016 | "Al Norte! Migration From and Through Oaxaca Study Abroad Seminar"<br>Presented at *National Heritage Language Research Institute Conference*, Seattle, WA. |
| March 2015 | "Migrant Student Tracking in the 21st Century"<br>Presented at *Migrant Education Harbor of Hope*, National Association of State Directors of Migrant Education Annual Conference, Seattle, Washington. |
| May 2015 | "Chicanos Revolt against Literacy Tests in the Pacific Northwest"<br>Presented at *Fighting Inequality: Class, Race, and Power,* Labor and Working-Class History and the Working-Class Studies Associations, Washington D.C. |
| April 2014 | "Literacy Tests, Chicano/a Political Activism, and Citizenship in Washington State"<br>Presented at *Citizenships in the Pacific Northwest*, Pacific Northwest History Conference, Vancouver, Washington. |
| April 2014 | "Chicano/a Struggle for Full Citizenship and Political Representation in Washington State's Yakima County"<br>Presented at *Fragmented Landscapes in Chicana and Chicano Studies: Deliberation, Innovation or Extinction?*, National Association of Chicana and Chicano Studies, Salt Lake City, Utah. |
| November 2012 | "Improving CAMP Student Writing by Promoting the Value of Instructor Office Hours"<br>Presented at HEP and CAMP…Creating Waves for Change, The National High School Equivalency Program/College Assistance Migrant Program Association Conference, San Padre Island, Texas. |
| October 2012 | "Increasing Student-Faculty Interactions through Writing"<br>Presented at *Revitalize Your Network, Refine Your Practices, and Redesign Your Approach to Educational Access*, TRiO Northwest Association of Educational Opportunity Programs (NAEOP), Coeur d'Alene, Idaho. |

# Josué Q. Estrada, Ph.D.

509-305-1489 l Josue.Estrada@gmail.com

| | |
|---|---|
| March 2012 | "A Growing Chicano/a Student Population and the Future of Diversity in Washington Colleges and Universities"<br>Presented at *Chican@ Studies Matters: The Legacy of Chican@ Studies in Northern Aztlán*, National Association of Chicana and Chicano Studies FOCO, Washington State University, Pullman, Washington. |
| October 2011 | "Achieving Success through Student-Faculty Interactions and Writing"<br>Presented at *The Future Begins with U-Meeting the Challenges, Making the Connections,* TRIO Northwest Association of Special Programs (NASP), Spokane, Washington. |
| April 2007 | "Tejano Migration: Vámonos Pa' Washington Chicano/a Recruitment, Migration, and Settlement (1948-1959)"<br>Presented at *Sociocultural and Ideological Shifts: Chicano/a Migratory and Immigration Passages,* National Association of Chicana and Chicano Studies, San Jose, California. |
| April 2007 | "Vámonos Pa'l Norte-Washington State Tejano/a and Mexicano/a Recruitment, Migration, and Settlement (1940-1960)"<br>Presented at *Labor and Leisure*, Pacific Northwest American Studies Association, Portland State University, Portland, Oregon. |
| March 2007 | "From Texas to Washington State: Chicano/a Recruitment, Migration and Settlement"<br>Presented at *El Otro Norte: Raza, Race and Resistance in the Pacific Northwest,* Pacific Northwest FOCO National Association of Chicana and Chicano Studies, Washington State University, Pullman, Washington. |

**OTHER ACADEMIC EMPLOYMENT**

| | |
|---|---|
| 2019-2021 | Principal Investigator and Director, Gaining Early Awareness and Readiness for Undergraduate Programs (GEAR UP), Central Washington University |
| 2018-2019 | Editorial Intern, Pacific Northwest Quarterly, University of Washington |
| 2015 | Assistant Director, University of Washington Study Abroad Summer Program: Al Norte! Migration from and through Oaxaca, Instituto Cultural Oaxaca, Mexico |
| 2013-2015 | Graduate Student Intern, Kelley Ethnic Cultural Center, University of Washington |
| 2009-2013 | Director, College Assistance Migrant Program, Washington State University |
| 2007-2009 | Recruiter/Enrollment Counselor, College Assistance Migrant Program, Washington State University |

**PUBLIC AND DIGITAL HISTORY EXPERIENCE**

| | |
|---|---|
| 2016-Present | Research Associate and Contributor*, Mapping American Social Movements Through the 20th Century*, University of Washington<br>I identified, collected, and organized data used to produce interactive maps of multiple social movements. Led the effort to create a section tracing the geography of the Chicano/a Movement, contributing to the production of over 25 maps and charts. See http://depts.washington.edu/moves/<br><br>Led the effort to collect and manage the data for the project to trace the geography of the National Association for the Advancement of Colored People (NAACP) chapters across six decades. See https://depts.washington.edu/moves/NAACP_intro.shtml |
| 2017 | 'Righting' and Preserving History—a project funded by the Mangels Fellowship, University of Washington |

# Josué Q. Estrada, Ph.D.

509-305-1489 ǀ Josue.Estrada@gmail.com

I designed an interactive workshop in collaboration with the Labor Archives of Washington and the Office of Minority Affairs to promote public history, and the importance of the preservation of historical records. By traveling to high schools across the state, I reached over 300 students including 200 prospective UW first-year students.

