**Preliminary Expert Report for Plaintiffs**
**Susan Soto Palmer, et al. v. Steven Hobbs, et al.**
**No. 3:22-cv-05035-RSL**

**By**

**Henry Flores, PhD**

Pursuant to 28 U.S.C. §1746, I, Henry Flores, PhD, declare that:

## I. Introduction

1.      My name is Henry Flores and I am over 18 years of age.  I have never been convicted of a crime and am fully competent to express the below opinions.  The following observations and opinions are within my personal and professional knowledge and are accurate and correct.

2.      Currently I am a Scholar in Residence in the Department of Political Science at the University of Houston in Houston, Texas. Additionally, I am the Distinguished University Research Professor of Political Science Emeritus at St. Mary's University in San Antonio, Texas, where I taught for thirty-five years.  During my tenure at St. Mary's, I was Dean of the Graduate School for nine years, Chair of the Department of Political Science for four years over two terms, Director of the Graduate Program in Public Administration for six years over three terms, and Director of the Graduate Political Science Program for two years.  A delineation of my academic service together with a partial list of all graduate and undergraduate courses I designed and taught are displayed in my résumé attached as Appendix A.

3.      I was awarded my PhD from the University of California at Santa Barbara in December 1981, with examination fields in American Politics (Urban and Latino), Public Administration (Organizational and Decision Theories), Political Philosophy (Conceptual Analysis and Structural Theories) and Multivariate Statistical Analyses.  I have published numerous books, scholarly articles, encyclopedia entries and invited chapters in books as well as presented learned papers on racially polarized voting, Latino and Urban Politics, racial intent,

structural discrimination, and decision theory.  Throughout my publications I note the racialized nature of politics in many areas of public policy including voting, gun control, immigration and economic development in the nation, Texas, San Antonio, and Los Angeles, California.  I have offered expert testimony in numerous civil and criminal cases.  A list of all cases in which I have provided testimony in the last 4 years is included in my attached résumé.  A true and correct summary of my training, education and experience is included in the résumé attached which was prepared by me.

4.      The Plaintiffs have retained me as an expert witness in the matter currently before this court.  I am being compensated at a rate of $150 per hour plus reasonable expenses for my work.  I have presently expended 121 hours.

5.      I was retained to determine whether the Washington State legislative district map drawn by the 2021 Washington Redistricting Commission and approved by the Washington Legislature intentionally discriminates against Latinos.  The standards used to reach this determination are those set forth by the Supreme Court in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 US 252 (1977)*.*

## II. Methodology and Evidence Used in this Report

6.      I have used and presented this methodology in four voting rights cases, and it has been accepted by the United States District Courts for the Western and Southern Districts of Texas.  My methodology begins with presenting evidence under each of the *Arlington Heights* factors.  Evidence will be provided for each of the relevant factors followed by a discussion as to why the final Enacted Plan was constructed.

7.      The United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp*, 429 U.S. 252 (1977) set forth guidance as to whether "discriminatory purpose was a motivating factor" in the policy decisional process. The Court pointed out that an inquiry of this nature "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Citing *Washington v. Davis*, 426 U.S. 229 (1976) the Court noted that "[t]he impact of the official action – whether it bears more heavily on one race than another may provide an important starting point." *Arlington Heights*, 429 U.S. at 266. The Court then identified several factors to consider in determining whether race was the determining basis for a policy decision:

2

i.    The historical background of the decision.

ii.    The discriminatory impact of the official action.

iii.    The specific sequence of events leading up to the challenged decision.

iv.    Substantive and procedural departures from the normal sequence of decision making.

v.    The legislative or administrative history as evidenced by contemporary statements by members of the decision making body, minutes of its meetings, or reports.

8.    For this report, I examined facts relevant to all five of these factors, with particular attention to how the actions of the Commission and associated personnel are relevant to this analysis. My analysis focuses on the sequence of events leading up to the challenged decisions and the legislative and administrative history of that sequence, as well as the substantive and procedural departures from the normal sequence of decision making.

9.    My opinion is based on a review of the following materials:

i.    Document production to date made by the parties including materials obtained by subpoena or open records request.  (A copy of the materials provided to me is disclosed herewith.)  Within these materials, I have paid special attention to the following:

a.    Minutes of meetings of the Washington State Redistricting Commission.

b.    Text messages between the members of the Commission and their respective staffs.

c.    Emails between Commissioners and their staffs.

d.    Emails from citizens to the Commission.

ii.    Depositions of the following individuals conducted in connection with this lawsuit: Commissioner Sarah Augustine; Executive Director Lisa McLean, staffers Pablo "Paul" Campos, Anton Grose, and Osta Davis.

iii.    Depositions of the following individuals conducted in connection with an OPMA lawsuit: Commissioner Sarah Augustine, Joe Fain, Paul Graves, April Sims, and Brady Walkinshaw; and staffers Ali O'Neil and Osta Davis.

3

iv.    Maps proposed and/or considered by each Commissioner as well as the final enacted map.

v.    A report issued by Dr. Matt Barreto entitled "Assessment of Voting Patterns in Central/Eastern Washington and Review of Federal Voting Rights Act, Section 2 Issues," dated October 15, 2021.

vi.    Several United States Supreme Court decisions including *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 US 252 (1977); *Gingles v. Thornburg,* 478 US 30 (1986); and *LULAC v. Perry,* 548 US 399 (2006).

vii.    Tversky, Amos and Daniel Khanaman.  1986.  "Rational Choice and the Framing of Decisions." *Journal of Business.*  59:  251-78.

viii.    Dewey, John.  1910, 1933, 1989.  *How We Think?*  Boston:  Houghton-Mifflin.

ix.    Flores, Henry.  2015.  *Latinos and the Voting Rights Act.*  New York: Lexington Press.

x.    _____. 2019.  *Racism, Latinos, and the Public Policy Process.* New York:  Lexington Press.

xi.    Gardner, Daniel.  2009.  *Science of Fear:  How the Culture of Fear Manipulates your Brain.*  New York:  Plume, an Imprint of Penguin Random House.

xii.    Kahneman, Daniel, Oliver Sibony and Cass R. Sunstein. 2021.  *Noise:  A Flaw in Human Judgment.*  New York:  Little, Brown Spark.

xiii.    _____. 2011.  *Thinking, Fast and Slow.*  New York:  Farrar, Straus and Giroux.

xiv.    Simon, Herbert.  1977.  *The New Science of Management Decisions, Revised Edition.*  Hoboken, New Jersey:  Prentice-Hall.

xv.    "Table 5. Decision Timeline" drafted by Dr. Loren Collingwood, provided to me by Plaintiffs' counsel, and incorporated herein as Appendix B. The information in this chart is representative of the type of data that was available to and/or being assessed by the Commissioners in both Dave's

Redistricting App and analyses of maps being done by caucus staffers.

(See, e.g., "RE_ Fain_v2 for ranking.pdf." "Fain_v2.xlsx.")

10.     I offer observations on both the specific and general levels.

11.     The specific observations are based on a detailed review of information and data substantiating each of the *Arlington Heights* Factors.

12.     My general observations are of the overall behavior of individuals participating in the redistricting decisional processes in Washington.

13.     This report uses the terms "Hispanic" and "Latino" interchangeably.

14.     I will review additional depositions and documents as they become available.  I may extend, amend or add to my opinions as additional information becomes available.

15.     I expect to be asked to provide testimony about the events and discussions leading up to the adoption of the challenged legislative plans, as those events are documented in the documents, communications and witness testimony. I expect to be asked to summarize voluminous documents and materials in order to aid the fact finder.

## III. Qualifying Statement

16.      This is a preliminary opinion based upon available information and data.  This opinion is subject to change as additional documentation is received through the discovery and deposition processes. As a result, I may supplement this report as needed.

## IV. Historical Background

17.     I have not conducted a full analysis of the historical background of discrimination against Latinos in the Yakima Valley region, and understand that another expert witness will opine on this topic. Invidious discrimination, however, is a matter of record in the communities in the Yakima Valley region.  Since 2014 there have been three voting rights lawsuits brought in the City and County of Yakima, and City of Pasco, which all settled or were adjudicated in favor of Latino voters resulting in changes to election systems in those jurisdictions.  *Montes v City of Yakima,* 40 F. Supp. 3d 1377 (E.D. Wash. 2014), *Aguilar v Yakima County, et al.,* No. 20-2-0018019 (Kittitas. Sup. Ct. July 13, 2020), *Portugal, et al. v. Franklin County, et al.*, No. 21-2-50210-11 (Franklin Sup. Court May 9, 2022), and *Glatt v City of Pasco,* Case No. 4:16 CV-05108-LRS, (E.D. Wash. Jan. 27, 2017).

5

**V. Discriminatory Impact**

18.     The Redistricting Commission configured Legislative District (LD) 15 to appear as though it was a Latino opportunity district with a majority Hispanic Citizen Voting Age Population (CVAP) of 50.02% using 2019 CVAP, the latest data which was available to the Commission when it was creating the map.  However, the district is purposefully not configured to allow Latinos to elect a candidate of their choice. (Email from Paul Graves to April Sims, RE: New map proposal, dated November 11, 2021; Deposition of Anton Grose, p. 175.). The configuration of LD 15 cracks the Latino population in the Yakima Valley region into various legislative districts including LDs 13, 14, 15 and 16. (My Districting/Washington Redistricting Commission.  Commissioner Graves Leg Proposal,

https://washington.mydistricting.com/legdistricting/comments/plan/1185/15;  Deposition of Paul Campos, p.117.). And, most importantly, it does not perform for Latino voters.

19.     As the U.S. Supreme Court pointed out, "the impact of the official action – whether it bears more heavily on one race than another may provide an important starting point." LD 15 in the Enacted Plan plainly does not perform to allow Latino voters the opportunity to elect their candidates of choice.  This is clearly evidenced by the performance analysis conducted by Dr. Loren Collingwood encapsulated in his "Decision Timeline" chart, included here as Appendix ("Appx.") B. While earlier proposed plans fared much better on this metric, in the Enacted Plan the Latino-preferred candidate in LD 15 would win in only two of the eight elections analyzed.

**VI. Sequence of Events and Contemporaneous Viewpoints Expressed by Decision Makers**

20.     The administrative record of the Redistricting Commission goes beyond the minutes of their meetings and includes private communications between commissioners, their staffs, other elected officials, and the public.  Each email, text, and public comment had a bearing on the formation of the legislative map and/or the information that was before the Commission that should have had a bearing on the formation of the legislative map.

21.     The administrative record and specific sequence of events leading up to the challenge includes evidence that the members of the Washington State Commission were briefed by the State Attorney General, staff, members of their respective parties and Dr. Barreto's Report

that adherence to the specifications of the Voting Rights Act were important if not paramount. (Depositions of Sarah Augustine, Lisa McLean; Official Meeting Minutes from June 21, 2021; Press releases of Commissioners Sims and Walkinshaw dated October 21, 2021;  Email from Ali O'Neil to April Sims, dated September 21, 2021).

22.     The publicly proposed maps, internally created and circulated draft maps, and Commission communications regarding those maps reveal that the Commissioners knew it was possible to draw a majority Latino CVAP district in the Yakima Valley that would allow Latinos the opportunity to elect their candidates of choice, knew that they were required to draw a Latino opportunity district by the VRA, and still made the ultimate decision to approve a map that provided only the façade of Latino opportunity while ensuring that the district would not perform for Latinos. Indeed, the evidence reveals that the ultimate map was the product of a conscious desire to maximize the extent to which the district would *block* Latino voters from electing their candidates of choice while at the same time maintaining the barest of a Hispanic CVAP majority in the district because doing so, they thought, would make litigation against the plan more difficult. I will be prepared to testify as to the sequence of the various proposed maps and the changes each proposed map included including referencing the racial impacts of each proposed alternative.

