SARAH AUGUSTINE – 10/06/2022

```
                                                    Page 1
          IN THE UNITED STATES DISTRICT COURT
 1            WESTERN DISTRICT OF WASHINGTON

 2  _____

 3  SUSAN SOTO PALMER, et al.,      )
                                    )
 4                                  )
    Plaintiffs,                     )
 5                                  )
            -vs-                    ) No.
 6                                  ) 3:22-cv-05035-RSL
                                    )
 7  STEVEN HOBBS, in his            )
    official capacity as            )
 8  Secretary of State of           )
    Washington, and the STATE OF    )
 9  WASHINGTON,                     )
                                    )
10  Defendants,                     )
                                    )
11  And                            )
                                    )
12  JOSE TREVINO, ISMAEL G.         )
    CAMPOS, and State               )
13  Representative ALEX YBARRA,     )
                                    )
14  Intervenor-Defendants.         )
                                    )
15  _____

16

              REMOTE DEPOSITION OF SARAH AUGUSTINE
17
    _____
18
                  Thursday, October 6, 2022
19
              9:00 a.m. PST to 4:00 p.m. PST
20
        Witness Location:  White Swan, Washington
21

22                     REPORTED BY:

23           Connie Recob, CCR, RMR, CRR
                Washington CCR No. 2631
24               Oregon CCR No. 15-0436
               Utah CCR No. 1133171-7801
25           connie@lakesidereporting.com
```

LAKESIDE REPORTING
833.365.DEPO

SARAH AUGUSTINE - 10/06/2022

Page 2

```
1      A P P E A R A N C E S - R E M O T E

2

3   FOR THE WITNESS:

4           AARON MILLSTEIN
            K&L GATES
5           925 Fourth Avenue, Suite 2900
            Seattle, Washington 98104
6           aaron.millstein@klgates.com

7   FOR PLAINTIFFS SOTO PALMER, et al., ON BEHALF OF
    CAMPAIGN LEGAL CENTER:
8
            SIMONE LEEPER
9           ANNABELLE HARLESS
            ASEEM MULJI
10          BEN PHILLIPS - Legal Fellow
            CAMPAIGN LEGAL CENTER
11          1101 14th Street Northwest, Suite 400
            Washington, DC 20005
12          SLeeper@CampaignLegalCenter.org
            AHarless@CampaignLegalCenter.org
13          AMulji@CampaignLegalCenter.org
            BPhillips@CampaignLegalCenter.org
14
     ON BEHALF OF UCLA VOTING RIGHTS PROJECT:
15
            SONNI WAKNIN
16          UCLA Voting Rights Project
            3250 Public Affairs Building
17          Los Angeles, California 90095
            Sonni@UCLAVRP.org
18
    ON BEHALF OF MALDEF:
19
            DEYLIN THRIFT-VIVEROS
20          ERNEST HERRERA
            JAZMINE PARRA
21          Mexican American Legal Defense and
            Educational Fund (MALDEF)
22          643 South Spring Street, 11th Floor
            Los Angeles, California 90014
23          DThrift-Viveros@MALDEF.org
            EHerrera@MALDEF.org
24          JParra@MALDEF.org

25
```

SARAH AUGUSTINE – 10/06/2022

```
                                                           Page 3
 1              APPEARANCES, continued:

 2
     FOR PLAINTIFFS, ON BEHALF OF MORFIN LAW FIRM:
 3
                EDWARDO MORFIN
 4              MORFIN LAW FIRM, PLLC
                7325 West Deschutes Avenue, Suite A
 5              Kennewick, Washington 99336
                Eddie@MorfinLawFirm.com
 6
     FOR DEFENDANT STATE OF WASHINGTON:
 7
                ANDREW R.W. HUGHES
 8              Assistant Attorney General
                ATTORNEY GENERAL OF WASHINGTON
 9              Complex Litigation Division
                800 Fifth Avenue, Suite 2000
10              Seattle, Washington 98104
                Andrew.Hughes@ATG.Wa.gov
11
     FOR INTERVENOR-DEFENDANTS:
12
                BRENNAN A.R. BOWEN
13              HOLTZMAN VOGEL
                Esplanade Tower IV
14              2575 East Camelback Road, Suite 860
                Phoenix, Arizona 85016
15              bbowen@@HoltzmanVogel.com

16

17

18

19

20

21

22

23

24

25
```

SARAH AUGUSTINE – 10/06/2022

```
                                                    Page 4
 1                    EXAMINATION INDEX

 2
     EXAMINATION BY:                          PAGE NO.
 3
     BY MR. THRIFT-VIVEROS                        5
 4
     BY MR. HUGHES                              150
 5
     BY MR. BOWEN                               159
 6
     BY MR. THRIFT-VIVEROS                      176
 7
     BY MR. HUGHES                              180
 8

 9                      EXHIBIT INDEX

10
     EXHIBIT NO.   DESCRIPTION            PAGE NO.
11
     Exhibit 1    6/21/21 Meeting Minutes      64
12
     Exhibit 2    Framework E-mails           101
13
     Exhibit 3    11/21/21 Timeline of Redistricting
14                Commission Events           112

15   Exhibit 4    11/15 Text Message          122

16   Exhibit 5    11/15 to 11/18 Text Messages  124

17   Exhibit 6    Handwritten Notes           138

18   Exhibit 7    11/24/21 Meeting Minutes    145

19   Intervenor-Defendant Exhibit 1  3/11/22
                  Seattle Times Article       170
20

21               WITNESS INSTRUCTED NOT TO ANSWER

22                      (None)

23
                     INFORMATION REQUESTED
24
                        (None)
25
```

SARAH AUGUSTINE - 10/06/2022

Page 5

```
 1            THURSDAY, OCTOBER 6, 2022; SEATTLE, WASHINGTON

 2                        9:00 A.M. PST

 3                            ***

 4

 5                       SARAH AUGUSTINE,

 6      having been sworn/affirmed on oath to tell the truth,

 7    the whole truth, and nothing but the truth, testified as

 8                          follows:

 9

10                  E X A M I N A T I O N

11       BY MR. THRIFT-VIVEROS:

12   Q. Hi.  Good morning, Ms. Augustine.  Do you prefer if I

13      call you Ms. Augustine or Sarah?

14   A. You can call me Sarah.

15   Q. Okay.  So my name is Deylin Thrift-Viveros, and you can

16      call me Deylin.  I'm an attorney at the Mexican

17      American Legal Defense and Educational Fund known as

18      MALDEF, and we're representing the plaintiffs in the

19      Soto Palmer v. Hobbs litigation.

20           Are you familiar with the lawsuit?

21   A. I am.

22   Q. Okay.  So please state your full name and address for

23      the record.

24   A. My name is Sarah Augustine.  My address is 3500 Island

25      Road, White Swan, Washington 98952.
```

SARAH AUGUSTINE - 10/06/2022

Page 6

1   Q. Okay.  And have you ever been deposed before?

2   A. I have.

3   Q. Okay.  So even though you've been deposed before, I

4       like to go over some ground rules so that we're on the

5       same page for this deposition.  So to keep the record

6       as clear as possible, I'd like to ask that you be

7       mindful of only having one speaker at a time.  I know

8       sometimes there can be a lag with the Zoom or, you

9       know, internet and everything, but I just like you to

10      wait until I'm done with my question before answering.

11          And your lawyer might make objections as well.  And

12      I ask for him to wait for me to complete my question

13      before objecting.  And once your lawyer completes his

14      objection, you must still answer the question that I

15      asked unless your attorney clearly instructs you not to

16      answer the question.  And usually your lawyer is

17      preserving the right to object to the question.

18          So the court reporter can only record verbal

19      responses, so it's important that you answer out loud,

20      clearly with words rather than just nodding your head

21      or shaking your head.

22          Does that make sense?

23   A. Yes.

24   Q. Okay.  And if you don't understand a question for any

25      reason, let me know.  I'll try to clarify it.  But if

SARAH AUGUSTINE - 10/06/2022

Page 7

1   you do answer a question, I'll assume that you've
2   understood it.
3        Do you understand that?
4   A. Yes.
5   Q. Great.  So, yeah, at any point, let me know if you need
6   to take a break.  We can take one.  I just ask that if
7   you're able to, to not ask for a break while a question
8   is still pending.
9        Is that okay?
10  A. Yes.
11  Q. So as you probably surmised, we are here to discuss the
12  redistricting commission process and the decisions that
13  were made throughout that process.  And just to be
14  clear, you're not a defendant in this case.  There are
15  no claims against you.  We're taking depositions of the
16  commissioners, of commission staff to get a better
17  sense of how the legislative maps were created and the
18  processes and metrics used in creating these maps.
19       So in the State of Washington's initial
20  disclosures, you were identified as someone familiar
21  with the information received and considered by the
22  redistricting commission, the assessment of alternative
23  and draft map configurations and the approval and
24  transmission of the final maps to the Supreme Court and
25  to the legislature.

SARAH AUGUSTINE - 10/06/2022

Page 8

1          Would you agree with this description?

2    A. Yes.

3    Q. Okay.  And do you understand that all of your responses

4       are being recorded?

5    A. Yes.

6    Q. So you'll have an opportunity to review your answers in

7       a physical booklet after the deposition and make any

8       changes you deem appropriate, and then you'll sign it

9       under penalty of perjury.

10          However, if you make more than clerical changes,

11      like fixing a typo or something like that, I or another

12      lawyer may look and make comments on your changes at

13      trial, which could affect your credibility before the

14      judge or the jury.  So it's just easiest to give the

15      best testimony possible today.

16          Do you understand that?

17   A. Yes.

18   Q. Great.  And the court reporter has put you under oath,

19      which means that you're under an obligation to tell the

20      truth.  And although we are in a somewhat informal

21      environment, that oath has the same force and effect as

22      if you were testifying in a court of law in front of a

23      judge or jury.

24          Do you understand that?

25   A. Yes.

SARAH AUGUSTINE - 10/06/2022

Page 9

1   Q. Great.  And then also, sometimes it might happen that

2      you give an answer as completely as you can in the

3      moment, but then later on you might remember something,

4      some information or you want to make a clarification

5      from a previous answer.  So if that happens, feel free

6      to tell me that you'd like to add something to an

7      earlier answer, and then we can do it right then while

8      it's fresh in your mind.

9         Is that okay?

10  A. Yes.

11  Q. Great.  And then lastly, if you don't know an answer to

12     a question, feel free to say so.  We are entitled to

13     your informed estimate, but I don't want you to

14     necessarily guess at something.  Like if it's a

15     timeline or something like that, if you can make a good

16     estimate, please do so.  And if you don't know the

17     answer to the question, you can simply say so as well.

18        Is that okay?

19  A. Yes.

20  Q. Great.

21           MR. BOWEN:  Deylin, before we get into a line

22     of question, can we get an objection by one party

23     preserves it for all?  Does anybody disagree with that?

24           MR. THRIFT-VIVEROS:  We're all in agreement to

25     that.

SARAH AUGUSTINE - 10/06/2022

Page 10

1    BY MR. THRIFT-VIVEROS:

2    Q. So, Sarah, you mentioned that you were deposed before.

3       What lawsuit -- or what was the deposition in

4       connection with?

5    A. The deposition was in connection with the OPMA lawsuit

6       brought against the commission.

7    Q. And do you recall when you were deposed?

8    A. I don't remember the specific date.  It was in 2022.

9    Q. Okay.  Like in the spring, potentially, or winter?

10   A. In the spring.

11   Q. In the spring, okay.  Had you been deposed for any

12      other issue prior to the OPMA lawsuit?

13   A. No.

14   Q. Okay.  Have you ever been a party to a lawsuit?

15   A. Yes.

16   Q. Okay.  And what was -- was it one or multiple?

17   A. One.

18            MR. MILLSTEIN:  Object to form.

19   BY MR. THRIFT-VIVEROS:

20   Q. One.  And what was that in connection with?

21   A. It was in connection with a boundary dispute and the

22      current ranch where I live with my family.

23   Q. Okay.  To prepare for this deposition, did you meet

24      with anyone in person or by phone or Zoom in any way,

25      other than your counsel, to prepare?

SARAH AUGUSTINE - 10/06/2022

Page 11

1    A. No.

2    Q. Okay.  Did you meet with your counsel to prepare for

3       the deposition?

4    A. Yes.

5    Q. Okay.  And about how many times did you meet?

6    A. Once.

7    Q. Okay.  Did you discuss this deposition with anyone else

8       besides your counsel?

9    A. Yes.

10   Q. And who did you discuss this deposition with besides

11      your counsel?

12   A. I discussed it with my employer, because today is a

13      workday for me.  So I scheduled to have this day off.

14      And I discussed it with my husband, asking him to care

15      for our child for this whole day including pick-up and

16      drop-off.

17   Q. Thank you for making the time to come to this

18      deposition and making those arrangements.

19          And so nobody else -- you did not -- excuse me.

20      You did not discuss this deposition with anyone else

21      besides the people you mentioned?

22   A. No one else.

23   Q. Okay.  Did you review any documents in preparation for

24      this deposition?

25   A. I did.

SARAH AUGUSTINE - 10/06/2022

Page 12

1   Q. And which documents were those?

2   A. I reviewed the documents related to the training that

3      we received, the commissioners received, and our

4      meeting on June 21st, 2021.

5   Q. Any other documents in preparation for this deposition?

6   A. No.

7   Q. And the training you received on June 21st, 2021, what

8      was that a training for?

9   A. It was a presentation by the person at the Attorney

10     General's Office felt to be the best expert to prepare

11     commissioners for following the Voting Rights Act.

12  Q. And when you say "following the Voting Rights Act," do

13     you mean in the process -- excuse me, in the process of

14     drafting the maps, ensuring compliance with the Voting

15     Rights Act?

16  A. Yes.

17            MR. MILLSTEIN:   Object to the form.

18     BY MR. THRIFT-VIVEROS:

19  Q. Okay.  I think we'll discuss that training a little bit

20     later on in this depo.

21        So during the redistricting process, what

22     communication devices did you use in the business of

23     conducting the redistricting?

24  A. I was issued a commission laptop and a commission

25     phone, and I used both of those devices.  There were

SARAH AUGUSTINE - 10/06/2022

Page 13

1    times when I went to Olympia, the office in Olympia,

2    and I worked with the independent staff that reported

3    to me in Olympia.

4         But I think I still -- I believe I still used my --

5    the laptop that was issued to me.  Although, I might

6    have looked on with other staff there in the Olympia

7    office.

8         And prior to receiving that laptop, I used my

9    computer at the Dispute Resolution Center in Yakima,

10   which was my employer at the time.  And that was maybe

11   for four weeks.  So that would have been --

12 Q. So you were -- oh, excuse me.

13        What was that?  Sorry.

14 A. -- in January.

15 Q. Oh.  So for about four weeks when you first started,

16   you did not have a laptop for redistricting, and you

17   used the computer at the Dispute Resolution Center?

18 A. Yes.

19 Q. Okay.  And as part of your duties on the commission,

20   did you use a specific e-mail address for redistricting

21   work?

22 A. I did.

23 Q. And what was that e-mail address, if you recall?

24 A. I'm embarrassed to say I don't recall specifically, but

25   I can give you an estimate of what I think it was.

SARAH AUGUSTINE - 10/06/2022

1    Q. Okay.  And if it's inaccurate, that's okay.  But, yeah,

2       what's your estimate?

3    A. I think it was sarah.washington at whatever the

4       extension is.  I apologize.  I don't really remember.

5       I could find that.

6    Q. Did you use a personal e-mail address to conduct

7       redistricting business?

8    A. I did.

9    Q. And what was that e-mail address?

10   A. I used that e-mail address until I was issued an e-mail

11      address from the redistricting commission.

12   Q. Okay.

13   A. And I can tell you that address.

14   Q. Yes, please.

15   A. director@drcyakima.org.

16   Q. And once you received your quote-unquote official

17      redistricting e-mail address, did you use your personal

18      e-mail address to do redistricting activities?

19   A. I believe that I did not.  To the best of my

20      recollection, I did not use that e-mail address.

21   Q. Do you recall more or less when you received the

22      official redistricting e-mail address?

23   A. I believe it was similar to the laptop receipt, so

24      January 2021 perhaps, for three or four weeks.

25   Q. And you mentioned also you were issued a phone.  Do you

SARAH AUGUSTINE - 10/06/2022

Page 15

1    recall when you received that phone for redistricting
2    activities?
3  A. I don't recall the exact date.  It came in a package.
4    So I received a phone and a laptop all in one package.
5  Q. Okay.  And did you use your personal phone for
6    redistricting activities prior to receiving that
7    package?
8  A. I don't remember.
9  Q. Okay.  For calls or for text messages, do you remember?
10 A. What I remember is the primary people I was
11   communicating with in that time period were the staff
12   of the -- so it would have been the chief of staff for
13   the senate and this -- I don't remember what the title
14   is for the house, but these were administrators who
15   were trying to prepare me.
16       So perhaps we spoke by phone.  That could be.  I
17   recall that primarily we were using e-mail.
18 Q. Okay.  And once you received your official
19   redistricting phone, did you use your personal phone to
20   do redistricting activities?
21 A. I did.
22 Q. And about how frequently would you use your personal
23   phone for redistricting activities?
24 A. Perhaps a handful of times if I forgot my redistricting
25   phone or if the battery was dead.  Not often.

SARAH AUGUSTINE - 10/06/2022

Page 16

1  Q. Did you use your personal phone to send text messages
2      relating to the redistricting?
3  A. I did.
4  Q. Okay.  And that kind of leads to my next question, but
5      were you asked to conduct any searches for documents in
6      response to public records requests?
7  A. Yes.
8  Q. And did you produce those documents?
9  A. I did.
10 Q. Okay.  And did you include the text messages from your
11     personal cell phone related to redistricting
12     activities?
13 A. I did.
14 Q. Did you use any other messaging platforms besides
15     e-mail or text messages relating to redistricting work?
16 A. No.
17 Q. Okay.  And when you produced -- or when you -- excuse
18     me.
19         When you did a search and production for
20     redistricting work -- sorry.  Excuse me.
21         When you did a search for production in response to
22     public records requests related to your redistricting
23     work, who asked you to produce those documents?
24             MR. MILLSTEIN:  Objection to form.
25             THE WITNESS:  Lisa McLean.

SARAH AUGUSTINE - 10/06/2022

Page 17

```
 1        BY MR. THRIFT-VIVEROS:
 2   Q. Okay.  And Lisa is the executive director of the
 3      redistricting commission; is that correct?
 4   A. Yes.
 5   Q. Okay.  And how many times did Lisa McLean ask you to
 6      conduct a search of your documents?
 7   A. I don't recall exactly.  It's possible that there was
 8      more than one request.
 9   Q. Okay.  Did -- excuse me.  Let me strike that.
10        What guidance did Lisa McLean give to you in
11      regards to searching your documents and records for
12      this production?
13             MR. MILLSTEIN:  Objection to form.
14             THE WITNESS:  She asked me to fully comply
15      with the request that she was processing.  So she would
16      describe the request and provide a timeline to produce
17      the records.
18        BY MR. THRIFT-VIVEROS:
19   Q. Okay.  When you first started as a commissioner, or I
20      guess at any point in the commission process, were you
21      given any guidance related to retaining communications
22      related to the redistricting work?
23   A. Can you please repeat the question?
24   Q. Yes.  Either from the -- excuse me.  Let me strike
25      that.
```

SARAH AUGUSTINE - 10/06/2022

Page 18

1            At any time in the redistricting process, were you

2      giving guidance on retaining communications related to

3      the redistricting work?

4                  MR. MILLSTEIN:  Object to form.  And I'll just

5      say, to the extent it's asking you for any

6      communications you've had with counsel, I'll ask you

7      not to answer on that but any other conversations or

8      guidance.

9                  THE WITNESS:  I'm sorry to be obtuse.  I don't

10     understand the question yet.

11     BY MR. THRIFT-VIVEROS:

12  Q. That's okay.

13          So I'm asking if at any point when you were serving

14     on the commission, did anyone tell you, it could have

15     been Lisa McLean or anyone else, about the process or

16     requirements to retain all communications regarding

17     redistricting?

18  A. Yes.

19  Q. Okay.  And who gave you that guidance?

20                 MR. MILLSTEIN:  Objection to form.

21                 THE WITNESS:  I don't recall, but it was

22     certainly pertaining to the OPMA suit and this suit.

23     BY MR. THRIFT-VIVEROS:

24  Q. Okay.  I won't ask you that many more questions about

25     this but I just kind of wanted to clarify.  Were you

SARAH AUGUSTINE - 10/06/2022

Page 19

1    only given guidance on retaining communications related

2    to the redistricting work after the OPMA lawsuit was

3    filed or after this lawsuit was filed?

4              MR. MILLSTEIN:  Objection to form.

5              THE WITNESS:  I am having trouble with this

6    question for a couple of reasons:  One is that it was

7    my intention to provide a clear record of everything we

8    did in this commission for the benefit of the next

9    commission.  That was always an intention.  I struggle

10   to remember who advised me specifically to retain

11   records, and the specific requests I remember were

12   pertaining to these cases.

13   BY MR. THRIFT-VIVEROS:

14   Q. Okay.  So you mention you had an intention to provide a

15      clear record.  What steps did you take personally to

16      act on that intention?

17   A. I asked for all of the minutes of our public meetings

18      to be archived, all of the reports that were generated

19      by the independent staff to be archived, for all of the

20      public comment that we received to be archived and for

21      a specific document on the process that we followed to

22      be drafted by Lisa McLean for posterity.

23   Q. And as far as you know, have all of those things that

24      you mentioned -- have all those things that you

25      mentioned been archived?

SARAH AUGUSTINE - 10/06/2022

Page 20

1  A. Yes.

2  Q. Okay.  And do you know who's in possession of the

3     archives?

4  A. I believe most of those documents are available to the

5     public on the archived website.

6  Q. Okay.  Great.  So even if it wasn't to prepare for this

7     deposition, have you reviewed any of the documents

8     filed in this case, for example, the complaint or

9     preliminary injunction motion?

10 A. I reviewed the complaint when it was issued.

11 Q. Did you -- excuse me.

12        Have you read any other documents filed in this

13     case?

14 A. No.

15 Q. Okay.  Do you have an opinion on the complaint that was

16     filed?

17 A. I have an opinion about the impact of the complaint as

18     it pertains to my role as the chair, and that opinion

19     was printed in the Seattle Times.

20 Q. And do you have any documents with you today?

21 A. No.

22 Q. Do you have any --

23 A. Oh, I -- excuse me.  I'll back that up and say I have a

24     file folder with the training that I described for you

25     earlier, which was held on June 21st.

SARAH AUGUSTINE - 10/06/2022

Page 21

1  Q. Okay.  Do you have any documents open on your computer

2     right now?

3  A. No.

4  Q. Okay.  Do you have any notes with you today?

5  A. Nothing.

6  Q. Okay.  So I know you reviewed -- excuse me.  You

7     mentioned you reviewed the complaint and you wrote the

8     op ed in the Seattle times.  Have you discussed this

9     lawsuit with anyone aside from your attorneys?

10 A. I pause because I have discussed the process of

11    redistricting with many people over many months.  I do

12    not recall talking about this lawsuit specifically with

13    anyone, to the best of my recollection.  However, I

14    have spoken extensively privately and publicly about

15    the process of redistricting.

16 Q. Okay.  So, yeah, you mention that you haven't spoken --

17    but just perhaps to jog your memory, for example, have

18    you spoken with any of the commissioners, any of the

19    other commissioners from the commission, regarding this

20    lawsuit?

21 A. Nothing comes to mind, but it is possible.  I pause

22    because it has been a long time, many months.  And if

23    there was discussion, it would have been cursory and

24    related to logistics.  I don't recall having an

25    in-depth conversation with the commissioners about

SARAH AUGUSTINE - 10/06/2022

Page 22

1    this.

2    Q. Okay.  And I guess, yeah, going to the op ed that you

3        wrote in the Seattle Times, I did read it, but I would

4        like to ask you to walk me through the events that led

5        to your resignation.

6    A. In the redistricting process, it was a priority for me

7        as chair to engage as much public input as possible.

8        And I believe, to the best of my knowledge, that we

9        engaged more public input than in any commission in

10       Washington State history, more than a million

11       communications.

12           And I took that role very seriously, putting the

13       voices of the public before the voting commissioners so

14       they would make informed decisions on behalf of all the

15       people of the state.  That mattered to me to the extent

16       that one of the very first things I did as chair was to

17       get a values agreement from all four commissioners, and

18       that value statement was read in every public meeting

19       to show the affirmation of the collective values that

20       the voters and the residents of Washington State could

21       count on.  And with that in mind, engaged as many

22       people as possible.

23           One of the very first tasks after hiring an

24       executive director was to hire an organizer.  During

25       the time of COVID, it was very difficult to have

SARAH AUGUSTINE - 10/06/2022

1  interaction with the public.  We created a strategy for

2  engaging as many voices as possible from the extremes

3  of political position all the way to the center, not

4  just parties, not just politically active people,

5  community members, using the public libraries, using

6  all manner of mechanisms, clubs, associations, chambers

7  of commerce to engage the widest range of people in

8  this process.

9      When I understood that the leaders of the

10  legislature in Washington State -- after the

11  legislature had affirmed the maps and they were the

12  law, my understanding is that they were not planning on

13  defending the law.

14      I -- the action that I felt I could take was to

15  resign at that time.  Simply because the people I

16  believe I had created a social contract with, the

17  people who participated in the process, that those

18  voices would be included in the final product.  It was

19  certainly my intention that the commissioners would be

20  accountable to that population.

21      And I believe, although this is simply a belief,

22  that the commissioners were responsive and responsible

23  to those voices.  And for the state leaders to not join

24  our commission in defending what had been created, I

25  felt I was in the position where I could not accept

SARAH AUGUSTINE - 10/06/2022

Page 24

1   that.

2  Q. So it's very admirable all the outreach work.  And I

3      know that there was a lot of time and effort placed

4      into it.  Is it your understanding that the legislative

5      leaders instructed the commissioners -- excuse me.  Let

6      me take that back.

7          You mentioned that the legislative leaders were not

8      in favor of defending the maps.  Is it your

9      understanding that the legislative leaders told the

10      commissioners, the two democratic appointed

11      commissioners, to not vote to defend the maps?

12                  MR. MILLSTEIN:  Objection to form.

13                  THE WITNESS:  I don't know what the democratic

14      leaders instructed anyone to do.  I have no idea what

15      their instructions were and -- yeah.

16  BY MR. THRIFT-VIVEROS:

17  Q. Prior to the meeting in which you resigned, had you

18      notified any of the commissioners that you were

19      planning on resigning if they did not vote to defend

20      the maps?

21                  MR. MILLSTEIN:  Objection to form.

22                  THE WITNESS:  I think that you're referring to

23      a meeting where the commission was determining whether

24      or not they would act as an intervenor in this case.  I

25      did not have any say into whether the commission would

SARAH AUGUSTINE - 10/06/2022

Page 25

1   or would not do that.  I made the decision to resign

2   before that meeting without the knowledge of anyone on

3   the commission.  Because whether or not the commission

4   chose to be an intervenor had nothing to do with the

5   decision of the leaders in the Washington State

6   legislature.

7     BY MR. THRIFT-VIVEROS:

8   Q. I see.  But prior to your resignation, had you informed

9     any other commissioners that you were planning to

10    resign?

11  A. No.

12  Q. Did you -- strike that.

13        You mentioned the meet in which the commission met

14    and voted not to intervene in this particular lawsuit;

15    is that right?

16  A. Yes.

17             MR. MILLSTEIN:  Objection to form.

18    BY MR. THRIFT-VIVEROS:

19  Q. Did you have conversations with any of the

20    commissioners to persuade them to vote in favor of

21    intervening in this lawsuit?

22  A. No.  I -- I guess I can just leave it at no.  No.  I

23    did not, I would not, huh-uh.

24  Q. And you say you would not.  Why -- why do you say that

25    you would not have tried to persuade them to intervene

SARAH AUGUSTINE - 10/06/2022

Page 26

1    in the lawsuit?

2  A. My purpose as chair was to provide the commissioners,

3     the voting commissioners, with the information and the

4     tools that they needed to make the best decision.  It

5     was not my role to be part of the decision-making

6     process beyond being an impartial facilitator.  And I

7     stuck to that role from beginning to end and instructed

8     all of my staff to do the same.

9  Q. Okay.  I'm going to ask a few questions just about your

10    hiring -- sorry, your appointment to the commission.

11       Do you recall the date you were selected to serve

12    as a commissioner?

13 A. I don't.

14 Q. Okay.  Do you recall the month, more or less?

15 A. It was January 2021.

16 Q. Okay.  And when you were selected, were you selected

17    as -- specifically to serve as the nonvoting commission

18    chair?

19 A. Yes.

20 Q. Okay.  And throughout the time from the time you were

21    selected to your resignation, did you work continuously

22    as the commissioner?

23 A. I did.

24 Q. Okay.  Did you hold other jobs during that time?

25 A. Yes.

Page 27

1   Q. During the entire time, did you hold another job?

2   A. Yes.

3   Q. And was that job as -- sorry.  Excuse me.

4        What was that job?

5   A. I served as the executive director of the Dispute

6      Resolution Center of Yakima and Kittitas Counties.

7   Q. So about how many hours per week did you work on

8      commission work?

9   A. Depending on the time frame, 20 to 30 hours per week.

10  Q. And your role as an executive director was a full-time

11     role as well?

12  A. Yes.

13  Q. That's an impressive amount of work.  Do you recall the

14     process that led to your appointment as the chair of

15     the commission?

16  A. I recall from my point of view.

17  Q. Okay.  Did you -- so, yeah, what was your point of view

18     on the process?

19  A. I was called by a staff member named Osta on a

20     Thursday.  It was a cold call.  I did not know Osta.

21     This was not on my radar.  And she asked me to

22     consider.  And I had a phone conversation with all four

23     of the voting commissioners between that time and the

24     Sunday meeting, at which time they appointed me.

25  Q. So you did not apply or send in an application for the

SARAH AUGUSTINE - 10/06/2022

Page 28

```
 1      role of commission chair?
 2   A. If there was an application process, I was unaware of
 3      it.
 4   Q. Okay.  And you said you were called by a staff member
 5      named Osta.  Is that Osta Davis?
 6   A. Yes.
 7   Q. Okay.  And when she called you, do you know if she was
 8      acting in the capacity of -- or strike that.
 9          When she cold called you, do you know if she was
10      acting as a representative of the commission or of a
11      specific commissioner?
12   A. It was my understanding that she was calling on behalf
13      of the commission.  At that time, I did not even
14      understand what Osta Davis's role was.
15   Q. Do you know if someone outside of the commission
16      recommended you -- or excuse me, strike that.
17          Do you know if anyone recommended to the commission
18      that you be appointed as the chair?
19              MR. MILLSTEIN:  Object to form.
20              THE WITNESS:  I don't know.  I don't know
21      how -- no, I don't know.
22       BY MR. THRIFT-VIVEROS:
23   Q. Did you ask anyone either a commissioner, commission
24      staff or anyone else why you were cold called for
25      consideration as the chair of the commission?
```

SARAH AUGUSTINE - 10/06/2022

Page 29

1  A. I may have had surmising conversation with Lisa McLean
2     many months later.  Lisa also did not know.  It was
3     curious to me.
4  Q. Okay.  So I'm going to ask you some, I guess, a little
5     bit more personal questions, but did you grow up in
6     Washington?
7  A. No.
8  Q. Where did you grow up?
9  A. I grew up in Colorado and New Mexico.
10 Q. And how long have you lived in Washington?
11 A. I moved to Washington in 1998.
12 Q. And I believe you live in the Yakima Valley currently;
13    is that correct?
14 A. Yes.
15 Q. How long have you been living there in the Yakima
16    Valley region?
17 A. I moved to the place where I now live in 2006.
18 Q. And prior to that, 2006, where did you live?
19 A. Seattle.
20 Q. In Seattle, okay.
21        Did you go to college?
22 A. I went to graduate school at the University of
23    Washington and then at Antioch University.
24 Q. Was Antioch University your undergraduate?
25 A. I went to graduate school at both of those

SARAH AUGUSTINE - 10/06/2022

1  universities.

2  Q. Oh, okay.  And where did you go to undergraduate?

3  A. University of New Mexico.

4  Q. Okay.  And in your undergraduate university, what was

5     your major?

6  A. My double major was in sociology and psychology.

7  Q. And your postgraduate degree, what was the -- excuse

8     me.  Let me strike that.

9        What was the topic or the major of your

10    postgraduate degree?

11 A. At the University of Washington, I was in a Ph.D

12    program in sociology where I studied organizations, and

13    I did not complete that work.  I completed a master's

14    degree at Antioch University in whole systems design.

15 Q. Forgive my ignorance, but what is whole systems design,

16    briefly?

17 A. Yeah.  Make sense out of that one.

18 Q. I know what each individual word means, but as a

19    collective, I don't.

20 A. Also organization, human systems.

21 Q. And when you say human systems and organization, is

22    that a sort of broad level of ethnic groups or societal

23    groups?

24 A. So in the discipline of sociology, organization is

25    thinking about how organizations are arranged and how

SARAH AUGUSTINE - 10/06/2022

Page 31

1    they work together and how they're designed.  There are
2    a variety of different theories to interpret that.  I
3    studied that.  And then at Antioch University, applied
4    that.  So really thinking more high level human
5    systems, institutions, organizations and how those
6    things fit together.
7  Q. That's very interesting.  Do you have any other
8    postgraduate experience?
9  A. No.
10 Q. Okay.  And how long -- or strike that.
11       Are you currently working?
12 A. Yes.
13 Q. And in what position?
14 A. I'm the executive director of the Dismantling the
15   Doctrine of Discovery Coalition.
16 Q. And how long have you been working in that role?
17 A. Since July 1st, 2022.
18 Q. And was your immediately prior job as the executive
19   director of the Dispute Resolution Center?
20 A. Yes.
21 Q. And how long did you work at the Dispute Resolution
22   Center?
23 A. Five and a half years.
24 Q. Okay.  And prior to that organization, where else did
25   you work?

SARAH AUGUSTINE - 10/06/2022

Page 32

1        Sorry.  Let's limit it to post college just for

2   ease.

3   A. Just to clarify, you want me to tell you everywhere

4      I've worked since I graduated from college?

5   Q. How many -- how many places was that, do you believe?

6   A. Probably quite a number.

7   Q. Okay.  Let's make it a little easier.  Have you --

8      prior to your experience on the redistricting

9      commission, had you done any work pertaining to map

10     making?

11  A. No.

12  Q. Had you done any work pertaining to voting rights?

13  A. No.

14  Q. Had you done work pertaining to race?

15           MR. MILLSTEIN:  Objection to form.

16           THE WITNESS:  Specifically, no.

17     BY MR. THRIFT-VIVEROS:

18  Q. Before the 2021 redistricting commission, had you

19     worked on previous redistricting cycles in any

20     capacity?

21  A. No.

22  Q. Had you worked on political campaigns for specific

23     candidates?

24  A. No.

25  Q. Had you worked on political campaigns for specific

SARAH AUGUSTINE - 10/06/2022

Page 33

1    legislation?

2                    MR. MILLSTEIN:  Objection to form.

3                    THE WITNESS:  Yes.

4    BY MR. THRIFT-VIVEROS:

5    Q. And what legislation was that?

6    A. There was a bill, I believe that passed in 2020, that

7       was called the NICA Act.  That's federal legislation.

8       I don't know the full name of that, of the law as it

9       stands, but I worked on the NICA Act until the time

10      that it passed as a volunteer.

11   Q. And when you say you worked on it, what do you mean by

12      that?

13   A. I collaborated with the senator who sponsored the bill,

14      with their staff to insert human rights language into

15      the bill.

16   Q. I'm sorry.  What was that bill about in a general

17      sense?

18   A. It was the sanction bill tying compliance by the state

19      of Nicaragua with regulations of the United States.

20   Q. Do you identify as a latina?

21   A. I do.

22   Q. Okay.  Are you Nicaraguan?  Just wondering.

23   A. No.

24   Q. Okay.  Are you familiar with demographics of the Yakima

25      Valley?

SARAH AUGUSTINE - 10/06/2022

Page 34

1   A. Yes.

2   Q. And in a general sense, what can you tell me about the

3      demographics of the Yakima Valley?

4              MR. BOWEN:  Objection.  Form.

5              THE WITNESS:  The Yakima Valley contains what

6      is arguably the largest Indian reservation in the state

7      of Washington.  The population is just over 50 percent

8      Latinx.  It is made up of a population of historical

9      growers who are from the dominant culture and those

10     people who have settled on the homeland of the

11     confederated bands and tribes of the Yakama Nation and

12     on the ceded territories of the confederated bands and

13     tribes of the Yakama Nation.

14         There is also a population of Filipino people that

15     live in the valley who have lived here historically as

16     settlers as well as a tiny minority of Japanese

17     settlers who have also participated in the agricultural

18     industry.

19         There is a small community of African Americans in

20     the city of Yakima.

21     BY MR. THRIFT-VIVEROS:

22     Q. Thank you.  In your work as the executive director --

23        or strike that.

24            Does the Dispute Resolution Center, at least when

25        you were working there, generally serve the Yakima

SARAH AUGUSTINE - 10/06/2022

Page 35

1    Valley?

2  A. Yes.

3  Q. And what kind of work does the Dispute Resolution

4     Center do?

5  A. The Dispute Resolution Center provides training tools

6     and interventions so that ordinary people can solve

7     their problems themselves.  So they provide mediations

8     at a micro level.

9         They also provide systems level dispute resolution

10    interventions, including the creation of a massive and

11    successful community policing program that's community

12    driven.

13        We also intervene in workplace conflicts, conflicts

14    at the community level, such as between school board

15    and the parents that live in that school district, and

16    a whole other variety of things.  They provide training

17    and resources to schools and school districts on

18    restorative practices and also other official

19    government institutions on restorative practices.

20        The Dispute Resolution Center also serves --

21    provides, serves as the facilitator in a variety of

22    statewide programs, including an eviction resolution

23    program that serves those people that are most

24    vulnerable of losing their homes.

25        The Dispute Resolution Center of Yakima and

SARAH AUGUSTINE – 10/06/2022

Page 36

1    Kittitas County is a bilingual center.  And in my

2    tenure, I took a center that had one staff of color to

3    a center that has now 70 percent staff of color that is

4    fully bilingual.

5 Q. That's great.  Do you believe that members of the

6    Latino community in Yakima Valley face discrimination?

7              MR. MILLSTEIN:  Objection to form.

8              THE WITNESS:  Yes.

9 BY MR. THRIFT-VIVEROS:

10 Q. In what ways?

11 A. In the United States, there is policy that excludes

12    human beings from being able to participate in the

13    legitimate economic structure, and that leads to many

14    various social problems.  I could list them for you,

15    but I'm sure you're familiar with them.  So I would say

16    in the broadest sense, that's the first line of

17    discrimination with the exclusion of workers and

18    families from the legitimate economic structure, that

19    is having access to jobs.

20         There are secondary, tertiary forms of

21    discrimination for people, not only those who are

22    undocumented, but for their decedents.

23 Q. Do you know of any -- or strike that.

24         Going into the redistricting process, were you

25    aware of previous litigation in the Yakima Valley

SARAH AUGUSTINE - 10/06/2022

Page 37

1    region around the Voting Rights Act?

2    A. Yes.

3    Q. Do you recall what litigation you were aware of?

4    A. I am aware that the city of Yakima was sued in order

5    that the city would -- district would provide

6    representation by district rather than having open

7    seating for the city council.

8    Q. Are you aware of other litigation in the Yakima Valley

9    region around the Voting Rights Act?

10   A. I believe there was also -- and maybe ongoing, I'm not

11   sure -- litigation at the county commission level as

12   well.

13   Q. Do you have an opinion on the City of Yakima litigation

14   that you mentioned?

15            MR. MILLSTEIN:  Objection to form.

16            THE WITNESS:  Yes.

17      BY MR. THRIFT-VIVEROS:

18   Q. And what is that opinion?

19   A. In order for democratic institutions to function

20   properly, the populus has to believe in them.  Open

21   city -- open seating in the city council in the City of

22   Yakima eroded the public's trust in the institution of

23   the city council itself.  Providing representation by

24   district was a clear way of strengthening the

25   democratic institution of the city council.

SARAH AUGUSTINE - 10/06/2022

Page 38

1  Q. Thank you.  Going back to the -- your role as a

2     commissioner, can you describe to me as specifically as

3     possible what your duties were as the chair of the

4     commission?

5  A. My first duty was to stand up the institution.  I began

6     by hiring an executive director, investigating where we

7     could have office space, setting up typical office

8     systems, including the procurement of business

9     machines, telephone numbers, connecting with HR to

10    create a process for hiring staff.

11         The very first job was in standing up the

12    institution.  Because when I came on as chair, there

13    was nothing.  There was nothing.  And so throughout

14    that process, I was also the facilitator of every

15    meeting, so informing myself on the laws and

16    regulations that the commission was accountable to and

17    then facilitating meetings.

18         This included creating, at the front end, a process

19    that each commissioner, voting commissioner, could

20    believe in, and as a professional mediator, in the

21    hopes of creating common ground so that they would be

22    able to negotiate in a good way through a lengthy

23    negotiation process.  So setting up that process was

24    another task.

25         The executive director and I then also had to

SARAH AUGUSTINE - 10/06/2022

Page 39

1      ensure that we had regular RCWs that were in place that

2      were reflective of the work that we needed to do, and

3      also to our contemporary times.  Those policies that

4      had been in place were antiquated, and it was important

5      to update them.  And that is a difficult and lengthy

6      task, I can tell you.

7           So I would break that down in saying that one task

8      was supervisory in nature and administrative.  Another

9      task was acting as a facilitator for a political body

10     that was born in conflict.  And a third task would be

11     to comply with laws and policies, as I understood them,

12     that pertain to the agency.

13  Q. Yeah, it sounds like you wore many hats.

14          When you were appointed, what duties -- or sorry.

15     Strike that.

16          When you were appointed as the chair of the

17     commission, what duties were you given?

18  A. None.

19  Q. Did you report to anyone?

20  A. No.

21  Q. Was there any body, either a body, agency, person, that

22     could have removed you, for example, as a chair of the

23     commission?

24  A. I don't believe so.

25  Q. Okay.  So I'm going to go into a few of the roles that

SARAH AUGUSTINE - 10/06/2022

1   you mentioned.  As a mediator in the commission -- let

2   me strike that.  I'm sorry.

3        Do you have any certification in mediation?

4  A. Yes.  I'm what's called a senior mediator in the

5   Washington State system.

6  Q. Did that require some sort of coursework or training?

7  A. Yes.  I was trained as a mediator in 2001 by the

8   Lombard Mennonite Peace Center.  And then when I became

9   the executive director at the Dispute Resolution

10   Center, I was trained by -- you know, by the Dispute

11   Resolution Center according to the standards of

12   Resolution Washington, which is a statewide

13   association.  And then, you know, accrued hours and

14   hours and hours of mediation to gain the status of a

15   senior mediator.

16  Q. In general, what kind of disputes did you mediate among

17   those hours and hours that you mediated?

18  A. Family mediation, which is often dissolution or divorce

19   and parenting plans; community mediation, which would

20   be especially within the K-12 system; community

21   mediation provided for the city related to tensions

22   around community policing; mediations within workplaces

23   and institutions where there was conflict going on

24   either between staff and the board or staff; many

25   mediations in universities and institutions of higher

SARAH AUGUSTINE - 10/06/2022

Page 41

1    learning, various types; also with agencies at the

2    community level that were in conflict where that

3    conflict was impacting the community itself.  So

4    multiple mediations between the police and other

5    agencies.

6  Q. Okay.  Okay.  And going back to your descriptions of

7    your roles, you mentioned you acted as a supervisor; is

8    that right?

9          MR. MILLSTEIN:  Objection to form.

10          THE WITNESS:  Yes.

11  BY MR. THRIFT-VIVEROS:

12  Q. And who did you supervise?

13  A. I supervised Lisa McLean, and she was empowered to hire

14    her staff and serve as the executive director and the

15    supervisor of her staff.

16  Q. Did you have the ability to remove Lisa McLean from her

17    position during the redistricting process?

18  A. Yes.

19  Q. Sorry.  Someone is at my door.

20        Did you have any staff members yourself as a

21    commissioner?

22  A. All of the staff -- all the independent staff reported

23    to Lisa McLean.  I had access to that entire staff, and

24    I met with them regularly.  And so while Lisa was the

25    direct supervisor, I had the opportunity to benefit

SARAH AUGUSTINE - 10/06/2022

Page 42

```
 1      from those staff in a variety of different ways, but
 2      Lisa was the supervisor.
 3   Q. Okay.  And were you involved in the hiring of the
 4      independent staff?
 5   A. I was involved in the hire of Lisa and then our
 6      communications director.
 7   Q. What was the name of the communications director?
 8   A. Jamie Nixon.
 9   Q. Were you involved in the hiring of Justin Bennett?
10   A. I believe I reviewed the CVs that came in, and I was
11      allowed to comment as a courtesy, but I wasn't directly
12      involved in those hires.
13   Q. And you mentioned that you met with the independent
14      staff regularly.  About how often was that?
15   A. I believe we had a weekly staff meeting, to the best of
16      my recollection.
17   Q. And just to be clear, this weekly meeting was with you,
18      with Lisa McLean, with the independent staff; is that
19      correct?
20   A. That's right.
21   Q. Were any of the commissioners or the commission staff
22      present at those weekly meetings?
23   A. No.
24   Q. And at those weekly meetings, what did you generally
25      discuss?
```

SARAH AUGUSTINE - 10/06/2022

Page 43

1   A. The redistricting commission is kind of like a musical

2      in that it unfolds in phases.  So what we were

3      discussing directly pertained to whichever phase we

4      were in.  In the beginning, it was really just getting

5      our apparatus up to recruit and host a massive number

6      of people in public testimony during COVID.

7           So it seems now, at this time in October of 2022,

8      that we've always known how to do this.  But we haven't

9      always.  And trying to set up the apparatus to do that

10     without systems failure took a lot of time and

11     planning.  And a lot of our early days were really just

12     focusing on that.

13          Keep in mind also, we did not have data from the

14     U.S. census until very late in the game.  I think maybe

15     even -- oh, gosh, I wish I remembered all this right on

16     the top of my head.  But it was -- it was months late.

17     And so whereas we may have been crunching numbers with

18     census data, what we were doing was forecasting using

19     past census data.  Trying to sort of, you know, think

20     through -- from my point of view, think through how to

21     provide the best information that we could to the

22     voting commissioners.  And so what metrics could we

23     use?

24          You know, we also had to figure out this software

25     that -- you know, you only redistrict every ten years.

SARAH AUGUSTINE - 10/06/2022

Page 44

1    So the software they used ten years ago was not -- I
2    mean, it took us quite some time to even get maps
3    figured out.  I don't mean -- I mean just to look at
4    the districts as they are now using the software.  I
5    mean, it was -- we spent a lot of time working on that.
6    So a lot of what we were doing was logistics.  Most of
7    what we were doing was logistics.
8  Q. And what software were you referring to?
9  A. I'm embarrassed to say I don't even remember what it
10   was called.
11 Q. That's okay.
12 A. When I was a young thing, we used AutoCAD.  But nobody
13   uses that.  Like, that's so ancient.  So that's --
14   those are the words that come into my mind.  I don't
15   remember what it's called at this stage.
16 Q. I remember AutoCAD.  But it was the map making
17   software?
18 A. Map making software is what I'm talking about, yep.
19   There was a lot of training.  We were trying to even
20   figure out how to mess with it.  And we were doing that
21   in the hopes that we would then be able -- "we" not
22   being me, those qualified staff who were trying to
23   train me, so that we could then train the commissioners
24   and their staff.
25 Q. And was that generally how the process went, that the

SARAH AUGUSTINE - 10/06/2022

Page 45

1   independent staff did presentations or trainings for
2   the commissioners?
3   A. To the extent the commissioners were interested and
4   willing.  But it was our intention to provide the very
5   best materials and preparation that we could in every
6   arena for the commissioners, the voting commissioners.
7   Q. Were any of the commissioners nonresponsive to these
8   map making trainings?
9   A. I don't remember the details.  Towards -- towards the
10  lower, the -- I would say the fourth or the third sort
11  of quarter, as we were trying to imagine a way to do
12  negotiations, the independent staff and myself came up
13  with a variety of options for how those negotiations
14  could happen.  And there was certainly a lack of
15  interest in learning about that.
16  Q. Can you elaborate a little bit more on that lack of
17  interest.  Was it specific commissioners or --
18  A. All commissioners.
19  Q. All commissioners.  And when you say lack of interest,
20  in the negotiation process, is that what?
21  A. In any negotiation process that I would recommend.
22  Q. Okay.  Do you feel -- or strike that.
23      Do you believe that the voting commissioners had
24  their own negotiation process separate from the one
25  that you recommended?

SARAH AUGUSTINE - 10/06/2022

Page 46

1    A. Yes.

2              MR. MILLSTEIN:  Object to the form.

3       BY MR. THRIFT-VIVEROS:

4    Q. And what was that process generally?

5    A. I can tell you in a global way what we agreed on in our

6       open public meeting, which is that we would have a

7       house team and a senate team; and the house team would

8       negotiate the legislative districts, and the senate

9       team would negotiate congressional districts.  Beyond

10      that, I do not know.

11   Q. And when you were referring to the lack of interest in

12      your negotiation style -- I guess, I don't know if

13      that's the right word -- but what were you recommending

14      that you felt there was a lack of interest in?

15   A. So that's a very complex answer, and I'll do my best to

16      describe it to you.  Redistricting is a strange puzzle

17      where every decision that is made impacts every future

18      decision.  So it can be very hard to -- it is a

19      difficult puzzle to figure out.

20           We were bound on both ends by time constraints.  So

21      our census data was months late, and a new

22      constitutional amendment demanded that we complete by

23      November 15th instead of the previous, January 1st.  So

24      we were squeezed on two ends.

25           So my design challenge was to figure out how to get

SARAH AUGUSTINE - 10/06/2022

Page 47

1    through a negotiation -- a geographical negotiation

2    process on time in a matter of ten weeks.  So the

3    process that I recommended was logistical in nature and

4    was just dealing with getting through geographies in a

5    quick way, so -- because you can't just go from left to

6    right.  That's -- it doesn't work that way.  You can't

7    go from corner to corner.  It depends on populations.

8    You have to think about populations.  And you also have

9    to think about geographical barriers.  And there's all

10   kinds of things, variables to consider.

11        So my independent staff and I were crunching

12   through trying to figure out how we could come up with

13   a geographical negotiation process that would get us to

14   the church on time, so to speak.  And the commissioners

15   just wanted to negotiate independent of any of that.

16   Q. Okay.  Thank you.  You mentioned that the commissioners

17      would vote -- or sorry, excuse me, that the commissions

18      would negotiate.  The house commissioners would

19      negotiate for the legislative maps, and the senate

20      appointed commissioners would negotiate for the

21      congressional maps; is that right?

22   A. Yes.

23   Q. And you would call those diads; is that correct?

24   A. I called them diads.

25   Q. Whose idea was it, if there -- strike that.

SARAH AUGUSTINE - 10/06/2022

Page 48

1    Whose idea was it to implement this diad structure?

2  A. I don't remember.  I would have to go back and watch

3     the record.  All of those decisions were made in public

4     meetings.  It could have -- I might have suggested it.

5     I don't feel a great sense of ownership over it, but

6     certainly there was precedent for doing it that way.

7     And so, you know, when that was decided, I don't

8     remember what meeting that came about, but there seemed

9     to be general, you know, comfort with that idea.

10    Nobody voiced, you know, discomfort with it.

11 Q. Okay.  Earlier you mentioned, in your weekly staff

12    meetings, that you would discuss metrics we could use.

13    Is that -- is that accurate that you said that?

14 A. Yes.

15 Q. What -- what do you mean by that?

16 A. There are a variety of variables around which you would

17    make decisions.  So those variables had to do with

18    geographical placement, population and all -- I mean,

19    one of the -- one of the big ones that came out of the

20    independent staff was the public input.  So thinking

21    through, you know, we were -- we were -- I wasn't.  My

22    staff, the independent staff were generating

23    spreadsheets and also visuals of public input by all

24    kinds of region and across a variety of dimensions.

25 Q. Okay.  And I understand that was one, if not the top,

SARAH AUGUSTINE - 10/06/2022

Page 49

```
1     priority of you is to have as much public input as
2     possible.
3          Do you feel that the other commissioners shared
4     that sentiment with you?
5  A. I don't know what the voting commissioners, what their
6     sentiment was.  It was a priority for me, and I had the
7     authority to ensure that that's what we did.
8  Q. So the commissioners never expressed one way or the
9     other their sentiment on having such a vast public
10    outreach effort?
11              MR. MILLSTEIN:  Objection to form.
12              THE WITNESS:  I don't recall hearing comment
13    one way or the other.
14    BY MR. THRIFT-VIVEROS:
15 Q. Who was in charge of public outreach in general?
16 A. Lisa as the executive director was directing the
17    outreach work.  And to that end, she hired Daniel --
18    I'm trying to remember his last name -- with -- you
19    know, with my tacet agreement.  I didn't sit in on
20    those interviews but Daniel was our outreach
21    coordinator.
22 Q. Okay.
23 A. Pailthorp.  That's what his name is, Daniel Pailthorp.
24 Q. Did you have a lot of in-person public outreach events?
25 A. We had no in-person public outreach events.
```

SARAH AUGUSTINE - 10/06/2022

Page 50

1   Q. Because of COVID, right?

2   A. That's right.

3   Q. And about how often -- so how would these public

4      outreach events usually take form, on Zoom?

5   A. They were on Zoom.

6   Q. And about how many public outreach events did you have?

7   A. Excuse me.  Six months ago I could have quoted all of

8      this to you off the top of my head.  I don't remember,

9      but I can tell you every -- every legislative district

10     had at least two.

11  Q. That's great.  And I kind of want to understand the

12     process of collecting the public comments and folks

13     that people said -- or things that people said at the

14     public outreach events.  And would -- yeah, basically

15     what was that process of gathering and then

16     synthesizing that information?

17  A. So every public outreach event is an open public

18     meeting, and it was recorded.  Staff would then -- they

19     would attend those events but then also comb through

20     them.  And a massive spreadsheet was generated with,

21     not only those people that came to open public

22     meetings, but also all the social media input, e-mails,

23     telephone messages, et cetera.

24         And all of that was paraphrased and put into a

25     spreadsheet that was searchable so that we could create

SARAH AUGUSTINE - 10/06/2022

Page 51

1    metrics of input.  All of that was shared with the

2    voting commissioners and their staff.  They had full

3    access to it.  It was stored on a shared drive.

4  Q. Did any of the voting commission or voting commission

5    staff express that -- to you, that they were using this

6    public outreach information in their map making?

7              MR. MILLSTEIN:  Objection to form.

8              THE WITNESS:  That was not expressed to me

9    personally, however, it was a common topic in staff

10   meetings.  And the independent staff would often report

11   during those meetings, contact that they had with the

12   house and senate staff.  And we would at times, you

13   know, troubleshoot how to address some of the issues

14   they were bringing forward.

15       So I believe it was used, but it was never

16   expressed to me personally.

17   BY MR. THRIFT-VIVEROS:

18  Q. Okay.

19  A. That I recall.

20             MR. THRIFT-VIVEROS:  Okay.  So we've hit the

21   hour and a half mark.  How would everyone feel about

22   taking a ten-minute break?

23             MR. BOWEN:  You bet.

24             MR. MILLSTEIN:  That's fine.

25       Is that okay with you, Sarah?

SARAH AUGUSTINE - 10/06/2022

Page 52

```
 1              THE WITNESS:  It is.  I do want to request
 2      that we -- that we break at noon, if you're open to
 3      that?
 4              MR. THRIFT-VIVEROS:  Yes.
 5              THE WITNESS:  That would be very helpful to
 6      me.
 7              MR. THRIFT-VIVEROS:  I'm already getting
 8      hungry, so I'm looking forward to the noon break.  But,
 9      yes, we'll take a break at noon.
10              MR. MILLSTEIN:  Real quick while we're
11      discussing this, Sarah, how long do you want to take
12      for lunch?
13              THE WITNESS:  I would like to take a minimum
14      of 45 minutes, if that's acceptable?
15              MR. THRIFT-VIVEROS:  I think we can take an
16      hour, if that's okay?
17          Okay.  So for now let's go off the record.
18                  (Recess 10:32-10:43.)
19
20          E X A M I N A T I O N  (Continuing)
21      BY MR. THRIFT-VIVEROS:
22  Q. So you mentioned earlier that you didn't have any
23      commission staff assigned to you; is that correct?
24          Besides the general staff?
25  A. To the best of my recollection, yes.
```

SARAH AUGUSTINE - 10/06/2022

Page 53

1  Q. Okay.  Was there a primary map maker for the
2     independent staff?
3  A. Yes.
4  Q. Was that Justin Bennett?
5  A. Yes, Justin Bennett.
6  Q. Okay.  Did you personally draw any maps?
7  A. No.
8  Q. Okay.  Did you direct staff members such as Justin
9     Bennett to draw maps?
10 A. No.  No.  I mean, it's hard -- he was working with the
11    mapping software.
12 Q. Okay.  Well, I guess, yeah, generally can you explain
13    the process of how a map would be created?
14 A. So in the process of negotiation, the parties in
15    negotiation would have to agree on the metrics around
16    which negotiation would occur.  Once you establish
17    those metrics, you could start working through
18    geographies and building a map based on those metrics
19    of importance.
20        So, for example, we knew from the census data that
21    they were going to be -- you know, I don't remember
22    exactly how many.  I think it was, like, close to
23    76,000 per legislative district.  And, gosh, I don't
24    remember what it was for the congressional district.
25    So you have some parameters.  You know that they all

SARAH AUGUSTINE - 10/06/2022

Page 54

1    have to be the same size.  We were really trying for

2    them to be within 1 percent.

3        So then you have to really determine, what are the

4    metrics that you're going to agree on?  And then you're

5    going to start negotiating around geographies based on

6    those metrics.  So the independent staff and I were

7    trying to create the best possible information for

8    agreeing on those metrics.  You can't really figure out

9    what those metrics are going to be without looking at

10   data.

11       So you might say, okay, you know, we're going to

12   care a lot about, you know, how we're going to cross,

13   you know, the Cascade range, for example.  That's a big

14   one.  How is it going to happen?  Because you can't

15   just -- you know, there's a geographical barrier.

16   That's why you can't go left to right and just say,

17   we're just going to catch 70-some thousand and just go

18   in consecutive order.

19       It doesn't work because they're -- because the

20   people who are testifying themselves are -- through

21   public comment and all the various ways, are saying,

22   this is my community of interest.  So you're trying to

23   figure out where are communities of interest, what are

24   the boundaries around those communities of interest and

25   then what metrics are important within that.

SARAH AUGUSTINE - 10/06/2022

Page 55

1           And so as we were working with a mapping software,

2    we were trying to figure out the best information to

3    provide to the voting commissioners for them to

4    determine what metrics were the metrics of import.

5           And I will tell you that they did not share that

6    with us.  So while we did -- while the independent

7    staff did all this work to create this, they were

8    negotiating with metrics, I assume.  But those metrics

9    were not shared with me.  And if they were shared with

10   independent staff, I am not aware.  They were doing

11   their process independent of us.

12  Q. What metrics did you and the independent staff

13   recommend?

14  A. So we weren't recommending metrics.  We were saying,

15   here's all the universe of things that you could -- you

16   could look at.  And so -- and there's quite -- you

17   know, there's quite a number.

18          I mean -- and certainly, you know, voting data is

19   part of that.  And, of course, that is how historically

20   and traditionally -- I shouldn't say -- that has been

21   an important dynamic for redistricting historically.

22          And the voting commissioners who were appointed are

23   coming in with a perspective of what their -- what --

24   you know, what they're hoping to achieve in that

25   regard.  So that's not an easy thing to achieve in that

SARAH AUGUSTINE - 10/06/2022

Page 56

1    regard.

2          You would think, Hey, I will just use voting data.

3    Well, which voting data will you use?  Will you use

4    that data for state races?  Will you use local races?

5    Will you use the most recent voting data?  Will you

6    pull it over the past ten years, because geographies

7    change over time?  These are all metrics to be messed

8    with, for example.

9    Q. And you don't know specifically what metrics the voting

10   members of the commission were using when creating

11   their maps?

12   A. No.

13   Q. Did you ever ask them, the voting members of the

14   commission, what metrics they were using in the

15   creation of their maps?

16   A. It was certainly discussed.

17   Q. And what were -- what did you discuss?

18   A. It is my opinion, although you will have to ask them,

19   much of what they were negotiating almost to the end

20   was those metrics.  So I don't know that anyone was

21   trying to keep that from me.  I'm not sure they had

22   that resolved until the very end.

23   Q. Okay.  And to narrow sort of what you're referring to

24   by metrics, do you mean specific races to use or

25   looking at racial demographics, for example?

SARAH AUGUSTINE - 10/06/2022

Page 57

1  A. The priorities of the commissioners were stated in

2     their public statements that are listed on the website.

3     So along with the rest of the public, I learned what

4     their priorities were through those statements.  And I

5     assume, because I actually believe in the integrity of

6     all four of those commissioners, that they followed

7     those priorities that they stated to the public.

8  Q. Going back kind of to the process of the map making, I

9     just want to have a sense of sort of the dynamics

10     between the -- an individual commissioner who is

11     creating a map and the independent staff.

12         How would that process work generally?

13             MR. MILLSTEIN:  Objection to form.

14             THE WITNESS:  From my point of view, the

15     independent staff offered multiple -- multiple times

16     over a long period of time sort of a menu of options,

17     and there was very little response to those offers.

18     BY MR. THRIFT-VIVEROS:

19  Q. And when you say "menu of options," what do you mean by

20     that?

21  A. For example, as we were looking at voter data and

22     trying to determine what kind of voter data to use,

23     like what race to use, we did a variety of mathematical

24     pooling to see what was the most neutral or the least

25     party influenced kind of data to use.

SARAH AUGUSTINE - 10/06/2022

Page 58

```
1         So then we would say, Look, here are the tests we
2    ran, here are the options of data to use and this is
3    our recommendation.
4  Q. Can you give me an example of some recommendations that
5    you -- that the independent staff made?
6  A. I don't -- I don't remember, of course, exactly.  But
7    I'm trying to remember, we did kind of -- we came up
8    with a pooled data option that was from -- I mean, I
9    think it was state races but it wasn't -- it was
10   like -- because, like, which state race?  Are you going
11   to poll them all?
12        I mean, you're trying to say let's look at -- let's
13   look at one where there is a republican in a seat,
14   let's look at one where there's a democrat in a seat.
15   And then if you're looking over a decade, where have --
16   where is one where it's been more -- you know, it's
17   gone back and forth, for example.
18        Because you're trying to get, you know, the best
19   kind of indicator of where most voters are at, you know
20   what I mean, so that it's not -- so that it's not
21   heavily pooled to one party or the other, for example.
22 Q. Okay.  Did you provide input to the voting
23   commissioners on how they should draw their maps?
24 A. My message that I repeated again and again was to care
25   for the input of all of the residents who bothered to
```

SARAH AUGUSTINE - 10/06/2022

Page 59

1    provide input.  To that extent, yes.  However, I never

2    had direct conversations with any voting commissioner

3    expressing my opinion about what they should do.  And

4    that was not solicited and not offered.  That would

5    have been a violation of my ethics.

6  Q. Did you -- once a map was created, and let's say it was

7    publicly released by a commissioner, did you conduct

8    any analysis on those maps after they had been created?

9              MR. MILLSTEIN:  Objection to form.

10              THE WITNESS:  Yes.

11     BY MR. THRIFT-VIVEROS:

12  Q. What kind of analysis did you do?

13  A. When the four voting commissioners submitted for the

14    public their first round of draft maps, I asked the

15    independent staff to review where there was the most

16    overlap with the intention of identifying interests

17    that they held in common.

18         As a professional mediator, it was my opinion that

19    if we started with the places that they agreed on most,

20    we may be able to gain some traction in terms of

21    carrying on the effective negotiation.

22  Q. Would you ask Justin Bennett specifically or someone

23    else to conduct this analysis of where there's the most

24    overlap?

25  A. I would ask Lisa McLean, and she would direct her staff

SARAH AUGUSTINE - 10/06/2022

Page 60

1    as appropriate.

2  Q. And did the independent staff produce, like, a report

3     explaining, this is where we have the most areas of

4     agreement and this is where we have the most areas of

5     disagreement?

6                MR. MILLSTEIN:  Objection to form.

7                THE WITNESS:  I don't remember reports

8     specifically, although I believe there must have been

9     reports.

10    BY MR. THRIFT-VIVEROS:

11  Q. Did members of the community submit proposed maps to

12     the commission?

13  A. Yes.

14  Q. Would you forward those maps to the voting

15     commissioners?

16  A. All of the maps were held on a shared drive.  I don't

17     remember the details of communication, but I believe

18     the independent staff then sent a notice every time

19     there was a new map that was deposited into that shared

20     drive.  There were many hundreds of maps.

21  Q. In your capacity as the chair of the commission, did

22     you meet with members of the state legislature?

23  A. Yes.

24  Q. Do you recall how many members you met with?

25  A. Two.

SARAH AUGUSTINE - 10/06/2022

1  Q. And who were they?

2  A. They were both from the house, so the minority leader

3     from the house and the speaker of the house.

4  Q. Do you recall what you discussed in those meetings?

5  A. I -- as I recall, I reached out to all four of them and

6     asked for meetings.  And the meetings that I recall

7     were "getting to know you" kind of meetings, very

8     general, short half-hour, with those folks and their

9     staff.

10 Q. Did you meet with party officials who are not members

11    of the legislature in your capacity as the chair of the

12    redistricting commission?

13 A. No.

14 Q. So going back to the meetings with the specific

15    legislators, you didn't discuss -- or did you discuss

16    anything substantive regarding the maps or specific

17    districts?

18              MR. MILLSTEIN:  Objection to form.

19              THE WITNESS:  No.

20    BY MR. THRIFT-VIVEROS:

21 Q. No, okay.

22         And you mentioned before you held many, many public

23    outreach meetings.  Who was -- strike that.

24         Did you attend most of these meetings, all of these

25    meetings or a few of these meetings?

SARAH AUGUSTINE - 10/06/2022

Page 62

1  A. I believe I -- I believe in my tenure as chair, I

2     missed one meeting.  And I don't remember if that was a

3     public outreach meeting.  It could have been our

4     regular open public meeting.

5  Q. At these public outreach meetings, were you usually

6     accompanied by one or more voting commissioners?

7  A. I believe that every district had a full slate, at

8     least one meeting.  And then in our second meeting --

9     our second round of meetings, there were -- I think

10     they split it up.  So then we would have had two

11     commissioners per meeting in the second round.  So most

12     of them made most of them, most of the meetings.

13  Q. So the first round was generally all of the

14     commissioners?

15  A. Yes.

16  Q. And the second round, when you said that it was split

17     up into two or two commissioners per meeting, was that

18     generally one republican appointed commissioner and one

19     democratic appointed commissioner?

20  A. Yes.

21  Q. Okay.  Aside from these general public outreach

22     meetings, did you have meetings with organizations to

23     discuss the redistricting process?

24  A. Yes.

25  Q. Do you recall how many meetings you had?

SARAH AUGUSTINE - 10/06/2022

Page 63

1  A. I do not.

2  Q. Can you give me a best estimate?  Like more than ten or

3     more than 50, more than 100?

4  A. Fewer than ten.  I responded to direct invitations to

5     make a public presentation.

6  Q. The public presentation that you just mentioned, what

7     was -- generally, what was the content of that

8     presentation?

9  A. The 101 of how redistricting works, why it is

10    important, how to get your constituency to public

11    meetings, the various venues for testimony, push -- a

12    push to our videos.  I believe we produced seven

13    educational videos.  It was educational in nature.

14 Q. In these meetings with these organizations, did you

15    discuss specific districts?

16 A. No.

17 Q. So you mentioned previously that you -- there was a

18    training on June 21st regarding the Voting Rights Act;

19    is that correct?

20 A. Yes.

21 Q. I have the minutes here.  Let me -- I'll put into the

22    chat of the Zoom.

23           MR. THRIFT-VIVEROS:  I'd like to get this

24    marked as Exhibit 1.

25    ////

SARAH AUGUSTINE - 10/06/2022

Page 64

```
 1                     (Exhibit No. 1 marked
 2                       for identification.)
 3        BY MR. THRIFT-VIVEROS:
 4   Q. Do you remember this meeting and this presentation?
 5               MR. MILLSTEIN:  Counsel, just a moment.  I'm
 6        still saving the file.
 7               MR. THRIFT-VIVEROS:  Sorry.  Did it go
 8        through?
 9               MR. MILLSTEIN:  It's gone through on my end.
10        You have to save it.  And I don't know for Sarah if
11        she's got it open yet either, so if you give us just a
12        minute.
13               MR. THRIFT-VIVEROS:  No problem.
14               THE WITNESS:  I don't have it open, nor will I
15        have it open until after lunch.  It will take at least
16        two hours to download this file where I live because I
17        live in a rural area.  It would be much more expedient
18        if you could share your screen.  It would probably be
19        better to do it that way.
20               MR. THRIFT-VIVEROS:  Let's do that.  If I can
21        figure that out.
22               MR. MILLSTEIN:  And, Sarah, if it helps, it's
23        just a PDF of the meeting minutes.  So it might
24        download quicker.
25               THE WITNESS:  Okay.
```

SARAH AUGUSTINE - 10/06/2022

Page 65

1           MR. MILLSTEIN:  It's not a large file.

2           THE WITNESS:  Okay.

3     BY MR. THRIFT-VIVEROS:

4     Q. Has it shown up for you?

5     A. Got it.

6     Q. Great.

7           So do you recall this meeting?

8     A. Yes.

9     Q. Okay.  Can you tell me who Brian Sutherland is?

10    A. Brian Sutherland is an assistant attorney general for

11       Washington State.

12    Q. Did you invite him to come speak at the meeting?

13    A. I believe Lisa invited him.

14    Q. Do you know why Lisa invited him specifically rather

15       than any other representative from the Attorney

16       General's Office?

17    A. Yes.

18    Q. And why is that?

19    A. I asked Lisa to find an educator for the commission to

20       review the Voting Rights Act and our obligations

21       pertaining to the Voting Rights Act.  Lisa reached out

22       to the Attorney General's Office, and Brian Sutherland

23       was recommended for that purpose.

24    Q. Were there any specific reason why you asked Lisa to

25       find someone to give a presentation on the Voting

SARAH AUGUSTINE – 10/06/2022

Page 66

1      Rights Act?

2   A. It was my understanding that the commission was

3      obligated to comply with the Voting Rights Act.

4   Q. Did you develop that understanding independently, or

5      did someone tell you that the commission is obligated

6      to follow the Voting Rights Act?

7                MR. MILLSTEIN:  Objection to form.

8                THE WITNESS:  I don't recall.  I was connected

9      with Brad and Bernard, the two senior administrators

10     from the house and the senate, and also with, I

11     think -- I want to say really with Brad and Bernard,

12     who were coaching me in creating this agency, standing

13     up the agency.

14          And I had -- I asked for and received the primary

15     laws that we would need to comply with in this agency.

16     And I believe the VRA was presented in that way, but I

17     am -- I don't remember exactly if that came from Brad

18     or Bernard or from documents that I read related to the

19     last redistricting commission, their executive director

20     and chair, I might have read it and understood it

21     there.

22        BY MR. THRIFT-VIVEROS:

23   Q. Okay.  So in the minutes, it mentions that some of the

24     commissioners asked questions.  Did you have

25     conversations with the commissioners after this

SARAH AUGUSTINE - 10/06/2022

Page 67

1     presentation about the Voting Rights Act?

2   A. Yes.

3   Q. About how many conversations did you have with the

4     commissioners after this presentation about the Voting

5     Rights Act?

6   A. I don't recall specifically, but I will venture that I

7     had at least one conversation with each commissioner

8     about the Voting Rights Act fairly soon after this

9     training or this presentation.

10  Q. Do you recall -- in your conversations with the

11    commissioners about the Voting Rights Act after this

12    presentation, do you recall how each commissioner

13    expressed to you their thoughts about the Voting Rights

14    Act?

15  A. That was not the nature of our conversation, that they

16    would share that with me.  So, no, that wasn't shared.

17  Q. So what was the nature of these conversations?

18  A. I requested that they consider hiring -- that the

19    commission would consider hiring a consultant that

20    would work together with the commission to provide the

21    best -- the best advice regarding the Voting Rights

22    Act.  So each of these conversations was requesting

23    that consideration.

24  Q. Whose -- who had the authority to hire a Voting Rights

25    Act consultant?

```
 1              MR. MILLSTEIN:  Objection to form.
 2              THE WITNESS:  All decisions must be made in an
 3      open public meeting with the majority of the
 4      commissioners.  So the majority of commissioners alone
 5      would be able to authorize a hire such as that.
 6      BY MR. THRIFT-VIVEROS:
 7   Q. For example, Lisa McLean hired independent staff.  What
 8      distinguishes the staff that Lisa McLean hired and the
 9      hiring of a VRA consultant?
10              MR. MILLSTEIN:  Objection to form.
11              THE WITNESS:  Lisa McLean was hired by me, at
12      my recommendation, but with the full participation of
13      all voting commissioners.  So Lisa McLean was hired by
14      the commission.  Then she was empowered by the
15      commission to hire her staff as the leader of our
16      employees.
17          But Lisa McLean, her contract was exactly like
18      anyone else, that the majority had to vote in an open
19      public meeting for her hire.  And any -- anyone else
20      who would be providing counsel, any kind of advice to
21      us, would have to be -- that would have to be done in
22      an open public meeting with at least three votes of the
23      voting commissioners.
24      BY MR. THRIFT-VIVEROS:
25   Q. I guess my question is why was -- or strike that.
```

SARAH AUGUSTINE - 10/06/2022

1       The commission empowered Lisa McLean to hire her

2    staff, but what distinguishes her -- the staff that she

3    was able to hire as opposed to a voting rights

4    consultant?

5       Was there a clear line between who the commission

6    would have to vote on to hire versus the staff that

7    Lisa McLean was empowered to hire?

8       Was there a clear division between those two

9    categories?

10          MR. MILLSTEIN:  Objection to form.

11          THE WITNESS:  If -- if Lisa McLean had not

12    been empowered to hire her staff, then every staff

13    would have been -- had to be hired through a majority

14    opinion.  But the commissioners, in an open public

15    meeting, voted to empower Lisa McLean specifically to

16    hire her staff.  So that was the authority she was

17    granted by the commission.

18       No one else was granted any such authority or Lisa

19    was not empowered to do any such thing.  All the

20    authority rested with the voting commissioners in a

21    majority.  So that's the difference.  Lisa was provided

22    that authority.

23    BY MR. THRIFT-VIVEROS:

24  Q. So sorry if I'm not asking as clearly as I could, but I

25    guess I'm just trying to understand, when you say that

SARAH AUGUSTINE - 10/06/2022

Page 70

1      Lisa McLean was empowered to hire her staff, was there

2      a categorical these are the employees that you can hire

3      or not?

4                   MR. MILLSTEIN:  Objection to form.

5                   THE WITNESS:  To the best of my recollection,

6      there was a budget, and that budget determined how many

7      staff Lisa McLean could hire.  Within that budget,

8      there was some discussion between Lisa and me about who

9      that staff should be.  In an open public meeting, she

10     was directed to hire her staff by the commission.

11     BY MR. THRIFT-VIVEROS:

12     Q. Could Lisa McLean have hired a VRA consultant if the

13        budget allowed?

14                   MR. MILLSTEIN:  Objection to form.

15                   THE WITNESS:  I don't have any way of

16     answering that question, because I don't -- I don't

17     have -- I don't know.

18     BY MR. THRIFT-VIVEROS:

19     Q. Did the commission have a separate budget -- apart from

20        the budget set aside for Lisa McLean to hire her staff,

21        did the commission have a separate budget for hiring

22        consultants?

23                   MR. MILLSTEIN:  Objection to form.

24                   THE WITNESS:  To the best of my recollection,

25     like many budgets -- organizational budgets, there were

SARAH AUGUSTINE - 10/06/2022

Page 71

1      line items.  And there was a line item for staff.  When

2      that staff slate came out, it was approved, I believe,

3      in an open public meeting.  Because all decisions were

4      made in the open and in the public.  So those staff

5      positions were created, the dollar amounts, all of that

6      was approved, in my recollection.  That's what I

7      remember.

8        BY MR. THRIFT-VIVEROS:

9    Q. Okay.  So going back to what you mentioned earlier,

10     that you asked Lisa McLean to conduct a search for a

11     Voting Rights Act consultant; is that correct?

12   A. Yes.

13   Q. And did she find a consultant for the commission?

14   A. She recommended a slate of consultants for

15     consideration.

16   Q. And did she give you that slate of consultants?

17   A. Yes.

18   Q. And what did you do with that slate of consultants?

19   A. She did share that report with all five commissioners.

20   Q. And did the commission vote on whether to hire a

21     consultant or not?

22   A. I believe that the commission did vote, or at least

23     there was certainly discussion.  I don't remember if

24     there was -- if there was a vote, an official vote.  I

25     would have to look in the minutes.  There was extensive

SARAH AUGUSTINE - 10/06/2022

Page 72

1    discussion, and I believe much of that discussion was

2    with counsel.

3  Q. When you say "counsel," is there someone specific

4    you're referring to?

5  A. I'm just saying that it was during executive session,

6    and it's privileged information.

7  Q. Apart from the discussions you had with counsel, can

8    you tell me what discussions the commission had around

9    the option to hire a Voting Rights Act consultant?

10         MR. BOWEN:  Objection to form.

11         THE WITNESS:  What I remember is there wasn't

12   consensus.  There was simply not consensus, and I don't

13   mean -- what I mean specifically is there wasn't

14   consensus around which consultant or group of

15   consultants to hire.

16      BY MR. THRIFT-VIVEROS:

17  Q. So ultimately since there wasn't consensus around a

18    specific consultant, did the commission decide not to

19    hire a consultant?

20  A. That is an interesting phrasing.  I imagine if you

21    assume that every nondecision is a decision, then the

22    answer is yes.

23  Q. Okay.  Do you recall how many consultants were listed

24    on this slate prepared by Lisa McLean?

25  A. I don't recall.  There were two or even three.  At

SARAH AUGUSTINE - 10/06/2022

Page 73

1     least two.  No more than four.  But I think there were

2     three.

3   Q. Do you remember their names?

4   A. I don't.

5   Q. Was one of them Matt Barreto from UCLA?

6                 MR. MILLSTEIN:  Objection to form.

7                 THE WITNESS:  Yes.

8     BY MR. THRIFT-VIVEROS:

9   Q. Do you recall if any of the commissioners were in favor

10    of retaining him as a consultant?

11  A. I would -- I will refrain from commenting on that

12    simply because you have access to the commissioners and

13    you can ask them that directly, and whatever I would

14    provide is hearsay.  I don't remember directly, and I

15    can't speak with confidence about how much of that was

16    privileged, that conversation was privileged.

17  Q. Okay.  Yeah, just to be clear, in this deposition, I'm

18    not asking you necessarily what other commissioners

19    thought but rather what other commissioners expressed

20    to you.  And that is something that you can testify to

21    is what conversations you had with the commissioners.

22  A. Thank you for that clarification.

23  Q. Yeah.  So I'm going to stop the screen share.

24        After -- do you recall when these conversations

25    around hiring of the VRA consultant occurred?

SARAH AUGUSTINE - 10/06/2022

Page 74

1   A. It was in the summer of 2021.  And I believe, to the

2      best of my recollection, it was after the release of

3      their first draft maps, the commissioners' first draft

4      maps.  I believe it was certainly before Matt Barreto's

5      report came out and was published.  But I can't tell

6      you the exact time frame.

7   Q. Okay.  Did you ever talk with any of the VRA

8      consultants recommended by Lisa McLean?

9   A. No.

10  Q. Okay.  Do you have a best estimate of the amount of

11     time between you asking Lisa McLean to go look for VRA

12     consultants and the ultimate decision to not hire a VRA

13     consultant?

14             MR. MILLSTEIN:  Objection to form.

15             THE WITNESS:  I don't recall.

16       BY MR. THRIFT-VIVEROS:

17  Q. Can you estimate whether it was a week, a month?

18  A. I would estimate between a month and two months, but I

19     don't feel confident.

20  Q. That's okay.

21         So after these discussions around the hiring of VRA

22     consultant ultimately resulted in the decision not to

23     hire a specific consultant, did you recommend later in

24     the process that the commission hire a VRA consultant?

25             MR. MILLSTEIN:  Objection to form.

SARAH AUGUSTINE - 10/06/2022

Page 75

1          THE WITNESS:  The commissioners could not

2     agree to hire a consultant.  I don't recall specific

3     discussion after that time.

4      BY MR. THRIFT-VIVEROS:

5   Q. Okay.  I guess just to clarify for myself, did the

6     commissioners not agree on a specific consultant and

7     that was the reason why the commission didn't hire a

8     consultant, or was it that the commission didn't agree

9     whether to hire one or not?

10          MR. MILLSTEIN:  Objection to form.

11          THE WITNESS:  My recollection is that they

12     could not agree on a specific consultant or team of

13     consultants.

14      BY MR. THRIFT-VIVEROS:

15   Q. And when you say "team of consultants," do you mean,

16     like, two separate consultants that both the democratic

17     appointed commissioners and the republican appointed

18     commissioners liked?

19   A. Yes.

20   Q. Okay.  Do you recall discussions with the commissioners

21     about why a commissioner did not want to hire a

22     specific consultant?

23   A. Those were not the kind of details that were generally

24     shared with me.

25   Q. So what kind of details were shared with you?

SARAH AUGUSTINE - 10/06/2022

Page 76

1   A. In this time period, not a whole lot.

2   Q. Do you recall speaking with Commissioner Sims about

3      hiring a VRA consultant?

4   A. I do.

5   Q. What -- what was that discussion?

6   A. She was generally open to a VRA consultant as I recall.

7   Q. Do you recall if she was open to a specific consultant?

8   A. She was open to -- I don't remember who all was on the

9      slate, and it was much discussed, but she was open to

10     Matt Barreto.

11  Q. Was she open to -- I know you might not remember

12     everyone on the slate, but was she open to another

13     consultant besides Matt Barreto?

14  A. In my recollection, which is dim because this has now

15     been some time ago, that's what I remember is that she

16     was open to Barreto.

17  Q. Do you recall any specific reasons why she was open to

18     hiring him?

19  A. None shared with me.

20  Q. Do you recall conversations with Commissioner Graves

21     about the potential hiring of a VRA consultant?

22  A. Yes.

23  Q. Can you tell me what those discussions were?

24  A. He had a consultant that was the front runner in his

25     mind and I don't recall their name.

SARAH AUGUSTINE - 10/06/2022

Page 77

1  Q. And he was different than Matt Barreto?

2  A. Yes, right.

3  Q. Did he express to you why he wanted this consultant?

4  A. No.

5  Q. What about Commissioner Walkinshaw?  Did you have

6     discussions with him about the potential hiring of a

7     VRA consultant?

8  A. This is the most hazy.  I may have discussed this with

9     Brady Walkinshaw, but I don't remember.  I don't

10    remember any details, if we did talk about it.  I'm

11    quite sure that I reached out to him.  But of all the

12    commissioners, I communicated with him the least.

13 Q. And why was that?  Why did you communicate with him the

14    least?

15 A. He was nonresponsive.

16 Q. Would he answer your e-mails?

17 A. Typically, no.

18 Q. If you gave him a call, would he answer?

19 A. Sometimes.

20 Q. Did he ever give you a reason why he was nonresponsive?

21 A. He often talked about being busy, which I believe.  He

22    was running a very large media concern.  And I would

23    note, all five commissioners were working full time.

24 Q. And then do you recall conversations with Commissioner

25    Fain --

SARAH AUGUSTINE - 10/06/2022

Page 78

1   A. Yes.

2   Q. -- around -- okay.

3        Do you recall what you discussed with Commissioner

4     Fain?

5   A. He also voiced preference for a, you know, a specific

6     consultant on the slate.

7   Q. Was that consultant Brunell?

8   A. I honestly don't remember.

9   Q. Do you remember if that was the same consultant that

10    Graves was interested in hiring?

11  A. I don't remember specifically.  There were -- there

12    were -- I believe there may have been more than three

13    that were presented and, you know...

14  Q. Okay.

15  A. Yeah, that's what I remember.

16  Q. So lastly on this topic, there was -- was there ever a

17    consideration of hiring one consultant that the

18    democratic appointed commissioners liked and one

19    consultant that the republican appointed commissioners

20    liked?

21  A. There was consideration of hiring a team that would

22    work together to advise the entire commission.

23  Q. And ultimately that idea of hiring a team failed; is

24    that correct?

25  A. Yes.

SARAH AUGUSTINE - 10/06/2022

Page 79

1  Q. Okay.  So apart from the June 21st, 2021, presentation

2     from Brian Sutherland, did anyone else give a

3     presentation to the commission on the Voting Rights

4     Act?

5  A. I don't recall.

6  Q. So what is your understanding of what is required under

7     the Voting Rights Act?

8            MR. MILLSTEIN:  Objection to form.

9            THE WITNESS:  I'm not an attorney, so I can

10    only give you an arm chair assessment.  What I remember

11    is that sort of the landmark legislation is the

12    Gingles, you know, decision -- I guess I shouldn't call

13    it a decision -- but the Gingles decision, which talks

14    about the various requirements in regards to packing,

15    which is where you put members of a racial category in

16    one district to prevent them from having impact in more

17    than one district, or cracking, which is where you

18    divide members that were vulnerable -- I guess, by

19    vulnerable, I mean a racial category that would be --

20    that would have more power if they were in more than

21    one district, and divide them to dilute their

22    influence.  And that both of these things would be

23    illegal under the Voting Rights Act.

24         I also understand that there are constitutional

25    requirements based on the 14th Amendment.  And those

SARAH AUGUSTINE - 10/06/2022

Page 80

1   constitutional requirements, under that -- in that

2   case, you would have to prove intent.  And that for the

3   Voting Rights Act, you don't have to prove intent.  And

4   I would say that would be the summary of what I

5   remember about the Voting Rights Act.

6    BY MR. THRIFT-VIVEROS:

7   Q. Okay.  So after these failed talks to hire a Voting

8     Rights Act consultant, did you have conversations with

9     the commissioners about whether their maps complied

10    with the Voting Rights Act or not?

11   A. I don't remember specific conversation.  What I

12    remember is when the Barreto report came out, if I

13    recall correctly, he felt that all the drafts maps

14    violated the Voting Rights Act, that is all four

15    commissioners had violated the Voting Rights Act.

16        And I remember discussion about being attentive to

17    that and striving to comply with the Voting Rights Act.

18   Q. Do you recall which commissioners you had discussions

19    with regarding compliance with the Voting Rights Act

20    after the Barreto report came out?

21   A. I remember talking with at least three of them.

22   Q. Which three?

23   A. Paul Graves, Joe Fain and April Sims.

24   Q. And do you recall, in their discussions, what they said

25    about the Barreto report?

SARAH AUGUSTINE – 10/06/2022

Page 81

1   A. In my capacity of chair calling to remind commissioners

2      of their obligations, I was typically met with stoney

3      silence.

4   Q. Did any of the commissioners not express stoney silence

5      to you in these discussions about the Barreto report?

6   A. The Barreto report -- I don't remember specifically

7      talking about the Barreto report with anyone in detail,

8      with any commissioner in detail.

9   Q. Okay.  Yeah, let me rephrase that question.

10          Did any of the commissioners not express the stoney

11     silence when you reminded them of their obligations, as

12     you said, as you stated?

13             MR. MILLSTEIN:  Objection to form.

14             THE WITNESS:  I mean, what I remember is that

15     those were cursory conversations with, you know, okay,

16     take it under advisement.  There wasn't -- if there was

17     lengthy discussion, and I'm sure there was, it wasn't

18     with me.

19     BY MR. THRIFT-VIVEROS:

20   Q. So do you believe -- when you say the likely

21     discussion, do you believe between the commissioners

22     but not you?

23   A. I believe between the commissioners and their staff

24     and, you know, those people they were representing.

25   Q. And when you say "people they were representing," do

SARAH AUGUSTINE - 10/06/2022

Page 82

1     you mean the legislative groups, the legislative

2     political groups?

3               MR. MILLSTEIN:  Objection to form.

4               THE WITNESS:  Yes.  I don't know that, but

5     that's what I assume.

6      BY MR. THRIFT-VIVEROS:

7  Q. Okay.  As far as you know, did any of the commissioners

8     take any steps to analyze their maps to ensure

9     compliance with the Voting Rights Act?

10               MR. MILLSTEIN:  Objection to form.

11               THE WITNESS:  What I know is what the

12     commissioners shared with the public in their draft

13     maps.  I believe two commissioners revised their maps,

14     their draft maps, and published those revised maps.

15     That's what I remember.  And the comments about those

16     maps are public knowledge, because they were submitted

17     along with their maps.

18         I also remember that Brady Walkinshaw commented on

19     the Barreto report in realtime.  So I think he was in

20     the article that the report was embedded in, if I'm not

21     mistaken.  So what I would know of his point of view

22     would have been expressed in that article.

23      BY MR. THRIFT-VIVEROS:

24  Q. As far as you know, did any of the commissioners

25     hire -- or strike that.

SARAH AUGUSTINE - 10/06/2022

Page 83

1           As far as you know, did any of the individual

2      commissioners consult with anyone outside of the

3      commission regarding the Voting Rights Act and how

4      their maps comply with it?

5           MR. MILLSTEIN:  Objection to form.

6           THE WITNESS:  I do not know, but the article

7      that I read in the Seattle Times with the rest of the

8      public expressed that the senate had hired a consultant

9      to create a report.  So I learned that with everyone

10     else.

11      BY MR. THRIFT-VIVEROS:

12  Q. Did each individual commissioner, and I know this --

13     strike that.  I'm sorry.

14          You mentioned, yeah, the senate hired a consultant.

15     But did an individual commissioner have a budget to

16     hire a consultant if they chose to?

17  A. No.

18  Q. Okay.  Did -- did the commission, each individual

19     commissioner have a budget to hire any staff at all?

20  A. None.

21  Q. Okay.  Did you ever ask Justin Bennett to conduct any

22     sort of analysis around the Voting Rights Act on the

23     maps submitted by the voting commissioners?

24  A. Not per se.

25  Q. Did you ever -- and strike that.

SARAH AUGUSTINE - 10/06/2022

Page 84

1         Did you ever recommend to any of the commissioners

2    that they conduct an analysis on their maps on whether

3    it complies with the Voting Rights Act or not?

4  A. I urged the commissioners to be aware of their

5    obligations to follow the law.

6  Q. Okay.  I'm going to ask just a few more questions

7    before we go to break.  You told me earlier what your

8    priorities were going into the redistricting process.

9         Did Commissioner Sims give you her priorities in

10   the redistricting process?

11 A. Commissioner Sims published her priorities along with

12   her first draft map, and I believe with her second

13   draft map.  And I heard those priorities in an open

14   public meeting and in a variety of open public meetings

15   as those draft maps were discussed.

16 Q. Did she ever express her priorities to you apart from

17   those in the public meetings or the publicly released

18   comments?

19 A. Yes.

20 Q. And what did she tell you?

21 A. I was directly involved in negotiation between April

22   Sims and Paul Graves in the weekend preceding the final

23   vote on the maps, and I learned during that time many

24   details of how that negotiation was going.  And so

25   through that negotiation, I learned her priorities at

SARAH AUGUSTINE - 10/06/2022

Page 85

1    the tail end of the negotiation about the few districts

2    that were being discussed at that time.

3  Q. Okay.  And do you recall what she told you were her

4    priorities in that last weekend?

5  A. In that last weekend, there was much discussion about

6    the 44th and the 28th.  And at that time, the only

7    metric that I know that was being discussed for those

8    specific districts in the last three days of the

9    negotiation process were voter data, party affiliation

10   data.

11 Q. Specifically party affiliation data or other voting

12   data?

13 A. Voting data.  I would say voting data related to party

14   affiliation.

15 Q. So how an individual voter voted in previous elections?

16 A. Yes.

17           MR. MILLSTEIN:  Objection to form.

18   BY MR. THRIFT-VIVEROS:

19 Q. Do you remember what the previous elections the

20   commissioners looked at in establishing their metrics?

21           MR. MILLSTEIN:  Objection to form.

22           THE WITNESS:  I don't recall what they finally

23   landed on.  It may have been -- it may have been the

24   secretary of state race, but I don't remember if

25   that's -- if that's what it was.  Maybe it was down to

SARAH AUGUSTINE - 10/06/2022

Page 86

1    one race.  I don't remember.

2    BY MR. THRIFT-VIVEROS:

3    Q. Okay.

4    A. They could tell you.

5    Q. Did Commissioner Walkinshaw give you his priorities in

6       the redistricting process, apart from what he mentioned

7       in public?

8    A. No.

9    Q. Okay.  Did Commissioner Graves give you his priorities

10      in the process, apart from what he mentioned in public

11      meetings or public statements?

12   A. Yes, as it pertains to the final three days of

13      negotiation pertaining to two or three districts.  I

14      believe it was the 28th and the 44th, and there may

15      have been -- maybe the 21st was under discussion.

16   Q. Sorry.  Can you repeat that?  It was breaking up a

17      little bit.  I got the 28th and the 44th and?

18   A. And it may have been the 21st.  But really we ended up

19      talking most about the 28th and the 44th.

20   Q. Okay.  And those are the two priorities for

21      Commissioner Sims as well; is that correct?

22   A. That was the substance of that discussion, yes.

23   Q. Got it.

24         Okay.  Did Commissioner Fain ever give you his

25      priorities in the redistricting process?

SARAH AUGUSTINE - 10/06/2022

Page 87

1  A. Not beyond what he issued to the public.

2  Q. Okay.

3  A. And I also want to state here that I believe in the

4     integrity of the four commissioners, and I believe that

5     the priorities that they stated publicly were truly

6     their priorities.

7  Q. Did any of the nonindependent staff give you their

8     priorities in the redistricting process?

9  A. Not that I recall.

10           MR. THRIFT-VIVEROS:  Okay.  I think this is a

11     good time to go off the record and take a break.

12           (Recess 11:54-1:01.)

13

14        E X A M I N A T I O N  (Continuing)

15     BY MR. THRIFT-VIVEROS:

16  Q. So I just have a few more questions about the Voting

17     Rights Act generally and how the commission worked with

18     it.

19        First off, do you know if any of the commissioners

20     or their staff conducted a racially polarized voting

21     analysis?

22           MR. MILLSTEIN:  Objection to form.

23           THE WITNESS:  I don't know.  I don't know

24     that.

25      BY MR. THRIFT-VIVEROS:

SARAH AUGUSTINE - 10/06/2022

Page 88

1   Q. Do you recall any conversations with the commissioners

2      regarding the amount of majority minority districts?

3              MR. MILLSTEIN:  Objection to form.

4              THE WITNESS:  Yes.

5        BY MR. THRIFT-VIVEROS:

6   Q. And who did you discuss majority minority districts

7      with?

8   A. In the last three days leading up to the final vote, I

9      was in negotiation with Paul Graves and April Sims.

10     And as they were working through that final

11     negotiation, this was a topic that came up.

12  Q. Was there -- strike that.

13         Did Commissioner Sims have an idea, or did she

14     express to you an idea, of how many majority minority

15     districts the legislative district map should have?

16             MR. MILLSTEIN:  Objection to form.

17             THE WITNESS:  She expressed conversation with

18     Paul about that in their negotiation, and I don't

19     recall the details of what she said.  It was in

20     reference to their previous negotiations that I was not

21     privy to.

22     BY MR. THRIFT-VIVEROS:

23  Q. And those conversations between Commissioner Sims and

24     Graves that you were mediating and that you were aware

25     of, did the commissioners discuss majority minority

SARAH AUGUSTINE - 10/06/2022

Page 89

1    districts in the context of the Voting Rights Act?

2              MR. MILLSTEIN:  Objection to form.

3              THE WITNESS:  As I've heard that discussed,

4    what I remember is reference to making sure there was

5    compliance with the Voting Rights Act.  And that was a

6    topic of conversation because there were, you know,

7    inconsistent interpretations of that.

8         But that was not really the topic under discussion.

9    It was -- you know, as I'm sure you understand, in any

10   negotiation, there are a series of trades.  And so

11   there was discussion about the whole legislative

12   district map, you know, leading up to this final

13   negotiation and the final two districts, if that makes

14   sense.

15        And in my presence, anytime a majority minority

16   district came up, commissioners were very careful to

17   refer to the Voting Rights Act in compliance with the

18   Voting Rights Act.

19   BY MR. THRIFT-VIVEROS:

20   Q. You said that the commissioners had different

21      interpretations of what constitutes requirements under

22      the Voting Rights Act; is that correct?

23   A. That was my sense.

24   Q. And what -- why did you have that sense that they had

25      inconsistent interpretations?

SARAH AUGUSTINE - 10/06/2022

Page 90

1   A. In this final three-day discussion that I was a part

2      of, there was shorthand that was being used, as they

3      were referring to previous agreements they had made.

4      And I wasn't taking notes or, you know, asking for

5      details or calling them out on that.  I was really

6      focused on negotiating the final two districts.  And so

7      I would say that was an impression that I had.

8   Q. Okay.  I'm just trying to glean where that impression

9      came from.  What conversations were there that caused

10     you to believe that there were inconsistent

11     interpretations?

12               MR. MILLSTEIN:  Objection to form.

13               THE WITNESS:  These conversations were cursory

14     at best.  It was more reference to previous decisions

15     that had negotiated agreements that had been made.  So

16     it would have, you know, been -- I mean, I really -- I

17     really can't re-create it.  I happened to be there as

18     they were talking about -- you know, I remember it

19     being referred to.  But there wasn't direct

20     conversation about it, and I didn't ask for details,

21     because it wasn't really an issue in the 44th or the

22     28th that was raised in my hearing.

23     BY MR. THRIFT-VIVEROS:

24   Q. Were you involved in discussions between Commissioner

25      Sims and Commissioner Graves regarding the legislative

SARAH AUGUSTINE - 10/06/2022

Page 91

1    districts in the Yakima Valley region?

2    A. What I remember hearing was reference to anxiety that

3       the Yakima Valley, the 15th -- the 14th and the 15th

4       would be the major sticking point and sort of interest

5       that, Oh, well, it turns out that's not really what

6       happened here.  The 44th was.  So that was the sort of

7       reference.  I don't remember discussion beyond that.

8    Q. And when you say "major sticking point," you mean major

9       sticking point in the negotiations between Sims and

10      Graves?

11   A. Yes, regarding the legislative district map.

12   Q. Did it -- as far as you know, did any of the other

13      commissioners spend significant time in the Yakima

14      Valley region?

15            MR. MILLSTEIN:  Objection to form.

16            THE WITNESS:  I don't know that any

17      commissioners spent time in the Yakima Valley beyond

18      our tribal consultation with the Yakama Nation.

19       BY MR. THRIFT-VIVEROS:

20   Q. Would it be safe to say that you were the most familiar

21      of everyone working on the commission with the Yakima

22      Valley region?

23            MR. MILLSTEIN:  Objection to form.

24            THE WITNESS:  The Yakima Valley is my

25      community, certainly.  And April Sims supervised an

SARAH AUGUSTINE - 10/06/2022

Page 92

1    employee also living in the Yakima Valley.  I asked

2    April Sims at one point if she had conversation with

3    her direct report, this person who reported directly to

4    her, and she said she felt it would be inappropriate

5    for that conversation to occur.  And I trust that.  I

6    trust her integrity in that regard.

7         So I would say I would have the most lived

8    experience, yes, in the Yakima Valley.

9     BY MR. THRIFT-VIVEROS:

10   Q. Did any of the commissioners ask you questions about

11      the demographics of the Yakima Valley region?

12   A. No.

13   Q. Did any of the commissioners ask for your advice on the

14      drawing of lines in the Yakima Valley region?

15   A. No.

16   Q. Okay.  Do you feel it would have been appropriate for a

17      commissioner to ask you about the demographics of the

18      Yakima Valley region for the purpose of drawing maps?

19   A. No.

20   Q. Okay.  And you mentioned before trades, which, of

21      course, in every negotiation trades happen.  Is it your

22      understanding that a majority minority district in the

23      Yakima Valley region was subject of one of these trades

24      between Commissioner Sims and Commissioner Graves?

25            MR. MILLSTEIN:  Objection to form.

SARAH AUGUSTINE - 10/06/2022

Page 93

1          THE WITNESS:  That was certainly not the

2     content of their negotiation around the 44th and the

3     28th.

4      BY MR. THRIFT-VIVEROS:

5  Q. Okay.  But did you ever hear in reference, passing

6     reference, or in a proposal somewhere that the lines in

7     the 14th and 15th districts were part of a trade?

8               MR. MILLSTEIN:  Objection to form.

9               THE WITNESS:  No.

10  BY MR. THRIFT-VIVEROS:

11  Q. Okay.  Beyond just looking at majority minority

12     districts, do you know if any of the commission -- any

13     of the commissioners or their staffs expressed to you

14     that they were looking at the ability of a minority in

15     a district to elect the candidates of their choice?

16  A. Yes.

17  Q. And who -- who did you discuss that with?

18  A. Brady Walkinshaw voiced that to me in conversation, and

19     in that same time period.  And what he said to me was

20     consistent with his published position that's on --

21     listed on our website.

22  Q. So I understand that, yeah, his statement is listed on

23     the website, but in his conversation with you, what did

24     he say regarding that?

25  A. So I had a conversation with him.  I went to see him to

SARAH AUGUSTINE - 10/06/2022

Page 94

1    see how he was doing.  I did this with all of the

2    commissioners multiple times throughout this three-day

3    period, just to check in and see how they were doing.

4         And it was an evening time.  I think it was a

5    Saturday.  And I asked how he was doing generally and

6    how he felt things were going generally.

7         He and Joe Fain were negotiating also.  And he

8    voiced to me during that conversation, it's very

9    important to me that there is at least one majority

10   minority district.

11        But if I recall, and I don't recall exactly, that

12   there were two and possibly even three.  He wasn't

13   talking about one.  He had -- he cared about more than

14   one.  And at the state level.

15        And so the way he was sharing that with me was

16   really sort of in a informal, casual way.  And he was

17   also voicing his faith in Commissioner Sims to

18   negotiate that map, because he was not directly engaged

19   in that negotiation.

20   Q. Did you communicate that conversation with Commissioner

21      Walkinshaw to Commissioner Sims?

22   A. Absolutely not.

23   Q. Okay.  And when he was talking -- when Commissioner

24      Walkinshaw was talking about one or two or possibly

25      three majority minority districts, was that in the

SARAH AUGUSTINE - 10/06/2022

Page 95

1   context of compliance with the Voting Rights Act?

2   A. I don't remember a reference to it.  I don't remember a

3   direct reference.  What I remember is a very deep

4   commitment to his constituency.  And that commitment,

5   when I say "constituency," I mean the residents of the

6   state of Washington.

7   Q. And when he was -- when Commissioner Walkinshaw was

8   referring to these potential majority minority

9   districts, was he specifically referring to the

10  districts in the Yakima Valley region?

11  A. Not in my hearing.

12  Q. He just said it in a general sense?

13  A. (Witness nods head up and down.)

14  Q. Okay.  In part of that -- excuse me.

15        Did you have other conversations with Commissioner

16  Walkinshaw regarding the potential creation of majority

17  minority districts and the legislative map?

18  A. Not that I recall.  That's the one I really remember.

19  Q. Okay.  Did Commissioner Walkinshaw, in that

20  conversation that you had with him, did he discuss the

21  idea of an opportunity district, as in a district that

22  allows a minority population to elect a candidate of

23  their choice?

24        MR. MILLSTEIN:  Objection to form.

25        THE WITNESS:  I don't remember hearing that

SARAH AUGUSTINE - 10/06/2022

Page 96

1   term, no.

2   BY MR. THRIFT-VIVEROS:

3   Q. And if not specifically that term but that general

4       concept, did he discuss that with you?

5   A. I don't remember that level of detail.

6   Q. Do you recall if he discussed the voting patterns of

7       Latino voters in the Yakima Valley region with you?

8   A. No.

9   Q. So in that conversation regarding -- with Commissioner

10      Walkinshaw regarding the creation of majority minority

11      districts, did you and Commissioner Walkinshaw discuss

12      anything else regarding the minority populations of

13      that area or the ability for -- or the voting patterns

14      or anything outside of, we should create a majority

15      minority district somewhere in Washington?

16              MR. MILLSTEIN:  Objection to form.

17              THE WITNESS:  I'm trying to remember if he

18      spoke directly about the Yakima Valley, and I honestly

19      don't remember.  And there were many conversations

20      going on over, you know, three days without sleep.  So

21      it's hard to recall exactly what was said and at what

22      time.

23          I remember that Commissioner Walkinshaw voiced a

24      very passionate priority around ensuring that people of

25      color would be adequately represented, and I just don't

SARAH AUGUSTINE - 10/06/2022

Page 97

```
 1    remember the exact detail.
 2    BY MR. THRIFT-VIVEROS:
 3  Q. Okay.  Did -- did you ever direct either Lisa McLean to
 4    direct Justin Bennett or Justin Bennett directly to
 5    perform a racial voting analysis on any of the maps?
 6  A. Yes.
 7              MR. MILLSTEIN:  Object to form.
 8    BY MR. THRIFT-VIVEROS:
 9  Q. Do you know how many times?
10  A. We were -- by "we," it's really Justin -- in meetings
11    with me and Lisa, and our team were once again trying
12    to develop appropriate metrics for use by the
13    commissioners.  So we generated -- "we" being Justin --
14    generated many different maps with -- with metrics that
15    were created by him in conversation with the
16    independent staff.
17       But these were not -- it's -- you know, I don't
18    want to imply that we were creating maps for the
19    commissioners, because we were not.  But we were
20    looking at a lot of data and often many maps in a row.
21    So we would adjust -- you know, Justin would adjust a
22    metric, and we'd look at it again.  And then make
23    another adjustment, and look at it again.
24       And often you're looking at, you know, five or six
25    or ten or 15 different ways of looking at something.
```

SARAH AUGUSTINE - 10/06/2022

Page 98

1    And the goal of this process is to provide the very

2    best data to the commissioners so that they would be

3    able to make informed decisions.  So we certainly did

4    that related to the Voting Rights Act.

5  Q. Do you know if Justin Bennett was looking at voting age

6    populations or citizen voting age populations when

7    making these maps and metrics?

8  A. I think we were looking at all of those.

9  Q. Do you know for sure, or do you just think maybe?

10  A. As I said, when we were looking at -- as we were

11    creating different metrics, we would say, Let's look at

12    race.  Okay, now let's look at you know, Hispanic.  Now

13    let's look at Hispanic voting age.  Now let's look at

14    all race voting age.

15      You know, many sequences of maps with all different

16    kinds of data.  I cannot speak to how much of those

17    resources were looked at or used by the voting

18    commissioners or their staff.

19  Q. When Justin Bennett would create one of these maps,

20    would he e-mail them to you or to Lisa McLean or

21    what -- how would he convey this product to you?

22  A. Often I would come to Olympia, and we would sit in a

23    room for eight hours and do this.

24  Q. Do you know if those maps are archived anywhere?

25  A. Certainly if a tool was created, it would be archived.

SARAH AUGUSTINE - 10/06/2022

Page 99

1    But in terms of those meetings, I'm not sure any of

2    that was saved.  It was a brainstorming session.

3         Some of it might be saved.  Justin would certainly

4    know that.  Justin was extremely careful about sharing

5    everything created with every commission and every

6    staff member of every voting commissioner, and careful

7    about cataloging, making sure that was all uploaded.

8    All of those drafts, I don't know.

9  Q. Okay.  Do you recall if Justin Bennett performed

10   analyses either in these metrics or maps regarding the

11   turnout rates of minority voters?

12 A. I don't recall, but if it was a piece of data, we

13   probably looked at it.  I don't recall that

14   specifically, but we were looking at everything.

15 Q. Okay.  And do you happen to know what set of data

16   Justin Bennett was using when producing these metrics,

17   as in the ACS data or before, you know, the census data

18   came out?

19         MR. MILLSTEIN:  Objection to form.

20         THE WITNESS:  I don't remember what data we

21   used for what metric.  We were certainly looking at the

22   2010 census data before we had 2020 census data.  And

23   then we were also looking at intermediate data and

24   voting data.

25         I don't -- I don't remember, you know, the sorting

SARAH AUGUSTINE - 10/06/2022

Page 100

1   criteria.  It depends -- from my point of view, we

2   would look at one thing and turn it and look at it

3   again, you know.  So we'd say, Hey, let's look at the

4   2010 data first.  Let's look at our most recent

5   imperfect data.  Let's look at it with the election

6   data.  We were looking at it every which way.

7   BY MR. THRIFT-VIVEROS:

8   Q. And I understand that Justin Bennett produced a lot of

9      these metrics and maps for the benefit of the

10     commissioners in drawing their maps, right?  Is that

11     correct?

12            MR. MILLSTEIN:  Objection to form.

13            THE WITNESS:  Yes.

14  BY MR. THRIFT-VIVEROS:

15  Q. Did Justin Bennett analyze through these contexts of

16     race and turnout, or whatever metrics that you

17     mentioned, did he apply those metrics to maps already

18     created by the commission?

19            MR. MILLSTEIN:  Objection to form.

20            THE WITNESS:  I don't remember.  The maps --

21  the analysis I remember really focusing on with the

22  draft maps before we had census data was really looking

23  for overlap so that we could define collective

24  interest.  We could look at the places where there was

25  the most distance and where there was the most overlap.

SARAH AUGUSTINE - 10/06/2022

Page 101

```
 1      BY MR. THRIFT-VIVEROS:
 2   Q. I have an e-mail I'll share in the chat, and I'll
 3      screen share it as well.
 4                    (Exhibit No. 2 marked
 5                     for identification.)
 6      BY MR. THRIFT-VIVEROS:
 7   Q. All right.  Can you see this e-mail?
 8   A. Yes.
 9   Q. So it looks like an e-mail that April Sims had sent to
10      Paul Graves and then forwarded it to you, and you
11      forwarded it to Lisa McLean; is that correct?
12   A. Right.
13   Q. Okay.  Do you recall receiving this e-mail?
14   A. Yes.
15   Q. Okay.  So here Commissioner Sims made a proposal for a
16      map to Commissioner Graves.  And one of the highlights
17      that she mentions is that the 15th Legislative District
18      is now 49.2 percent in ACS 2019 CVAP estimates.
19          Did you have any discussion with April Sims about
20      the fact that her -- this legislative district now was
21      lower than 50 percent?
22   A. I remember this conversation and trying to ask for the
23      basis of the negotiations that they had done up to this
24      point.  What -- what were the criteria or the main
25      topics they were negotiating around?
```

SARAH AUGUSTINE - 10/06/2022

Page 102

1          And so April sent this.  And I forwarded it to Lisa
2     so that we could analyze it among the independent
3     staff.  And then I drove to Olympia so that we could
4     look at it together.
5          And so what I remember is my independent staff,
6     that is to say Justin and Lisa and Daniel, and I sat
7     down so that they could brief me so I could come to the
8     negotiation fully informed and I would understand what
9     all the things, the details of what they were talking
10    about.
11         To this point, I had been excluded from the
12    negotiation.  So this was the first time I heard what
13    the -- what was the main substance of their
14    negotiation.  And so what I remember is April sent this
15    to me.  I went to Olympia, looked at it with Daniel and
16    Lisa and Justin.  And then came to the negotiation with
17    April and Paul equipped to talk about what they needed
18    to talk about.
19         And so what I remember is not -- I don't remember
20    having specific conversation about any of these bullet
21    points.  What we were really focused on is the 44th and
22    the 28th.  And this was context for me to help them
23    wade through that negotiation.
24 Q. So in your -- was it your understanding that everything
25    else other than those two districts that you mentioned

SARAH AUGUSTINE - 10/06/2022

Page 103

1    were pretty much resolved at this stage?

2                    MR. MILLSTEIN:  Objection to form.

3                    THE WITNESS:  I understood that everything was

4    resolved until the governor appointed the secretary of

5    state out of the 44th to a state position.  Then

6    everything went up in the air.

7    BY MR. THRIFT-VIVEROS:

8    Q. Can you give me a brief description of how that

9    appointment affected these negotiations?

10   A. I believe that prior to that appointment, the

11   legislative district map was close to being negotiated.

12   I think it was -- I don't know, but I think they were

13   close, if not essentially done.  I don't know that, but

14   that's an assumption that I make.

15        Part of the agreement they made in the 44th -- and

16   I don't remember the details of what happened in the

17   44th.  But part of the agreement they made was

18   predicated on the idea that, while a democrat was in

19   office in the 44th, he was a moderate democrat who

20   sometimes voted with republicans.

21        So there was assurance that -- you know, that

22   whatever deals they had made in the 44th were going to

23   be -- it would be -- it would -- I guess my

24   understanding is that the district composition -- it

25   felt like having a competitive district or making gains

SARAH AUGUSTINE - 10/06/2022

Page 104

```
 1      for democratic voters in that district would not be
 2      terrible for the republican constituents to swallow
 3      because there was a moderate democrat in the seat.
 4           And so when that appointment was made, when the
 5      secretary of state was appointed to that position, the
 6      secretary of state, that undermined Commissioner
 7      Graves' trust that Commissioner Sims was negotiating in
 8      good faith.  So he believed that she knew that was
 9      coming and made a negotiation.  And he felt very
10      foolish.  So the main substance of our negotiation was
11      trying to reestablish trust between Paul Graves and
12      April Sims.
13  Q.  Did you have any reason to believe that Commissioner
14      Sims knew about this appointment ahead of time?
15  A.  I have no opinion about that.  I believe, you know,
16      what April Sims said in the negotiation, which is that
17      she did not have any knowledge of that.  And I trust
18      her integrity.
19  Q.  Okay.  When you took this proposal to the independent
20      staff for analysis, do you recall what the -- if any,
21      the conclusions were regarding the 15th Legislative
22      District?
23  A.  Can you ask that again, please?
24  Q.  Yes.
25           When you took this proposal, this latest proposal
```

SARAH AUGUSTINE - 10/06/2022

1    here, to your independent staff to look at, right,

2    before the last couple of days of the negotiations, do

3    you recall if there were any conclusions or discussions

4    about the 15th Legislative District?

5                 MR. MILLSTEIN:  Object to form.

6                 THE WITNESS:  So there were certainly

7    discussions.  So if -- I don't recall exactly what we

8    discussed.  But my guess is, based on what we had done

9    previously, we would have looked at all of these

10   different -- we would have looked at each one of these.

11   So we would have looked at the 2019 CVAP data.  We

12   would have looked at the ASC 2019 data and compared

13   them all, just so that I would be prepared to talk

14   about this if it came up.  So that I would have enough

15   information and knowledge to be a -- a reasonably

16   equipped, you know, partner in the negotiation.

17   BY MR. THRIFT-VIVEROS:

18   Q. Was there any concern about the 15th Legislative

19      District expressed by the independent staff?

20   A. No.

21   Q. Okay.  And correct me if I'm wrong, but my

22      understanding from what you said, you're well prepared

23      on to discuss between the commissioners about all of

24      these bullet points but the legislative district --

25      15th Legislative District didn't come up for the --

SARAH AUGUSTINE - 10/06/2022

Page 106

1          MR. MILLSTEIN:  Object to form.

2          THE WITNESS:  I don't remember that it came

3     up.  And I felt very well prepared for that weekend.

4     And, you know, here we are nearly a year later.  I

5     don't remember any instances really of that

6     conversation.

7          I also want to make one additional comment.  My

8     expectations of the independent staff were high of Lisa

9     and her staff.  The independent staff is to be

10    impartial and to comply with that at all times

11    regardless of what their personal opinions would be.

12    It was my ambition that they would not ever know what

13    each other's personal opinions were, that we would

14    operate with the highest level of integrity to ensure

15    that we would supply the best possible advice to the

16    commissioners.

17    BY MR. THRIFT-VIVEROS:

18    Q. Did you consider it a duty of the independent staff to

19       inform the commissioners if they believed that a map is

20       not compliant with the Voting Rights Act?

21    A. Yes.

22    Q. Okay.  Do you recall a situation where a member of the

23       independent staff informed you or another commissioner

24       that a map was not compliant with the Voting Rights

25       Act?

SARAH AUGUSTINE – 10/06/2022

Page 107

1          MR. MILLSTEIN:  Objection to form.

2          THE WITNESS:  No.  While we looked carefully

3    at the Barreto report, no one on the independent staff

4    is an attorney or has specific expertise in the Voting

5    Rights Act.  Our job was to supply the commissioners

6    with the best information that they could have so that

7    they could make the decision.

8          And I was very clear with all of my staff and with

9    the public and repeated over and over and over again in

10   open public meetings that I would not have my thumb on

11   the scale, that the commissioners were entrusted by the

12   public to make the best decision for everyone.  And

13   that was their job to do.

14         The best way that I could help them to prevent

15   making decisions in violation of the Voting Rights Act

16   was:  Number one, to make sure they were trained,

17   number two, to make sure they had regular access to

18   counsel to ask questions and to make sure that they

19   could check in on their decisions, and three was to

20   strongly encourage them to retain expert counsel to

21   make the best decisions possible.  Beyond that, it was

22   their job to comply with all of their mandates.

23   BY MR. THRIFT-VIVEROS:

24   Q. Do you believe that the commissioners were sufficiently

25      trained in the requirements of the Voting Rights Act?

SARAH AUGUSTINE - 10/06/2022

Page 108

1           MR. MILLSTEIN:  Objection to form.

2           THE WITNESS:  I don't know.  Two commissioners

3   are attorneys.  The other two commissioners had access

4   to professional staff supplied by the houses of the

5   legislature.  I didn't question that.  I felt they had

6   access to expertise.  That was my job was to equip them

7   with expertise.  Not my job to advise them on what

8   decision to make.  My job to equip them so they're

9   prepared to make good choices.

10   BY MR. THRIFT-VIVEROS:

11   Q. If a commissioner wanted to speak to an attorney, a

12      counsel, regarding anything regarding the redistricting

13      maps, would they contact the office themselves or would

14      they contact you or how would that work?

15           MR. MILLSTEIN:  Object to form.

16           THE WITNESS:  Only one person was empowered to

17   make expenditures without a majority decision of the

18   commission, and that was Lisa McLean.  As the executive

19   director, she was empowered to make decisions up to a

20   $15,000.  There was a $15,000 cap.  No other person,

21   including any commissioner, could spend commission

22   money without going to an open public meeting and

23   voting.

24   BY MR. THRIFT-VIVEROS:

25   Q. Did the commissioners have access to attorneys from the

SARAH AUGUSTINE - 10/06/2022

Page 109

1       Attorney General's Office to discuss legal components?
2   A. The Attorney General's Office provided what I would
3       call a detail to us.  I'm not saying that's what they
4       call it.  I don't know what they call it.  But we had
5       two attorneys that we consulted with regularly from the
6       AG's Office.  And we consulted with them in open
7       meetings in executive session multiple times.
8   Q. Outside of these open meetings, do you know if any of
9       the commissioners consulted with an attorney, whether
10      from the Attorney General's Office or any other office,
11      regarding the compliance of their maps?
12              MR. MILLSTEIN:  I'm just going to object to
13      the extent you are seeking anything that would be
14      covered by the attorney-client privileged, the joint
15      privilege of the commissioners and the discussions they
16      had.
17              MR. THRIFT-VIVEROS:  So just to clarify, I'm
18      not asking about the substance but rather if this
19      communication happened.
20              MR. MILLSTEIN:  But you are asking if they
21      were seeking legal advice about specific issues.
22              MR. THRIFT-VIVEROS:  Okay.  I can rephrase it.
23      BY MR. THRIFT-VIVEROS:
24   Q. As far as you know, did a commissioner contact an
25      attorney outside of these open public meetings to

SARAH AUGUSTINE - 10/06/2022

Page 110

1    discuss redistricting?

2  A. I am going to try and summarize what I know in the

3     hopes that it answers your question.  As the chair, I

4     spoke with AG folks regularly, very often.  Sometimes

5     weekly or multiple times a week.  Any communication I

6     had with the AG, the AG's Office or assistant attorney

7     general, was privileged to the extent that anything I

8     shared with them could be and would be shared with

9     every commissioner on the commission.  That was the

10    agreement.  Because the assistant AG represented the

11    commission, not individual commissioners.

12         So I don't know if that helps to answer your

13    question.  I assume that all commissioners understood

14    that they had access to the Attorney General's Office,

15    with the understanding that whatever they ask and share

16    could be shared with the rest of the commission.

17  Q. Okay.  Yeah, that's good to know.

18         And one last question about this:  Did -- you

19    mentioned that there was a budget for consulting or

20    anything, and if someone went outside of that budget,

21    they would have to vote on it; is that correct?

22              MR. MILLSTEIN:  Objection.  Misstates prior

23    testimony.

24              THE WITNESS:  We had monthly administrative

25    meetings.  And every month at the administrative

SARAH AUGUSTINE - 10/06/2022

Page 111

1    meeting, a budget was shared.  At that time, Lisa

2    McLean would explain -- she would give a budget report

3    and explain what expenditure had been made.

4        It was a complex budget with multiple line items.

5    So as various aspects that were discussed, that was

6    uploaded to the internet so that everyone could have

7    access to it in open public meeting.  Expenditures were

8    to be voted on, unless they were made by Lisa McLean

9    and under $15,000.  Anything over $15,000 would have to

10   be voted on, and a majority of votes would have to

11   carry that decision.

12   BY MR. THRIFT-VIVEROS:

13   Q. Okay.  And last question:  When the attorney

14   representatives from the attorney general came and made

15   those presentations in the open meetings, was there any

16   sort of, like, fee arrangement that had to come out of

17   the commission budget to the Attorney General's Office

18   or anything like that?

19            MR. MILLSTEIN:  Object to form.

20            MR. THRIFT-VIVEROS:  Sorry.

21            THE WITNESS:  Yes, we were charged by the

22   Attorney General's Office for the representation that

23   they provided to us.

24   BY MR. THRIFT-VIVEROS:

25   Q. Okay.  Do you recall how much?

SARAH AUGUSTINE - 10/06/2022

Page 112

1  A. No, but that is a matter of public record and would be

2      easily found on the website.

3  Q. Okay.  I keep saying this is the last question, but I

4      guess one last question:  Do you know if the attorney

5      general would bill per consult, or was it like a

6      general retainer agreement?

7                    MR. MILLSTEIN:  Objection to form.

8                    THE WITNESS:  I'm so thankful that I had a

9      highly competent executive director who managed details

10     of that nature.  I don't recall, but luckily Lisa was

11     tracking all of that.

12    BY MR. THRIFT-VIVEROS:

13 Q. Okay.  So now I want to talk a little bit about the

14     last couple of days of the negotiation, which we've

15     talked on a few times already.  I'm going to share a --

16                    MR. THRIFT-VIVEROS:  Oh, Connie, if you aren't

17     already, that e-mail should be marked as No. 2.  Thank

18     you.

19          So I'm going to share -- I'd like this to be marked

20     as Exhibit 3.

21                        (Exhibit No. 3 marked

22                          for identification.)

23    BY MR. THRIFT-VIVEROS:

24 Q. And this is a memo from Ali O'Neil to the senate

25     majority leader with kind of a timeline of the

SARAH AUGUSTINE - 10/06/2022

1    redistricting events.  Have you seen this memo before?

2    A. I have.

3    Q. Have you read it fully?

4    A. Yes, very many months ago.

5    Q. Uh-huh.  We're just going to refer to it because it's

6       as complete a timeline as I've seen from the last

7       couple of days.

8           Did you read a draft of this before Ali O'Neil sent

9       it to the senate majority leader?

10               MR. HUGHES:  Object to form, specifically the

11      prolog.

12               THE WITNESS:  No.

13   BY MR. THRIFT-VIVEROS:

14   Q. Sorry.  I didn't hear your answer, Sarah.

15   A. No.

16   Q. Okay.  And I know you read it a few months ago, but do

17      you feel this memo is relatively accurate?

18   A. No.

19   Q. Do you recall specifically where you disagree with what

20      the memo says?

21          And you can let me know if you want me to scroll.

22   A. Sure.  I'll let you know.

23               MR. MILLSTEIN:  And, Sarah, this is a

24      relatively small PDF.  So you can download the whole

25      thing to review at your leisure.

SARAH AUGUSTINE - 10/06/2022

Page 114

1                    THE WITNESS:  Okay.  Thank you.

2              So this last bullet point, I don't -- that's not

3         what I remember.  I would not provide a proposal from

4         one party to the other.  I was mediating a direct

5         negotiation between two people, and I don't agree with

6         the way that's conveyed here.

7              So you can keep paging down.

8              Okay.  You can keep paging down.

9              Many of the details that -- or that Ali lists here,

10        I was simply not privy to.

11         BY MR. THRIFT-VIVEROS:

12    Q. Okay.  We can revisit the rest of the document, but I

13        have a few questions.

14    A. Sure.

15    Q. So the commission had a deadline to pass a completed

16        and final map by midnight on the night of

17        November 15th; is that correct?

18    A. That's right.

19    Q. Was it part of your duty as the chair of the commission

20        to ensure that the maps were passed by the deadline?

21    A. No, absolutely not.

22    Q. As far as you know, is there a single person that had

23        the duty to ensure that the maps were passed by this

24        deadline?

25    A. Maybe I need you to rephrase the question.

SARAH AUGUSTINE - 10/06/2022

Page 115

1    Q. So you said you didn't -- or you said that you didn't

2       think that the -- ensuring the passage of these maps

3       were part of your duties as the chair; is that right?

4                 MR. MILLSTEIN:  Object to form.

5                 THE WITNESS:  When you say that, what I hear

6       in terms of passage of the maps, is that it's my job to

7       ensure that they vote and come to a vote where they

8       agree on the passage of maps.  That is not my job.

9       That's their job.  My job is to provide them with the

10      best facilitation that I possibly can.  It's not my job

11      to produce maps.  It's the voting commissioners' job to

12      do that.

13       BY MR. THRIFT-VIVEROS:

14    Q. Okay.  So you don't take any responsibility for the

15      failure of the maps -- or the failure of the consensus

16      around the maps to be passed by midnight?

17                MR. MILLSTEIN:  Objection to form.

18                THE WITNESS:  I don't understand the question.

19       BY MR. THRIFT-VIVEROS:

20    Q. Do you take responsibility, any responsibility, for the

21      failure of the maps to be passed before the midnight

22      deadline?

23                MR. MILLSTEIN:  Objection to form.

24                THE WITNESS:  I'm reflecting on all the ways I

25      could interpret that question.  I can probably think of

SARAH AUGUSTINE - 10/06/2022

Page 116

1   at least three.  So I will say no to all of that.  I

2   did not take responsibility.

3     BY MR. THRIFT-VIVEROS:

4   Q. What were your three interpretations, if you don't mind

5   me asking?

6   A. Not at all.

7        One, that it's my job to get a final product, that

8   was not my responsibility.  Two, to make sure that they

9   agree, also not my responsibility.  Three, to produce

10   the physical objects themselves, no, not my

11   responsibility.

12   Q. Okay.  So you mentioned that you disagreed with the

13   bullet point in the Ali O'Neil memo, the last bullet

14   point on Page 2; is that correct?

15   A. That's not how I remember that conversation going, and

16   I'm pretty sure Ali O'Neil wasn't in the room when we

17   were having the conversation.

18   Q. Okay.  Did you -- did you act as a mediator that day

19   between Commissioner Sims and Commissioner Graves?

20   A. Yes.

21   Q. Can you explain to me what you did as a mediator on

22   that day?

23   A. I provided each of them the opportunity to be fully

24   heard by the other.  I strongly encouraged them round

25   after round to think about every potential possibility

SARAH AUGUSTINE - 10/06/2022

1    for what could be, to expand the conversation beyond

2    rigid positions of the two parties to try and think

3    creatively about areas of give and to reestablish a

4    relationship of trust between the parties.

5  Q. Were Commissioner Sims and Commissioner Graves in the

6    same room for most of the day?

7  A. What day are you talking about?

8  Q. On November 15th.

9  A. November 15th.  This is Monday.

10       What I remember is that on Monday there were

11    intermediate meetings followed by long periods of, you

12    know, breakout space where they would go and talk with

13    their staff.  I believe in that breakout space what

14    they were doing was mapping the different scenarios.

15  Q. Were you going between the rooms that these

16    commissioners were located conveying offers or not?

17  A. No.  In fact, I stayed in the central space, and they

18    came to me and periodically I would go and do

19    check-ins, not conveying offers but rather just

20    checking in to see if they were getting what they

21    needed and asking to see what additional things they

22    might need.

23  Q. Can you give me some examples of some additional things

24    that they might need?

25  A. Probably the thing that was most requested was time,

SARAH AUGUSTINE - 10/06/2022

1    just wanting more time.  But, you know, this would be
2    the kind of thing where, is there -- is there someone
3    that -- that -- you know, is there -- could Justin
4    provide a service for you?  Could Daniel provide a
5    service for you?  So that just to help support your
6    staff as they're trying to map this.
7         Are there -- you know, are there metrics that we
8    can supply you with?  Because when you start trying to
9    thinking outside the box, perhaps those metrics could
10    change.  And so those were the kinds of things.
11  Q. Further down on Page 3 is the sixth -- sixth bullet
12    point -- fifth bullet point, sorry.  Ali O'Neil writes,
13    "Just before 7 PM Commission staff member Justin
14    Bennett sent a calendar invite for a 'Final Map
15    Verification Meeting.'"
16         Did you request that meeting?
17  A. Yes, I did.
18  Q. Okay.  Were you planning on requesting it at that time,
19    or did you come up with that idea at that moment?
20  A. That meeting was scheduled in an open public meeting,
21    the meeting just prior to this.  So we had created a
22    calendar for how the final day would go, and we agreed
23    at that time that we would have -- that we would go
24    over the final maps at 7:00 p.m.
25  Q. And did you go over the final maps at that time?

SARAH AUGUSTINE - 10/06/2022

Page 119

1   A. We did not.

2   Q. Okay.  And then later on, this is Bullet Point 7, Ali

3       O'Neil writes:  As it was initially explained to me at

4       a meeting on November 12th, commission staff were

5       supposed to join the public meeting every half-hour.

6           Do you recall if the commission staff were joining

7       the public meeting every half-hour?

8   A. If commission staff were joining at every half-hour?

9   Q. Yeah.  That's what she wrote.

10  A. I don't recall who was attending those meetings every

11      half-hour.  I was attempting to be on those meetings

12      every half-hour.  And I think there was a long period

13      where nobody -- there was just, you know, a -- like a

14      placard or something.  But I was the one who was in

15      that public meeting more than anyone else, is what I

16      remember.

17  Q. Okay.  And then later on in the bullet point, she

18      writes, "Commissioner Augustine was telling staff and

19      the Commissioners that counsel was instructing them to

20      join the public meeting more frequently and give more

21      detailed updates on what they were discussing."

22          Would you agree with that?

23  A. I would agree that I encouraged the commissioners many

24      times to give updates during those meetings, yes.

25  Q. Okay.  And during this time, were you still acting as a

SARAH AUGUSTINE – 10/06/2022

Page 120

1    mediator between Sims and Graves?

2    A. From the time the public meeting started, my main job

3       was just running the public meeting.  And that was a

4       fairly chaotic meeting because the teams were still

5       negotiating.

6          So this was what I understood.  Prior to this

7       meeting, prior to 7 o'clock, there were two teams.

8       There was the house team, and there was the senate

9       team.  And they were forming agreements and generating

10      agreements.

11         My understanding, as it was conveyed to me, was

12      that they then at that time switched.  This was very

13      late in the game.  We wanted to have all of this done

14      by Friday.  But here we are at the 11th hour trying to

15      negotiate this.  And at this time, there would then be

16      a republican team and a democratic team.  And at this

17      time, they would be briefing each other on the maps.

18         Because they hadn't done that in an open public

19      meeting prior to that.  You know, had we had the full

20      maps done at 7 o'clock, they would have been doing it

21      there.  But now we're in a situation where, you know,

22      the democrats are briefing each other on what their

23      maps are like, and the republicans are briefing each

24      other on what the maps are like so that when they go

25      over it in the open public meeting, they'll be able to

SARAH AUGUSTINE - 10/06/2022

1    vote.  Because the negotiation went so long that, you

2    know, they were needing to brief each other on what was

3    going on, what they were going to be seeing in these

4    proposals.

5         So there was a lot going on at that time.  There

6    were a lot of conversations going on.  And what I

7    understood -- and to put that another way, I guess,

8    what I understood is that's what was happening.  The

9    republican team was meeting, and the democratic team

10   was meeting.

11   Q. Sorry.  Going back to the last bullet point on Page 2,

12      I meant to ask.  Although you disagree with the

13      sentiment of this bullet point, that Commissioner Sims

14      conveyed to the republicans a proposal on partisan

15      metrics through you, do you know if Commissioner Sims

16      conveyed a proposal to the republicans on partisan

17      metrics at all?

18   A. There were three people in the room, as I recall, Paul

19      Graves, April Sims and me.  And there were many

20      proposals going back and forth during that time.

21   Q. Would you characterize any of those proposals as being

22      on partisan metrics?

23   A. They were about the 44th and the 28th.  And they were

24      about partisan voter -- based on partisan voter data.

25      So to establish, is this going to be a lean district,

SARAH AUGUSTINE - 10/06/2022

Page 122

```
 1    will it be a competitive district or what?  I mean,
 2    really, at that stage there's only two, lean or
 3    competitive for that final negotiation.
 4  Q. Okay.  Sorry.  I'm pulling up another exhibit.
 5        So this is a text message produced by April Sims.
 6    And she says it was texted to Sarah Augustine.  Do you
 7    remember this text message conversation?
 8              MR. MILLSTEIN:  Deylin, can you share this
 9    exhibit?
10              MR. THRIFT-VIVEROS:  Yeah, sorry.  I'm working
11    on it.
12              MR. MILLSTEIN:  Can we pause on the questions
13    until we have it?
14              MR. THRIFT-VIVEROS:  Oh, yeah.
15              MR. MILLSTEIN:  And then are you going to
16    introduce this as well?
17              MR. THRIFT-VIVEROS:  Yes.
18                  (Exhibit No. 4 marked
19                   for identification.)
20              MR. THRIFT-VIVEROS:  Sorry.  I can't figure
21    out how to share screen and open the chat at the same
22    time.  There.
23        Yeah, I'd like to have this introduced as the next
24    exhibit.
25    BY MR. THRIFT-VIVEROS:
```

SARAH AUGUSTINE - 10/06/2022

1   Q. So in the text message exchange, you texted, "How's it

2      going?"

3          And April Sims texted, "We are at a stale mate."

4          Do you recall this conversation?

5   A. Yes.

6   Q. Did you attempt to mediate between the two of them

7      after this text message conversation?

8   A. This is at 8:09 p.m.?

9   Q. Uh-huh.

10  A. I think by this time I'm in the open public meeting.

11     So I'm really just checking in with them to see if

12     there's progress.  I don't remember mediating at this

13     point.  What I remember is, once the public meeting

14     started, I was trying to just give updates and then put

15     pressure on the commissioners and their staff to use

16     the maps.

17  Q. Okay.  I'm going to go back to this memo.  On the

18     second bullet point on Page 4, Ali O'Neil writes:  At

19     around 8:45 I heard Commissioners Walkinshaw and Sims

20     agreed to a deal that was based almost solely on

21     partisanship numbers in a few legislative districts.

22         Do you remember -- were you privy to that deal?

23             MR. MILLSTEIN:  Objection to form.

24             THE WITNESS:  No.  My goal at this time was

25     simply to determine whether they were going to carry on

SARAH AUGUSTINE - 10/06/2022

Page 124

1    or call it.  And what I mean by "call it" is just

2    announce to the public they could not come to

3    agreement.

4         So my understanding of what was going on at that

5    time was the republican team was meeting, democratic

6    team was meeting.  And they were determining, you know,

7    what they were prepared to do.

8    BY MR. THRIFT-VIVEROS:

9    Q. I'm going to share one more text message exchange with

10   April Sims.

11              MR. MILLSTEIN:  And could you put that in the

12   chat first?

13              MR. THRIFT-VIVEROS:  Yeah, I just did.

14                  (Exhibit No. 5 marked

15                   for identification.)

16   BY MR. THRIFT-VIVEROS:

17   Q. So at 11:38 p.m., Commissioner Sims text you, "Are you

18   asking us to vote during this meeting?"

19         And you said, "Yes."

20         And she said, "I wasn't aware of that, I haven't

21   talked to Brady about the cd maps."

22         Do you recall this text message exchange?

23   A. I do.

24   Q. Okay.  What prompted Commissioner Sims to ask you, "Are

25   you asking us to vote during this meeting?"

SARAH AUGUSTINE - 10/06/2022

1   A. I cannot imagine what prompted her to ask that.  We had

2      laid out very clearly what the process would be that

3      evening, and we had -- we had -- "we" being the

4      independent staff, mainly me as the facilitator but

5      also Lisa McLean, ad nauseam what the steps would be

6      and that the final maps would need to be voted on to

7      become the law.

8          So when she asked this message, I was shocked.  I

9      was floored.  And I guess I don't have any more to say

10     about it.  I don't understand what motivated that

11     question in the least.

12  Q. So you believe that you had fully informed the

13     commission that they were going to vote during this

14     meeting; is that correct?

15              MR. MILLSTEIN:  Objection to form.

16              THE WITNESS:  Yes.  I had reiterated and

17     repeated the law, which was open to everyone to see and

18     review from the very first day.

19              MR. THRIFT-VIVEROS:  Okay.  I'd like to have

20     this marked as the next exhibit.

21  BY MR. THRIFT-VIVEROS:

22  Q. Do you recall when you called for the final vote on the

23     maps?

24  A. It was, if I recall, slightly before midnight.

25  Q. Were all the commissioners in the same room or was it

SARAH AUGUSTINE - 10/06/2022

Page 126

1    on Zoom, the vote?

2    A. It was on Zoom, to the best of my recollection.  I was

3       sitting in the hallway of the hotel with my laptop.  So

4       I honestly don't know where the rest of the

5       commissioners were.  I was in the hall.

6    Q. Do you know if -- strike that.  Sorry.

7          Do you recall what you told the commissioners you

8       were going to be voting on -- or they were going to be

9       voting on?

10                 MR. MILLSTEIN:  Objection to form.

11                 THE WITNESS:  I don't understand the question.

12   BY MR. THRIFT-VIVEROS:

13   Q. When you -- did you -- did you tell the commissioners,

14      Now we are going to vote?

15                 MR. MILLSTEIN:  Objection to form.

16                 THE WITNESS:  The agenda for the meeting was a

17      public document a full month before.  And in that

18      agenda, there was a call for a vote.  So at some point,

19      I believe, in the public meeting, I said -- I called

20      for a vote, yes.

21   BY MR. THRIFT-VIVEROS:

22   Q. And why did you call for a vote at specifically the

23      time you called for the vote?

24   A. Because the commissioners indicated to me that they had

25      finished their negotiations and they were ready to

SARAH AUGUSTINE - 10/06/2022

Page 127

1    vote.

2    Q. Did the commissioners present maps to vote on?

3    A. They did not.

4    Q. Was it your understanding that -- or strike that.

5         When you called the final vote, what was your

6    understanding -- what did you understand would be voted

7    on?

8              MR. MILLSTEIN:  Objection to form.

9              THE WITNESS:  I understood that maps were

10   being drawn all the way along the negotiation process.

11   Certainly staff were communicating with each other and

12   mapping side by side.  While I was not privy to it, I

13   assumed that was going on for the months leading up to

14   this final weekend.  But in my view, for at least two

15   days, the staff were mapping side by side.

16        So I assumed that there was an impasse about the

17   final two districts in the congressional district map.

18   I understood that the -- I'm sorry, that the

19   congressional district maps -- excuse me.

20        I understood that the congressional district maps

21   were completed and that the legislative district maps

22   were nearly completed, with the exception of the final

23   two districts.  So what I imagined was that the maps

24   were nearly complete and only had to have adjustments

25   made in the two, the two districts that were being

SARAH AUGUSTINE - 10/06/2022

1    negotiated.

2         Understanding that that's still a complex thing,

3    because whatever you decide there is going to impact

4    the populations in all of the surrounding areas and it

5    has a cascading effect.  So I knew that there would

6    have to be some adjustment, but I assumed that these

7    maps were primarily mapped.

8         So as they were voting, I assumed they were voting

9    on maps that had been described, that they had been

10   viewed, that when the republican team and democratic

11   team were meeting, that they were discussing this.

12   Their staff were briefing them, they were sharing it

13   with each other and that they were ready to vote on

14   completed maps.  That's what I understood we were

15   voting on.

16        I also understood that we did not have physical

17   maps that we were sharing with the public.  I

18   understood that.  But I believe they were nearing

19   completion and that they would be -- that we would post

20   them on the website within an hour or two of the final

21   vote.

22    BY MR. THRIFT-VIVEROS:

23   Q. Did anyone tell you that the maps were completed before

24   the final vote?

25   A. No.

SARAH AUGUSTINE - 10/06/2022

Page 129

1   Q. And when did the maps end up getting posted for the
2      public?
3   A. I think the congressional map was posted at 6:00 a.m.
4      And I think the legislative map was posted at 4:00 p.m.
5      on the 16th of November.  Sometime around 6:00 p.m.
6      6:00, 6:15, something like that.
7   Q. So were you surprised that the maps were not in a state
8      to be posted within an hour?
9   A. Yes.
10  Q. Did you convey that feeling to anyone else?
11  A. Yes.  I conveyed frustration throughout the evening
12     that they were not sending my staff, the independent
13     staff, maps.  Because I believed that they were close,
14     and I believed they were ready to send those.
15         And I will also make it clear, I believed that we
16     lost jurisdiction at midnight.  I understood that.  I
17     was aware of it, as were all the commissioners.  The
18     commissioners were all aware that we lost jurisdiction
19     at midnight.
20  Q. So just to understand a little bit about the process
21     that you had already scheduled in advance, was the
22     procedure to be once the maps were agreed on and drawn,
23     it would be sent to the independent staff so the
24     independent staff can post online?  Is that how the
25     process went?

1          MR. MILLSTEIN:  Objection to form.

2          THE WITNESS:  The process was that the

3     independent staff would be mapping together, and they

4     would send that to the independent staff who would post

5     it.

6      BY MR. THRIFT-VIVEROS:

7  Q. Sorry.  The nonindependent staff would be mapping

8     together and then send it to the independent staff to

9     post, okay?

10 A. Yes.

11         So Justin sent that e-mail, that invitation, at

12    7:00 p.m. believing that the congressional staff would

13    then together review the maps that they had mutually

14    drawn and make any adjustments they needed to make

15    before they sent it to Justin.  And that is, in fact,

16    the process that happened, but it happened many hours

17    later.

18 Q. So further down in this memo on Page 7, Bullet Point 2,

19    Ali O'Neil writes, "The Commissioners agreed to send

20    the congressional map file to commission staff."

21         Do you recall that meeting?

22         MR. MILLSTEIN:  Objection to form.

23         THE WITNESS:  I had very little to do with

24    what happened in the congressional map.

25    BY MR. THRIFT-VIVEROS:

SARAH AUGUSTINE - 10/06/2022

Page 131

1  Q. Okay.  Further down on Page 7, Bullet Point, 1, 2, 3,
2     4, 5, 6, 7, Ali O'Neil writes, "I then heard the
3     Commissioners discuss how they would portray what they
4     had done.  They discussed saying that they did not make
5     the deadline and did not adopt final maps, but that
6     they drew maps later that fit the agreement they voted
7     on."
8         Were you part of that conversation?
9  A. Yes.
10 Q. Can you elaborate a little bit more about that
11    conversation of how to portray the events of the night
12    of November 15th?
13 A. Yes.  So at this point, the public meeting had ended.
14    And I conveyed -- this is the first time that we had
15    ever all been in a room together.  And I conveyed to
16    the commissioners what they knew, which is that we had
17    lost our jurisdiction.
18        So at that point, we were discussing how we would
19    proceed in communicating, given that we acknowledged
20    that we had lost our jurisdiction.  So we were
21    discussing how -- what we would convey and how and to
22    whom, acknowledging that there weren't maps presented
23    in the open public meeting.  And the next step was to
24    cede our jurisdiction to the Supreme Court.
25 Q. So further down on the last page, Page 8, Bullet Point

SARAH AUGUSTINE - 10/06/2022

Page 132

1    1, 2, 3 -- Bullet Point 6:  At approximately 8:50 p.m.
2    on Tuesday, November 16th, I saw an e-mail from Lisa
3    McLean transmitting the legislative map and
4    congressional map files to the Washington Supreme
5    Court.
6         Did you -- do you know who made the decision to
7    send the map files to the Washington Supreme Court?
8    A. Yes.
9    Q. Was that you or someone else?
10   A. That was me.
11   Q. Okay.  Did you review the maps before sending them to
12   the Washington Supreme Court?
13   A. No.
14   Q. Did you draft the letter to the Washington Supreme
15   Court that was conveyed with the maps?
16   A. Yes.
17   Q. Okay.  Did you consult with any of the commissioners
18   prior to sending the files to the Washington Supreme
19   Court?
20   A. What I remember was that we discussed the transmission
21   of the maps to the Supreme Court, basically the steps
22   of relinquishing our jurisdiction.  And this was
23   between midnight and 4:00 in the morning, between the
24   14th and 15th.  So midnight the 16th through 4:00 in
25   the morning.

SARAH AUGUSTINE - 10/06/2022

1      There was a discussion and then map -- and then

2   staff were mapping side by side.  So there was this

3   sense of, Well, we didn't do it, but at least we can

4   convey to the Supreme Court we can give them the work

5   that we did.  Because we did actually come to

6   consensus, and we can share with them the work that we

7   completed.

8      At about 4:30 in the morning, I left.  And my

9   understanding was that staff and commissioners were

10   going to sleep and complete their tasks.  I went to the

11   office in Olympia and worked with the independent staff

12   to generate -- you know, to get ready to generate the

13   memo and to receive the maps, that we assumed were

14   coming pretty quickly, so that we could post those to

15   the internet, we could post those to our website, and

16   then convey that full package to the Supreme Court with

17   our best wishes.

18 Q. Were you under the impression that all of the voting

19   commissioners had seen the final maps before they were

20   conveyed to you?

21 A. Can you -- can you restate that, please?

22 Q. I guess who -- who sent you or a member of the

23   independent staff the final legislative district map?

24      MR. MILLSTEIN:  Objection to form.

25      THE WITNESS:  The final legislative district

SARAH AUGUSTINE - 10/06/2022

1   map was reviewed by the legislative districts -- or by

2   the -- by the legislative map team staff, with Justin

3   Bennett just as we planned.  It didn't happen at

4   7:00 p.m. on the 15th.  It happened in the afternoon on

5   the 16th.  But it was exactly the same.

6        Those staff who had created the map were in a

7   meeting with Justin, and I was in the building when

8   that happened.  They were conveying the final map.  And

9   that bipartisan staff team reviewing it to ensure that,

10  yes, this is indeed what we agreed to that we would do.

11  BY MR. THRIFT-VIVEROS:

12  Q. Do you know if Justin Bennett or any of the other

13     members of the legislative district team conveyed those

14     final maps to the other two commissioners before

15     sending them to you as the final maps?

16            MR. MILLSTEIN:  Objection to form.

17            THE WITNESS:  I don't recall.

18  BY MR. THRIFT-VIVEROS:

19  Q. Okay.  And after you drafted the letter that would be

20     conveyed with the maps to the Supreme Court, did anyone

21     else review it before you sent it to the Supreme Court?

22            MR. MILLSTEIN:  Objection to form.

23            THE WITNESS:  So I composed that letter with

24  Lisa McLean.  That was a joint effort.  She certainly

25  reviewed it.  And I remember receiving a text from Joe

SARAH AUGUSTINE - 10/06/2022

Page 135

1    Fain asking to see it.  And I remember sending that to

2    him as an attachment, because he requested it.

3         Please understand that all of the commissioners had

4    agreed what process we were going to follow.  And Joe

5    happened to ask me, Hey, I could I see that letter?

6         And I said sure.  I took a picture of it with my

7    phone and texted it to him.

8    BY MR. THRIFT-VIVEROS:

9    Q. Did he make any changes to the letter or request any

10   changes?

11   A. I -- I don't remember that.

12   Q. Okay.  Did any commissioners after -- strike that.

13        After you posted the maps to the website and

14   conveyed them to the Supreme Court, did any

15   commissioners reach out to you expressing concern that

16   they hadn't seen these final maps before they were

17   conveyed?

18             MR. MILLSTEIN:  Objection to form.

19             THE WITNESS:  Yes.

20   BY MR. THRIFT-VIVEROS:

21   Q. Who reached out to you?

22   A. Brady Walkinshaw.

23   Q. And what did he say?

24   A. He left a voicemail, as I recall, saying that he was

25   disappointed because he had not seen the legislative

SARAH AUGUSTINE - 10/06/2022

Page 136

1    map.

2  Q. Did he express any reason why he felt disappointed

3     other than, I hadn't seen it?

4  A. That's what I remember.

5  Q. Okay.  Did you call him back?

6  A. I had a conversation with Brady on Thursday morning.

7     Wednesday -- Thursday morning, I think.

8  Q. And do you recall what happened in that conversation on

9     Thursday?

10 A. Yes.  Brady apologized to me for being difficult

11    throughout the redistricting process and asked for my

12    forgiveness.  He also told me that he affirmed the maps

13    and he was looking forward to our press unveil, which

14    we had later on Thursday.

15 Q. Sorry.  Can you repeat that last thing you said?  It

16    was breaking up a little bit.

17 A. He was looking forward to our press unveil, which we

18    had later on that Thursday.

19 Q. Okay.  And when he apologized for being difficult

20    throughout the redistricting process, what does that

21    mean to you?

22 A. I hesitate to speculate.

23 Q. Well, do you believe that he was difficult to you

24    throughout the redistricting process?

25 A. I believe that every person, every voting commissioner,

SARAH AUGUSTINE - 10/06/2022

1    had interests that they were bringing to the table.

2    And Brady had interests he was bringing to the table.

3    And I believe he did the best that he could given the

4    interests that he held.

5  Q. Can you elaborate any further on that?

6  A. Any elaboration I would make would be speculation.

7    I -- my experience of Brady was that it was hard to get

8    ahold of him.  He was nonresponsive typically when I

9    reached out to him.  And when I offered resources and

10   opportunity, he declined those things, and at times,

11   let me know that he -- that he didn't value my position

12   or anything that I had to offer.

13 Q. When you mention that he had some interests that he

14   brought to the table, what do you mean by that?

15            MR. MILLSTEIN:  Objection.  Asked and

16   answered.

17            THE WITNESS:  He was appointed to a public

18   office in a very important process and was accountable

19   to those people, perhaps, who appointed him as well as

20   his constituents.  What his specific interests were, I

21   don't know, because he did not share them with me.  But

22   I assume that everybody in the process was coming with

23   many interests.

24   BY MR. THRIFT-VIVEROS:

25 Q. Okay.  The voicemail that Commissioner Walkinshaw left

SARAH AUGUSTINE - 10/06/2022

Page 138

```
 1    you, did he leave that voicemail on your personal phone
 2    or on the commission issued phone?
 3  A. Remember, I used the commission phone to the extent
 4    possible.  And in the early days of the commission,
 5    none of us had commission phones.  So sometimes when we
 6    called each other before we had commission phones, the
 7    number could be captured as that person's phone number.
 8        And I didn't talk to Brady very often throughout
 9    the process, less than any other commissioner.  So it's
10    possible that when he captured those early calls, he --
11    you know, he called me on my personal phone.  It could
12    be.  I don't remember, honestly.  I'm sure those
13    records are available.  All of those records have been
14    provided, I think.
15            MR. THRIFT-VIVEROS:  I have another exhibit.
16    And we are wrapping up, or at least I'm wrapping up my
17    questioning.  Thank you for hanging in there.
18            (Exhibit No. 6 marked
19                for identification.)
20    BY MR. THRIFT-VIVEROS:
21  Q. So these are notes from your journal regarding the
22    redistricting.  Do you recognize these notes?
23  A. I do.
24            MR. THRIFT-VIVEROS:  Okay.  I'd like to get
25    this marked as the next exhibit.
```

1   BY MR. THRIFT-VIVEROS:

2   Q. So on Page 2 -- or, I guess, on the second scanned page

3      here, you wrote, "Sims, agreement on VRA, CVAP hisp R

4      performing."

5           Does CVAP hisp mean Hispanic?

6   A. Hisp certainly means Hispanic.  I don't remember what

7      CVAP means.

8   Q. Okay.  Generally CVAP would mean Citizen Voting Age

9      Population?

10  A. Right.

11  Q. Do you believe that's what it is?

12  A. Yes, that's right.

13  Q. Do you recall what this means, agreement on VRA?

14  A. So to me, that says that they had agreed that it was

15     VRA compliant.

16  Q. They agreed that the map was VRA compliant?

17  A. Or whatever their agreement was.  I don't know that

18     there was the map at this time.  But whatever their

19     agreement was, they had -- you know, there wasn't a

20     dispute over it, is what it looks like to me.

21  Q. And as far as you recall, when you were taking these

22     notes, did each of them express to you that they

23     believed that the agreement they had reached was VRA

24     compliant?

25           MR. MILLSTEIN:  Objection to form.

SARAH AUGUSTINE - 10/06/2022

Page 140

1           THE WITNESS:  Can you ask that question again,

2     please?

3     BY MR. THRIFT-VIVEROS:

4  Q. I'll ask a slightly different question.  Do you

5     remember where in the negotiations you wrote these

6     notes in the timeline?

7  A. Yes.  So this would have been on Saturday -- so the

8     first page there was certainly from Saturday.  So I'm

9     guessing these two pages are from Saturday.  And

10    they're using treasurer data, I see.  That was the data

11    they agreed on.

12 Q. Okay.

13 A. Yeah.

14 Q. And when you wrote down "Agreement on VRA," did

15    Commissioner Sims affirmatively tell you that she

16    believed that the agreement they had reached was

17    compliant with the Voting Rights Act?

18           MR. MILLSTEIN:  Objection to form.

19           THE WITNESS:  Honestly, I don't know.  Now

20    that I'm looking at this, I'm wondering if really what

21    these notes mean is they had agreed on what VRA

22    compliance meant.  That they had agreed that they had

23    some metric and were in agreement on what VRA meant and

24    looked like.

25        I wonder that because there's no district listed

SARAH AUGUSTINE - 10/06/2022

Page 141

1  here.  So they're not talking about a specific
2  district.  So that's why it makes me think that it's
3  really more like a metric, that they had agreed on what
4  this meant.
5      BY MR. THRIFT-VIVEROS:
6  Q. Directly underneath "Agreement on VRA" where it says
7     "CVAP hisp R performing" --
8  A. Right.
9  Q. -- do you believe that would indicate a specific
10    district?
11  A. I mean, that's what it made me think at first, that
12    would be indicating a certain district.  Because, well,
13    that just makes sense.  But I don't think that pertains
14    to the 44th, which is the first district you see listed
15    there.
16      So that's what makes me think that they had
17    agreement on the VRA as the metric.  Because I don't
18    think that was a conversation that was in play
19    regarding the 44th.
20  Q. Could your notes right here about agreement on VRA be
21    referring to the 15th Legislative District?
22  A. I'm sorry; what?
23              MR. MILLSTEIN:  Object to form.
24    BY MR. THRIFT-VIVEROS:
25  Q. The notes that you took here where you wrote,

SARAH AUGUSTINE - 10/06/2022

Page 142

1    "Agreement on VRA, CVAP hisp R performing," when you

2    wrote those notes, could you have been referring to

3    Legislative District 15?

4              MR. MILLSTEIN:  Objection to form.

5              THE WITNESS:  Honestly, I don't remember.  And

6    the fact that there isn't a district listed is the

7    thing that makes me question that they were talking

8    about a specific district.  And it makes me think,

9    Gosh, this really looks like they're talking about,

10   Hey, we already have agreement on this.  We have

11   agreement on what VRA means.

12   BY MR. THRIFT-VIVEROS:

13   Q. Okay.  Do you recall any further conversations about

14      the VRA after you wrote these notes down?

15   A. Yeah, thank you for paging down.  I'm trying to

16      remember.

17          Oh, here's our lunch menu, okay.

18   Q. Oh, you should see my notes.  They're all over the

19      place.

20   A. So you notice they're talking about the 44th, the 38th.

21      And a lot about the 44th, the 28th.  And then you see

22      they're talking boundaries here in the Tulalip area,

23      and that these are kind of -- this where it's got

24      Columns G and S, they're kind of saying this is what

25      we're striving for.

SARAH AUGUSTINE - 10/06/2022

```
 1           Oh, and maybe this is their maps, actually.  Now
 2      that I think about it.
 3           So we're just trying to see the advantage by party
 4      here.  I mean, you see the main districts they're
 5      talking about, 44th, 28th, 38th, 47th.
 6   Q. So going back up to this -- where is that?
 7           Do you know what this right here -- sorry, where it
 8      says "15 Safe R," is that referring to the 15th
 9      Legislative District?
10   A. I think so.  So this looks like -- it looks like it
11      says here, there was an agreement in the 44th that was
12      contingent upon Hobbs being in the 44th.
13           And then what I remember is Paul was saying -- or
14      Sims was saying that this whole hub bub about the 44th
15      was just an excuse to back away from their previous
16      agreement.
17           And so then what data they're using, they're using
18      the data from the treasury race.  And so it looks like
19      they're saying they want -- somebody wants the 23rd to
20      be a safe D, the 15th to be a safe R and 11 -- I'm
21      sorry, 23 safe -- I'm sorry, this is the number of
22      districts, 23 safe dems, 15 safe R and 11 competitive.
23      So maybe this was their original agreement.
24   Q. Okay.  Yeah, that makes sense.
25           And then on the left-hand side of the page, you
```

SARAH AUGUSTINE - 10/06/2022

Page 144

1  wrote 15th here.  I believe that would refer to the

2  15th District; is that right?

3  A. That's what I think too.  That's what it looks like.

4  And there's no comment about that, and then the 5th is

5  a lean R.

6  So maybe somebody said the 15th, and I wrote it

7  down, but then I didn't have any follow-up of what they

8  were wanting to negotiate about that in that

9  negotiation.

10  Q. So it appears that at the time you were taking these

11  notes, you did discuss the 15th District; is that

12  correct?

13  A. Or somebody mentioned it and I was just writing down

14  everything I heard.

15  Q. Okay.  So I'm going to close these notes.

16  So District 15 -- allegedly, District 15 is the

17  district with the highest Latino citizen voting age

18  population.  Do you agree with that?

19  MR. MILLSTEIN:  Objection to form.

20  THE WITNESS:  I don't know.

21  BY MR. THRIFT-VIVEROS:

22  Q. Okay.

23  A. It's certainly -- I don't remember.  It's one of the --

24  one of the districts in the state with the most Latinx

25  residents, but I don't remember that it is the most.  I

SARAH AUGUSTINE - 10/06/2022

Page 145

1    don't remember.

2  Q. Okay.  Do you recall any negotiations around the

3     numbering of districts, particularly District 15?

4            MR. MILLSTEIN:  Objection to form.

5            THE WITNESS:  No.

6  BY MR. THRIFT-VIVEROS:

7  Q. Okay.  I'm going to -- I have one last exhibit.  Let me

8     put this in the chat.

9                 (Exhibit No. 7 marked

10                  for identification.)

11  BY MR. THRIFT-VIVEROS:

12  Q. So here are minutes from November 24th meeting.  Do you

13     remember this meeting?

14  A. I don't off the top of my head.  But once reviewing the

15     minutes, I'm sure it will come to mind.

16  Q. Okay.  I'll scroll down so we can take a look.

17         This was a week or two -- or a little bit less than

18     two weeks after the maps were sent to the Supreme

19     Court.

20         So in Section 2, it says, "Chair SA opened

21     discussion about the redistricting report titled '2021

22     Report to the Legislature.'"

23         Do you know who prepared that report?

24  A. So this is the population and percentage deviation of

25     all the districts from the target number, a map of all

SARAH AUGUSTINE - 10/06/2022

Page 146

1    the districts' demographic information about each

2    district and a report from the executive director.  So

3    this would be the independent staff who created this

4    report.  So this would be Lisa McLean and especially

5    Justin doing the mapping.

6    Q. Okay.  On the first bullet point under heading 2, it

7       says, "BW asked to strike the paragraph regarding the

8       Voting Rights Act at the bottom of page six of the

9       draft stand-alone ED report/page 11 of the full

10      to-be-published report."

11          Do you recall a discussion around that paragraph?

12              MR. MILLSTEIN:  Objection to form.

13              THE WITNESS:  I do not.

14   BY MR. THRIFT-VIVEROS:

15   Q. Okay.  And BW means Brady Walkinshaw; is that right?

16   A. Right.

17   Q. Do you recall what that paragraph regarding the Voting

18      Rights Act said?

19   A. I don't.

20   Q. Do you have a draft of this report prior to that

21      paragraph being stricken?

22              MR. MILLSTEIN:  Objection to form.

23              THE WITNESS:  Probably not, but it probably

24      exists.

25   BY MR. THRIFT-VIVEROS:

SARAH AUGUSTINE - 10/06/2022

Page 147

1   Q. Do you know if anyone else would have a draft of this

2      report with that paragraph regarding the Voting Rights

3      Act?

4               MR. MILLSTEIN:  Objection to form.

5               THE WITNESS:  I think you're asking if anyone

6      else has a copy of that report.  And what I believe is

7      that it would be in our archived e-mail.  Certainly it

8      would be in my archived e-mail.  I no longer have

9      access to that, but all of that e-mail has been

10     archived.  And the draft minutes would have been sent

11     to me for review.  And it probably exists on a server

12     somewhere.

13              MR. THRIFT-VIVEROS:  Okay.  I don't have --

14     well, can we take a five-minute break?  Is that okay?

15              THE WITNESS:  Sure.

16                 (Recess 2:52-2:59.)

17

18           E X A M I N A T I O N  (Continuing)

19     BY MR. THRIFT-VIVEROS:

20     Q. I just have one or two more questions around the notes,

21        just for my own clarification.  So you're not entirely

22        sure when you wrote "Agreement on VRA," what that

23        means; is that correct?

24              MR. MILLSTEIN:  Objection to form.

25              THE WITNESS:  Yes.

SARAH AUGUSTINE - 10/06/2022

Page 148

1      BY MR. THRIFT-VIVEROS:

2   Q. Okay.  And then underneath that, you wrote, "CVAP hisp

3      R performing"; is that correct?

4   A. Yes.

5   Q. Do you believe when you wrote these notes you were

6      referring to a specific district?

7   A. I don't remember.

8   Q. Were there -- from what you remember at this stage in

9      the negotiations, were there any majority CVAP Hispanic

10     districts in the map?

11              MR. MILLSTEIN:  Objection to form.

12              THE WITNESS:  I don't know.

13     BY MR. THRIFT-VIVEROS:

14  Q. Do you know if there were any other -- any -- sorry.

15     Strike that.

16         The line below, you wrote, "Paul/April Agreement in

17     44th."

18         I believe you mentioned earlier that the 44th was

19     one of the districts that was being negotiated until

20     nearly the very end; is that correct?

21  A. Yes.

22  Q. Do you know what that agreement that you wrote in your

23     notes was?

24              MR. MILLSTEIN:  Objection to form.

25              THE WITNESS:  It appears to me that what my

SARAH AUGUSTINE - 10/06/2022

Page 149

1    notes indicate here is that the agreement in the 44th

2    was predicated upon Hobbs remaining in the 44th.

3    BY MR. THRIFT-VIVEROS:

4  Q. Okay.  Because Hobbs was appointed and -- as secretary

5    of state, you testified earlier that that caused an

6    agreement -- a disagreement between the two; is that

7    correct?

8              MR. MILLSTEIN:  Objection to form.

9              THE WITNESS:  It threatened the agreement they

10   had to that point.

11   BY MR. THRIFT-VIVEROS:

12 Q. Specifically for that district; is that correct?

13 A. No, for every district.

14 Q. Okay.  Do you know what each commissioner was seeking

15   for the 44th District?

16 A. No.

17 Q. And then finally, do you know if either commissioner

18   was seeking a CVAP Hispanic majority district?

19             MR. MILLSTEIN:  Objection to form.

20             THE WITNESS:  I don't know.

21             MR. THRIFT-VIVEROS:  Okay.  I don't have any

22   more questions.  Thank you for your time and for

23   bearing with me.

24       And I think I hit the two-hour mark that I

25   expected, so we have time for other questions.

SARAH AUGUSTINE - 10/06/2022

```
                                                   Page 150
 1              THE WITNESS:  Thank you.  It was a pleasure to
 2       get to talk with you.
 3              MR. THRIFT-VIVEROS:  Thank you.  Likewise.
 4              MR. HUGHES:  Good afternoon, Sarah.
 5          Deylin, could you stop sharing your screen?
 6              MR. THRIFT-VIVEROS:  Yeah, sorry.
 7              MR. HUGHES:  Of course.
 8
 9              E X A M I N A T I O N
10       BY MR. HUGHES:
11    Q. Sarah, I'm Andrew Hughes.  I'm an assistant attorney
12       general with the State of Washington.  I represent the
13       state in this case.  Just a few hopefully quick
14       questions.
15          First, were you involved in the decision-making
16       process for the maps that were ultimately adopted?
17    A. No.
18    Q. You were asked some questions previously by
19       Mr. Thrift-Viveros about the commissioners' priorities.
20       Do you remember that?
21    A. Yes.
22    Q. Was it your impression that any commissioner did not
23       prioritize compliance with the Voting Rights Act or did
24       not otherwise think complying with the VRA was an
25       important consideration?
```

SARAH AUGUSTINE - 10/06/2022

```
 1              MR. MILLSTEIN:  Object to form.
 2              THE WITNESS:  No.
 3        BY MR. HUGHES:
 4   Q. So in other words, is it fair to say that your
 5      impression was that all the commissioners wanted to
 6      comply with all applicable laws, including the VRA?
 7   A. Yes.
 8   Q. Okay.  Was keeping the Yakama Nation together an
 9      important consideration in drafting maps in the Yakima
10      Valley?
11   A. I cannot say what the priorities were of the
12      commissioners as they were negotiating the 14th and the
13      15th Districts.  What I can say is that we engaged --
14      the commission engaged in tribal consultation with
15      eight American Indian tribes in the state of
16      Washington, and that tribal consultation was taken very
17      seriously because it was a nation-to-nation
18      consultation in compliance with the law.
19           And because of the law in Washington State, tribal
20      governments have the right and the consideration to be
21      consulted whenever decisions are being made that
22      directly relate to their lands.  And so that tribal
23      consultation was taken very seriously.
24   Q. And you attended a tribal consultation with the Yakama
25      Nation, correct?
```

SARAH AUGUSTINE - 10/06/2022

Page 152

1  A. I did.

2  Q. And did the Yakama Nation, do you recall, express the

3     belief that they wanted the Yakama Nation to be

4     preserved in one -- strike that.

5        Did the Yakama Nation express the belief that they

6     wanted their nation to be joined in one legislative

7     district?

8  A. Yes.

9  Q. Previously it had been split, correct?

10 A. Yes.

11 Q. And the Yakama Nation goes beyond the borders of the

12    Yakama Reservation, correct?

13 A. That's correct.

14 Q. What does it include beyond the borders of the

15    reservation?

16 A. I don't have my notes directly in front of me, but they

17    have some territory along the Columbia River and asked

18    expressly for that territory to be included.

19 Q. Would that territory be referred to as -- let me start

20    over again.

21       Would that territory be referred to as ceded land?

22 A. I apologize.  I don't remember the details of the

23    specific communities they were talking about along the

24    Columbia, but they didn't designate those lands.  It is

25    possible, in consultation, they referred to ceded

SARAH AUGUSTINE - 10/06/2022

Page 153

1      territories, because there are many members of the

2      Yakama Nation that live in ceded territories.

3          However, what I remember they expressly wanted was

4      lands that are considered to be collectively owned

5      territory along the Columbia that are not contiguous

6      with the reservation.

7   Q. Understood.  And that's part of the Yakama Nation?

8   A. Yes.

9   Q. And just so we're all situated, that's along the

10      Columbia River in Klickitat County, correct?

11  A. That's right.

12  Q. As you can see, I'm trying to draw a map with my hands

13      in mid air.

14          Does the LD14 that the commission created and

15      approved keep the Yakama Nation together in a single

16      district?

17  A. Yes.

18  Q. And that includes the territory along the Columbia

19      River?

20  A. That's correct.

21  Q. Okay.  I'm going to share my screen with you.  And I'm

22      going to show you a document that I'm going to find any

23      minute now.

24          Right here.  Can you see my screen?

25  A. Yes.

SARAH AUGUSTINE - 10/06/2022

Page 154

1    Q. Are you looking at what looks like a court pleading in
2       this case?
3    A. Yes.
4    Q. Perfect.
5           And as you can see here, this is Document 54-1 in
6       the case of Soto Palmer versus Hobbs, et al.?
7    A. Yes.
8    Q. And can you tell me the title of this document?
9    A. Exhibit 1:  Plaintiffs' Proposed Plan.
10   Q. And I'm going to scroll down and show you the document.
11      There's a bigger version, and here is a part that is
12      zoomed in on Plaintiffs' District 14.
13          Do you see that?
14   A. Yes.
15   Q. Does this District 14 appear to keep together the
16      Yakama Nation in a single district?
17   A. No.
18   Q. Why not?
19   A. I don't see the cities on this map, but I believe it
20      takes Toppenish and Wapato out of -- out of those two
21      towns that are on the Yakama Reservation and places
22      them separate from the reservation.
23   Q. Does this map -- let me show you the larger version.
24   A. Okay.
25   Q. I'll zoom in a bit.

SARAH AUGUSTINE - 10/06/2022

Page 155

1           Does this Plaintiffs' Proposed Plan extend down to

2       the Columbia River?

3   A. No.

4   Q. So it does not include those fishing villages you

5       mentioned earlier along the Columbia River that are

6       part of the Yakama Nation?

7   A. That's right.

8   Q. Okay.  I'm going to show you another document.  Do you

9       see what -- it should say "Expert Report of Dr. Loren

10      Collingwood."

11          Do you see that?

12  A. Yes.

13  Q. And this is dated, in European fashion, August 3rd,

14      2022.  Do you see that?

15  A. Yes.

16  Q. And I'm going to scroll down to Page 22 of this.  And

17      you see here is a Figure 8.  Can you read me the title

18      of Figure 8?

19  A. "Washington House Legislative District 14, Plaintiffs'

20      Demonstrative 1."

21  Q. And if you look in the -- what I'll call -- well, if

22      you look at the southwest corner of this image, does

23      this appear to include the entirety of the Yakama

24      Nation in one district?

25          I know it's hard without very much geographic

SARAH AUGUSTINE – 10/06/2022

1    identification, no cities or anything.

2    A. I'm sorry; I can't tell.

3    Q. Fair.

4         Okay.  Let me move on to the next one.

5              MR. THRIFT-VIVEROS:  Sorry to interrupt.  Can

6    you share this in the chat, please?

7              MR. HUGHES:  I suppose I could.  I'm not

8    intending to list this as an exhibit, but I can share

9    it for your benefit.

10             MR. THRIFT-VIVEROS:  Thank you.

11             MR. HUGHES:  This is already in the record, so

12   give me just a moment.

13        I've navigated away from it for a moment.  Can we

14   briefly go off the record?

15                  (Discussion off the record.)

16   BY MR. HUGHES:

17   Q. All right.  I'm going to reshare my screen.

18        Sarah, are you looking what should say Figure 9

19   right now?

20   A. Not yet.

21        Oh, there, yes.

22   Q. And can you read me the title of Figure 9?

23   A. "Washington House Legislative District 14, Plaintiffs'

24   Demonstrative 2.

25   Q. And does this district extend down to the Columbia

SARAH AUGUSTINE - 10/06/2022

Page 157

1    River?

2    A. No.

3    Q. Does this district contain the entire Yakama Nation

4       together, as the nation requested?

5    A. No.

6    Q. Okay.  Moving down to Figure 10, can you read me the

7       title of this figure?

8    A. "Washington House Legislative District 14, Plaintiffs'

9       Demonstrative 3."

10   Q. And does this district contain the entire Yakama Nation

11      in it?

12   A. No.

13   Q. Okay.  I'm going to do something I shouldn't and try

14      again with No. 1.

15          Okay.  Back to Figure 8, Washington House

16      Legislative District 14, Plaintiffs' Demonstrative 1.

17      Having seen the last two demonstratives, do you know

18      whether this -- can you tell whether this district

19      includes the entire Yakama Nation?

20   A. It does not.

21   Q. Okay.  I'm going to show you now what is -- well, do

22      you recognize this document?

23   A. Yes.

24   Q. Correct me if I'm wrong, this is the revised

25      legislative district map from Commissioner April Sims

SARAH AUGUSTINE - 10/06/2022

Page 158

1      from October 25th, 2021; is that right?

2    A. I can't recall it on site, but I take your word for it.

3    Q. Okay.  Well, do you see that title right here at the

4      bottom?

5    A. Oh, I don't, but let's see.

6    Q. Let me try again.

7    A. That's okay.

8    Q. Now do you see it?

9    A. No.  Now it's just a blank map.

10         Yes, now I see it.  Yes.

11   Q. Okay.  So just to be sure the record is clear, it

12     appears that this is Commissioner April Sims' revised

13     legislative district map from October 25th, 2021; is

14     that correct?

15   A. Yes.

16   Q. Okay.  Looking at exhibit -- sorry, looking at District

17     14, does it extend down to the Columbia River?

18   A. No.

19   Q. Does it contain the entire Yakama Nation, a single

20     district?

21   A. No.

22   Q. And finally, do you recognize -- let me zoom in.  Do

23     you recognize this document?

24   A. Yes.

25   Q. What is this document?

SARAH AUGUSTINE - 10/06/2022

1  A. Oh, so this is Commissioner Brady Walkinshaw, revised

2     legislative district, also October 25th, 2021.

3  Q. And does this district contain the entire -- sorry.

4     Does this version of Legislative District 14 contain

5     the entire Yakama Nation in a single district?

6  A. No.

7  Q. Why not?

8  A. It does not extend down to the Columbia either.

9  Q. Sarah, do you think it's possible to create a

10    district -- strike that.

11             MR. HUGHES:  No further questions.  Thank you.

12             MR. BOWEN:  Can we go off the record really

13    quick?

14             (Discussion off the record.)

15

16             E X A M I N A T I O N

17    BY MR. BOWEN:

18 Q. Sarah, I appreciate you bearing with us here on this

19    long day.

20        You mentioned earlier that you reviewed the

21    complaint when it was initially filed in this case,

22    correct?

23 A. I did.

24 Q. Okay.  Were you surprised to see that a lawsuit had

25    been filed on the legislative district map?

SARAH AUGUSTINE - 10/06/2022

1   A. No.

2   Q. Why not?

3   A. Because the maps had been contested in a variety --

4      within a variety of different tools.

5   Q. What were some of those tools?

6   A. The OPMA lawsuit was based on the assumption that a

7      secret meeting had been held out of the public eye and

8      relief would be -- the relief that was requested was to

9      expunge the maps or to get rid of the maps.

10         And from my point of view, the basis of that

11     lawsuit was kind of silly.  Because if there had been

12     attempt to hold meetings in private, it would have been

13     seamless and no one would have been the wiser.  There

14     was chaos because we were doing all of that work in

15     public and in the public eye.

16         And we had a huge audience because we had engaged

17     so many members of the public.  More than a million

18     communications.  And so the idea that we were somehow

19     doing some kind of behind closed doors, secret

20     negotiating was a little bit silly, because if we

21     had -- if that had been my intention as chair, or even

22     the commissioners, we would have done the whole thing

23     in quite a different way.

24         We would have had much fewer public meetings.  We

25     would have had fewer opportunities to engage.  We would

SARAH AUGUSTINE - 10/06/2022

1    not have had simultaneous translation and multiple

2    languages in every single meeting.  We would not have

3    gone to the lengths to engage as many people as we did.

4         And, therefore, there were a lot of eyes on us.

5    And when the OPMA lawsuit was called, from my point of

6    view, whether I think it's silly or not, that's the

7    process.  People have a chance to be heard.  And so

8    that -- that lawsuit was -- was brought.  The idea that

9    relief would be to do away with the maps seemed a

10   little like a pretty severe form of relief.

11   Q. So to your knowledge, there was no such secret meeting,

12      as you said?

13   A. No.  No.  There was no secret meeting.

14         And I recognize that that lawsuit was settled.  But

15      from my point of view, everything that the commission

16      had done was done in the big, grand wide open, warts

17      and all.  And, you know, otherwise there wouldn't have

18      been embarrassing things that happened if we hadn't

19      tried to do it all in the open.

20         So it was clear that there were attempts to prevent

21      a negotiated political compromise from being the last

22      result.

23   Q. On that note, you've talked a lot about Commissioner

24      Sims and Graves and negotiations happening in the last

25      three days leading up to finalizing the map today; is

SARAH AUGUSTINE - 10/06/2022

1   that correct?

2   A. Yes.

3   Q. Is it fair to say that in that time, those final three

4   days, they took the partisan nature of the elections

5   into account more than, say, race or ethnicity?

6           MR. MILLSTEIN:  Objection to form.

7           THE WITNESS:  In the districts that I was --

8   where I was privy to the negotiation in those last

9   three days, partisan voting records were the primary

10   metrics they were looking at and negotiating about.

11   BY MR. BOWEN:

12   Q. Okay.  To your knowledge of the commission as a whole,

13   would you say that considerations of partisan voting

14   predominated more so than considerations of race or

15   ethnicity in drawing the lines?

16           MR. MILLSTEIN:  Objection to form.

17           MR. HUGHES:  Lack of foundation.

18           THE WITNESS:  I don't know.  I was only privy

19   to the negotiation of the last -- in the last three

20   days.

21       And the commissioners were very clear in the

22   statement of their priorities in open public meetings,

23   expressing those to the public and then also publishing

24   those.  So -- and I want to be clear about that.  They

25   expressed what those were.  They created maps based on

SARAH AUGUSTINE - 10/06/2022

Page 163

1    that.  And then there was quite a lot of public

2    interaction with them in response to that.

3         So those -- those priorities were pretty well

4    chewed over.  And that is to say, the commissioners

5    received a lot of comment, not all of it positive, in

6    response to that.  And so it was pretty well -- you

7    know, it was pretty well established, because they had

8    to defend those things.  Two of them revised their

9    priorities based on public input.

10        And I trusted the integrity of what they said, and

11   I believe their behavior bore that out.  They stated

12   what their priorities were.  And so far as I saw, I

13   didn't see any divergence from those priorities that

14   they stated.

15   BY MR. BOWEN:

16   Q. Okay.  Let's shift gears a little bit more to the data

17      that was being used by the commission.  You mentioned

18      earlier that the census data came in later than

19      expected; is that right?

20   A. Yes.

21   Q. But the commission did use census data in generating

22      the maps, correct?

23   A. That's right.

24   Q. Okay.  Are you aware of how the U.S. Census Bureau

25      defines Hispanic?

SARAH AUGUSTINE - 10/06/2022

Page 164

1   A. Not today.  I probably would have known that a year

2      ago, but today I don't -- I don't remember.

3   Q. I guess to the best of your recollection, do you recall

4      if the Bureau defined Hispanic as a race or ethnicity?

5   A. Ethnicity, to the best of my recollection.

6   Q. Okay.  So a voter could be, say, white Hispanic?

7   A. Yes.

8   Q. A voter could also be Native American Hispanic?

9   A. That's right.

10  Q. Or sorry to be redundant here, but also black Hispanic?

11  A. Yes.

12  Q. Or Asian Hispanic?

13  A. Yes.

14  Q. To the best of your knowledge, do Hispanics tend to

15     vote more for democrats or republicans in the state of

16     Washington?

17  A. I don't know.

18  Q. Okay.  Would you -- strike that.

19        To the best of your knowledge, do Hispanics tend to

20     vote more for republicans or democrats in Yakima Valley

21     specifically?

22  A. I remember looking at the data.  And I remember

23     Hispanics in the Yakima Valley voting more often for

24     democrats.  And I'm also aware that there are

25     republican Hispanic politicians in the Yakima Valley

SARAH AUGUSTINE - 10/06/2022

1    that are successful.  So, yeah, I guess that's -- I'll

2    leave it there.

3 Q. I'm going to change gears again here, switching over to

4    a little bit more of the legal requirements.  You said

5    earlier that you had familiarized yourself with some of

6    the law and you were trying -- strike that.

7        Earlier you mentioned familiarizing yourself with

8    the law so that you could do your best to make sure the

9    commission complied with the law; is that correct?

10 A. Yes.

11 Q. Okay.  And that included things like the Voting Rights

12    Act, the 14th Amendment and Washington State law,

13    correct?

14 A. Yes.

15 Q. To your knowledge, does the Washington Constitution

16    require any sort of partisan competitiveness when

17    drawing districts?

18        MR. MILLSTEIN:  Objection.  Calls for a legal

19    conclusion.

20        THE WITNESS:  The statute that establishes the

21    process of redistricting does mention competitiveness,

22    to the best of my recollection.

23    BY MR. BOWEN:

24 Q. When you were reminding -- strike that.

25        You said earlier that during the redistricting

SARAH AUGUSTINE - 10/06/2022

1    process, you would remind the commissioners of their

2    duty to follow the law, correct?

3  A. Yes.

4  Q. To your recollection, do you ever remember specifically

5    reminding them of their duty to follow the provision we

6    discussed earlier about partisanship?

7  A. So in all of the open public meetings, and they were

8    numerous, we reiterated the specifics of that statute

9    again and again and again.  At every single one.

10   That's what I remember.  And there was a summary.  And

11   the commissioners were present for that.  It was

12   important to me and as the facilitator for the

13   meetings, I had the opportunity to remind everyone what

14   we were doing and why.

15 Q. As someone who said the law was important to you and

16   that was reminding the commission to follow it, what

17   did that provision mean to you?

18          MR. MILLSTEIN:  Object to form.

19          THE WITNESS:  I can speak to what it means to

20   me, and I can't speak for what it means to the voting

21   commissioners or -- yeah, I could just speak for

22   myself.

23       That provision, to me, meant that maps should not

24   be drawn exclusively by one party or another with their

25   own interest being prioritized above everything else.

SARAH AUGUSTINE - 10/06/2022

Page 167

1    But that in order to represent all the residents of

2    Washington, that there would have to be a compromise so

3    that the -- no one party would be empowered to be the

4    decision-maker for everyone.

5        BY MR. BOWEN:

6    Q. Okay.  Thank you.

7            I'm going to change gears again here and talk a

8    little bit about your working relationship with

9    Commissioner Walkinshaw.  You mentioned earlier that he

10   had apologized for you, I think how you phrased it, for

11   being difficult throughout the process and asked for

12   your forgiveness; is that right?

13   A. Yes.

14   Q. Did you feel that apology was warranted?

15   A. Yes.

16   Q. Why is that?

17   A. Commissioner Walkinshaw was, from my point of view, not

18   always collaborative in terms of working through the

19   process.  Commissioner Walkinshaw came to the meetings

20   and voiced his opinion and he voted.  Those were his

21   responsibilities.

22           He was not willing to participate in commission

23   activities outside of those scheduled or designated

24   meetings.  And this is what I mean by that,

25   collaborating with me, with the independent staff.  And

SARAH AUGUSTINE - 10/06/2022

1      I guess those are the things I could know and comment

2      about.  And that was, at times, stressful.

3          It was also infusing to see comments in the press

4      that were not shared ahead of time.  That's not an

5      obligation, but it is a good thing to do if you want to

6      collaborate with your team.  And sometimes, in ways,

7      that seemed to try to impede the process.

8  Q. So is it your belief that Commissioner Walkinshaw made

9      the process of collaboration more difficult?

10 A. I -- I can't speak to the commission.  I don't know

11     that.  I can say that I appreciated it when the other

12     commissioners received my calls and would talk through

13     the business of the commission.  That was really

14     helpful.

15 Q. Did any of the staff, either partisan or independent,

16     have difficulty working with Commissioner Walkinshaw?

17          MR. MILLSTEIN:  Objection to form.

18          THE WITNESS:  I don't remember that

19     specifically.

20   BY MR. BOWEN:

21 Q. Was he always -- strike that.

22          As far as you remember, was Commissioner Walkinshaw

23     always respectful towards you?

24 A. I don't recall Commissioner Walkinshaw ever being

25     verbally abusive, and I would not ever say that.  And I

SARAH AUGUSTINE - 10/06/2022

Page 169

1    think it's respectful, if you call someone, to call

2    them back.  I think that's respectful.  So in that way,

3    I would have appreciated that respect.

4         And as I said before, I can't -- I don't want to

5    guess at intent.  And all of the commissioners were

6    under a great deal of pressure managing full-time jobs

7    and trying to do this work well.  And, you know, on

8    balance, if you're trying to prioritize how you're

9    going to use your time, I can understand, you know, not

10   being able to get to everything.

11   Q. You mentioned earlier that Commissioner Walkinshaw, I

12   believe the phrase you said was, did not value your

13   position or what you had to offer; is that right?

14   A. Yes.

15   Q. What did you mean by that?

16   A. My ambition in the commission was to provide the best

17   possible information to the commissioners, to engage

18   the public to the highest degree possible, to

19   demonstrate the effectiveness of democratic

20   institutions through engagement and to negotiate in a

21   very difficult time period in a succinct and organized

22   way.  And I did not experience any interest in those

23   things that I had to offer.

24   Q. Okay.  Thank you for sharing.

25        I'm going to change gears one last time here, and

SARAH AUGUSTINE - 10/06/2022

Page 170

1    I'm actually going to attempt to share with counsel

2    what I would like to mark as Intervenor-Defendants

3    Exhibit 1.  Forgive me while I work through this.

4                    (Intervenor-Defendants Exhibit No. 1

5                    marked for identification.)

6     BY MR. BOWEN:

7    Q. I am going to attempt to screen share here.  And as my

8       co-counsel said earlier, I'm not as adept as I should

9       be at this here.  So I appreciate your forbearance

10      here.

11         Can you see the PDF document that is titled at the

12      top "Why I Resigned As Chair of the Redistricting

13      Commission"?

14   A. Yes.

15   Q. Okay.  And this is a PDF version of the online article

16      from the Seattle Times.  Can you verify that?

17   A. Yes.

18   Q. This looks like an article that you wrote then in March

19      of 2022; is that correct?

20   A. Yes.

21   Q. Okay.  And I'm going to scroll down this and just read

22      through a couple of quotes together.  I'll try to

23      highlight this.  So the highlighted quote here, and

24      correct me if I'm wrong, you were speaking about the

25      affect of the State's refusing initially to defend the

SARAH AUGUSTINE - 10/06/2022

1     proposed map.

2         And you said, and I'm quoting, "Worse, it

3     undermines the values that drive the redistricting

4     process in Washington State:  Independence from

5     political influence, collaboration and bipartisan

6     compromise."

7         Is that quote correct?

8   A. Yes.

9   Q. Do you believe that the commission engaged in that

10    bipartisan compromise?

11  A. I do.

12  Q. The maps that were drawn, in your opinion, then were a

13    result of partisan compromise; is that correct?

14  A. Yeah, it was a result of bipartisan compromise.

15  Q. And the maps then, in your opinion, that were drawn

16    were not a result of racial discrimination?

17  A. I want to be very careful not to interpret the maps,

18    because I didn't draw the maps, and I'm also not an

19    attorney with expertise on this matter.  But I can say

20    that I believe with confidence that there was no intent

21    to create racial discrimination among the

22    commissioners, that all four of them acted with a high

23    degree of integrity in terms of remaining true to the

24    interests that they voiced in their priorities for

25    their position as commissioners.

SARAH AUGUSTINE - 10/06/2022

Page 172

1  Q. I'm going to scroll down and read another section here
2     on what is the third of four pages.  I'm going to
3     highlight the end of the second paragraph into the
4     third paragraph.
5        You wrote, "For a redistricting plan to become the
6     law, it must be affirmed by at least three voting
7     commissioners, requiring bipartisan agreement.  This
8     intentionally bipartisan process is meant to ensure a
9     spirit of collaboration over bipartisanship, and
10    compromise over 'winner takes all.'  It is Washington
11    State's attempt to avoid gerrymandering, which occurs
12    in states where the legislature draws the maps and the
13    party that holds the majority in the legislature can
14    draw boundaries to its political advantage."
15       Is that a correct quote?
16 A. Yes.
17 Q. Is it your opinion that the proposed map here avoided
18    partisan gerrymandering?
19 A. Yes.
20 Q. Is it your opinion here that the proposed map avoided
21    racial gerrymandering?
22 A. Yes.
23 Q. I'm going to scroll down further still.  This will be
24    at the bottom of Page 3, top of Page 4, the highlighted
25    section.

SARAH AUGUSTINE - 10/06/2022

Page 173

1        "It has been suggested that the argument over the
2    15th and 14th Districts is a justice issue for
3    vulnerable communities of color; a coalition of Latino
4    voters believes the current district boundaries will
5    not allow Latino voters the chance to elect candidates
6    of their choice.  However, their suit directly demands
7    splitting the Yakama Reservation by bringing towns on
8    the Yakama Reservation into the 15th District, in
9    direct opposition to the interests of the Yakama Nation
10    reflected in the current plan.  In
11    government-to-government consultation, the Yakama
12    Nation required that Yakima territories be contained in
13    one district.  By refusing to defend the law, aren't
14    Washington leaders hanging out to dry communities of
15    color, like the Yakama Nation, whose interests are
16    expressed in the final map?"
17        Is that a correct quote?
18  A. Yes.
19  Q. Is it your opinion that the proposed map reflects the
20    interests of communities of color like the Yakama
21    Nation?
22  A. Yes.
23  Q. It sounds like then, reading this opinion you wrote,
24    that you view the dispute as one between different
25    communities of color, that is the Yakama Nation and the

SARAH AUGUSTINE - 10/06/2022

Page 174

1    coalition of Latino voters challenging the map.

2         Is that a fair characterization?

3              MR. HUGHES:  Object to form.

4              THE WITNESS:  Can you repeat the question,

5    please?

6      BY MR. BOWEN:

7    Q. Yeah, let me rephrase.

8         You said in here that the map was challenged by a

9    coalition of Latino voters; is that correct?

10   A. Yes.

11   Q. And those Latino voters would be a community of color;

12   is that correct?

13   A. Yes.

14   Q. And you said that the map which has the Yakama Nation

15   as one district represents the interests of that

16   community of color; is that correct?

17   A. Yes.

18   Q. So is it fair to say then that there's a tension

19   between dividing that district or keeping it whole --

20   strike that.

21        Is it fair to say then that there may be competing

22   interests between two communities of color on how these

23   districts are drawn?

24              MR. HUGHES:  Object to form.

25              MR. MILLSTEIN:  Object to form.

SARAH AUGUSTINE - 10/06/2022

Page 175

1          THE WITNESS:  The intention of my op ed was to
2   challenge the leaders of our state to keep their
3   commitments, that is to defend maps that were affirmed
4   by the legislature according to Washington State law.
5          In my op ed, I was pointing out that by hanging it
6   on a racial justice issue, that was -- that is an
7   unfair characterization of a very complex process.
8   Trying to boil it down to a justice issue for one
9   community is an unfair characterization.
10          So I want to be clear, the Latino coalition
11   bringing suit has the right to do that under the law.
12   I don't dispute that or fault that coalition.  That is
13   our process.  If the outcome doesn't work for them,
14   they have the right to bring suit.
15          What I was writing about here was that regardless
16   of who challenges the law, it's the obligation of the
17   leaders to defend the law out of respect for all the
18   people who participated in the process.  So I want to
19   be really clear that I would like to not characterize
20   this dispute, from my point of view, as simply a
21   tension between two communities of color, because I
22   think that's an unfair characterization.
23          I would characterize this as a powerful political
24   party working towards its best advantage and calling
25   that a racial tension.  And that is why I wrote this op

SARAH AUGUSTINE - 10/06/2022

1    ed.

2       BY MR. BOWEN:

3    Q. Thank you for sharing.

4          Last question for me:  Are you proud of the maps

5       that were passed as a result of the commission's work?

6    A. Yes, absolutely proud.

7              MR. BOWEN:  Okay.  Thank you and thank you for

8       your service.  That's all the questions I have.

9              THE WITNESS:  Thank you.

10             MR. THRIFT-VIVEROS:  I have just a few

11      questions on redirect on topics that were raised since

12      my line of questioning.

13

14          F U R T H E R   E X A M I N A T I O N

15      BY MR. THRIFT-VIVEROS:

16   Q. Sorry, just a few more.

17   A. That's okay.

18   Q. But, yeah, thank you so much for sticking with us.

19          Are you aware that the Yakama Nation includes a

20      tribal or tribal trust lands in Skamania County?

21             MR. MILLSTEIN:  Objection to form.

22             THE WITNESS:  I would have to look at a map,

23      and I would be happy to do that.

24      BY MR. THRIFT-VIVEROS:

25   Q. Okay.  Do you know the location of the tribal and

SARAH AUGUSTINE - 10/06/2022

Page 177

1    tribal trust lands of the Yakama Nation?

2  A. I am not an expert on that, and I would want to refer

3     to the map that was provided to me by the Yakama

4     Nation.

5  Q. Okay.  I'm going to share screen on the enacted maps.

6         So this is the Washington State Redistricting

7     Commission website.  And I'm going to open up the

8     Washington State legislative district map.  And I'm

9     going to zoom in.

10        Do you recognize this as the final and acting map?

11 A. I do.

12 Q. Okay.  And would you agree that District 14 includes

13    some of the land -- some Yakima County land; is that

14    correct?

15 A. Did you mean the Yakama Nation land?

16 Q. Yeah.

17 A. Or did you mean Yakima County?

18 Q. Yakima County land.

19 A. Yes.

20 Q. The land in Yakima County, okay.

21 A. Yeah.

22 Q. And would you agree that the District 14 of the enacted

23    plan does not include land in Skamania County?

24 A. Yes.

25 Q. Okay.  Since some Yakama trust lands are in Skamania

SARAH AUGUSTINE - 10/06/2022

Page 178

1    County, is it possible to draw a district with all of

2    the Yakama Nation and trust lands into one district?

3              MR. MILLSTEIN:  Objection.  Lacks foundation.

4              THE WITNESS:  I don't know.

5       BY MR. THRIFT-VIVEROS:

6  Q. I am also going to look at the report that Mr. Hughes

7    presented.  I'll scroll back up to the top.

8          It's the expert report of Dr. Loren Collingwood.

9    And within the report it contains demonstrative map

10   from plaintiffs of a proposed District 14.

11         I'm going to represent that I have in Dave's

12   Redistricting, the same exact map, same exact boundary

13   lines as the map contained in Dr. Loren Collingwood.

14   And we can flip back and forth to look at the shape.

15         The shape is about the same, would you agree?

16             MR. MILLSTEIN:  Objection to form.

17             THE WITNESS:  I'm sorry.  I don't understand

18   your question.

19      BY MR. THRIFT-VIVEROS:

20  Q. So I'm just -- for purposes of being able to identify

21   cities, I have here and I'm demonstrating that this is

22   an exact, same replica of the map contained in Loren

23   Collingwood's report, demonstrative -- plaintiffs'

24   demonstrative map 2 that was shared to you by

25   Mr. Hughes.

SARAH AUGUSTINE - 10/06/2022

Page 179

1   A. Okay.

2   Q. And do the shapes look substantially similar to you?

3   A. I haven't had a chance to study these reports, but they

4      appear to be similar.

5   Q. Just looking at the areas.  Okay.

6           And I'm going to zoom in, and hopefully you can see

7      the city labels contained within District 14.

8           Do you see that Wapato is contained within

9      plaintiffs' demonstrative District 14?

10  A. Yes.

11                MR. MILLSTEIN:  Form.

12      BY MR. THRIFT-VIVEROS:

13  Q. And do you see that Toppenish is located within

14      plaintiffs' demonstrative plan for District 14?

15  A. Yes.

16  Q. Okay.  Did you understand the commission to have a

17      legal obligation to draw a district that contained all

18      of the Yakama Nation and trust lands into the same

19      district?

20                MR. MILLSTEIN:  Objection.  Calls for a legal

21      conclusion.

22                THE WITNESS:  From my point of view, the

23      commission did not have a legal obligation to do more

24      than consult with the Native American tribe that called

25      for tribal consultation.

SARAH AUGUSTINE - 10/06/2022

1    BY MR. THRIFT-VIVEROS:

2    Q. Did any of the commissioners express a priority of

3        keeping all the Yakama Nation and trust lands together?

4                MR. HUGHES:  Sorry.  Object to form.

5                THE WITNESS:  I was not part of the

6        negotiation process of the 14th or the 15th, so...

7    BY MR. THRIFT-VIVEROS:

8    Q. Okay.

9    A. Honestly, I can't speak to that.  I can tell you that

10       at the tribal consultation, April Sims and Paul Graves

11       attended that consultation, and they made a commitment

12       to the Yakama Nation to take very seriously their

13       request.  That's what I heard in the public meeting.

14               MR. THRIFT-VIVEROS:  Okay.  I don't have any

15       more questions.  Thank you.

16               MR. HUGHES:  I just have maybe one or two

17       quick follow-ups.

18

19               F U R T H E R   E X A M I N A T I O N

20           BY MR. HUGHES:

21   Q. Sarah, I just want to be very clear on an exchange that

22       you had with Mr. Bowen towards the end.  You don't

23       believe the interests of Native American Washingtonians

24       and Hispanic Washingtonians are opposed, do you?

25               MR. BOWEN:  Objection.  Form.

SARAH AUGUSTINE - 10/06/2022

Page 181

1            THE WITNESS:  That is a really big question to

2      ask me.

3      BY MR. HUGHES:

4  Q. I can ask a different question or slightly different

5      question if you'd like?

6  A. I can tell you that trying to characterize tension

7      between these two racial groups is interesting.  That

8      is certainly the case.  And, you know, these are large

9      complex diverse communities within Washington State who

10     don't -- they're not monolithic with one set of

11     interests.

12            So, you know -- you know, I feel that it's

13     difficult to characterize whether or not they have --

14     I'm sure there are many interests that are in tension,

15     and I would not say, in general, that their interests

16     are in opposition to each other.

17            MR. HUGHES:  Thank you.  That's all I got.

18            MR. BOWEN:  Nothing further.

19            MR. MILLSTEIN:  I'm not going to be asking any

20     questions.  So it sounds like we are done; is that

21     correct?

22        We can go off the record.

23        (Signature reserved.)

24        (Deposition concluded at 4:00 p.m.)

25

SARAH AUGUSTINE - 10/06/2022

Page 182

1                    REPORTER'S CERTIFICATE

2

3         I, CONNIE A. RECOB, the undersigned Certified Court

4    Reporter, pursuant to RCW 5.28.010 authorized to

5    administer oaths and affirmations in and for the State

6    of Washington, do hereby certify that the sworn

7    testimony and/or proceedings, a transcript of which is

8    attached, was given before me at the time and place

9    stated therein; that any and/or all witness(es) were

10   duly sworn to testify to the truth; that the sworn

11   testimony and/or proceedings were by me

12   stenographically recorded and transcribed under my

13   supervision, to the best of my ability; that the

14   foregoing transcript contains a full, true, and

15   accurate record of all the sworn testimony and/or

16   proceedings given and occurring at the time and place

17   stated in the transcript; that a review of which was

18   requested; that I am in no way related to any party to

19   the matter, nor to any counsel, nor do I have any

20   financial interest in the event of the cause.

21        WITNESS MY HAND and SIGNATURE this 18th day of

22   October, 2022.

23   _____

24        CONNIE A. RECOB, RMR, CRR
          Washington Certified Court Reporter, CCR 2631
25        connie@lakesidereporting.com

SARAH AUGUSTINE – 10/06/2022

Page 183

```
1              DEPOSITION ERRATA SHEET

2    Our Assignment No. 1195

3    Case Caption:  SOTO PALMER vs. HOBBS

4

5         DECLARATION UNDER PENALTY OF PERJURY

6

7             I declare under penalty of perjury

8          that I have read the entire transcript of

9         my Deposition taken in the captioned matter

10             or the same has been read to me, and

11          the same is true and accurate, save and

12          except for changes and/or corrections, if

13          any, as indicated by me on the DEPOSITION

14          ERRATA SHEET hereof, with the understanding

15     that I offer these changes as if still under oath.

16

17   Signed on the _____ day of _____, 2022.

18

19        _____

20                    SARAH AUGUSTINE

21

22

23

24

25
```

SARAH AUGUSTINE – 10/06/2022

Page 184

1        DEPOSITION ERRATA SHEET

2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24      SIGNATURE:_____DATE:_____

25              SARAH AUGUSTINE

**$**

**$15,000** 108:20
  111:9

**1**

**1** 54:2 63:24
  64:1 131:1
  132:1 154:9
  155:20 157:14,
  16 170:3,4
**10** 157:6
**100** 63:3
**101** 63:9
**10:32-10:43**
  52:18
**11** 143:20,22
  146:9
**11:38** 124:17
**11:54-1:01**
  87:12
**11th** 120:14
**12th** 119:4
**14** 154:12,15
  155:19 156:23
  157:8,16 158:17
  159:4 177:12,22
  178:10 179:7,9,
  14
**14th** 79:25 91:3
  93:7 132:24
  151:12 165:12
  173:2 180:6
**15** 97:25 142:3
  143:8,22 144:16
  145:3
**15th** 46:23 91:3
  93:7 101:17
  104:21 105:4,
  18,25 114:17

117:8,9 131:12
132:24 134:4
141:21 143:8,20
144:1,2,6,11
151:13 173:2,8
180:6
**16th** 129:5
  132:2,24 134:5
**1998** 29:11
**1st** 31:17 46:23

**2**

**2** 101:4 112:17
  116:14 121:11
  130:18 131:1
  132:1 139:2
  145:20 146:6
  156:24 178:24
**20** 27:9
**2001** 40:7
**2006** 29:17,18
**2010** 99:22
  100:4
**2019** 101:18
  105:11,12
**2020** 33:6 99:22
**2021** 12:4,7
  14:24 26:15
  32:18 74:1 79:1
  145:21 158:1,13
  159:2
**2022** 5:1 10:8
  31:17 43:7
  155:14 170:19
**21st** 12:4,7
  20:25 63:18
  79:1 86:15,18
**22** 155:16
**23** 143:21,22
**23rd** 143:19

**24th** 145:12
**25th** 158:1,13
  159:2
**28th** 85:6 86:14,
  17,19 90:22
  93:3 102:22
  121:23 142:21
  143:5
**2:52-2:59**
  147:16

**3**

**3** 112:20,21
  118:11 131:1
  132:1 157:9
  172:24
**30** 27:9
**3500** 5:24
**38th** 142:20
  143:5
**3rd** 155:13

**4**

**4** 122:18 123:18
  131:2 172:24
**44th** 85:6 86:14,
  17,19 90:21
  91:6 93:2
  102:21 103:5,
  15,17,19,22
  121:23 141:14,
  19 142:20,21
  143:5,11,12,14
  148:17,18
  149:1,2,15
**45** 52:14
**47th** 143:5
**49.2** 101:18
**4:00** 129:4
  132:23,24

181:24
**4:30** 133:8

**5**

**5** 124:14 131:2
**50** 34:7 63:3
  101:21
**54-1** 154:5
**5th** 144:4

**6**

**6** 5:1 131:2
  132:1 138:18
**6:00** 129:3,5,6
**6:15** 129:6

**7**

**7** 118:13 119:2
  120:7,20 130:18
  131:1,2 145:9
**70** 36:3
**70-some** 54:17
**76,000** 53:23
**7:00** 118:24
  130:12 134:4

**8**

**8** 131:25 155:17,
  18 157:15
**8:09** 123:8
**8:45** 123:19
**8:50** 132:1

**9**

**9** 156:18,22
**98952** 5:25

**9:00** 5:2

**A**

**a.m.** 5:2 129:3
**ability** 41:16
  93:14 96:13
**absolutely** 94:22
  114:21 176:6
**abusive** 168:25
**accept** 23:25
**acceptable**
  52:14
**access** 36:19
  41:23 51:3
  73:12 107:17
  108:3,6,25
  110:14 111:7
  147:9
**accompanied**
  62:6
**account** 162:5
**accountable**
  23:20 38:16
  137:18
**accrued** 40:13
**accurate** 48:13
  113:17
**achieve** 55:24,25
**acknowledged**
  131:19
**acknowledging**
  131:22
**ACS** 99:17
  101:18
**act** 12:11,12,15
  19:16 24:24
  33:7,9 37:1,9
  63:18 65:20,21
  66:1,3,6 67:1,5,
  8,11,14,22,25

71:11 72:9 79:4,
7,23 80:3,5,8,
10,14,15,17,19
82:9 83:3,22
84:3 87:17 89:1,
5,17,18,22 95:1
98:4 106:20,25
107:5,15,25
116:18 140:17
146:8,18 147:3
150:23 165:12

**acted** 41:7
171:22

**acting** 28:8,10
39:9 119:25
177:10

**action** 23:14

**active** 23:4

**activities** 14:18
15:2,6,20,23
16:12 167:23

**ad** 125:5

**add** 9:6

**additional** 106:7
117:21,23

**address** 5:22,24
13:20,23 14:6,9,
10,11,13,17,18,
20,22 51:13

**adept** 170:8

**adequately**
96:25

**adjust** 97:21

**adjustment**
97:23 128:6

**adjustments**
127:24 130:14

**administrative**
39:8 110:24,25

**administrators**
15:14 66:9

**admirable** 24:2

**adopt** 131:5

**adopted** 150:16

**advance** 129:21

**advantage** 143:3
172:14 175:24

**advice** 67:21
68:20 92:13
106:15 109:21

**advise** 78:22
108:7

**advised** 19:10

**advisement**
81:16

**affect** 8:13
170:25

**affected** 103:9

**affiliation** 85:9,
11,14

**affirmation**
22:19

**affirmatively**
140:15

**affirmed** 23:11
136:12 172:6
175:3

**African** 34:19

**afternoon** 134:4
150:4

**AG** 110:4,6,10

**AG's** 109:6
110:6

**age** 98:5,6,13,14
139:8 144:17

**agencies** 41:1,5

**agency** 39:12,21
66:12,13,15

**agenda** 126:16,
18

**agree** 8:1 53:15
54:4 75:2,6,8,12

114:5 115:8
116:9 119:22,23
144:18 177:12,
22 178:15

**agreed** 46:5
59:19 118:22
123:20 129:22
130:19 134:10
135:4 139:14,16
140:11,21,22
141:3

**agreeing** 54:8

**agreement** 9:24
22:17 49:19
60:4 103:15,17
110:10 112:6
124:3 131:6
139:3,13,17,19,
23 140:14,16,23
141:6,17,20
142:1,10,11
143:11,16,23
147:22 148:16,
22 149:1,6,9
172:7

**agreements**
90:3,15 120:9,
10

**agricultural**
34:17

**ahead** 104:14
168:4

**ahold** 137:8

**air** 103:6 153:13

**Ali** 112:24 113:8
114:9 116:13,16
118:12 119:2
123:18 130:19
131:2

**allegedly** 144:16

**allowed** 42:11

**alternative** 7:22

**ambition** 106:12
169:16

**amendment**
46:22 79:25
165:12

**American** 5:17
151:15 164:8
179:24 180:23

**Americans**
34:19

**amount** 27:13
74:10 88:2

**amounts** 71:5

**analyses** 99:10

**analysis** 59:8,12,
23 83:22 84:2
87:21 97:5
100:21 104:20

**analyze** 82:8
100:15 102:2

**ancient** 44:13

**Andrew** 150:11

**announce** 124:2

**answering** 6:10
70:16

**answers** 8:6
110:3

**Antioch** 29:23,
24 30:14 31:3

**antiquated** 39:4

**anxiety** 91:2

**anytime** 89:15

**apologize** 14:4
152:22

**apologized**
136:10,19
167:10

**apology** 167:14

**apparatus** 43:5,
9

**appears** 144:10
148:25 158:12

**applicable** 151:6

**application**
27:25 28:2

**applied** 31:3

**apply** 27:25
100:17

**appointed** 24:10
27:24 28:18
39:14,16 47:20
55:22 62:18,19
75:17 78:18,19
103:4 104:5
137:17,19 149:4

**appointment**
26:10 27:14
103:9,10 104:4,
14

**appreciated**
168:11 169:3

**approval** 7:23

**approved** 71:2,6
153:15

**approximately**
132:1

**April** 80:23
84:21 88:9
91:25 92:2
101:9,19 102:1,
14,17 104:12,16
121:19 122:5
123:3 124:10
157:25 158:12
180:10

**archived** 19:18,
19,20,25 20:5
98:24,25 147:7,
8,10

**archives** 20:3

**area** 64:17 96:13
142:22

**areas** 60:3,4
  117:3 128:4
  179:5
**arena** 45:6
**arguably** 34:6
**argument** 173:1
**arm** 79:10
**arranged** 30:25
**arrangement**
  111:16
**arrangements**
  11:18
**article** 82:20,22
  83:6 170:15,18
**ASC** 105:12
**Asian** 164:12
**aspects** 111:5
**assessment** 7:22
  79:10
**assigned** 52:23
**assistant** 65:10
  110:6,10 150:11
**association**
  40:13
**associations**
  23:6
**assume** 7:1 55:8
  57:5 72:21 82:5
  110:13 137:22
**assumed** 127:13,
  16 128:6,8
  133:13
**assumption**
  103:14 160:6
**assurance**
  103:21
**attachment**
  135:2
**attempt** 123:6
  160:12 170:1,7
  172:11

**attempting**
  119:11
**attempts** 161:20
**attend** 50:19
  61:24
**attended** 151:24
  180:11
**attending**
  119:10
**attentive** 80:16
**attorney** 5:16
  6:15 12:9 65:10,
  15,22 79:9
  107:4 108:11
  109:1,2,9,10,25
  110:6,14
  111:13,14,17,22
  112:4 150:11
  171:19
**attorney-client**
  109:14
**attorneys** 21:9
  108:3,25 109:5
**audience** 160:16
**August** 155:13
**Augustine** 5:5,
  12,13,24 119:18
  122:6
**authority** 49:7
  67:24 69:16,18,
  20,22
**authorize** 68:5
**Autocad** 44:12,
  16
**avoid** 172:11
**avoided** 172:17,
  20
**aware** 36:25
  37:3,4,8 55:10
  84:4 88:24
  124:20 129:17,

18 163:24
  164:24 176:19

_____

## B

_____

**back** 20:23 24:6
  38:1 41:6 48:2
  57:8 58:17
  61:14 71:9
  121:11,20
  123:17 136:5
  143:6,15 157:15
  169:2 178:7,14
**balance** 169:8
**bands** 34:11,12
**Barreto** 73:5
  76:10,13,16
  77:1 80:12,20,
  25 81:5,6,7
  82:19 107:3
**Barreto's** 74:4
**barrier** 54:15
**barriers** 47:9
**based** 53:18
  54:5 79:25
  105:8 121:24
  123:20 160:6
  162:25 163:9
**basically** 50:14
  132:21
**basis** 101:23
  160:10
**battery** 15:25
**bearing** 149:23
  159:18
**began** 38:5
**beginning** 26:7
  43:4
**behalf** 22:14
  28:12
**behavior** 163:11

**beings** 36:12
**belief** 23:21
  152:3,5 168:8
**believed** 104:8
  106:19 129:13,
  14,15 139:23
  140:16
**believes** 173:4
**believing** 130:12
**benefit** 19:8
  41:25 100:9
  156:9
**Bennett** 42:9
  53:4,5,9 59:22
  83:21 97:4 98:5,
  19 99:9,16
  100:8,15 118:14
  134:3,12
**Bernard** 66:9,
  11,18
**bet** 51:23
**big** 48:19 54:13
  161:16 181:1
**bigger** 154:11
**bilingual** 36:1,4
**bill** 33:6,13,15,
  16,18 112:5
**bipartisan** 134:9
  171:5,10,14
  172:7,8
**bipartisanship**
  172:9
**bit** 12:19 29:5
  45:16 86:17
  112:13 129:20
  131:10 136:16
  145:17 154:25
  160:20 163:16
  165:4 167:8
**black** 164:10
**blank** 158:9

**board** 35:14
  40:24
**body** 39:9,21
**boil** 175:8
**booklet** 8:7
**borders** 152:11,
  14
**bore** 163:11
**born** 39:10
**bothered** 58:25
**bottom** 146:8
  158:4 172:24
**bound** 46:20
**boundaries**
  54:24 142:22
  172:14 173:4
**boundary** 10:21
  178:12
**Bowen** 9:21 34:4
  51:23 72:10
  159:12,17
  162:11 163:15
  165:23 167:5
  168:20 170:6
  174:6 176:2,7
  180:22,25
  181:18
**box** 118:9
**Brad** 66:9,11,17
**Brady** 77:9
  82:18 93:18
  124:21 135:22
  136:6,10 137:2,
  7 138:8 146:15
  159:1
**brainstorming**
  99:2
**break** 7:6,7 39:7
  51:22 52:2,8,9
  84:7 87:11
  147:14

**breaking** 86:16
136:16

**breakout**
117:12,13

**Brian** 65:9,10,
22 79:2

**briefing** 120:17,
22,23 128:12

**briefly** 30:16
156:14

**bring** 175:14

**bringing** 51:14
137:1,2 173:7
175:11

**broad** 30:22

**broadest** 36:16

**brought** 10:6
137:14 161:8

**Brunell** 78:7

**bub** 143:14

**budget** 70:6,7,
19,20,21 83:15,
19 110:19,20
111:1,2,4,17

**budget allowed**
70:13

**budgets** 70:25

**building** 53:18
134:7

**bullet** 102:20
105:24 114:2
116:13 118:11,
12 119:2,17
121:11,13
123:18 130:18
131:1,25 132:1
146:6

**Bureau** 163:24
164:4

**business** 12:22
14:7 38:8

168:13

**busy** 77:21

**BW** 146:7,15

─────────

**C**

─────────

**calendar**
118:14,22

**call** 5:13,14,16
27:20 47:23
77:18 79:12
109:3,4 124:1
126:18,22 136:5
155:21 169:1

**called** 27:19
28:4,7,9,24 33:7
40:4 44:10,15
47:24 125:22
126:19,23 127:5
138:6,11 161:5
179:24

**calling** 28:12
81:1 90:5
175:24

**calls** 15:9 138:10
165:18 168:12
179:20

**campaigns**
32:22,25

**candidate** 95:22

**candidates**
32:23 93:15
173:5

**cap** 108:20

**capacity** 28:8
32:20 60:21
61:11 81:1

**captured** 138:7,
10

**care** 11:14 54:12
58:24

**cared** 94:13

**careful** 89:16
99:4,6 171:17

**carefully** 107:2

**carry** 111:11
123:25

**carrying** 59:21

**Cascade** 54:13

**cascading** 128:5

**case** 7:14 20:8,
13 24:24 80:2
150:13 154:2,6
159:21 181:8

**cases** 19:12

**casual** 94:16

**cataloging** 99:7

**catch** 54:17

**categorical** 70:2

**categories** 69:9

**category** 79:15,
19

**caused** 90:9
149:5

**cd** 124:21

**cede** 131:24

**ceded** 34:12
152:21,25 153:2

**cell** 16:11

**census** 43:14,18,
19 46:21 53:20
99:17,22 100:22
163:18,21,24

**center** 13:9,17
23:3 27:6 31:19,
22 34:24 35:4,5,
20,25 36:1,2,3
40:8,10,11

**central** 117:17

**certification**
40:3

**cetera** 50:23

**chair** 20:18
22:7,16 26:2,18
27:14 28:1,18,
25 38:3,12
39:16,22 60:21
61:11 62:1
66:20 79:10
81:1 110:3
114:19 115:3
145:20 160:21
170:12

**challenge** 46:25
175:2

**challenged**
174:8

**challenges**
175:16

**challenging**
174:1

**chambers** 23:6

**chance** 161:7
173:5 179:3

**change** 56:7
118:10 165:3
167:7 169:25

**chaos** 160:14

**chaotic** 120:4

**characterization**
174:2 175:7,9,
22

**characterize**
121:21 175:19,
23 181:6,13

**charge** 49:15

**charged** 111:21

**chat** 63:22 101:2
122:21 124:12
145:8 156:6

**check** 94:3
107:19

**check-ins**
117:19

**checking** 117:20
123:11

**chewed** 163:4

**chief** 15:12

**child** 11:15

**choice** 93:15
95:23 173:6

**choices** 108:9

**chose** 25:4 83:16

**church** 47:14

**cities** 154:19
156:1 178:21

**citizen** 98:6
139:8 144:17

**city** 34:20 37:4,
5,7,13,21,23,25
40:21 179:7

**claims** 7:15

**clarification** 9:4
73:22 147:21

**clarify** 6:25
18:25 32:3 75:5
109:17

**clear** 6:6 7:14
19:7,15 37:24
42:17 69:5,8
73:17 107:8
129:15 158:11
161:20 162:21,
24 175:10,19
180:21

**clerical** 8:10

**close** 53:22
103:11,13
129:13 144:15

**closed** 160:19

**clubs** 23:6

**co-counsel**
170:8

coaching 66:12

coalition 31:15 173:3 174:1,9 175:10,12

cold 27:20 28:9, 24

collaborate 168:6

collaborated 33:13

collaborating 167:25

collaboration 168:9 171:5 172:9

collaborative 167:18

collecting 50:12

collective 22:19 30:19 100:23

collectively 153:4

college 29:21 32:1,4

Collingwood 155:10 178:8,13

Collingwood's 178:23

color 36:2,3 96:25 173:3,15, 20,25 174:11, 16,22 175:21

Colorado 29:9

Columbia 152:17,24 153:5,10,18 155:2,5 156:25 158:17 159:8

Columns 142:24

comb 50:19

comfort 48:9

comment 19:20 42:11 49:12 54:21 106:7 144:4 163:5 168:1

commented 82:18

commenting 73:11

comments 8:12 50:12 82:15 84:18 168:3

commerce 23:7

commission 7:12,16,22 10:6 12:24 13:19 14:11 17:3,20 18:14 19:8,9 21:19 22:9 23:24 24:23,25 25:3,13 26:10, 17 27:8,15 28:1, 10,13,15,17,23, 25 32:9,18 37:11 38:4,16 39:17,23 40:1 42:21 43:1 51:4 52:23 56:10,14 60:12,21 61:12 65:19 66:2,5,19 67:19,20 68:14, 15 69:1,5,17 70:10,19,21 71:13,20,22 72:8,18 74:24 75:7,8 78:22 79:3 83:3,18 87:17 91:21 93:12 99:5 100:18 108:18, 21 110:9,11,16

111:17 114:15, 19 118:13 119:4,6,8 125:13 130:20 138:2,3,4,5,6 151:14 153:14 161:15 162:12 163:17,21 165:9 166:16 167:22 168:10,13 169:16 170:13 171:9 177:7 179:16,23

commission's 176:5

commissioner 17:19 26:12,22 28:11,23 38:2, 19 41:21 57:10 59:2,7 62:18,19 67:7,12 75:21 76:2,20 77:5,24 78:3 81:8 83:12, 15,19 84:9,11 86:5,9,21,24 88:13,23 90:24, 25 92:17,24 94:17,20,21,23 95:7,15,19 96:9, 11,23 99:6 101:15,16 104:6,7,13 106:23 108:11, 21 109:24 110:9 116:19 117:5 119:18 121:13, 15 124:17,24 136:25 137:25 138:9 140:15 149:14,17 150:22 157:25 158:12 159:1 161:23 167:9,

17,19 168:8,16, 22,24 169:11

commissioners 7:16 12:3,11 21:18,19,25 22:13,17 23:19, 22 24:5,10,11, 18 25:9,20 26:2, 3 27:23 42:21 43:22 44:23 45:2,3,6,7,17, 18,19,23 47:14, 16,18,20 49:3,5, 8 51:2 55:3,22 57:1,6 58:23 59:13 60:15 62:6,11,14,17 66:24,25 67:4, 11 68:4,13,23 69:14,20 71:19 73:9,12,18,19, 21 75:1,6,17,18, 20 77:12,23 78:18,19 80:9, 15,18 81:1,4,10, 21,23 82:7,12, 13,24 83:2,23 84:1,4 85:20 87:4,19 88:1,25 89:16,20 91:13, 17 92:10,13 93:13 94:2 97:13,19 98:2, 18 100:10 105:23 106:16, 19 107:5,11,24 108:2,3,25 109:9,15 110:11,13 117:16 119:19, 23 123:15,19 125:25 126:5,7, 13,24 127:2

129:17,18 130:19 131:3,16 132:17 133:9,19 134:14 135:3, 12,15 151:5,12 160:22 162:21 163:4 166:1,11, 21 168:12 169:5,17 171:22,25 172:7 180:2

commissioners' 74:3 115:11 150:19

commissions 47:17

commitment 95:4 180:11

commitments 175:3

common 38:21 51:9 59:17

communicate 77:13 94:20

communicated 77:12

communicating 15:11 127:11 131:19

communication 12:22 60:17 109:19 110:5

communications 17:21 18:2,6,16 19:1 22:11 42:6, 7 160:18

communities 54:23,24 152:23 173:3,14,20,25 174:22 175:21 181:9

community 23:5
34:19 35:11,14
36:6 40:19,20,
22 41:2,3 54:22
60:11 91:25
174:11,16 175:9

compared
105:12

competent
112:9

competing
174:21

competitive
103:25 122:1,3
143:22

competitiveness
165:16,21

complaint 20:8,
10,15,17 21:7
159:21

complete 6:12
30:13 46:22
113:6 127:24
133:10

completed 30:13
114:15 127:21,
22 128:14,23
133:7

completely 9:2

completes 6:13

completion
128:19

complex 46:15
111:4 128:2
175:7 181:9

compliance
12:14 33:18
80:19 82:9 89:5,
17 95:1 109:11
140:22 150:23
151:18

compliant
106:20,24
139:15,16,24
140:17

complied 80:9
165:9

complies 84:3

comply 17:14
39:11 66:3,15
80:17 83:4
106:10 107:22
151:6

complying
150:24

components
109:1

composed
134:23

composition
103:24

compromise
161:21 167:2
171:6,10,13,14
172:10

computer 13:9,
17 21:1

concept 96:4

concern 77:22
105:18 135:15

concluded
181:24

conclusion
165:19 179:21

conclusions
104:21 105:3

conduct 14:6
16:5 17:6 59:7,
23 71:10 83:21
84:2

conducted 87:20

conducting

12:23

confederated
34:11,12

confidence
73:15 171:20

confident 74:19

configurations
7:23

conflict 39:10
40:23 41:2,3

conflicts 35:13

congressional
46:9 47:21
53:24 127:17,
19,20 129:3
130:12,20,24
132:4

connected 66:8

connecting 38:9

connection 10:4,
5,20,21

Connie 112:16

consecutive
54:18

consensus
72:12,14,17
115:15 133:6

consideration
28:25 67:23
71:15 78:17,21
150:25 151:9,20

considerations
162:13,14

considered 7:21
153:4

consistent 93:20

constituency
63:10 95:4,5

constituents
104:2 137:20

constitutes
89:21

Constitution
165:15

constitutional
46:22 79:24
80:1

constraints
46:20

consult 83:2
112:5 132:17
179:24

consultant
67:19,25 68:9
69:4 70:12
71:11,13,21
72:9,14,18,19
73:10,25 74:13,
22,23,24 75:2,6,
8,12,22 76:3,6,
7,13,21,24 77:3,
7 78:6,7,9,17,19
80:8 83:8,14,16

consultants
70:22 71:14,16,
18 72:15,23
74:8,12 75:13,
15,16

consultation
91:18 151:14,
16,18,23,24
152:25 173:11
179:25 180:10,
11

consulted 109:5,
6,9 151:21

consulting
110:19

contact 51:11
108:13,14
109:24

contained
173:12 178:13,
22 179:7,8,17

contemporary
39:3

content 63:7
93:2

contested 160:3

context 89:1
95:1 102:22

contexts 100:15

contiguous
153:5

contingent
143:12

Continuing
52:20 87:14
147:18

continuously
26:21

contract 23:16
68:17

conversation
21:25 27:22
29:1 67:7,15
73:16 80:11
88:17 89:6
90:20 92:2,5
93:18,23,25
94:8,20 95:20
96:9 97:15
101:22 102:20
106:6 116:15,17
117:1 122:7
123:4,7 131:8,
11 136:6,8
141:18

conversations
18:7 25:19 59:2
66:25 67:3,10,
17,22 73:21,24
76:20 77:24

80:8 81:15 88:1,
23 90:9,13
95:15 96:19
121:6 142:13
**convey** 98:21
129:10 131:21
133:4,16
**conveyed** 114:6
120:11 121:14,
16 129:11
131:14,15
132:15 133:20
134:13,20
135:14,17
**conveying**
117:16,19 134:8
**coordinator**
49:21
**copy** 147:6
**corner** 47:7
155:22
**correct** 17:3
29:13 42:19
47:23 52:23
63:19 71:11
78:24 86:21
89:22 100:11
101:11 105:21
110:21 114:17
116:14 125:14
144:12 147:23
148:3,20 149:7,
12 151:25
152:9,12,13
153:10,20
157:24 158:14
159:22 162:1
163:22 165:9,13
166:2 170:19,24
171:7,13 172:15
173:17 174:9,
12,16 177:14

181:21
**correctly** 80:13
**council** 37:7,21,
23,25
**counsel** 10:25
11:2,8,11 18:6
64:5 68:20 72:2,
3,7 107:18,20
108:12 119:19
170:1
**count** 22:21
**Counties** 27:6
**county** 36:1
37:11 153:10
176:20 177:13,
17,18,20,23
178:1
**couple** 19:6
105:2 112:14
113:7 170:22
**coursework**
40:6
**court** 6:18 7:24
8:18,22 131:24
132:5,7,12,15,
19,21 133:4,16
134:20,21
135:14 145:19
154:1
**courtesy** 42:11
**covered** 109:14
**COVID** 22:25
43:6 50:1
**cracking** 79:17
**create** 38:10
50:25 54:7 55:7
83:9 96:14
98:19 159:9
171:21
**created** 7:17
23:1,16,24
53:13 59:6,8

71:5 97:15
98:25 99:5
100:18 118:21
134:6 146:3
153:14 162:25
**creating** 7:18
38:18,21 56:10
57:11 66:12
97:18 98:11
**creation** 35:10
56:15 95:16
96:10
**creatively** 117:3
**credibility** 8:13
**criteria** 100:1
101:24
**cross** 54:12
**crunching** 43:17
47:11
**culture** 34:9
**curious** 29:3
**current** 10:22
173:4,10
**cursory** 21:23
81:15 90:13
**CVAP** 101:18
105:11 139:3,5,
7,8 141:7 142:1
148:2,9 149:18
**CVS** 42:10
**cycles** 32:19

---

## D

**Daniel** 49:17,20,
23 102:6,15
118:4
**data** 43:13,18,19
46:21 53:20
54:10 55:18
56:2,3,4,5
57:21,22,25

58:2,8 85:9,10,
11,12,13 97:20
98:2,16 99:12,
15,17,20,22,23,
24 100:4,5,6,22
105:11,12
121:24 140:10
143:17,18
163:16,18,21
164:22
**date** 10:8 15:3
26:11
**dated** 155:13
**Dave's** 178:11
**Davis** 28:5
**Davis's** 28:14
**day** 11:13,15
116:18,22
117:6,7 118:22
125:18 159:19
**days** 43:11 85:8
86:12 88:8
96:20 105:2
112:14 113:7
127:15 138:4
161:25 162:4,9,
20
**dead** 15:25
**deadline** 114:15,
20,24 115:22
131:5
**deal** 123:20,22
169:6
**dealing** 47:4
**deals** 103:22
**decade** 58:15
**decedents** 36:22
**decide** 72:18
128:3
**decided** 48:7
**decision** 25:1,5

26:4 46:17,18
72:21 74:12,22
79:12,13 107:7,
12 108:8,17
111:11 132:6
**decision-maker**
167:4
**decision-making**
26:5 150:15
**decisions** 7:12
22:14 48:3,17
68:2 71:3 90:14
98:3 107:15,19,
21 108:19
151:21
**declined** 137:10
**deem** 8:8
**deep** 95:3
**defend** 24:11,19
163:8 170:25
173:13 175:3,17
**defendant** 7:14
**defending**
23:13,24 24:8
**Defense** 5:17
**define** 100:23
**defined** 164:4
**defines** 163:25
**degree** 30:7,10,
14 169:18
171:23
**demanded**
46:22
**demands** 173:6
**democrat** 58:14
103:18,19 104:3
**democratic**
24:10,13 37:19,
25 62:19 75:16
78:18 104:1
120:16 121:9

124:5 128:10 169:19

democrats 120:22 164:15, 20,24

demographic 146:1

demographics 33:24 34:3 56:25 92:11,17

demonstrate 169:19

demonstrating 178:21

demonstrative 155:20 156:24 157:9,16 178:9, 23,24 179:9,14

demonstratives 157:17

dems 143:22

Depending 27:9

depends 47:7 100:1

depo 12:20

deposed 6:1,3 10:2,7,11

deposited 60:19

deposition 6:5 8:7 10:3,5,23 11:3,7,10,18,20, 24 12:5 20:7 73:17 181:24

depositions 7:15

describe 17:16 38:2 46:16

description 8:1 103:8

descriptions 41:6

design 30:14,15 46:25

designate 152:24

designated 167:23

designed 31:1

detail 81:7,8 96:5 97:1 109:3

detailed 119:21

details 45:9 60:17 75:23,25 77:10 84:24 88:19 90:5,20 102:9 103:16 112:9 114:9 152:22

determine 54:3 55:4 57:22 123:25

determined 70:6

determining 24:23 124:6

develop 66:4 97:12

deviation 145:24

devices 12:22,25

Deylin 5:15,16 9:21 122:8 150:5

diad 48:1

diads 47:23,24

difference 69:21

difficult 22:25 39:5 46:19 136:10,19,23 167:11 168:9 169:21 181:13

difficulty 168:16

dilute 79:21

dim 76:14

dimensions 48:24

direct 41:25 53:8 59:2,25 63:4 90:19 92:3 95:3 97:3,4 114:4 173:9

directed 70:10

directing 49:16

directly 42:11 43:3 73:13,14 84:21 92:3 94:18 96:18 97:4 141:6 151:22 152:16 173:6

director 17:2 22:24 27:5,10 31:14,19 34:22 38:6,25 40:9 41:14 42:6,7 49:16 66:19 108:19 112:9 146:2

director@ drcyakima.org. 14:15

disagree 9:23 113:19 121:12

disagreed 116:12

disagreement 60:5 149:6

disappointed 135:25 136:2

discipline 30:24

disclosures 7:20

discomfort 48:10

Discovery 31:15

discrimination 36:6,17,21 171:16,21

discuss 7:11 11:7,10,20 12:19 42:25 48:12 56:17 61:15 62:23 63:15 88:6,25 93:17 95:20 96:4,11 105:23 109:1 110:1 131:3 144:11

discussed 11:12, 14 21:8,10 56:16 61:4 76:9 77:8 78:3 84:15 85:2,7 89:3 96:6 105:8 111:5 131:4 132:20 166:6

discussing 43:3 52:11 119:21 128:11 131:18, 21

discussion 21:23 70:8 71:23 72:1 75:3 76:5 80:16 81:17,21 85:5 86:15,22 89:8, 11 90:1 91:7 101:19 133:1 145:21 146:11 156:15 159:14

discussions 72:7,8 74:21 75:20 76:23 77:6 80:18,24 81:5 90:24 105:3,7 109:15

Dismantling

31:14

dispute 10:21 13:9,17 27:5 31:19,21 34:24 35:3,5,9,20,25 40:9,10 139:20 173:24 175:12, 20

disputes 40:16

dissolution 40:18

distance 100:25

distinguishes 68:8 69:2

district 35:15 37:5,6,24 50:9 53:23,24 62:7 79:16,17,21 88:15 89:12,16 91:11 92:22 93:15 94:10 95:21 96:15 101:17,20 103:11,24,25 104:1,22 105:4, 19,24,25 121:25 122:1 127:17, 19,20,21 133:23,25 134:13 140:25 141:2,10,12,14, 21 142:3,6,8 143:9 144:2,11, 16,17 145:3 146:2 148:6 149:12,13,15,18 152:7 153:16 154:12,15,16 155:19,24 156:23,25 157:3,8,10,16, 18,25 158:13,

16,20 159:2,3,4,
5,10,25 173:4,8,
13 174:15,19
177:8,12,22
178:1,2,10
179:7,9,14,17,
19

**districts** 35:17
44:4 46:8,9
61:17 63:15
85:1,8 86:13
88:2,6,15 89:1,
13 90:6 91:1
93:7,12 94:25
95:9,10,17
96:11 102:25
123:21 127:17,
23,25 134:1
143:4,22 144:24
145:3,25
148:10,19
151:13 162:7
165:17 173:2
174:23

**districts'** 146:1

**divergence**
163:13

**diverse** 181:9

**divide** 79:18,21

**dividing** 174:19

**division** 69:8

**divorce** 40:18

**Doctrine** 31:15

**document** 19:21
114:12 126:17
153:22 154:5,8,
10 155:8 157:22
158:23,25
170:11

**documents**
11:23 12:1,2,5
16:5,8,23 17:6,

11 20:4,7,12,20
21:1 66:18

**dollar** 71:5

**dominant** 34:9

**door** 41:19

**doors** 160:19

**double** 30:6

**download** 64:16,
24 113:24

**draft** 7:23 59:14
74:3 82:12,14
84:12,13,15
100:22 113:8
132:14 146:9,20
147:1,10

**drafted** 19:22
134:19

**drafting** 12:14
151:9

**drafts** 80:13
99:8

**draw** 53:6,9
58:23 153:12
171:18 172:14
178:1 179:17

**drawing** 92:14,
18 100:10
162:15 165:17

**drawn** 127:10
129:22 130:14
166:24 171:12,
15 174:23

**draws** 172:12

**drew** 131:6

**drive** 51:3
60:16,20 171:3

**driven** 35:12

**drop-off** 11:16

**drove** 102:3

**dry** 173:14

**duties** 13:19
38:3 39:14,17
115:3

**duty** 38:5
106:18 114:19,
23 166:2,5

**dynamic** 55:21

**dynamics** 57:9

_____

**E**
_____

**e-mail** 13:20,23
14:6,9,10,17,18,
20,22 15:17
16:15 98:20
101:2,7,9,13
112:17 130:11
132:2 147:7,8,9

**e-mails** 50:22
77:16

**earlier** 9:7 20:25
48:11 52:22
71:9 84:7
148:18 149:5
155:5 159:20
163:18 165:5,7,
25 166:6 167:9
169:11 170:8

**early** 43:11
138:4,10

**ease** 32:2

**easier** 32:7

**easiest** 8:14

**easily** 112:2

**easy** 55:25

**economic** 36:13,
18

**ed** 21:8 22:2
146:9 175:1,5
176:1

**educational**
5:17 63:13

**educator** 65:19

**effect** 8:21 128:5

**effective** 59:21

**effectiveness**
169:19

**effort** 24:3 49:10
134:24

**elaborate** 45:16
131:10 137:5

**elaboration**
137:6

**elect** 93:15
95:22 173:5

**election** 100:5

**elections** 85:15,
19 162:4

**embarrassed**
13:24 44:9

**embarrassing**
161:18

**embedded** 82:20

**employee** 92:1

**employees** 68:16
70:2

**employer** 11:12
13:10

**empower** 69:15

**empowered**
41:13 68:14
69:1,7,12,19
70:1 108:16,19
167:3

**enacted** 177:5,
22

**encourage**
107:20

**encouraged**
116:24 119:23

**end** 26:7 38:18
49:17 56:19,22
64:9 85:1 129:1

148:20 172:3
180:22

**ended** 86:18
131:13

**ends** 46:20,24

**engage** 22:7
23:7 160:25
161:3 169:17

**engaged** 22:9,21
94:18 151:13,14
160:16 171:9

**engagement**
169:20

**engaging** 23:2

**ensure** 39:1 49:7
82:8 106:14
114:20,23 115:7
134:9 172:8

**ensuring** 12:14
96:24 115:2

**entire** 27:1
41:23 78:22
157:3,10,19
158:19 159:3,5

**entirety** 155:23

**entitled** 9:12

**entrusted**
107:11

**environment**
8:21

**equip** 108:6,8

**equipped**
102:17 105:16

**eroded** 37:22

**essentially**
103:13

**establish** 53:16
121:25

**established**
163:7

**establishes**
165:20

**establishing**
85:20

**estimate** 9:13,16
13:25 14:2 63:2
74:10,17,18

**estimates**
101:18

**et al** 154:6

**ethics** 59:5

**ethnic** 30:22

**ethnicity** 162:5,
15 164:4,5

**European**
155:13

**evening** 94:4
125:3 129:11

**event** 50:17

**events** 22:4
49:24,25 50:4,6,
14,19 113:1
131:11

**eviction** 35:22

**exact** 15:3 74:6
97:1 178:12,22

**examples**
117:23

**exception**
127:22

**exchange** 123:1
124:9,22 180:21

**excluded** 102:11

**excludes** 36:11

**exclusion** 36:17

**exclusively**
166:24

**excuse** 11:19
12:13 13:12
16:17,20 17:9,
24 20:11,23

21:6 24:5 27:3
28:16 30:7
47:17 50:7
95:14 127:19
143:15

**executive** 17:2
22:24 27:5,10
31:14,18 34:22
38:6,25 40:9
41:14 49:16
66:19 72:5
108:18 109:7
112:9 146:2

**exhibit** 63:24
64:1 101:4
112:20,21
122:4,9,18,24
124:14 125:20
138:15,18,25
145:7,9 154:9
156:8 158:16
170:3,4

**exists** 146:24
147:11

**expand** 117:1

**expectations**
106:8

**expected** 149:25
163:19

**expedient** 64:17

**expenditure**
111:3

**expenditures**
108:17 111:7

**experience** 31:8
32:8 92:8 137:7
169:22

**expert** 12:10
107:20 155:9
177:2 178:8

**expertise** 107:4
108:6,7 171:19

**explain** 53:12
111:2,3 116:21

**explained** 119:3

**explaining** 60:3

**express** 51:5
77:3 81:4,10
84:16 88:14
136:2 139:22
152:2,5 180:2

**expressed** 49:8
51:8,16 67:13
73:19 82:22
83:8 88:17
93:13 105:19
162:25 173:16

**expressing** 59:3
135:15 162:23

**expressly**
152:18 153:3

**expunge** 160:9

**extend** 155:1
156:25 158:17
159:8

**extension** 14:4

**extensive** 71:25

**extensively**
21:14

**extent** 18:5
22:15 45:3 59:1
109:13 110:7
138:3

**extremely** 99:4

**extremes** 23:2

**eye** 160:7,15

**eyes** 161:4

_____

**F**
_____

**face** 36:6

**facilitating**
38:17

**facilitation**
115:10

**facilitator** 26:6
35:21 38:14
39:9 125:4
166:12

**fact** 101:20
117:17 130:15
142:6

**failed** 78:23 80:7

**failure** 43:10
115:15,21

**Fain** 77:25 78:4
80:23 86:24
94:7 135:1

**fair** 151:4 156:3
162:3 174:2,18,
21

**fairly** 67:8 120:4

**faith** 94:17
104:8

**familiar** 5:20
7:20 33:24
36:15 91:20

**familiarized**
165:5

**familiarizing**
165:7

**families** 36:18

**family** 10:22
40:18

**fashion** 155:13

**fault** 175:12

**favor** 24:8 25:20
73:9

**federal** 33:7

**fee** 111:16

**feel** 9:5,12 45:22
48:5 49:3 51:21
74:19 92:16
113:17 167:14

181:12

**feeling** 129:10

**felt** 12:10 23:14,
25 46:14 80:13
92:4 94:6
103:25 104:9
106:3 108:5
136:2

**fewer** 63:4
160:24,25

**figure** 43:24
44:20 46:19,25
47:12 54:8,23
55:2 64:21
122:20 155:17,
18 156:18,22
157:6,7,15

**figured** 44:3

**file** 20:24 64:6,
16 65:1 130:20

**filed** 19:3 20:8,
12,16 159:21,25

**files** 132:4,7,18

**Filipino** 34:14

**final** 7:24 23:18
84:22 86:12
88:8,10 89:12,
13 90:1,6
114:16 116:7
118:14,22,24,25
122:3 125:6,22
127:5,14,17,22
128:20,24 131:5
133:19,23,25
134:8,14,15
135:16 162:3
173:16 177:10

**finalizing**
161:25

**finally** 85:22
149:17 158:22

**find** 14:5 65:19,
25 71:13 153:22
**fine** 51:24
**finished** 126:25
**fishing** 155:4
**fit** 31:6 131:6
**five-minute**
147:14
**fixing** 8:11
**flip** 178:14
**floored** 125:9
**focused** 90:6
102:21
**focusing** 43:12
100:21
**folder** 20:24
**folks** 50:12 61:8
110:4
**follow** 66:6 84:5
135:4 166:2,5,
16
**follow-up** 144:7
**follow-ups**
180:17
**foolish** 104:10
**forbearance**
170:9
**force** 8:21
**forecasting**
43:18
**Forgive** 30:15
170:3
**forgiveness**
136:12 167:12
**forgot** 15:24
**form** 10:18
12:17 16:24
17:13 18:4,20
19:4 24:12,21
25:17 28:19
32:15 33:2 34:4

36:7 37:15 41:9
46:2 49:11 50:4
51:7 57:13 59:9
60:6 61:18 66:7
68:1,10 69:10
70:4,14,23
72:10 73:6
74:14,25 75:10
79:8 81:13 82:3,
10 83:5 85:17,
21 87:22 88:3,
16 89:2 90:12
91:15,23 92:25
93:8 95:24
96:16 97:7
99:19 100:12,19
103:2 105:5
106:1 107:1
108:1,15 111:19
112:7 113:10
115:4,17,23
123:23 125:15
126:10,15 127:8
130:1,22 133:24
134:16,22
135:18 139:25
140:18 141:23
142:4 144:19
145:4 146:12,22
147:4,24
148:11,24
149:8,19 151:1
161:10 162:6,16
166:18 168:17
174:3,24,25
176:21 178:16
179:11 180:4,25
**forming** 120:9
**forms** 36:20
**forward** 51:14
52:8 60:14
136:13,17

**forwarded**
101:10,11 102:1
**found** 112:2
**foundation**
162:17 178:3
**fourth** 45:10
**frame** 27:9 74:6
**free** 9:5,12
**frequently**
15:22 119:20
**fresh** 9:8
**Friday** 120:14
**front** 8:22 38:18
76:24 152:16
**frustration**
129:11
**full** 5:22 33:8
51:2 62:7 68:12
77:23 120:19
126:17 133:16
146:9
**full-time** 27:10
169:6
**fully** 17:14 36:4
102:8 113:3
116:23 125:12
**function** 37:19
**Fund** 5:17
**future** 46:17

———————

**G**

**gain** 40:14 59:20
**gains** 103:25
**game** 43:14
120:13
**gathering** 50:15
**gave** 18:19
77:18
**gears** 163:16
165:3 167:7

169:25
**general** 33:16
34:2 40:16 48:9
49:15 52:24
61:8 62:21
65:10 95:12
96:3 110:7
111:14 112:5,6
150:12 181:15
**General's** 12:10
65:16,22 109:1,
2,10 110:14
111:17,22
**generally** 34:25
42:24 44:25
46:4 53:12
57:12 62:13,18
63:7 75:23 76:6
87:17 94:5,6
139:8
**generate** 133:12
**generated** 19:18
50:20 97:13,14
**generating**
48:22 120:9
163:21
**geographic**
155:25
**geographical**
47:1,9,13 48:18
54:15
**geographies**
47:4 53:18 54:5
56:6
**gerrymandering**
172:11,18,21
**Gingles** 79:12,
13
**give** 8:14 9:2
13:25 17:10
58:4 63:2 64:11
65:25 71:16

77:20 79:2,10
84:9 86:5,9,24
87:7 103:8
111:2 117:3,23
119:20,24
123:14 133:4
156:12
**giving** 18:2
**glean** 90:8
**global** 46:5
**goal** 98:1 123:24
**good** 5:12 9:15
38:22 87:11
104:8 108:9
110:17 150:4
168:5
**gosh** 43:15
53:23 142:9
**government**
35:19
**government-to-
government**
173:11
**governments**
151:20
**governor** 103:4
**graduate** 29:22,
25
**graduated** 32:4
**grand** 161:16
**granted** 69:17,
18
**Graves** 76:20
78:10 80:23
84:22 86:9 88:9,
24 90:25 91:10
92:24 101:10,16
104:11 116:19
117:5 120:1
121:19 161:24
180:10

**Graves'** 104:7
**great** 7:5 8:18
9:1,11,20 20:6
36:5 48:5 50:11
65:6 169:6
**grew** 29:9
**ground** 6:4
38:21
**group** 72:14
**groups** 30:22,23
82:1,2 181:7
**grow** 29:5,8
**growers** 34:9
**guess** 9:14 17:20
22:2 25:22 29:4
46:12 53:12
68:25 69:25
75:5 79:12,18
103:23 105:8
112:4 121:7
125:9 133:22
139:2 164:3
165:1 168:1
169:5
**guessing** 140:9
**guidance** 17:10,
21 18:2,8,19
19:1

---

### H

**half** 31:23 51:21
**half-hour** 61:8
119:5,7,8,11,12
**hall** 126:5
**hallway** 126:3
**handful** 15:24
**hands** 153:12
**hanging** 138:17
173:14 175:5
**happen** 9:1

**45:14 54:14**
92:21 99:15
134:3
**happened** 90:17
91:6 103:16
109:19 130:16,
24 134:4,8
135:5 136:8
161:18
**happening**
121:8 161:24
**happy** 176:23
**hard** 46:18
53:10 96:21
137:7 155:25
**hats** 39:13
**hazy** 77:8
**head** 6:20,21
43:16 50:8
95:13 145:14
**heading** 146:6
**hear** 93:5
113:14 115:5
**heard** 84:13
89:3 102:12
116:24 123:19
131:2 144:14
161:7 180:13
**hearing** 49:12
90:22 91:2
95:11,25
**hearsay** 73:14
**heavily** 58:21
**held** 20:25 59:17
60:16 61:22
137:4 160:7
**helpful** 52:5
168:14
**helps** 64:22
110:12
**hesitate** 136:22

**Hey** 56:2 100:3
135:5 142:10
**high** 31:4 106:8
171:22
**higher** 40:25
**highest** 106:14
144:17 169:18
**highlight** 170:23
172:3
**highlighted**
170:23 172:24
**highlights**
101:16
**highly** 112:9
**hire** 22:24 41:13
42:5 67:24 68:5,
15,19 69:1,3,6,
7,12,16 70:1,2,
7,10,20 71:20
72:9,15,19
74:12,23,24
75:2,7,9,21 80:7
82:25 83:16,19
**hired** 49:17
68:7,8,11,13
69:13 70:12
83:8,14
**hires** 42:12
**hiring** 22:23
26:10 38:6,10
42:3,9 67:18,19
68:9 70:21
73:25 74:21
76:3,18,21 77:6
78:10,17,21,23
**hisp** 139:3,5,6
141:7 142:1
148:2
**Hispanic** 98:12,
13 139:5,6
148:9 149:18
163:25 164:4,6,

**8,10,12,25**
180:24
**Hispanics**
164:14,19,23
**historical** 34:8
**historically**
34:15 55:19,21
**history** 22:10
**hit** 51:20 149:24
**Hobbs** 5:19
143:12 149:2,4
154:6
**hold** 26:24 27:1
160:12
**holds** 172:13
**homeland** 34:10
**homes** 35:24
**honestly** 78:8
96:18 126:4
138:12 140:19
142:5 180:9
**hopes** 38:21
44:21 110:3
**hoping** 55:24
**host** 43:5
**hotel** 126:3
**hour** 51:21
52:16 120:14
128:20 129:8
**hours** 27:7,9
40:13,14,17
64:16 98:23
130:16
**house** 15:14
46:7 47:18
51:12 61:2,3
66:10 120:8
155:19 156:23
157:8,15
**houses** 108:4

**How's** 123:1
**HR** 38:9
**hub** 143:14
**huge** 160:16
**Hughes** 113:10
150:4,7,10,11
151:3 156:7,11,
16 159:11
162:17 174:3,24
178:6,25 180:4,
16,20 181:3,17
**huh-uh** 25:23
**human** 30:20,21
31:4 33:14
36:12
**hundreds** 60:20
**hungry** 52:8
**husband** 11:14

---

### I

**idea** 24:14 47:25
48:1,9 78:23
88:13,14 95:21
103:18 118:19
160:18 161:8
**identification**
64:2 101:5
112:22 122:19
124:15 138:19
145:10 156:1
170:5
**identified** 7:20
**identify** 33:20
178:20
**identifying**
59:16
**ignorance** 30:15
**illegal** 79:23
**image** 155:22
**imagine** 45:11

72:20 125:1

**imagined**
127:23

**immediately**
31:18

**impact** 20:17
79:16 128:3

**impacting** 41:3

**impacts** 46:17

**impartial** 26:6
106:10

**impasse** 127:16

**impede** 168:7

**imperfect** 100:5

**implement** 48:1

**imply** 97:18

**import** 55:4

**importance**
53:19

**important** 6:19
39:4 54:25
55:21 63:10
94:9 137:18
150:25 151:9
166:12,15

**impression** 90:7,
8 133:18 150:22
151:5

**impressive**
27:13

**in-depth** 21:25

**in-person** 49:24,
25

**inaccurate** 14:1

**inappropriate**
92:4

**include** 16:10
152:14 155:4,23
177:23

**included** 23:18
38:18 152:18

165:11

**includes** 153:18
157:19 176:19
177:12

**including** 11:15
35:10,22 38:8
108:21 151:6

**inconsistent**
89:7,25 90:10

**Independence**
171:4

**independent**
13:2 19:19
41:22 42:4,13,
18 45:1,12
47:11,15 48:20,
22 51:10 53:2
54:6 55:6,10,11,
12 57:11,15
58:5 59:15 60:2,
18 68:7 97:16
102:2,5 104:19
105:1,19 106:8,
9,18,23 107:3
125:4 129:12,
23,24 130:3,4,8
133:11,23 146:3
167:25 168:15

**independently**
66:4

**Indian** 34:6
151:15

**indicating**
141:12

**indicator** 58:19

**individual** 30:18
57:10 83:1,12,
15,18 85:15
110:11

**industry** 34:18

**influence** 79:22
171:5

**influenced**
57:25

**inform** 106:19

**informal** 8:20
94:16

**information**
7:21 9:4 26:3
43:21 50:16
51:6 54:7 55:2
72:6 105:15
107:6 146:1
169:17

**informed** 9:13
22:14 25:8 98:3
102:8 106:23
125:12

**informing** 38:15

**infusing** 168:3

**initial** 7:19

**initially** 119:3
159:21 170:25

**injunction** 20:9

**input** 22:7,9
48:20,23 49:1
50:22 51:1
58:22,25 59:1
163:9

**insert** 33:14

**instances** 106:5

**institution**
37:22,25 38:5,
12

**institutions** 31:5
35:19 37:19
40:23,25 169:20

**instructed** 24:5,
14 26:7

**instructing**
119:19

**instructions**
24:15

**instructs** 6:15

**integrity** 57:5
87:4 92:6
104:18 106:14
163:10 171:23

**intending** 156:8

**intent** 80:2,3
169:5 171:20

**intention** 19:7,9,
14,16 23:19
45:4 59:16
160:21 175:1

**intentionally**
172:8

**interaction** 23:1
163:2

**interest** 45:15,
17,19 46:11,14
54:22,23,24
91:4 100:24
166:25 169:22

**interested** 45:3
78:10

**interesting** 31:7
72:20 181:7

**interests** 59:16
137:1,2,4,13,20,
23 171:24
173:9,15,20
174:15,22
180:23 181:11,
14,15

**intermediate**
99:23 117:11

**internet** 6:9
111:6 133:15

**interpret** 31:2
115:25 171:17

**interpretations**
89:7,21,25
90:11 116:4

**interrupt** 156:5

**intervene** 25:14,
25 35:13

**intervening**
25:21

**intervenor**
24:24 25:4

**intervenor-
defendants**
170:2,4

**interventions**
35:6,10

**interviews** 49:20

**introduce**
122:16

**introduced**
122:23

**investigating**
38:6

**invitation**
130:11

**invitations** 63:4

**invite** 65:12
118:14

**invited** 65:13,14

**involved** 42:3,5,
9,12 84:21
90:24 150:15

**Island** 5:24

**issue** 10:12
90:21 173:2
175:6,8

**issued** 12:24
13:5 14:10,25
20:10 87:1
138:2

**issues** 51:13
109:21

**item** 71:1

**items** 71:1 111:4

**J**

**Jamie** 42:8
**January** 13:14
14:24 26:15
46:23
**Japanese** 34:16
**job** 27:1,3,4
31:18 38:11
107:5,13,22
108:6,7,8 115:6,
8,9,10,11 116:7
120:2
**jobs** 26:24 36:19
169:6
**Joe** 80:23 94:7
134:25 135:4
**jog** 21:17
**join** 23:23
119:5,20
**joined** 152:6
**joining** 119:6,8
**joint** 109:14
134:24
**journal** 138:21
**judge** 8:14,23
**July** 31:17
**June** 12:4,7
20:25 63:18
79:1
**jurisdiction**
129:16,18
131:17,20,24
132:22
**jury** 8:14,23
**justice** 173:2
175:6,8
**Justin** 42:9 53:4,
5,8 59:22 83:21
97:4,10,13,21

98:5,19 99:3,4,
9,16 100:8,15
102:6,16 118:3,
13 130:11,15
134:2,7,12
146:5

**K**

**K-12** 40:20
**keeping** 151:8
174:19 180:3
**kind** 16:4 18:25
35:3 40:16 43:1
50:11 57:8,22,
25 58:7,19
59:12 61:7
68:20 75:23,25
112:25 118:2
142:23,24
160:11,19
**kinds** 47:10
48:24 98:16
118:10
**Kittitas** 27:6
36:1
**Klickitat** 153:10
**knew** 53:20
104:8,14 128:5
131:16
**knowledge** 22:8
25:2 82:16
104:17 105:15
161:11 162:12
164:14,19
165:15

**L**

**labels** 179:7
**lack** 45:14,16,19
46:11,14 162:17

**Lacks** 178:3
**lag** 6:8
**laid** 125:2
**land** 152:21
177:13,15,18,
20,23
**landed** 85:23
**landmark** 79:11
**lands** 151:22
152:24 153:4
176:20 177:1,25
178:2 179:18
180:3
**language** 33:14
**languages** 161:2
**laptop** 12:24
13:5,8,16 14:23
15:4 126:3
**large** 65:1 77:22
181:8
**larger** 154:23
**largest** 34:6
**lastly** 9:11 78:16
**late** 43:14,16
46:21 120:13
**latest** 104:25
**latina** 33:20
**Latino** 36:6 96:7
144:17 173:3,5
174:1,9,11
175:10
**Latinx** 34:8
144:24
**law** 8:22 23:12,
13 33:8 84:5
125:7,17
151:18,19
165:6,8,9,12
166:2,15 172:6
173:13 175:4,
11,16,17

**laws** 38:15 39:11
66:15 151:6
**lawsuit** 5:20
10:3,5,12,14
19:2,3 21:9,12,
20 25:14,21
26:1 159:24
160:6,11 161:5,
8,14
**lawyer** 6:11,13,
16 8:12
**LD14** 153:14
**leader** 61:2
68:15 112:25
113:9
**leaders** 23:9,23
24:5,7,9,14 25:5
173:14 175:2,17
**leading** 88:8
89:12 127:13
161:25
**leads** 16:4 36:13
**lean** 121:25
122:2 144:5
**learned** 57:3
83:9 84:23,25
**learning** 41:1
45:15
**leave** 25:22
138:1 165:2
**led** 22:4 27:14
**left** 47:5 54:16
133:8 135:24
137:25
**left-hand** 143:25
**legal** 5:17 109:1,
21 165:4,18
179:17,20,23
**legislation** 33:1,
5,7 79:11
**legislative** 7:17

24:4,7,9 46:8
47:19 50:9
53:23 82:1
88:15 89:11
90:25 91:11
95:17 101:17,20
103:11 104:21
105:4,18,24,25
123:21 127:21
129:4 132:3
133:23,25
134:1,2,13
135:25 141:21
142:3 143:9
152:6 155:19
156:23 157:8,
16,25 158:13
159:2,4,25
177:8
**legislators** 61:15
**legislature** 7:25
23:10,11 25:6
60:22 61:11
108:5 172:12,13
175:4
**Legislature.'**
145:22
**legitimate**
36:13,18
**leisure** 113:25
**lengths** 161:3
**lengthy** 38:22
39:5 81:17
**letter** 132:14
134:19,23
135:5,9
**level** 30:22 31:4
35:8,9,14 37:11
41:2 94:14 96:5
106:14
**libraries** 23:5

**Likewise** 150:3

**limit** 32:1

**lines** 92:14 93:6
162:15 178:13

**Lisa** 16:25 17:2,
5,10 18:15
19:22 29:1,2
41:13,16,23,24
42:2,5,18 49:16
59:25 65:13,14,
19,21,24 68:7,8,
11,13,17 69:1,7,
11,15,18,21
70:1,7,8,12,20
71:10 72:24
74:8,11 97:3,11
98:20 101:11
102:1,6,16
106:8 108:18
111:1,8 112:10
125:5 132:2
134:24 146:4

**list** 36:14 156:8

**listed** 57:2 72:23
93:21,22 140:25
141:14 142:6

**lists** 114:9

**litigation** 5:19
36:25 37:3,8,11,
13

**live** 10:22 29:12,
17,18 34:15
35:15 64:16,17
153:2

**lived** 29:10
34:15 92:7

**living** 29:15 92:1

**local** 56:4

**located** 117:16
179:13

**location** 176:25

**logistical** 47:3

**logistics** 21:24
44:6,7

**Lombard** 40:8

**long** 21:22
29:10,15 31:10,
16,21 52:11
57:16 117:11
119:12 121:1
159:19

**longer** 147:8

**looked** 13:6
85:20 98:17
99:13 102:15
105:9,10,11,12
107:2 140:24

**Loren** 155:9
178:8,13,22

**losing** 35:24

**lost** 129:16,18
131:17,20

**lot** 24:3 43:10,11
44:5,6,19 49:24
54:12 76:1
97:20 100:8
121:5,6 142:21
161:4,23 163:1,
5

**loud** 6:19

**lower** 45:10
101:21

**luckily** 112:10

**lunch** 52:12
64:15 142:17

---

### M

**machines** 38:9

**made** 7:13 25:1
34:8 46:17 48:3
58:5 62:12 68:2
71:4 90:3,15

101:15 103:15,
17,22 104:4,9
111:3,8,14
127:25 132:6
141:11 151:21
168:8 180:11

**main** 101:24
102:13 104:10
120:2 143:4

**major** 30:5,6,9
91:4,8

**majority** 68:3,4,
18 69:13,21
88:2,6,14,25
89:15 92:22
93:11 94:9,25
95:8,16 96:10,
14 108:17
111:10 112:25
113:9 148:9
149:18 172:13

**make** 6:11,22
8:7,10,12 9:4,15
22:14 26:4
30:17 32:7
48:17 63:5
97:22 98:3
103:14 106:7
107:7,12,16,17,
18,21 108:8,9,
17,19 116:8
129:15 130:14
131:4 135:9
137:6 165:8

**maker** 53:1

**makes** 89:13
141:2,13,16
142:7,8 143:24

**making** 11:17,
18 32:10 44:16,
18 45:8 51:6
57:8 89:4 98:7

99:7 103:25
107:15

**MALDEF** 5:18

**managed** 112:9

**managing** 169:6

**mandates**
107:22

**manner** 23:6

**map** 7:23 32:9
44:16,18 45:8
51:6 53:1,13,18
57:8,11 59:6
60:19 84:12,13
88:15 89:12
91:11 94:18
95:17 101:16
103:11 106:19,
24 114:16
118:6,14 127:17
129:3,4 130:20,
24 132:3,4,7
133:1,23 134:1,
2,6,8 136:1
139:16,18
145:25 148:10
153:12 154:19,
23 157:25
158:9,13 159:25
161:25 171:1
172:17,20
173:16,19
174:1,8,14
176:22 177:3,8,
10 178:9,12,13,
22,24

**mapped** 128:7

**mapping** 53:11
55:1 117:14
127:12,15
130:3,7 133:2
146:5

**maps** 7:17,18,24
12:14 23:11
24:8,11,20 44:2
47:19,21 53:6,9
56:11,15 58:23
59:8,14 60:11,
14,16,20 61:16
74:3,4 80:9,13
82:8,13,14,16,
17 83:4,23 84:2,
15,23 92:18
97:5,14,18,20
98:7,15,19,24
99:10 100:9,10,
17,20,22 108:13
109:11 114:20,
23 115:2,6,8,11,
15,16,21
118:24,25
120:17,20,23,24
123:16 124:21
125:6,23 127:2,
9,19,20,21,23
128:7,9,14,17,
23 129:1,7,13,
22 130:13
131:5,6,22
132:11,15,21
133:13,19
134:14,15,20
135:13,16
136:12 143:1
145:18 150:16
151:9 160:3,9
161:9 162:25
163:22 166:23
171:12,15,17,18
172:12 175:3
176:4 177:5

**March** 170:18

**mark** 51:21
149:24 170:2

**marked** 63:24
64:1 101:4
112:17,19,21
122:18 124:14
125:20 138:18,
25 145:9 170:5
**massive** 35:10
43:5 50:20
**master's** 30:13
**mate** 123:3
**materials** 45:5
**mathematical**
57:23
**Matt** 73:5 74:4
76:10,13 77:1
**matter** 47:2
112:1 171:19
**mattered** 22:15
**Mclean** 16:25
17:5,10 18:15
19:22 29:1
41:13,16,23
42:18 59:25
68:7,8,11,13,17
69:1,7,11,15
70:1,7,12,20
71:10 72:24
74:8,11 97:3
98:20 101:11
108:18 111:2,8
125:5 132:3
134:24 146:4
**means** 8:19
30:18 139:6,7,
13 142:11
146:15 147:23
166:19,20
**meant** 121:12
140:22,23 141:4
166:23 172:8
**mechanisms**
23:6

**media** 50:22
77:22
**mediate** 40:16
123:6
**mediated** 40:17
**mediating** 88:24
114:4 123:12
**mediation** 40:3,
14,18,19,21
**mediations** 35:7
40:22,25 41:4
**mediator** 38:20
40:1,4,7,15
59:18 116:18,21
120:1
**meet** 10:23 11:2,
5 25:13 60:22
61:10
**meeting** 12:4
22:18 24:17,23
25:2 27:24
38:15 42:15,17
46:6 48:8 50:18
62:2,3,4,8,11,17
64:4,23 65:7,12
68:3,19,22
69:15 70:9 71:3
84:14 108:22
111:1,7 118:16,
20,21 119:4,5,7,
15,20 120:2,3,4,
7,19,25 121:9,
10 123:10,13
124:5,6,18,25
125:14 126:16,
19 128:11
130:21 131:13,
23 134:7
145:12,13 160:7
161:2,11,13
180:13

**Meeting.'**
118:15
**meetings** 19:17
38:17 42:22,24
48:4,12 50:22
51:10,11 61:4,6,
7,14,23,24,25
62:5,9,12,22,25
63:11,14 84:14,
17 86:11 97:10
99:1 107:10
109:7,8,25
110:25 111:15
117:11 119:10,
11,24 160:12,24
162:22 166:7,13
167:19,24
**member** 27:19
28:4 99:6
106:22 118:13
133:22
**members** 23:5
36:5 41:20 53:8
56:10,13 60:11,
22,24 61:10
79:15,18 134:13
153:1 160:17
**memo** 112:24
113:1,17,20
116:13 123:17
130:18 133:13
**memory** 21:17
**Mennonite** 40:8
**mention** 19:14
21:16 137:13
165:21
**mentioned** 10:2
11:21 14:25
19:24,25 21:7
24:7 25:13
37:14 40:1 41:7
42:13 47:16

48:11 52:22
61:22 63:6,17
71:9 83:14 86:6,
10 92:20 100:17
102:25 110:19
116:12 144:13
148:18 155:5
159:20 163:17
165:7 167:9
169:11
**mentions** 66:23
101:17
**menu** 57:16,19
142:17
**mess** 44:20
**message** 58:24
122:5,7 123:1,7
124:9,22 125:8
**messages** 15:9
16:1,10,15
50:23
**messaging** 16:14
**messed** 56:7
**met** 25:13 41:24
42:13 60:24
81:2
**metric** 85:7
97:22 99:21
140:23 141:3,17
**metrics** 7:18
43:22 48:12
51:1 53:15,17,
18 54:4,6,8,9,25
55:4,8,12,14
56:7,9,14,20,24
85:20 97:12,14
98:7,11 99:10,
16 100:9,16,17
118:7,9 121:15,
17,22 162:10
**Mexican** 5:16

**Mexico** 29:9
30:3
**micro** 35:8
**mid** 153:13
**midnight** 114:16
115:16,21
125:24 129:16,
19 132:23,24
**million** 22:10
160:17
**MILLSTEIN**
10:18 12:17
16:24 17:13
18:4,20 19:4
24:12,21 25:17
28:19 32:15
33:2 36:7 37:15
41:9 46:2 49:11
51:7,24 52:10
57:13 59:9 60:6
61:18 64:5,9,22
65:1 66:7 68:1,
10 69:10 70:4,
14,23 73:6
74:14,25 75:10
79:8 81:13 82:3,
10 83:5 85:17,
21 87:22 88:3,
16 89:2 90:12
91:15,23 92:25
93:8 95:24
96:16 97:7
99:19 100:12,19
103:2 105:5
106:1 107:1
108:1,15
109:12,20
110:22 111:19
112:7 113:23
115:4,17,23
122:8,12,15
123:23 124:11
125:15 126:10,

15 127:8 130:1,
22 133:24
134:16,22
135:18 137:15
139:25 140:18
141:23 142:4
144:19 145:4
146:12,22
147:4,24
148:11,24
149:8,19 151:1
162:6,16 165:18
166:18 168:17
174:25 176:21
178:3,16
179:11,20
181:19

**mind** 9:8 21:21
22:21 43:13
44:14 76:25
116:4 145:15

**mindful** 6:7

**minimum** 52:13

**minority** 34:16
61:2 88:2,6,14,
25 89:15 92:22
93:11,14 94:10,
25 95:8,17,22
96:10,12,15
99:11

**minute** 64:12
153:23

**minutes** 19:17
52:14 63:21
64:23 66:23
71:25 145:12,15
147:10

**missed** 62:2

**Misstates**
110:22

**mistaken** 82:21

**moderate**
103:19 104:3

**moment** 9:3
64:5 118:19
156:12,13

**Monday** 117:9,
10

**money** 108:22

**monolithic**
181:10

**month** 26:14
74:17,18 110:25
126:17

**monthly** 110:24

**months** 21:11,22
29:2 43:16
46:21 50:7
74:18 113:4,16
127:13

**morning** 5:12
132:23,25 133:8
136:6,7

**motion** 20:9

**motivated**
125:10

**move** 156:4

**moved** 29:11,17

**Moving** 157:6

**multiple** 10:16
41:4 57:15 94:2
109:7 110:5
111:4 161:1

**musical** 43:1

**mutually** 130:13

────────────

**N**

**named** 27:19
28:5

**names** 73:3

**narrow** 56:23

**nation** 34:11,13
91:18 151:8,25
152:2,3,5,6,11
153:2,7,15
154:16 155:6,24
157:3,4,10,19
158:19 159:5
173:9,12,15,21,
25 174:14
176:19 177:1,4,
15 178:2 179:18
180:3,12

**nation-to-nation**
151:17

**Native** 164:8
179:24 180:23

**nature** 39:8 47:3
63:13 67:15,17
112:10 162:4

**nauseam** 125:5

**navigated**
156:13

**nearing** 128:18

**necessarily** 9:14
73:18

**needed** 26:4
39:2 102:17
117:21 130:14

**needing** 121:2

**negotiate** 38:22
46:8,9 47:15,18,
19,20 94:18
120:15 144:8
169:20

**negotiated**
90:15 103:11
128:1 148:19
161:21

**negotiating** 54:5
55:8 56:19 90:6
94:7 101:25
104:7 120:5

151:12 160:20
162:10

**negotiation**
38:23 45:20,21,
24 46:12 47:1,
13 53:14,15,16
59:21 84:21,24,
25 85:1,9 86:13
88:9,11,18
89:10,13 92:21
93:2 94:19
102:8,12,14,16,
23 104:9,10,16
105:16 112:14
114:5 121:1
122:3 127:10
144:9 162:8,19
180:6

**negotiations**
45:12,13 88:20
91:9 101:23
103:9 105:2
126:25 140:5
145:2 148:9
161:24

**neutral** 57:24

**NICA** 33:7,9

**Nicaragua**
33:19

**Nicaraguan**
33:22

**night** 114:16
131:11

**Nixon** 42:8

**nodding** 6:20

**nods** 95:13

**nondecision**
72:21

**nonindependent**
87:7 130:7

**nonresponsive**
45:7 77:15,20

137:8

**nonvoting** 26:17

**noon** 52:2,8,9

**note** 77:23
161:23

**notes** 21:4 90:4
138:21,22
139:22 140:6,21
141:20,25
142:2,14,18
144:11,15
147:20 148:5,23
149:1 152:16

**notice** 60:18
142:20

**notified** 24:18

**November**
46:23 114:17
117:8,9 119:4
129:5 131:12
132:2 145:12

**number** 32:6
43:5 55:17
107:16,17 138:7
143:21 145:25

**numbering**
145:3

**numbers** 38:9
43:17 123:21

**numerous** 166:8

────────────

**O**

**O'NEIL** 112:24
113:8 116:13,16
118:12 119:3
123:18 130:19
131:2

**oath** 5:6 8:18,21

**object** 6:17
10:18 12:17
18:4 28:19 46:2

97:7 105:5 106:1 108:15 109:12 111:19 113:10 115:4 141:23 151:1 166:18 174:3, 24,25 180:4

**objecting** 6:13

**objection** 6:14 9:22 16:24 17:13 18:20 19:4 24:12,21 25:17 32:15 33:2 34:4 36:7 37:15 41:9 49:11 51:7 57:13 59:9 60:6 61:18 66:7 68:1, 10 69:10 70:4, 14,23 72:10 73:6 74:14,25 75:10 79:8 81:13 82:3,10 83:5 85:17,21 87:22 88:3,16 89:2 90:12 91:15,23 92:25 93:8 95:24 96:16 99:19 100:12,19 103:2 107:1 108:1 110:22 112:7 115:17,23 123:23 125:15 126:10,15 127:8 130:1,22 133:24 134:16,22 135:18 137:15 139:25 140:18 142:4 144:19 145:4 146:12,22 147:4,24 148:11,24

149:8,19 162:6, 16 165:18 168:17 176:21 178:3,16 179:20 180:25

**objections** 6:11

**objects** 116:10

**obligated** 66:3,5

**obligation** 8:19 168:5 175:16 179:17,23

**obligations** 65:20 81:2,11 84:5

**obtuse** 18:9

**occur** 53:16 92:5

**occurred** 73:25

**occurs** 172:11

**October** 5:1 43:7 158:1,13 159:2

**offer** 137:12 169:13,23

**offered** 57:15 59:4 137:9

**offers** 57:17 117:16,19

**office** 12:10 13:1,7 38:7 65:16,22 103:19 108:13 109:1,2, 6,10 110:6,14 111:17,22 133:11 137:18

**official** 14:16,22 15:18 35:18 71:24

**officials** 61:10

**Olympia** 13:1,3, 6 98:22 102:3, 15 133:11

**ongoing** 37:10

**online** 129:24 170:15

**op** 21:8 22:2 175:1,5,25

**open** 21:1 37:6, 20,21 46:6 50:17,21 52:2 62:4 64:11,14, 15 68:3,18,22 69:14 70:9 71:3, 4 76:6,7,8,9,11, 12,16,17 84:13, 14 107:10 108:22 109:6,8, 25 111:7,15 118:20 120:18, 25 122:21 123:10 125:17 131:23 161:16, 19 162:22 166:7 177:7

**opened** 145:20

**operate** 106:14

**opinion** 20:15, 17,18 37:13,18 56:18 59:3,18 69:14 104:15 167:20 171:12, 15 172:17,20 173:19,23

**opinions** 106:11, 13

**OPMA** 10:5,12 18:22 19:2 160:6 161:5

**opportunities** 160:25

**opportunity** 8:6 41:25 95:21 116:23 137:10 166:13

**opposed** 69:3 180:24

**opposition** 173:9 181:16

**option** 58:8 72:9

**options** 45:13 57:16,19 58:2

**order** 37:4,19 54:18 167:1

**ordinary** 35:6

**organization** 30:20,21,24 31:24

**organizational** 70:25

**organizations** 30:12,25 31:5 62:22 63:14

**organized** 169:21

**organizer** 22:24

**original** 143:23

**Osta** 27:19,20 28:5,14

**other's** 106:13

**outcome** 175:13

**outreach** 24:2 49:10,15,17,20, 24,25 50:4,6,14, 17 51:6 61:23 62:3,5,21

**overlap** 59:16, 24 100:23,25

**owned** 153:4

**ownership** 48:5

**P**

**p.m.** 118:24 123:8 124:17 129:4,5 130:12

132:1 134:4 181:24

**package** 15:3,4, 7 133:16

**packing** 79:14

**pages** 140:9 172:2

**paging** 114:7,8 142:15

**Pailthorp** 49:23

**Palmer** 5:19 154:6

**paragraph** 146:7,11,17,21 147:2 172:3,4

**parameters** 53:25

**paraphrased** 50:24

**parenting** 40:19

**parents** 35:15

**part** 13:19 26:5 55:19 90:1 93:7 95:14 103:15,17 114:19 115:3 131:8 153:7 154:11 155:6 180:5

**participate** 36:12 167:22

**participated** 23:17 34:17 175:18

**participation** 68:12

**parties** 23:4 53:14 117:2,4

**partisan** 121:14, 16,22,24 162:4, 9,13 165:16 168:15 171:13

172:18
**partisanship**
  123:21 166:6
**partner** 105:16
**party** 9:22 10:14
  57:25 58:21
  61:10 85:9,11,
  13 114:4 143:3
  166:24 167:3
  172:13 175:24
**pass** 114:15
**passage** 115:2,6,
  8
**passed** 33:6,10
  114:20,23
  115:16,21 176:5
**passing** 93:5
**passionate**
  96:24
**past** 43:19 56:6
**patterns** 96:6,13
**Paul** 80:23
  84:22 88:9,18
  101:10 102:17
  104:11 121:18
  143:13 180:10
**Paul/april**
  148:16
**pause** 21:10,21
  122:12
**PDF** 64:23
  113:24 170:11,
  15
**Peace** 40:8
**penalty** 8:9
**pending** 7:8
**people** 11:21
  15:10 21:11
  22:15,22 23:4,7,
  15,17 34:10,14
  35:6,23 36:21

43:6 50:13,21
  54:20 81:24,25
  96:24 114:5
  121:18 137:19
  161:3,7 175:18
**percent** 34:7
  36:3 54:2
  101:18,21
**percentage**
  145:24
**Perfect** 154:4
**perform** 97:5
**performed** 99:9
**performing**
  139:4 141:7
  142:1 148:3
**period** 15:11
  57:16 76:1
  93:19 94:3
  119:12 169:21
**periodically**
  117:18
**periods** 117:11
**perjury** 8:9
**person** 10:24
  12:9 39:21 92:3
  108:16,20
  114:22 136:25
**person's** 138:7
**personal** 14:6,17
  15:5,19,22 16:1,
  11 29:5 106:11,
  13 138:1,11
**personally**
  19:15 51:9,16
  53:6
**perspective**
  55:23
**persuade** 25:20,
  25
**pertain** 39:12

**pertained** 43:3
**pertaining**
  18:22 19:12
  32:9,12,14
  65:21 86:13
**pertains** 20:18
  86:12 141:13
**Ph.d** 30:11
**phase** 43:3
**phases** 43:2
**phone** 10:24
  12:25 14:25
  15:1,4,5,16,19,
  23,25 16:1,11
  27:22 135:7
  138:1,2,3,7,11
**phones** 138:5,6
**phrase** 169:12
**phrased** 167:10
**phrasing** 72:20
**physical** 8:7
  116:10 128:16
**pick-up** 11:15
**picture** 135:6
**piece** 99:12
**placard** 119:14
**place** 29:17
  39:1,4 142:19
**placement** 48:18
**places** 32:5
  59:19 100:24
  154:21
**plaintiffs** 5:18
  178:10
**plaintiffs'** 154:9,
  12 155:1,19
  156:23 157:8,16
  178:23 179:9,14
**plan** 154:9 155:1
  172:5 173:10
  177:23 179:14

**planned** 134:3
**planning** 23:12
  24:19 25:9
  43:11 118:18
**plans** 40:19
**platforms** 16:14
**play** 141:18
**pleading** 154:1
**pleasure** 150:1
**PM** 118:13
**point** 7:5 17:20
  18:13 27:16,17
  43:20 57:14
  82:21 91:4,8,9
  92:2 100:1
  101:24 102:11
  114:2 116:13,14
  118:12 119:2,17
  121:11,13
  123:13,18
  126:18 130:18
  131:1,13,18,25
  132:1 146:6
  149:10 160:10
  161:5,15 167:17
  175:20 179:22
**pointing** 175:5
**points** 102:21
  105:24
**polarized** 87:20
**police** 41:4
**policies** 39:3,11
**policing** 35:11
  40:22
**policy** 36:11
**political** 23:3
  32:22,25 39:9
  82:2 161:21
  171:5 172:14
  175:23
**politically** 23:4

**politicians**
  164:25
**poll** 58:11
**pooled** 58:8,21
**pooling** 57:24
**population**
  23:20 34:7,8,14
  48:18 95:22
  139:9 144:18
  145:24
**populations**
  47:7,8 96:12
  98:6 128:4
**populus** 37:20
**portray** 131:3,
  11
**position** 23:3,25
  31:13 41:17
  93:20 103:5
  104:5 137:11
  169:13 171:25
**positions** 71:5
  117:2
**positive** 163:5
**possession** 20:2
**possibility**
  116:25
**possibly** 94:12,
  24 115:10
**post** 32:1 128:19
  129:24 130:4,9
  133:14,15
**posted** 129:1,3,
  4,8 135:13
**posterity** 19:22
**postgraduate**
  30:7,10 31:8
**potential** 76:21
  77:6 95:8,16
  116:25

**potentially** 10:9

**power** 79:20

**powerful** 175:23

**practices** 35:18, 19

**precedent** 48:6

**preceding** 84:22

**predicated** 103:18 149:2

**predominated** 162:14

**prefer** 5:12

**preference** 78:5

**preliminary** 20:9

**preparation** 11:23 12:5 45:5

**prepare** 10:23, 25 11:2 12:10 15:15 20:6

**prepared** 72:24 105:13,22 106:3 108:9 124:7 145:23

**presence** 89:15

**present** 42:22 127:2 166:11

**presentation** 12:9 63:5,6,8 64:4 65:25 67:1, 4,9,12 79:1,3

**presentations** 45:1 111:15

**presented** 66:16 78:13 131:22 178:7

**preserved** 152:4

**preserves** 9:23

**preserving** 6:17

**press** 136:13,17 168:3

**pressure** 123:15 169:6

**pretty** 103:1 116:16 133:14 161:10 163:3,6, 7

**prevent** 79:16 107:14 161:20

**previous** 9:5 32:19 36:25 46:23 85:15,19 88:20 90:3,14 143:15

**previously** 63:17 105:9 150:18 152:9

**primarily** 15:17 128:7

**primary** 15:10 53:1 66:14 162:9

**printed** 20:19

**prior** 10:12 13:8 15:6 24:17 25:8 29:18 31:18,24 32:8 103:10 110:22 118:21 120:6,7,19 132:18 146:20

**priorities** 57:1, 4,7 84:8,9,11, 13,16,25 85:4 86:5,9,20,25 87:5,6,8 150:19 151:11 162:22 163:3,9,12,13 171:24

**prioritize** 150:23 169:8

**prioritized** 166:25

**priority** 22:6 49:1,6 96:24 180:2

**private** 160:12

**privately** 21:14

**privilege** 109:15

**privileged** 72:6 73:16 109:14 110:7

**privy** 88:21 114:10 123:22 127:12 162:8,18

**problem** 64:13

**problems** 35:7 36:14

**procedure** 129:22

**proceed** 131:19

**process** 7:12,13 12:13,21 17:20 18:1,15 19:21 21:10,15 22:6 23:8,17 26:6 27:14,18 28:2 36:24 38:10,14, 18,23 41:17 44:25 45:20,21, 24 46:4 47:2,3, 13 50:12,15 53:13,14 55:11 57:8,12 62:23 74:24 84:8,10 85:9 86:6,10,25 87:8 98:1 125:2 127:10 129:20, 25 130:2,16 135:4 136:11, 20,24 137:18,22 138:9 150:16 161:7 165:21 166:1 167:11,19 168:7,9 171:4

172:8 175:7,13, 18 180:6

**processes** 7:18

**processing** 17:15

**procurement** 38:8

**produce** 16:8,23 17:16 60:2 115:11 116:9

**produced** 16:17 63:12 100:8 122:5

**producing** 99:16

**product** 23:18 98:21 116:7

**production** 16:19,21 17:12

**professional** 38:20 59:18 108:4

**program** 30:12 35:11,23

**programs** 35:22

**progress** 123:12

**prolog** 113:11

**prompted** 124:24 125:1

**properly** 37:20

**proposal** 93:6 101:15 104:19, 25 114:3 121:14,16

**proposals** 121:4, 20,21

**proposed** 60:11 154:9 155:1 171:1 172:17,20 173:19 178:10

**proud** 176:4,6

**prove** 80:2,3

**provide** 17:16 19:7,14 26:2 35:7,9,16 37:5 43:21 45:4 55:3 58:22 59:1 67:20 73:14 98:1 114:3 115:9 118:4 169:16

**provided** 40:21 69:21 109:2 111:23 116:23 138:14 177:3

**providing** 37:23 68:20

**provision** 166:5, 17,23

**PST** 5:2

**psychology** 30:6

**public** 16:6,22 19:17,20 20:5 22:7,9,13,18 23:1,5 43:6 46:6 48:3,20,23 49:1, 9,15,24,25 50:3, 6,12,14,17,21 51:6 54:21 57:2, 3,7 59:14 61:22 62:3,4,5,21 63:5,6,10 68:3, 19,22 69:14 70:9 71:3,4 82:12,16 83:8 84:14,17 86:7, 10,11 87:1 107:9,10,12 108:22 109:25 111:7 112:1 118:20 119:5,7, 15,20 120:2,3, 18,25 123:10,13

124:2 126:17,19
128:17 129:2
131:13,23
137:17 160:7,
15,17,24
162:22,23
163:1,9 166:7
169:18 180:13

**public's** 37:22

**publicly** 21:14
59:7 84:17 87:5

**published** 74:5
82:14 84:11
93:20

**publishing**
162:23

**pull** 56:6

**pulling** 122:4

**purpose** 26:2
65:23 92:18

**purposes** 178:20

**push** 63:11,12

**put** 8:18 50:24
63:21 79:15
121:7 123:14
124:11 145:8

**putting** 22:12

**puzzle** 46:16,19

———————

**Q**

———————

**qualified** 44:22

**quarter** 45:11

**question** 6:10,
12,14,16,17,24
7:1,7,9:12,17,22
16:4 17:23
18:10 19:6
68:25 70:16
81:9 108:5
110:3,13,18
111:13 112:3,4

114:25 115:18,
25 125:11
126:11 140:1,4
142:7 174:4
176:4 178:18
181:1,4,5

**questioning**
138:17 176:12

**questions** 18:24
26:9 29:5 66:24
84:6 87:16
92:10 107:18
114:13 122:12
147:20 149:22,
25 150:14,18
159:11 176:8,11
180:15 181:20

**quick** 47:5 52:10
150:13 159:13
180:17

**quicker** 64:24

**quickly** 133:14

**quote** 170:23
171:7 172:15
173:17

**quote-unquote**
14:16

**quoted** 50:7

**quotes** 170:22

**quoting** 171:2

———————

**R**

———————

**race** 32:14 57:23
58:10 85:24
86:1 98:12,14
100:16 143:18
162:5,14 164:4

**races** 56:4,24
58:9

**racial** 56:25
79:15,19 97:5

171:16,21
172:21 175:6,25
181:7

**racially** 87:20

**radar** 27:21

**raised** 90:22
176:11

**ran** 58:2

**ranch** 10:22

**range** 23:7
54:13

**rates** 99:11

**RCWS** 39:1

**re-create** 90:17

**reach** 135:15

**reached** 61:5
65:21 77:11
135:21 137:9
139:23 140:16

**read** 20:12 22:3,
18 66:18,20
83:7 113:3,8,16
155:17 156:22
157:6 170:21
172:1

**reading** 173:23

**ready** 126:25
128:13 129:14
133:12

**Real** 52:10

**realtime** 82:19

**reason** 6:25
65:24 75:7
77:20 104:13
136:2

**reasons** 19:6
76:17

**recall** 10:7
13:23,24 14:21
15:1,3,17 17:7
18:21 21:12,24

26:11,14 27:13,
16 37:3 49:12
51:19 60:24
61:4,5,6 62:25
65:7 66:8 67:6,
10,12 72:23,25
73:9,24 74:15
75:2,20 76:2,6,
7,17,20,25
77:24 78:3 79:5
80:13,18,24
85:3,22 87:9
88:1,19 94:11
95:18 96:6,21
99:9,12,13
101:13 104:20
105:3,7 106:22
111:25 112:10
113:19 119:6,10
121:18 123:4
124:22 125:22,
24 126:7 130:21
134:17 135:24
136:8 139:13,21
142:13 145:2
146:11,17 152:2
158:2 164:3
168:24

**receipt** 14:23

**receive** 133:13

**received** 7:21
12:3,7 14:16,21
15:1,4,18 19:20
66:14 163:5
168:12

**receiving** 13:8
15:6 101:13
134:25

**recent** 56:5
100:4

**recess** 52:18
87:12 147:16

**recognize**
138:22 157:22
158:22,23
161:14 177:10

**recollection**
14:20 21:13
42:16 52:25
70:5,24 71:6
74:2 75:11
76:14 126:2
164:3,5 165:22
166:4

**recommend**
45:21 55:13
74:23 84:1

**recommendatio
n** 58:3 68:12

**recommendatio
ns** 58:4

**recommended**
28:16,17 45:25
47:3 65:23
71:14 74:8

**recommending**
46:13 55:14

**record** 5:23 6:5,
18 19:7,15 48:3
52:17 87:11
112:1 156:11,
14,15 158:11
159:12,14
181:22

**recorded** 8:4
50:18

**records** 16:6,22
17:11,17 19:11
138:13 162:9

**recruit** 43:5

**redirect** 176:11

**redistrict** 43:25

**redistricting**
7:12,22 12:21,

23 13:16,20
14:7,11,17,18,
22 15:1,6,19,20,
23,24 16:2,11,
15,20,22 17:3,
22 18:1,3,17
19:2 21:11,15
22:6 32:8,18,19
36:24 41:17
43:1 46:16
55:21 61:12
62:23 63:9
66:19 84:8,10
86:6,25 87:8
108:12 110:1
113:1 136:11,
20,24 138:22
145:21 165:21,
25 170:12 171:3
172:5 177:6
178:12

**redundant**
164:10

**reestablish**
104:11 117:3

**refer** 89:17
113:5 144:1
177:2

**reference** 88:20
89:4 90:14 91:2,
7 93:5,6 95:2,3

**referred** 90:19
152:19,21,25

**referring** 24:22
44:8 46:11
56:23 72:4 90:3
95:8,9 141:21
142:2 143:8
148:6

**reflected** 173:10

**reflecting**
115:24

**reflective** 39:2

**reflects** 173:19

**refrain** 73:11

**refusing** 170:25
173:13

**regard** 55:25
56:1 92:6

**region** 29:16
37:1,9 48:24
91:1,14,22
92:11,14,18,23
95:10 96:7

**regular** 39:1
62:4 107:17

**regularly** 41:24
42:14 109:5
110:4

**regulations**
33:19 38:16

**reiterated**
125:16 166:8

**relate** 151:22

**related** 12:2
16:11,22 17:21,
22 18:2 19:1
21:24 40:21
66:18 85:13
98:4

**relating** 16:2,15

**relationship**
117:4 167:8

**release** 74:2

**released** 59:7
84:17

**relief** 160:8
161:9,10

**relinquishing**
132:22

**remaining** 149:2
171:23

**remember** 9:3
10:8 14:4 15:8,
9,10,13 19:10,
11 44:9,15,16
45:9 48:2,8
49:18 50:8
53:21,24 58:6,7
60:7,17 62:2
64:4 66:17 71:7,
23 72:11 73:3,
14 76:8,11,15
77:9,10 78:8,9,
11,15 79:10
80:5,11,12,16,
21 81:6,14
82:15,18 85:19,
24 86:1 89:4
90:18 91:2,7
95:2,3,18,25
96:5,17,19,23
97:1 99:20,25
100:20,21
101:22 102:5,
14,19 103:16
106:2,5 114:3
116:15 117:10
119:16 122:7
123:12,13,22
132:20 134:25
135:1,11 136:4
138:3,12 139:6
140:5 142:5,16
143:13 144:23,
25 145:1,13
148:7,8 150:20
152:22 153:3
164:2,22 166:4,
10 168:18,22

**remembered**
43:15

**remind** 81:1
166:1,13

**reminded** 81:11

**reminding**
165:24 166:5,16

**remove** 41:16

**removed** 39:22

**repeat** 17:23
86:16 136:15
174:4

**repeated** 58:24
107:9 125:17

**rephrase** 81:9
109:22 114:25
174:7

**replica** 178:22

**report** 39:19
51:10 60:2
71:19 74:5
80:12,20,25
81:5,6,7 82:19,
20 83:9 92:3
107:3 111:2
145:21,22,23
146:2,4,10,20
147:2,6 155:9
178:6,8,9,23

**report/page**
146:9

**reported** 13:2
41:22 92:3

**reporter** 6:18
8:18

**reports** 19:18
60:7,9 179:3

**represent**
150:12 167:1
178:11

**representation**
37:6,23 111:22

**representative**
28:10 65:15

**representatives**

**reminded** 81:11

111:14

**represented**
96:25 110:10

**representing**
5:18 81:24,25

**represents**
174:15

**republican**
58:13 62:18
75:17 78:19
104:2 120:16
121:9 124:5
128:10 164:25

**republicans**
103:20 120:23
121:14,16
164:15,20

**request** 17:8,15,
16 52:1 118:16
135:9 180:13

**requested** 67:18
117:25 135:2
157:4 160:8

**requesting**
67:22 118:18

**requests** 16:6,22
19:11

**require** 40:6
165:16

**required** 79:6
173:12

**requirements**
18:16 79:14,25
80:1 89:21
107:25 165:4

**requiring** 172:7

**reservation** 34:6
152:12,15 153:6
154:21,22
173:7,8

**reserved** 181:23

reshare 156:17
residents 22:20
58:25 95:5
144:25 167:1
resign 23:15
25:1,10
resignation 22:5
25:8 26:21
resigned 24:17
170:12
resigning 24:19
resolution 13:9,
17 27:6 31:19,
21 34:24 35:3,5,
9,20,22,25 40:9,
11,12
resolved 56:22
103:1,4
resources 35:17
98:17 137:9
respect 169:3
175:17
respectful
168:23 169:1,2
responded 63:4
response 16:6,
21 57:17 163:2,
6
responses 6:19
8:3
responsibilities
167:21
responsibility
115:14,20
116:2,8,9,11
responsible
23:22
responsive
23:22
rest 57:3 83:7
110:16 114:12

126:4
restate 133:21
rested 69:20
restorative
35:18,19
result 161:22
171:13,14,16
176:5
resulted 74:22
retain 18:16
19:10 107:20
retainer 112:6
retaining 17:21
18:2 19:1 73:10
review 8:6 11:23
59:15 65:20
113:25 125:18
130:13 132:11
134:21 147:11
reviewed 12:2
20:7,10 21:6,7
42:10 134:1,25
159:20
reviewing 134:9
145:14
revised 82:13,14
157:24 158:12
159:1 163:8
revisit 114:12
rid 160:9
rights 12:11,12,
15 32:12 33:14
37:1,9 63:18
65:20,21 66:1,3,
6 67:1,5,8,11,
13,21,24 69:3
71:11 72:9 79:3,
7,23 80:3,5,8,
10,14,15,17,19
82:9 83:3,22
84:3 87:17 89:1,
5,17,18,22 95:1

98:4 106:20,24
107:5,15,25
140:17 146:8,18
147:2 150:23
165:11
rigid 117:2
River 152:17
153:10,19
155:2,5 157:1
158:17
Road 5:25
role 20:18 22:12
26:5,7 27:10,11
28:1,14 31:16
38:1
roles 39:25 41:7
room 98:23
116:16 117:6
121:18 125:25
131:15
rooms 117:15
round 59:14
62:9,11,13,16
116:24,25
row 97:20
rules 6:4
runner 76:24
running 77:22
120:3
rural 64:17

_____

        S

_____

SA 145:20
safe 91:20
143:8,20,21,22
sanction 33:18
Sarah 5:5,13,14,
24 10:2 51:25
52:11 64:10,22
113:14,23 122:6

150:4,11 156:18
159:9,18 180:21
sarah.
washington 14:3
sat 102:6
Saturday 94:5
140:7,8,9
save 64:10
saved 99:2,3
saving 64:6
scale 107:11
scanned 139:2
scenarios
117:14
scheduled 11:13
118:20 129:21
167:23
school 29:22,25
35:14,15,17
schools 35:17
screen 64:18
73:23 101:3
122:21 150:5
153:21,24
156:17 170:7
177:5
scroll 113:21
145:16 154:10
155:16 170:21
172:1,23 178:7
seamless 160:13
search 16:19,21
17:6 71:10
searchable
50:25
searches 16:5
searching 17:11
seat 58:13,14
104:3
seating 37:7,21

Seattle 5:1 20:19
21:8 22:3 29:19,
20 83:7 170:16
secondary 36:20
secret 160:7,19
161:11,13
secretary 85:24
103:4 104:5,6
149:4
section 145:20
172:1,25
seeking 109:13,
21 149:14,18
selected 26:11,
16,21
senate 15:13
46:7,8 47:19
51:12 66:10
83:8,14 112:24
113:9 120:8
senator 33:13
send 16:1 27:25
129:14 130:4,8,
19 132:7
sending 129:12
132:11,18
134:15 135:1
senior 40:4,15
66:9
sense 6:22 7:17
30:17 33:17
34:2 36:16 48:5
57:9 89:14,23,
24 95:12 133:3
141:13 143:24
sentiment 49:4,
6,9 121:13
separate 45:24
70:19,21 75:16
154:22
sequences 98:15

series 89:10
serve 26:11,17
  34:25 41:14
served 27:5
server 147:11
serves 35:20,21,
  23
service 118:4,5
  176:8
serving 18:13
session 72:5
  99:2 109:7
set 43:9 70:20
  99:15 181:10
setting 38:7,23
settled 34:10
  161:14
settlers 34:16,17
severe 161:10
shaking 6:21
shape 178:14,15
shapes 179:2
share 55:5 64:18
  67:16 71:19
  73:23 101:2,3
  110:15 112:15,
  19 122:8,21
  124:9 133:6
  137:21 153:21
  156:6,8 170:1,7
  177:5
shared 49:3
  51:1,3 55:9
  60:16,19 67:16
  75:24,25 76:19
  82:12 110:8,16
  111:1 168:4
  178:24
sharing 94:15
  99:4 128:12,17
  150:5 169:24

176:3
shift 163:16
shocked 125:8
short 61:8
shorthand 90:2
show 22:19
  153:22 154:10,
  23 155:8 157:21
shown 65:4
side 127:12,15
  133:2 143:25
sign 8:8
signature
  181:23
significant
  91:13
silence 81:3,4,11
silly 160:11,20
  161:6
similar 14:23
  179:2,4
simply 9:17
  23:15,21 72:12
  73:12 114:10
  123:25 175:20
Sims 76:2 80:23
  84:9,11,22
  86:21 88:9,13,
  23 90:25 91:9,
  25 92:2,24
  94:17,21 101:9,
  15,19 104:7,12,
  14,16 116:19
  117:5 120:1
  121:13,15,19
  122:5 123:3,19
  124:10,17,24
  139:3 140:15
  143:14 157:25
  161:24 180:10
Sims' 158:12

simultaneous
  161:1
single 114:22
  153:15 154:16
  158:19 159:5
  161:2 166:9
sit 49:19 98:22
site 158:2
sitting 126:3
situated 153:9
situation 106:22
  120:21
sixth 118:11
size 54:1
Skamania
  176:20 177:23,
  25
slate 62:7 71:2,
  14,16,18 72:24
  76:9,12 78:6
sleep 96:20
  133:10
slightly 125:24
  140:4 181:4
small 34:19
  113:24
social 23:16
  36:14 50:22
societal 30:22
sociology 30:6,
  12,24
software 43:24
  44:1,4,8,17,18
  53:11 55:1
solely 123:20
solicited 59:4
solve 35:6
sort 30:22 40:6
  43:19 45:10
  56:23 57:9,16
  79:11 83:22

91:4,6 94:16
  111:16 165:16
sorting 99:25
Soto 5:19 154:6
sounds 39:13
  173:23 181:20
southwest
  155:22
space 38:7
  117:12,13,17
speak 47:14
  65:12 73:15
  98:16 108:11
  166:19,20,21
  168:10 180:9
speaker 6:7 61:3
speaking 76:2
  170:24
specific 10:8
  13:20 19:11,21
  28:11 32:22,25
  45:17 56:24
  61:14,16 63:15
  65:24 72:3,18
  74:23 75:2,6,12,
  22 76:7,17 78:5
  80:11 85:8
  102:20 107:4
  109:21 137:20
  141:1,9 142:8
  148:6 152:23
specifically
  13:24 19:10
  21:12 26:17
  32:16 38:2 56:9
  59:22 60:8
  65:14 67:6
  69:15 72:13
  78:11 81:6
  85:11 95:9 96:3
  99:14 113:10,19
  126:22 149:12

164:21 166:2
  168:19
specifics 166:8
speculate
  136:22
speculation
  137:6
spend 91:13
  108:21
spent 44:5 91:17
spirit 172:9
split 62:10,16
  152:9
splitting 173:7
spoke 15:16
  96:18 110:4
spoken 21:14,
  16,18
sponsored 33:13
spreadsheet
  50:20,25
spreadsheets
  48:23
spring 10:9,10,
  11
squeezed 46:24
staff 7:16 13:2,6
  15:11,12 19:19
  26:8 27:19 28:4,
  24 33:14 36:2,3
  38:10 40:24
  41:14,15,20,22,
  23 42:1,4,14,15,
  18,21 44:22,24
  45:1,12 47:11
  48:11,20,22
  50:18 51:2,5,9,
  10,12 52:23,24
  53:2,8 54:6
  55:7,10,12
  57:11,15 58:5

59:15,25 60:2,
18 61:9 68:7,8,
15 69:2,6,12,16
70:1,7,9,10,20
71:1,2,4 81:23
83:19 87:7,20
97:16 98:18
99:6 102:3,5
104:20 105:1,19
106:8,9,18,23
107:3,8 108:4
117:13 118:6,13
119:4,6,8,18
123:15 125:4
127:11,15
128:12 129:12,
13,23,24 130:3,
4,7,8,12,20
133:2,9,11,23
134:2,6,9 146:3
167:25 168:15

**staffs** 93:13

**stage** 44:15
103:1 122:2
148:8

**stale** 123:3

**stand** 38:5

**stand-alone**
146:9

**standards** 40:11

**standing** 38:11
66:12

**stands** 33:9

**start** 53:17 54:5
118:8 152:19

**started** 13:15
17:19 59:19
120:2 123:14

**state** 5:22 7:19
22:10,15,20
23:10,23 25:5
33:18 34:6 40:5

56:4 58:9,10
60:22 65:11
85:24 87:3
94:14 95:6
103:5 104:5,6
129:7 144:24
149:5 150:12,13
151:15,19
164:15 165:12
171:4 175:2,4
177:6,8 181:9

**State's** 170:25
172:11

**stated** 57:1,7
81:12 87:5
163:11,14

**statement** 22:18
93:22 162:22

**statements** 57:2,
4 86:11

**states** 33:19
36:11 172:12

**statewide** 35:22
40:12

**status** 40:14

**statute** 165:20
166:8

**stayed** 117:17

**step** 131:23

**steps** 19:15 82:8
125:5 132:21

**sticking** 91:4,8,9
176:18

**stoney** 81:2,4,10

**stop** 73:23 150:5

**stored** 51:3

**strange** 46:16

**strategy** 23:1

**strengthening**
37:24

**stressful** 168:2

**stricken** 146:21

**strike** 17:9,24
25:12 28:8,16
30:8 31:10
34:23 36:23
39:15 40:2
45:22 47:25
61:23 68:25
82:25 83:13,25
88:12 126:6
127:4 135:12
146:7 148:15
152:4 159:10
164:18 165:6,24
168:21 174:20

**striving** 80:17
142:25

**strongly** 107:20
116:24

**structure** 36:13,
18 48:1

**struggle** 19:9

**stuck** 26:7

**studied** 30:12
31:3

**study** 179:3

**style** 46:12

**subject** 92:23

**submit** 60:11

**submitted** 59:13
82:16 83:23

**substance** 86:22
102:13 104:10
109:18

**substantially**
179:2

**substantive**
61:16

**successful** 35:11
165:1

**succinct** 169:21

**sued** 37:4

**sufficiently**
107:24

**suggested** 48:4
173:1

**suit** 18:22 173:6
175:11,14

**summarize**
110:2

**summary** 80:4
166:10

**summer** 74:1

**Sunday** 27:24

**supervise** 41:12

**supervised**
41:13 91:25

**supervisor** 41:7,
15,25 42:2

**supervisory**
39:8

**supplied** 108:4

**supply** 106:15
107:5 118:8

**support** 118:5

**suppose** 156:7

**supposed** 119:5

**Supreme** 7:24
131:24 132:4,7,
12,14,18,21
133:4,16
134:20,21
135:14 145:18

**surmised** 7:11

**surmising** 29:1

**surprised** 129:7
159:24

**surrounding**
128:4

**Sutherland**
65:9,10,22 79:2

**swallow** 104:2

**Swan** 5:25

**switched** 120:12

**switching** 165:3

**sworn/affirmed**
5:6

**synthesizing**
50:16

**system** 40:5,20

**systems** 30:14,
15,20,21 31:5
35:9 38:8 43:10

---

**T**

**table** 137:1,2,14

**tacet** 49:19

**tail** 85:1

**takes** 154:20
172:10

**taking** 7:15
51:22 90:4
139:21 144:10

**talk** 74:7 77:10
102:17,18
105:13 112:13
117:12 138:8
150:2 167:7
168:12

**talked** 77:21
112:15 124:21
161:23

**talking** 21:12
44:18 80:21
81:7 86:19
90:18 94:13,23,
24 102:9 117:7
141:1 142:7,9,
20,22 143:5
152:23

**talks** 79:13 80:7

SARAH AUGUSTINE - 10/06/2022 Index: t..T

**target** 145:25

**task** 38:24 39:6, 7,9,10

**tasks** 22:23 133:10

**team** 46:7,9 75:12,15 78:21, 23 97:11 120:8, 9,16 121:9 124:5,6 128:10, 11 134:2,9,13 168:6

**teams** 120:4,7

**telephone** 38:9 50:23

**telling** 119:18

**ten** 43:25 44:1 47:2 56:6 63:2,4 97:25

**ten-minute** 51:22

**tend** 164:14,19

**tension** 174:18 175:21,25 181:6,14

**tensions** 40:21

**tenure** 36:2 62:1

**term** 96:1,3

**terms** 59:20 99:1 115:6 167:18 171:23

**terrible** 104:2

**territories** 34:12 153:1,2 173:12

**territory** 152:17,18,19,21 153:5,18

**tertiary** 36:20

**testified** 5:7 149:5

**testify** 73:20

**testifying** 8:22 54:20

**testimony** 8:15 43:6 63:11 110:23

**tests** 58:1

**text** 15:9 16:1, 10,15 122:5,7 123:1,7 124:9, 17,22 134:25

**texted** 122:6 123:1,3 135:7

**thankful** 112:8

**theories** 31:2

**thing** 44:12 55:25 69:19 100:2 113:25 117:25 118:2 128:2 136:15 142:7 160:22 168:5

**things** 19:23,24 22:16 31:6 35:16 47:10 50:13 55:15 79:22 94:6 102:9 117:21,23 118:10 137:10 161:18 163:8 165:11 168:1 169:23

**thinking** 30:25 31:4 48:20 118:9

**thought** 73:19

**thoughts** 67:13

**thousand** 54:17

**threatened** 149:9

**three-day** 90:1 94:2

**Thrift-viveros** 5:11,15 9:24 10:1,19 12:18 17:1,18 18:11, 23 19:13 24:16 25:7,18 28:22 32:17 33:4 34:21 36:9 37:17 41:11 46:3 49:14 51:17,20 52:4,7, 15,21 57:18 59:11 60:10 61:20 63:23 64:3,7,13,20 65:3 66:22 68:6, 24 69:23 70:11, 18 71:8 72:16 73:8 74:16 75:4, 14 80:6 81:19 82:6,23 83:11 85:18 86:2 87:10,15,25 88:5,22 89:19 90:23 91:19 92:9 93:4,10 96:2 97:2,8 100:7,14 101:1, 6 103:7 105:17 106:17 107:23 108:10,24 109:17,22,23 111:12,20,24 112:12,16,23 113:13 114:11 115:13,19 116:3 122:10,14,17, 20,25 124:8,13, 16 125:19,21 126:12,21 128:22 130:6,25 134:11,18 135:8,20 137:24

138:15,20,24 139:1 140:3 141:5,24 142:12 144:21 145:6,11 146:14,25 147:13,19 148:1,13 149:3, 11,21 150:3,6, 19 156:5,10 176:10,15,24 178:5,19 179:12 180:1,7,14

**thumb** 107:10

**Thursday** 5:1 27:20 136:6,7,9, 14,18

**time** 6:7 11:17 13:10 15:11 18:1 21:22 22:25 23:15 24:3 26:20,24 27:1,9,23,24 28:13 33:9 43:7, 10 44:2,5 46:20 47:2,14 56:7 57:16 60:18 74:6,11 75:3 76:1,15 77:23 84:23 85:2,6 87:11 91:13,17 93:19 94:4 96:22 102:12 104:14 111:1 117:25 118:1, 18,23,25 119:25 120:2,12,15,17 121:5,20 122:22 123:10,24 124:5 126:23 131:14 139:18 144:10 149:22,25 162:3 168:4 169:9,21, 25

**timeline** 9:15 17:16 112:25 113:6 140:6

**times** 11:5 13:1 15:24 17:5 20:19 21:8 22:3 39:3 51:12 57:15 83:7 94:2 97:9 106:10 109:7 110:5 112:15 119:24 137:10 168:2 170:16

**tiny** 34:16

**title** 15:13 154:8 155:17 156:22 157:7 158:3

**titled** 145:21 170:11

**to-be-published** 146:10

**today** 8:15 11:12 20:20 21:4 161:25 164:1,2

**told** 24:9 84:7 85:3 126:7 136:12

**tool** 98:25

**tools** 26:4 35:5 160:4,5

**top** 43:16 48:25 50:8 145:14 170:12 172:24 178:7

**topic** 30:9 51:9 78:16 88:11 89:6,8

**topics** 101:25 176:11

**Toppenish** 154:20 179:13

**towns** 154:21
173:7

**tracking** 112:11

**traction** 59:20

**trade** 93:7

**trades** 89:10
92:20,21,23

**traditionally**
55:20

**train** 44:23

**trained** 40:7,10
107:16,25

**training** 12:2,7,
8,19 20:24 35:5,
16 40:6 44:19
63:18 67:9

**trainings** 45:1,8

**translation**
161:1

**transmission**
7:24 132:20

**transmitting**
132:3

**treasurer**
140:10

**treasury** 143:18

**trial** 8:13

**tribal** 91:18
151:14,16,19,
22,24 176:20,25
177:1 179:25
180:10

**tribe** 179:24

**tribes** 34:11,13
151:15

**trouble** 19:5

**troubleshoot**
51:13

**true** 171:23

**trust** 37:22 92:5,
6 104:7,11,17

117:4 176:20
177:1,25 178:2
179:18 180:3

**trusted** 163:10

**truth** 5:6,7 8:20

**Tuesday** 132:2

**Tulalip** 142:22

**turn** 100:2

**turnout** 99:11
100:16

**turns** 91:5

**two-hour**
149:24

**tying** 33:18

**types** 41:1

**typical** 38:7

**typically** 77:17
81:2 137:8

**typo** 8:11

_____

**U**
_____

**U.S.** 43:14
163:24

**UCLA** 73:5

**Uh-huh** 113:5
123:9

**ultimate** 74:12

**ultimately** 72:17
74:22 78:23
150:16

**unaware** 28:2

**undergraduate**
29:24 30:2,4

**undermined**
104:6

**undermines**
171:3

**underneath**
141:6 148:2

**understand** 6:24
7:3 8:3,16,24
18:10 28:14
48:25 50:11
69:25 79:24
89:9 93:22
100:8 102:8
115:18 125:10
126:11 127:6
129:20 135:3
169:9 178:17
179:16

**understanding**
23:12 24:4,9
28:12 66:2,4
79:6 92:22
102:24 103:24
105:22 110:15
120:11 124:4
127:4,6 128:2
133:9

**understood** 7:2
23:9 39:11
66:20 103:3
110:13 120:6
121:7,8 127:9,
18,20 128:14,
16,18 129:16
153:7

**undocumented**
36:22

**unfair** 175:7,9,
22

**unfolds** 43:2

**United** 33:19
36:11

**universe** 55:15

**universities** 30:1
40:25

**university**
29:22,23,24
30:3,4,11,14

31:3

**unveil** 136:13,17

**update** 39:5

**updates** 119:21,
24 123:14

**uploaded** 99:7
111:6

**urged** 84:4

_____

**V**
_____

**valley** 29:12,16
33:25 34:3,5,15
35:1 36:6,25
37:8 91:1,3,14,
17,22,24 92:1,8,
11,14,18,23
95:10 96:7,18
151:10 164:20,
23,25

**values** 22:17,19
171:3

**variables** 47:10
48:16,17

**variety** 31:2
35:16,21 42:1
45:13 48:16,24
57:23 84:14
160:3,4

**vast** 49:9

**venture** 67:6

**venues** 63:11

**verbal** 6:18

**verbally** 168:25

**Verification**
118:15

**verify** 170:16

**version** 154:11,
23 159:4 170:15

**versus** 69:6
154:6

**videos** 63:12,13

**view** 27:16,17
43:20 57:14
82:21 100:1
127:14 160:10
161:6,15 167:17
173:24 175:20
179:22

**viewed** 128:10

**villages** 155:4

**violated** 80:14,
15

**violation** 59:5
107:15

**visuals** 48:23

**voiced** 48:10
78:5 93:18 94:8
96:23 167:20
171:24

**voicemail**
135:24 137:25
138:1

**voices** 22:13
23:2,18,23

**voicing** 94:17

**volunteer** 33:10

**vote** 24:11,19
25:20 47:17
68:18 69:6
71:20,22,24
84:23 88:8
110:21 115:7
121:1 124:18,25
125:13,22
126:1,14,18,20,
22,23 127:1,2,5
128:13,21,24
164:15,20

**voted** 25:14
69:15 85:15
103:20 111:8,10
125:6 127:6

131:6 167:20
**voter** 57:21,22
85:9,15 121:24
164:6,8
**voters** 22:20
58:19 96:7
99:11 104:1
173:4,5 174:1,9,
11
**votes** 68:22
111:10
**voting** 12:11,12,
14 22:13 26:3
27:23 32:12
37:1,9 38:19
43:22 45:6,23
49:5 51:2,4
55:3,18,22 56:2,
3,5,9,13 58:22
59:2,13 60:14
62:6 63:18
65:20,21,25
66:3,6 67:1,4,8,
11,13,21,24
68:13,23 69:3,
20 71:11 72:9
79:3,7,23 80:3,
5,7,10,14,15,17,
19 82:9 83:3,22,
23 84:3 85:11,
13 87:16,20
89:1,5,17,18,22
95:1 96:6,13
97:5 98:4,5,6,
13,14,17 99:6,
24 106:20,24
107:4,15,25
108:23 115:11
126:8,9 128:8,
15 133:18
136:25 139:8
140:17 144:17
146:8,17 147:2

150:23 162:9,13
164:23 165:11
166:20 172:6
**VRA** 66:16 68:9
70:12 73:25
74:7,11,12,21,
24 76:3,6,21
77:7 139:3,13,
15,16,23
140:14,21,23
141:6,17,20
142:1,11,14
147:22 150:24
151:6
**vulnerable**
35:24 79:18,19
173:3

———————

**W**

———————

**wade** 102:23
**wait** 6:10,12
**walk** 22:4
**Walkinshaw**
77:5,9 82:18
86:5 93:18
94:21,24 95:7,
16,19 96:10,11,
23 123:19
135:22 137:25
146:15 159:1
167:9,17,19
168:8,16,22,24
169:11
**wanted** 18:25
47:15 77:3
108:11 120:13
151:5 152:3,6
153:3
**wanting** 118:1
144:8
**Wapato** 154:20

179:8
**warranted**
167:14
**warts** 161:16
**Washington** 5:1,
25 22:10,20
23:10 25:5 29:6,
10,11,23 30:11
34:7 40:5,12
65:11 95:6
96:15 132:4,7,
12,14,18 150:12
151:16,19
155:19 156:23
157:8,15 164:16
165:12,15 167:2
171:4 172:10
173:14 175:4
177:6,8 181:9
**Washington's**
7:19
**Washingtonians**
180:23,24
**watch** 48:2
**ways** 36:10 42:1
54:21 97:25
115:24 168:6
**website** 20:5
57:2 93:21,23
112:2 128:20
133:15 135:13
177:7
**Wednesday**
136:7
**week** 27:7,9
74:17 110:5
145:17
**weekend** 84:22
85:4,5 106:3
127:14
**weekly** 42:15,
17,22,24 48:11

110:5
**weeks** 13:11,15
14:24 47:2
145:18
**whichever** 43:3
**white** 5:25 164:6
**wide** 161:16
**widest** 23:7
**winner** 172:10
**winter** 10:9
**wiser** 160:13
**wishes** 133:17
**wondering**
33:22 140:20
**word** 30:18
46:13 158:2
**words** 6:20
44:14 151:4
**wore** 39:13
**work** 13:21
16:15,20,23
17:22 18:3 19:2
24:2 26:21 27:7,
8,13 30:13 31:1,
21,25 32:9,12,
14 34:22 35:3
39:2 47:6 49:17
54:19 55:7
57:12 67:20
78:22 108:14
133:4,6 160:14
169:7 170:3
175:13 176:5
**workday** 11:13
**worked** 13:2
32:4,19,22,25
33:9,11 87:17
133:11
**workers** 36:17
**working** 31:11,
16 34:25 44:5

53:10,17 55:1
77:23 88:10
91:21 122:10
167:8,18 168:16
175:24
**workplace**
35:13
**workplaces**
40:22
**works** 63:9
**Worse** 171:2
**wrapping**
138:16
**writes** 118:12
119:3,18 123:18
130:19 131:2
**writing** 144:13
175:15
**wrong** 105:21
157:24 170:24
**wrote** 21:7 22:3
119:9 139:3
140:5,14 141:25
142:2,14 144:1,
6 147:22 148:2,
5,16,22 170:18
172:5 173:23
175:25

———————

**Y**

———————

**Yakama** 34:11,
13 91:18 151:8,
24 152:2,3,5,11,
12 153:2,7,15
154:16,21
155:6,23 157:3,
10,19 158:19
159:5 173:7,8,9,
11,15,20,25
174:14 176:19
177:1,3,15,25

178:2 179:18
180:3,12

**Yakima** 13:9
27:6 29:12,15
33:24 34:3,5,20,
25 35:25 36:6,
25 37:4,8,13,22
91:1,3,13,17,21,
24 92:1,8,11,14,
18,23 95:10
96:7,18 151:9
164:20,23,25
173:12 177:13,
17,18,20

**year**  106:4 164:1

**years**  31:23
43:25 44:1 56:6

**young**  44:12

---

**Z**

---

**zoom**  6:8 10:24
50:4,5 63:22
126:1,2 154:25
158:22 177:9
179:6

**zoomed**  154:12