2014            Associate Editor, *Seattle Civil Rights and Labor History Project*, University of Washington
I conducted four oral interviews to create original content and edited undergraduate student essays for online publication.
See http://depts.washington.edu/civilr/

**DEPARTMENT/UNIVERSITY SERVICE**

Central Washington University

| | |
|---|---|
| 2021-Present | Committee Member, Curriculum and Assessment, Department of History, Central Washington University |
| 2021-Present | Committee Member, Recruitment and Outreach, Department of History, Central Washington University |
| 2021-Present | Provost's Council for Diversity and Equity, Central Washington University |
| 2021-Present | Board Member, Centro for Latinx Studies, Central Washington University |
| 2018-Present | Board Member, College Assistance Migrant Program, Central Washington University |
| 2020 | Selection Chair for GEAR UP Associate Director, Central Washington University |
| 2019 | Hispanic Leadership Institute Student Scholarship Selection Committee, Central Washington University |

University of Washington

| | |
|---|---|
| 2018-2020 | Advisory Member, College Assistance Migrant Program, University of Washington |
| 2017-2018 | Diversity Committee, Department of History, University of Washington |
| 2015, 2016 | Reader for Competitive College Assistance Migrant Program (CAMP) Grant, Office of Migrant Education, US Department of Education |

Washington State University

| | |
|---|---|
| 2009-2013 | Guidance Committee Member, TRIO Student Support Services, Washington State University |
| 2011-2013 | Advisory Member, College Spark—Critical Literacies Achievement and Success Program |
| 2011-2013 | Advisory Member, College Spark—Washington State Educational Access Coalition for HB 1079 (undocumented) Students |
| 2010-2013 | Scholarship Committee, Academic Diversity Award, Washington State University |
| 2008-2013 | Planning Committee, Bilingual Orientation, Washington State University |

**GRANT WRITING EXPERIENCE**

| | |
|---|---|
| 2021 | Assisted writing the Gaining Early Awareness and Readiness for Undergraduate Programs (GEAR UP) Grant, **Adelante GEAR UP** (in partnership with the Yakima School District), Office of Migrant Education, US Department of Education. **Grant scored 105/105 possible points. (Co-Principal Investigator and Director)** |
| 2021 | Assisted writing the Gaining Early Awareness and Readiness for Undergraduate Programs (GEAR UP) Grant, **Pathways to Success** (in partnership with schools in the Okanogan County), Office of Migrant Education, US Department of Education. **Grant scored 105/105 possible points. (Co-Principal Investigator and Director)** |

# Josué Q. Estrada, Ph.D.

509-305-1489 l Josue.Estrada@gmail.com

| | |
|---|---|
| 2013 | Dare to Dream Math/Science Academies, Office of Superintendent of Public Instruction Successfully awarded-$104,000. (Co-Principal Investigator) |
| 2011, 2012 | CAMP Supplemental Award, Washington Student Achievement Council Successfully awarded-$3,751 each year. (Co-Principal Investigator) |
| 2011 | Assisted writing the College Assistance Migrant Program (CAMP) Grant, Office of Migrant Education, US Department of Education. **Successfully awarded-$2.3 million (Director)** |
| 2009 | Phil and June Lightly Leadership Fund, Washington State University. Successfully awarded-$2,500 (Director) |

**LEADERSHIP AND CIVIC ENGAGEMENT ACTIVITIES**

| | |
|---|---|
| 2022 | Guest Lecture, History of Chicanxs in Washington, High School Equivalency Program (HEP), Central Washington University |
| 2021 | Co-Chair, Central Washington University, Latinx Alumni Association |
| 2020 | Invited Speaker, College Assistance Migrant Program, Central Washington University |
| 2019 | Volunteer Judge, Regional Contest-National History Day, Central Washington University |
| 2018 | Keynote Speaker, *Annual Latinx Welcome*, Central Washington University |
| 2014-2018 | Graduate Diversity Ambassador, Graduate Opportunities and Minority Achievement Program, University of Washington |
| 2017 | Invited Speaker, *Why Race Matters: Resistance and Resilience*, University of Washington |
| 2016 | Keynote Speaker, The Pacific Northwest College Assistance Migrant Program Consortium Conference |
| 2012-2013 | Advisor, Gamma Iota Omicron (GIO), Washington State University |
| 2012 | Keynote Speaker, Na-ha-shnee: Native American Health Science Camp, Washington State University |
| 2009, 2012 | Facilitator, Secondary Education for Migrant Youth (SEMY) State Leadership Conference |
| 2008-2009 | Mentor, Hometown College Success Foundation, Mabton High School |
| 2008 | Mentor, National Hispanic Institute Leaders Conference, Washington State University |

**MEDIA COVERAGE**

| | |
|---|---|
| 2021 | "Uncounted: The History and Impact of Voter Suppression," Humanities Washington, https://www.humanities.org/wp-content/uploads/2021/05/HW_Spark_Issue2_2021_LO.pdf |
| 2021 | "Ballot Blocked Episode 5: Mexican American Voting Rights," National Park Service https://www.nps.gov/articles/000/ballot-blocked-episode-5.htm |
| 2017 | "Labor Archives: To be an Academic," University of Washington TV, www.uwtv.org/series/laborarchives/watch/H1m-nAwuauE/ |

**LANGUAGES**
Heritage Spanish Speaker

**PROFESSIONAL MEMBERSHIPS/AFFILIATIONS**
The National Association of Chicana and Chicano Studies
The Western History Association
The Labor and Working-Class History Association

# Josué Q. Estrada, Ph.D.

509-305-1489 | Josue.Estrada@gmail.com

**COMPUTER SKILLS**

Learning Management System (Canvas)

Office suite (Microsoft Office)

Presentation software (PowerPoint, Prezi, Keynote)

Communication and collaboration tools (Zoom, Skype, Teams)

Data visualization (Tableau)