23.     The numbering of the Yakima Valley region district as LD 14 rather than LD 15 indicated a desire to have the Yakima district contested during a Presidential Election due to a higher turnout rate. Numbering it as the 14th district versus the 15th would put it up for election during a Presidential and gubernatorial election year rather than in off-year elections.  Latino turnout is generally higher during Presidential versus midterm election years.  (June 18, 2021 text messages between Fain and Sims, "2.9 to 8.26 (AS-JF)").

24.     Early on, Commissioners acknowledged the significance of numbering the Yakima Valley district LD 14 rather than LD 15. For example, on June 18 2021, Commissioner Fain and Sims exchanged texts regarding the importance of the numbering the Yakima Valley region district LD 14 "to have it on the ballot in a presidential year." [June 18, 2021 text messages between Fain and Sims, "2.9 to 8.26 (AS-JF)"].



25.      Further, the Commissioners were repeatedly given information on their obligation to comply with the Federal Voting Rights Act (VRA). On June 21, 2021, the Washington State Redistricting Commission held a meeting where an attorney from the Washington Attorney General's office, Brian Sutherland, provided an "overview of the Federal Voting Rights Act and minority vote dilution as it relates to redistricting." (Official Meeting Minutes from June 21, 2021). In this meeting, Mr. Sutherland provided the Commissioners with information on

*Thornburg v, Gingles* "and explained how to determine if there is evidence of a Gingles district or racially polarized voting." (Official Meeting Minutes from June 21, 2021). During the presentation, Commissioners Sims, Fain, and Graves all asked questions about the legal requirements of the VRA. (Official Meeting Minutes from June 21, 2021).

26.    Although the Commission was aware of the need to hire a consultant on VRA compliance, the Commission did not do so.  (Sarah Augustine Deposition dated October 06, 2022 pp. 66-67; Lisa McLean Deposition dated October 05, 2022, p. 87, 92 ("It was, go hire a voting rights consultant. We had money. I knew we had money.")).

27.    The Commission never advertised for or sought the services of a VRA consultant even though they had recommendations from both parties.  (Lisa McLean Deposition, October 05, 2022, p. 95).  Although Chairperson Augustine sent a recommendation to the voting members of the commission to hire a VRA consultant, the commissioners "had no more appetite to hire a VRA consultant" after Commissioner Graves passed on Dr. Barreto, instead recommending Dr. Brunell.  (Lisa McLean Deposition, October 05, 2022, pp. 108-109).

28.    It is not clear why the commissioners lost interest in hiring a VRA consultant, which leads me to conclude that they did not make complying with the VRA a priority. (Lisa McLean Deposition, October 05, 2022, p. 109; Sarah Augustine Deposition, October 06, 2022, pp.72-75; Texts through State-paid phones through 3.29.22_FOR REVIEW, text from Augustine to McLean on August 17, 2021 ("It looks like there is no support for a VRA consultant of any kind. I think it's time to give it up.")).

29.    On September 21, the four voting Commissioners each released their initial public proposal for the legislative maps (September 21 Proposals, Appx. C). None of the four proposed legislative maps included a majority Latino CVAP legislative district in the Yakima Valley. Neither the Fain nor Graves Proposals would provide Latinos with the opportunity to elect their candidates of choice, and, in fact, those proposals further split the Latino communities in the Yakima Valley such that their proposals had smaller Latino populations and worse outcomes for Latino-preferred candidates than even the prior configuration of LD 15. ("Analysis of 9.21 Commissioner Proposed Leg Maps.pdf." "DraftComparison.xlsx.").  And of the four proposals, only Walkinshaw's numbered the Yakima Valley District LD 14. ("Decision Timeline," Appx. B).

9

30.     In a public statement, composed by staff for the commission, it was clear that the Latino community in the Yakima Valley requested to be unified in public meetings.  (October 13 E-Mail from O'Neil to Meyers, "MEYERS_004619.pdf").

31.     In a slide show presentation dated October 15, Dr. Matt Barreto provided analysis demonstrating that there was "crystal clear" evidence of racially polarized voting in the Yakima Valley Region, illustrating the flaws with the Commissioners' September proposals' Yakima Valley districts from a VRA perspective, and providing alternative maps that would comply with the Voting Rights Act's requirement that there be a district in the Yakima Valley Region that would provide Latinos with the opportunity to elect their candidates of choice ("WA state presentation.pdf").

32.     On October 21, Commissioner Walkinshaw publicly released the Barreto analysis ("RELEASE_ New analysis shows final Washington st…(1).pdf." "Barreto-WA-Redistricting-Public-Version.pdf"). That release summarized that "Dr. Barreto's analysis found that to comply with federal law, the legislative map adopted by the Washington State Redistricting Commission must include a majority-Hispanic district based on Citizen Voting Age Population (not total or voting age population) that also has the demonstrated ability to allow Latino voters to elect candidates of their choice to the Washington State Legislature." This was emphasized by Commissioner Walkinshaw when he noted "it is mission critical to me that the maps we put forward guarantee the voting rights of this historically underrepresented and marginalized community (Latinos)." Earlier in his press release Commissioner Walkinshaw pointed out "...the political choices of those voters have not been reflected in their elected representatives.  That's why we have heard repeatedly throughout this redistricting process from the public that Latino communities must be kept together and allowed to elect candidates of their choice…..That's why Commissioner Sims and I will be releasing new statewide legislative maps early next week that incorporate public feedback we've received in the last few weeks and include a VRA-compliant 14th district in the Yakima Valley.  We encourage our Republican colleagues to do the same." ("RELEASE_ New analysis shows final Washington st…(1).pdf").

33.     Commissioners Sims and Walkinshaw redrew their respective maps after exposure to Dr. Barreto's Presentation together with public comment from the Latino community,  both were Latino majority, Sims HCVAP 51.6% , Walkinshaw HCVAP 51.6%. ("Decision Timeline," Appx. B; October 25 Proposals, Appx. D). In announcing her

reconstituted LD 14, Commissioner Sims acknowledges the "presence of racially polarized voting in the Yakima Valley region and provides the Commission with a clear directive:  draw a district that allows the Latino community in Yakima Valley to elect their candidate of choice." ("Updated Sims Map Statement 10252021.pdf").  Additionally, Commissioner Walkinshaw, citing both public comment from the Latino community and Dr. Barreto's presentation, included a VRA-compliant 14th Legislative District in the Yakima Valley.  Walkinshaw stated "Now that we have this information, we as commissioners should not consider legislative district maps that don't comply with the VRA.  It is irresponsible to the historically underrepresented communities in the Yakima Valley to entertain any proposals that undermine their rights under federal law…" ("RELEASE Walkinshaw Releases New Legislative District Map.eml.pdf").

34.     The other two commissioners, Fain and Graves, did not issue new public proposals even after becoming aware of the Barreto analysis and the applicability of the VRA to the Yakima Valley region district.  (Depositions of Anton Grose, August 16, 2021 p.164, and Paul Campos, August 15, 2021 p. 87-88).

35.     Commissioner Graves sought consultation concerning legal representation in the event of a VRA complaint.  He inquired if the state would incur the costs of legal representation or if he would be required to cover this expense.  ("Official email Sims_Redacted.pdf" pp.51-53; Texts through State-paid phones through 3.29.22_FOR REVIEW, text from Augustine to Graves on October 22, 2021 at 0:59 "Hi there Paul. I just sent you an email explaining complications in retaining VRA counsel. Call me once you've read it if you wish.").

36.     The Senate Democratic Caucus redistricting staffer noted, in an email to Commissioner Walkinshaw, that based on the "VRA-analysis and what we have heard repeatedly in public comment" the number One "must-have" in an approved map is a "VRA-compliant 14th, dem performing, non-negotiable" district.   (Oct. 27 E-Mail from O'Neil to Walkinshaw, "Leg map must-haves.pdf").

37.     On October 28, 2021, the Washington Attorney General's office sent the Commissioners a memorandum related to the Voting Rights Act which purportedly "largely finds that if the Barreto analysis is correct, there is a sufficient legal need for a VRA district." (October 28 Email from O'Neil to Walkinshaw, "Official Email Walkinshaw_Redacted.pdf" at 64-65. Text messages between Fain and Graves, "Graves_10..28_30_11.01_02_03.png").

38.     Following the release of the Barreto analysis and a memorandum from the
Washington Attorney General's office regarding the VRA, all four Commissioners began
internal negotiations regarding the Yakima Valley Region district, at times referring to that
district as LD 14 (as was preferred by Commissioners Walkinshaw and Sims) and LD 15 (as was
preferred by Commissioners Graves and Sims). On October 30, 2021, Commissioners Graves
texted Commissioner Fain that he was working on a map starting with Commissioner
Walkinshaw and Sims' preferred LD14 configuration. (Text messages between Fain and Graves,
"Graves_10..28_30_11.01_02_03.png").



39.     At the November 1, 2021 Commission meeting, Commissioner Walkinshaw
shared that he had spoken with each of the Commissioners individually and that there were "a lot
of questions about the Voting Rights Act and the district in the Yakima Valley." Commissioner
Fain noted that they discussed the Voting Rights Act and each commissioner's priorities.  Both
Commissioners Sims and Graves were clear that they were about to enter into the negotiation
phase of the redistricting process.  (Nov. 1, 2021 Washington Redistricting Commission Meeting
Minutes at 10). (Nov. 1, 2021 Washington Redistricting Commission Meeting Minutes at 11).

40.     At the end of the November 1 Commissioner's meeting Walkinshaw requested
staff to send to the Chair and Executive Director of the Commission Dr. Barreto's full report to
be shared with all commissioners.(Nov. 1, 2021 Email from O'Neil to Augustine, McLean, "Dr.
Barreto's VRA Analysis.pdf." Nov. 1, 2021 Washington Redistricting Commission Meeting
Minutes.).

41.     At some point between November 1, 2021 and early November 3, 2021, the
Washington Assistant Attorney General provided new analysis on Section 2 of the VRA.  (Texts

through State-paid phones through 3.29.22_FOR REVIEW, text between McLean and Augustine on November 03, 2021 at 0:13).

42.     On November 3, 2021, Commissioner Fain texted Commissioner Graves that it was necessary to draw a "dem leaning Latino district in Yakima" (Text messages between Fain and Graves, "Graves_10..28_30_11.01_02_03.png").



Wed, Nov 3, 7:19 AM

Based on initial returns, 78% of Yakima voters are approving Prop 3 to add a local income tax ban to the city charter. This means 11 cities and one county in Washington

We will need to draw a dem leaning Latino district in Yakima that doesn't include any yakima

43.     Commissioner Graves offered a "dem leaning" district to Walkinshaw that same day.  (Text messages between Fain and Graves, "Fain_11.03 (2).png"). (Nov. 3, 2021 E-mail from O'Neil to Walkinshaw, "Fwd_LD Offer from Graves.pdf"). The map, labeled "GravesLD14," would have drawn LD 14 to have a Hispanic CVAP of 50.6% and the Latino-preferred Democratic candidates would have prevailed in 8 of 8 recent statewide elections with margins ranging from 52.8% to 60.3% ("Decision Timeline," Appx. B). The district proposed by Commissioner Graves on November 3, 2022 is shown below:

**"GravesLD14" Map—November 3, 2021**



44.     When Commissioner Fain texted Commissioner Graves the next day to report that the Democratic Commissioners' proposal actually had lower performance for Latino-preferred candidates, Commissioner Graves replied that they should scrap his own proposal.  (Texts between Graves and Fain, "Fain_11.04.png"):



45.     Subsequently, they did make the changes, with the proposals by Graves and Fain for the VRA district substantially changing its configuration—jettisoning the Lower Yakima Valley heavily Latino (and heavily Democratic) communities of Toppenish, Wapato, and Mabton—and shifting north and east. Doing so reduced the electoral possibilities for Latino-preferred candidates in the district.

46.     On November 4, 2021, Commissioners Graves and Fain received a memorandum that they had requested from attorneys at Davis, Wright, Tremain to "evaluate Dr. Matt Barreto's Assessment of Voting Patterns in Central / Eastern Washington and Review of Federal Voting Rights Act, Section 2 Issue ('the Assessment')." The memo was "predominantly legal, rather than factual" and did not "endeavor[] to conduct factual research regarding demographic trends, voting behavior, election results, or other factual assertions in the Assessment." Nor did the memorandum seek to address the legal analysis provided by the Washington Attorney General's office in the days prior ("Redistricting VRA Memo.pdf"). Commissioner Graves forwarded this memorandum to Commissioner Sims on November 5 (November 5, 2021 e-mail from Graves to Sims, "Fwd_ Legal memo.pdf"). While the memorandum advised the Commissioners that they could not draw a majority Latino CVAP district in the Yakima Valley Region without running afoul of the law and risking a lawsuit, Commissioner Graves and Fain did not follow that advice. The evidence clearly demonstrates that Graves' intent, ultimately reflected in the final map, was to draw a majority Latino CVAP district in the Yakima Valley, but with a progressively decreasing likelihood for Latinos there to elect their candidates of choice.

47.     For example, on November 7, 2021, Commissioner Graves created a map labeled "11-7 New leg proposal," which he shared with Commissioner Sims in a meeting on November 8 (Texts between Graves and Fain, "Fain_11.07_.08.png"). That map is shown below:

**Graves "11-7 New leg proposal" – November 7, 2021**



48.    Commissioner Graves's November 7 proposed LD 14 had a Latino CVAP of 50.9% and the Latino-preferred Democratic candidates would have prevailed in 5 of Commissioner 8 recent statewide elections, with winning vote shares ranging from 48.3% to 55.7%. ("Decision Timeline," Appx. B). Before Commissioner Graves finished this proposal and shared it with Commissioner Sims, he texted Commissioner Fain asking if he had taken any notes on what "price" the Democratic Commissioners were willing to pay in order for Commissioners Graves and Fain to agree to a Yakima area district that complied with the federal Voting Rights Act (Text messages between Graves and Fain, "Fain_11.07_.08.png").

Sun, Nov 7, 4:35 PM

If you had notes on the price for their 14, can you please send them to me? I'll try to put together a full map for tomorrow and want to make sure we're on the same page.

49.    On several occasions Commissioner Graves made clear that he was only willing to comply with the VRA in the Yakima area for a "price"—i.e., Republican gains elsewhere in

16

the map (Nov. 11, 2021 Email from Graves to Sims, "RE_New map proposal.pdf"). In other words, despite knowledge of mandates of federal law and what it required for the Yakima area district, Commissioner Graves treated complying with Latino voters' federally protected rights as a negotiating tactic to extract political benefits elsewhere in the map.

50.     On November 8, Commissioner Fain circulated a proposed map that increased the performance for Latino-preferred Democratic candidates, but that switched the district number from LD 14 to LD 15, which would result in the senate election occurring in the off-year cycle in which Latino turnout is lower ("Fwd_Fain LD Map.pdf"). In Commissioner Fain's proposal, LD 15 would have a Hispanic CVAP of 50.6%, and Latino-preferred Democratic candidates would have won in 7 of 8 recent statewide elections, with a tie in the 2018 U.S. Senate race—the only recent off-year statewide election. ("Decision Timeline," Appx. B). That map is shown below:

**"Fain V2" – November 8, 2021**



51.     The documentation regarding the sequence of events that took place between Commissioner Graves's release of his November 7 proposal and the map that was ultimately adopted reveal two key facts relevant to discriminatory intent: (1) the Democratic Commissioners were unwilling to agree to more competitive districts in other parts of the state in exchange for a new VRA-compliant Yakima district, and (2) the Commissioners—in an effort seemingly led by Commissioner Graves—consciously sought to undermine the ability of Latino voters to elect their candidate of choice in the Yakima area while at the same time maintaining the façade of Latino electoral opportunity by surgically selecting precincts to add and remove

from the district in order to maximize Republican performance while still maintaining the barest of Latino majorities.

52.     The first fact—that the Democratic Commissioners knowingly and intentionally protected incumbents despite knowing federal law required them to protect Latino voting rights—is obvious because the Republican Commissioners proposed plans that would perform for Latino voters in the Yakima Valley region, and Democratic Commissioners rejected those offers.

53.     The second fact—the conscious effort to conceal the knowing VRA violation—is likewise obvious from the evidence, including contemporaneous notes and from the surgical alterations Commissioner Graves and his staff made leading up to the adoption of the final map.

54.     Ali O'Neil, a legislative staffer who observed some of the negotiations, recorded her recollections of November 11-16, 2021 in a timeline of those days drafted November 18-19, 2021. In those notes, she recorded the following for November 15, 2021. (Ali O'Neil Production, "Timeline of Redistricting Commission Events 11.19.docx"):

> Brady told graves that his priority was a VRA compliant district, but that he would not negotiate a VRA district for anything else in the map and that he might be willing to vote for a district that was not compliant. He asked for the republicans to draw the district the way they wanted, and for it to be the 14th district. Graves insisted that he wanted to make it majority Hispanic by CVAP, but that it would be a Republican district, and that he wanted to do this to be able to protect against any lawsuit. He said repeatedly that this was the best thing to do to not lose a lawsuit.

55.     Unwilling to do what was required to actually comply with the VRA, Commissioner Graves thus insisted that the map attempt to conceal its noncompliance (and

evade legal liability) by remaining a majority Hispanic CVAP district despite the fact it intentionally would not perform for Latino voters.

56.     The progression of Commissioner Graves's proposed plans corroborates Ms. O'Neil's recorded notes of Graves's approach to the Yakima Valley district. And Commissioner Fain made clear he was in lockstep with Commissioner Graves's approach, texting him that Fain's and Graves's staffers were instructed to work together on their position on the Yakima district ("Fain_11.07_.08.png"):



57.     On Thursday November 11, Commissioner Graves shared a proposal that the Republican staffers—Mr. Campos and Mr. Grose—collaboratively developed the prior evening. (Text messages between Fain and Graves, "Fain_11.11_12.png." Nov. 11, 2021 E-mail chain with Graves, Grose, Sims, Davis, and Meyers, "RE_New map proposal.pdf."). The map was labeled "Graves1110LD." The map was largely the same as Commissioner Graves's November 7 proposal, except it made a few key changes to reduce the Hispanic population and boost Republican performance. Commissioner Graves wrote to Commissioner Sims that "The 14th here is ever so slightly more Republican here than your last proposal, but is still firmly swing. It is majority Hispanic CVAP." Graves specified that an LD 14 with this composition would have to be in exchange for shifted partisan performance elsewhere on the map (Nov. 11, 2021 E-mail from Graves, "FW_New map proposal.pdf."). This presents a suspicion that Commissioner Graves was willing to bargain with a potentially VRA-compliant district to achieve partisan gains elsewhere in the statewide plan.

**From:** Graves, Paul <Paul.Graves@redistricting.wa.gov>
**Sent:** Thursday, November 11, 2021 10:48 AM
**To:** Sims, April <April.Sims@redistricting.wa.gov>
**Cc:** Grose, Anton <Anton.Grose@leg.wa.gov>; Davis, Osta <Osta.Davis@leg.wa.gov>; Meyers, Dominique <Dominique.Meyers@leg.wa.gov>
**Subject:** New map proposal

Hi April,

Anton is sending over our next map offer shortly. Highlights below, and looking forward to talking at 1:

- The 14th here is ever so slightly more Republican here than your last proposal, but is still firmly swing. It is majority Hispanic CVAP.
- As we've discussed, that is a huge shift, with many resulting challenges in Central and Eastern Washington. I understand from our talks Monday and yesterday that you agree such a big shift should result in something given in exchange, but that applying points to other districts is not a framework you are interested in. My biggest question to you then: what do you think a fair exchange

is for this 14th?
- My proposal here for that 14th is Republican improvement in 47, 24, and 28. That improvement in 47, as I texted yesterday, necessarily eats into Republican performance in 5, moving 5 to safe D and necessitating 38 being in the discussion. This 38, accordingly, both does good by communities of interest (uniting Tulalip and all of Marysville, for example), and pegs it close to current 5th partisan performance.
- As I made clear yesterday, a 50/50 10th would be two points worse for Republicans. We can work toward that, if you'd like, but it would require concessions in other swings.
- To that end, this map takes the three districts with true split delegations (42, 10, 26), and keeps them the same as they are now, performance-wise.

Again, looking forward to talking at 1, and I will be especially interested to hear from you what you think a fair price is for this 14th. I will also be interested to hear how your talks with Brady are going. Ideally, we would be sending proposals from here on out that have the support of each partisan dyad, but perhaps Brady might not be agreeable to that, which could present some challenges as we work toward three votes for a map.

58.     The map below illustrates the changes that were made: the dark gray region shows the geography that remained the same between the two proposals, the red illustrates the precincts that were removed, and the green illustrates the precincts that were added:

**Graves November 7 Map v. Graves November 11 Map**



**Yakima Close-Up**



59.    Notably, Commissioner Graves's November 7 proposal includes zero split precincts, while the November 11 proposal splits five precincts, including the two Yakima precincts shown in the close-up image above. That red area includes 7 Census blocks that were removed from Precinct 104—381 people with a Hispanic CVAP of 60.9%. The green area includes 4 Census blocks that were added from Precinct 112—100 people with a Hispanic CVAP of 42.4%.

60.    Below is a chart showing the demographic and electoral characteristics of the population that remained, was added, and was removed from the November 7 to the November 11 proposals.

**Graves November 7 Map v. Graves November 11 Map Data**

| Area | Total Population | Hispanic CVAP | White CVAP | 2020 Treasurer - Pellicciotti % | 2020 President - Biden % |
|---|---|---|---|---|---|
| **Remained (Gray)** | 154,366 | 51.0% | 43.8% | 48.6% | 50.6% |
| **Added (Green)** | 2,895 | 14.2% | 81.7% | 23.9% | 29.9% |
| **Removed (Red)** | 2,931 | 45.2% | 50.6% | 55.0% | 57.3% |

61.    These surgical alterations—including splitting precincts—resulted in the Hispanic CVAP of the district dropping from 50.9% to 50.3%. The removed citizen voting age population is predominantly Hispanic voters, and the removal of such population weakens performance for Latino-preferred candidates, as demonstrated by the demographic and electoral figures. By contrast, the population added to the district is heavily white and votes predominantly against Latino candidates of choice.

62.    The next representative proposal from Commissioner Graves was drawn on November 12 and forwarded to Commissioner Sims and her staff on November 13 (Email from Graves to Sims, "Fwd map proposal.eml.msg.pdf"). In transmitting it, Graves noted that he was changing the number of the district from LD 14 to LD 15 "for ease of incumbents" and that he rejected Commissioner Sims's most recent proposal for the district because its Hispanic CVAP was just below 50% and he wanted it to be "just over 50%":

**From:** Graves, Paul <Paul.Graves@redistricting.wa.gov>
**Sent:** Saturday, November 13, 2021 8:48 AM
**To:** Sims, April <April.Sims@redistricting.wa.gov>
**Cc:** Grose, Anton <Anton.Grose@leg.wa.gov>; Davis, Osta <Osta.Davis@leg.wa.gov>; Meyers, Dominique <Dominique.Meyers@leg.wa.gov>
**Subject:** Re: Map proposal

Sorry, two quick corrections (we're moving pretty quickly over here): we made the CVAP district the 15th rather than the 14th for ease of incumbents, and it's not the just-below-2019-CVAP you proposed, but instead it's at just over 50% CVAP.

Paul Graves
Sent from my phone

> On Nov 13, 2021, at 8:42 AM, Graves, Paul <Paul.Graves@redistricting.wa.gov> wrote:
>
> ?
> Good morning,
>
> Anton is going to send an EZIP file of our proposal in just a minute. As discussed yesterday, it:

- Starts with the 14th as you proposed it most recently. That involves a 3 point shift in partisan performance, and in exchange the map makes the 47th just 0.36% better for republicans.
- Five of the seven current swing or lean districts (26, 10, 42, 44, and 28) see their partisan performance stay within 0.1% of status quo using the treasurer's race number.
- Whichever way the 24th grows, its partisan performance will change. So this map makes it 0.5% better for republicans, and makes the 17th 0.45% better for democrats.

This map also works to keep as many incumbents in their current districts. Here are the members who would be districted out, and there may be some flex in these joints, especially with members in safe districts:

63.     In this instance, "ease of incumbents" refers specifically to the Republican incumbents that Commissioner Graves and the other commissioners knew were the candidates white voters joined together as a bloc to support to defeat the Hispanic voters' candidate of choice. As the Commissioners knew, numbering the district with an odd number would ensure a depressed Hispanic turnout (see, e.g. "SDC Map Presentation_9.16").

64.     The map below illustrates the changes made between Commissioner Graves's November 11 proposal and his November 12 proposal, with the dark gray region the geography that remained, the red region the geography that was removed, and the green region the geography that was added:

**Graves November 11 Map v. Graves November 12 Map**



**Yakima Close-Up**



65.     In Yakima, Commissioner Graves's November 12 proposal eliminates the split of the 7 Census blocks in Precinct 104 by returning them to the district, but removes two precincts with large Hispanic populations (47.3% and 41.3%) that overwhelmingly support Latino-preferred candidates. Those voters are replaced with white voters, as reflected in the chart below:

**Graves November 11 Map v. Graves November 12 Map Data**

| Area | Total Population | Hispanic CVAP | White CVAP | 2020 Treasurer - Pellicciotti % | 2020 President - Biden % |
|------|-----------------|---------------|------------|----------------------------------|---------------------------|
| **Remained (Gray)** | 153,141 | 50.5% | 44.5% | 47.3% | 49.4% |
| **Added (Green)** | 4,132 | 39.2% | 54.5% | 34.1% | 37.2% |
| **Removed (Red)** | 4,120 | 42.8% | 46.3% | 63.9% | 64.1% |

66.     Overall, the Hispanic CVAP fell from 50.3% in Commissioner Graves's November 11 proposal to 50.2% in his November 12 proposal. A comparison between the November 7-to-November 11 changes and the November 11-to-November 12 changes illustrates just how surgical the map tinkering became in order to maximize the chance that Latino-preferred candidates would be defeated while still maintaining a bare majority-Hispanic district. The November 7-to-11 changes moved just under 6,000 people and dropped the Hispanic CVAP by over half a percent (0.6%). Having fallen to 50.3% in the November 11 proposal, the Republican Commissioners' staff had to be more careful in selecting precincts to manipulate the district's electoral performance while still maintaining the façade of a Latino opportunity district. So in the November 11-to-November 12 changes, over 8,000 people were shifted into and out of the district; while the Hispanic CVAP fell by just 0.1%, the change had a large effect on the performance for Hispanic preferred candidates.

67.     The electoral ramifications illustrate this careful tinkering: the November 12 proposal drops from five to two—out of eight—the number of elections in which the Hispanic-preferred candidates prevail in the district, with one race a tie. ("Decision Timeline," Appx. B). By dropping the Hispanic CVAP by just 0.1% and carefully targeting the precincts to add and remove, the map drawers flipped the district from one in which Hispanic-preferred candidates prevailed in the majority of recent elections to one in which Hispanic-preferred candidates were defeated in the majority of recent elections.

68.     The final map enacted by the Commission included several additional tweaks that dropped the Latino population even further—from 50.2% to 50.**02%**--and likewise increased the performance of opponents of Latinos' candidates of choice.  The map below illustrates the changes between Commissioner Graves's November 12 proposal and the Enacted Plan, with the

dark gray region the area that remained, the red region the area that was removed, and the green region the area that was added:

**Graves November 12 Map v. Enacted Map**



**Yakima Close Up**



69.     In Yakima, the Enacted Plan splits Precinct 143 (which was wholly contained in LD 15 in Commissioner Graves's November 12 proposal) and does so starkly along racial lines—removing both the Hispanic-majority Census blocks from the precinct. The image below shows the Precinct with shading to reflect Hispanic population. The Enacted Plan splits this precinct to remove the two Census blocks on the left, which contain 268 people with a Hispanic CVAP of 69.2%. The rest of the precinct that remains in the district comprises 809 people with a white CVAP of 56.9%.



70.     This granular targeting of Hispanic voters was repeated throughout the final changes from the November 12 Graves proposal to the Enacted Plan, as illustrated in the table below:

**Graves November 12 Map v. Enacted Map Data**

| Area | Total Population | Hispanic CVAP | White CVAP | 2020 Treasurer - Pellicciotti % | 2020 President - Biden % |
|---|---|---|---|---|---|
| **Remained (Gray)** | 156,724 | 50.1% | 44.8% | 46.7% | 49.0% |
| **Added (Green)** | 507 | 18.3% | 75.7% | 28.8% | 31.5% |
| **Removed (Red)** | 549 | 63.4% | 36.6% | 61.7% | 62.1% |

71.     These final alterations dropping the Hispanic CVAP from 50.2% to 50.02% also improve Latino-preferred candidates' opponents' performance by shifting the one election in which there was a tie in the November 12 proposal to the Latino-preferred candidates' opponents' favor in the Enacted Plan, resulting in a district in which the Latino-preferred candidates lost in six out of eight recent statewide elections.

72.     The map below illustrates the sum of these iterative changes from the November
7 Graves proposal to the Enacted Plan, with the dark gray area representing unchanged
geography, the red showing removed geography, and the green showing added geography.

**Graves November 7 Map v. Enacted Map**



73.     A series of changes across four maps resulted in the district (1) dropping in
Hispanic CVAP from 50.9% to 50.02%, (2) flipping from Hispanic-preferred candidates
prevailing in a majority of elections to white-preferred candidates prevailing in a majority of
elections, and (3) having its numbering changed from LD 14 to LD 15 to reduce the Hispanic
turnout and aid the electoral prospects of the white incumbents—opposed by Hispanic voters—
even further. The table below shows the demographic and electoral effect of these changes:

**Graves November 7 Map v. Enacted Map Data**

| Area | Total Population | Hispanic CVAP | White CVAP | 2020 Treasurer - Pelicciotti% | 2020 President - Biden% |
|---|---|---|---|---|---|
| Remained (Gray) | 150,404 | 51.2% | 43.8% | 48.2% | 50.3% |
| Added (Green) | 6,827 | 26.8% | 68.0% | 28.0% | 32.6% |
| Removed (Red) | 6,893 | 44.7% | 47.7% | 61.5% | 62.5% |

74.     By changing the demographic makeup of just over 4% of the district's total population (shifting in and out just under 7,000 out of roughly 157,000 people), Commissioners Graves and Fain—in maps drawn by them and their staff and ultimately agreed to by all four Commissioners—flipped the district from one that would permit Latinos to elect 5 out 8 of their preferred candidates to one in which they could elect just 2 out of 8 of their preferred candidates.

75.     The progression of Graves' draft maps, the makeup of the final plan, and deposition testimony reveal that Graves' approach was the methodology which guided the final configuration of LD 15. (Anton Grose Deposition, Aug. 16, 2022, p. 242).

76.     The sequence and details of these micro-targeted alterations illustrate the careful attention that was paid to maximizing the dilutive effect of the map on Latino voting strength while advancing Commissioner Graves's view that the map could evade a legal challenge while accomplishing his goal of diluting Latino voting strength by precisely maintaining a bare Hispanic majority in the district. The evidence shows this was intentional vote dilution.

77.     The evidence shows that, while Commissioners Graves and Fain were fine-tuning their vote-dilution in the Yakima Valley region district, Commissioner Sims began proposing maps which used decreased Latino-preferred candidates' performance in LD 14/15 as a bargaining chip for increased performance elsewhere. Meanwhile, Commissioner Walkinshaw initially put forward proposals recognizing his continued understanding that a VRA-compliant district enabling Latinos to elect their candidates of choice in the Yakima Valley region was required.  Ultimately, however, both Commissioners agreed to the final maps with knowledge that those maps diluted Latino voting strength in the Yakima Valley while creating a mere façade of opportunity.

78.     On November 4, 2021, Osta Davis, a House Democratic Caucus staffer who worked with Commissioner Sims throughout the redistricting process, sent Commissioner Sims

the below configuration of LD 14 which she identified as having 51.3% Latino CVAP and 50% vote share for the Latino-preferred candidate in the 2020 Treasurer's race ("New 14th.pdf.;" "14th LD.pdf."):



Hispanic CVAP: 51.3%

Minority CVAP: 56.5%

Pellicciotti Performance: 50%

79.     Also on November 4, 2021, Ali O'Neil e-mailed with Osta Davis regarding LD 14. O'Neil revealed that the maps that Walkinshaw and she were working on were "very similar" to the one sent to O'Neil that day by Davis. O'Neil identified their map as containing a majority Latino CVAP LD 14 which would allow Latinos to elect Latino candidate of choice Jay Inslee. O'Neil flagged that the map she was working on would also minimize impacts to incumbents. (Nov. 14, 2021 E-mail chain between O'Neil and Davis, "DAVIS_019053").

80.     On November 9, 2021, Commissioner Sims was exchanging e-mails with Osta Davis regarding a map in which LD 14 would vote 52.59% for the Latino-preferred candidate in the 2020 Treasurer's race. Commissioner Sims noted that she was "[w]ondering if we should give a little somewhere, but not sure where?" Davis responded with updated numbers for several districts including LD 14 which, in this new configuration, would only vote 50.2% for the Latino-preferred candidate. Davis noted that they "could drop the 10th to 49.9% and then we'd have 2 lean D/R districts and 3 swing D/R districts each with the 14th being 50/50." She said that that "sound[ed] super fair to" her. (Nov. 9, 2021 E-mail thread between Sims, David, Meyers, "RE_Map draft(2).pdf").

81.     On November 10, 2021, Ali O'Neil, at the request of Commissioner Brady, sent a new proposal to Paul Campos, the staffer working with Joe Fain. Paul Campos then forwarded that proposal to Commissioner Fain. (Nov. 10, 2021 E-mail from Campos to Fain, "FW_Walkinshaw 11.10 leg map, new VRA.pdf"). The map, titled "BW > Fain 11.10 new VRA," had a Latino CVAP of 52.6% and the Latino-preferred candidate would prevail in eight out of eight recent elections. ("Decision Timeline," Appx. B).

82.     Commissioner Fain texted with Commissioner Graves regarding Walkinshaw's November 10 proposal, casting that proposal aside as "a bad faith offer." Commissioner Graves's next text on the morning of November 11 demonstrates that the Republican Commissioners' staffers had, like Fain, disregarded Walkinshaw's November 10 proposal and instead continued working on Graves' proposal discussed above. (Nov. 10-11, 2021 text messages between Fain and Graves, "Graves_11.10_11_12_13.png").



83.     On November 11, Commissioner Sims texted Commissioner Walkinshaw that she was working on LD 14 and was planning to drop the CVAP below 50%. She said that doing so would allow them to decrease performance for Democratic candidates and that Democratic

performance would be even lower if they renumbered the district to LD 15. (November 11, 2021 text messages between Walkinshaw and Sims, "Sims_11.11(4).pdf").



84.     On November 12, Commissioner Sims followed through on her intent to renumber the district to LD 15 in a proposal she first sent to Commissioner Graves and Fain, and then forwarded to Commissioner Walkinshaw ("Fwd_Updated Proposal Email(1).pdf"). Sims identified LD 15 in the proposal as 49.2% CVAP with the Latino-preferred candidate in the 2020 Treasurer's race gaining just 45.7% of the vote. Analysis shows that Latino-preferred candidates in this LD 15 would be defeated in seven out of eight recent elections. This is a marked difference from Sims's September 21 and October 25 proposals in which Latino candidates of choice would have prevailed in eight out of eight recent elections. ("Decision Timeline," Appx. B).

85.     The decreased performance of LD 15 in Sims's November 12 proposal from LD 14 in Graves's November 7 proposal is consistent with an e-mail exchange between Commissioner Sims and Osta Davis regarding her November 12 proposal revealing that the map "adopt[ed] Graves' E. WA, minus the 3rd and some slight changes to decrease performance in the 15th." In the e-mail, when deciding whether to also include decreased performance in LD 10, Davis questioned whether doing so would "translate too much as a point for point swap?" ("Re_ Newest version.pdf."). This phase in the negotiations accordingly reflects that Commissioner Sims had begun using decreased performance in the Yakima Valley district as a bargaining chip to achieve her objectives for other legislative districts.

86.     Commissioner Sims's November 12 proposal was forwarded to Dr. Matt Barreto and his feedback was later forwarded to Commission Walkinshaw (Nov. 13 E-mail from Adam Hall to Walkinshaw, "Fwd Updated Proposal Email.eml.msg.pdf").

87.     Commissioner Sims's November 12 proposal was forwarded to Dr. Matt Barreto and his feedback was later forwarded to Commission Walkinshaw. Dr. Barreto was insistent that the Latino district in the Yakima Valley needed to be numbered LD 14 "to keep the Senate seat up in Presidential years when turnout is higher for our community." He went on to explain that "[i]n this region of the state, registration and turnout is historically low due to history of exclusion, intimidation and discrimination." (Nov. 13 E-mail from Adam Hall to Walkinshaw, "Fwd Updated Proposal Email(1).pdf.pdf").

88.     On November 13, 2021, following Sims's November 12 proposal drastically decreasing positive outcomes for Latino-preferred candidates in the Yakima Valley region, Commissioner Walkinshaw sent Commissioner Fain another configuration of LD 14, titled "BW 11/13 leg proposal" with 51.6% Latino CVAP, a slight decrease from his November 11 proposal. (Nov. 13, 2021 E-mail from Walkinshaw to Fain, "Fwd_BW 11.13 leg map proposal.pdf"). The district would nonetheless allow Latinos to elect their candidate of choice in eight out of eight recent elections. Walkinshaw's November 13 proposal also notably kept the Latino CVAP district numbered LD 14. ("Decision Timeline," Appx. B).

89.     Commissioner Fain texted Commissioner Walkinshaw, rejecting Walkinshaw's proposal (Nov. 13, 2021 Text from Fain to Walkinshaw, "BW_11.11_13_14.pdf").

Sat, Nov 13, 2:28 PM

Just reviewed the map and charts. It's moving the opposite direction. Not really worth discussing.

90.     On the evening of November 13, Commissioner Fain distributed a memorandum to the rest of the Commissioners comparing Commissioner Walkinshaw and Graves's proposals and outlining "competitiveness" as his primary outstanding concern, but making no mention of VRA compliance. ("Memo.pdf." "Fain_20211113 V2.pdf.").

91.     The remaining sequence of events demonstrates that Commissioner Walkinshaw joined Commissioner Sims in permitting performance in the Yakima Valley district to drop in the leadup to the November 15 vote. For example, a draft map circulated by Ali O'Neil on November 14 on behalf of Commissioner Walkinshaw included "the CVAP district from the Republicans" which O'Neil flagged as something that "we still need to discuss." ("RE_Merged leg map.pdf"). The Yakima Valley district in that map was numbered LD 15 and only one of eight Latino-preferred candidates would prevail in recent elections. ("Decision Timeline," Appx. B).

92.     At 10:48 pm on November 15, 2021, Osta Davis sent Ali O'Neil a copy of "the R's version of the plan map." (Nov. 15 E-mail from Davis to O'Neil, "FW_ R Map Proposal.pdf"). The plan was nearly identical to the final plan with 50% Latino CVAP and Latino candidates of choice prevailing in only two of eight recent elections. ("Decision Timeline," Appx. B).

93.     The sequence of events in this case—and the overwhelming evidence of knowledge, surgical targeting of Hispanic voters, and intent to evade liability by purposefully creating a dilutive façade Latino opportunity district—is strongly suggestive of a racially discriminatory intent.

**VII. Procedural or Substantive Deviations**

94.     Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

95.     The decisional process utilized by the Washington State Redistricting Commission was fraught with irregularities.

96.     It is also clear that the Washington State Redistricting Commission's process in 2021 made substantive departures from what was done by the Commission in prior years.

Notably, the Commission violated Washington's Open Meeting Act, was sued under Washington's Public Records Act, and did not present final maps to the public or Commission staff when the "maps" were voted upon.

97.     Testimony from the Executive Director of the Washington Redistricting Commission, Lisa McLean detailed procedural departures. For example, Ms. McLean detailed the 2011 process in how maps were drawn and negotiated by the 2011 Commission, while the 2021 Commission took no such steps ("So there was never a process, a formal process, as had been done in 2011." (Lisa McLean Depo p. 66).  Additionally, the 2021 Commission utilized dyads (organized meetings of the Commissioners in pairs) to circumvent public meeting laws (Lisa McLean Deposition p.69). And negotiations over the metrics for the final map were conducted in private during the last days of commission meetings. (O'Neil Depo, pp. 39-53).

98.     Commissioner Graves at one point acknowledged that much of the Commission's decision-making and debating was happening in private. At a November 1, 2021 meeting of the Commission "[h]e shared that many of the meetings are one-on-one conversations that discuss priorities and areas where there is agreement and disagreement. He assured the public that a final agreement will only be made in an open public meeting." (November 1, 2021 Minutes of the Washington Redistricting Commission).

99.     The interaction between the Commissioners in the final days of negotiations was described as "chaotic" by one staffer because it was unclear what the Commissioners were approving on the last official day of negotiations.  (Sarah Augustine Deposition dated October 06, 2022, p. 120 "From the time the public meeting started, my main job was just running the public meeting. And that was a fairly chaotic meeting because the teams were still negotiating.")

100.     On the night of November 15, 2021, the final legislative district map that was adopted was not shared with executive staff nor the public. (Lisa McLean Deposition, October 05, 2022, pp.129-131)  This is unlike what was done in 2011, in which the Commission made available over the course of the last month of negotiations, multiple legislative district maps for the public to provide comment on, including on the last night to adopt a legislative district map proposal. (2011 Commissioners' Draft Plans- December 31, 2011, http://2011.redistricting.wa.gov/maps_dec31_2011.asp).

101.     Walkinshaw thought he was signing an agreement on a framework for the political metrics of the proposed legislative districts and that he would have an opportunity to

review the final map before it was transmitted to the State Supreme Court.  However, the next morning he discovered that a final map had been posted on the commission website and transmitted to the Supreme Court without him even seeing it.  (Ali O'Neil Deposition, Jan. 10, 2022, p. 35).

102.    In a public statement on Tuesday, November 16 accompanying the publishing of the final map, the Commission stated that they "fail[ed] to submit a final mapping plan by the statutory deadline." (Nov. 16 E-mail from Washington State Redistricting Commission to Walkinshaw, "The Washington State Redistricting Commission p….pdf").

103.    Moreover, the 2021 Commission substantively departed from prior Commissions with its heavy emphasis on protecting incumbents—including at the expense of Latino voters' VRA rights. Contrary to the 2021 Commission's focus on incumbent protection, as evidenced in the text messages and email evidence, the 2011 Commission sought to ensure that its plans "do not favor or discriminate against any incumbent . . . ." (http://2011.redistricting.wa.gov/faq.asp).

104.    In some cases, communications reveal that the Commissioners were in contact with elected legislators throughout the redistricting process.  The legislators who communicated with the commissioners were concerned that the district boundaries remain in such a way to ensure reelection to the legislature. (See, e.g., September 21 text messages between Graves and Fain re: Dufault's input on drawing LD 15 lines to include current elected officials and potential candidates for office in LD 15, "GROSE_000015-16"). In some cases, legislators communicated with Commissioners directly implicating LDs 14 and 15. For example, on November 10, when the Commissioners were still debating the configuration and numbering of the Yakima Valley district, Commissioner Fain received a texted request from State Representative Curtis King to "keep [him] in the 14th." ("10.11 to 11.10 (JF+King).png").

105.    In contrast, the Washington State Redistricting Commission was unresponsive to the pleading of representatives of the Latino community for the creation of a majority Latino legislative district centered in the Yakima Valley. ("Public Comment Notes Tracking.xlsx").

106.    In the aftermath of Commissioner Sims and Walkinshaw's October 25 public proposals, Commissioner Graves went so far as to contribute suggestions to a politically-organized "call to action" requesting that individuals submit public comments to the Commission to contradict the Yakima Valley region Latino community's request to have a district that would allow them to elect their candidate of choice. (October 30, 2021 text thread including Jeremie

Dufault, Chris Corry, and Paul Graves, "Dufault_Corry_10.30.PNG" and "Dufault_Corry_10.30.PNG(1)").

107.     Ultimately, the Latino community's interests were ignored even after evidence of racial discrimination, harassment of Latino candidates, the inability of Latino candidates to win elections, racially polarized voting, and the history VRA lawsuits brought against various jurisdictions in the Yakima Region was known by the commission members. [See, e.g. Anton Grose Deposition, August 16, 2021, pp. 173-75 (admitting that none of the Republican Commissioners bothered to determine whether the final map was VRA compliant)].

108.     The enacted redistricting plan generally and LD 15 specifically, is tenuous, at best, because it is technically a majority Latino district at 50.02% CVAP yet it will not perform to elect a candidate who is the choice of Latino voters.

109.     This is particularly strange given that the composition of LDs 14 and 15 were a point of contention in the 2011 negotiations. For example, official meeting minutes from the 2011 Redistricting Commission show that negotiations over LD 15 were debated. "Commissioner Huff indicated that he and Commissioner Foster had good negotiations up to that point, but that the discussions about the 14th and 15th legislative districts were contentious." (http://2011.redistricting.wa.gov/assets/Agendas/Minutes_20111229.pdf).

### XIII. Additional Conclusions

110.     The Washington State Redistricting Commission was aware of racially polarized voting patterns in the Yakima Valley.

111.     The Washington State Redistricting Commission was aware of the need to consider the requirements of the VRA during the redistricting process.

112.     The Washington State Redistricting Commission was presented with at least four viable options of Latino majority districts that could be drawn in the Yakima Valley Region and provide Latinos with the opportunity to elect their candidates of choice.

113.     All four of the voting commissioners created, considered, or otherwise engaged with versions of Latino majority districts that could be drawn in the Yakima Valley Region and provide Latinos with the opportunity to elect their candidates of choice. Indeed, the progression of maps and the surgically targeted alterations directed at diluting the voting strength of Latino

voters while maintaining the barest façade of a Latino opportunity district itself reveals the discriminatory intent of the Commission.

114.    The Washington State Redistricting Commission chose to ignore the racially polarized patterns of voting, ignored the many district configurations that would perform for the Latino community, and ignored the pleas of the Latino community during the redistricting process, instead ensuring that their respective political parties could gain from the process.

115.    The entirety of the evidence reveals a mapdrawing process infected with discriminatory intent.

116.     As more information becomes available, I reserve the right to update my analysis.

Executed on November 2, 2022, at Houston, Texas.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Henry Flores, PhD

Consultant

# Appendix A

**HENRY FLORES, Ph.D.**

**Distinguished University Research Professor Emeritus**
**Institute for Public Administration, Politics and Public Policy**
**and**
**Professor Emeritus, Political Science and International Relations**
**St. Mary's University**
**Scholar in Residence**
**Department of Political Science**
**University of Houston**
**and**
**President and Principle of FloreStat, LLC**
(November, 2022)

Address:            2304 West Main Street; Houston, TX; 77098

Phone:             (210) 436-3214 (O)
                   (210) 525-1330 (H)

Place of Birth:    San Antonio, TX

## <u>EDUCATION</u>

B.A.; St. Mary's University; San Antonio, TX;
        May 1974.
        Major:  Political Science
        Minor:  English

M.A.; University of California, Santa Barbara; Santa Barbara, CA;
        December 1975.
        Major:  Political Science

Ph.D.; University of California, Santa Barbara; Santa Barbara, CA; December 1981.
        Major:  Political Science
        Examination Fields:        Public Administration,
                                   American Politics,
                                   Political Philosophy,
                                   Multivariate Statistical Analysis.

## DISSERTATION

"The Politics of Urban Land Use Decisions Underlying Industrial Development in
Los Angeles, California: An Exegesis of Systemic Weakness."

## AWARDS AND DISTINCTIONS
- Chancellor's Fellow, University of California at Santa Barbara, Santa Barbara, California, 1974 – 1977.
- Ford Foundation Dissertation Fellow, 1977 – 1979.
- "Best Paper in Chicano Politics," Western Political Science Association, 1986.
- Fulbright Fellow, Argentina, *La Universidad Católica de Buenos Aires,* 1992.
- Distinguished Faculty Award, St. Mary's University Alumni Association, 2000 – 2001.
- Civil Rights Lifetime Achievement Award, St. Mary's University, 2010.
- Distinguisehd Alumni Service Award, Central Catholic High School, 2014.
- Distinguished University Research Professor Emeritus, 2018.

## PROFESSIONAL ASSOCIATIONS
Conference of Southern Graduate Schools, 2004 – 2013.
Texas Association of Graduate School Deans, 2004 – 2013, President, 2012-2013.
American Political Science Association - September 1975 - present.
 Chair, Dissertation Award Committee, Section on Race and Ethnicity, 2000-2001.
 Nominations Committee, Member, Section on Urban Politics, 1998-1999.
 Nominations Committee, member, Section of Representation and Electoral
  Systems, 1999-2000.
 Program Committee, Head, Section on Representation and Electoral
  Systems, 1997-1998.
 Committee for the Status of Latinos in the Profession - January 1994 - December 1996.
 Governing Council, Pi Sigma Alpha - September 1994 - August 1997.
 Editor, Urban Politics Section Newsletter - January 1996 – June 2000.
 Book Review Editor, Representation and Electoral
  Systems Newsletter, 2000-2002.
 Member, Byran O. Jackson Memorial Award Committee - 1996.
 Chair, Hallet Award Committee - 1996-1997.
 Member, Ralph Bunche Memorial Award Committee-2000, 2004.
 Member, Dissertation Award Committee-2000.
 Member, Committee on Best Book on Race-2014.

Southwestern Political Science Association - March 1985 - present.
 Executive Committee – March 2013 – present.
 Executive Committee - March 1986 - April 1988.
 Nominations Committee - March 1995 - April 1998. March 1999 – April 2002
 Section Head, Mass Political Behavior - March 1995 - February 1996

Western Political Science Association - March 1976 - present.
 Chair, Dissertation Award Committee, 1997-1998.
 Committee for the Status of Chicanos in the Profession - March 1984 - February 1987.

Committee for Ethics in the Profession - March 1990 - February 1991.
Executive Committee - March 1987 - February 1991.
Pi Sigma Alpha Committee - March 1995 - February 1998.
Program Committee – 2002 – 2003.
Dissertation Award Committee – 2002 – 2003.
Best Paper Award Committee – 2003 - 2004.

Associate Editor, <u>Urban Affairs Review</u>, 1995-1998.
Associate Editor, <u>American Review of Politics</u>, 1996-Present.
Editorial Board, <u>Texas Journal of Political Studies</u>, 1996-1999.
Book Series Editor, Lexington Press, Rowman and Littlefield, *Latinos and American Politics,*
    2015-2022.

## COMMUNITY - PUBLIC SERVICE ACTIVITIES
Founding Board Member, Mexican American Civil Rights Institute, 2019-2020.
Member, City of San Antonio, Charter Revision Commission, 2018-2021.
Member, City of San Antonio's Correct Count Census Committee, 2019.
Member, Board of Governors, Institute Mexican American Institute of Civil Rights, 2019.
Participant, National Committee for a 50 Year Blueprint for Chicanos, 2018-Present.
Member, Organizing Committee for the National High School Walkout Conference, 2019.
Presenter, Texas Gerrymandering and Voter Suppression, UTSA Social Work Advanced Policy
    Graduate Students, Our Lady of the Lake University, San Antonio, TX. Nov. 29, 2017.
Moderator, Gerrymandering: What's in the Secret Sauce?  On the Bar.  San Antonio Bar
    Association.  June, 2016.
Presenter, "Evolution of Voting Rights for Mexican Americans in South Texas," San Antonio
    Historical Association, San Antonio, Texas, September 27, 2016.
Panel Participant, "Implications of the Voter ID Law," League of Women Voters, San Antonio,
    Texas, September 20, 2016.
Presentation, *Camara de Comercia Argentino* (Argentine Chamber of Commerce),
    *"Camino a la Casa Blanca:  Hillary contra Trump y sus Implicancias,"*
    ("Path to the White House:  Hillary versus Trump Implications), June, 2016.
    Presentation in Spanish.
Presenter, 100th Birthday Symposium on Congressman Henry B. Gonzalez, 2016.
Convener/Moderator, 50th Anniversary Symposium on Voting Rights Act, "What is the Future
    Of the VRA," St. Mary's University School of Law, 2016
Presenter, 50th Anniversary Conference on Voting Rights Act, "Latinos, the Voting Rights Act
    And Political Engagement," 2015.
Presenter, "The New Latino Electorate of the United States in the 2012 Elections and Beyond,"
    *Consejo Argentino para las Relaciones Internacionales,* Buenos Aires, Argentina,
    March 23, 2011.
Testified, Joint House Committee:  Justice and Redistricting, State of Texas, McAllen, Texas,
    July 21, 2010.
Member, Board, Design Committee, University Heath Systems, Bexar County, San Antonio,
    Texas, 2009-2013.
Member, Board, The National Center for Behavioral Health Solutions, San Antonio, Texas,
    2008-2014.

Member, Correct Count Census Committee, Bexar County and San Antonio, Texas, 2009-
        2011 (Chairperson of Subcommittee on Under-Represented Communities).
Member, Westside Creeks Oversight Committee, San Antonio River Authority, 2008-2010.
Member, Westside Development Corporation, San Antonio, Texas, 2007-2011.
Member, Educational Affairs Advisory Committee, San Antonio Manufacturer's Association,
        2006-2009.
Member, National Latino Advisory Committee, Nielsen Media Company, 2007 – 2013.
Member, St. Mary's University, Neighborhood Revitalization Committee, 2006 – 2014.
University Representative, City of San Antonio, Westside Development Corporation,
        2006-2013.
Presenter, "The Latino Electorate, Poverty and Education," David and Lucille
        Packard Foundation, Sonoma, CA, 2006.
Presenter, "The VRA, Poverty, and Education," William C. Velasquez Institute, San
        Antonio, Texas, 2005.
Opinion Columnist, *La Prensa*, San Antonio, Texas, 2003 – 2007.
Commentary Writer, *NewsTaco,* online news service, 2007 – present.
Presenter, Stormont Lectures, Victoria College, Victoria, Texas, Feb. 2003, Feb. 2009.
Presenter, Latino Academy, Southwest Voter Registration and Education Project,
        San Antonio, TX, Aug. 9, 2002.
Presenter, US House Committee Hearings on Irregularities in the Voting Process,
        San Antonio, Texas.  Apr. 2001.
Presenter, The Texas Forum on Civil Liberties and Civil Rights and The Hispanic
        Journal of Law and Policy of the University of Texas School of Law's Symposium
        "Drawing Line in the Sand:  The Texas Latino Community and Redistricting
        2001." Apr. 2001.
Presenter, Joint Senate-House Redistricting Committee, State of Texas, Apr. 2001.
Presenter, Texas Senate Redistricting Committee, Mar. 2001.
Presenter, Texas House Redistricting Committee, Mar. 2001.
Presenter, Redistricting Symposium, Willie C. Velasquez Institute, League of United
        Latin American Citizens, Mexican American Legal Defense and Educational
        Fund, and National Association of Latino Elected Officials, Feb. 2001, Austin,
        TX.
Presenter, Summit of the States, Center for Policy Alternatives, Dec. 2000, Washington,
        D.C.
Presenter, Latino Issues Conference, Willie C. Velasquez Institute, Nov. 2000, Menger
        Hotel, San Antonio, Texas.
Presenter, Latino Academy, Willie C. Velasquez Institute, Oct. 2000, Kerrville, TX.
Presenter, Willie C. Velasquez Institute Redistricting Conference, Aug. 2000, Houston,
        Texas.
Presenter, Southwest Voter Registration and Educational Project Conference, Feb.
        2000, Palm Springs, CA.
Member, Henry B. Gonzalez Congressional Library Fundraising Committee, 1997.
Member, San Antonio/Bexar County, City/County Consolidation Committee, 1996.
         Chair, Subcommittee on Voting Rights.
Presenter, Hispanic Chamber of Commerce, 1995.
Member, Board of Directors, Hemispheric Institute for Public Service (HIPS), San

Antonio, Texas, January 1988 - present.
Member, Advisory Committee, Mexican American Legal Defense and Educational
Fund's (MALDEF) Leadership Development Program, 1987-1988.

## ACADEMIC ACTIVITIES

Scholar in Residence, Department of Political Science, University of Houston, Aug. 2021-
Present.
Visiting Professor of Urban Studies, Trinity University, Aug. 2020 – May 2021.
Professor Emeritus, May, 2018
Professor of Political Science, Departments of Political Science and International Relations,
Fall, 2013 – May, 2018.
Distinguished University Research Professor, Institute for Public Administration, Politics
and Public Policy, St. Mary's university, San Antonio, Texas, June 2013 – May 2018.
Sabbatical Leave, Fall-2013.
Dean, Graduate School, June 2004 – May 2013.
Sabbatical Leave, Willie C. Velasquez Research Institute, San Antonio, TX, Fall – 2001.
Professor, Department of Political Science, St. Mary's University, Spring 1993 – May, 2018.
Acting Graduate Director, Masters in Public Administration, St. Mary's University, San
Antonio, Texas, Fall, 1997.
Chair, Department of Political Science, St. Mary's University, San Antonio, Texas, June 1991 -
May 1995, Acting Chair January – August 1998.
Fulbright Scholar, *Universidad Católica de Argentina,* Buenos Aires, Argentina, 1991 -1992.
Director, Graduate Program in Political Science, St. Mary's University, San
Antonio, Texas, Fall 1989 - May 1991; January 1996 – May 1999; June 2003.
Director, Masters in Public Administration, St. Mary's University, San Antonio,
Texas, Fall 1983 - May 1991; Fall 2000 – Spring 2004; Spring 2014 – May, 2018.
Associate Professor, Political Science, St. Mary's University, San Antonio, Texas,
Spring 1986 – Spring, 1993.
Assistant Professor, Political Science, St. Mary's University, San Antonio, Texas, Fall
1983 - Spring 1986.

## INTERNATIONAL RELATIONS

Fulbright Scholar, Argentina, *La Universidad de Mendoza, La Universidad de Empresas de
Buenos Aires, y La Universidad Católica de Buenos Aires,* 1992.

Presentation, *La Camara Argentina de Comercio* (Argentine Chamber of Commerce),
*"Camino a la Casa Blanca: Hillary contra Trump y sus Implicancias,"*
("Path to the White House:  Hillary versus Trump Implications), June, 2016.
Presentation in Spanish.

Presenter, "The New Latino Electorate of the United States in the 2012 Elections and Beyond,"
*Consejo Argentino para las Relaciones Internacionales,* Buenos Aires, Argentina,
March, 2011.  Presentation in Spanish.

Presenter, "The Voting Rights of Latinos as a Violation of the Declaration of Human Rights,"
*FORO Ecumenico,* Buenos Aires, March, 2013.  Presentation in Spanish.

5

Presenter, "The US Latino Electorate:  A Sleeping Giant," *Fundacíon Internacíonal Jorge Luis Borges,* Buenos Aires, March, 2013.  Presentation in Spanish.

On behalf of St. Mary's I participated on the team to negotiate Memoranda of Understanding with *Shanghai Lixin University of Commerce, Wuxi South Coast College, East China University of Science and Technology* and *Shanghai University of Finance and Economics.* China.

On behalf of St. Mary's I led the team to negotiate Memoranda of Understanding with *Universidad Abierta Interamericana, Universidad Nacional de Tres de Febrero, FORO Ecuménico, Fundación Internacional Jorge Luis Borges,* and *IDEAR (Instituto de Estudios Argentinos en Politicas Publicas.* Argentina.

## COURSES DESIGNED AND TAUGHT AT ST. MARY'S

Have designed and taught 20 different undergraduate courses during 35 years of teaching at St. Mary's.  Below are some of the graduate classes I have taught.

PA/PO 6300 – Political Science Research Methods (Graduate Statistics Seminar)
PA/PO 6301 - Public Administration (Graduate Seminar)
PO 6302      - Public Policy Analysis (Graduate Seminar)
PO 6302      - Political Economics (Graduate Seminar)
PA/PO 6303 - Urban Political Institutions and Processes (Graduate Seminar)
PO 6304      - Urban Politics (Graduate Seminar)
PA/PO 6305 - American Political Institutions (Graduate Seminar)
PO 6310 - Comparative Politics (Graduate Seminar)
PO 6352 - U.S. Latino Communities (Graduate Seminar)
PO 6353 - Urban Issues in the Americas (Graduate Seminar)
PA/PO 6354 – Campaign Management (Graduate Seminar)

## ACADEMIC SERVICE ACTIVITIES
President, Texas Association of Graduate Schools, 2012-2013.
Member, Search Committee Dean of School of Humanities and Social Sciences, 2016.
Member, Committee on Faculty Evaluations, 2013.
Chair, Search Committee for VPAA, 2009-2010.
Chair, Search Committee for Director of Institutional Research, 2009-2010.
Representative of Independent Colleges and Universities of Texas (ICUT), The Texas
       Higher Education Coordinating Board, Advisory Council on Doctoral Education
       in the State of Texas, 2006 – 2013.
Member, Task Force on Mission and Identity, 2005.
Member, Academic Council, Fall 2004 – 2013.
Member, St. Mary's Contingent to Marianist Universities Meetings,
       Chaminade University, Honolulu, Hawaii, June, 2003; University of Dayton,
       Dayton, OH, June, 2005; Chaminade University, Honolulu, Hawaii, June 2006;
       San Antonio, TX, June 2007.
Member, Search Committee, Vice President for Enrollment Management – 2003.

Advisor, Young Democrats [St. Mary's University Chapter]-2000 - 2002.

Advisor, LULAC (League of United Latin American Citizens [St. Mary's Student
       Chapter]-1999-2004.

Advisor, MEChA (Movemiento Estudientil Chicano de Aztlan)-1997-1998.

Member, University-Wide Strategic Planning Coordinating Committee, 1994 -1996.

Member, Strategic Planning Committee for Planning and Information Management,
       1994 - 1996.

Member, University Board of Trustees, Academic Affairs Subcommittee, 1993 -1995.

Chairperson, University Task Force on Scholarship and Change, 1994.

President, Faculty Senate, 1993 - 1995.

Member, Alumni Association Board of Trustees, Ex-Officio, 1993-1994, 1994 - 1995.
       Subcommittee on Strategic Planning.
       Subcommittee on Fund Raising.
       Subcommittee on Awards.

Member, Committee on Facilities Management, 1993 -1995.

Member, University Tenure Review Committee, Spring 1993.

Member, University Committee on Writing Evaluation, 1992 -1994.

Member, University Pre-Law Advisory Committee, 1991 -1992.

Chair, Academic Affairs Committee, Faculty Senate, 1988 -1989.

Member, Graduate Council, 1983 -1991; 2000 – 2018.

Chair, Faculty Budgetary Committee, 1987 -1989.

Member, Committee on Graduate Education, 1987 -1989.

Member, Search Committee, Dean, School of Humanities and Social Sciences, 1986 -
       1987.

Member, Search Committee, Dean of Graduate School, 1985 - 1986.

Member, Humanities and Social Sciences Committee on Faculty Evaluations, 1987 -
       1988.

Member, Faculty Senate Committee for the Status of Faculty, 1985 - 1987.

Member, Honor's Council, 1984 –1987; 2000 - 2004.

Chair, Committee on the Philosophy of the Liberal Arts, 1983 -1984.

Member, President's Peace Commission, 1983 -1984.


## BOOKS

Henry B. González:  A Texas Maverick.  (Under Review University of Texas Press, 2022).

Racism, Latinos, and the Public Policy Process. (Lexington Books, 2019).
       Presented at San Antonio Book Fair, 2020.

Latinos and the Voting Rights Act:  The Search for Racial Purpose. (Lexington Books, 2015).
       Presented at San Antonio Book Fair, 2016.

The Evolution of the Liberal Democratic State With a Case Study of Latinos in
       San Antonio, Texas.   (Edwin Mellon Press, 2003).

<u>Mexican Americans and the Law</u>.  Co-authored with Sonia Garcia, Roberto Juarez,
and Rey Valencia.  (University of Arizona Press, 2004).

## ARTICLES AND CHAPTERS IN BOOKS

"Voter Discrimination in Texas:  *A History of State-Sanctioned Hostility Toward the Rights of
Mexican Americans."*  Chapter in book entitled *Fiftieth Anniversary of
The Civil Rights Act and Latinos.*  Lansing, MI:  Michigan State University Press.  2021.

"The Meaning of One-Person, One-Vote or Let's Split the Baby in Half:  Evenwel v Abbott."
<u>Social Science Quarterly,</u> (January, 2020).

"Latinos in American Politics".  <u>Encyclopedia of Immigration and Minority Studies.</u>
Sage Publications, (Spring, 2011).

 "The 2008 Texas Vote in a Transitional Election." <u>Journal of South Texas Studies.</u>
2009.

"The 2004 WCVI National Latino Election Day Exit Poll."  William C. Velasquez
Institute.  San Antonio, TX, 2004.

"Contemporary San Antonio Politics:  1900 – 2003." In <u>San Antonio Politics</u>.
Edited by Richard Gambitta.  NY:  McGraw-Hill Publishing, Co, 2004.

"Are Latinos Becoming More Republican?"  <u>Journal of South Texas Studies,</u>
Summer, 2003.

"Between a Rock and a Hard Place:  Texas Latinos and Redistricting 2001," <u>The
Texas Hispanic Journal of Law and Policy</u>, Austin, TX:  The University of
Texas School of Law, 2001.

"Political Rhetoric for the 1990s" in <u>The '94 Election (Non) Voters Companion</u>, edited
by Dean Harris (Claremont, CA: 1996).

"Man A Mexican Doesn't Have A Chance:  An Assessment of Congressman Henry B.
Gonzalez's Leadership," <u>Texas Journal of Political Studies</u>, (June, 1993).

"East Los Angeles:  A Field of Dreams" in <u>City of Angels</u>, edited by Gerry Riposa and
Carolyn Dersch (Dubuque, IA:  Kendall/Hunt Publishing Co., 1992).

"The Texas Hispanic Voter:  Prospects and Trends," with Robert Brischetto in <u>From
Rhetoric to Reality:  Latino Politics in the 1988 Elections</u> edited by Rodolfo De
LaGarza and Louis De Sipio (San Francisco:  Westview Press, 1992).

"Deconstruction and Chicano Politics," in <u>Latinos and Political Coalitions:  Political
Empowerment for the 1990s</u>, edited by Robert Villarreal and Norma Hernandez
(New York:  Greenwood Press, 1991).

"The Selectivity of the Capitalist State:  Chicanos and Economic Development,"
    Western Political Quarterly, Summer, 1989.

"Structural Barriers to Chicano Empowerment," in Latino Empowerment: Progress,
     Problems, and Prospects, edited by Roberto Villarreal, Howard Neighbors and
     Norma Hernandez (New York:  Greenwood Press, 1988).

"La Ecología y medio Ambiente en la Zona Frontera del sur de Texas," Mexico - E.U.A.:
     Cooperación y Conflicto, Memoria del Foro Efctuado en Mexico, D.F.,
     Diciembre, 1986

"The Urban Land Use Decision making Process: An Exegesis of Systemic Weakness,"
    Proceedings of the National Association for Chicano Studies, 1979.

"Some Different Thoughts Concerning Machismo," Comadre, Fall, 1978.

**Book Reviews**
Reviewed approximately 50 different volumes for various scholarly journals.

## RESEARCH AND WORK IN PROGRESS
Gathering preliminary data on "The Denial of Voting Rights in the United States as a Violation
Of the Universal Declaration of Human Rights."
Beginning working draft on volume with working title "Nonlinear Dynamical Model of the
Liberal Democratic State."
Composing article on the use of decision theory in uncovering racial intent in voting rights
litigation.

## PAPERS DELIVERED & SCHOLARLY PRESENTATION

"Current Political Status of Latinos in Texas, 2022."  Raza Unida, 50th Anniversary Conference.
    San Antonio, TX. University of Texas San Antonio.  September 17, 2022.

"Voter Suppression of Hispanics in the United States:  An Historical Perspective."  International
    Interdisciplinary Social Sciences.  Oxford, UK, July 21-23, 2021.

"The Relationship Between the Expert Witness and the Trial Attorney."  National
    Redistricting Workshop.  Texas A & M School of Law.  Ft. Worth, Texas, February 13-
    14, 2020.

"Bail In Under Section 3 of the Voting Rights Act:  The Case of Texas."  11th International
    Conference on Interdisciplinary Social Sciences," Hiroshima, Japan, July, 2017.

"Pockets of Discrimination:  The Voting Rights Act and the Role of 'Bail-In' After
    Shelby v Holder." March, 2016, Midwest Political Science Association, Chicago, IL.

9

"The Meaning of 'One-Person, One-Vote' or Let's Split the Baby in Half:  Some Preliminary Comments and Observations." January, 2016, Southern Political Science Association, San Juan, Puerto Rico.

"The Proof of Racism When Racism is Non-existent:  A Mixed Methods Approach to Public Policy Analysis." July 30 – August 1, 2013, 8th International Conference On Interdisciplinary Social Sciences, Charles University, Prague, Czech Republic.

"Invisible Racism in the Texas Voter ID Law." April, 2013, Midwest Political Science Annual Meeting, Chicago, IL.

"Wither Section 5 of the Voting Rights Act."  March, 2013, Western Political Science Association, Hollywood, CA.

"The Latino Electorate, The Electoral College, and Realigning Elections." June, 2010, Atiner Symposium, Athens, Greece.

"The Changing Face of the American Electorate and the Possible Effects on USA Immigration Policy."  April, 2010, Midwest Political Science Annual Meeting.  Chicago, IL.

"The Political Maturation of Latinos or What Needs to be Done to Get a Seat at the Table?: Some Comments on a Much Larger Project." April, 2009, Midwest Political Science Annual Meeting.  Chicago, IL.

"Latino Public Opinion and Public Policy:  the 2006 Exit Polls."  September, 2006, American Political Science Association.  Philadelphia, PA.

"Latino Political Participation and Power:  2004 National Latino Exit Poll." April, 2006, Midwest Political Science Association.  Chicago, IL.

"Latino Political Participation and Power:  2004 National Latino Exit Poll." March 18, 2006.  Western Political Science Association.  Albuquerque, New Mexico.

"The Negative Legacies of the Voting Rights Act for the State of Texas." April 21-23, 2005.  Invited Paper.  Yale University.  Center for the Study of American Politics. "Lessons From the Past, Prospects for the Future:  Honoring the Fortieth Anniversary of the Voting Rights Act of 1965."  New Haven, CN.

"Can Critical Realigning Elections Be Artificially Constructed:  A Case Study of the 2001 - 2004 Texas Redistricting Debacle." 2004, Western Political Science Association, Portland, OR.

"Some Methodological Barriers to be Overcome Attempting to Utilize Census Data in Longitudinal Studies." 2004. Midwest Political Science Annual Meeting, Chicago, 2004.

10

Mayor Ed Garza of San Antonio, TX:  A Cisneros Legacy." 2001, <u>Western Political Science Association</u>, Long Beach, CA.

"Competitiveness and Electoral Systems:  Are Districted Elections More Competitive Than At-Large Systems?"  2000, <u>The American Political Science Association,</u> Washing, D.C.

"The Effects of Single Member Districts on Latino Political Participation or Is the Baby Being Thrown Out With the Bath Water?" 1999, <u>The American Political Science Association</u>, Atlanta, GA.

Roundtable on <u>Morning Glories:  the Politics of Southwestern Cities</u> by Amy Bridges, 1999, <u>Western Political Science Association</u>, Seattle, WA.

"Term Limits and the Voting Rights Act:  The Case of San Antonio, Texas," 1998, <u>The American Political Science Association</u>, Boston, MA.

"Voter Turnout and Majority-Minority Districts:  The Effect on Municipal Districts," 1997, <u>The American Political Science Association</u>, Washington, D.C.

" 'No Room!  No Room!'  They Cried Out When They Saw Alice Coming: The Recent Gerrymandering Decisions of the South," 1995, <u>Southwestern Social Science Association</u>, Dallas, TX.

Roundtable, "The Selma March and the Voting Rights Act After Thirty Years:  A Commemoration, Assessment of the Past, and Preview of the Future," (Thematic Session), 1995, <u>Southwestern Social Science Association</u>, Dallas TX.

Roundtable, "An Assessment of Latino Political Influence in the Southwest," 1995, <u>Southwestern Social Science Association</u>, Dallas, TX.

"Chaos and the City," 1994, <u>Western Political Science Association</u>, Albuquerque, NM.

"The Voting Rights Act of 1965 and the Delivery of Municipal Services," 1993, <u>Western Political Science Association</u>, Pasadena, CA.

"The Voting Rights Act and the Equitable Distribution of Municipal Services," 1992, <u>American Political Science Association</u>, Chicago, IL.

"An Evolution of City Typologies," 1991, <u>Western Political Science Association</u>, Seattle, WA.

"Post Modernism and Chicano Politics," 1990, <u>Western Political Science Association</u>, Newport Beach, CA.

"Water Policy in South Central Texas:  An Impossible Dream," 1989, <u>Southwestern</u>

<u>Political Science Association</u>, Little Rock, AK.

"Deconstruction and Chicano Politics," 1988, <u>Southwestern Political Science</u>
 <u>Association</u>, Houston, TX

"Growth and Justice in Local Politics:  The Issues for the Coming Decade," 1988,
 <u>Western Political Science Association</u>, San Francisco, CA.

"Playing Power Politics the American Way," 1987, <u>Western Political Science</u>
 <u>Association</u>, Anaheim, CA. Award for Best Paper on Chicano Politics.

"The Ecology and Environment of the South Texas Border Region," 1986, <u>Mexico –</u>
 <u>E.U.A.:  Cooperación y Conflicto, Colegio Nacional de Ciencias Politicas y</u>
 <u>Administración Publica, A.C.</u>, Mexico City, D.F.

"Structural Barriers to Chicano Empowerment," 1986, <u>Symposium on Chicano</u>
 <u>Empowerment, University of Texas at El Paso</u>, El Paso, TX.

Panel Chair, "The Status of Hispanics in the United States in the 1980's" 1986,
 <u>Southwestern Political Science Association</u>, San Antonio, TX.

"The Cohesiveness of the Congressional Hispanic Caucus," 1985, <u>Southern Political</u>
 <u>Science Association</u>, Nashville, TN.

"The Cohesiveness and Representativeness of the Congressional Hispanic Caucus:  Some
 Preliminary Considerations," 1985, <u>Southwest Social Science Association</u>, Houston, TX.

"The Bourgeoisification of Chicano Youth:  What Is To Be Done?" 1984, <u>National</u>
 <u>Association of Chicano Studies</u>, Austin, TX.

"Chicanos and Politics in the 1980's," 1984, <u>Western Political Science Association</u>,
 Sacramento, CA.

"An Inherently Discriminatory Cobweb:  Some Considerations Concerning the American
 Political System," 1983, <u>National Association of Chicano Studies</u>, Ypsilanti, MI.

## <u>LITIGATION RESEARCH AND EXPERT LEGAL TESTIMONY</u>

<u>Texas Latino Redistricting Task Force, et al v. Perry, et al., 2011</u>.  Expert report,
 deposition and trial testimony (discriminatory racial intent).

<u>Jayla Allen, et al v Waller County, et al, 2019.</u> Expert Report, deposition.  ("Totality of
 Circumstances," Senate Factors).

<u>LULAC, et al v Gregg Abbott, et al, 2021.</u>  Expert Report, deposition.  ("Totality of

12

Circumstances, Senate Factors, and Racial Intent).

Campaign Legal Center; American Civil Liberties Foundation of Texas; Mexican American Legal Defense and Educational Fund, Inc.; Lawyers Committee for Civil Rights Under Law; and Demos A Network for Ideas and Action, Ltd., v. JOHN B. SCOTT, in his official capacity as Secretary of State of the State of Texas, 2021.  Expert Report.  (Totality of Circumstances, Senate Factors, and Racial Intent). CA No. 1:22-cv-92.

Susan Soto Palmer et al., v Steven Hobbs, in his official capacity as Secretary of State of Washington, et al. and Jose Trevinok Ismael G. Campos and State Representative Alex Ybarra. 2022. (Racial Intent).  CA No.  3:22-cv-5035-RSL.

# Appendix B

## Decision Timeline

| Map | Dist # | '19 5-Yr ACS Latino CVAP % | '20 5-Yr ACS Latino CVAP % | Vote Share of Latino-Preferred Candidate (shaded if > white-preferred candidate's vote share) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 2020 Pres% Biden | 2020 Gov% Inslee | 2020 AG% Ferguson | 2020 Treas.% Pellicciotti | 2018 U.S. Senate% Cantwell | 2016 Pres% Clinton | 2016 Gov% Inslee | 2016 U.S. Senate% Murray |
| **9.8 LD Draft** Dominique Meyers to Sims | 15 | 44.9 | 46.4 | 53 | 51.5 | 53.6 | 50.9 | 50.1 | 49.4 | 53.4 | 56.8 |
| **9.21 Fain Proposal** Fain public release | 15 | 33.8 | 35.5 | 46.2 | 44.4 | 46.2 | 43.3 | 43.7 | 41.9 | 46.7 | 49.8 |
| **9.21 Graves Proposal** Graves public release | 15 | 34.2 | 36.3 | 40.6 | 38.8 | 40.7 | 37.7 | 38.8 | 37.3 | 42.1 | 45.7 |
| **9.21 Sims Proposal** Sims public release | 15 | 44.7 | 46.1 | 54.1 | 52.5 | 54.6 | 51.9 | 51.4 | 50.4 | 54.4 | 58 |
| **9.21 Walkinshaw Prop** Walkinshaw public release | 14 | 40.4 | 41.5 | 55.4 | 53.7 | 55.8 | 53.1 | 53.7 | 51.5 | 55.3 | 59.4 |
| **10.25 Sims proposal** Sims public release | 14 | 51.6 | 53 | 56.1 | 54.4 | 56.8 | 54.1 | 53.5 | 53.3 | 56.8 | 60.7 |
| **10.25 Walkinshaw Prop** Walkinshaw public release | 14 | 51.6 | 53 | 56.1 | 54.4 | 56.8 | 54.1 | 53.5 | 53.3 | 56.8 | 60.7 |
| **11.3 Graves LD 14 (2)** Graves proposal | 14 | 50.6 | 52.0 | 55.6 | 53.9 | 56.3 | 53.6 | 53.2 | 52.8 | 56.4 | 60.3 |
| **11.7 New leg proposal** Anton Grose to Paul Graves | 14 | 50.9 | 52.6 | 50.7 | 49.3 | 51.3 | 48.7 | 48.2 | 48.3 | 51.7 | 55.7 |
| **11.8 Fain V2** Fain proposal | 15 | 50.6 | 52.0 | 52.4 | 50.8 | 52.9 | 50.2 | 50.0[1] | 50.0 | 53.4 | 57.4 |
| **11.10 BW 11.10 new VRA** Walkinshaw proposal | 14 | 52.6 | 54 | 58.8 | 57.3 | 59.5 | 56.9 | 56.8 | 56.0 | 59.6 | 63.6 |
| **11.11 Base proposal** Brady Walkinshaw | 14 | 51.6 | 53 | 56.1 | 54.4 | 56.8 | 54.1 | 53.5 | 53.3 | 56.8 | 60.7 |
| **11.11 Graves1110LD** Anton Grose to Graves, Sims | 14 | 50.3 | 52 | 49.7 | 48.2 | 50.3 | 47.6 | 47.3 | 47.4 | 50.8 | 54.8 |
| **11/12** April Sims to Paul Graves | 15 | 49.2 | 50.6 | 47.9 | 46.3 | 48.3 | 45.7 | 45.4 | 45.4 | 48.9 | 52.8 |
| **11.12 Graves Draft Nov12 (1)** Paul Graves and staff | 15 | 50.2 | 51.6 | 49.0 | 47.4 | 49.5 | 46.8 | 46.5 | 46.5 | 50.0 | 53.9 |
| **11.13 BW leg proposal** Ali O'Neil to Fain staff | 14 | 51.6 | 53 | 56.1 | 54.4 | 56.8 | 54.1 | 53.5 | 53.3 | 56.8 | 60.7 |
| **11.15 Copy of 11/14 7:30pm Merged D Map** Walkinshaw/Sims | 15 | 49.2 | 50.5 | 47.9 | 46.3 | 48.4 | 45.7 | 45.5 | 45.4 | 48.9 | 52.8 |
| **11.15 R Prop Rebalanced** Osta Davis to Ali O'Neil | 15 | 50 | 51.5 | 48.9 | 47.3 | 49.4 | 46.7 | 46.4 | 46.3 | 49.8 | 53.8 |
| **Enacted Plan** | 15 | 50 | 51.5 | 48.9 | 47.3 | 49.4 | 46.6 | 46.3 | 46.3 | 49.8 | 53.7 |

---

[1] Light shade indicates a percentage tie (50%-50%).

# Appendix C





**Washington State**
Redistricting Commission

**Commissioner Paul Graves - Proposed Legislative District Map, September 21, 2021**







**Washington State**
Redistricting Commission

**Commissioner Joe Fain - Proposed Legislative District Map, September 21, 2021**







**Washington State**
Redistricting Commission

**Commissioner April Sims** - Proposed Legislative District Map, September 21, 2021







**Washington State**
Redistricting Commission

**Commissioner Brady Piñero Walkinshaw - Proposed Legislative District Map, September 21, 2021**

# Appendix D





**Washington State**
Redistricting Commission

**Commissioner Brady Piñero Walkinshaw - Revised Legislative District Map, October 25, 2021**





**Washington State**
Redistricting Commission

**Commissioner April Sims** - Revised Legislative District Map, October 25, 2021