The State objects to this designation in its entirety because the witness is not unavailable within the meaning of FRCP 32(a)(4). Although the parties have stipulated to the admissibility of certain deposition testimony notwithstanding FRCP 32(a)(4), both the State and Intervenor-Defendants have been clear that they would not stipulate to the admissibility of deposition testimony of the Commissioners or their four primary staffers. See ECF #180 at p.4.

# Soto Palmer, et al.,
# v.
# Hobbs, et al.

## *  *  *  *  *

# Deposition Upon Oral Examination of
# Osta Davis
# August 19, 2022

## *  *  *  *  *

Defendant State of Washington, on the eve of the deadline to file this document, and Intervenor-Defendants, with just hours left before the deadline to file this document, provided and adopted extensive edits that substantially expanded on the objections they asserted to these deposition designations. This maneuver deprived Plaintiffs of a meaningful opportunity to respond and therefore deprived the Court of additional substantive responses from the Plaintiffs' perspective.

Plaintiffs provide their responses to objections in yellow text boxes,

REPORTED BY:
LAKESIDE REPORTING
Jeanne M. Gersten, RDR, CCR 2711
(833) 365-3376
Jeanne@LakesideReporting.com
Contact@LakesideReporting.com

Osta Davis                                        August 19, 2022

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

_____
                                )
SUSAN SOTO PALMER, et al.,       )
                                )
        Plaintiffs,              )
                                )
    v.                           )
                                )
STEVEN HOBBS, in his official    )
capacity as Secretary of State   )
of Washington, and the STATE OF  )
WASHINGTON,                      ) No. 3:22-cv-05035-RSL
                                )
        Defendants,              )
                                )
    and                          )
                                )
JOSE TREVINO, ISMAEL G. CAMPOS,  )
and State Representative         )
ALEX YBARRA,                     )
                                )
        Intervenor-Defendants.   )
_____)

DEPOSITION UPON ORAL EXAMINATION OF
OSTA DAVIS
_____

Friday, August 19, 2022
9:10 a.m. to 5:50 p.m.

Office of the Attorney General
1250 Pacific Avenue
Tacoma, Washington

REPORTED BY:    LAKESIDE REPORTING
Jeanne M. Gersten, RDR, CCR 2711
Registered Diplomate Reporter
(833) 365-3376
Jeanne@LakesideReporting.com
Contact@LakesideReporting.com

## Page 2

APPEARANCES:
FOR THE WITNESS, OSTA DAVIS:
    JESSICA L. GOLDMAN
    SUMMIT LAW GROUP
    315 Fifth Avenue South, Suite 1000
    Seattle, Washington  98104-2682
    JessicaG@SummitLaw.com

FOR PLAINTIFFS SOTO PALMER, et al.,
on behalf of CAMPAIGN LEGAL CENTER:
    SIMONE LEEPER (via Zoom)
    ANNABELLE HARLESS (via Zoom)
    ASEEM MULJI (via Zoom)
    CAMPAIGN LEGAL CENTER
    1101 14th Street Northwest, Suite 400
    Washington, DC  20005
    SLeeper@CampaignLegalCenter.org
    AHarless@CampaignLegal Center.org
    AMulji@CampaignLegal Center.org

For Plaintiffs on behalf of UCLA VOTING RIGHTS PROJECT:

    SONNI WAKNIN (via Zoom)
    BERNADETTE REYES (via Zoom)
    UCLA Voting Rights Project
    3250 Public Affairs Building
    Los Angeles, California  90095
    Sonni@UCLAVRP.org
    Bernadette@UCLAVRP.org

For Plaintiffs on behalf of MALDEF:
    ERNEST HERRERA
    DEYLIN THRIFT-VIVEROS
    Mexican American Legal Defense and Educational
      Fund (MALDEF)
    634 South Spring Street, 11th Floor
    Los Angeles, California  90014
    EHerrera@MALDEF.org
    DThrift-Viveros@MALDEF.org

                (Continued on next page)

## Page 3

APPEARANCES, continued:
For Plaintiffs, on behalf of MORFIN LAW FIRM:
    EDWARDO MORFIN (via Zoom)
    MORFIN LAW FIRM, PLLC
    7325 West Deschutes Avenue, Suite A
    Kennewick, Washington  99336
    Eddie@MorfinLawFirm.com

FOR DEFENDANT STATE OF WASHINGTON:
    ANDREW R.W. HUGHES (via Zoom)
    CRISTINA SEPE (via Zoom)
    ERICA FRANKLIN
    Assistant Attorneys General
    ATTORNEY GENERAL OF WASHINGTON
    Complex Litigation Division
    800 Fifth Avenue, Suite 2000
    Seattle, Washington  98104
    Andrew.Hughes@ATG.Wa.gov
    Cristina.Sepe@ATG.Wa.gov
    Erica.Franklin@ATG.Wa.gov

FOR INTERVENOR-DEFENDANTS:
    DALLIN HOLT  (via Zoom)
    HOLTZMAN VOGEL
    15405 John Marshall Highway
    Haymarket, Virginia  20169-2706
    DHolt@HoltzmanVogel.com

                * * * * *

## Page 4

EXAMINATION INDEX
OSTA DAVIS                        PAGE
By Mr. Thrift-Viveros              7
By Ms. Franklin                  211
By Mr. Holt                      229

                * * * * *

E X H I B I T S
NUMBER        DESCRIPTION          INTRODUCED
1    Email 10/19/21 to April Sims       104
     from Osta Davis re Latest Draft,
     V4 Possible Draft 2, 10/19/21
2    Emails 10/22/21 with Dominique     124
     Meyers, April Sims, Osta Davis
     and Matt Bridges re Apologies
3    Email 10/25/21 to April Sims and   149
     Dominique Meyers re Statement with
     attached Values in Action
4    Email 10/25/21 to April Sims from  152
     Osta Davis re Most Updated Map,
     attached V5 10/22/21
5    Emails 11/2/21 with Kurt Fritts,   155
     April Sims and Osta Davis re
     Map w/new E. WA District,
     attached 11/10/21 Proposal

6    Email 11/4/21 to April Sims and    160
     Dominique Meyers from Osta Davis
     re New 14th, attached 14th LD

7    Emails 11/12/21 with April Sims,   164
     Brady Walkinshaw, Ali O'Neil re
     Fwd: Updated Proposal Email,
     attached 11/12 Map
                (Continued on next page)

                                    1 (Pages 1 to 4)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                     35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 5

NUMBER        DESCRIPTION              INTRODUCED

8     Emails 11/14/21 with Osta Davis,        169
      April Sims, Dominique Meyers,
      Adam Hall, Kamau Chege re Scheduling
      a Meeting with Matt Barreto today

9     Emails 11/13/21 with Anton Grose,       176
      Paul Graves, April Sims re Map
      Proposal

10    Memo 11/21/21 to Senate Majority        182
      Leader Andy Billig from Ali O'Neil,
      SDC Staff Member, re Timeline of
      Redistricting Commission Events

11    Emails 11/15/21 with Osta Davis,        187
      April Sims, Dominique Meyers and
      Chris Kilduff re FW: Redistricting Memo,
      with attached Memo 11/15/21 to
      Dom Meyers from Chris Kilduff re
      Court-Adopted Redistricting Plan

12    Emails 11/15/21 with Ali O'Neil         197
      and Osta Davis re FW R Map Proposal
      with attached Copy of Copy of Copy
      of R Prop Rebalanced

13    Email 11/15/21 to April Sims from       201
      Osta Davis re MAP, with attached
      Copy of Copy of 11/14 7:30 PM
      Merged D Map - LD

14    Email 3/25/21 to April Sims from        213
      Osta Davis re a Couple of Things

15    MGGG Article January, 2020, "Analysis   217
      of County Commission Elections in
      Yakima County"

16    Printout of Matt Barreto Slides         220

17    Email 3/25/21 to Lisa McLean and        223
      Lisa Biscay from Sarah Augustine
      re FW: Job Descriptions and Budget
      Items

              (Continued on next page)

Page 6

NUMBER        DESCRIPTION              INTRODUCED

18    The Supreme Court of Washington Order   233
      Regarding the Washington State
      Redistricting Commission's Letter
      to the Supreme Court on November 15,
      2021 and the Commission Chair's
      November 21, 2021 Declaration

19    Washington Constitution Article II,     236
      Section 43 on Redistricting

Page 7

August 19, 2022, Tacoma, Washington:

PROCEEDINGS:  9:10 a.m.

(Zoom conferencing set up with all participants.)

OSTA DAVIS,

having been sworn/affirmed on oath to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. THRIFT-VIVEROS:

Q    Hi.  Good morning, Osta.

Do you prefer that I call you Osta or Ms. Davis?

A    Osta works.

Q    Okay.  Great.  My name is Deylin Thrift-Viveros. I'm an attorney with the Mexican American Legal Defense Educational Fund, also known as MALDEF.  We are representing the plaintiffs in the Soto Palmer v. Hobbs litigation.

Are you familiar with the lawsuit?

A    Yes.

Q    Okay.  What do you know about it?

A    I read the Complaint.

Q    Okay.  So in the room and on Zoom are other parties and counsel.  I'll identify each attorney and who they represent.

So in person Ernest Herrera.  I'll represent --

Page 8

Yeah, I'll just talk about the plaintiffs' counsel.

So Ernest Herrera from MALDEF, also.  Sonni Waknin from UCLA Voting Rights Project is on Zoom.  So is Simone Leeper from the Campaign Legal Center, also Annabelle Harless from Campaign Legal Center and Aseem Mulji from Campaign Legal Center.  And also Eddie Morfin from his own office.

And --

MS. FRANKLIN:  My name is Erica Franklin. I represent the State of Washington.  And my colleague, Andrew Hughes, also from the Attorney General's Office, is on the Zoom, and my colleague Cristine Sepe will be joining us shortly.

MS. GOLDMAN:  Good morning.  I'm Jessica Goldman.  I'm a Special Assistant Attorney General from the Summit Law Group, and I represent the witness.

MR. HOLT:  Good morning.  My name is Dallin Holt.  I'm with Holtzman Vogel, and I'm here on behalf of the intervenor defendants.

MR. THRIFT-VIVEROS:  Dallin, is anyone else from intervenor defendants joining?

MR. HOLT:  No, it will just be myself.

MR. THRIFT-VIVEROS:  Okay.  Great.

Q    (By Mr. Thrift-Viveros) So I'd just like to go over a few ground rules just so we're on the same page when we

2 (Pages 5 to 8)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)          35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

Page 9

start this deposition.

I'm going to be asking questions. All I ask is that we be mindful of not talking over each other. That makes it easier to get a clear record. So basically the process is going to go I'm going to ask you questions. Your counsel, she may object, and usually it's to preserve an objection for the record later; but generally you're going to have to answer the question afterwards.

If she says, "Please do not answer this question" because of a privilege or something like that, then don't answer the question. Simple as that. And based on your answers I might ask some followup questions, so we'll just have to be very mindful of not speaking over each other.

Let's see. Also, yeah, the court reporter, she can only record verbal responses, so it's important that you answer out loud with words. You know, not shaking your head, nodding, those. Generally I will ask you to say yes or no or answer the question.

If you don't understand a question for any reason, please tell me. I'll try to clarify it; but if you do answer a question, I'll assume that you've understood it.

Does that make sense?

A    That does make sense.

Q    Great. And just let me know if at any point you need a break. We're going to take a lunch break. We'll

Page 10

probably take other smaller breaks, but for whatever reason, let me know.

I only ask that you finish responding to my question if it's in the middle of it, or if you're in the middle of an answer that you complete your answer.

A    (Nodded.)

Q    Great. So today we're here to discuss the Redistricting Commission process, the decisions that were made throughout it; and just to be clear, --

MR. HOLT:  Deylin, if you don't -- If you don't mind, just to go on the record real fast.

MR. THRIFT-VIVEROS:  Yes.

MR. HOLT:  For purposes of objections, we talked before going on the record just so we don't have everyone objecting all the time, an objection made by the State or counsel for the witness or intervenor-defendants regarding a question would suffice for all parties, as opposed to having everyone have to object separately. That was something we had agreed to beforehand.

If anyone disagrees with that, please speak up.

MS. GOLDMAN:  We're in agreement with that. Thank you.

MS. FRANKLIN:  The State is in agreement as well. Thank you.

MR. THRIFT-VIVEROS:  And we're in agreement

Page 11

with that. Thanks.

Sorry. Let me -- I'm getting distracted by my own image, so I'll turn the video off.

Q    (By Mr. Thrift-Viveros) So just to be clear, in this litigation you're not a defendant. There are no claims against you. We're taking the depositions of commissioners and aides to get a better sense of how the maps were created, specifically the legislative maps, and the processes and metrics that were used in creating these maps.

So in the State of Washington's initial disclosures you were identified as someone familiar with the information received and considered by the Redistricting Commission and the commissioners' assessment of alternative and draft map configurations.

Would you agree with this description?

A    Yes.

Q    Okay. And you understand that all your responses are being recorded?

A    I do.

Q    Okay. And so then later on after the transcript has been prepared you'll have an opportunity to review your answers in a physical booklet, make any changes you deem appropriate, and then you'll sign it under penalty of perjury.

Page 12

However, if you make more than just fixing some typos, I or another plaintiffs' lawyer or another lawyer may look and make comments on your changes at trial, which could affect credibility before the judge or a jury.

So I just ask that you give the best testimony you can here today.

A    I'll do my best.

Q    So although we're in a somewhat informal environment today, the oath that you took with the court reporter has the same force and effect as if you were testifying in a court of law in front of a judge or a jury.

Do you understand that?

A    I do.

Q    Okay. The court reporter will take down everything you say, anything anyone else says, unless we go off the record.

So is there anything that will prevent you from giving me your full attention today? For example, are you taking any medication that might affect your ability to testify?

A    No.

Q    Okay. Are you prepared to answer my questions today?

A    I am.

Q    Okay. And yeah, again, if you don't understand a

3 (Pages 9 to 12)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                    August 19, 2022

Page 13

question, just tell me that you don't understand, and I'll try to rephrase it in a way that is more helpful.

And yeah, if you don't know the answer to a question, you can say so. We're entitled to your informed estimate for like dates or, you know, order of things that happened, but I don't want you to guess.

So if you don't know the answer to a question you can simply say so, but otherwise I would like an informed estimate, if you can remember the order of things or, you know, vaguely what month something happened in, something like that.

Also, it might happen that you give an answer as completely as you can in that moment, and then later on you remember some more information or maybe some clarification of like a previous response. So if that happens, please tell me you'd like to add something to your previous response, and then we'll do it right then while it's still fresh in your mind.

So have you ever been deposed before?

A   I have.

Q   Okay. In connection with what?

A   The Redistricting Commission.

Q   Okay. And was that -- What litigation was that for?

A   The Open Public Meetings Act.

Q   Okay. And have you ever been a party to a lawsuit?

Page 14

A   No.

Q   Okay. So to prepare for this depo, deposition, did you meet in person, by phone or Zoom with anyone --

A   Yes.

Q   -- to prepare?

Okay. With who?

A   My counsel.

Q   Okay. With anyone else?

A   No.

Q   Did you -- Excuse me. Did you discuss this deposition with anyone else besides your counsel?

A   Yes.

Q   Okay. With who?

A   My significant other.

Q   Okay. I don't want to pry too much into details, but is your significant other involved in the commission at all?

A   No.

Q   Okay. And what does your significant do for work?

A   Pediatrician.

Q   And who is your counsel? Who is representing you?

A   Jessica Goldman.

Q   Okay. Anyone else?

A   No.

Q   Have you retained -- You've not retained anyone else

Page 15

for counsel?

A   I have not.

Q   Have you had any written communications with anyone besides your counsel to prepare for this deposition?

A   No.

Q   Did you review any documents in preparation for this deposition?

A   Yes.

Q   And what documents are those?

A   The Complaint.

Q   Okay. Anything else?

A   No.

Q   Okay. Were you asked to conduct any searches in connection with requests for information or production of documents related to this case?

A   I'm not sure.

Q   Okay. Were you asked to conduct any searches in connection with requests for information or production of documents related to the Garcia v. Hobbs lawsuit?

A   No, I don't believe so.

Q   So no one asked you to go back through your emails or cellphone records; do you recall?

MS. GOLDMAN: Objection, vague.

Q   (By Mr. Thrift-Viveros) In relation to, you know, a records request or something like that.

Page 16

MS. GOLDMAN: Objection, vague.

A   Ohad "Lowry" with the State Legislature periodically sends out emails; and I do not necessarily read them in their entirety, but he --

MS. GOLDMAN: I'm going to --

THE WITNESS: Oh.

MS. GOLDMAN: -- stop you here.

Mr. Lowy is a lawyer for the Legislature, and I'm going to instruct you not to answer as to any communications that were directed to you by Mr. Lowy.

Q   (By Mr. Thrift-Viveros) How do you spell Mr. Lowry's name; do you know?

A   Last name L-O-W-R-Y.

MS. GOLDMAN: No, L-O-W-Y.

THE WITNESS: Oh.

MR. THRIFT-VIVEROS: Okay.

MS. GOLDMAN: It's a tough one.

Q   (By Mr. Thrift-Viveros) And his first name?

A   O-H-A-D.

Q   Okay. And Mr. Lowy is an attorney for the Legislature or a specific House?

MS. GOLDMAN: He is the lawyer for the House.

MR. THRIFT-VIVEROS: For the House.

For the House in general, or for --

4 (Pages 13 to 16)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                    August 19, 2022

Page 17

MS. GOLDMAN: Yes.

MR. THRIFT-VIVEROS: -- one of the caucuses?

MS. GOLDMAN: Yes, nonpartisan.

Q   (By Mr. Thrift-Viveros) In response to these records requests did you produce any documents?

MS. GOLDMAN: I'm going to object. When you say "these records requests," to what do you refer, if you don't mind saying?

MR. THRIFT-VIVEROS: So Osta mentioned that there were emails asking for records, I believe -- or perhaps I'm misstating what I understood.

MS. GOLDMAN: Counsel, if I may suggest that you could reference a litigation-specific request, that would be helpful; because there are lot of requests for records that have --

MR. THRIFT-VIVEROS: Right.

MS. GOLDMAN: -- been served, and I think that might be the witness's confusion here.

MR. THRIFT-VIVEROS: Yeah.

MS. GOLDMAN: So I don't mean to intervene in your questioning, --

MR. THRIFT-VIVEROS: No, that's fine.

MS. GOLDMAN: -- but it is confusing.

Q   (By Mr. Thrift-Viveros) So I did ask for this

Page 18

litigation; right, the Soto Palmer v. Hobbs.

Did you receive requests to go through your emails, to go through your cellphone records?

A   No, I don't believe so.

Q   Okay.  Did you receive requests to go through emails or cellphone records regarding redistricting for any other litigation?

A   Yes.

Q   Okay.  And do you recall what litigation that was?

A   The litigation regarding the Open Public Meetings Act.

Q   And did you go through your emails and pull out specific ones for that?

A   I believe in the Legislature there is a designated public records officer who conducts the records search, retention, et cetera.

Q   And do you know that officer's name?

A   No.

Q   Okay.  And do you know if they work for the Legislature as a whole or work for the House or the Senate?

MS. GOLDMAN: Objection, calls for speculation.  You can answer.

Q   (By Mr. Thrift-Viveros) If you know.

A   My understanding is the House.

Page 19

Q   Okay.  When you were working on Redistricting Commission work did you send emails regarding the Redistricting Commission work from -- Sorry.  Let me take that back.

What email accounts did you use when you were working on the Redistricting Commission?

MS. GOLDMAN: Objection, vague.

Q   (By Mr. Thrift-Viveros) What email accounts did you use to conduct Redistricting Commission work while you were doing Redistricting Commission work?

A   My legislative email.

Q   Okay.  And what email is that?

A   Osta.Davis@Leg.Wa.Gov.

Q   At dot WA.

A   W-A.

Q   Did you use any other email addresses to conduct Redistricting Commission business while you were working on the Redistricting Commission?

A   Not to my recollection.

Q   So a personal email address that you have you didn't use to do Redistricting Commission work?

MS. GOLDMAN: Objection, asked and answered.

Q   (By Mr. Thrift-Viveros) You can answer.

A   Not to my recollection.  I may have unintentionally

Page 20

received emails there, --

Q   Okay.

A   -- but my practice was to forward them to my legislative address and respond to anything through the legislative account.

Q   Okay.  While you were working on the Redistricting Commission work did you do Redistricting Commission work on your cellphone, like text messages or --

A   Yes.

Q   Okay.  Sorry that wasn't clear, but -- Yeah, did you send and receive text messages in connection to your redistricting work?

A   Yes.

Q   And did you use a personal phone, or was it issued by your job?

A   Personal phone.

Q   Personal phone.  Okay.

And did you use -- What platforms did you use on your phone for Redistricting Commission work?

A   Primarily text messages, the messaging app.  The Legislature did provide a special app that I'm not sure the name of, but occasionally I received phone calls through that.

Q   Okay.  Do you know if that special app is exclusive to the Legislature or if it's like a more general use app?

5 (Pages 17 to 20)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                         August 19, 2022

Page 21

MS. GOLDMAN:  Objection, calls for speculation.

A    I'm not sure.

Q    (By Mr. Thrift-Viveros) Okay.  In relation to the records request for the Open Public Meetings Act lawsuit did you conduct any searches of your personal email for emails related to the Redistricting Commission?

A    I do not recall.

Q    Okay.  In regards to the records request for the Open Public Meetings Act litigation did you conduct searches of your phone for text messages or things like that?

A    I did.

Q    Okay.  And did you send those to the public records officer, or do you remember who you sent them to?

A    I sent them to the attorney.

Q    Okay.  And did you take like screen shots of the text messages and send them; is that how?

A    I did.

Q    Okay.  So were you -- We've just taken it for a given that you worked on the 2021 redistricting cycle.  Can you tell me what date you started working for that?  If you don't remember the date, but just kind of in general.

A    I believe I started working the day after

Page 22

Martin Luther King Day holiday was observed.

Q    Okay.

A    So a Tuesday.

Q    Had you done any work on previous redistricting cycles?

A    No, I had not.

Q    Okay.  And what was your -- I guess we can go back.  Are you from Washington?

A    Yes.

Q    Okay.  And what high school did you go to?

A    I went to The Bush School.

Q    Okay.  And did you go to college?

A    I did.

Q    Okay.  What college did you go to?

A    Whitman College.

Q    Okay.  And what did you study in college?

A    Politics.

Q    So did I.  And did you do any coursework related to mapping, or -- Did you do any coursework related to mapping?

A    No.

Q    Okay.  Did you do any coursework related to politics?  I mean -- sorry -- of course you did.  Did you do any coursework related to race?

Page 23

MS. GOLDMAN:  To what?

MR. THRIFT-VIVEROS:  To race, like race, like --

MS. GOLDMAN:  Objection, vague.

MR. THRIFT-VIVEROS:  -- race theory, things of that nature.

A    Yes.

Q    (By Mr. Thrift-Viveros) Can you tell me what courses, if you remember?

A    I do not remember.

Q    Okay.  And then after college did you have a job?  Did you get a job after college?

A    Yes.

Q    Okay.  And what job was that?

A    I worked on a campaign in the City of SeaTac.

Q    Okay.  And then after that?

A    I continued to be employed.

Q    Okay.  Well, basically, yeah, I'd like a list of your jobs after you graduated college and before you started working for the commission.

A    Yeah.  I started at a fellowship called the Washington Bus that was a stipend position.  And then I worked on the campaign, a campaign in the City of SeaTac.  And then I managed a campaign for a state legislative candidate.

Page 24

And then I worked for the State Senate Democratic Campaign Committee.  And then I worked for K&L Gates.  And then I worked for the House Democratic Campaign Committee.  Oh, I also worked for the Legislature.

Q    Okay.

A    And then I worked for the Legislature again as working on the Redistricting Commission.

Q    Okay.  And what positions did you hold with the Legislature the two times?

A    The first time I worked as a legislative assistant.

Q    Was it for a specific legislator, or --

A    Yes.

Q    Okay.  What was their name?

A    Christine Kilduff.

Q    Is she still a legislator now?

A    No.

Q    Okay.  And then your second stint with the Legislature?

A    I worked as a redistricting analyst.

Q    And that was for this cycle, the redistricting cycle?

A    Yes.

Q    Okay.  And then you mentioned you worked on some campaigns.  Can you tell me whose campaigns you worked for?

6 (Pages 21 to 24)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

## Page 25

A    Yes.  Well, in 2013 I worked on the campaign in SeaTac for a minimum wage ballot initiative.

In 2014 I worked to elect Christine Kilduff to the State Legislature.

In 2016 I worked for the Senate Democratic Campaign Committee, and so that involved a number of State Senate campaigns.

And then for the 2018 and 2020 cycles I worked for the House Democratic Campaign Committee, which involved a number of House Democratic legislative campaigns.

Q    For the Senate Dem Campaign Committee do you have like an estimate of how many legislators or how many senators or candidates' campaigns that you worked on?

A    No.

Q    It was a lot?

A    It was -- I worked in a role that supported the campaign committee that provides support to all of their members' senators.

Q    And with the House Democratic Campaign Committee was it a similar situation?

A    Yes.

Q    Okay.  So you mentioned before that you read the Complaint for this lawsuit.

A    (Nodded.)

Q    When did you read the Complaint; do you recall?

## Page 26

A    Last night.

Q    Okay.  Had you read it before?

A    Yes.

Q    Do you recall when?

A    Wednesday.

Q    Okay.  Anytime before then, or --

A    Not thoroughly.  Not to my knowledge.

Q    Okay.  Do you have an opinion on the Complaint?

MS. GOLDMAN: Objection, vague.

A    No.

Q    (By Mr. Thrift-Viveros) Did you bring any documents with you today?

A    No.

Q    Okay.  And besides meetings with your counsel and reading the Complaint, did you do anything else to prepare for this deposition?

A    No.

Q    Okay.  Oh, yeah, I wanted to ask one more thing about your job history.  Sorry.

Can you tell me what Washington Bus is?

A    It's a nonprofit that engages young people in the civic process.

Q    Okay.  So like what kind of activities?

A    Primarily the bulk of the work is voter registration.

## Page 27

Q    Oh, okay.  And then for K&L Gates what kind of work did you do?

A    I was a Government Affairs Specialist.

Q    And what does that entail?

A    I supported clients that in this case were primarily school districts.

Q    Sorry.  Is K&L Gates a law firm?

A    Yes.

Q    Okay.  And what was your job title with them?

A    I was hired as a Government Affairs Specialist, and I believe the title was adjusted to reflect Government Affairs Practice Specialist.

Q    Okay.

A    I don't remember the exact --

Q    That's fine.

A    -- title.

Q    Are you currently employed?

A    Yes.

Q    And where are you working now?

A    The State Legislature.

Q    Okay.  And what's your title?

A    Policy analyst.

Q    Okay.  And is that a nonpartisan position?

A    No.

Q    Okay.  Are you working for a specific legislator or

## Page 28

for the body as a whole?

A    I'm working for the House Democratic Caucus.

Q    Okay.  Prior to your work on this redistricting cycle of 2020 had you done any work in drawing maps?

A    Yes.

Q    Can you tell me in what capacity?

A    A personal interest capacity.

Q    Okay.  So you were just interested in looking at maps, or can you elaborate a little bit more on that?

A    Yes.  I had spent some time playing around with the Dave's Redistricting App and had worked on maps mostly as a way to familiarize myself with the platform.

Q    Did you do that in anticipation -- Sorry.

Did you do that in anticipation of getting a job doing mapmaking?

MS. GOLDMAN: Objection, vague.

A    No.  I think I just did it because of personal interest.

Q    (By Mr. Thrift-Viveros) Okay.  Yeah.

So for the purposes of this deposition I'm going to use the terms Hispanic and Latino interchangeably.

What's your understanding of the term Hispanic?

A    My understanding is that it includes people of Central and South American descent.

Q    And what's your understanding of the definition of

7 (Pages 25 to 28)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                      August 19, 2022

Page 29

Latino?

A    My understanding is the same.

Q    Okay.  And when you were doing work on the commission would you personally use those words interchangeably, or did you have distinct definitions for them?

MS. GOLDMAN:  Objection, compound.

A    I did not have distinct definitions, and my understanding is that they were used interchangeably.

Q    (By Mr. Thrift-Viveros) Okay.  When you say they were used interchangeably, who are you referring to using them interchangeably?

A    Staff communications.

Q    Okay.  Does that include the commissioners?

MS. GOLDMAN:  Objection, vague.

A    I don't recall.

Q    (By Mr. Thrift-Viveros) Okay.

A    My understanding is the census data uses Hispanic.

Q    Okay.  Do you identify as Hispanic or Latino?

A    No.

Q    Prior to the Redistricting Commission had you ever done any work in the Yakima Valley region?

A    No.

Q    Okay.  And when I refer to Yakima Valley region, I'm referring to Yakima, Benton, Adams, Franklin Counties.

Page 30

Okay.  Is that your understanding of the term Yakima Valley region?

MS. GOLDMAN:  Objection, calls for speculation.

A    More or less.

Q    (By Mr. Thrift-Viveros) Okay.  I just want to make sure I'm getting the geography right.

What do you know about the demographics about the Yakima Valley region?

A    I know that the Latino/Hispanic population has increased significantly since the last round of redistricting.

Q    Do you know by -- When you say significantly, do you know how much that is?

A    No.

Q    Okay.  Do you know how much of the population of the Yakima Valley is Latino?

A    No.

Q    Okay.  And what do you know about the demographics of Pasco and the area around Pasco?

MS. GOLDMAN:  Objection, compound.

A    My understanding is that the Hispanic population there has similarly increased.

Q    (By Mr. Thrift-Viveros) Do you know about how much?

A    No.

Page 31

Q    Okay.  Are you aware of discrimination experienced by Latinos in the Yakima Valley region?

A    Yes.

Q    Have you heard of specific stories or anecdotes?

A    Yes.

Q    What have you heard?

A    I heard the descriptions of what was written in the Complaint, and I heard about the lawsuit around, I believe, the county and city council.

Q    Okay.  What have you -- Sorry.  What have you heard about that lawsuit?

A    That there was proof of discrimination as it relates to elections.

Q    So before you started the redistricting process had you heard about previous litigation in the Yakima Valley region around the Voting Rights Act and voting?

A    Yes.

Q    Do you recall what cases you have heard of prior to starting redistricting work?

A    No.

Q    Have you heard about the Montes v. City of Yakima case?

A    That sounds familiar.

Q    Okay.  Have you heard about the Glatt v. City of Pasco case?

Page 32

A    I don't recall.

Q    Okay.

(Court reporter request for clarification.)

MR. THRIFT-VIVEROS:  Glatt, G-L-A-T-T.

Q    Have you heard about the Aguilar v. Yakima County case?

A    I believe so.

Q    Okay.  Had you heard about it before you started work on the redistricting process?

A    I believe so.

Q    What did you know about that case?

A    My understanding is it was related to how districts were drawn, and I had read some analysis about the effects of the current districts.

Q    Do you recall what that analysis was?

A    My sense was that the analysis pointed to the presence of racially polarized voting.

Q    What does racially polarized voting mean to you?

MS. GOLDMAN:  Objection, calls for a legal conclusion.

Q    (By Mr. Thrift-Viveros) You can answer.

A    Yeah, in my own understanding racially polarized voting would be when folks in different racial or ethnic blocs vote cohesively in contrast to the majority or white voters, or I guess it could -- It doesn't necessarily

8 (Pages 29 to 32)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

## Page 33

depend on the race of the groups, but that there is distinct cohesive racial or ethnic voting blocs that are in contrast to one another.

Q   Okay.  And what does cohesive mean to you in this context?

A   My understanding is that that would indicate that at least a majority of a certain racial or ethnic group votes in a similar way.

Q   Okay.  In general when you -- or let me take that back.

When you were working for the commission did you -- Sorry, let me take that back one more time.

Let's go back a little bit.  So you mentioned that you were hired shortly after Martin Luther King, Jr. day.

What was your official job title?

A   Redistricting Analyst.

Q   Okay.  And who was your employer?

A   The House Democratic Caucus.

Q   Okay.  Did you work with all of the commissioners or specific ones?

A   I worked primarily with Commissioner April Sims.

Q   Okay.  And when you say primarily, can you give me an estimate, like a percentage estimate of how much time you would work with her versus -- Well, yeah, a percentage of how much of your normal workweek you worked with

## Page 34

Commissioner Sims?

A   Is that how much time we were actively working together or time that I was working independent from her but at her direction?

Q   That's a good question, and I'll ask you both.

So how much of your average workweek did you work like with Commissioner Sims in active communication, either in meetings or by text, if you have an estimate?

A   I would say it varied.  In the fall when the commission was most active the communication was six or seven days a week, but before the commission had fully gotten up and running and we'd received the census data, that was probably three or four times a week.

Q   Okay.  Do you recall when you received the census data?

A   I believe it was mid August.

Q   Okay.  And you mentioned that you were hired on Martin Luther -- the day after Martin Luther King, Jr. day was your first day.

What year was that?

A   2021.

Q   Okay.  And can you walk me a little bit -- Sorry, I keep going back in time, but can you walk me through a little bit of the hiring process?  Did you submit a job application, or did you talk to someone to get the job?

## Page 35

MS. GOLDMAN:  Objection, compound.

A   My understanding was that I sent my résumé to the chief of staff of the House Democratic Caucus.

Q   (By Mr. Thrift-Viveros) Okay.

A   Following that I had conversations with the chief of staff and then was more formally interviewed by Commissioner April Sims.

Q   Okay.  And when you applied for your position did you specifically apply for the position of redistricting analyst?

A   Yes.

Q   Okay.  And was it specifically for Commissioner Sims, or --

A   Yes.  Commissioner Sims hadn't formally been appointed at that point, but it was my understanding that she would go on to be the commissioner.

Q   Okay.  Had you worked with Commissioner Sims before?

A   No.

Q   Had you met her before?

A   Yes.

Q   Okay.  In what capacity did you meet her?

A   I believe in 2018 we both spoke on a panel.

Q   Okay.  And what was that panel about, if you remember?

A   Elections and civic engagement.

## Page 36

Q   So once you started working, you started your job, what were your -- Or walk me through like a typical day, and you can start early on and then later on in the fall what a typical day looked like.

MS. GOLDMAN:  Objection, compound.

A   At the early stages of my job much of the work seemed to be figuring out how this agency would come about.

When I was hired there were no employees at the Redistricting Commission, and so some element of my role was helping Commissioner Sims have the resources to begin posting job searches for these roles, as well as coordinating the basics of the redistricting meetings that occurred before there were redistricting staff.

Once the census data was received much more of the focus turned to mapping.

Q   (By Mr. Thrift-Viveros) Were you the primary mapmaker for Commissioner Sims?

A   No.

Q   Okay.  Who was?

A   Dominique Meyers and I both contributed to making maps.

Q   Okay.  Do you recall when Dominique Meyers was hired?

A   No.

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                 August 19, 2022

Page 37

Q    Okay.  But you were the first employee of the commission?

A    Dominique Meyers is the Deputy Chief of Staff and had worked at the Legislature before I was hired and continues to work at the Legislature.

Q    Okay.  And you mentioned earlier that you helped with job postings and things like that when you first started out.  Were you the first employee of the commission?

MS. GOLDMAN:  Objection, misstates the testimony.

A    I was not employed by the commission.

Q    (By Mr. Thrift-Viveros) Okay.  Right.

Were you the first staff member of the commission?

MS. GOLDMAN:  Objection, misstates the testimony.

A    I wasn't employed by the commission.

Q    (By Mr. Thrift-Viveros) Right.  Okay.  So were you the first non-commissioner to work on commission work?

A    No.

Q    Okay.  Who else was there before you?

A    Many of the folks involved in redistricting have worked at the Legislature for quite a while, --

Q    Right.

A    -- so I would not have a sense as to when they began

Page 38

working on this.

Q    Okay.  I'm just trying to get a better sense sort of of how the aides and the commissioners worked together, so if you could help me understand.

Did each commissioner have a set of aides that would primarily report to them?

A    My understanding -- and it's difficult to speak to how the other commissioners set up their role or what support they had -- but my understanding is that primarily one staff member was assigned to work most closely with each commissioner, and then within our respective caucuses we could use other staff as resources to help field questions as they came up.

Q    Was Dominique Meyers in that second category of people you were talking about?

A    Yes.

Q    Okay.  So did Commissioner Sims have any other aides, people who reported directly to her, besides you?

A    We did hire a GIS analyst who worked exclusively on redistricting for Commissioner Sims.

Q    And what's their name; do you know?

A    I believe her name is Melissa Vanderwerf.

Q    Did you work closely with her?

A    Yes.

Q    Okay.  Do you recall the dates of her employment?

Page 39

A    Not specifically, but my understanding was that she was hired around mid August --

Q    Okay.

A    -- and worked through mid November.

Q    So she was there until the end?

A    I don't know when it's all ended, but she was there in November.

Q    Okay.  And forgive me for my ignorance, but what does a GIS analyst do?

A    I don't know what this role would look like in other teams, but for us her primary job was to upload maps into the Edge software.

Q    Was the Edge software the primary map platform that you used?

A    No.

Q    What was the primary map platform that you used?

A    Dave's Redistricting App.

Q    Okay.  So I'm going to get back to the mapmaking in a bit, but -- or I guess -- Yeah, sort of -- Let me strike all that.

What was the process that you would use when you would make maps?  And by process I kind of want to know what platforms did you use?  Did you upload to Dave's and then send it to the GIS analyst?  Like can you walk me through that process?

Page 40

MS. GOLDMAN:  Objection, compound.

A    We nearly exclusively used Dave's Redistricting App.  That is the platform where by my estimation 99 percent of our mapping occurred.

Other commissioners used other software, as did the Redistricting Commission itself.  And so my understanding, my recollection of mapmaking processes was that it was nearly exclusively -- Maps were nearly exclusively drafted in Dave's Redistricting App, and then once we had a final map we would send them to our analyst to upload those maps into Edge.

Q    (By Mr. Thrift-Viveros) Do you know what platforms the other commissioners and their aides used?

MS. GOLDMAN:  Objection, calls for speculation.

A    I can't say for certain, but my understanding is that every commissioner except Commissioner Fain used Dave's Redistricting App, whereas Commissioners -- Commissioner Fain's staff primarily preferred using Edge.

Q    (By Mr. Thrift-Viveros) When the commission -- or sorry.  When the commissioners would release their maps to the public what program were those maps made in; do you know?

MS. GOLDMAN:  Objection, compound, vague.

A    My understanding is that the -- that Edge was used

10 (Pages 37 to 40)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

## Page 41

by the nonpartisan staff, and so to post maps on their website they necessarily required them to be in Edge --

Q    (By Mr. Thrift-Viveros) Okay.

A    -- to publish maps.

Q    And why did you use Dave's Redistricting as your primary mapmaking platform?

A    By my estimation Dave's Redistricting was far and away the most user-friendly tool.

Q    And if I recall, that was the tool that you used before redistricting for your personal use; is that correct?

A    Yes.

Q    Okay.  So what roles did you hold in your position as a Redistricting Analyst?

MS. GOLDMAN:  Objection, vague.

Q    (By Mr. Thrift-Viveros) Or what were your job duties?

A    My job duties included staffing Commissioner Sims during public meetings and preparing her for meetings and public hearing sessions.  They included working with other staff, commissioner-assigned staff.

They included weekly meetings with the nonpartisan commission staff.  They included drafting maps and analyzing maps and consolidating and digesting feedback from both the public and members of the House Democratic

## Page 42

Caucus.

Q    Okay.  So I'm going to walk through those job duties.  So first you said you would staff Commissioner Sims at public meetings.

A    (Nodded.)

Q    What does that mean, staffing?

A    That would mean joining the Zoom.  All of her meetings were held virtually.

Q    And when you say public meetings, what does that mean?

A    My -- What I meant by that term were meetings that were held by the Redistricting Commission.

Q    Okay.  And sorry, just to clarify, when you say meetings held by the Redistricting Commission, does that mean meetings with people outside of the commission when you say public meetings?

A    I was referring to the meetings that were listed on the Redistricting Commission website that were open and available to anyone and advertised as such.

Q    Understood.  Did you ever staff other commissioners on this, on these meetings?

A    No.

Q    Okay.  Did you ever take assignments from other commissioners?

A    Not to my recollection.

## Page 43

Q    Okay.  And each commissioner, as far as you know, had their own aide that they worked with; is that --

A    That was my understanding.

Q    Okay.  Do you know if every commissioner had their own GIS analyst?

A    No.

Q    Do you know which commissioners, if any, did have their own GIS analyst besides Commissioner Sims?

A    Commissioner Walkinshaw had a team of folks, and my understanding is that most of the mapping was done by folks who were not his specific assigned person.  I'd say primarily Matt Bridges and Adam Bartz I know both drafted maps.

Q    Matt Bridges, Adam Bartz.  Do you know how to spell his last name?

A    B-A-R-T-Z.

Q    Okay.  And do you know if Matt Bridges and Adam Bartz were GIS analysts?

A    No.

Q    Okay.  And for Commissioners Graves -- or for Commissioner Graves do you know if he had a GIS analyst?

A    My understanding was that Anton exclusively did all of his mapping, --

Q    Okay.

A    -- but that was -- that was all that I was aware of.

## Page 44

And then for Commissioner Fain there was an additional staff person who I saw on weekly calls, but I was not completely aware of her -- what her role entailed.  It might have been related to mapping.

Q    Do you remember her name?

A    No.

Q    Okay.  Do you remember what Commissioner Fain's aide's name is?

A    Yes, Paul Campos.

Q    Okay.  And when you mentioned Anton before, you meant Anton Grose?

A    Yes.

Q    Okay.  Do you know if Commissioner Graves had other staff members besides Anton Grose?

MS. GOLDMAN:  Objection, calls for speculation.

A    Not that I was aware of.

Q    (By Mr. Thrift-Viveros) Okay.  And for Ms. Augustine, did she have aides and staff as well, as far as you know?

MS. GOLDMAN:  Objection vague.

A    Chair Augustine was similarly a nonpartisan commissioner, and so my understanding -- it could be interpreted differently -- was that the nonpartisan Redistricting Commission staff in some capacity were her

11 (Pages 41 to 44)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Page 45

staff as well.

Q    (By Mr. Thrift-Viveros) Understood.  As far as you know did Chair Augustine participate in the mapmaking process?

MS. GOLDMAN:  Objection, calls for speculation.

A    No, I do not recall her being involved in mapmaking.

Q    (By Mr. Thrift-Viveros) What did you understand Commissioner Augustine's role to be?

A    My understanding was that Commissioner Augustine served as chair during our meetings and helped draft addenda items for those meetings.

She also served as in a facilitator capacity and helped give guidance to the executive director in terms of developing a public outreach calendar.

Q    Was -- Sorry.  The public outreach calendar, did each commissioner have their own public outreach calendar?

A    No.

Q    Okay.  So the public outreach calendar was generally scheduled for the entire commission?

A    Yes.  The Redistricting Commission came up with a number of meetings soliciting public outreach from different regions of the state.

Q    And those public outreach meetings, were they conducted in person?

Page 46

A    They were all on Zoom.

Q    Okay.  Did you attend any of those public outreach meetings?

A    Yes.

Q    Do you recall how many?

A    No.

Q    Do you think more than five?  More than -- More than five?

A    My understanding is yes.  I forget the exact number of public outreach meetings, but I would estimate that I attended all but perhaps one or two.

Q    Okay.  And just an estimate, like 20 or ten or 50?

A    I -- My understanding was that there were at least ten meetings.

Q    Okay.

A    I do not believe that there were 20, but I would have to look at the website to know for certain.

Q    Okay.  So between ten and 20 seems about right?

A    Yeah.

Q    It's not a -- Yeah.  Okay.

And you believe you attended most of them?

A    Yes.

Q    And in these public outreach meetings were they specifically -- Let me strike that.

These public outreach meetings, were they open to

Page 47

everyone, or were they focused on specific groups of people or geographic regions?

MS. GOLDMAN:  Objection, compound.

A    My understanding is that they were primarily designated for certain geographic regions.

Q    (By Mr. Thrift-Viveros) Do you know how these public outreach meetings were advertised?

A    My understanding is that emails and press releases were sent out, as well as advertising through social media.  And I believe that certain community groups that had been identified were also reached out to as well.

Q    Okay.  Did you -- Sorry.

Did the commission, as far as -- Excuse me.  Let me take that back.

As far as you know did the commission conduct a public outreach event for the Yakima Valley region?

A    Yes.  My understanding is that yes.

Q    Did you attend that meeting?

A    I believe so.

Q    Okay.  Do you recall anything from that meeting?

A    Not specifically.

Q    Okay.  And you mentioned community groups.  Would Commissioner Sims specifically, since I presume you know more about -- Sorry.  Let me take all that back.

Did you work on scheduling events for

Page 48

Commissioner Sims?

A    Not to my recollection.

Q    Okay.  Did you have access to Commissioner Sims's calendar?

A    Yes.

Q    Okay.  As far as you know, would Commissioner Sims meet with these public interest groups or individually, on an individual basis?

A    Yes.  There certainly were some meetings with interested groups.

Q    Okay.  Would you generally -- Did you attend those meetings?

A    Yes.

Q    Would you say you attended all those meetings or some?

A    I would say that I attended the clear majority of those meetings.

Q    Okay.  Did you ever meet with groups or individuals on behalf of Commissioner Sims but without Commissioner Sims?

A    Yes.

Q    And how often, if you recall?

A    Less frequently.

Q    Would you say once a week or more frequently?

A    Less frequently than once a week.

12 (Pages 45 to 48)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                August 19, 2022

## Page 49

Q   Okay.

A   I would primarily attend on her behalf if she had a scheduling conflict or was running late.

Q   Do you recall who you met with when it was just you individually on behalf of Commissioner Sims but without Commissioner Sims?

A   Yes.  I met with a local Democratic group in roughly northwest Washington.  I believe I may have met with members of the Redistricting Justice Coalition group.

Q   When you met with -- or sorry.

Do you recall any other meetings besides that one and the Redistricting Justice?

        MS. GOLDMAN:  Objection, vague.

A   No, I don't recall.

Q   (By Mr. Thrift-Viveros) Okay.  Did you meet with -- and this is you representing Commissioner Sims but without Commissioner Sims -- did you meet with each of those two groups one time or multiple times?

A   I met with the Redistricting Coalition on a reoccurring basis, but primarily Commissioner Sims was present --

Q   Um-hmm.  Okay.

A   -- or would join 15 minutes late.

Q   Okay.  Did the Redistricting -- or sorry.  Let me strike that.

## Page 50

Can you tell me a little bit about the Redistricting Justice Coalition?  Do you know who they are?

A   My understanding was that it was comprised of a number of people.  It seemed like there were a couple of folks who acted more as leads for the coalition but that the coalition included individuals and private citizens as well as other interested advocacy groups.

Q   Okay.  So the coalition was made up of other groups and individuals?

A   That was my understanding.

Q   Okay.  Did the coalition express to you certain goals that they -- or sorry.

Did the coalition express to you certain things that they wanted to see from the redistricting process?

A   Yes.

Q   What did they -- Do you recall what they asked for?

A   I don't recall in entirety, but I know they included points such as accessibility at public meetings.  They included creating more districts for communities of color to be able to elect their candidate of choice.

Q   Okay.  When you say creating more districts for communities of color to elect candidates of their choice, was there any specific areas that the Redistricting Justice Coalition pointed to?

A   Yes.  At the start it's -- My recollection was that

## Page 51

their focus was primarily in south King County.

Q   Okay.

A   And then later on during the course of redistricting they had more interest in the Yakima Valley region.

Q   And when you say -- or sorry.  You said further on; right, they had more interest in the Yakima Valley region?

Do you recall around when?  Was it -- What month, maybe?

A   My guess would be October-ish, --

Q   Okay.

A   -- but that would -- It would be hard to pin down exactly.

Q   Commissioner Sims and Commissioner Walkinshaw released maps to the public, posted on the public website in September; is that correct?

A   Yes.

Q   And was that the first set of public posted maps?

A   Yes.

Q   Okay.  And sorry, was it all the commissioners posted in September the public maps, as far as you know?

A   Yes.

Q   Okay.  And also in October as well; right?

        MS. GOLDMAN:  Objection as to form, vague.

Q   (By Mr. Thrift-Viveros) Sorry.  In October all of the commissioners -- Did all of the commissioners post

## Page 52

public maps in October as well?

A   No.

Q   Was it just Commissioner Sims and Walkinshaw?

A   Yes.

Q   Okay.  And do you recall if the coalition, the Redistricting Justice Coalition started pushing for or started expressing interest in a district for communities of color in Yakima, do you recall if that happened before or after the release of the September map?

A   I --

        MS. GOLDMAN:  Objection.  Objection as to form, vague.

A   I don't recall.

Q   (By Mr. Thrift-Viveros) Okay.  And do you recall if they started pushing for that Yakima Valley district before or after Commissioners Walkinshaw and Sims released their October maps?

A   I don't recall.

        MR. THRIFT-VIVEROS:  Should we take a break?

        MS. GOLDMAN:  Sure.

        MR. THRIFT-VIVEROS:  Is everyone okay with a break?

All right.  We'll go off the record.

        (Break 10:21 a.m. to 10:31 a.m.)

Objection to lines 50:4-51:4: hearsay.  Redistricitng Justice Washington is not a party to this litigation or a speaking agent for a party.

Pls Response: These statements represent then-existing state of mind under FRE 803(3) because they describe Redistricting Justice for Washington's, or the Redistricting Justice Coalition's, "motive, intent, or plan" regarding that group's goals in redistricting.  The statements also concern the "reputation in a community — arising before the controversy — concerning boundaries of land in the community" under FRE 803(20).

13 (Pages 49 to 52)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                August 19, 2022

Page 53

MR. THRIFT-VIVEROS: All right. We'll go back on the record. Thank you.

Q (By Mr. Thrift-Viveros) So as we said before we went on break, we were talking about the Redistricting Justice Coalition, and you mentioned that Commissioner Sims and you would meet with them on a regular basis or recurring basis; is that correct?

A Yes.

Q Do you recall how frequently you would meet with them?

A About once a month.

Q Okay. Was it generally -- Sorry. Let me just take that back.

In those meetings about how many people represented the Redistricting Justice Coalition, on average?

A I would say anywhere from ten to 20 people.

Q Okay. And as far as you know were those people like the leadership of the coalition or representatives from different organizations?

A I don't recall.

Q As far as you know did the Redistricting Justice Coalition meet with any other commissioners?

MS. GOLDMAN: Objection, calls for speculation.

A Yes.

Page 54

Q (By Mr. Thrift-Viveros) And how do you know that?

A Commissioner Walkinshaw would attend meetings with us.

Q Okay. Did you work with Commissioner Walkinshaw?

A Yes.

Q In what capacity?

A We would attend meetings together. I worked probably more closely with his staff, but we were often at the same meetings or on email chains together.

Q Okay. And do you recall who was on Commissioner Walkinshaw's staff?

A Yes.

Q Do you have their names?

A Yes. Commissioner Walkinshaw worked with Ali O'Neil, I believe primarily, but then the team also included Matt Bridges --

Q Okay.

A -- and other people that I don't remember their names.

Q The other name that you mentioned earlier, Adam Bartz; right?

A Yes. My understanding is that Adam Bartz was involved.

I believe there was also another person named Adam who was also involved.

Page 55

Q Okay. And you don't recall the other Adam's last name?

A No.

Q Okay. And going back to Dominique Meyers, what duties, job duties, did she have when she was working on the redistricting work?

MS. GOLDMAN: Objection, calls for speculation, lack of foundation.

A Dominique Meyers primarily became involved I would say mid August through November. Dominique helped draft maps and staff negotiations.

Q (By Mr. Thrift-Viveros) As far as you know was there a particular reason that Dominique Meyers was brought on for redistricting work?

A Yes.

Q And what was that reason?

A I was on medical leave.

Q Okay. You don't have to go into particulars of the medical leave, but do you recall what the dates of your medical leave were?

A I believe it began the first day of September and lasted a number of weeks.

Q Okay. So do you believe you returned more or less at the end of September, beginning of October?

A I believe it was in October that I returned.

Page 56

Q Okay. And again, not to go into any particulars, but was this medical leave something you had planned before, or was it unexpected?

A It was planned.

Q Okay.

A Yeah.

Q And do you -- As far as you know was there a plan that Dominique Meyers would start working for Commissioner Sims when you went on leave when you were -- first started on the Redistricting Commission?

A No.

Q Okay. And so when you went on leave would it be fair to characterize Dominique Meyers as like your replacement for when you were on leave or like a fill-in?

A Yes.

Q Okay. And when you returned from leave did Dominique Meyers continue working in the same capacity as she was when you were on your leave, as far as you know?

A More or less we shared duties, so I imagine it looked slightly different than when I was completely out.

Q Okay. Naturally.

Did you report to Dominique Meyers, or would you still continue reporting to Commissioner Sims?

A I reported to Commissioner Sims.

Q And would Dominique Meyers report to you or to

14 (Pages 53 to 56)

Electronically signed by Jeanne Gersten (001-357-668-4110)                35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                    August 19, 2022

Page 57

Commissioner Sims when you returned?

A    To Commissioner Sims.

Q    Okay.  Would you communicate with Dominique Meyers on a regular basis and -- Sorry.  Let me clarify that.
On a daily basis?

MS. GOLDMAN:  Objection as to form.

A    To my recollection, yes, it was daily communication.

Q    (By Mr. Thrift-Viveros) Okay.  And in the time that you had returned from your medical leave you were working with -- together with Dominique Meyers, were either -- did both of you work on mapmaking?  On mapmaking.

A    Yes.

Q    Between you and Dominique Meyers did one of you draw more maps than the other?

A    I would have no way of knowing that.

Q    Okay.  So it wasn't a sort of obvious disparity in the mapmaking between you and Dominique Meyers?

MS. GOLDMAN:  Objection, asked and answered.

MS. FRANKLIN:  Objection to form.

A    I wouldn't necessarily know.

Q    (By Mr. Thrift-Viveros) Okay.  In terms of maps -- Okay.  Let me take that back.
I just want to talk a little bit about your process for making maps and how you would work with

Page 58

Commissioner Sims.
So yeah, how did you -- How did you start drawing maps for the redistricting process?

A    We had different approaches at different times.  Sometimes we would start with a particular region and then expand from there.  Other times we would start with the maps that were produced from the 2011 Redistricting Commission and then adjust those existing maps.
So I'd say it varied.

Q    And after let's say you drew a complete map of the legislative districts for the whole state, would you send that to Commissioner Sims, or would you do something else after you drew the maps?

A    I would generally be drawing maps on her request, so I would send them to Commissioner Sims.

Q    Okay.  And did Commissioner Sims, would she generally say, "Thank you," or would she send them right back to you and say, "Can you adjust this or that?"

A    I wouldn't -- I can't recall.

Q    Okay.  And we'll talk about some specific maps, also, but I just kind of want a general sense.
So then after you would draw a map would you do any sort of analysis or anything, or would you be sending it directly to Commissioner Sims right away?

MS. GOLDMAN:  Objection, compound.

Page 59

A    I would primarily send maps from Dave's Redistricting App.  On that platform there is a function that provides statistical analysis.

Q    (By Mr. Thrift-Viveros) Okay.

A    So that was included in the link.

Q    So you would draw the maps in Dave's Redistricting, and then would you send a link to the map to Commissioner Sims, --

A    Yes.

Q    -- generally?
Did you ever draw maps in the Edge program?

A    No.

Q    Okay.  As far as you know did Commissioner Sims draw maps in Dave's Redistricting?

A    My understanding was that she was familiar with the tools.  I don't recall her ever drafting --

Q    Okay.

A    -- a complete map.

Q    And is that the same for -- Sorry.
Do you know if Commissioner Sims drew maps in the Edge program?

A    No, she did not.

Q    Okay.  And can you explain why the maps that you drew had to be uploaded to the Edge program?

A    The nonpartisan commissioners -- The nonpartisan

Page 60

commission staff requested the maps to be in an Edge format to receive them.

Q    Okay.

A    The Edge program also had a more sophisticated analysis.

Q    And what do you mean by that, a more sophisticated analysis?

A    My understanding is that in the Edge program you could upload different election results, whereas Dave's Redistricting App had a preset number of election results that you could look at.

Q    Okay.  And when you mentioned the nonpartisan commission staff, was there someone in particular that you would send these maps to for them to upload to -- or sorry.  Let me take that back.
Who from the nonpartisan commission staff requested maps from you?

A    The maps were sent to Justin Bennett.

Q    Okay.  And what was his position?

A    I believe he was a GIS analyst.

Q    Okay.  Do you know -- Do you know what would happen after you sent the maps to Mr. Bennett?

MS. GOLDMAN:  Objection, calls for speculation.

MS. FRANKLIN:  Objection, speculation.

15 (Pages 57 to 60)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

Page 61

A   My understanding is that he would upload and verify the maps and then work to post them publicly on the website.

Q   (By Mr. Thrift-Viveros) Okay.  What do you mean by verify?

A   I don't recall.

Q   Okay.  Was that a word that he used?

A   Yes, I believe so.

Q   Okay.  After you submitted -- or about how many times if you recall did you submit maps to Mr. Bennett?

A   I believe we sent him maps in October when Commissioner Sims released a new map, as well as in November the final maps were sent to Justin Bennett.

Q   Okay.  Did Justin Bennett send the maps back to you after you submitted it to him?  Sorry, let me rephrase that.

After you submitted the maps to Justin Bennett did he ever send them back to you and for any reason?

A   I don't recall.

Q   Okay.  So as far as you know the maps that you sent to Justin Bennett were the maps that were posted by the commission?

MS. GOLDMAN:  Objection as to form.

A   Yes.  And I would say that I personally did not send him the final map.

Page 62

Q   (By Mr. Thrift-Viveros) Okay.

A   I believe another staffer sent that map to him.

Q   Do you know which staffer sent the final map?

A   My assumption would be that it was Paul Campos because he had the most familiarity with Edge, but I can't say for sure.  And in October it may have been our GIS analyst that sent that map to Justin Bennett.

Q   Okay.  So you personally didn't send any maps to Justin Bennett, as far as you know?

A   It's hard for me to remember the exact chain of events.

Q   Yeah.  Okay.  And you said you assumed it was Paul Campos because of his familiarity with Edge.

Are you basing your assumption on anything else?

A   No.

Q   Okay.  Did you work with Paul Campos during the redistricting process?

A   Yes.

Q   In what capacity?

A   We both attended public meetings together.  We attended weekly meetings with the Redistricting Commission nonpartisan staff.  That was primarily the capacity in which we worked together.

Q   Did you work on maps together with Paul Campos?

A   Very little, but perhaps in November.

Page 63

Q   Um-hmm.  As far as you know was Paul Campos the primary mapmaker for Commissioner Fain?

A   That was my understanding.

Q   Okay.  And as far as you know did Commissioner Fain have any other staff members that worked on maps?

A   There was another woman who I believe was part of his team.  I don't remember her name or job duties.

Q   Okay.  And you mentioned that you have regular meetings with the nonpartisan staff of the Redistricting Commission; is that right?

A   Yes.

Q   How often were those meetings?

A   They were weekly, though as we got closer to the deadline I believe we didn't have those meetings.

Q   Oh, okay.  And generally what did you -- or what did the attendees of those meetings discuss?

A   A number of things.  I would say that primarily the executive director would brief us on potential agenda items for the upcoming Redistricting Commission meetings.  Those meetings also included tutorials on the Edge software.

Q   Who would conduct those tutorials on the Edge software?

A   One tutorial was conducted by a man employed by Edge.

Page 64

Q   Okay.

A   And then following that Justin Bennett provided a tutorial.

Q   Was it just those two tutorials?

MS. GOLDMAN:  Objection as to form.

A   Those are the only two I can recall.

Q   (By Mr. Thrift-Viveros) Okay.  Do you recall what Justin Bennett talked about in his tutorial?

A   No.

Q   Okay.  And so after you or another staff member would send maps to Justin Bennett on behalf of Commissioner Sims, would he ever send you any data back to you?

MS. GOLDMAN:  Objection, calls for speculation.

A   I can't recall.

Q   (By Mr. Thrift-Viveros) Okay.  And would he ever send you back like a request for followup on a map?

A   I can't recall what he would send back, but he would generally acknowledge that he received the files.

Q   Okay.  And did he ever ask for further analysis of a map?

A   That was not my understanding.

Q   Okay.  And in those tutorials you mentioned do you recall who the attendees were of Justin Bennett's

16 (Pages 61 to 64)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                August 19, 2022

Page 65

tutorial?

A    I believe it was primarily the staff person that was working most closely with each respective commissioner.

Q    Were the commissioners at that meeting, too, or --

A    No.

Q    -- at that tutorial?

Okay.  And in the tutorial led by the representative from Edge, do you recall who was present at that tutorial?

A    I believe it was the same group of people.

Q    Okay.  And no commissioners?

A    No commissioners.

Q    Okay.  And no one from outside of the commission staff?

MS. GOLDMAN:  Objection as to form, vague.

A    Well, the commission staff were employed by the respective caucuses, so they're technically outside of that; but I do not recall anyone that wasn't working on redistricting or working very closely with us.

Q    (By Mr. Thrift-Viveros)  Okay.  So it was you.  It was Ali O'Neil.  It was Paul Campos?

A    Yes.

Q    It was Anton Grose?

A    (Nodded.)

Q    Do you recall anyone else?

A    I believe Matt Bridges attended as well.

Page 66

Q    Okay.  Both or -- both tutorials on Edge or just one?

A    I remember him attending the first one.  I don't recall if he attended the one led by Justin Bennett.

Q    Okay.  Did the tutorial only discuss the Autobound Edge software or anything else?

A    Just the software to my understanding of the technical jargon.

Q    Yeah.  Did the Edge representative when they conducted the tutorial, did they discuss the racial shading tool in the Edge software; do you recall?

A    I don't recall.

Q    Did Justin Bennett in his tutorial discuss the racial shading software -- or tool, sorry -- in the software during his tutorial?

A    I don't recall.

Q    Okay.  So if you could estimate a percentage of your work that involved mapmaking, like drawing maps, thinking about maps, looking at the maps, analyzing the maps, what percentage would you say, in general?

A    Again, I'd say before we received the census data it perhaps was about 40 percent of my job; and then following the receipt of the census data, if we include thinking about maps I would say that that was about 90 percent of my job.

Page 67

Q    Okay.  And before you received the census data what set of data were you using?  What were you -- Sorry.

Before the census data did you use one set of data to draw your maps or multiple sets of data?

MS. GOLDMAN:  Objection, compound.

A    I believe there were multiple sets of data.

Q    (By Mr. Thrift-Viveros)  Do you recall what sets of data you were using?

A    I remember using American Community Survey estimate data, as well as OFM, Office of Financial Management population estimates; though primarily for those I don't believe that I exported that into a mapping form, but I would reference that in the mapping process as well.

Q    The Office of Financial Management; is that --

A    (Nodded.)

Q    -- is that a state agency?

A    Yes.

Q    Okay.  And do they release -- What information do they release that you relied on?

A    They release population estimates.

Q    Like by county or by --

A    My understanding is that it's by county, city, school district, legislative and congressional district.

Q    Okay.  And do you know how they gather that information?

Page 68

A    No.

Q    And would they release these population estimates annually?

A    My --

MS. GOLDMAN:  Objection, calls for speculation.

A    My understanding is that they have annual estimates.

Q    (By Mr. Thrift-Viveros)  Okay.  And so when you were using the OFM population management estimate did you use it from a particular year?

A    Yes.

Q    What year was that?

A    My sense is that it would have been the most recent years, so depending on when it was released, that was likely 2020.

Q    Right.  Okay.  Did you use the OFM population management -- population estimates, did you use that throughout the entire process?

A    No.

Q    Did you -- When did you stop using them?

A    Once we received current census data.

Q    Okay.  And why did you start using the current census data and not the OFM population management estimates?

A    Because the Redistricting Commission is required to

17 (Pages 65 to 68)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

Page 69

map based on census data.

Q   Okay.  And then ACS estimate data, do you recall what year you used for the ACS estimate data when you were using it?

A   My understanding was that it was 2019, but it may have been 2020.

Q   Okay.  When you used the ACS estimate data would you use the five-year average or the single year set?

A   I don't recall.

Q   Okay.  Did you continue using the ACS estimate data after you received the census data?

A   No.

Q   Okay.  As far as you remember -- and this is just going at the five-year versus -- the five-year average versus the single -- did you use one set of ACS estimate data throughout the entire time that you were using ACS estimate data?

MS. GOLDMAN:  Objection, vague.

A   I don't recall.

Q   (By Mr. Thrift-Viveros)  So you don't recall whether you might have used an average one time or a single year another time; you don't recall?

A   No.

Q   Okay.  Do you recall if at any time in the redistricting process that you were using the ACS estimate

Page 70

data if a new set from like the new year ACS estimate data came out, do you recall whether that --

A   No.

Q   Okay.  So the map publicly posted by Commissioner Sims in September, did you draw that map?

A   No.

Q   Who drew that map?

A   Dominique Meyers.

Q   Okay.  Did you contribute to that map?

MS. GOLDMAN:  Objection as to form, vague.

A   Not to the physical map.

Q   (By Mr. Thrift-Viveros)  And the map released in October -- Sorry.  Let me take that back.

The map -- When the map was released by Commissioner Sims and prepared by Dominique Meyers in September, were you on medical leave when that map came out?

A   Yes.

Q   Okay.  And the map posted by Commissioner Sims in October, did you draw that map?

A   I believe so.

Q   Okay.  Did Dominique Meyers, also?

A   I believe that I primarily drew that map.

Q   Okay.  For the map that you -- Sorry.  Let me take that back.

Page 71

For the map that was released by Commissioner Sims in October, did you generally draw that in Dave's Redistricting?

A   Yes.

Q   Okay.  And did you share that with other staffers of the commission --

A   Yes.

Q   -- prior to the public posting?

Okay.  Do you recall which staffers?

A   I believe that that map was shared with Commissioner Walkinshaw's team and then shared with Justin Bennett so that he could post it.

Q   Okay.  Did you share it with Commissioner Walkinshaw's team -- Sorry, let me take that back.

Did you receive approval of the map from Commissioner Sims before you sent it to Commissioner Walkinshaw's team?

A   I believe so.

Q   Okay.  We can take a break if you'd like.

A   No, it's --

Q   I know.  I feel like the air is very dry in this room, so I'm very thirsty as well.

So after you draw a map what sort of assessments or analysis would you do on that map?

A   We'd tend to look at the population variance between

Page 72

each district, as well as we looked at electoral performance.  On some maps we'd consider the number of cities or counties that were split.  And we looked at the demographics of each district.

Q   When you say population variance, what does that mean?

A   The goal is to have the districts contain an equal population amongst all of the districts; but naturally it's impossible to have them have that variance be zero, so there would be some slight fluctuation in population from district to district.

Q   Did you personally have a sort of limit or a limit on how much variance there could be between each district?

MS. GOLDMAN:  Objection, vague.

A   No.

Q   (By Mr. Thrift-Viveros) Okay.  Did Commissioner Sims have a maximum, like this is the maximum deviation from the population variance?

A   No.  No.

Q   Okay.  Did you have like a goal that you would try to hit of this is the maximum population variance between each district?

A   We didn't have a specific number.

Q   Okay.  And then when you -- You mentioned you would look at electoral performance.  Can you elaborate on that?

18 (Pages 69 to 72)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 73

What does that mean?

A    We would look at the performance of various candidates. We'd look at the performance that was uploaded in the Dave's Redistricting App. And we'd often look at the performance relative to the 2020 State Treasurer's race.

Q    Okay. So you said various candidates. Was there a specific -- Besides the 2020 State Treasurer's race was there specific races that you would look at when making these electoral performance analyses?

A    Dave's Redistricting App has some races that are preset, so we would see them naturally when we produced any map because that was displayed easily.

Q    Right. Do you recall what races? Was it presidential or county level?

A    I believe those races included governor's races as well as presidential.

Q    Okay. And just in a general sense you would look at a district, and it would say if this district were to vote in the 2020 presidential election, this many would vote for Biden. This many would vote for Trump.

Is that what it would look like?

A    Yes. It used existing data, so I guess it was less would have, and this is how many had.

Q    Right. Okay. Yeah, you mentioned the 2020 State

Page 74

Treasurer's race. How would you utilize that race in your electoral performance analyses?

A    We used that primarily when discussing districts with Commissioner Graves.

Q    Okay. Why specifically with Commissioner Graves?

A    Because that was an agreed upon metric.

Q    Do you know who agreed upon using that metric?

A    Commissioner Sims and Commissioner Graves.

Q    Okay. And did the other commissioners as far as you know use that metric?

A    No, that was not my understanding.

Q    Okay. As far as you know did the other commissioners use -- the other commissioners besides Graves and Sims use a different race for electoral performance?

A    I -- I don't know which data they used particularly.

Q    Okay. Do you know how Commissioner Sims and Commissioner Graves reached the agreement to use the 2020 State Treasurer race?

A    Yes. I believe that the State Treasurer's race more closely reflected legislative performance in those districts.

Q    Do you know when Commissioner Sims and Commissioner Graves agreed on using that race as the metric?

Page 75

A    My sense is that was in October.

Q    Okay. And prior to that agreement do you know of any other agreement between Commissioners either Sims and Graves or Sims and any other commissioner to use a specific electoral race?

A    No.

MS. GOLDMAN: Objection, compound.

Q    (By Mr. Thrift-Viveros) You don't know?

A    No.

Q    Okay. Do you know how that -- Sorry. You mentioned that your understanding is that the 2020 State Treasurer race was utilized because it more closely related to legislative races; is that correct?

A    Yes.

Q    Okay. Do you know who made that determination that it was closely related to legislative races?

A    I know that I had analyzed the data and found that to be the case.

Q    And how did you -- or why did you analyze this data? Like -- Sorry.

Did Commissioner Sims ask you to find an electoral race that looks -- that's closely related to the legislative districts?

A    I can't recall.

Q    Okay. And do you recall how you made that

Page 76

determination? You mentioned you analyzed the data.

Can you get any more specific?

A    I guess for mapping it is much easier to map based on statewide results rather than individual legislative races, and so in my recollection we looked at all of the legislative results for all of the individual legislators and compared them district by district to the performance of a number of candidates, including the State Treasurer's.

Q    And you looked at like governor's race, perhaps?

A    Yes.

Q    Okay. And then you determined that the State Treasurer's race was more closely aligned with the legislative district performance?

A    Yes.

Q    Sorry. Let me go back.

Okay. You also mentioned that you would look at the cities and counties, the splitting of cities and counties.

You would take that into consideration when you would draw your maps; is that correct?

A    Yes.

Q    Okay. Can you explain that to me? What would you look for? Or you would look for cities and counties being split, but what was sort of your thought process of how much is too much, or this is a justifiable amount of

Objection to lines 74:5-75:6: hearsay. Neither the Commissioners nor the now defunct Commission are parties to this litigation or speaking agents for parties, and the Commissioners were not conveying present-sense impressions or then-existing mental conditions in reaching this alleged agreement, so FRE 801(1) and (3) do not apply.

Pls Response: Mr. Graves's and Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe their "motive, intent, or plan." Mr. Graves and Ms. Sims made the statements in their role as a commissioners, state actors. Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2).

19 (Pages 73 to 76)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

## Page 77

cities and counties being split?

MS. GOLDMAN: Objection, compound.

A    One of the commissioners' directives that is set out in statute is to reduce the splits of cities, counties, municipalities, and so we held that directive with a number of priorities.

Certain cities were too large to not be split.

Q    (By Mr. Thrift-Viveros) Do you recall what cities you made the determination had to be split, were too big to not be split?

A    The City of Seattle.

Q    Um-hmm.  Any other cities?

A    Tacoma.

Q    Um-hmm.  Any other cities?

A    I don't know if we came up with a list.

Q    Okay.  But those are just kind of what you had in mind --

A    Yes.

Q    -- is we're going to have to split these up?

Okay.  What about counties?  Were there any counties that you determined couldn't be kept whole, that they had to be split?

MS. GOLDMAN: Object as to form, vague.

A    I mean, certainly all of the counties that exceeded the population of what a legislative district or

## Page 78

congressional district had to be population-wise necessarily required splitting.

Q    Okay.  Going back to the 2020 State Treasurer's race, would you use that metric of that race to analyze every map that you created after it was agreed upon as the metric?

Sorry.  Did that make sense?  Or I can rephrase.

A    I don't know if it was every map.

Q    Okay.  Do you recall if that metric was agreed upon before or after the October map was released by Commissioner Sims publicly?

A    I don't recall.

Q    Do you recall if that agreement was made over email or in person or over Zoom, the agreement between Graves and Sims?

A    I remember it being agreed upon over Zoom.

Q    Okay.  Were you at that meeting?

A    Yes.

Q    Okay.  And did you like give a presentation on like your analyses, or did you explain why?

A    No.

Q    Okay.  Did you suggest the 2020 State Treasurer's race, you personally?

A    Not during the meeting.

Q    Okay.  But you did suggest it like to

## Page 79

Commissioner Sims prior to the meeting?

A    My understanding was that Commissioners Sims and Graves had been in communication before this meeting, --

Q    Okay.

A    -- and that I don't know what those conversations necessarily looked like.

Q    Okay.  But the reason that they chose that -- As far as you know the reason that they chose that race was because of the analysis that you had done?

MS. GOLDMAN: Objection, misstates the testimony.

A    I know that I had done that analysis.  My assumption was that the Republicans had done their own analysis.

Q    (By Mr. Thrift-Viveros) Um-hmm.

A    So it would be hard to say that my analysis --

Q    Okay.

A    -- would have motivated Commissioner Graves in any way.

Q    Okay.  I had one more question.  Do you know why -- -- Sorry.

Were Commissioners Fain and Walkinshaw present at that meeting that Commissioner Graves and Sims agreed to use that race as their electoral performance metric?

A    No.

Q    Do you know if -- As far as you know was

## Page 80

Commissioner Walkinshaw consulted prior to this agreement to use this as the metric?

A    I don't remember.

Q    Okay.  And what about if Commissioner Fain was consulted prior to this agreement?

A    I don't remember.

Q    Do you know why Commissioner Walkinshaw and Commissioner Fain were not included in this agreement?

A    Yes.

Q    Can you tell me why?

A    Because there was a decision to negotiate in dyads.

Q    Okay.  Can you explain what a dyad is?

A    The commission defined the dyads as two commissioners of differing political parties.

Q    Okay.  And how did that sort of dyad system work?  Can you kind of generally explain to me?

A    Primarily Commissioner Sims and Commissioner Graves would negotiate in a dyad, and that Commissioners Fain and Walkinshaw would negotiate in a dyad.

Q    Okay.  And were these dyads stable or the same throughout the redistricting process, as far as you know?

A    I guess I -- Certainly other commissioners talked together, talked to each other in groups of two; but as far as negotiating dyads, that was the primary structure throughout.

Objection to lines 79:2-18: Lack of foundation, speculation. Ms. Davis did not participate in these alleged conversations and lacks foundation to speak to what motivated the Commissioners.

Pls Response: There is foundation because Ms. Davis was a staffer, as established in this deposition, deeply involved in these negotiations and testifies here about what analysis she conducted. This testimony does not contain speculation because Ms. Davis testifies only to what she knows.

Objection to lines 78:13-16: hearsay.  Neither the Commissioners nor the now defunct Commission are parties to this litigation or speaking agents for parties, so their alleged statements do not qualify as statements of party opponents, and the Commissioners were not conveying present-sense impressions or then-existing mental state under FRE 803(1) and (3).

Pls Response: Mr. Graves's and Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe their "motive, intent, or plan." Mr. Graves and Ms. Sims made the statements in their role as commissioners, state actors.  Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2).

20 (Pages 77 to 80)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

Page 81

Q    Were these dyads assigned at the outset of the redistricting process or later on?

A    I believe later on.

Q    Okay.  Do you recall more or less when?

A    No.

Q    Okay.  Would you say that it happened before or after the release of the September maps?

MS. GOLDMAN:  Objection, vague.

A    I believe it occurred while I was on leave.

Q    (By Mr. Thrift-Viveros) Okay.  Do you know who assigned -- Was there -- Sorry.  Let me take that back.

Was this dyad arrangement, do you know whose idea it was to come up with this dyad arrangement?

A    No.

Q    Okay.  Do you know how say Commissioner Sims was assigned to be in a dyad with Commissioner Graves?

MS. GOLDMAN:  Objection, asked and answered.

A    No.

Q    (By Mr. Thrift-Viveros) Okay.  Do you know why Commissioner Sims was in a dyad with Commissioner Graves and not Commissioner Fain?

MS. GOLDMAN:  Objection, asked and answered.

A    No.

Page 82

Q    (By Mr. Thrift-Viveros) Okay.  So as part of this dyad agreement would you -- would Commissioner Sims and Commissioner Graves meet frequently?

A    Yes.

Q    About how often would you say?

A    It varied, but I'd say multiple times a week, generally.

Q    Okay.  And would you attend these meetings usually?

A    Yes.

Q    Okay.  And would the aide to Commissioner Graves attend those meetings regularly?

A    Yes.

Q    And that was Anton Grose; right?

A    Yes.

Q    Okay.  So these meetings as part of the dyad would consist of Commissioner Sims, Commissioner Graves, you, Anton Grose.  Anyone else?

A    Yes.

Q    Who else was there?

A    Dominique Meyers.

Q    Okay.  Anyone else?

A    No.

Q    Okay.  Was this dyad arrangement formalized anywhere, or -- as far as you know?

A    Not -- I don't believe it was.

Page 83

Q    Okay.  It wasn't written anywhere, as far as you know?

MS. GOLDMAN:  Objection, asked and answered.

A    I don't know.

Q    (By Mr. Thrift-Viveros) Okay.  Another thing you mentioned that you would look at when you were drawing maps and looking at the districts was the demographics was the word that you used.

What do you mean by that, by demographics?

A    I believe primarily again we looked at the data that was in Dave's Redistricting App.  So I believe they include racial and ethnic data, as well as age, I think.  I don't remember if they include age or not.

Q    Okay.  And how would you utilize that data when you would look at your maps?

A    We would generally look at how that data compared to the current existing maps.

Q    In what way?

A    Whether the demographics of certain districts shifted compared to their current district.

Q    And by shifted do you mean that a population, a certain ethnic population, for example, would increase or decrease?

A    Yes.

Page 84

Q    Okay.  Would you -- I know Dave's -- Sorry.  You mentioned Dave's Redistricting has multiple sets of data.  When you would look at the demographics was there a specific set of data that you would utilize?

A    I believe they had a total population as well as a citizen voting age population.

Q    And would you utilize both of those sets of data?

MS. GOLDMAN:  Objection as to form.

A    Yes.

Q    (By Mr. Thrift-Viveros) Did you look at any other sets of data when you were analyzing your maps besides those two?

A    Yes.

Q    Do you recall which ones?

A    Election data.

Q    Okay.  Do you recall anything else?

A    No.

Q    Okay.  As far as you know did -- Strike that.

Would other -- As far as you know would other staff members, such as Dominique Meyers or anyone else, any other staff members that you sent your maps to conduct analyses of your maps?

MS. GOLDMAN:  Objection, calls for speculation.

A    I don't know of that occurring.

21 (Pages 81 to 84)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

Objection to lines 85:1-14: lack of foundation. Ms. Davis is not qualified to speak to the analyses conducted by others.

Pls Response: There is foundation because Ms. Davis was a staffer deeply involved in these negotiations and testifies here about what she observes as a staff member working with commissioner Sims and Dominique Meyers, another Sims staff member. She testifies as to her understanding regarding Ms. Meyers's work.

Pls Response (88:1-14): The Washington AG representative made the statements in their role as a state agent. Since the state is a party and is defending the actions of the commission, and becuse the AG is defending the State's actions, this statement should be admitted as an admission by party opponents. FRE 801(d)(2).

Objection to lines 88:1-14: Hearsay. The individual from the Attorney General's Office who gave this presentation is not a party to this case or a speaking agent for a party, and so these alleged statements are not statements of party opponents. Nor was the individual conveying a present-sense impression or then-existing mental state under FRE 801(1) or (3).

Page 85

Q    (By Mr. Thrift-Viveros) Okay. As far as you know would Dominique Meyers conduct analyses of the maps that she drew?

MS. GOLDMAN: Objection, calls for speculation.

A    My understanding is that Dominique Meyers similarly drafted maps in Dave's Redistricting App, so she would have those preset analysis tools at her disposal as well.

Q    (By Mr. Thrift-Viveros) Okay. As far as you know did Commissioner Sims conduct analyses of the maps that you drew and submitted to her?

A    I believe Commissioner Sims would similarly look through and digest the data tables that were provided with the Dave's link to the map.

Q    Okay. Did you receive training on the legal requirements for a redistricting plan?

MS. GOLDMAN: And that is a yes or no question, and the reason I'm telling you that is because the next question may result in a privilege instruction.

A    What constitutes training?

Q    (By Mr. Thrift-Viveros) Someone conducts a class, a training, a workshop, and they say, "When you are drawing maps these are the legal requirements that you have to fulfill."

A    No, I don't recall a formal training.

Page 86

Q    Okay. And so as far as you know, as far as you recall there was not a situation where you consulted with someone on the legal requirements of -- Sorry. Let me strike that.

Did you or Commissioner Sims -- Did you -- Sorry.

Did you consult with anyone on the legal requirements of a map?

MS. GOLDMAN: That again is a yes or no question.

A    Yes.

Q    (By Mr. Thrift-Viveros) Okay. Do you recall who?

A    We met with Dr. Barreto.

Q    Okay. Do you recall meeting with anyone else on the legal requirements of a map that needed to be submitted by the commission?

A    I recall the commissioners receiving a briefing in an open public meeting from I believe the Attorney General's Office.

Q    Okay. And this was an open public meeting, you said?

A    Yes.

Q    Okay. And as far as you know members of the public attended this meeting?

A    Yes.

Q    Do you recall who gave that presentation?

Page 87

A    No.

Q    Okay. But you do recall it was an attorney from the Attorney General's Office?

A    That was my understanding.

Q    Okay. Do you recall when that was?

A    I believe it was in the spring.

Q    Okay. And do you recall if that presentation included a discussion of the Voting Rights Act?

A    I believe that it exclusively involved the Voting Rights Act.

Q    Okay. And do you recall if all the commissioners were present at that meeting?

A    No.

Q    Sorry. That was part of my question fault, but is that no, that you don't recall, or that not all the commissioners were present at the meeting?

MS. GOLDMAN: Objection, compound.

A    I don't recall if all of the --

Q    (By Mr. Thrift-Viveros) Okay.

A    -- commissioners were present.

Q    Was Commissioner Sims present at that meeting?

A    Yes.

Q    Okay. Do you recall what was stated as requirements for the Voting Rights Act?

A    Can you repeat the question?

Page 88

Q    Um-hmm. At this presentation at the open public meeting that you attended with an attorney from the Attorney General's Office, do you recall what they said were the legal requirements of the Voting Rights Act as it pertains to the maps that you were drawing?

A    In broad strokes, yes.

Q    Okay. Do you recall them now?

A    In broad strokes, yes.

Q    Can you give me some -- the broad strokes?

A    My understanding is that if there is the existence of racially polarized voting amongst a population large enough and compact enough, that districts should be drawn to allow for the minority community to elect their candidate of choice.

Q    Okay.

A    And that it was also illegal to draw districts on the basis of race.

Q    Okay. You mentioned if the minority population is large enough and compact enough.

What do you understand those to mean?

MS. GOLDMAN: Objection, calls for a legal conclusion.

A    My understanding in my own opinion is that it would mean that the geographic constraints would make it possible to draw a district that also respected the rule

22 (Pages 85 to 88)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 89

of roughly equal population amongst the districts.

Q    (By Mr. Thrift-Viveros) Do you base your understanding of the requirements of the Voting Rights Act under -- Sorry.  Do you -- yeah.

Your understanding of the Voting Rights Act and the legal requirements as it applies to the maps that you drew, do you base your understanding on anything else other than that open public meeting with the attorney from the Attorney General's Office and that meeting you had with Dr. Barreto?

MS. GOLDMAN:  That's a yes or no question.

MR. THRIFT-VIVEROS:  That's true, it is.

A    No.

Q    (By Mr. Thrift-Viveros) Okay.  Are you certain?

A    Can you repeat the question again?

Q    Yeah.  So you mentioned to me -- I asked do you base this -- Sorry.  I asked what you base your understanding of the Voting Rights Act.  Sorry.  Let me take that back.

I asked you who you consulted with on the legal requirements of the Voting Rights Act as it applied to your maps, and you answered Dr. Barreto and this open public meeting with the attorney from the Attorney General's Office; is that correct?

A    That is correct.

Q    Okay.  And then now I'm asking you are you basing

Page 90

your understanding of the requirements of the Voting Rights Act on anything else other than your talks with Dr. Barreto and with this meeting with the Attorney Generals?

A    Yes.

Q    Okay.  And what is that?

A    I believe I attended a webinar put on by the National Conference of State Legislatures --

Q    Okay.

A    -- that discussed the Voting Rights Act as well.

Q    Do you recall when that webinar was?

A    I believe that was in January of 2021.

Q    Okay.  So it was before you were hired?

A    Yes.

Q    Okay.  So did you take steps to assess the compliance of your maps with -- Sorry.  Yes.

Did you take steps to assess the compliance of your maps with the Voting Rights Act?

A    No.

Q    Do you know if anyone else took steps to ensure -- or sorry.  Strike that.

Do you know if anyone else took steps to assess the compliance of your maps with the Voting Rights Act?

MS. GOLDMAN:  Objection, calls for speculation.

Page 91

MS. FRANKLIN:  Objection, lack of foundation.

Q    (By Mr. Thrift-Viveros) You can answer.

A    My understanding -- or I believe that Dr. Barreto analyzed the maps.

Q    Okay.  Is there a reason why you did not take steps to assess the compliance of your maps with the requirements of the Voting Rights Act?

A    No.

Q    Okay.  Did anyone tell you that you should assess your maps to see if they comply with the Voting Rights Act?

A    I don't remember --

Q    Okay.

A    -- that specific instruction to me.

Q    Okay.  So you do not -- So Commissioner Sims, as far as -- Strike that.

As far as you remember did Commissioner Sims tell you, "Let's ensure that these maps are compliant with the Voting Rights Act"?

A    I don't remember.

Q    Okay.  Do you remember discussions with Commissioner Sims on the Voting Rights Act?

A    Yes.

Q    Okay.  Can you tell me what you discussed?

Page 92

MS. GOLDMAN:  And here I'm going to counsel you to the degree that any of those conversations involved a lawyer for the legislature or for the Democratic -- for the House Democratic Caucus or for the commission, I'm instructing you not to answer.

If none of those -- If there were such conversations that did not include those lawyers, you may answer as to the latter.

MR. THRIFT-VIVEROS:  Sorry.  I just want to ask in this objection are you discussing not her lawyers, like lawyers for the legislature is what you're saying?

MS. GOLDMAN:  I'm saying lawyers for the commission, lawyers for the House Democratic Caucus, any other lawyers, the legislative lawyers --

MR. THRIFT-VIVEROS:  Okay.

MS. GOLDMAN:  -- who were providing legal advice.

Q    (By Mr. Thrift-Viveros) So this question I'm asking in your conversations with Commissioner Sims what did you discuss about the Voting Rights Act?

MS. GOLDMAN:  Subject to my instruction.

A    I think we discussed opinions that Commissioner Graves had regarding the Voting Rights Act.  I believe we discussed or -- that neither of us are attorneys and wouldn't necessarily be able to know 100 percent one way

23 (Pages 89 to 92)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Objection to lines 90:22-91:5: lack of foundation.  Ms. Davis is not in a position to speak to others' efforts to assess compliance.

Pls Response: There is foundation because Ms. Davis was a staffer deeply involved in these negotiations and testifies here about what she observes as a staff member working with Commissioner Sims and other staff for Commissioner Sims and the other commissioners.

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                      August 19, 2022

Page 93

or the other what compliance would look like.

Q    (By Mr. Thrift-Viveros) Can you elaborate on what you mean by the opinions of Commissioner Graves on the Voting Rights Act?

A    I believe that Commissioner Graves released a memo from attorneys that he had hired regarding the issue. That's my recollection.

Q    Okay.  So when you said that you would discuss with Commissioner Sims the opinions of Commissioner Graves on the Voting Rights Act, are you just referring to the memo, or are you also referring to something else?

A    My recollection, it was concerning the memo or his comments summarizing the memo.

Q    Do you remember what the memo said?

A    No.

Q    Okay.  And then the other thing you mentioned is that in your conversations with Commissioner Sims you discussed that, you know, neither of you are attorneys, so you won't be sure one way or another on complete compliance.

Did you discuss hiring an attorney to help you comply or to help guide you through these issues?

A    I can't remember.

Q    Okay.  Do you remember if not necessarily hiring an attorney, but consulting with an attorney from the caucus

Page 94

or from elsewhere, did you discuss that?

A    I remember conversations with attorneys that worked for the caucus regarding the Voting Rights Act.

Q    Sorry.  You discussed with these attorneys, or you discussed with Commissioner Sims that you both would want to discuss with these attorneys?

        MS. GOLDMAN:  Objection, compound.

A    I remember having a conversation with an attorney regarding the Voting Rights Act.

Q    (By Mr. Thrift-Viveros) Do you know that attorney's name?

A    Alec Osenbach.

Q    Do you know where Alec Osenbach works?

A    The House Democratic Caucus.

Q    Okay.  Do you recall how many times you met with Mr. Osenbach?

A    No.

Q    Was it more than once?

A    Yes.

Q    Was it more than ten times?

A    I don't recall.

Q    Okay.  When you would meet with Alec Osenbach was it just you, or was it you and someone else?

A    I remember generally meeting with him with others present as well.

Page 95

Q    And when you say generally -- I'm sorry. Generally others present would mean who?

A    It's my recollection I believe Dominique Meyers may have been present.  I remember a meeting where the chief of staff was present.

Q    Sorry to interrupt.  Who is the chief of staff?

A    At the time the chief of staff was Alex MacBain.

Q    And he's the chief of staff for the caucus or for the House?

A    For the Speaker.

Q    Oh, for the Speaker?  Okay.

And then who else?  Sorry.  Dominique Meyers, Alex, chief of staff.

A    Amy Ruble.

Q    And what's her position?

A    I believe her role is Senior Tribal Liaison, but I'm not sure if that's the official title.

Q    And who does she work for?

A    The House Democratic Caucus.

Q    Okay.  Anyone else you can remember at those meetings?

A    I believe our GIS analyst may have attended a meeting.

Q    And when you say "our GIS analyst," you mean for Commissioner Sims?

Page 96

A    Commissioner Sims.

Q    Do you recall anyone else?

A    No.

Q    Okay.  Were -- Sorry.  I didn't catch the chief of staff of the Speaker's last name.  Alex, what was it?

A    MacBain.

Q    MacBain.  Okay.

A    I believe it's M-A-C-B-A-I-N.

Q    MacBain.  Okay.

Did you have discussions with Alex MacBain about redistricting?

A    Yes.

Q    About how often would you speak with Alex MacBain about redistricting?

A    A small handful of times.

Q    Do you think that's more than ten times?

A    No.

Q    More than five times?

A    No.

Q    So fewer than five times would you say?

A    Yeah.

Q    Okay.  Would you -- As far as you know would you characterize Alex MacBain as being heavily involved in the redistricting process?

A    No.

24 (Pages 93 to 96)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                         August 19, 2022

Objection to lines 97:1-9: Lack of foundation. Ms. Davis lacks foundation to speak to conversations between Commissioner Sims and others.

There is foundation because Ms. Davis was a staffer deeply involved in these negotiations and testifies here about what she observes as a staff member working with commissioner Sims and other staff for Commissioner Sims and the other commissioners.

---

Page 97

Q   Do you know if Alex MacBain would talk with Commissioner Sims about the redistricting process?

A   No, not to my knowledge.

Q   To your knowledge did Alex MacBain talk with Commissioner Walkinshaw about the redistricting process?

A   No.

Q   And as far as you know did Alex MacBain talk with Ali O'Neil about the redistricting process?

A   No, I don't believe so.

Q   Okay.  And when you did speak with Alex MacBain about the redistricting process did you discuss the Voting Rights Act compliance?

A   I don't believe so.

Q   Okay.  Do you recall the conversations that you had with Alex MacBain about redistricting?

A   Vaguely.

Q   Do you remember what you talked about?

MS. GOLDMAN:  And here I'm just going to counsel you that to the degree that those conversations with Alex MacBain happened with an attorney present providing legal advice, including Alec Osenbach, I'm instructing you not to answer.

If you can otherwise answer, please do.

A   Yeah, I believe -- I believe we talked about dynamics between the House and Senate.

---

Page 98

Q   (By Mr. Thrift-Viveros) Okay.  What does that mean?

A   I believe to my recollection I may have given him an update about the process and discussed the opinions that were held by members in the House and Senate.

Q   Okay.  Did you speak with members of the House about redistricting?

A   Yes.

Q   About how many members of the House?

A   About 55.

Q   How many members of the House are there?

A   I believe there are 56.

Q   Okay.  Sorry.  These are members of the House Democratic Caucus?

A   Yes.

Q   Okay.  Was there a particular one that you didn't talk to?

A   I believe I didn't talk to Representative Sharon Wylie.

Q   Is there a reason why?

A   She didn't show up to our scheduled meeting time.

Q   Okay.  So 55.  And then did you ever meet with members of the Senate?

A   Yes.

Q   About how many?

A   Maybe three or four.

---

Page 99

Q   Okay.  Would you meet with -- In general did you conduct these meetings on your own or with Commissioner Sims?

A   With Commissioner Sims.

Q   Was as far as you recall Commissioner Sims present at all of these meetings?

A   Yes.

Q   Okay.  And in general -- I know this is a lot of meetings, but in general what were topics of conversation for these meetings?

A   Generally we were aiming to get the legislators' insight into their communities, how they have changed or perceived them to have changed over the last ten years.

We asked about notable characteristics of the district -- universities, hospitals -- and that was primarily the focus.

Q   Did you ever show draft maps to members of the legislature?

A   I believe that I would pull up the existing map, but I don't recall ever providing draft iterations.

Q   By existing map you mean like the map that was --

A   The twenty -- The map that was in effect in 2021.

Q   Okay.  Do you know whether Commissioner Sims showed draft maps to members of the legislature?

A   I believe so.

---

Page 100

Q   Okay.  Do you know which members of the legislature?

A   I believe draft maps were shared with Representative Joe Fitzgibbon.

Q   Do you remember any other legislators?

A   I don't remember any others.

Q   Okay.  Do you know if Commissioner Sims presented the draft map to Joe Fitzgibbon by email or in person?

A   My understanding is that it would have been by email.

Q   Okay.  And when you met with the three or four senators what were the general topics that you would talk about?

A   I believe Senator -- Republican Senator Brad Hawkins met with Commissioner Sims and I to talk about broadly the Wenatchee region and his ties to Central Washington University.

Q   Do you recall any other conversations with senators?

A   Yes.

Q   And what happened in those conversations?

A   I recall meeting with Senator Jamie Pedersen as well as Majority Leader Billig.

Q   And what did you discuss in those meetings?

A   I believe that we discussed timelines and negotiation strategies primarily.

Q   Okay.  Did you share draft maps with any of the

---

25 (Pages 97 to 100)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 101

senators that you met with?

A    No.

Q    Do you know if Commissioner Sims shared draft maps with any of the senators that you met with?

A    No, I don't know.

Q    Okay. Did you generally talk about the reelection chances of the legislators in their districts?

        MS. GOLDMAN: Objection, vague.

A    No.

Q    (By Mr. Thrift-Viveros) Okay. And you said earlier that you met with Dr. Barreto; is that correct?

A    Yes.

Q    Who was at that meeting?

A    I believe I met with Dr. Barreto with Ali O'Neil, Commissioner Sims, Dominique Meyers, Adam with the last name I can't remember. And there may have been others.

Q    Do you recall when that meeting was?

A    October.

Q    So Dr. Barreto released the presentation on October 19th. Do you recall -- It was like a presentation report.

    Do you recall reading that report?

A    Yes.

Q    Did you meet with -- Did you have this meeting with him before or after that report was released?

Page 102

A    This meeting was before --

Q    Okay.

A    -- it was publicly released.

Q    Okay. What do you recall from the meeting with Dr. Barreto?

A    I remember the meeting primarily being him presenting his slide deck that he went on to release.

Q    Okay. And what do you recall from that presentation?

A    I recall the analysis he did. I recall he had a surname analysis tool that he utilized. There were a number of graphs, and I believe there were a number of -- or a couple of proposed draft maps --

Q    Okay.

A    -- in the Yakima Valley region.

Q    Did you discuss his presentation with anyone else? Did you discuss his presentation with anyone?

A    Outside of the meeting?

Q    Or those in the meeting, but yeah, outside of the meeting, with anyone.

        MS. GOLDMAN: Objection, compound.

A    Not that I recall.

Q    (By Mr. Thrift-Viveros) Okay. So even of the folks in the meeting, you don't recall discussing the meeting with them outside of the meeting?

Page 103

A    I remember having a question and answer time in the meeting --

Q    Yeah.

A    -- where we discussed the material.

Q    Do you recall any of the questions that were asked?

A    No.

Q    Okay. Did you ask any questions, do you remember?

A    I don't recall. I don't believe so.

Q    Okay. And you mentioned Dr. Barreto's analysis of the surnames. Did you ever conduct a surname analysis for any of your maps?

A    No.

Q    Okay. Do you know if anyone else on the commission conducted a surname analysis on the maps?

A    No.

Q    Okay. I have a couple emails here, and then I'm just going to ask you a few questions about this email first. Here's one. And then --

        MS. GOLDMAN: Can I have one, please?

        MR. THRIFT-VIVEROS: There's a --

        MS. GOLDMAN: One is the exhibit.

        MR. THRIFT-VIVEROS: Yeah, one is the exhibit. Sorry.

    There's a Dave's Redistricting link that I can drop into the chat, and we can open it up.

Page 104

        MS. GOLDMAN: Are you going to mark this?

        MR. THRIFT-VIVEROS: Well, I'm going to ask Osta a couple questions, but yeah, we can mark it as Exhibit 1.

        (Davis Exhibit No. 1 introduced.)

Q    (By Mr. Thrift-Viveros) So Osta, is that your name at the top?

A    Yes.

Q    And do you recall sending this email, after you have a chance to read through it?

        MR. HOLT: Is there a chance that digital copies of the emails can be put in the chat box?

        MR. HERRERA: I'll do it.

        MR. THRIFT-VIVEROS: Yeah, I'm trying to figure that out right know. Sorry.

        MR. HOLT: No, you're fine. I just couldn't see what was going on there, so I apologize.

        MR. THRIFT-VIVEROS: The October 19th emails.

        MR. HERRERA: I'll pull it up.

        MR. THRIFT-VIVEROS: Great.

A    Yes.

        MR. THRIFT-VIVEROS: Okay. And we'll let Ernest share in the chat first so all the remote attendees can take a look. And also I'm going to screen share it so

26 (Pages 101 to 104)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                                35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

---

Page 105

that we can open the Dave's Redistricting link on my computer. So I did a printout, but I'd rather look at the link. Thank you, Ernest.

MS. GOLDMAN: Counsel, may I ask you a question?

MR. THRIFT-VIVEROS: Yes.

MS. GOLDMAN: So this is a two-page document. So is the attachment where you're going to on the link?

MR. THRIFT-VIVEROS: Yes.

MS. GOLDMAN: Okay. Thank you.

MR. THRIFT-VIVEROS: And I'm going to pull up the link on --

MS. GOLDMAN: Would you mind showing us the email so we can watch you go from the link?

MR. THRIFT-VIVEROS: Yes.

MS. GOLDMAN: Thank you.

MR. THRIFT-VIVEROS: That's what I'm doing right now, as soon as I figure it out.

MS. GOLDMAN: Thanks.

MR. THRIFT-VIVEROS: Great. Are you seeing my email?

MS. GOLDMAN: Yes.

MR. THRIFT-VIVEROS: Are you seeing any privileged information?

---

Page 106

MS. GOLDMAN: No.

MR. THRIFT-VIVEROS: Okay. Just making sure.

Q    (By Mr. Thrift-Viveros) Okay. So before we open the Dave's Redistricting link do you recall sending this email, Osta?

A    Yes.

Q    Okay. And so you wrote, "Here's an updated VRA version of the map."

What do you mean by VRA version, or what did you mean?

A    I believe I meant a version that incorporated the information from Dr. Barreto's presentation.

Q    Okay. And VRA means Voting Rights Act?

A    Yes.

Q    Okay. Do you recall specifically what you tried to incorporate or what you incorporated from Dr. Barreto's presentation when drawing this map?

A    No.

Q    Okay. So I'm going to open the link that is contained in this email, and I'll wait for it to load; but yeah, we can go back to the email.

You wrote, "The VRA district is 51.7 percent Hispanic CVAP and a total VAP of 76.34 percent."

What do you mean or what did you mean by VRA

---

Page 107

district?

A    I meant district that we redrew based on the presentation from Dr. Barreto.

Q    Okay. And when you were -- When you redrew this district what consideration per -- Sorry.

So you mentioned that you were redrawing the district based on Dr. Barreto's report. Do you recall what factors or what criteria you had in mind when you were redrawing this district?

A    I remember a goal not related to the VRA, but a goal was to have the Yakama Nation Reservation as intact as possible.

Q    And why was that a goal?

A    We had conducted a consultation with the Yakama Nation, and they had stated that as a priority of theirs.

Q    Okay. When you were redrawing this map in district were you taking into consideration the Hispanic citizen voting age population of the area?

A    Yes, I did consider that.

Q    Okay. Did you conduct -- Sorry. Did you conduct a racially polarized voting analysis on this district?

A    No.

Q    Did you conduct a racially polarized voting analysis on any of the districts in this map?

A    No.

---

Page 108

Q    Okay. Do you know if this is the map that was released by Commissioner Sims publicly posted?

A    I do not know.

Q    Okay. Was part of -- So you mentioned that when you were redrawing this map one of your goals was keeping the Yakama Indian Reservation whole, and then also a majority Hispanic CVAP.

Was it your goal to put them into the same district?

MS. GOLDMAN: Objection, misstates the testimony.

A    Not necessarily. We attended the presentation with members of Commissioner Walkinshaw's team, and one of the goals was to have similar districts with the Senate.

Q    (By Mr. Thrift-Viveros) Sorry. Can you explain that? You said similar districts with the Senate?

A    With Commissioner Walkinshaw's team, and he was appointed by the Senate.

Q    Oh, gotcha. Okay.

Do you recall -- Sorry. Let me strike that.

This meeting with the Yakama Nation, who did you meet with from the Yakama Nation?

A    We met with their Tribal Council.

Q    About how many people are on the Tribal Council?

A    It was a large auditorium, but folks were spaced out because of COVID.

---

27 (Pages 105 to 108)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Pls Response (111:8-113:8): Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe her "motive, intent, or plan." Ms. Sims made the statements in her role as a commissioner, a state actors. Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2). Ms. Davis has knowledge because she worked closely with Commissioner Sims in the redistricting process, and Ms. Davis testifies here about her undesrtanding of Ms. Sims's priorities when asked about what she discusseed with Ms. Sims in that process.

Objection to lines 111:8-113:8 - hearsay, lack of foundation, speculation. Neither Commissioner Sims nor the now-defunct Commission are parties to this litigation or speaking agents for parties, so these are not statements of a party-opponent, nor are these alleged statements conveying present-sense impressions or then-existing mental state under FRE 803(1) or (3). Ms. Davis was not in a position to know what was in Commissioner Sims' mind.

---

**Page 109**

Q   Okay.

A   So it's difficult to guess how many people were in the room, but it was in a large --

Q   Okay.

A   -- auditorium.

Q   And that was you, I presume -- I'm sorry. Did you go in person for that meeting?

A   Yes.

Q   And did Commissioner Sims go in person for that meeting?

A   Yes.

Q   Okay. And how many times did you meet with the Tribal Council from the Yakama Indian Reservation?

A   I only remember meeting with them that one time.

Q   Okay. Did you have any other takeaways from that meeting besides that the Nation wanted to be kept whole?

A   Yes.

Q   And what were those?

A   I think there were conversations about land and boundaries as a cultural concept and an understanding that Yakama Nation land and cultural identity extends well beyond the Reservation and encompasses a majority of the state.

Q   Okay. Did you meet with any other groups when you were in the Yakima Valley?

---

**Page 110**

A   We had a lunch with a select number of folks from the Tribal Council and then attended the full council meeting.

Q   Okay. And did that lunch with the select number of members of the Tribal Council, do you have any takeaways from that lunch?

A   I don't remember -- I remember the lunch being more close conversations; and I was seated next to staff, so I don't remember takeaways from that meeting.

Q   Okay. So going back to the map -- Sorry if I missed it or misheard it -- did you say that having a Hispanic CVAP district higher than 50 percent was something you were trying to do?

A   I believe so, yes.

Q   Okay. So how did you go about doing this through Dave's? Can you walk me through the process?

A   Yes. In this instance I believe Matt Bridges had drawn this district --

Q   Okay.

A   -- and asked that we adopt it and release it in another round of public maps.

Q   And Matt Bridges worked for Commissioner Walkinshaw; is that correct?

A   Yes.

Q   Okay. Did you make any changes to this map between

---

**Page 111**

Matt Bridges sending it to you and you sending it to Commissioner Sims?

A   I don't believe so. My intention was to upload it to retain the same character. The rest of our map differed from that of Commissioner Walkinshaw's, but I don't recall specifically changing this district from what Matt had sent over.

Q   Okay. Going back to a general sort of sense, and I should have asked this earlier, but did Commissioner Sims state her priorities to you for the redistricting process, like, "These are the things I want to see in a final map"?

A   Yes.

Q   And what were those?

A   From what I remember, her priorities strongly focused on equity and creating districts around which communities could organize and have more of a voice in government and elect representatives of their choice.

I believe her desire was to engage in a tribal consultation process and bring the voices of indigenous folks into the process in a way that they hadn't previously.

I believe that she wanted to create a map that reflected the political reality of Washington state and respected the past political trends of the state as well.

And she certainly wanted to try to eliminate the

---

**Page 112**

splitting of counties and cities.

Q   And she expressed all this to you?

A   Um-hmm.

Q   Okay.

THE REPORTER: Is that a yes?

A   Yes. Yes.

Q   Can you explain what the political reality of Washington state as you understood it to mean?

A   I believe when Commissioner Sims was saying that she was referencing to the fact that Washington state has continually elected Democrats for president and governor and that in her mind the legislature should reflect the majority of voters' at least statewide vote for Democrats, and that that proportional representation should play a part in how the legislative districts are drawn.

Q   Was keeping that proportion in the legislature a priority of Commissioner Sims? Is that my understanding?

A   It wasn't strictly written down or assessed, but she certainly wouldn't -- didn't want to suppress or crack or pack votes based on that.

Q   Okay. And you mentioned that Commissioner Sims had told you that a priority is ensuring that certain communities have the opportunity to elect their candidates.

Did she specifically mention the Yakima Valley

---

28 (Pages 109 to 112)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                      August 19, 202?

## Page 113

Latino community as a priority?

A    I'm sure at times, yes.

Q    Okay.  Was there a -- Did her stated priorities to you change over the course of the redistricting process?

A    No.

Q    Did you perceive her priorities to change over the course of the redistricting process?

A    No.

Q    Okay.  What were your priorities going into the redistricting process?

A    My priorities were to serve the commissioner to the best of my ability and help accomplish the goal in a timely fashion in the best way that I could.

Q    And by goal, you mean the --

A    Meet our November 15th deadline.

Q    Okay.  Do you feel that your priorities changed over the course of the redistricting process?

A    No.

Q    Okay.

MR. THRIFT-VIVEROS:  It is 12:20.  Should we take a lunch break soon?  Now?

MS. GOLDMAN:  (Nodded.)

MR. THRIFT-VIVEROS:  Yeah?  All right.

THE REPORTER:  Off the record?

MR. THRIFT-VIVEROS:  Yes, let's go off the

## Page 114

record.

(Discussion off the record.)

(Break 12:22 p.m. to 1:24 p.m.)

MR. THRIFT-VIVEROS:  I'm ready to go back on the record.

Q    (By Mr. Thrift-Viveros) So again, Osta, if you need to take a break, let me know.  That's fine.  I think we went like two hours without a break before, which was fine with me, but let me know if you ever need one.

So I'm going to pull up the last exhibit, Exhibit 1 that we had.  I'm going to pull that up again, and I'll share screen.  I just have one more question about this.

(Davis Exhibit No. 1 displayed.)

Q    So in the map -- This is the Dave's Redistricting map that was linked in this email.  The Hispanic CVAP majority district is District No. 15; is that right?

A    Yes.

Q    And this is the district that included the Yakama Indian Reservation; is that right?

A    Yes.  Yes.

Q    Okay.  Is there a reason why you or -- Sorry.

You testified that Matt Bridges was the person who drew this district; is that right?

A    Yes.

Q    Okay.  Did you discuss with Matt Bridges the

## Page 115

numbering of this district and why it would be District 15?

A    Yes.

Q    Can you elaborate on that discussion?

A    Yeah, and I'm not sure if this map is actually the version that Commissioner Sims released in October; --

Q    Okay.

A    -- because I believe both Commissioners Walkinshaw and Sims had the district numbered the same number, so perhaps it would have been 14 in the released ones.

Q    Okay.

A    But there was conversation about the cycles when the state senate seats would be up, and I believe in even numbered districts the seats are up on presidential election cycles.

Q    Okay.  And then for odd numbered districts what year -- what years would those be up for election?

MS. GOLDMAN:  Objection, vague.

A    So I was working primarily for the House Democratic Caucus, and so those seats are up every two years.

Q    (By Mr. Thrift-Viveros) Right.  Okay.

A    The Senate seats are up every four years, with half of the seats up each election cycle.

Q    Okay.  So just to clarify, the even numbered districts are during presidential years, and then the odd

## Page 116

numbered districts are during the like midterm years?

MS. GOLDMAN:  Objection, misstates the testimony.

A    I would need to know a list or look at past election results to say for sure which districts are up when, --

Q    (By Mr. Thrift-Viveros) Okay.

A    -- but I know that half are up each two years.

Q    Okay.  And although as you mentioned you worked for the House Caucus, did the numbering of the districts influence your mapmaking personally?

A    Yes.

Q    Um-hmm.  In what ways?

A    In that it was a priority for the Senate and therefore a consideration of ours as well.

Q    Okay.  And did Commissioner Sims, did you have conversations with her about the numbering of the districts?

A    Yes.

Q    And do you recall those conversations?

A    I recall her liking the idea of having the seat, the Senate seat up during a presidential year, but also her -- uncertain in terms of how Commissioner Graves or Fain would feel about those decisions.

Q    Okay.  And when you say the Senate seat, what are you referring to?

29 (Pages 113 to 116)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

---

**Margin annotations:**

Pls Response (116:15-118:25): Mr. Walkinshaw's and Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe their "motive, intent, or plan." Mr. Walklinshaw and Ms. Sims made the statements in their role as a commissioners, state actors. Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2). Ms. Sims's statements about Walkinshaw's priorities are not double hearsay because those statements themselves are also party opponent admissions.

Objection to lines 116:15-118:25 - hearsay and lack of foundation. Neither Commissioner nor the now-defunct Commission, is a party to this litigation. The statements describing Commissioner Walkinshaw's priorities are double hearsay. None of these alleged statements are conveying present-sense impressions or then-existing mental condition under FRE 803(1) or (3).

Page 117

A    The State Senate seat that's up on that four-year cycle, whereas our seats and the congressional seats are up every two years, --

Q    Right.

A    -- so it really wouldn't make too much of a difference.

Q    And when you say the Senate seat, do you mean for districts -- for the Hispanic CVAP majority districts?

A    Yes.

Q    Okay.  So just so I'm clear, Commissioner Sims expressed that she wanted the Hispanic CVAP majority district to have their Senate elections during presidential election years?

        MS. GOLDMAN:  Objection, misstates the testimony.

A    My understanding is that Commissioner Sims was aware of Commissioner Walkinshaw's priorities around that, the numbering of the districts, and shared his priorities.

Q    (By Mr. Thrift-Viveros) Okay.  Yeah, let's get a little bit into Commissioner Walkinshaw's priorities.

    Did he express his priorities to you?

A    I don't recall if he explicitly expressed his priorities to me directly.

Q    Okay.  But did he express them to Commissioner Sims, and then she told you?

Page 118

A    Yes.

Q    Okay.  And do you recall what those priorities as conveyed by Commissioner Sims to you were?

A    I recall that Commissioner Walkinshaw expressed a great deal of interest in the Yakima Valley region and felt that as a Latino commissioner himself that he wanted to take lead on that district.

Q    Okay.  Do you recall when Commissioner Sims told you about Commissioner Walkinshaw's interest in taking lead on that district?

A    No.

Q    Do you have an estimate of when she conveyed that to you?  Was it before the September maps, for example?

A    I primarily recall those conversations after I came back from leave, --

Q    Okay.

A    -- so that would be October.

Q    Okay.  And was part of those priorities an interest in the numbering of the Latino or the Hispanic CVAP majority district?

A    I believe so.

Q    Okay.  And did Commissioner Sims express an opinion to you on Commissioner Walkinshaw's interest in taking lead on the formation of that district?

A    I don't recall a strong opinion.

Page 119

Q    Okay.

A    Yeah.

Q    Did she say like she was okay with it?

A    Yes.  I would say that Commissioner Sims appreciated the work that Commissioner Walkinshaw was putting in.

Q    How did she express that appreciation?

A    I believe to my recollection she may have thanked him for holding the meeting where Dr. Barreto presented his slides.

Q    Okay.  Do you know if the dyad of Commissioner Sims and Commissioner Graves discussed the Matt Barreto, the Dr. Barreto presentation?

        MS. GOLDMAN:  Objection, calls for speculation.

A    I believe so.

Q    (By Mr. Thrift-Viveros) And what do you base that belief on?

A    I believe that I remember a meeting where that was discussed.

Q    Okay.  That you were present at?

A    Yes.

Q    Okay.  Do you remember anything about the discussion?

A    Yes.

Q    Do you remember -- Can you elaborate?

Page 120

A    My take from that meeting was that Commissioner Graves didn't put that much weight into Dr. Barreto's analysis.

Q    Did he say why?

A    I believe he might have said something along the lines that he could hire someone to come up with a different analysis.

Q    And did he hire someone to come up with an analysis?

        MS. GOLDMAN:  Objection, calls for speculation.

A    I know that there was a memo released.

Q    (By Mr. Thrift-Viveros) Um-hmm.  Okay.

A    I don't know if that was the same nature of the type of analysis that Dr. Barreto produced.

Q    Okay.  The same question about -- Well, yeah, sorry.

    Did Commissioner Sims and Commissioner Graves as far as you know discuss the applicability of the Voting Rights Act to these maps?

A    Yes.

Q    Were you present at those discussions, or at least one of the discussions?

A    Yes.

Q    Do you recall what they discussed?

A    Yes.

Q    Can you tell me what they discussed?

Pls Response (119:22-120:7): Mr. Graves's statements represent then-existing state of mind under FRE 803(3) because they describe their "motive, intent, or plan."  Mr. Graves was a commissioner, a state actor. Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2).

Objection to lines 119:22-120:7: hearsay. Commissioner Graves is not a party to this litigation or speaking agent for a party, and so the alleged statement is not a statement of a party-opponent. Nor did it convey a present-sense impression or then existing mental condition under FRE 803(1) or (3).

30 (Pages 117 to 120)

Electronically signed by Jeanne Gersten (001-357-668-4110)          35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 121

A    In my recollection Commissioner Sims said that we needed -- the commission needed to come up with final maps that were certainly different than the initial September maps that everyone proposed, and that there needed to be a district where Hispanic voting age population had the ability to elect their candidates of choice.

Q    And how did you determine whether a district was drawn in a way that would allow Hispanic -- the Hispanics of that district to elect the candidates of their choice?

A    I didn't determine that.

Q    Who did?

MS. GOLDMAN:  Objection, calls for speculation.

A    I'm not aware of folks doing that.

Q    (By Mr. Thrift-Viveros) Okay.  Did Commissioner Graves beyond his opinion of the Dr. Barreto analysis, did he express an opinion in conversations that you were present on the Voting Rights Act?

A    Yes.

Q    Do you recall what he said?

A    I -- My recollection was that Commissioner Graves had pushed back on the idea that a Voting Rights Act compliant district wouldn't necessarily require the district to be a strongly Democratic district, and I recall him saying that, that sentiment.

Page 122

Q    In your opinion based on these conversations did Commissioner Graves conflate Latinos with Democrats?

A    No.

Q    Okay.  Did he say anything else about the Voting Rights Act?

A    Not that I recall.

Q    Okay.  Did he say anything about how the Voting Rights Act would apply to Washington state in general?

A    No.

Q    Okay.  And when Commissioner Sims said that she believes that there should have been -- there should be a district that allows Hispanics to elect their candidate of choice, how did Graves respond to that?

A    My perception was that Commissioner Graves was receptive to hearing what Commissioner Sims had to say but disagreed in terms of what that -- the drawing of that district would look like.

Q    Do you recall like what he said or how he disagreed?

A    I think he primarily disagreed with the drawings of that district that made it what he considered to be more of a safe Democratic seat.

Q    Okay.  Did he express an opinion that Latinos electing Democrats is them electing the candidates of their choice?

A    I don't remember him saying that.

Page 123

Q    Okay.  Did he say why he thought that a district that elected Democratic candidates didn't need to comply with the Voting Rights Act?

MS. GOLDMAN:  Objection, misstates the testimony.

A    My understanding is that every district needs to comply with the Voting Rights Act.  Only in some districts are the pre-conditions of racially polarized voting present, and so my understanding is every district in Washington should be in compliance.

Q    (By Mr. Thrift-Viveros)  And did Commissioner Graves express an opinion either way on that statement you just made?

A    It was never my perception that Commissioner Graves did not want to follow the law.

Q    Okay.  And when you say that the Hispanics of a district want to elect the candidates of their choice, how would you make an assessment to determine that Hispanics of a certain district can elect the candidates of their choice?

MS. GOLDMAN:  Objection, vague.

A    I didn't run a formal analysis, but we certainly referenced Dr. Barreto's presentation.

Q    (By Mr. Thrift-Viveros) Do you know if anyone else that worked for Commissioner Sims, if they ran an analysis

Page 124

on the ability of the Hispanics of a certain district to elect the candidates of their choice?

A    I do not believe they did.

Q    Okay.  Do you know if any one of Commissioner Walkinshaw's staff conducted analyses of whether Hispanics of a certain district could elect the candidates of their choice?

A    Yes.

Q    Do you know who?

A    My understanding is that they shared draft districts with Dr. Barreto's team.

Q    Okay.  Do you know how many maps they shared with Dr. Barreto's team?

A    No.

MR. THRIFT-VIVEROS:  I have an email here.  We'll mark it as Exhibit 2.

(Davis Exhibit No. 2 introduced.)

MS. GOLDMAN:  Thank you.

MR. THRIFT-VIVEROS:  And let me drop it in the chat.

(Discussion with Mr. Herrera.)

Q    (By Mr. Thrift-Viveros) Is that your name in the recipient line --

A    Yes.

Q    -- from the top email?

Objection to lines 122:10-21: hearsay.  Neither Commissioner Sims nor Graves is a party to this litigation or speaking agent for a party, and so these statements are not statements of party opponents.  Nor do they convey present-sense impressions or then-existing mental states under FRE 803(1) or (3).

Pls Response in left margin.

Pls Response (122:10-21): Mr. Graves's and Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe their "motive, intent, or plan." Mr. Graves and Ms. Sims made the statements as commissioners, state actors. Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2).

31 (Pages 121 to 124)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                              August 19, 2022

Pls Response (125:14-126:1): Not hearsay as present sense impression under 803; then-existing mental condition. Bridges was expressing his state of mind with regard to Sims's actions regarding redistricting

125:14-126:1: Hearsay. Mr. Bridges is not a party to this lawsuit nor a speaking agent for a party. Nor does his alleged statement convey his present-sense impressions or then-existing metal state under FRE 803(1) or (3).

## Page 125

Okay. Do you recall receiving this email?

A   Yes.

MR. THRIFT-VIVEROS:  And oh, yeah, let me put it in the chat box.

Q   Were you present at the meeting that Matt Bridges says that he was apologizing for losing his cool?

A   Yes.

Q   Can you tell me what was that meeting about?

A   I believe it was about the Voting Rights Act and Yakima Valley.

Q   Do you remember anything else?

A   Yes.

Q   What else happened?

A   I remember at that point in the meeting Matt Bridges accused Commissioner Sims of not standing up for communities of color and expressed very strong accusations around that.

Q   Do you know why he said that?

MS. GOLDMAN:  Objection, calls for speculation.

A   I do not.

Q   (By Mr. Thrift-Viveros) What exactly were his accusations to Commissioner Sims?

A   I think -- I mean, what I just said previously, that -- that she could potentially be letting down

## Page 126

communities of color, and lecturing her about her job.

Q   Who else was present at that meeting?

A   Dominique Meyers, Ali O'Neil, and Matt Bridges. And I don't recall if there was anyone else.

Q   Okay. And was Matt Bridges' accusations, did they arise out of a specific map that was proposed?

MS. GOLDMAN:  Objection, calls for speculation, asked and answered.

A   And going back, I believe Adam with the last name I don't remember was also at that meeting.

Q   (By Mr. Thrift-Viveros) Okay.

A   No, I do not believe that it was in reference to a specific map.

Q   Were these accusations specifically about the Yakima Valley region?

A   Yes.

Q   Were the accusations that Commissioner Sims wasn't prioritizing creating a district that would elect Hispanic candidates of choice?

A   Not necessarily. I recall Commissioner Sims expressing concern that through negotiations we might get a watered down version of an attempted Voting Rights Act compliant district and that she would be disappointed by that outcome, and I recall Matt Bridges becoming very agitated.

Objection to lines 126:5-127:7: Lack of foundation, hearsay. See previous hearsay objection; Ms. Davis lacks foundation to testify as to the source of Mr. Bridges' accusations.

Pls Response (126:5-127:7): There is foundation. Ms. Davis was present at the meeting and was a staffer for Sims. Not hearsay as present sense impression under 803; then-existing mental condition. Bridges was expressing his state of mind with regard to Sims's actions regarding redistricting Reputation concerning land boundary, FRE 803(20).

## Page 127

Q   Um-hmm. And how did Commissioner Sims respond to Matt Bridges' outburst?

A   I recall her responding that it created a very uncomfortable situation to have an all white staff lecturing her about standing up for communities of color.

Q   Anything else?

A   That's the main -- That's mostly what I remember.

Q   Okay. Do you know -- Just within the context of this conversation, do you know what race Commissioner Sims identifies as?

A   My understanding is that she identifies as Black.

Q   Okay. And you mentioned that Commissioner Sims was discussing that the -- as you said, the VRA compliant district was watered down.

What is your understanding of what the watered down version means?

MS. GOLDMAN:  Objection, misstates the testimony.

A   At the time of that discussion I do not believe that there was a specific district that we were looking at.

Commissioner Sims raised the concern that through negotiation that this district might look quite a bit different from the October maps that the commissioners revealed -- posted; and her concerns were more from a negotiation perspective, that that was something that she

Objection to lines 127:12-131(16): Hearsay, lack of foundation. The Commissioners are not parties to this litigation nor speaking agents, so their alleged statements are not statements of party-opponents. Nor do they convey present-sense impressions or then-existing mental condition under FRE 803(1) and (3). Ms. Davis lacks foundation to testify as to what was in Commissioner Sims' or Mr. Bridges' mind.

## Page 128

could foresee happening during negotiations, and Matt Bridges lambasted her for those observations.

Q   Did she express to you why she felt that this was something that could happen during negotiations?

MS. GOLDMAN:  Objection, vague.

A   I think so.

Q   (By Mr. Thrift-Viveros) Do you recall what she said?

A   My recollection was that she was referencing Commissioner Graves' strong assertion that a Voting Rights Act compliant district didn't necessary mean a strong Democratic district, and that he would not or did not seem to have an interest in voting on a map that would create a strong Democratic district.

Q   Did Commissioner Sims express to you whether she considered it acceptable to end up with a watered -- quote, "watered down" VRA compliant district if she achieved other goals, like in her negotiations?

MS. GOLDMAN:  Objection, vague.

A   Commissioner Sims expressed that she would -- that she would consult with Commissioner Walkinshaw and defer to his judgment on the final maps as they related to Yakima Valley.

Q   (By Mr. Thrift-Viveros) In your opinion did Commissioner Sims defer to Commissioner Walkinshaw's judgment regarding Yakima Valley?

Pls Response (127:12-131:16): There is foundation. Ms. Davis was present at the meeting and was a staffer for Sims. She testifies regarding her recollection of Sims's statements. Sims's statements give her then-existing mental, emotional condition in this meeting and regarding VRA compliance. Statements are made by a party opponent as a commissioner. Reputation concerning land boundary, FRE 803(20). Residual exception, FRE 807: More probative than what Pls. can obtain by other means, and Davis speaks as someone who has interest in preserving map, thus it is trustworthy.

32 (Pages 125 to 128)

v. Hobbs, et al.
(833) 365-3376

Page 129

A   My recollection is that she consulted with Commissioner Walkinshaw, and he agreed with the maps and gave his approval.

Q   With which maps?

A   The final maps.

Q   Okay.  From what you recall was the term watered down VRA district, was that -- were those the words that Commissioner Sims used in that meeting?

A   I don't remember her specific wording.

Q   Okay.  But that was the idea that you came away with?

        MS. GOLDMAN:  Objection, vague.

A   Yes.

Q   (By Mr. Thrift-Viveros) Okay.  What did you understand that to mean, a watered down VRA district?

A   My sense is that -- and my memory vaguely is that Commissioner Sims thought that perhaps it might be more difficult to bring a Voting Rights Act violation case against the commission if they had a majority CVAP Hispanic district, even if that district didn't necessarily allow for the ability for that community to elect their candidates of choice.

Q   Commissioner Sims expressed that?

A   Yes.

Q   So as Commissioner Sims expressed to you, for a

Page 130

district to be VRA compliant you just needed a CVAP majority -- Latino CVAP majority?

A   No.

Q   No?  Oh, okay.  Sorry if I misunderstood.  What did Commissioner Sims express to you as to what was required for a VRA compliant district?

A   Commissioner Sims expressed that it presented quite a bit of difficulty to negotiate something that has legal requirements rather than just a back-and-forth of commissioner desires or priorities.

Q   Um-hmm.

A   What was the rest of that question?

        THE REPORTER:  I can read it back.

        MR. THRIFT-VIVEROS:  Can you read it back?  Thank you.

        (Question read back.)

A   Yes.  Commissioner Sims and I both attended the presentation from Dr. Barreto; and so to my understanding we were both absorbing the information that he presented, and that was my assumption in terms of her understanding of the requirements as well.

Q   Do you know if Matt Bridges had a different understanding of what was required for a VRA compliant district?

        MS. GOLDMAN:  Objection, calls for

Page 131

speculation.

A   No.

Q   (By Mr. Thrift-Viveros) Did he express to you or Commissioner Sims or anyone present at that meeting what he believed would be required for a VRA compliant district?

A   My sense is that Matt Bridges expressed a strong desire for what we would describe as a safe Democratic district.

Q   And how did he express that?

A   Through conversations.

Q   In that meeting or other meetings?

A   At that meeting primarily.

Q   Okay.  And did he tell you what he meant by a safe Democratic district?

A   Not that I recall.

Q   What is your understanding of what a safe Democratic district means?

A   In our negotiations with Commissioner Graves we created categories in terms of safe and lean districts, and so internally we had described a safe district as a district where the State Treasurer's performance exceeded 55 percent.

Q   Okay.  And what was categorized as a lean district?

A   Districts between -- A lean Democratic district

Page 132

would be between 50 and 54.9 percent, I believe, or 53.  I believe we may have had subcategories.

Q   Like was there like a tossup category that could go either way?

A   I don't recall.

Q   Do you recall where the district, the Latino majority CVAP -- sorry.  The -- Excuse me.  Do you recall where the majority Latino CVAP district in the October maps, what category that district fell in?

        MS. GOLDMAN:  Counsel, can you specify which maps you're talking about?

Q   (By Mr. Thrift-Viveros) The October maps that were released by -- publicly posted by Commissioner Sims and Commissioner Walkinshaw that were the same district; right?

A   Yes.  I do not recall exactly what the performance was of those districts.

Q   Okay.  So how did you, or do you -- Sorry.  Did you balance -- I'm sorry.  Let me take that back.  How would you analyze the interplay between electoral performance and -- Sorry.  Let me strike that.  How would you balance when creating a district the electoral performance and the ethnic makeup if you wanted

33 (Pages 129 to 132)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

Page 133

to achieve a VRA compliant district?

MS. FRANKLIN: Objection, calls far a legal conclusion.

MS. GOLDMAN: Yes, same objection, and vague.

A    Commissioners Sims and Graves would have negotiations and discussions back and forth regarding I'd say primarily to my understanding political performance. Yeah.

Q    (By Mr. Thrift-Viveros) Okay. And do you know if one of their priorities was to maintain a similar balance of safe Republican seats, safe Democratic seats, leaning Republican seats, leaning Democratic seats, as the current map is composed?

MS. GOLDMAN: Objection, compound, and it calls for speculation. Lack of foundation.

A    No.

Q    (By Mr. Thrift-Viveros) Did you examine data related to elections that involved a Latino candidate in the Latino majority, the Latino CVAP majority district?

MS. GOLDMAN: Objection, vague.

A    I looked at the analysis provided by Dr. Barreto.

Q    (By Mr. Thrift-Viveros) Okay. Do you know if any other commission staff conducted an analysis of Latino candidates running in the Hispanic majority CVAP district?

Page 134

A    Not to my knowledge.

Q    Okay. Do you know if any of the commissioners contracted with someone outside of their staff to conduct an analysis of Latino candidates running in a Latino CVAP majority district?

A    Yes.

Q    You do know?

A    Yes.

Q    And who's that?

A    Commissioner Walkinshaw contracted with Dr. Barreto to run that analysis.

Q    Okay. Anyone else?

A    Not that I'm aware of.

Q    Okay. Did Commissioner Walkinshaw as far as you know consult with Commissioner Sims on the contracting with Dr. Barreto?

A    Not that I'm aware of.

Q    Okay. As far as you know was Commissioner Sims surprised that Commissioner Walkinshaw contracted with Dr. Barreto?

A    I am not aware.

Q    Okay. And going back to this meeting with Matt Bridges, what was -- from yeah, this email from October 22nd, was there any fallout from this meeting, any lasting consequences?

Page 135

MS. FRANKLIN: Objection, vague.

A    Yes.

Q    (By Mr. Thrift-Viveros) And what were those?

A    I believe or my perception was that there was a lasting lack of camaraderie between Commissioner Sims and Commissioner Walkinshaw's team, and certainly a perceived on our end lack of respect from Commissioner Walkinshaw's staff.

Q    Do you know if this affected the relationship between Commissioner Sims and Commissioner Walkinshaw?

A    I do not believe that it did.

Q    Okay. But between the staffs?

A    I would say between the staffs, as well as between Commissioner Sims and Commissioner Walkinshaw's staff.

Q    Did you continue working with Matt Bridges after this meeting?

A    Yes.

Q    In what capacity?

A    I believe there may have been other calls or meetings that we both attended, and there may have been email exchanges.

Q    What was your personal impression from that meeting? Did it affect the way that you worked with Commissioner Walkinshaw's staff?

A    Yes.

Page 136

Q    In what way?

A    It made me perceive Commissioner Walkinshaw's staff as viewing their role as much more active in terms of pursuing their own personal agendas rather than deferring to their commissioner.

Q    Okay. And when you're talking about personal agendas, are you only referring to Matt Bridges, or are you referring to other staff members of Commissioner Walkinshaw?

A    I would refer to other staff members as well.

Q    Do you know what the -- When you say personal agenda of -- Sorry, strike that.

Which other staff members?

A    Ali O'Neil, and perhaps others on their team, but I primarily interacted with Ali O'Neil.

Q    What would you describe as their personal agenda that you were mentioning, for Ali O'Neil, let's say?

A    I -- My understanding was that they had a particular vision of the maps that they wanted the commission to produce, and that determination on whether they wanted maps to pass was not based off Commissioner Walkinshaw's direction.

Q    Can you clarify that? What were they looking for that you believed to not be under Commissioner Walkinshaw's direction?

34 (Pages 133 to 136)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Objection to lines 133:10-17: Lack of foundation. Ms. Davis lacks foundation to testify as to Commissioner Sims' and Graves' priorities.

Pls Response: There is foundation because Ms. Davis was a staffer deeply involved in these negotiations and testifies here about what she observes as a staff member working with commissioner Sims and other staff for Commissioner Sims and the other commissioners.

Pls Response: foundation exists because of Davis's presence in meetings and involvement in negotiations. She speaks to her perception of these goals based on Walkinshaw's staff's statements. Those statements are not hearsay as they are statements of a party opponent, Walkinshaw, and his staff.

Objection to lines 136:1-138:8: hearsay, lack of foundation. Ms. Davis lacks foundation to testify to communications between Commissioner Walkinshaw and his staff, and Commissioner Walkinshaw is not a party to this litigation or speaking agent, so his statements are not statements of a party-opponent. Nor do they convey a present-sense impression or then-existing mental state under FRE 803(1)-(3).

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 137

A    I believe there are certain districts or certain -- certain areas that Commissioner Walkinshaw had expressly expressed his approval, and his staff vehemently disagreed with and didn't defer to his direction.

Q    Do you recall what districts those were?

A    I recall that occurring with the 47th legislative district.

Q    And where is that located?

A    That includes Kent, south King County area.

Q    Okay.  Do you know if there was a dispute between Commissioner Walkinshaw and his staff on the districts in the Yakima Valley region?

A    I am not sure of those conversations.

Q    Okay.  What other districts do you recall that there was disagreement besides the 47th?

A    The 47th comes to mind first and foremost.  I couldn't say what the other districts were.

Q    Okay.  Do you recall what the staff of Commissioner Walkinshaw did in the 47th district that he did not approve of?

A    I guess I wouldn't necessarily characterize them as doing things he didn't approve of.  I'd rather characterize it as Commissioner Walkinshaw agreeing to maps that his staff hadn't drafted, either our staff or Commissioner Graves staff had drafted, and then

Page 138

Commissioner Walkinshaw's team expressing strong disagreement with his decision to agree to those maps.

Q    Do you know what the disagreement was over the 47th district?

A    My understanding was that they wanted a larger increase in Democratic political performance.

Q    The staff specifically?

A    Yes.

Q    Okay.  Did Commissioner Sims have a list of priority areas on the map or priority legislative districts?

MS. FRANKLIN:  Objection, compound.

A    Yes.

Q    (By Mr. Thrift-Viveros) And do you recall what those areas were?

A    Yes.

Q    What were they?

A    Commissioners Sims and Graves agreed to a number of districts that were in play that would fall into that bucket, as well as some non-district specific priorities.

Q    And what were those priorities, the non-district specific?

A    I recall Commissioner Sims expressing an interest in having more majority minority districts in King County and an increase from the current 2011 commission created maps, as well as a desire for fewer city splits than there were

Page 139

in the previous maps.

Q    Okay.  Any specific cities that you remember that were split that she wanted to not split?

A    Yes.  I believe the City of Renton was particularly vocal about their desire to not be split.

Q    Okay.  Any other cities that you recall?

A    No.

Q    Was the City of Yakima discussed on keeping -- discussed whether it would be split or not between districts?

A    I don't recall that conversation.

Q    Okay.  And you mentioned that -- and forgive me if I misheard or am misstating, but that Commissioners Sims and Graves had a list of priority districts that they wanted to work on; is that right?

A    That's correct.

Q    Okay.  Do you recall which districts those were?

A    Yes.

Q    And what were they?

A    And I may have forgotten some, but off the top of my head I would say legislative districts 42, 10, 44, five, 47, 30, 28, 35, 17, and the district that at the time we weren't sure -- we were calling 14/15 -- but a Yakima Valley district.

Q    Okay.  You have a good memory for remembering all of

Page 140

those.

A    And I don't know if I said 10, but also legislative district 10 as well.

Q    So we can, yeah, focus on the Yakima Valley region.  So you -- or forgive me again if I am misstating, but you were saying that that area was a priority for both Commissioner Sims and Commissioner Graves?

A    Yes.

Q    Did they share similar goals, or how did they both have -- Sorry.  What do you mean by it was a priority, that district, for both of them?

A    I believe that they both understood that there would be a lot of focus and public interest in that area.  I think they both understood that the population in western Washington had grown significantly, and how eastern Washington was drawn would create downstream effects in the rest of the state.

And those were the primary considerations, I'd say.

Q    Do you know what the -- Or what are you basing the statement that they believe that there would be a lot of public interest in that region, what are you basing that on?

A    I was basing that on different public comment as well as sentiments expressed from the Redistricting

Soto Palmer, et a
LAKESIDE REPORTI

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

---

**Margin annotations:**

Pls Response (138:20-139:11): Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe her "motive, intent, or plan."  Ms. Sims made the statements in her role as a commissioner, a state actors. Admission by party opponents, as described above. FRE 801(d)(2).

Objections to lines 138:20-139:11: hearsay. Commissioner Sims was not a party to this litigation, nor were her alleged statements conveying present-sense impressions or then-existing mental condition under FRE 803(1) or (3).

Objection to lines 140:4-141:4: Lack of foundation. Ms. Davis lacks foundation to testify to Commissioner Sims' and Graves' priorities and understandings.

Pls Response: Mr. Graves's and Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe their "motive, intent, or plan."  Mr. Graves and Ms. Sims made the statements in their role as a commissioners, state actors. Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2). Davis had knowledge as a staffer involved in these negotiations, and describes how she knows Sims's priorities-- from a statement to Ms. Davis.

Page 141

Justice Coalition.

Q   And the certain public comment, do you remember what that comment was?

A   No.

Q   Okay.  You also mentioned that it was one of Sims' priorities to create the -- and sorry if I'm misremembering, but creating majority minority districts. I don't know the exact words that you used.

MR. THRIFT-VIVEROS:  Can you read back a little bit of the ways?

THE REPORTER:  Sure.

"A   I recall Commissioner Sims expressing an interest in having more majority minority districts in King County and an increase from the current 2011 commission created maps, as well as a desire for fewer city splits than there were in the previous maps."

MR. THRIFT-VIVEROS:  Great.  Thank you.

Q   Was she specific -- Was Commissioner Sims specific on where these majority -- or sorry.  Let me take that back.

What does majority minority district mean to you?

A   My understanding in the conversations about those districts, they were more in relation to the total population being majority non-white.

Q   The total population of that district?

Page 142

A   Yes.

Q   Okay.  Was it total population or total citizen voting age population?

A   My recollection was that conversations regarding that were more based on total population.

Q   Okay.  And just to clarify, total population and not voting age population; right?

A   Correct.

Q   Okay.  Did Commissioner Sims have a number of majority minority districts that she wanted to create?

A   Maybe.

Q   Did she express that to you, that number?

A   Maybe, but I don't recall.

Q   Okay.  And did she -- Let me take a moment.

Did you do any analysis of Latino communities of interest?  Or sorry.  Let me take that back.

Did you do any analysis on the maps of communities of interest?

A   We certainly considered communities of interest and considered that when drafting our maps.

Q   Okay.  In what way?  How?  What do you mean by you considered it?

A   Oftentimes the public comment was -- some of the public comment included folks testifying and describing localized communities of interest, and Commissioner Sims

Page 143

aimed to be responsive to that public testimony.

Q   Do you recall any public comments from residents of the Yakima Valley regarding communities of interest there?

A   No.

Q   Okay.  Did you do any other examination of communities of interest like in the Yakima Valley?

A   We looked at Tribal Reservations and communities.

Q   Okay.  Did any other commissioners -- Going back to you mentioning that Commissioner Sims expressed an interest in creating majority minority districts, did any of the other commissioners or commissioners' staff express to you that they had a goal of a certain amount of majority minority districts?

A   I don't remember.

Q   Did you ever conduct an analysis of Latino voter turnout rates when you created these maps?

A   No.

Q   Okay.  Did you conduct an analysis of any turnout rates for voters in the process of creating these maps?

A   No.

Q   And did you conduct a racially polarized voting analysis for any district in any of the maps?

A   No.

Q   Do you know if any other commissioner or commission staff conducted a racially polarized voting analysis on

Page 144

any district in any map?

MS. GOLDMAN:  In what map?

Q   (By Mr. Thrift-Viveros) Any district in any map.

A   Yes.

MS. FRANKLIN:  Objection, lack of foundation.

Q   (By Mr. Thrift-Viveros) Do you know who that was?

A   My -- I remember Commissioner Walkinshaw hiring Dr. Barreto.

Q   Okay.  Do you recall anyone else?

A   Not that I remember.

Q   Okay.  Do you know what Commissioner Sims considered a majority minority district?

A   I believe that in those considerations she was looking at total population.

Q   Okay.  And that's not voting age population or citizen voting age population?

A   No.

Q   Did any other commissioner express to you what they understood a majority minority district to mean?

A   Not that I recall.

Q   Do you recall any conversations with commission staff on what they considered a majority minority district to mean?

A   No.

36 (Pages 141 to 144)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                          August 19, 2022

Objection to lines 145:1-146:7: hearsay and lack of foundation. Ms. Davis lacks foundation to testify to Commissioner Sims' views, and Commissioner Sims was is not a party to this litigation or speaking agent, so her alleged statements are not statements of a party opponent. Nor was she conveying a present-sense impression or then-existing mental condition under FRE 803(1) or (3).

Pls Response: Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe her "motive, intent, or plan." Ms. Sims made the statements in her role as a commissioner, a state actors. Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2). Ms. Davis has knowledge because she worked closely with Commissioner Sims in the redistricting process, and Ms. Davis testifies here about her undesrtanding of Ms. Sims's priorities when asked about what she discusseed with Ms. Sims in that process.

---

Page 145

Q    Okay.  I'm sorry.  Going back to this Matt Bridges email, Exhibit No. 2, Matt Bridges in his email apologizing to Commissioner Sims says, "I view the fight for voting rights as the most critical one of our time, and I let the passion get the better of me."
      What do you recall was the disagreement between Bridges and Commissioner Sims on what the fight for voting rights could mean?
A    I recall Commissioner Sims expressing that she didn't want to negotiate something that was legally required in the sense that the commission, if it has legal requirements, that that shouldn't be up to personal opinion and negotiation and would not make sense in negotiations with Graves, for Commissioner Graves to gain a negotiating upper hand for the commission adopting something that in her opinion was legally required.
Q    Sorry.  What was in her opinion legally required?
      MS. GOLDMAN:  Objection, vague.
A    My understanding is that she viewed a VRA compliant Yakima Valley district as something that the commission may be legally required to draw.
Q    (By Mr. Thrift-Viveros) And did Matt Bridges disagree with that?
      MS. GOLDMAN:  Objection, calls for speculation.

---

Page 146

A    Not to my understanding, no.
Q    (By Mr. Thrift-Viveros) Okay.  So -- Okay.  So they weren't necessarily in disagreement on that at this meeting?
      MS. GOLDMAN:  Objection, vague.  Asked and answered.
A    No.
Q    (By Mr. Thrift-Viveros) Okay.
      MS. GOLDMAN:  Counsel, I'm wondering -- it's been an hour -- if we could take a break.
      MR. THRIFT-VIVEROS:  Yeah, that's fine.
      (Break 2:27 p.m. to 2:40 p.m.)
      MR. THRIFT-VIVEROS:  Let's go back on the record.  Thank you.
Q    (By Mr. Thrift-Viveros) Just going back to a little bit of your job history, you mentioned that you worked in voter registration; is that right?
A    Yes.
Q    Were you like signing people up to register to vote, or was it a campaign?
A    I've worked both on campaigns and in purely voter registration capacities.
Q    Were you like out in the field signing people up to register to vote?
A    I have been.

---

Page 147

Q    Okay.  I did some of that, too.
      Where did you do that work?
A    I have done voter registration efforts in Seattle, in SeaTac.  And generally when I've been out working for campaigns I carry along voter registration forms and just bring them with me around the state.
Q    Okay.  In that work did you learn anything about voter registration rates among different minority groups?
A    Yes.
Q    What have you learned?
A    I learned that there are disparities in terms of voter registration rates as they vary by race.
Q    And as far as you know how does the voting registration rates of Latinos compare with white voters?
      MS. GOLDMAN:  I'm going to object that it calls for speculation, but if you know.
A    My understanding is that the voter registration rate is lower among Hispanic and Latino populations.
Q    (By Mr. Thrift-Viveros) Okay.  Are you familiar at all with voter registration rates in the Yakima Valley area?
A    I remember reading information about that in the Complaint last night.
Q    Okay.  But prior to the Complaint did you know anything about voter registration rates in the Yakima

---

Page 148

Valley?
A    My understanding was that roughly those rates were lower than amongst white voters.
Q    Okay.  And when you would draw maps during the redistricting process did you conduct analyses on your maps of voter registration rates?
A    No.
Q    Okay.  Did you conduct analyses of voter registration rates on other maps circulated within the commission?
A    No.
Q    Okay.  Do you know if anyone else, either a commissioner or a commission staff or someone contracted by a commissioner, conducted voter registration analyses of any map?
A    I believe so.
Q    Do you believe a specific person did, or --
A    My recollection is yes.
Q    And who is that?
A    Dr. Barreto's team.
Q    Okay.  And anyone else?
A    Not to my knowledge.
Q    Okay.  And sorry, I didn't clarify this before, but when I'm asking about voter registration rates I'm asking in general.  So also that includes Latinos, non-Latinos.

---

37 (Pages 145 to 148)

Electronically signed by Jeanne Gersten (001-357-668-4110)                                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

Page 149

As far as you know no one other than Matt Barreto that worked in the commission or was contracted by the commission conducted analyses of voter registration figures; is that correct?

A    That's correct.

Q    Okay.  Thanks.  So let's see.  Let's do this.  So I have here an email sent by you on October 25th.  That's Exhibit 3.

(Davis Exhibit No. 3 introduced.)

Q    And did you send this email?  Is that your name in the from line?

A    Yes.

Q    Okay.  And do you recall sending this email?

A    I don't necessarily recall sending it, but that was my email.

MR. THRIFT-VIVEROS:  Okay.  Sorry.  I'm trying to drop this into the chat.  I don't have -- For some reason I don't have a specific one, but this attachment -- and because of the nature of the production it was hard to -- There's no Bates stamp, but I'll represent that the document that's attached, stapled to this email is the attachment.

And I just dropped it in the chat, and I'll screen share the statement, also.

Q    (By Mr. Thrift-Viveros) Do you recall drafting this

Page 150

statement from Commissioner Sims?

A    I don't recall drafting it from scratch.

Q    Okay.  So just a few questions.

So you didn't draft it from scratch, but do you recall working on this statement?

A    Yes.

Q    Okay.  And did you work on it with Commissioner Sims or with Dominique Meyers?

MS. GOLDMAN:  Objection, compound.

A    Yes.

Q    (By Mr. Thrift-Viveros) With both of them, or --

A    Yes.

Q    Okay.  So one of the priorities or one of the sections of this statement says Values in Action and discusses the Voting Rights Act, and part of it says, "Commissioner Sims's updated map proposal responds to this directive by creating a majority Latino district based on citizen voting age population."

Was this a priority of Commissioner Sims?

MS. GOLDMAN:  Was what a priority?

Q    (By Mr. Thrift-Viveros) Creating a Latino district based on citizen voting age population in the Yakima Valley, based on this statement.

A    Yes.

Q    Okay.  And then it says, "The proposed district

Page 151

unites the Yakama Nation Reservation and responds to the public testimony regarding the interconnectedness of the Latino and tribal communities within the Yakima Valley."

Was that a priority of Commissioner Sims was to keep those two connected?

A    Yes.

Q    Okay.  Do you recall public testimony regarding the interconnectedness of the Latino and tribal communities?

A    Yes.

Q    Do you recall specific people saying that, something to that effect?

A    I don't recall which specific people said it, but I remember that sentiment being expressed.

Q    Okay.  Do you remember like what they said, even if you don't remember the specific people?

A    I remember them saying that there is an interconnectedness between those communities, and a lot of collaboration amongst those communities.

Q    Okay.  And then it further says, "This district aims to undo historic wrongs that came from fracturing these communities amongst multiple districts."

Do you know what that means, the historic wrongs that came from fracturing these communities?

A    My assumption is that that was in reference to previous maps.

Page 152

Q    Okay.  And do you know what historic wrongs means in those maps?

MS. GOLDMAN:  Objection, asked and answered.  Calls for speculation.

Go ahead.

A    My understanding is that it just referenced the fracturing of those communities, in my sense particularly the current legislative maps at that time created by the 2011 commission.

MR. THRIFT-VIVEROS:  Okay.  So I have another email and attachment.  You can mark it as Exhibit 4.

(Davis Exhibit No. 4 introduced.)

MR. THRIFT-VIVEROS:  And I'll put it --

MR. HOLT:  And Counsel, could you please re-post Exhibit 3?  It just posted the file path.  The document actually never attached.

MR. THRIFT-VIVEROS:  Yes, that was my fault.  I don't have -- Oh, it was just the file path?

MR. HOLT:  Yeah.

MR. THRIFT-VIVEROS:  Okay.  I honestly don't know how to do this.

MR. HERRERA:  Which one?

MR. THRIFT-VIVEROS:  It was the statement.

MR. HOLT:  That's fine.  You can just email

38 (Pages 149 to 152)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 153

it to me afterwards or tomorrow or something.  It's not huge, but I just want to make sure I get it.

MR. THRIFT-VIVEROS:  Yes.

MR. HOLT:  Thanks.

MR. THRIFT-VIVEROS:  It's called Updated Sims Statement.  And then this one is October --

And this one is called October 25th email.  You can add this one.

MR. HERRERA:  Okay.

Q    (By Mr. Thrift-Viveros) Okay.  So is that your name in the from section of this email?

A    Yes.

Q    Do you recall sending this email?

A    Sure.

MR. THRIFT-VIVEROS:  I'm going to open the link that's attached to it, the Dave's Redistricting Link, and I'll copy it.  Okay.

(Document displayed.)

Q    Do you recall working on this map?

A    Yes.

Q    Okay.  So this map is titled V5 10/22/21, and you submitted this on October 25th.  This was sent about a week after the map you sent on October 19th, 2021.

The map from October 19th has the majority Hispanic CVAP district as District 15 with 51.7 percent Hispanic

Page 154

CVAP, as we discussed.

This map has the majority Hispanic CVAP district at 51.6 percent, and it is District No. 14.

MS. GOLDMAN:  Counsel, can I ask you a question?

MR. THRIFT-VIVEROS:  Yes.

MS. GOLDMAN:  You're referring back to Exhibit 1?

MR. THRIFT-VIVEROS:  Yes.

MS. GOLDMAN:  Okay.  Thank you.

MR. THRIFT-VIVEROS:  Sorry.  They're about a week apart.

MS. GOLDMAN:  And I'm sorry, I don't know if there was a question there.

MR. THRIFT-VIVEROS:  Yeah.  Sorry.

Q    (By Mr. Thrift-Viveros) The question is why did -- Do you know why the number of the Hispanic CVAP majority district switched from 15 to 14?

A    I believe that was at the direction of Commissioner Sims.

Q    Okay.  Do you recall a conversation where she told you that, to do that?

A    I don't remember the specific conversation, but I generally remember her directing me to do that.

Q    Did she express why?

Page 155

A    Not that I recall specifically.

Q    Okay.

(Court reporter discussion with counsel.)

(Screen shot taken.)

MR. THRIFT-VIVEROS:  All right.  Sorry.  There's a lot of maps, but we're going to keep looking at them.  So I'd like this marked as Exhibit 5.

(Davis Exhibit No. 5 introduced.)

Q    (By Mr. Thrift-Viveros) And this is an email chain, and I'd like you to take a look at it before I ask any questions.  And I'll put that in the --

Now, let me know once you've taken a look.

A    I have read it through.

Q    Okay.  So the first question, who is Kurt Fritts?

A    Kurt Fritts was the assigned Redistricting Commission staffer during the 2001 redistricting cycle.

Q    Do you know what his job title was during the redistricting process when you were emailing him?

A    Currently?

Q    Yes.  If it's current, --

A    This year?

Q    -- yeah.

A    I do not know his particular job title.

Q    Okay.  And what capacity was he acting in in this email exchange?

Page 156

A    He was acting in the capacity of a former redistricting staff that occasionally provided feedback.

Q    Okay.  So he wasn't a formal consultant?

A    No.

Q    Do you know if he was hired by the commission for consultation?

A    My understanding is that he was not hired.

Q    Okay.  So on Zoom I'm going to open the Dave's Redistricting link, but first off do you --

Is that your name in the from line?

A    Yes.

Q    And do you recall sending this email?

A    Yes.

Q    Among the many emails I'm sure you sent.

Okay.  So I'm opening the attachment from the Dave's Redistricting email.

MS. GOLDMAN:  Counsel, can I ask you a question about the document?

MR. THRIFT-VIVEROS:  Yes.

MS. GOLDMAN:  So is it your view that the last page of this set of emails is appended to the first page?

MR. THRIFT-VIVEROS:  Oh, did I get the order wrong?

MS. GOLDMAN:  I just --

39 (Pages 153 to 156)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Objection to lines 154:16-155:2: Hearsay.  Commissioner Sims is not a party to this litigation, and her alleged direction was not conveying a present-sense impression or then existing mental state under FRE 803(1) or (3).

Pls Response: Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe her "motive, intent, or plan."  Ms. Sims made the statements in her role as a commissioner, a state actors.  Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2).

Electronically signed by Jeanne Gersten (001-357-668-4110)                        35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                              August 19, 2022

Page 157

MR. THRIFT-VIVEROS: Sorry.

MS. GOLDMAN: I'm not sure. Is this map what you just clicked on for the link, the live link?

MR. THRIFT-VIVEROS: Yeah, the map that's --

MS. GOLDMAN: On the first page.

MR. THRIFT-VIVEROS: -- on the first page, yeah.

MS. GOLDMAN: Thank you.

MR. THRIFT-VIVEROS: Oh, you mean the last page here is the map, right.

Q   (By Mr. Thrift-Viveros) Okay. So let's take a look at this map. It's entitled the November 10, '21 Proposal, and in your email you wrote, "Here's an updated version of a majority Hispanic CVAP district."

MS. GOLDMAN: Okay. Counsel, I need to object here because the email is dated November 2nd.

MR. THRIFT-VIVEROS: Okay. Well, the email is dated November 2nd; and the map is dated November 10th or is titled 11/10/21, and this is the email -- This is the map that is attached to the November 2nd email.

MS. GOLDMAN: Okay.

MR. THRIFT-VIVEROS: I can open it again if you'd like me to.

MS. GOLDMAN: Sure. If you wouldn't mind

Page 158

one more time, --

MR. THRIFT-VIVEROS: Yeah.

MS. GOLDMAN: -- that would be great.

MR. THRIFT-VIVEROS: I'll close it, and then I will --

Can you see it on the screen share?

MS. GOLDMAN: Yes. Thank you.

MR. THRIFT-VIVEROS: So I'll open it here, copy, paste. And now the title is not showing up, but -- I'm going to pull up these statistics -- No?

MS. GOLDMAN: There it is.

MR. THRIFT-VIVEROS: There it is, 11/10/21 Proposal.

Q   (By Mr. Thrift-Viveros) I guess let me start with that. Do you know why this map is titled 11/10/21 Proposal, even though you sent it on November 2nd?

A   My estimation would be that it's likely that the version that was sent on the 2nd was adjusted between the 2nd and the 10th.

Q   Okay. So in this map the Hispanic CVAP district is District 14 right here, and it has a 50.0 percent Hispanic CVAP; is that correct?

A   Yes, that's correct.

Q   Do you know why the Hispanic CVAP has gone down in this district since the last map that was -- that we were

Page 159

looking at? I forgot the exhibit number.

MS. GOLDMAN: Counsel, are you referring to Exhibit 4?

MR. THRIFT-VIVEROS: Yes. I need to mark them myself. So Exhibit 1, 2, 3, 4.

A   My recollection was that it was at the direction of Commissioner Sims.

Q   (By Mr. Thrift-Viveros) Do you recall anything specific from Commissioner Sims altering this map?

A   No.

Q   Okay. And so far we've been looking at the citizen voting age population 2019, or numbers from the 2019 ACS, American Community Survey; is that correct?

A   Yes.

Q   And when you were drafting these maps did you use the census data as well?

MS. GOLDMAN: I'm going to object to "these maps" as being vague.

MR. THRIFT-VIVEROS: Okay.

Q   (By Mr. Thrift-Viveros) When you -- Actually, yes, let's focus on this one. When you were drawing this map did you take into account census data as well as the ACS data?

A   Yes.

Q   How did you use the census data?

Page 160

A   My understanding is that the PL file was uploaded into Dave's, and that was the primary tool in terms of drawing districts.

Q   And when you say primary tool -- Sorry. I'm just looking at Dave's, the statistics right now on the right side, right of this map.

Which one? Is it the voting age population 2020 that corresponds with the census data that you would use?

A   I don't recall all of the options that Dave's had.

Q   Okay. If I click on this little thing and we look at these datasets, would that help?

A   My understanding is that total population 2020 was the census data, but that I would have to verify that or read through Dave's Redistricting's explanation of their datasets.

(Screen shot taken.)

MR. THRIFT-VIVEROS: Okay. I have one more email exhibit here, and we'll mark it as Exhibit 6.

(Davis Exhibit No. 6 introduced.)

MR. THRIFT-VIVEROS: So just for context, Exhibit 5, the email and the map that we were looking at on Dave's was sent on November 2nd.

MS. GOLDMAN: I'm going to object. That misstates the testimony regarding the date of the map that we just looked at.

40 (Pages 157 to 160)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

## Page 161

MR. THRIFT-VIVEROS: The email was sent on November 2nd. And let me share this document. I will represent that this second page of the exhibit and what I just shared in the chat is the linked attachment to this email contained in the document production.

Q    (By Mr. Thrift-Viveros) So do you recall sending this email?

A    Vaguely.

Q    Do you know if this map is different from the map of Exhibit 5?

MS. GOLDMAN: I'm going to object. It calls for speculation.

A    The description of the map indicates that it's different.

Q    (By Mr. Thrift-Viveros) Okay. Do you recall what changed between the two maps, November 2nd and this map?

MS. GOLDMAN: Again, I'm going to object that it misstates the testimony regarding the date of the map that is appended to Exhibit 5.

Q    (By Mr. Thrift-Viveros) The map that you sent by email on November 2nd versus this map that you sent by email on November 4th.

A    I guess it would be hard to know what map was sent on November 2nd, as there likely could have been edits to that map between the 2nd and the 10th.

## Page 162

Q    Okay. Do you know why you sent this map in Exhibit 6 as a PDF?

A    No.

Q    Okay. And do you know why the Hispanic CVAP number has gone up from 50 in the map that you sent on November 2nd to 51.3 percent in the map that you sent on November 4th?

MS. GOLDMAN: Again, misstates the testimony regarding the date of the map that is appended to Exhibit 5.

A    I know that we looked at many different iterations of the district; so I couldn't say for sure exactly why this one was different, though it wasn't surprising considering we looked at many versions of this district.

Q    (By Mr. Thrift-Viveros) Okay. Do you know why there were so many different iterations of this district?

MS. GOLDMAN: Objection, vague.

A    This district was a priority for the commissioners, and my recollection is that they were interested in seeing different versions of how this district could be drawn.

Q    (By Mr. Thrift-Viveros) Okay. Why was it a priority for -- Sorry. Did you say it was a priority for all the commissioners?

A    I believe I said that.

Q    Okay. Why was it a priority for all the

*Objections to lines 162:15-163:7: foundation. Ms. Davis lacks foundation to testify to all Commissioners' priorities.*

*Pls Response: There is foundation because Ms. Davis was a staffer deeply involved in these negotiations and testifies here about what she observes as a staff member working with commissioner Sims and other staff for Commissioner Sims and the other commissioners.*

## Page 163

commissioners? I believe we discussed a little bit, but I just want to know why it was a priority for all the commissioners.

MS. GOLDMAN: Objection, asked and answered.

A    In part because the public had a strong interest in this region.

Q    (By Mr. Thrift-Viveros) Okay. Can you describe in sort of general terms what was different about the different iterations of this district?

MS. GOLDMAN: Objection, vague and ambiguous.

A    Different iterations of this district had different political performance, citizen voting age population adjustments, and different precincts and census blocs and geographic areas as well as numbering.

Q    (By Mr. Thrift-Viveros) As far as you know did the configuration of this district change based on whether it would vote Republican or Democrat?

MS. GOLDMAN: Objection, vague.

A    I recall commissioners wanting to see versions of this district that considered a number of factors in different political performance would look like as it relates to this district.

Q    (By Mr. Thrift-Viveros) So would you say that that

*Objection to lines 163:21-24: Hearsay. Commissioners are not parties to this litigation, and so these statements are not statements of party-opponents, nor do they convey present-sense impressions or then-existing mental conditions under FRE 803(1) or (3).*

## Page 164

was -- the electoral performance was an influence on the contours of this district?

MS. GOLDMAN: Objection, vague.

A    I would say that the political performance was something that we reported to the commissioners in the different iterations of the district.

Q    (By Mr. Thrift-Viveros) Okay. Sorry. Give me one second.

All right. Continuing on the march to November 15, I have another email here and another map.

THE REPORTER: This will be Exhibit 7.

MR. THRIFT-VIVEROS: Exhibit 7. Thank you. And oh, yeah, let me put it in the chat.

(Davis Exhibit No. 7 introduced.)

Q    All right. Have you had a chance to look at it?

A    Yes.

Q    Okay. I'll screen share here.

(Document displayed.)

Q    Is that your name in the carbon copy line, the cc line?

A    Yes.

Q    Do you recall receiving this email?

A    Yes.

Q    Okay. So this email is from -- it's a forward of an email that Commissioner Sims sent to Commissioner Graves

r. Hobbs, et al.
(833) 365-3376

*Pls Response: Commissioners statements represent then-existing state of mind under FRE 803(3) because they describe their "motive, intent, or plan." Commissioners made the statements in their role as a commissioners, state actors. Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2).*

Electronically signed by Jeanne Gersten (001-357-668-4110)                35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                        August 19, 2022

Page 165

regarding, quote, "our latest proposal" on November 12th.

So Commissioner -- I'm sorry.

Do you recall if you drew this map that Commissioner Sims has attached to this email?

A    I believe that I did draw this map.

Q    Okay.

A    Well, or -- Let me clarify.  It's -- From this printout attachment it's actually hard to tell --

Q    Yeah.

A    -- what the map is.

MR. THRIFT-VIVEROS:  Sorry.  I had a bad job of screen shotting.  So I'm going to open on the screen share, and we can take a look at it in Dave's Redistricting.  So I'm going to look at it right now, and this map that was send on November 12th has a title of 11/12.

(Document displayed.)

MS. GOLDMAN:  Counsel, is it possible to put all of the map on the screen, the bottom part?

MR. THRIFT-VIVEROS:  What does it look like in yours?

MS. GOLDMAN:  It just kind of cuts off at the bottom.

MR. THRIFT-VIVEROS:  I can definitely try moving it up.

Page 166

MS. GOLDMAN:  There you go.  Thank you.

MR. THRIFT-VIVEROS:  Is that okay?

MS. GOLDMAN:  Yes.

MR. THRIFT-VIVEROS:  Good.

MS. GOLDMAN:  And I'm sorry, I don't recall if there was a question pending.

MR. THRIFT-VIVEROS:  No, I just wanted to --

MS. GOLDMAN:  Okay.  Thank you.

MR. THRIFT-VIVEROS:  -- take a look at it.  Sorry.  No, there was not any --

MS. GOLDMAN:  Okay.  Thank you.  Sorry.

Q    (By Mr. Thrift-Viveros)  So I just have a few questions.  So do you -- and sorry if I missed your answer.

Do you recall working on this map?

A    Yes.  My memory is that I helped draft this map.

Q    Okay.  And I just want to resolve a discrepancy between Commissioner Sims's email on November 12th to Commissioner Graves and what I'm seeing in Dave's Redistricting because in the 15th legislative district, which my cursor is hovering over on Dave's, it shows ACS 2019 CVAP Hispanic as 47.8 percent, but in Commissioner Sims's email she writes 49.2 percent.

Do you know why there's that discrepancy?

Page 167

A    It looks like in terms of what I'm looking at on the screen is there seems to be a block of unassigned precincts.

Q    Is it over here where I'm --

A    Yes.

Q    Okay.  Okay.  Well, that helps.

So these precincts were not part of any district in this current map?

A    By my estimation it seems likely that those districts were assigned when Commissioner Sims sent the map --

Q    Okay.

A    -- and may have been -- They're currently not assigned now.

Q    Okay.  Thank you.  So do you believe that something happened to this map, as in someone edited it perhaps to make another map between the time of Commissioner Sims sending that email and now?

A    That is how I would understand this map.

Q    Okay.  In Commissioner Sims's email to Commissioner Graves she wrote, "Our analysis shows that" -- in the first bullet point -- "Our analysis shows that the ACS 2019 data significantly undercounts minority CVAP numbers."

Do you know what analysis she's referring to in this

Page 168

email?

A    Yes.

Q    And what analysis was that?

A    Dr. Barreto's presentation.

Q    Okay.  And, "We feel solid that a 2020 CVAP for this district would likely still have the Hispanic CVAP over 50 percent."

Do you know why Commissioner Sims felt, quote, unquote, "felt solid about the 2020 CVAP for this district being over 50 percent"?

A    I believe she was referencing Dr. Barreto's presentation that indicated that the 2019 numbers were an undercount.

Q    So there was no outside -- There was only Matt Barreto's analysis for the likelihood that a 2020 CVAP would be significantly -- or not significantly -- yeah, that would be higher than 50 percent?

Sorry.  To reach this conclusion that Commissioner Sims wrote here about, "Our analysis shows this, and we feel solid that a 2020 CVAP for this district would be over 50 percent," this is all based only on Dr. Barreto's report --

A    Yes.

Q    -- to your understanding?  Okay.

(Screen shot taken.)

Objection to lines 168:8-23: foundation. Ms. Davis lacks foundation to testify to what Commissioner Sims meant.

Specifically mentions that they were discussing the Barreto analysis in her answers designated before this testimony.

42 (Pages 165 to 168)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                              August 19, 2022

Page 169

Q    Okay.  Not many more exhibits.  I promise.  Here's one right here.

THE REPORTER:  This will be No. 8.

(Davis Exhibit No. 8 introduced.)

MR. THRIFT-VIVEROS:  No. 8.  So just a few questions on this one.  Let me upload it to the --

MS. GOLDMAN:  Counsel, --

MR. THRIFT-VIVEROS:  Yes.

MS. GOLDMAN:  -- I know that there is --

This is from a lawyer.  Would you mind if we took a break so that I can consult with counsel here?

MR. THRIFT-VIVEROS:  Oh, okay.  Yes.

MS. GOLDMAN:  Before you ask any questions.

MR. THRIFT-VIVEROS:  Yes, that's fine.

MS. GOLDMAN:  Thank you.

MS. FRANKLIN:  Hang on one second.

(Discussion off the record.)

(Pause in proceedings.)

MS. GOLDMAN:  So thank you, Counsel, for giving me an opportunity.  We have no objection.

MR. THRIFT-VIVEROS:  Okay.  Thank you.  Did we mark this exhibit?

THE REPORTER:  This is No. 8.

MR. THRIFT-VIVEROS:  So this Exhibit 8 is an email.  Yeah, I don't believe there's any privileged

Page 170

information here, but I just have a few questions.

Q    (By Mr. Thrift-Viveros) So this email is from Adam Hall, Senior Policy and Redistricting Counsel with the State Senate Democratic Caucus.

Did you work with Adam Hall in the redistricting process?

A    Yes.

Q    Okay.  In what capacity?

A    Adam Hall and I attended meetings together and exchanged emails with one another.

Q    Okay.  And not to go too much into the substance of those emails, but did he provide counsel on compliance with the Voting Rights Act?

A    He primarily worked with Commissioner Walkinshaw, --

Q    Okay.

A    -- so I do not recall requesting advice or counsel from him.

Q    Okay.  And his email, which is on the lower part of this sheet, was to Kamau Chege. I apologize if I'm mispronouncing that name, but do you know who that is?

A    Yes.

Q    And who is that?

A    I believe he's the executive director of the Washington Community Alliance, though I'm not particularly sure of his current title.

Page 171

Q    Okay.  Do you know -- Can you tell me a little bit about the Washington Community Alliance, what you know?

A    My understanding is that they receive funding regarding certain advocacy priorities and work with a number of coalition partners.

Q    Did you meet with Mr. Chege or representatives from the Washington Community Alliance in the course of the redistricting process?

A    Yes.

Q    Okay.  What meetings did you have with them, or how many meetings did you have with them that you recall?

A    I don't recall how many meetings I had with Kamau, though I believe that members of the Washington Community Alliance were also part of the Redistricting Justice Coalition.

Q    Okay.  Do you recall what you discussed in the meetings with the Washington Community Alliance?

A    I guess there were a number of meetings with the Washington Redistricting Coalition, --

Q    Okay.

A    -- which was comprised of members of that Alliance.

Q    Okay.  And this email was also sent to Katie Stultz.  Do you know who Katie Stultz is?

A    Yes.

Q    Is she affiliated with an organization called Win/

Page 172

Win Action?

A    Yes.

Q    What can you tell me about that organization?

A    I believe that Win/Win helps provide data and elections databases to progressive organizations.

Q    Do you know what kind of data?

A    My understanding is that they provide voter file information.

Q    Okay.  Did they provide you with any data for your redistricting work?

A    My recollection is that Katie Stultz was similarly part of the Redistricting Justice Coalition, and they provided proposals that they would like in regards to certain districts.

Q    Okay.

A    So they presented that data to us.

Q    Do you recall which districts?

A    Not all of them off the top of my head.

Q    Okay.  Were they interested in the districts in the Yakima Valley region?

A    Yes.

Q    Okay.  Do you recall what they asked for for a district in the Yakima Valley region?

A    I remember multiple requests.

Q    Anything specific?

43 (Pages 169 to 172)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                          35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 173

A    I remember that following our -- Commissioner Sims' second release of maps that they had submitted their own version of a Yakima Valley district for us to consider.

Q    Do you recall using their proposed maps to help you draw your own maps?

A    I recall analyzing those maps and considering those maps.

Q    Okay.  And this email is regarding scheduling a call for coalition leaders and members to meet with Dr. Matt Barreto, and this email also mentions that Dr. Barreto met with Democratic commissioners this morning -- the morning of November 14th, I'm assuming.

Were you present at that morning meeting with Dr. Barreto and the commissioners on November 14th?

A    No.

Q    Okay.  Did you attend the meeting that was being scheduled, the call being scheduled for 3:30 that day?

A    I believe so, yes.

Q    Do you remember what you discussed?

A    Yes.

Q    What was that?

A    Yakima Valley.

Q    And in specific terms what?

A    I believe we discussed the Redistricting Justice Commission's proposed district for that region.

Page 174

Q    Do you recall what the Hispanic CVAP was for the Redistricting Justice Coalition's map?

MS. GOLDMAN:  Objection, calls for speculation.

A    No.

Q    (By Mr. Thrift-Viveros) Okay.  Do you recall if the Redistricting Justice Coalition's map was significantly different than the maps that you had been drawing up to that point?

A    Yes.

Q    Do you recall in what way?

A    Not particularly.

Q    Do you recall anything about the differences between the proposed map from the Redistricting Justice Coalition and your maps?

A    I think I remember their maps connecting Pasco with Yakima, but I couldn't say for certain.

Q    And when you say connecting Pasco with Yakima, do you mean Yakima City?

A    Not in its entirety.

Q    Did your maps that you had been drawing, such as the map of Exhibit -- so this is my fault -- sorry -- the one that's titled 11/12.

MS. GOLDMAN:  Seven.

Q    (By Mr. Thrift-Viveros)  From Exhibit 7.

Page 175

MR. THRIFT-VIVEROS:  And I can pull it up.  I have it in front of me on Dave's Redistricting.  I can put it on screen share.

(Document displayed.)

Q    (By Mr. Thrift-Viveros) Did this map connect Pasco and the City of Yakima?

MS. GOLDMAN:  And I'm going to object that the witness testified that this is a different map than the one that was sent that's part of Exhibit 7.

A    Yeah, this is a different map than what that email is referring to.

Q    (By Mr. Thrift-Viveros) Sorry.  Which map is Exhibit 7? I meant the email from November 12 from April Sims.  Yeah, so this map is the one that I have pulled up here.  I can reopen it again.

MS. GOLDMAN:  No, the witness testified that there were changes made to that map.

MR. THRIFT-VIVEROS:  Oh, right, with the precinct.  My apologies on that.

Well, we can move on from this exhibit.

Q    (By Mr. Thrift-Viveros) Well, sorry.  Going back to this last exhibit, this email and the meeting with Dr. Barreto and the Redistricting Justice Coalition, had they -- had members of the Redistricting Justice Coalition seen the latest proposed map from Commissioner Sims that

Page 176

you had drawn?

MS. GOLDMAN:  Objection, calls for speculation.

A    It was my understanding that they had seen the version that Commissioner Sims had posted publicly.

Q    (By Mr. Thrift-Viveros) In October?

A    Yes.

Q    Okay.  But you did not -- You personally did not send the latest proposed map from Commissioner Sims from November 12th to members of the Redistricting Justice Coalition?

A    I do not remember or believe that I had done that.

Q    Okay.

MR. THRIFT-VIVEROS:  And I have one more email to mark as Exhibit 9.

(Davis Exhibit No. 9 introduced.)

MS. GOLDMAN:  Do you have another one?

MR. THRIFT-VIVEROS:  Yes.  Let me upload it to the Zoom chat.  I don't have it right in front of me, but I'll send it to everyone later.

This is Exhibit 9?

THE REPORTER:  Yes.

MR. THRIFT-VIVEROS:  Okay.  I'll send it to everyone later.  Sorry about that.  I have a printout, but I can't find the file.  This is my first hybrid

44 (Pages 173 to 176)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                          August 19, 2022

Pls Response (178:22-179:18): Davis is a staffer for Sims and was involved in negotiations. She testifies as to what her understanding of Sims's conversation with Graves was. Not double hearsay because it was Ms. Sims speaking. Admission of party opponent.

Objection to lines 178:22-179:18: Foundation; hearsay. Ms. Davis lacks foundation to testify to Commissioner Sims' thought process. The reference to a conversation between Commissioners Sims and Graves may be double hearsay.

Objection to lines 180:19-182:5: Hearsay, foundation. Commissioner Sims is not a party to this litigation or speaking agent for a party, so her alleged statements are not statements of a party-opponent, nor do they convey present-sense impressions or then-existing mental conditions under FRE 803(1) or (3). Ms. Davis lacks foundation to testify to Commissioner Sims' thoughts.

**Page 177**

deposition, so I apologize to everyone on the remote, but I will send it around.

Q    (By Mr. Thrift-Viveros) So do you recall receiving this top email from Anton Grose to you on November 13th?

A    Yes.

Q    Okay.  And do you recall receiving this email that's below the email from Anton Grose sent by Commissioner Graves to Commissioner Sims, and you are cc'd on it?
     Do you recall this, receiving this?

A    Sent from --

Q    Commissioner Graves.

A    Vaguely.

Q    Okay.  And in Commissioner Graves' email he says, "We made this CVAP district the 15th rather than the 14th for ease of incumbents."
     Do you know what that means?

A    Yes.

Q    What does that mean?

A    It means that -- or my understanding of that is a desire to displace a fewer number of incumbent legislators.

Q    And do you know how changing the CVAP district from the 14th district to the 15th district affected incumbents?

A    My understanding is that it displaced some

Objection to lines 177:13-21: foundation. Ms. Davis lacks foundation to testify to what Commissioner Graves meant.

Pls Response: Davis is a staffer for Sims and was deeply involved in negotiations, as well as being party to this email.  She is testifying as to her understanding of what Mr. Graves meant.

**Page 178**

incumbents, but I'm not sure exactly which incumbents those -- that was.

Q    Okay.  And then is your understanding that Commissioner Graves's proposal here affected fewer incumbents than by -- Changing the CVAP district from 14 to 15 affected fewer incumbents than it would have otherwise?

A    That is my assumption.  I would have to look at the maps and addresses to know for sure if that was the case, but --

Q    Okay.  Yeah.

A    -- that's my assumption.

Q    Okay.  That's fine.
     And then Commissioner Graves also mentions it, referring to the 15th district, which was the CVAP district, "It's not just below the 2019 CVAP you proposed, but instead it's just over 50 percent CVAP."
     When he says "we made the CVAP district," is it your understanding that that means the Latino majority CVAP district?

A    Yes.

Q    Okay.  Do you know if Commissioner Sims had any thoughts about this proposal where the Republican commissioner is presenting a district with over 50 percent CVAP versus her district that proposed less than

**Page 179**

50 percent CVAP?

A    Yes.

Q    What was -- What did she tell you about that?

A    My recollection is that she took that as an indication that Commissioner Graves may have been under the opinion that the commission was required to create a majority Hispanic CVAP district.

Q    Okay.  Do you know if -- Beyond this email do you know if Commissioner Graves expressed that to Commissioner Sims?

A    Not to my memory.

Q    Okay.  So her statement that she believes that Commissioner Graves is now looking for a majority Hispanic CVAP district was based on this email, as you understand?

     MS. GOLDMAN:  Objection, vague.  Calls for speculation.

A    In my recollection that opinion of hers was conveyed through conversation.

Q    (By Mr. Thrift-Viveros) Okay.  Did you have an opinion on the fact that the Republican commissioner proposed a CVAP district that had a higher percentage than the one proposed by Commissioner Sims?

A    I agreed with Commissioner Sims' assessment and opinion in that situation.

Q    That opinion being that Commissioner Graves was --

**Page 180**

Sorry.  What was that opinion?

A    That opinion was that this was the first more solid indication we had that Commissioner Graves wanted or potentially thought that the map needed to have a majority Hispanic CVAP district.

Q    Okay.  And then further down on the same Exhibit 9 there's one more email from Commissioner Graves, and he says, "It starts with the 14th as you proposed it most recently.  That involves a three point shift in partisan performance, and in exchange the map makes the 47th just .36 percent better for Republicans."
     Do you know what he's referring to when he says three point shift in partisan performance?

A    My understanding is that that would likely have represented a shift in the State Treasurer performance.

Q    In the direction of which party?

A    A shift, an increase in Republican performance as it related to Duane Davidson's results.

Q    Okay.  Do you recall Commissioner Sims -- Beyond what you've already mentioned about her opinion on Commissioner Graves demonstrating for the first time an interest in a majority Hispanic CVAP district, other than that opinion do you recall Commissioner Sims having an opinion on or expressing an opinion to you on this proposal?

Pls Response: Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe her "motive, intent, or plan."  Ms. Sims made the statements in her role as a commissioner, a state actors. Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2).  Ms. Davis has knowledge because she worked closely with Commissioner Sims in the redistricting process, and Ms. Davis testifies here about her undesrtanding of Ms. Sims's priorities and thoughts when asked about what she discusseed with Ms. Sims in that process.  Reputation regarding land and boundaries. FRE 803(20).

(Pages 177 to 180)

et al.
5-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                              August 19, 2022

Page 181

A    Vaguely.

Q    Do you recall what that opinion was?

A    In my recollection I remember that Commissioner Sims' opinion was that because Commissioner Graves had gone back and made it a majority Hispanic CVAP district of his own will, that that first bullet point regarding improving Republican performance elsewhere didn't hold weight.

Q    Okay.  What do you mean by that, it didn't hold weight?

A    My recollection was that Commissioner Sims thought this was an indication that Commissioner Graves thought we had some sort of legal responsibility in the Yakima Valley region, and because of that legal responsibility it was not the same situation as a one-for-one district trade in terms of partisan performance.

Q    Okay.  And up until that point had the negotiations with Commissioner Sims and Commissioner Graves as you understood it involved more of that one-for-one trade of districts in regards to partisan performance?

A    My recollection is that Commissioner Sims had always made it clear that she did not want to have to negotiate down for something that was a legal requirement, --

Q    Um-hmm.

A    -- and that was not her interest in negotiations.

Page 182

She also made it clear that the areas of the state that had grown the most in the last ten years were in primarily strong Democratic areas, and that a one-for-one trade wouldn't be appropriate given the shifting state demographics.

Q    Okay.  Going back to Exhibit 7, the proposal from Commissioner Sims, as you understand it -- and we don't have to look at the map.  We can just look at her email where she says, "The 15th legislative district is now 49.2 percent in ACS 2019 CVAP estimates."

Do you understand Commissioner Sims's proposal -- Or do you understand -- Sorry.  Strike this.

In your understanding when Commissioner Sims sent this proposal did she consider this district to be compliant with the Voting Rights Act?

MS. GOLDMAN:  Objection, calls for speculation.

A    I do not believe that Commissioner Sims had done analysis regarding whether this was compliant with the Voting Rights Act.

MR. THRIFT-VIVEROS:  Okay.  All right.  I have another exhibit here.  We'll mark it as Exhibit 10.

(Davis Exhibit No. 10 introduced.)

Q    (By Mr. Thrift-Viveros) I won't ask you to authenticate this because this is a memo from Ali O'Neil

Objection to lines 182:6-20: foundation.  Ms. Davis lacks foundation to testify to Commissioner Sims' beliefs.

Ms. Davis testifies regarding her understanding of Ms. Sims's opinion at that time, as a staffer for Ms. Sims in redistricting.

Page 183

to Senate Majority Billig, and I kind of want to use this as a guide for the last few days of the redistricting process.

Have you seen this memo before?

A    I believe so.

Q    Okay.  Have you read it all through?  It's like eight pages.

A    Previously.

Q    Okay.  If you want to take a couple minutes to go through it again, but I just wanted to point out specific events and see how you remember it.

Would you like to take a moment just to skim it, or --

A    Go for it.

Q    Okay.  So I guess my first question is this memo, did you view a draft of this memo before Ali O'Neil sent it to the Senate Majority Leader?

A    No.

Q    Okay.  The first sentence of the memo -- Oh, yeah, let me put it in the chat.  Sorry.

So in the first sentence of the memo Ali O'Neil writes, "Pursuant to your request, I have prepared the following memorandum documenting a timeline of events."

Did you receive a request from Senate Majority Leader Billig or anyone else to prepare a memorandum?

Page 184

A    No.

Q    Did you speak with Ali O'Neil about this memorandum, either before or after she prepared it?

A    No.

Q    Okay.  Do you know why Ali O'Neil was asked to prepare this and not you?

MS. GOLDMAN:  Objection, calls for speculation.

A    No.

Q    (By Mr. Thrift-Viveros) Okay.  Do you know of any reason why Ali O'Neil would have been requested to prepare this memorandum?

MS. GOLDMAN:  Objection, calls for speculation.

A    No.

Q    (By Mr. Thrift-Viveros) Okay.  So yeah, I'm going to ask a few questions about this as a guide; and if you disagree with anything that -- anything written here, you can let me know.  That's fine.

But first off what was your understanding of where the negotiations were on the morning of -- the negotiations on redistricting were on the morning of November 15?

A    On the morning of November 15th I believe that we were still in active negotiations.

46 (Pages 181 to 184)

Electronically signed by Jeanne Gersten (001-357-668-4110)                                   35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                         August 19, 2022

Page 185

Q   Okay.  In particular, do you know -- or what was your understanding of where the negotiations on the legislative district in the Yakima Valley region, do you know where those negotiations stood on the morning of November 15?

A   I don't recall.

Q   Okay.  Well, I guess before we go into this memo, what's your narrative of what happened on that day of November 15?

A   My recollection was that commissioners and some staff were meeting in person in Federal Way and engaged in discussions and negotiations in an attempt to come up with final maps by the deadline.

Q   And what was your role in these negotiations?

A   My role was to staff the negotiations.

Q   So did you -- Were you with Commissioner Sims for most of the day?

A   Yes.

Q   All of the day?

A   Most of the day.

Q   Okay.  And were you present when Commissioner Sims would meet with other commissioners?

A   For the most part, yes.

Q   Okay.  In the afternoon, or according to this memo -- and again, correct -- feel free to offer a

Page 186

different opinion -- but Ali on the fourth bullet point on page No. 2 says, "Throughout the afternoon, offers on the legislative district maps were being traded back and forth between Commissioner Sims and Graves.  It is my understanding that these offers were exchanged both via text message and in-person meetings."

Would you say that's correct?

A   I couldn't say for sure what the text messages contained, but I do know that there were in-person conversations.

Q   Were you present at these conversations?

A   For the most part.

Q   Okay.  Do you remember what Commissioner Sims and Commissioner Graves discussed in these conversations?

A   Primarily district performance, political performance.

Q   Do you recall any specific districts that were, quote -- you know, were being traded back and forth between the commissioners?

A   The districts that come to mind are districts -- legislative districts 47 and 28 --

Q   And --

A   -- and 44.

Q   Okay.  And what sort of offers were being made around those districts?

Page 187

A   There were discussions about what improved Democratic performance might look like in those districts, and what some of the geography might entail.  That's primarily the conversation.

Q   Would you consider these offers to be major changes between from one offer to the other, or were they more tinkering on the edges of districts?

MS. GOLDMAN:  Objection, compound.

A   My recollection of that day was that throughout the day the conversations were regarding political performance in the narrative sense and didn't necessarily include draft maps that accompanied every proposal.

MR. THRIFT-VIVEROS:  Okay.  Let me pull up another email.

Q   (By Mr. Thrift-Viveros) So in the middle of the day at 3:29 you received this email -- or you sent this email.  I'm sorry.

THE REPORTER:  This will be Exhibit 11.

MR. THRIFT-VIVEROS:  Exhibit 11.

(Davis Exhibit No. 11 introduced.)

MR. THRIFT-VIVEROS:  And I will represent that attached, stapled to this email is a memo, an attachment from the email.  I'm not sure -- Sorry.  I'm just putting it into --

Q   (By Mr. Thrift-Viveros) All right.  You don't have

Page 188

to look at this whole memo, but I have a few questions.  So who is --

So at the bottom email, the first email that was sent in this thread was from Chris Kilduff.

Do you know who Chris Kilduff is?

A   Yes.

Q   Who is he?

A   She --

Q   Or she.  Sorry.

A   -- is the Speaker's attorney.

Q   Okay.

MS. GOLDMAN:  So counsel, here I think we're going to have to take a break, if you don't mind.

MR. THRIFT-VIVEROS:  That's okay.  Yeah.

MS. GOLDMAN:  Was this document produced by the State?

MR. THRIFT-VIVEROS:  I believe so, yeah.

MR. HERRERA:  I think so, yes.  Let's see.

MR. THRIFT-VIVEROS:  We don't have Bates numbers on the documents that are produced.

MS. FRANKLIN:  Did you put this one in the Zoom?

MR. THRIFT-VIVEROS:  Yeah.

Yeah, it was produced by the State.

Sorry.  Are we still on the record?

Objection to lines 186:13-187:4: hearsay.  Neither Commissioner is a party to this litigation or a speaking agent for a party, so these alleged statements are not statements of a party-opponent, nor are they conveying present-sense impressions or then-existing mental states under FRE 803(1) or (3).

Pls Response: Mr. Graves's and Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe their "motive, intent, or plan."  Mr. Graves and Ms. Sims made the statements in their role as a commissioners, state actors, and particularly regarding negotiations here. Since the state is a party and is defending the actions of the commission, this statement should be admitted as an admission by party opponents. FRE 801(d)(2).

47 (Pages 185 to 188)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                              August 19, 2022

Page 189

THE REPORTER: Yes.

MR. THRIFT-VIVEROS: Okay. We can take a break if you'd like.

MR. HERRERA: Go off the record.

THE REPORTER: Do you want to go off the record?

MS. GOLDMAN: I'm going to defer to Erica on this issue.

MS. FRANKLIN: Let's go off the record for just a couple minutes.

MR. THRIFT-VIVEROS: We'll go off the record. Thank you.

(Discussion off the record.)

(Break 4:10 p.m. to 4:14 p.m.)

MR. THRIFT-VIVEROS: Let's go back on the record.

MR. HOLT: Deylin, if you don't mind, I said something when you were gone, just understanding and acknowledging that intervenor-defendants did not cross-notice this deposition, the hope is we can still get 20 to 30 minutes to ask some questions in hopes to avoid Ms. Davis having to appear for another deposition for us to ask questions.

So if you can reserve us some time at the end of this, we'd appreciate it.

Page 190

MR. THRIFT-VIVEROS: Yeah, I consent to you asking some questions. I'll do my best to wrap up to give you some time, but no guarantees. I'll do my best, though. I don't think there's going to be a whole lot more time.

What is our time at?

THE REPORTER: 329 minutes.

MS. GOLDMAN: Five hours and 29 minutes.

MR. THRIFT-VIVEROS: Okay.

MR. HOLT: I appreciate that. Thank you.

MR. THRIFT-VIVEROS: Yes. So -- Sorry.

MS. FRANKLIN: Counsel, as for this document, we are -- The privilege holder is not represented here, but we think this looks privileged. So we'd ask that we not look at this document and discuss it today.

MR. THRIFT-VIVEROS: So we believe the privilege was waived because this was -- I apologize if I misspoke before that it was produced by the State, but it was produced per a subpoena to the commissioner. So we believe the privilege is waived based on that production.

MS. FRANKLIN: Just one moment.

MR. THRIFT-VIVEROS: Yeah, that's fine.

MS. FRANKLIN: I think we would maintain our original position and ask that you -- that we not

Page 191

discuss it in this deposition.

MR. THRIFT-VIVEROS: It's also our understanding that it was produced in response to a public records request; but if you'd like, we can --

I'd like to ask the questions, and you can request to seal the questions under a protective order; and we can discuss that later, or we can reserve the right to reopen the deposition later once we resolve these issues.

MS. FRANKLIN: I think we would need to call the Court if we wanted to continue today with that line of questioning.

MR. THRIFT-VIVEROS: Okay. So would you agree that we'd be able to reopen the deposition after we resolve these questions of privilege for this memo, or --

MS. FRANKLIN: Yes.

MR. HERRERA: Rather than call the Court right now.

MS. GOLDMAN: And we represent different parties here.

MR. THRIFT-VIVEROS: Yeah.

MS. GOLDMAN: The privilege issue is here. The witness issue is here, and we'll reserve on the question of the witness and how that happens; but it's our understanding that this is a privilege that the witness is going to be instructed not to answer on because it's being

Page 192

asserted by the entity that owns the privilege.

MR. THRIFT-VIVEROS: Okay. And our position is that it's not privileged because the privilege was waived upon production.

MS. GOLDMAN: Understood. And obviously it's not going to be resolved here, unless you want to call Judge Lasnik; and I would highly recommend that you not call Judge Lasnik at 4:18 on a Friday afternoon, --

MR. THRIFT-VIVEROS: Yeah, I was just thinking --

MS. GOLDMAN: -- but I'll leave you to that.

MR. THRIFT-VIVEROS: -- about that.

MS. FRANKLIN: So provided we do have time left, we -- The State is fine with using that time later once that issue is resolved.

MR. THRIFT-VIVEROS: Okay. Thank you.

So we'll pass on that exhibit, and we can discuss it later.

Q    (By Mr. Thrift-Viveros) So if we return to the Ali O'Neil memo, --

MS. GOLDMAN: That's Exhibit 10?

MR. THRIFT-VIVEROS: Exhibit 10, yes. Sorry.

Q    (By Mr. Thrift-Viveros) So on the second bullet

48 (Pages 189 to 192)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

Page 193

point on page 3 Ali O'Neil writes that the SDC and the HDC staff were grouped together in a room.

MS. GOLDMAN: I'm sorry, I thought you said page 3.

MR. THRIFT-VIVEROS: Yes.

MS. GOLDMAN: And what bullet number?

MR. THRIFT-VIVEROS: The second bullet point.

MS. GOLDMAN: Oh, my apologies. Go right ahead.

Q    (By Mr. Thrift-Viveros) The SDC and HDC staff were grouped together in a room, giving offers to the other side.

And then in the third bullet point, that offers were being traded back and forth between Commissioner Graves and Commissioner Sims and then relayed to Ali O'Neil and Commissioner Walkinshaw.

Would you call this an accurate characterization of those hours of around 6:00 until 7:30?

A    More or less. As HDC staff -- my sense is that's referring to me -- and I personally was not working on a statement for leadership or the commissioners.

Q    Okay. Do you know if anyone else was working on statements for leadership and the commissioners if no maps were approved?

Page 194

A    Potentially Dominique Meyers and Ali O'Neil were, --

Q    Okay.

A    -- though I wouldn't know 100 percent.

Q    Were you present in that room on the second floor of the Hampton Inn?

A    Yes.

Q    Okay. Were you present at the conversations between Commissioner Graves and Commissioner Sims between 6:30 and 7:30?

A    No.

Q    Okay. Is it your understanding that around that time for about an hour Commissioner Graves and Commissioner Sims were meeting and making offers back and forth?

A    That's my recollection.

Q    Did you -- So in the next sentence Ali O'Neil writes, "They were being relayed to me and Commissioner Walkinshaw in person."

Do you know who was -- Were you receiving those offers in person? Were those -- Sorry.

Were those offers being relayed to you as well?

A    Yes.

Q    Okay. Do you recall any specifics about these offers?

A    My recollection is that they were in regards to just

Page 195

a very few districts. My understanding was that it included legislative district numbers 28, 47, and 44.

Q    Okay. And is Ali O'Neil's statement that there were no maps associated, or she "did not see any maps associated with these proposals, and to my knowledge neither did Commissioner Walkinshaw," did you see any maps associated about those proposals?

A    I guess I would say that leading up to this day we had seen a number of proposals, and my implicit assumption at the time was that the proposals would have been roughly the maps that we had exchanged previously, but for some slight tweaks in those three districts.

Q    Okay. As far as you know were there any discussions or proposals made regarding the Yakima Valley region districts?

A    I believe that at that time there was agreement regarding the Yakima Valley district.

Q    Okay. And as you understand was that agreement what ended up in the final map?

A    Yes.

Q    Okay. Later in bullet point four Ali O'Neil writes, "Dominique Meyers was encouraging Commissioner Sims not to accept the deals that were being offered at this time. Commissioner Sims agreed."

Would you agree with that characterization, or were

Page 196

you present at that conversation?

MS. GOLDMAN: Objection, compound.

A    I believe that I was present at that conversation, and I recall receiving proposals that Commissioner Sims did not accept.

Q    (By Mr. Thrift-Viveros) And were those proposals regarding those specific districts that you mentioned before, 47, 44 and 58?

A    Twenty-eight.

Q    Oh, 28. Sorry.

A    There's only 49 districts.

Q    That was my fault. It's a long day.

But yeah, is that your understanding was those proposals that Dominique Meyers was encouraging Commissioner Sims to reject regarding those three districts only?

A    That was my recollection, that it was those three districts. I don't have perfect memory of that day, but my understanding is it was just those three.

Q    Okay. Sorry. Just give me one second here.

Okay. And then on the next page, page 4, bullet point two, Ali O'Neil writes, "At around 8:45 p.m. I heard Commissioners Walkinshaw and Sims say they agreed to a deal with the Republican commissioners that was based almost solely on partisanship numbers in a few legislative

Objection to lines 194:21-195:2: Hearsay. Neither Commissioner Graves nor Sims are parties to this litigation or speaking agents for parties, and these alleged offers did not convey present-sense impressions or then-existing mental states under FRE 803(1) or (3).

Pls Response on bottom of page.

49 (Pages 193 to 196)

Pls Response (194:21-195:2): Mr. Graves's and Ms. Sims's statements represent then-existing state of mind under FRE 803(3) because they describe their "motive, intent, or plan." Mr. Graves and Ms. Sims made the statements in their role as a commissioners, state actors, and particularly regarding negotiations here. Since the state is a party and is defending the actions of the commission, this statement should be

Electronically signed by Jeanne Gersten (001-357-668-4110)                35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                August 19, 2022

Page 197

districts."

Do you recall hearing about this deal with the Republican commissioners based almost solely on partisanship numbers?

A    I would disagree with that characterization in that there were weeks and months of negotiations leading up to that point; and so while the partisanship number of very few districts was in consideration, there were certainly many other points that had already been discussed and were implicitly assumed to be a part of the agreement.

Q    Can you tell me what partisanship numbers means?

A    That -- My understanding is that was political performance specifically as it related to the State Treasurer's race.

Q    Okay.  And this agreement, do you know which legislative districts it involved?

A    Again, my understanding was that it included legislative districts 44, 47 and 28.

MR. THRIFT-VIVEROS:  Okay.  I have another email here on that day, November 15th at 11:00 p.m.  We'll mark it as Exhibit --

THE REPORTER:  This is No. 12.

MR. THRIFT-VIVEROS:  -- No. 12.

(Davis Exhibit No. 12 introduced.)

MR. THRIFT-VIVEROS:  There's no attorneys

Page 198

involved in this email.

So yeah, let me open it in the chat, and then I'll screen share so we can take a look at the map together.

(Document displayed.)

MR. THRIFT-VIVEROS:  Were you laughing at the title?

MS. GOLDMAN:  Yes.

MR. THRIFT-VIVEROS:  The title of this map, as everyone can see, is Copy of Copy of Copy of R Prop Rebalanced.

Q    (By Mr. Thrift-Viveros) So in this email at 10:48 p.m. you sent to Ali O'Neil, and you said in your email -- Or did you send this email?

A    Yes.

Q    Do you remember sending this email?

A    Yes.

Q    Okay.  And you wrote, "Here's the R version of the plan map."  Does R refer to Republican?

A    Yes.

Q    Okay.  And then you wrote, "We need to go through and find out what things we don't like about it."

Do you recall what things you found that you didn't like about it?

A    I recall some of the things we didn't like.

Q    And what were those?

Page 199

A    I recall that in east King County they had displaced Representative Roger Goodman from his district.

Q    Okay.

A    And there may have been others, but that's the main thing that comes to mind.

Q    So I'm going to open this map here.

(Document displayed.)

And as always, we go back to the Yakima Valley region.

MS. GOLDMAN:  And again, would you mind scrolling up so we can see all of that, --

MR. THRIFT-VIVEROS:  Yes.

MS. GOLDMAN:  -- 14?

Q    (By Mr. Thrift-Viveros) But mainly I just wanted --

MS. GOLDMAN:  Thank you.

Q    (By Mr. Thrift-Viveros) -- to go back to something you mentioned before in the context of the negotiations that there was essentially agreement already on the legislative districts in the Yakima Valley region; is that correct?

A    That was my understanding.

Q    Okay.  Do you know whose district between Commissioner Sims or Commissioner Graves or otherwise was chosen as the final district?

MS. GOLDMAN:  You mean map?

Page 200

MR. THRIFT-VIVEROS:  Well, district in regards to the district in the Yakima Valley region.

MS. GOLDMAN:  Objection, vague.

A    My recollection is that the district pretty closely resembled a recent district that Commissioner Graves had sent us.

Q    (By Mr. Thrift-Viveros) Okay.  And I don't want to have to go through all the overlays and stuff, but I want to take a look just really quickly.  This is the City of Yakima here where my cursor is.

And would you agree that in this map, which was essentially the final map for this district as you mentioned, that Yakima City is broken into multiple districts?

A    Yes.

Q    Did you have any concerns about splitting Yakima City into multiple districts?

A    I guess I'm uncertain of the total population of the City of Yakima and whether it would be possible to include it wholly within one district.

Q    Okay.  Did Commissioner Sims ever express any concerns about splitting Yakima City into multiple districts?

A    Not that I recall.

Q    Okay.

50 (Pages 197 to 200)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                      35f458e5-fb11-4fff-9f56-2f32593a31d8

Case 3:22-cv-05035-RSL    Document 191-6    Filed 05/24/23    Page 52 of 101

Osta Davis                                      August 19, 2022

## Page 201

(Screen shot taken.)

MR. THRIFT-VIVEROS: Did you get a screen shot?

THE REPORTER: Yes.

MR. THRIFT-VIVEROS: Okay. Great. Sorry. I'm just checking something.

Okay. One more email.

THE REPORTER: This will be Exhibit 13.

(Davis Exhibit No. 13 introduced.)

MR. THRIFT-VIVEROS: Let me put it into the chat here. So let me put this on screen share.

(Document displayed.)

Q   (By Mr. Thrift-Viveros) So at 11:22, not long before midnight, you sent this email to Commissioner Sims. Do you remember sending this email?

A   Yes.

Q   Okay. Were you in the same room with Commissioner Sims at the time, or do you remember?

A   I don't recall.

Q   Okay. In the time leading up to you sending this email had you been working on maps for the most part?

MS. GOLDMAN: Objection, vague.

A   Yes.

Q   (By Mr. Thrift-Viveros) Okay. So I'm going to open the redistricting link here. This map is titled Copy of

## Page 202

Copy of 11/14 7:30 Merged D map.

So if we look at this map that was attached to this email that you sent, it says, "Look at this map" in all caps, it shows District 15 with a Hispanic CVAP in 2019 of 49.2 percent; is that correct?

A   That's what I'm seeing now.

Q   Okay. Just hold on one sec. Did you prepare this map; do you recall?

MS. GOLDMAN: So Counsel, all of a sudden --

MR. THRIFT-VIVEROS: Oh, sorry.

MS. GOLDMAN: -- we just got truncated, and we're only seeing a piece of it.

MR. THRIFT-VIVEROS: Oh, there.

MS. GOLDMAN: There we go. Thank you.

MR. THRIFT-VIVEROS: Yeah, I'm sorry about that.

Q   (By Mr. Thrift-Viveros) Do you recall preparing this map?

MS. GOLDMAN: And I'm going to object to this map on the grounds of authenticity, as we have seen that multiple maps already that were saved were changed. So on those grounds I object.

A   I recall assisting in the drafting of this map.

Q   (By Mr. Thrift-Viveros) Okay. Who did you assist

## Page 203

drafting the map?

A   My recollection is that both Dominique Meyers and myself helped draft this map.

Q   Okay. Was it your intention that this District 15 had a Hispanic CVAP of 49.2 percent, less than 50 percent?

A   No, I don't recall that being the case.

Q   Okay. Did Anton Grose participate in the creation of this map; do you recall?

A   No.

Q   Okay.

MR. THRIFT-VIVEROS: Do you want to get a screen shot before I close it?

THE REPORTER: Yes. I was just waiting for you to pause a second. Thank you.

(Screen shot taken.)

Q   So you sent this map to Commissioner Sims at 11:22. Did she respond to this map to you?

A   I do not recall.

Q   Okay. So I'm going to stop screen sharing that map. All right. So on page 5 of this memo, throughout this memo Ali O'Neil is kind of describing some conversations she had with different people; and on page 5, the last bullet point before Tuesday, November 16th, she mentions that the commissioners were voting to approve on an agreement that was not restated

## Page 204

nor written down anywhere. Is that your understanding of what happened at midnight?

A   I guess I don't understand what restated means.

Q   Okay. Do you know what agreement the commissioners voted on at around midnight?

A   Yes.

Q   What was that agreement?

A   It was an agreement that again incorporated weeks of negotiations and had come down to the performance in three legislative districts.

Q   Is it your understanding that there was an agreement between the commissioners at the time of that vote?

A   Yes.

Q   On those three legislative districts?

A   On the full map.

Q   On the full map? Okay. So further on page 6 in bullet point -- one, two, three, four, five, six, seven -- eight, Ali O'Neil writes, "During this time," which is presumably after 1:00 a.m. or so on November 16th, "During this time Anton Grose and Osta Davis were working together on the same laptop to reconcile the two legislative map proposals." Do you recall -- Is that correct?

A   That sentence is correct.

51 (Pages 201 to 204)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

Page 205

Q    Okay.  Then the next sentence or the two sentences later she wrote, "They were making decisions about which of the two proposals' lines they would adopt as they were going through the map."

Would you characterize that as correct?

A    In part.  I would say that some of those decisions had been made before that time, and we were adjusting the map to reflect the decisions that had been made prior to that time.

Q    Did you make any decisions in these final legislative district maps that had not been decided ahead of time?

MS. GOLDMAN:  Objection, vague.

A    We were working on reconciling the maps, and in doing so that necessarily required some adjustments.

Q    (By Mr. Thrift-Viveros) Were you consulting Commissioner Sims at this time?

A    Commissioner Sims, yes, was consulted.

Q    And she approved of the changes you were making?

A    Anton Grose and I were making these changes in a very public area where anyone could walk and see the reconciliation process occur.

Q    Okay.  On page 8 -- and right now in the narrative we are in the morning of November 16th, and Ali O'Neil writes that she dropped Commissioner Walkinshaw off at his

Page 206

house.  She returned home, and during the day she had received no calls or emails from other commissioners or staff regarding the final review of the legislative map file.  "Commissioner Walkinshaw told me he did not receive any calls or emails, either."

Did you send legislative maps to either Ali O'Neil or Commissioner Walkinshaw?

MS. GOLDMAN:  Objection, vague.

A    Sorry.  What bullet point?

Q    (By Mr. Thrift-Viveros)  Oh, sorry.  One, two, three four -- five.

A    I do not recall sending emails to Commissioner Walkinshaw or Ali O'Neil.

Q    Do you know if Commissioner Sims sent maps, these legislative maps to Commissioner Walkinshaw or to Ali O'Neil?

A    I am not aware.

Q    Okay.  Is there a reason why you didn't send the maps to Commissioner Walkinshaw or Ali O'Neil?

A    No.

Q    Okay.  Do you know if there was a reason why Commissioner Sims did not send these maps --

MS. GOLDMAN:  Object.

Q    (By Mr. Thrift-Viveros) -- as far as you know to Commissioner Walkinshaw and Ali O'Neil?

Page 207

A    I can't say if she sent them or not.

Q    Okay.  So can you explain what you were doing in the time between the morning press conference at 10:00 a.m. that's described in bullet point two -- or one, sorry -- and the transmittal of the maps to the Supreme Court by Lisa McLean?

A    My recollection is that they canceled the 10:00 a.m. press conference.

Q    Okay.  And so what were you doing throughout the day before the transmittal of the final maps?

A    I was -- In the morning I was in the main conference room area with staff and commissioners, and then later in the day Anton Grose, Paul Campos and I were in a room making final reconciliations and uploading the map to the Edge software.

Q    And then once that was completed who did you send it to?  Did you send it to someone, or do you know if Anton Grose or Paul Campos sent it to someone?

A    My recollection is that either Paul or Anton sent the Edge file to Justin Bennett.

Q    And then your understanding is Justin Bennett finalized the maps?

MS. GOLDMAN:  Objection, vague.

A    My understanding is that Justin Bennett uploaded the maps and verified that the file was correct.

Page 208

Q    (By Mr. Thrift-Viveros) Okay.  So I just have a few more questions.  Did you run any analyses on the final map that was submitted to the Washington Supreme Court?

A    Yes.

Q    What analyses was that -- were that?

A    I remember looking at political performance as it related to the legislative districts in that map.

Q    Using the 2020 treasurer race?

A    Yes, as well as I believe the 2020 presidential race.

Q    Okay.  Did you run a racially polarized voting analysis on the final map?

A    No.

Q    Okay.  Do you know if anyone else ran a racially polarized voting analysis on the final map before it was submitted to the Supreme Court?

MS. GOLDMAN:  Objection, calls for speculation.

A    No.

Q    (By Mr. Thrift-Viveros) Do you know why the City of Othello was included in the final map for Legislative District 15?

A    No.

Q    Okay.  When you were looking to create a majority CVAP district did you look at a multicounty district, or

52 (Pages 205 to 208)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                        August 19, 2022

Page 209

were you just -- were you looking for a district with multiple counties inside of it?

MS. GOLDMAN:  Objection, compound.

A    I guess I don't understand the distinction between multi-county and a district with multiple counties within it.

Q    (By Mr. Thrift-Viveros) Yeah, that's a -- That was a poorly phrased question.  Sorry.  I'll ask a different question.

Is there a reason why the City of Toppenish was not included in the final District 15?

A    Not that I recall.

Q    Okay.  Is there a reason why the City of Wapato was not included in the final Legislative District 15?

A    Not that I recall.

Q    Okay.  Do you recall discussions around whether to include the City of Toppenish in Legislative District 15 or the majority CVAP -- majority Latino CVAP district?

A    No.

Q    Okay.  Do you recall any conversations regarding the inclusion of the City of Wapato in the majority Latino CVAP district?

A    No.

Q    Do you recall any conversations regarding the inclusion of the City of Othello in the Hispanic CVAP

Page 210

majority district?

A    No.

Q    Okay.  Were you aware -- During the redistricting process were you aware that the City of Othello has a lower Hispanic turnout rate than the areas of Wapato and Toppenish?  Sorry, Toppenish.

A    No.

MR. THRIFT-VIVEROS:  I'm going to ask for a five-minute break, and then we'll figure out if I have any more questions to ask.

So let's go off the record for five minutes.  Thank you.

(Break 4:55 p.m. to 4:58 p.m.)

MR. THRIFT-VIVEROS:  I'm ready.

Okay.  So we're back on the record.  I don't have any more questions.  Thank you, Osta, for the marathon, and I appreciate your answering all our questions.

And so if the intervenor-defendants have questions or the State, you can go ahead.

MS. FRANKLIN:  The State does have questions.  Should we go first, or --

MR. HOLT:  I'm fine with whatever.  I've got probably 20 or 30 minutes.  I'm sure our questions will probably cancel each other out in some areas, too.

MS. FRANKLIN:  I'm happy to go.

Page 211

MR. HOLT:  Go for it.  Go for it.

MS. FRANKLIN:  I probably have a similar timeframe.  Okay.  So --

And is this an okay place to stay?

MR. THRIFT-VIVEROS:  We can swap if you want.

(Discussion off the record.)

EXAMINATION

BY MS. FRANKLIN:

Q    Thank you so much for your time.  My name is Erica Franklin.  I am an attorney for the State, and I'll try to be quick because I know it's been a long day.

So I just want to briefly return to something you said earlier today.  You said that you sometimes played around in the Dave's Redistricting App to sort of familiarize yourself and out of personal interest.

Do you remember when approximately that was?

A    I believe that was in the fall of 2020.

Q    Okay.  And when do you first recall the issue of a majority Hispanic CVAP district in the Yakima Valley first arising?

A    I recall noting that around the time when the commission was given a briefing on the Voting Rights Act, and I recall being familiar or learning more about Dr. Barreto's work.

Page 212

Q    When you mentioned the commission's briefing, was that the briefing by the Attorney General's Office in the open public meeting?

A    Yes.

Q    Okay.  Did you think it was necessary to create a district that performs for Latino voters in the Yakima Valley?

MS. GOLDMAN:  Objection, calls for a legal conclusion.

A    My sense and my own personal opinion was that the pre-conditions, including racially polarized voting, existed in that region, yes.

Q    (By Ms. Franklin) And what was your personal -- What was your opinion based on, without sharing any advice of counsel?

A    My awareness of racially polarized voting came from some awareness of city and county council -- or county commission cases where racially polarized voting had occurred and that there were lawsuits that had been in my understanding settled prior to the Redistricting Commission.

Q    Okay.  Was there anything else that informed your understanding of racially polarized voting in the Yakima Valley?

A    I believe that I had come across some work done by

53 (Pages 209 to 212)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                              August 19, 2022

Page 213

Dr. Barreto that pointed to that as well.

Q    Anything else?

A    No.

Q    And did you share your views as to racially polarized voting in the Yakima Valley with the commissioners?

A    Yes.

Q    April Sims?

A    Yes.

Q    And what about other commissioners?

A    No, I don't recall that I did.

Q    And did you share those views with commission staffers?

A    I don't recall doing that.

Q    And when you said you shared them with Commissioner Sims, in what manner, verbally or in writing?

A    My recollection is that I had sent an email containing work that Dr. Barreto had done previously that pointed to that being the case.

Q    Okay.  And I think that actually segues into my next exhibit.

        MS. FRANKLIN:  And I apologize, I forgot which number we're on.

        THE REPORTER:  We're on 14.

        (Davis Exhibit No. 14 introduced.)

Page 214

Q    (By Ms. Franklin) Do you recognize this email?

A    Yes.

Q    And is this an email you sent on March 25th, "2001" to Commissioner Sims?

A    Yes.

Q    You stated in this email that you were researching redistricting stuff.  Do you see that?

A    Yes.

Q    And what were you researching?  What did you mean by that?

A    My recollection was that I was researching particularly more analysis regarding redistricting and polarized voting.

Q    And at whose direction were you doing that research?

A    I had attended a redistricting conference hosted by NCSL, the National Conference on State Legislatures, prior to being hired, and one of the presenters worked at the lab, MGGG Labs, I believe, that was referenced in that first bullet point.

Q    So is that what prompted you to do this general research on redistricting?

A    Yes.  I'd say that I began being interested and looking into that before I was hired and then continued to try to stay abreast of the analysis done in Washington state.

Page 215

Q    Okay.  And what was your thinking at this point in time when you sent this email as to why the VRA might apply in the Yakima Valley, --

        MS. GOLDMAN:  Object --

Q    (By Ms. Franklin) -- or I guess require a majority Hispanic CVAP in the Yakima Valley?

        MS. GOLDMAN:  Objection, calls for a legal conclusion.

A    Can you restate, or can you repeat the question?

Q    (By Ms. Franklin) So I'm just trying to understand what your thinking was at this point in time.  This is back in March.

        What was your thinking as to whether the VRA might require a majority CVAP, Hispanic CVAP district in the Yakima Valley?

        MS. GOLDMAN:  Objection, calls for a legal conclusion.

A    My understanding through the research seemed to indicate and build a strong case for the presence of racially polarized voting, and so it was my sense that given there was an indication that that existed, that it would directly have an impact on the districts we drew at the state legislative level.

Q    (By Ms. Franklin) Okay.  And why were you sending this material to Commissioner Sims?

Page 216

A    I believe I was sending it to her in case it was of interest to her.  From my read of it, that my sense reading this email is that I may have sent this following a meeting with Congresswoman Jayapal, and that may have sparked a conversation about redistricting as it relates to a majority Hispanic district.

Q    And can you tell me more about that meeting with Congresswoman Jayapal, please?

A    I remember meeting with Congresswoman Jayapal and Commissioner Sims to discuss redistricting broadly.

Q    And who initiated that meeting?

A    I believe both my team and Congresswoman Jayapal's team coordinated in terms of the scheduling.  I believe it was following a congressional delegation meeting where there was an agreement that the commissioners would meet with members of congress, Democratic members of congress.

Q    Okay.  And do you remember what was said at that meeting?

A    Not in its entirety.

Q    Okay.  So going back to this email, in bullet one you talk about a report that OneAmerica commissioned.  Do you see that?

A    Yes.

Q    And you said that, "OneAmerica could build a pretty strong case for a majority Latinx district in eastern

54 (Pages 213 to 216)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 217

Washington."

What was the basis for that statement?

A    The basis was my understanding that OneAmerica had been very active in terms of voter registration, candidate support, and work on the specifically city council races out there and had a deep connection to the Yakima Valley region.

Q    Okay.

MS. FRANKLIN:  And now I'd like to turn to the next exhibit.  So this will be Exhibit 15.

(Davis Exhibit No. 15 introduced.)

MR. HERRERA:  Thank you.

MR. THRIFT-VIVEROS:  Thank you.

Q    (By Ms. Franklin)  So I will just represent to you that this is the report that comes up when you click the link in part one of the email we were just looking at where you refer to the MGGG report.

Do you recognize this report?

A    Yes.

Q    And what do you know about who published this report?

A    My understanding is that this report came to my attention after attending a conference session with Professor Moon Duchin.

(Court reporter request for clarification.)

Page 218

THE WITNESS:  First name Moon, M-O-O-N, last name Duchin, D-U-C-H-I-N, who I believe is involved with MGGG Labs.

Q    And what do you know about why this report was commissioned?

MS. GOLDMAN:  Objection, calls for speculation.

A    I do not know much about why it was commissioned.

Q    (By Ms. Franklin)  Okay.  That's fair.

Starting in the middle of the third paragraph it says, "We find that Yakima has a clear pattern of racial polarization, with strong Gingles 2 and 3 findings.  In particular, we find strong cohesion between Hispanic and Native voters in their support of Hispanic candidates, while white voters block these candidates of choice for the minority coalition from ever reaching office."

Do you recall this conclusion?

A    Yes.

Q    And did it mean anything to you at the time?

A    Yes.

Q    What was the significance for you?

A    Certainly there was significance about the presence of racially polarized voting as it related to county commission races, and my sense is that likely would have carried over to legislative and congressional races.

Page 219

One question that I believe was posed during the Voting Rights Act briefing was the concept of coalition districts and wanting more clarity or understanding of what a coalition Voting Rights Act district would look like.

Q    Okay.  And why did you think it was important for Commissioner -- I guess first did you think it was important for Commissioner Sims to be aware of this report?

A    Yes.

Q    Why?

A    I thought it was important and part of my responsibility to provide as much relevant information as possible to Commissioner Sims.

Q    Okay.  Let's go back to Exhibit 14, which is the email you sent to Commissioner Sims in March.

So in the bullet two you mention Matt Barreto.  Do you see that?

A    Yes.

Q    And why did you raise Dr. Barreto with Commissioner Sims at this point in time?

A    I believe that I had just through my own research come across the work that he had done in Washington state, and that seemed directly applicable to the work that the Redistricting Commission would engage in.

Page 220

Q    Okay.  And you said, "I might put it on Sarah's radar if it makes sense."

Were you referring there to Sarah Augustine?

A    Yes.

Q    And did you end up raising it with her?

A    Yes.

Q    And what was the upshot of that?

A    My understanding, though I do not completely recall the timeline of events, but my recollection is that Commissioner Augustine may have floated the idea of the nonpartisan commission retaining Dr. Barreto at some point.

Q    Okay.

MS. FRANKLIN:  And let's move to the next exhibit.  This will be Exhibit 16; right?

THE REPORTER:  Yes.

(Davis Exhibit No. 16 introduced.)

Q    Are you aware that this is the report that comes up when you put the link in the second part of the email we were just looking at?

A    Yes.

Q    All right.  So this looks like the date on this document is February 6, 2013; is that correct?

MS. GOLDMAN:  Objection.  The document speaks for itself.  Calls for speculation.

55 (Pages 217 to 220)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                              August 19, 2022

Page 221

Q    (By Ms. Franklin) At the time you were --
     MS. FRANKLIN: I'll just move on.
Q    (By Ms. Franklin) At the time you were -- Actually, strike that.
     Are you aware of why Dr. Barreto did this analysis?
     MS. GOLDMAN: Objection, calls for speculation.
A    No, I'm not aware.
Q    (By Ms. Franklin) Okay. If you could please turn to page 3. What did you understand this slide -- I think, actually, hang on. Scratch that. Slide three.
     What did you understand this slide --
     MS. GOLDMAN: What is slide three? Oh, on the second page, you mean?
     MS. FRANKLIN: Yeah.
     MS. GOLDMAN: At the top?
     MS. FRANKLIN: Yes.
Q    (By Ms. Franklin) What did you understand this slide to mean?
     MS. GOLDMAN: Objection, the document speaks for itself.
A    I believe that to mean that there were various techniques to calculate the degree of racially polarized voting.
Q    (By Ms. Franklin) Okay. And moving on to the slide

Page 222

directly below it, so the second slide on page 2, can you explain to me just in your own words how you interpret this slide?
A    I interpret the Y axis to be the percentage of the vote one and the X axis to be the percentage of the Latino population.
Q    Okay. And let's just skip ahead now to page 4. Can you tell me what the slides on page 4, how you explain those slides?
A    And it's page 4, not slide four?
Q    Yes.
A    Okay.
Q    Sorry to switch back and forth.
     MS. GOLDMAN: I'm going to object that it calls for speculation, lack of foundation.
A    My sense, though it's not indicated, is that perhaps the size of the dots correlates to population in a unit such as a precinct, and on the X axis it shows the percentage of the Latino population in that geographic unit. Perhaps it could have been in a precinct. As well as the Y axis then showing the performance of a candidate, though I'm not completely certain which candidate that is, or perhaps Farias.
Q    (By Ms. Franklin) Okay. And now just looking at this report as a whole, what did you understand to be

Page 223

Dr. Barreto's ultimate conclusion in your mind?
     (Mr. Herrera left at 5:20 p.m.)
A    My conclusion is or my takeaway was that Dr. Barreto had come to the understanding that racially polarized voting existed in Washington state.
Q    And did this lead you to believe that there needed to be a majority -- majority Hispanic CVAP district in the Yakima Valley?
A    I would say it led me to believe that analysis would be very useful in making that determination.
Q    Okay. And why did you think it was important for Commissioner Sims to be aware of this report?
A    I believed that it would help familiarize her with the voting patterns in these areas.
Q    Okay. Any other reasons?
A    At the time I wasn't sure if Dr. Barreto himself may be a resource in the process but wanted to bring to her attention that he had conducted work here.
     MS. FRANKLIN: Okay. Let's turn to the next exhibit, please.
     (Davis Exhibit No. 17 introduced.)
     MS. FRANKLIN: Thank you.
     MR. THRIFT-VIVEROS: Thank you.
Q    (By Ms. Franklin) Do you recognize this document?
A    Yes.

Page 224

Q    In the lower email in the thread, did you send this email to Sarah Augustine on March 25th, 2021?
A    Yes.
Q    What were you requesting in this email?
A    I do not believe I had a specific request. I believe my intention was just to bring this information to her radar.
Q    And why were you trying to bring this information to her radar?
A    My understanding was that Commissioner Augustine was in the process of getting the agency up and running and wanted to see what other commissions had done, and I was pointing her to some of the work the California Redistricting Commission as well as Oklahoma Redistricting Commission had done.
     MS. FRANKLIN: Hang on one moment. I apologize, I have not been putting these in the chat. Maybe I will take a moment and do that, if that would be helpful for counsel who are remote.
     MR. HOLT: I'm fine if you just want to email them to me afterwards.
     MS. FRANKLIN: Yeah, I can do that. It's getting late.
     MR. HOLT: To kind of move things along.
     MS. FRANKLIN: Yeah.

56 (Pages 221 to 224)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                          August 19, 2022

Page 225

MR. HOLT: Unless someone else that's remote objects to that.

MS. FRANKLIN: Okay.

MR. HOLT: Just as long as you mark them to which exhibit they were admitted as, that would be helpful.

MS. FRANKLIN: Yes.

MR. HOLT: You can just title the PDF whatever, that's --

MS. FRANKLIN: Yes, we can do that.

Just one moment. I apologize, I need to check one thing. I just want to grab -- I think I've got exhibits mixed up.

Q (By Ms. Franklin) Okay. Now I'd like to turn to Exhibit No. 5. So I'd like to start at the earliest email, which is on the first page, and go forward from there.

So when in that email you said it comes in at 48.2 percent Pellicciotti, why was that important information?

A That was the metric that Commissioners Graves and Sims had agreed upon in part of their discussion.

Q Okay. And then going to the next email on page 2, the second page of this document, Kurt Fritts responds, "Excellent work," and he asks you a question.

Page 226

Do you see that?

A Yes.

Q And can you explain what's going on here?

A Yes. Or what was the -- Can you repeat the question?

Q I just am wondering if you can explain what Kurt Fritts is talking about in this email.

A Kurt Fritts is discussing what metrics to use to determine -- most accurately determine the citizen voting age population.

Q Okay. So now I'm going to ask you about the next email from November 2nd at 4:14 p.m.

Do you see that one?

A Yes.

Q Can you please explain what you're saying there?

A My sense is that I am screen shotting what I believe is a slide from Dr. Barreto's presentation and sending it to Kurt Fritts and April Sims, describing the perceived discrepancy between the 2019 ACS data versus what we would anticipate the actual Latino citizen voting age population to be.

Q Okay. And what did you mean when said, "Room to play with the 14th legislative district LD makeup," what did you mean by that?

A My sense is that -- My sense is that a district that

Page 227

had 2019 ACS data of citizen voting age population that was less than 50 percent would still very likely in census terms be above 50 percent.

Q Okay. Now let's look at the final email from November 2nd at 4:50 p.m. So it says, "It would give Paul a little more room to get a district that very likely stays Republican in the near future, but for our purposes it starts us down a path toward a dist that is eventually swing."

(Court reporter request for clarification.)

MS. FRANKLIN: D-I-S-T that is eventually swing.

Q To your knowledge is Paul a reference to Commissioner Graves?

A Yes.

Q So was it your understanding that the LD 15 you were drawing, even if it leaned Republican, would eventually -- would in short order swing to the Democrats?

MS. GOLDMAN: Objection, calls for speculation.

A I don't know if that was my understanding at the time.

Q (By Ms. Franklin) Okay. We can move on to the next sentence. Kurt Fritts talks about changes mid decade.

Was your understanding that this district would

Page 228

become Democratic before it moved to the next round of redistricting?

A My opinion is that the district would likely continue to change rapidly as it had done in the past ten years, but I don't believe I had a clear understanding of the partisan direction of the district.

Q Okay. Do you recall at any point reviewing demographic data about the growth of the Hispanic population in this area relative to other races or ethnicities?

A I don't specifically recall that.

Q Okay. And just a moment. I think I'm almost done.

Okay. I actually just want to -- I'm sorry to go back and forth. I just want to -- I have a couple more questions on Exhibit 17, if I could.

So in the first bullet you said, "One of my takeaways in researching Voting Rights Act requirements is that compliance will likely require much more sophisticated analysis than has happened in the past."

What did you mean by this?

A My understanding is that I became aware of more sophisticated analytical tools that to my knowledge had not been utilized ten years ago with past commissions.

MS. FRANKLIN: Okay. I don't have any further questions for you. Thank you so much for your

57 (Pages 225 to 228)

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 229

time.

MS. GOLDMAN: Dallin, will you be asking any questions?

MR. HOLT: Yes. I'm sorry, I didn't understand what you just said. Did you turn the time over to me?

MS. FRANKLIN: Yes. I'm sorry if I wasn't clear.

MR. HOLT: Sorry, my apologies.

Yes, I've got a couple of questions. As far as time, I probably have 20 to 30 minutes. I don't know what our situation is there.

MS. GOLDMAN: We have 15 left.

MR. HOLT: I'll do what I can do, and we'll go from there.

EXAMINATION

BY MR. HOLT:

Q    Well, good afternoon, Ms. Davis. My name is Dallin Holt. I'm an attorney for the intervenor defendants in this case. I just want to go back and clarify a few things and just ask you a couple questions.

You mentioned earlier in your deposition that the commission took into account partisan performance of elections, particularly the 2020 State Treasurer race, when negotiating the maps; is that correct?

Page 230

A    That's correct.

Q    Okay. And would you agree with the statement that the commission cared more about partisanship than race when drawing the maps?

A    My sense was that every commissioner had their own set of priorities and that the commission as a whole did not have a cohesive set of priorities.

Q    Okay. How did Dr. Matt Barreto come to be involved in this redistricting process? You mentioned that he was contracted with Commissioner Walkinshaw.

Could you walk me through how that happened?

A    No, in that I believe he was retained by Commissioner Walkinshaw while I was on leave.

Q    Okay. So was this in Commissioner Walkinshaw's official capacity?

MS. GOLDMAN: Objection, calls for speculation.

A    My understanding is that Commissioner Walkinshaw did not use personal funds, so my assumption is that he was retained through resources from the Senate Democratic Caucus.

Q    (By Mr. Holt) Okay. Was he retained to achieve a certain objective?

MS. GOLDMAN: Objection, calls for speculation.

Page 231

A    I have no clue.

Q    (By Mr. Holt) Okay. And would you agree that Dr. Barreto was a partisan actor?

MS. GOLDMAN: Objection, vague.

A    I would agree that Dr. Barreto was retained by a commissioner that was appointed by a partisan leader.

Q    (By Mr. Holt) Are you aware of any Republican or Republican leaning organization that has ever retained Dr. Barreto?

MS. GOLDMAN: Objection, calls for speculation.

A    No.

Q    (By Mr. Holt) Okay. You mentioned a presentation that Dr. Barreto provided to the Democratic commissioners and their staffs before the maps were first published; is that correct?

A    Yes.

Q    Do you know who requested this meeting?

A    My understanding was that the meeting was coordinated by Commissioner Walkinshaw's staff.

Q    Okay. Why were the Republican commissioners and their staffs not invited to participate in this meeting?

MS. GOLDMAN: Objection, calls for speculation.

A    I can't speak to the decisions made by

Page 232

Commissioner Walkinshaw or his staff in terms of who to include.

Q    (By Mr. Holt) Why do you think they weren't invited?

MS. GOLDMAN: Objection, calls for speculation. Lack of foundation. Asked and answered.

A    I couldn't say, though my understanding is that his findings were intended to be made public, and the Republicans would have access to those materials at that time.

Q    (By Mr. Holt) Would you agree with the statement that Dr. Barreto was retained to assist the Democratic caucus in obtaining a more favorable map for their political causes?

MS. GOLDMAN: Objection, calls for speculation, lack of foundation, asked and answered.

A    No.

Q    (By Mr. Holt) Okay. To your knowledge do Hispanics tend to vote more for Democrats or Republicans in the state of Washington?

MS. GOLDMAN: Objection, incomplete hypothetical.

A    My general understanding is that they tend to vote more Democratically.

Q    (By Mr. Holt) Is that same for the Yakima Valley?

A    That is my general understanding.

58 (Pages 229 to 232)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Osta Davis                                              August 19, 2022

Page 233

Q   And have you noticed any shifts in that understanding over the last few years, or has it been fairly steady to your knowledge?

MS. GOLDMAN:  And Counsel, are you asking her for the shift in her understanding or the shift in the data?

MR. HOLT:  Shift in the data.

MS. GOLDMAN:  Objection, calls for --

Q   (By Mr. Holt) Go ahead.

MS. GOLDMAN:  Objection, calls for speculation, lack of foundation.

A   No, I'm not aware of a shift.

MR. HOLT:  Okay.  I'm going to introduce an exhibit here. I'll drag it in.

THE REPORTER:  This will be No. 18.

(Davis Exhibit No. 18 introduced.)

MR. HOLT:  Okay.  You all let me know when you've got it.

MS. GOLDMAN:  Will you be sharing your screen?

MR. HOLT:  I don't believe I need to share the screen on this one.  Unless it would be easier for me to do that, I'm happy to do that.

MS. GOLDMAN:  Well, the witness can't see it if you don't do that.

Page 234

MR. HOLT:  Okie dokie.  Let me figure this out then.  I've got a lot of windows open here.

MS. GOLDMAN:  You know, Counsel, if it's going to take you a while I can open it on mine, and she can look on my screen if you don't object.

MR. HOLT:  Just give me one sec.  I can --
Yeah, my preferences aren't allowing me to do it, so go right ahead and open it up.  Thank you.
Just let me know when you have it there.

MS. GOLDMAN:  Okay.  This is the Order of the Supreme Court that was filed December 3rd, 2021; correct?

MR. HOLT:  That is correct.

MS. GOLDMAN:  Okay.  I have the front page open.

MR. HOLT:  Okay.

Q   (By Mr. Holt) Have you seen this before, Ms. Davis?

A   I believe so.

Q   Okay.  I'll represent that this is the Order of the Supreme Court essentially accepting the maps as passed by the commission.
Is that what you believe this document to be as well?

A   Yes.

Q   Okay.  If you could turn to page 3.

Page 235

MS. GOLDMAN:  Go ahead.

Q   (By Mr. Holt) In the third sentence of that first paragraph starting with Redistricting raises," I'm going to go ahead and read that sentence, and then we'll talk about it.
It says, "Redistricting raises largely political questions best addressed in the first instance by commissioners appointed by the legislative caucuses where negotiation and compromise is necessary for agreement."
Do you agree with that statement?

MS. GOLDMAN:  Objection, calls for a legal conclusion.
You can answer.

A   Yes.

Q   (By Mr. Holt) Is this process of negotiation and compromise one that you witnessed while the maps were going through the process in Washington state?

A   Yes.

Q   Give me a few examples.  Walk me through what you witnessed as far as negotiation and compromise that leads you to agree with that statement from the Supreme Court.

A   In my experience I witnessed Commissioner Graves and Commissioner Sims both hold strongly held priorities and make tradeoffs between which priorities would make it into the final maps, including compromises regarding the

Page 236

geography involved in particular districts as well as partisan makeup of districts.

Q   Okay.  Is it your understanding that the Washington Constitution requires partisan competitiveness when drawing districts?

MS. GOLDMAN:  Objection, calls for a legal conclusion.

A   My understanding is that electoral competitiveness is one factor among many that the commissioners must consider.

MR. HOLT:  Okay.  I'm going to go ahead and throw another exhibit in.  Counsel, if you won't mind opening this up, that would be great.

THE REPORTER:  This will be No. 19.

MR. HOLT:  Okay.

(Davis Exhibit No. 19 introduced.)

MR. HOLT:  Just let me know when you have it.  It's Article II, Section 43 of the Washington Constitution.

MS. GOLDMAN:  Okay.  And I have it open.

Q   (By Mr. Holt) Okay.  If you could look at subsection five, are you able to read that last sentence there for me, Ms. Davis, subsection five of Section 43?

A   "The commission's plan shall not be drawn purposely to favor or discriminate against any political party or

59 (Pages 233 to 236)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                      August 19, 2022

Page 237

group."

Q    And is it your opinion that in arriving at the compromise for District 14 the commission was trying to adhere to that principle?

MS. GOLDMAN:  Objection to the degree it calls far a legal conclusion.

A    In my opinion the District 14 was not drawn purposely to favor or discriminate any political party or group.

Q    (By Mr. Holt) Okay.  And you stated earlier that it was Commissioner Sims' belief that the maps -- As the Democratic party had control of the legislature, the maps should be drawn to continue that control; is that correct?

A    My understanding is that Commissioner Sims desired to create maps that reflected Washington state voting patterns as a whole as they relate to political representation.

Q    Favor the Democratic party; is that correct?

A    I -- I guess I don't understand what favor would mean in that capacity, but my understanding was that the intention was to favor the representation of the opinions held by Washingtonians.

Q    What political party was that?

A    I guess I don't understand what favor would mean in the context of that decision.

Page 238

Q    What do you believe it means?

MS. GOLDMAN:  Objection, asked and answered.  She just said she doesn't know what it means.

And Counsel, I'll let you know we have a minute left, so you might want to ask your last question.

MR. HOLT:  Okay.  We'll just hold on for another day.  We'll just notice another deposition.

MS. GOLDMAN:  And --

MR. HOLT:  I have probably about 20 more minutes, but we'll just regroup then.

MS. GOLDMAN:  Okay.  We are at --

MR. HOLT:  Thank you, Ms. Davis.

MS. GOLDMAN:  We're at the conclusion, and we will reserve our rights to discuss that.  We're certainly not agreeing to that on the record, and we reserve rights to signature.  Thank you.

Okay.  Good evening.

MR. HOLT:  Thanks.

MS. FRANKLIN:  Thank you.

(Deposition adjourned at 5:50 p.m.)

(Signature reserved.)

Page 239

CERTIFICATE

STATE OF WASHINGTON   )
                      ) SS
County of King        )

I, the undersigned Washington Certified Court Reporter, pursuant to RCW 5.28.010 authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify:

That the annexed and foregoing deposition of the witness named herein was taken stenographically before me and reduced to typewritten form under my direction.

I further certify that the witness examined will be given an opportunity to review and sign their deposition after the same is transcribed, unless indicated in the record that the parties and witness waived the signing.

I further certify that all objections made at the time of said examination to my qualifications or the manner of taking the deposition or to the conduct of any party have been noted by me upon the deposition.

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof.

I further certify that the witness before examination was by me duly sworn to testify the truth, the whole truth, and nothing but the truth.

I further certify that the deposition, as transcribed, is a full, true and correct transcript of the testimony, including questions and answers and all objections, motions and exceptions of counsel made and taken at the time of the foregoing examination and was prepared pursuant to Washington Administrative Code 308-14-135, the transcript preparation format guideline.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of August, 2022.

_____
Jeanne M. Gersten, RDR, CCR
Registered Diplomate Reporter
Washington CCR No. 2711
License effective until April 2, 2023
Residing at Seattle, Washington

Page 240

CHANGE/SIGNATURE SHEET

I, the undersigned, OSTA DAVIS, hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate, with the exception of the following corrections listed below:

PAGE   LINE   CHANGE      REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____  _____
     Signature                  Date

Witness: Osta Davis
Soto Palmer, et al. v. Hobbs, et al.
USDC Western District of Washington
Cause No. 3:22-cv-05035-RSL
Date: August 19, 2022
Reported by:   Jeanne M. Gersten, RDR, CCR No. 2711
          LAKESIDE REPORTING
          (833) 365-3376
          Jeanne@LakesideReporting.com
          Contact@LakesideReporting.com

60 (Pages 237 to 240)

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Electronically signed by Jeanne Gersten (001-357-668-4110)                    35f458e5-fb11-4fff-9f56-2f32593a31d8

Osta Davis                                                    August 19, 2022

Page 241

**A**

**a.m** 1:17 7:2 52:25,25 204:20 207:3,7
**ability** 12:19 113:12 121:6 124:1 129:21
**able** 50:20 92:25 191:13 236:22
**abreast** 214:24
**absorbing** 130:19
**accept** 195:23 196:5
**acceptable** 128:15
**accepting** 234:20
**access** 48:3 232:8
**accessibility** 50:18
**accompanied** 187:12
**accomplish** 113:12
**account** 20:5 159:22 229:23
**accounts** 19:5,8
**accurate** 193:18 240:3
**accurately** 226:9
**accusations** 125:16,23 126:5,14,17
**accused** 125:15
**achieve** 133:1 230:22
**achieved** 128:17
**acknowledge** 64:20
**acknowledging** 189:19
**ACS** 69:2,3,7,10 69:15,16,25

70:1 159:12,22 166:22 167:23 182:10 226:19 227:1
**Act** 13:24 18:11 21:5,10 31:16 87:8,10,24 88:4 89:3,5,18 89:20 90:2,10 90:18,23 91:8 91:12,20,23 92:20,23 93:4 93:10 94:3,9 97:12 106:14 120:18 121:18 121:22 122:5,8 123:3,7 125:9 126:22 128:10 129:18 150:15 170:13 182:15 182:20 211:23 219:2,4 228:17
**acted** 50:5
**acting** 155:24 156:1
**action** 4:15 150:14 172:1 239:12,13
**active** 34:7,10 136:3 184:25 217:4
**actively** 34:2
**activities** 26:23
**actor** 231:3
**actual** 226:20
**Adam** 5:3 43:12 43:14,17 54:21 54:22,24 101:15 126:9 170:3,5,9
**Adam's** 55:1
**Adams** 29:25
**add** 13:16 153:8
**addenda** 45:12
**additional** 44:2

**address** 19:20 20:4
**addressed** 235:7
**addresses** 19:16 178:9
**adhere** 237:4
**adjourned** 238:20
**adjust** 58:8,18
**adjusted** 27:11 158:18
**adjusting** 205:7
**adjustments** 163:15 205:15
**administer** 239:5
**Administrative** 239:18
**admitted** 225:5
**adopt** 110:20 205:3
**adopting** 145:15
**advertised** 42:19 47:7
**advertising** 47:9
**advice** 92:17 97:21 170:16 212:14
**advocacy** 50:7 171:4
**Affairs** 2:16 27:3,10,12
**affect** 12:4,19 135:23
**affiliated** 171:25
**affirmations** 239:5
**afternoon** 185:24 186:2 192:8 229:18
**age** 83:13,14 84:6 107:18 121:5 142:3,7 144:16,17 150:18,22

159:12 160:7 163:14 226:10 226:20 227:1
**agency** 36:7 67:16 224:11
**agenda** 63:18 136:11,16
**agendas** 136:4,7
**agitated** 126:25
**ago** 228:23
**agree** 11:16 138:2 191:13 195:25 200:11 230:2 231:2,5 232:10 235:10 235:21
**agreed** 10:19 74:6,7,24 78:5 78:9,16 79:22 129:2 138:17 179:23 195:24 196:23 225:22
**agreeing** 137:23 238:15
**agreement** 10:21,23,25 74:18 75:2,3 78:13,14 80:1 80:5,8 82:2 195:16,18 197:10,15 199:18 203:25 204:5,8,9,12 216:15 235:9
**Aguilar** 32:5
**AHarless@Ca...** 2:11
**ahead** 152:5 193:10 205:11 210:19 222:7 233:9 234:8 235:1,4 236:11
**aide** 43:2 82:10
**aide's** 44:8
**aides** 11:7 38:3,5

38:18 40:13 44:19
**aimed** 143:1
**aiming** 99:11
**aims** 151:19
**air** 71:21
**al** 1:3 2:6 240:20 240:20
**Alec** 94:12,13,22 97:21
**Alex** 1:11 95:7 95:12 96:5,10 96:13,23 97:1 97:4,7,10,15 97:20
**Ali** 4:23 5:7,12 54:15 65:20 97:8 101:14 126:3 136:14 136:15,17 182:25 183:16 183:21 184:2,5 184:11 186:1 192:21 193:1 193:16 194:1 194:16 195:3 195:21 196:22 198:12 203:21 204:19 205:24 206:6,13,16,19 206:25
**aligned** 76:13
**Alliance** 170:24 171:2,7,14,17 171:21
**allow** 88:13 121:8 129:21
**allowing** 234:7
**allows** 122:12
**altering** 159:9
**alternative** 11:15
**ambiguous** 163:12
**American** 2:21

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Osta Davis                                                    August 19, 2022

Page 242

7:14 28:24
67:9 159:13
**amount** 76:25
143:12
**AMulji@Cam...**
2:12
**Amy** 95:14
**analyses** 73:10
74:2 78:20
84:22 85:2,10
124:5 148:5,8
148:14 149:3
208:2,5
**analysis** 5:19
32:13,15,16
58:23 59:3
60:5,7 64:21
71:24 79:9,12
79:13,15 85:8
102:10,11
103:9,10,14
107:21,23
120:3,7,8,14
121:16 123:22
123:25 133:22
133:24 134:4
134:11 142:15
142:17 143:15
143:18,22,25
167:21,22,25
168:3,15,19
182:19 208:12
208:15 214:12
214:24 221:5
223:9 228:19
**analyst** 24:19
27:22 33:16
35:10 38:19
39:9,24 40:10
41:14 43:5,8
43:21 60:20
62:7 95:22,24
**analysts** 43:18
**analytical**
228:22

**analyze** 75:19
78:4 132:22
**analyzed** 75:17
76:1 91:5
**analyzing** 41:24
66:19 84:11
173:6
**Andrew** 3:8
8:11
**Andrew.Hugh...**
3:12
**Andy** 5:7
**anecdotes** 31:4
**Angeles** 2:16,22
**Annabelle** 2:8
8:5
**annexed** 239:6
**annual** 68:7
**annually** 68:3
**answer** 9:8,9,11
9:16,18,21
10:5,5 12:22
13:3,7,12 16:9
18:23 19:24
32:21 91:3
92:5,7 97:22
97:23 103:1
166:15 191:25
235:13
**answered** 19:23
57:19 81:18,24
83:4 89:21
126:8 146:6
152:4 163:5
232:5,15 238:3
**answering**
210:17
**answers** 9:12
11:23 239:16
**anticipate**
226:20
**anticipation**
28:13,14
**Anton** 5:4 43:22
44:10,11,14

65:22 82:13,17
177:4,7 203:7
204:21 205:20
207:13,17,19
**Anytime** 26:6
**apart** 154:12
**apologies** 4:13
175:19 193:9
229:9
**apologize**
104:17 170:19
177:1 190:18
213:22 224:17
225:11
**apologizing**
125:6 145:3
**app** 20:20,21,24
20:25 28:11
39:17 40:2,9
40:18 59:2
60:10 73:4,11
83:12 85:7
211:15
**appear** 189:22
**APPEARAN...**
3:1
**appended**
156:21 161:19
162:9
**applicability**
120:17
**applicable**
219:24
**application**
34:25
**applied** 35:8
89:20
**applies** 89:6
**apply** 35:9 122:8
215:3
**appointed** 35:15
108:17 231:6
235:8
**appreciate**
189:25 190:10

210:17
**appreciated**
119:4
**appreciation**
119:6
**approaches** 58:4
**appropriate**
11:24 182:4
**approval** 71:15
129:3 137:3
**approve** 137:20
137:22 203:25
**approved**
193:25 205:19
**approximately**
211:17
**April** 4:10,12,14
4:16,18,20,22
5:2,5,9,15,17
33:21 35:7
175:13 213:8
226:18 239:23
**area** 30:20
107:18 137:9
140:6,14
147:21 205:21
207:12 228:9
**areas** 50:23
137:2 138:10
138:14 163:16
182:1,3 210:5
210:24 223:14
**arising** 211:21
**arrangement**
81:12,13 82:23
**arriving** 237:2
**Article** 5:19 6:5
236:18
**Aseem** 2:9 8:6
**asked** 15:13,17
15:21 19:22
50:16 57:18
81:17,23 83:3
89:16,17,19
99:14 103:5

110:20 111:9
126:8 146:5
152:3 163:4
172:22 184:5
232:5,15 238:2
**asking** 9:2 17:11
89:25 92:18
148:24,24
190:2 229:2
233:4
**asks** 225:25
**asserted** 192:1
**assertion** 128:9
**assess** 90:15,17
90:22 91:7,10
**assessed** 112:18
**assessment**
11:14 123:18
179:23
**assessments**
71:23
**assigned** 38:10
43:11 81:1,11
81:16 155:15
167:10,14
**assignments**
42:23
**assist** 202:25
232:11
**assistant** 3:9
8:15 24:10
**assisting** 202:24
**associated** 195:4
195:5,7
**assume** 9:21
**assumed** 62:12
197:10
**assuming**
173:12
**assumption** 62:4
62:14 79:12
130:20 151:24
178:8,12 195:9
230:19
**attached** 4:15,17

Osta Davis                                                    August 19, 2022

Page 243

4:19,21,24
5:10,13,15
149:21 152:17
153:16 157:21
165:4 187:22
202:2
**attachment**
105:8 149:19
149:22 152:11
156:15 161:4
165:8 187:23
**attempt** 185:12
**attempted**
126:22
**attend** 46:2
47:18 48:11
49:2 54:2,7
82:8,11 173:16
**attended** 46:11
46:21 48:14,16
62:20,21 65:25
66:4 86:23
88:2 90:7
95:22 108:11
110:2 130:17
135:20 170:9
214:15
**attendees** 63:16
64:25 104:24
**attending** 66:3
217:23
**attention** 12:18
217:23 223:18
**attorney** 1:19
3:10 7:14,23
8:11,15 16:20
21:16 86:17
87:2,3 88:2,3
89:8,9,22,22
90:3 93:21,25
93:25 94:8
97:20 188:10
211:11 212:2
229:19 239:12
239:13

**attorney's** 94:10
**attorneys** 3:9
92:24 93:6,18
94:2,4,6
197:25
**auditorium**
108:24 109:5
**August** 1:17 7:1
34:16 39:2
55:10 239:20
240:22
**Augustine** 5:22
44:19,22 45:3
45:10 220:3,10
224:2,10
**Augustine's**
45:9
**authenticate**
182:25
**authenticity**
202:21
**authorized**
239:4
**Autobound** 66:5
**available** 42:19
**Avenue** 1:19 2:4
3:4,11
**average** 34:6
53:15 69:8,14
69:21
**avoid** 189:21
**aware** 31:1
43:25 44:3,17
117:16 121:14
134:13,17,21
206:17 210:3,4
219:8 220:18
221:5,8 223:12
228:21 231:7
233:12
**awareness**
212:16,17
**axis** 222:4,5,18
222:21

| **B** |
| --- |

**B** 4:8
**B-A-R-T-Z**
43:16
**back** 15:21 19:4
22:7 33:10,12
33:13 34:23
39:18 47:14,24
53:2,13 55:4
57:23 58:18
60:15 61:14,18
64:12,18,19
70:13,25 71:14
76:16 78:3
81:11 89:18
106:22 110:10
111:8 114:4
118:15 121:22
126:9 130:13
130:14,16
132:21 133:7
134:22 141:9
141:20 142:16
143:8 145:1
146:13,15
154:7 175:21
181:5 182:6
186:3,18
189:15 193:15
194:13 199:8
199:16 210:15
215:12 216:20
219:15 222:13
228:14 229:20
**back-and-forth**
130:9
**bad** 165:11
**balance** 132:20
132:24 133:11
**ballot** 25:2
**Barreto** 5:3,21
86:12 89:10,21
90:3 91:4
101:11,14,19
102:5 107:3

119:8,12,12
120:14 121:16
130:18 133:22
134:10,16,20
144:9 149:1
173:10,10,14
175:23 213:1
213:18 219:17
219:20 220:11
221:5 223:3,16
230:8 231:3,5
231:9,14
232:11
**Barreto's** 103:9
106:13,17
107:7 120:3
123:23 124:11
124:13 148:20
168:4,11,15,21
211:25 223:1
226:17
**Bartz** 43:12,14
43:18 54:21,22
**base** 89:2,7,16
89:17 119:16
**based** 9:11 69:1
76:3 107:2,7
112:20 122:1
136:21 142:5
150:17,22,23
163:18 168:21
179:14 190:21
196:24 197:3
212:14
**basically** 9:4
23:18
**basics** 36:13
**basing** 62:14
89:25 140:20
140:22,24
**basis** 48:8 49:20
53:6,7 57:4,5
88:17 217:2,3
**Bates** 149:20
188:19

**becoming**
126:24
**began** 37:25
55:21 214:22
**beginning** 55:24
**behalf** 2:7,13,19
3:2 8:19 48:19
49:2,5 64:11
**belief** 119:17
237:11
**believe** 15:20
17:11 18:4,14
21:25 27:11
31:9 32:7,10
34:16 35:22
38:22 46:16,21
47:10,19 49:8
54:15,24 55:21
55:23,25 60:20
61:8,11 62:2
63:6,14 65:2,9
65:25 67:6,12
70:21,23 71:10
71:18 73:16
74:20 81:3,9
82:25 83:11,12
84:5 85:12
86:17 87:6,9
90:7,12 91:4
92:23 93:5
95:3,16,22
96:8 97:9,13
97:24,24 98:2
98:11,17 99:19
99:25 100:2,13
100:23 101:14
102:12 103:8
106:12 110:14
110:17 111:3
111:18,22
112:9 115:8,13
118:21 119:7
119:15,18
120:5 124:3
125:9 126:9,12

Osta Davis                                    August 19, 2022

                                              Page 244

127:19 132:1,2
135:4,11,19
137:1 139:4
140:13,21
144:14 148:16
148:17 154:19
162:24 163:1
165:5 167:15
168:11 169:25
170:23 171:13
172:4 173:18
173:24 176:12
182:18 183:5
184:24 188:17
190:17,21
195:16 196:3
208:9 211:18
212:25 214:18
216:1,12,13
218:2 219:1,22
221:22 223:6,9
224:5,6 226:16
228:5 230:12
233:21 234:18
234:22 238:1
**believed** 131:5
136:24 223:13
**believes** 122:11
179:12
**Bennett** 60:18
60:22 61:10,13
61:14,17,21
62:7,9 64:2,8
64:11 66:4,13
71:12 207:20
207:21,24
**Bennett's** 64:25
**Benton** 29:25
**BERNADETTE**
2:15
**Bernadette@...**
2:17
**best** 12:5,7
113:12,13
190:2,3 235:7

240:3
**better** 11:7 38:2
145:5 180:11
**beyond** 109:22
121:16 179:8
180:19
**Biden** 73:21
**big** 77:9
**Billig** 5:7 100:21
183:1,25
**Biscay** 5:22
**bit** 28:9 33:13
34:22,24 39:19
50:1 57:24
117:20 127:22
130:8 141:10
146:16 163:1
171:1
**Black** 127:11
**block** 167:2
218:15
**blocs** 32:24 33:2
163:15
**body** 28:1
**booklet** 11:23
**bottom** 165:19
165:23 188:3
**boundaries**
109:20
**box** 104:12
125:4
**Brad** 100:13
**Brady** 4:23
**break** 9:25,25
52:20,23,25
53:4 71:19
113:21 114:3,7
114:8 146:10
146:12 169:10
188:13 189:3
189:14 210:9
210:13
**breaks** 10:1
**Bridges** 4:13
43:12,14,17

54:16 65:25
110:17,22
111:1 114:22
114:25 125:5
125:14 126:3
126:24 128:2
130:22 131:7
134:23 135:15
136:7 145:1,2
145:7,22
**Bridges'** 126:5
127:2
**brief** 63:18
**briefing** 86:16
211:23 212:1,2
219:2
**briefly** 211:13
**bring** 26:11
111:19 129:18
147:6 223:17
224:6,8
**broad** 88:6,8,9
**broadly** 100:14
216:10
**broken** 200:13
**brought** 55:13
**bucket** 138:19
**Budget** 5:23
**build** 215:19
216:24
**Building** 2:16
**bulk** 26:24
**bullet** 167:22
181:6 186:1
192:25 193:6,7
193:14 195:21
196:21 203:23
204:18 206:9
207:4 214:19
216:20 219:17
228:16
**Bus** 23:22 26:20
**Bush** 22:11
**business** 19:17

|  C  |
| --- |

**C** 2:1 239:1,1
**calculate** 221:23
**calendar** 45:15
45:16,17,19
48:4
**California** 2:16
2:22 224:13
**call** 7:11 173:8
173:17 191:10
191:16 192:7,8
193:18
**called** 23:21
153:5,7 171:25
**calling** 139:23
**calls** 18:22 20:22
21:1 30:3
32:19 40:14
44:2,15 45:5
53:23 55:7
60:23 64:14
68:5 84:23
85:4 88:21
90:24 119:13
120:9 121:12
125:19 126:7
130:25 133:2
133:16 135:19
145:24 147:16
152:4 161:12
174:3 176:2
179:15 182:16
184:7,13 206:2
206:5 208:17
212:8 215:7,16
218:6 220:25
221:6 222:15
227:19 230:16
230:24 231:10
231:23 232:4
232:14 233:8
233:10 235:11
236:6 237:6
**camaraderie**
135:5

**campaign** 2:7,9
8:4,5,6 23:15
23:23,23,24
24:2,3 25:1,5,9
25:11,17,19
146:20
**campaigns**
24:24,24 25:7
25:10,13
146:21 147:5
**Campos** 1:10
44:9 62:4,13
62:16,24 63:1
65:20 207:13
207:18
**cancel** 210:24
**canceled** 207:7
**candidate** 23:25
50:20 88:14
122:12 133:19
217:4 222:21
222:22
**candidates**
50:22 73:3,7
76:8 112:24
121:6,9 122:23
123:2,17,19
124:2,6 126:19
129:22 133:25
134:4 218:14
218:15
**candidates'**
25:13
**capacities**
146:22
**capacity** 1:6
28:6,7 35:21
44:25 45:13
54:6 56:17
62:19,22
135:18 155:24
156:1 170:8
230:15 237:20
**caps** 202:4
**carbon** 164:19

cared 230:3
carried 218:25
carry 147:5
case 15:15 27:5
  31:22,25 32:6
  32:11 75:18
  129:18 178:9
  203:6 213:19
  215:19 216:1
  216:25 229:20
cases 31:18
  212:18
catch 96:4
categories
  131:20
categorized
  131:24
category 38:14
  132:3,9
caucus 28:2
  33:18 35:3
  42:1 92:4,13
  93:25 94:3,14
  95:8,19 98:13
  115:20 116:9
  170:4 230:21
  232:12
caucuses 17:3
  38:11 65:16
  235:8
Cause 240:21
causes 232:13
cc 164:19
cc'd 177:8
CCR 1:22
  239:22,23
  240:23
cellphone 15:22
  18:3,6 20:8
census 29:18
  34:12,14 36:15
  66:21,23 67:1
  67:3 68:21,23
  69:1,11 159:16
  159:22,25

160:8,13
  163:15 227:2
Center 2:7,9 8:4
  8:5,6
Center.org 2:11
  2:12
Central 28:24
  100:15
certain 33:7
  40:16 46:17
  47:5,10 50:11
  50:13 77:7
  83:20,23 89:14
  112:22 123:19
  124:1,6 137:1
  137:1,2 141:2
  143:12 171:4
  172:14 174:17
  222:22 230:23
certainly 48:9
  77:24 80:22
  111:25 112:19
  121:3 123:22
  135:6 142:19
  197:8 218:22
  238:15
Certified 239:4
certify 239:5,7,9
  239:11,14,15
  240:2
cetera 18:16
chain 62:10
  155:9
chains 54:9
chair 44:22 45:3
  45:11
Chair's 6:4
chance 104:10
  104:11 164:15
chances 101:7
change 113:4,6
  163:18 228:4
  240:5
CHANGE/SI...
  240:1

changed 99:12
  99:13 113:16
  161:16 202:22
changes 11:23
  12:3 110:25
  175:17 187:5
  205:19,20
  227:24
changing 111:6
  177:22 178:5
character 111:4
characteristics
  99:14
characterizati...
  193:18 195:25
  197:5
characterize
  56:13 96:23
  137:21,23
  205:5
chat 103:25
  104:12,24
  124:20 125:4
  149:17,23
  161:4 164:13
  176:19 183:20
  198:2 201:11
  224:17
check 225:11
checking 201:6
Chege 5:3
  170:19 171:6
chief 35:3,5 37:3
  95:4,6,7,8,13
  96:4
choice 50:20,22
  88:14 111:17
  121:6,9 122:13
  122:24 123:17
  123:20 124:2,7
  126:19 129:22
  218:15
chose 79:7,8
chosen 199:24
Chris 5:10,11

188:4,5
Christine 24:14
  25:3
circulated 148:9
cities 72:3 76:18
  76:18,23 77:1
  77:4,7,8,12,14
  112:1 139:2,6
citizen 84:6
  107:17 142:2
  144:17 150:18
  150:22 159:11
  163:14 226:9
  226:20 227:1
citizens 50:6
city 23:15,23
  31:9,21,24
  67:22 77:11
  138:25 139:4,8
  141:15 174:19
  175:6 200:9,13
  200:17,19,22
  208:20 209:10
  209:13,17,21
  209:25 210:4
  212:17 217:5
civic 26:22
  35:25
claims 11:5
clarification
  13:15 32:3
  217:25 227:10
clarify 9:20
  42:13 57:4
  115:24 136:23
  142:6 148:23
  165:7 229:21
clarity 219:3
class 85:21
clear 9:4 10:9
  11:4 20:10
  48:16 117:10
  181:22 182:1
  218:11 228:5
  229:8

click 160:10
  217:15
clicked 157:3
clients 27:5
close 110:8
  158:4 203:12
closely 38:10,23
  54:8 65:3,18
  74:21 75:12,16
  75:22 76:13
  200:4
closer 63:13
clue 231:1
coalition 49:9,19
  50:2,5,6,8,11
  50:13,24 52:5
  52:6 53:5,15
  53:18,22 141:1
  171:5,15,19
  172:12 173:9
  174:14 175:23
  175:24 176:11
  218:16 219:2,4
Coalition's
  174:2,7
Code 239:18
cohesion 218:13
cohesive 33:2,4
  230:7
cohesively 32:24
collaboration
  151:18
colleague 8:10
  8:12
college 22:12,14
  22:15,16 23:11
  23:12,19
color 50:19,22
  52:8 125:16
  126:1 127:5
come 36:7 81:13
  120:6,8 121:2
  185:12 186:20
  204:10 212:25
  219:23 223:4

Osta Davis

August 19, 2022

230:8
**comes** 137:16
199:5 217:15
220:18 225:18
**comment** 140:24
141:2,3 142:23
142:24
**comments** 12:3
93:13 143:2
**commission** 5:8
5:19 6:4 10:8
11:14 13:22
14:16 19:2,3,6
19:9,10,17,18
19:21 20:7,7
20:19 21:7
23:20 24:7
29:4,21 33:11
34:10,11 36:10
37:2,9,12,14
37:17,19 40:6
40:20 41:23
42:12,14,15,18
44:25 45:20,21
47:13,15 56:10
58:8 60:1,13
60:16 61:22
62:21 63:10,19
65:12,15 68:25
71:6 80:13
86:15 92:4,13
103:13 121:2
129:19 133:24
136:19 138:24
141:14 143:24
144:22 145:11
145:15,20
148:10,13
149:2,3 152:9
155:16 156:5
179:6 211:23
212:18,21
213:12 218:24
219:25 220:11
224:14,15

229:23 230:3,6
234:21 237:3
**commission's**
6:3 173:25
212:1 236:24
**commissioned**
216:21 218:5,8
**commissioner**
33:21 34:1,7
35:7,12,14,16
35:17 36:11,18
38:5,11,17,20
40:17,17,19
41:18 42:4
43:1,4,8,9,21
44:1,7,13,23
45:9,10,17
47:23 48:1,3,6
48:19,20 49:5
49:6,16,17,20
51:13,13 52:3
53:5 54:2,4,10
54:14 56:9,23
56:24 57:1,2
58:1,12,15,16
58:24 59:8,13
59:20 61:12
63:2,4 64:12
65:3 70:5,15
70:19 71:1,11
71:13,16,16
72:16 74:4,5,8
74:8,17,18,23
74:24 75:4,21
78:11 79:1,17
79:22 80:1,4,7
80:8,17,17
81:15,16,21,21
81:22 82:2,3
82:10,16,16
85:10,12 86:5
87:21 91:16,18
91:23 92:19,22
93:3,5,9,9,17
94:5 95:25

96:1 97:2,5
99:3,4,5,23
100:6,14 101:3
101:15 108:2
108:12,16
109:9 110:22
111:2,5,9
112:9,17,21
113:11 115:6
116:15,22
117:10,16,17
117:20,24
118:3,4,6,8,9
118:22,23
119:4,5,11,11
120:2,16,16
121:1,15,21
122:2,10,14,15
123:11,14,25
124:4 125:15
125:23 126:17
126:20 127:1,9
127:12,21
128:9,14,19,20
128:24,24
129:2,8,17,23
129:25 130:5,7
130:10,17
131:4,19
132:14,15
134:10,14,15
134:18,19
135:5,6,7,10
135:10,14,14
135:23 136:2,5
136:8,21,24
137:2,11,19,23
137:25 138:1,9
138:22 140:7,7
141:12,18
142:9,25 143:9
143:24 144:8
144:12,19
145:3,7,9,14
148:13,14

150:1,7,16,19
151:4 154:20
159:7,9 164:25
164:25 165:2,3
166:19,20,23
167:10,17,20
167:21 168:8
168:18 170:14
173:1 175:25
176:5,9 177:7
177:8,11,13
178:4,14,22,24
179:5,9,10,13
179:20,22,23
179:25 180:3,7
180:19,21,23
181:3,4,11,12
181:18,18,21
182:7,11,13,18
185:16,21
186:4,13,14
190:20 193:15
193:16,17
194:8,8,12,13
194:18 195:6
195:22,24
196:4,15
199:23,23
200:5,21
201:14,17
203:16 205:17
205:18,25
206:4,7,12,14
206:15,19,22
206:25 213:16
214:4 215:25
216:10 219:7,8
219:14,16,21
220:10 223:12
224:10 227:14
230:5,10,13,14
230:18 231:6
231:20 232:1
235:22,23
237:11,14

**commissioner...**
41:21
**commissioners**
11:7 29:14
33:19 38:3,8
40:5,13,18,21
42:20,24 43:7
43:20 51:19,25
51:25 52:16
53:22 59:25
65:4,10,11
74:9,13,13
75:3 79:2,21
80:14,18,22
86:16 87:11,16
87:20 115:8
127:23 133:6
134:2 138:17
139:13 143:8
143:11 162:18
162:23 163:1,3
163:21 164:5
173:11,14
185:10,22
186:19 193:22
193:24 196:23
196:24 197:3
203:24 204:5
204:13 206:2
207:12 213:6
213:10 216:15
225:21 231:14
231:21 235:8
236:9
**commissioners'**
11:14 77:3
143:11
**commissions**
224:12 228:23
**committee** 24:2
24:3 25:6,9,11
25:17,19
**communicate**
57:3
**communication**

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Osta Davis                                              August 19, 2022

Page 247

34:7,10 57:7 79:3

**communicatio...** 15:3 16:10 29:13

**communities** 50:19,22 52:7 99:12 111:16 112:23 125:16 126:1 127:5 142:15,17,19 142:25 143:3,6 143:7 151:3,8 151:17,18,21 151:23 152:7

**community** 47:10,22 67:9 88:13 113:1 129:21 159:13 170:24 171:2,7 171:13,17

**compact** 88:12 88:19

**compare** 147:14

**compared** 76:7 83:17,21

**competitiveness** 236:4,8

**Complaint** 7:21 15:10 25:23,25 26:8,15 31:8 147:23,24

**complete** 10:5 58:10 59:18 93:19

**completed** 207:16

**completely** 13:13 44:3 56:20 220:8 222:22

**Complex** 3:10

**compliance** 90:16,17,23 91:7 93:1,20

97:12 123:10 170:12 228:18

**compliant** 91:19 121:23 126:23 127:13 128:10 128:16 130:1,6 130:23 131:5 133:1 145:19 182:15,19

**comply** 91:11 93:22 123:2,7

**composed** 133:14

**compound** 29:7 30:21 35:1 36:5 40:1,24 47:3 58:25 67:5 75:7 77:2 87:17 94:7 102:21 133:15 138:11 150:9 187:8 196:2 209:3

**comprised** 50:3 171:21

**compromise** 235:9,16,20 237:3

**compromises** 235:25

**computer** 105:2

**concept** 109:20 219:2

**concern** 126:21 127:21

**concerning** 93:12

**concerns** 127:24 200:16,22

**conclusion** 32:20 88:22 133:3 168:18 212:9 215:8,17 218:17 223:1,3 235:12 236:7

237:6 238:13

**conduct** 15:13 15:17 19:9,16 21:6,10 47:15 63:22 84:21 85:2,10 99:2 103:10 107:20 107:20,23 134:3 143:15 143:18,21 148:5,8 239:10

**conducted** 45:25 63:24 66:10 103:14 107:14 124:5 133:24 143:25 148:14 149:3 223:18

**conducts** 18:15 85:21

**conference** 90:8 207:3,8,11 214:15,16 217:23

**conferencing** 7:3

**configuration** 163:18

**configurations** 11:15

**conflate** 122:2

**conflict** 49:3

**confusing** 17:24

**confusion** 17:19

**congress** 216:16 216:16

**congressional** 67:23 78:1 117:2 216:14 218:25

**Congresswom...** 216:4,8,9,12

**connect** 175:5

**connected** 151:5

**connecting** 174:16,18

**connection** 13:21 15:14,18 20:11 217:6

**consent** 190:1

**consequences** 134:25

**consider** 72:2 107:19 173:3 182:14 187:5 236:10

**consideration** 76:19 107:5,17 116:14 197:8

**considerations** 140:19 144:14

**considered** 11:13 122:20 128:15 142:19 142:20,22 144:12,23 163:22

**considering** 162:14 173:6

**consist** 82:16

**consolidating** 41:24

**constitutes** 85:20

**Constitution** 6:5 236:4,19

**constraints** 88:24

**consult** 86:6 128:20 134:15 169:11

**consultant** 156:3

**consultation** 107:14 111:19 156:6

**consulted** 80:1,5 86:2 89:19 129:1 205:18

**consulting** 93:25 205:16

**Contact@Lak...**

1:24 240:25

**contain** 72:7

**contained** 106:21 161:5 186:9

**containing** 213:18

**context** 33:5 127:8 160:20 199:17 237:25

**continually** 112:11

**continue** 56:17 56:23 69:10 135:15 191:10 228:4 237:13

**continued** 2:25 3:1 4:25 5:25 23:17 214:23

**continues** 37:5

**Continuing** 164:9

**contours** 164:2

**contracted** 134:3,10,19 148:13 149:2 230:10

**contracting** 134:15

**contrast** 32:24 33:3

**contribute** 70:9

**contributed** 36:21

**control** 237:12 237:13

**conversation** 94:8 99:9 115:12 127:9 139:11 154:21 154:23 179:18 187:4 196:1,3 216:5

**conversations** 35:5 79:5 92:2

Osta Davis                                        August 19, 2022

Page 248

94:2 97:14,19
100:17,19
109:19 110:8
116:16,19
118:14 121:17
122:1 131:11
137:13 141:22
142:4 144:22
186:10,11,14
187:10 194:7
203:22 209:20
209:24
**conveyed** 118:3
118:12 179:17
**cool** 125:6
**coordinated**
216:13 231:20
**coordinating**
36:13
**copies** 104:12
**copy** 5:13,13,13
5:16,16 153:17
158:9 164:19
198:9,9,9
201:25 202:1
**correct** 41:11
51:15 53:7
75:13 76:20
89:23,24
101:11 110:23
139:16 142:8
149:4,5 158:22
158:23 159:13
185:25 186:7
199:20 202:5
204:24,25
205:5 207:25
220:23 229:25
230:1 231:16
234:12,13
237:13,18
239:16
**corrections**
240:3
**correlates**

222:17
**corresponds**
160:8
**council** 31:9
108:22,23
109:13 110:2,2
110:5 212:17
217:5
**counsel** 7:23 8:1
9:6 10:16 14:7
14:11,21 15:1
15:4 17:13
26:14 92:1
97:19 105:4
132:11 146:9
152:15 154:4
155:3 156:17
157:16 159:2
165:18 169:7
169:11,19
170:3,12,16
188:12 190:12
202:9 212:15
224:19 233:4
234:3 236:12
238:4 239:12
239:13,17
**counties** 29:25
72:3 76:18,18
76:23 77:1,4
77:20,20,24
112:1 209:2,5
**county** 5:19,20
31:9 32:5 51:1
67:21,22 73:15
137:9 138:23
141:13 199:1
212:17,17
218:23 239:3
**couple** 5:18 50:4
102:13 103:16
104:3 183:9
189:10 228:14
229:10,21
**course** 22:24

51:3 113:4,7
113:17 171:7
**courses** 23:9
**coursework**
22:19,21,23,25
**court** 1:1 6:2,3
9:14 12:9,11
12:14 32:3
155:3 191:10
191:16 207:5
208:3,16
217:25 227:10
234:11,20
235:21 239:4
**Court-Adopted**
5:11
**COVID** 108:25
**crack** 112:19
**create** 111:22
128:12 140:17
141:6 142:10
179:6 208:24
212:5 237:15
**created** 11:8
78:5 127:3
131:20 138:24
141:14 143:16
152:8
**creating** 11:9
50:19,21
111:15 126:18
132:24 141:7
143:10,19
150:17,21
**creation** 203:7
**credibility** 12:4
**CRISTINA** 3:8
**Cristina.Sepe...**
3:12
**Cristine** 8:12
**criteria** 107:8
**critical** 145:4
**cross-notice**
189:20
**cultural** 109:20

109:21
**current** 32:14
68:21,22 83:18
83:21 133:13
138:24 141:14
152:8 155:20
167:8 170:25
**currently** 27:17
155:19 167:13
**cursor** 166:22
200:10
**cuts** 165:22
**CVAP** 106:24
108:7 110:12
114:15 117:8
117:11 118:19
129:19 130:1,2
132:7,8 133:20
133:25 134:4
153:25 154:1,2
154:17 157:15
158:20,22,24
162:4 166:23
167:23 168:5,6
168:9,15,20
174:1 177:14
177:22 178:5
178:15,16,17
178:18,19,25
179:1,7,14,21
180:5,22 181:5
182:10 202:4
203:5 208:25
209:18,18,22
209:25 211:20
215:6,14,14
223:7
**cycle** 21:21
24:20,21 28:4
115:23 117:2
155:16
**cycles** 22:5 25:8
115:12,15

———————
**D**
———————

**D** 5:16 202:1
**D-I-S-T** 227:11
**D-U-C-H-I-N**
218:2
**daily** 57:5,7
**Dallin** 3:16 8:18
8:20 229:2,19
**data** 29:18 34:12
34:15 36:15
64:12 66:21,23
67:1,2,3,3,4,6
67:8,10 68:21
68:23 69:1,2,3
69:7,10,11,16
69:17 70:1,1
73:23 74:16
75:17,19 76:1
83:11,13,15,17
84:2,4,7,11,15
85:13 133:18
159:16,22,23
159:25 160:8
160:13 167:23
172:4,6,9,16
226:19 227:1
228:8 233:6,7
**databases** 172:5
**datasets** 160:11
160:15
**date** 21:22,23
160:24 161:18
162:9 220:22
240:18,22
**dated** 157:17,19
157:19
**dates** 13:5 38:25
55:19
**Dave's** 28:11
39:17,23 40:2
40:9,18 41:5,7
59:1,6,14 60:9
71:2 73:4,11
83:12 84:1,2
85:7,14 103:24
105:1 106:5

Osta Davis                                                        August 19, 2022

Page 249

110:16 114:14
153:16 156:8
156:15 160:2,5
160:9,14,22
165:13 166:20
166:22 175:2
211:15
**Davidson's**
180:18
**Davis** 1:15 2:2
4:2,10,12,16
4:18,21 5:2,9
5:13,15,18 7:4
7:11 104:5
114:13 124:17
149:9 152:13
155:8 160:19
164:14 169:4
176:16 182:23
187:20 189:22
197:24 201:9
204:22 213:25
217:11 220:17
223:21 229:18
233:16 234:17
236:16,23
238:12 240:2
240:20
**day** 21:25 22:1
33:14 34:18,18
34:19 36:2,4
55:21 173:17
185:8,17,19,20
187:9,10,15
195:8 196:12
196:18 197:20
206:1 207:9,13
211:12 238:7
239:20
**days** 34:11
183:2
**DC** 2:10
**deadline** 63:14
113:15 185:13
**deal** 118:5

196:24 197:2
**deals** 195:23
**decade** 227:24
**December**
234:11
**decided** 205:11
**decision** 80:11
138:2 237:25
**decisions** 10:8
116:23 205:2,6
205:8,10
231:25
**deck** 102:7
**Declaration** 6:4
**decrease** 83:24
**deem** 11:23
**deep** 217:6
**defendant** 3:7
11:5
**defendants** 1:8
8:19,21 229:20
**Defense** 2:21
7:14
**defer** 128:20,24
137:4 189:7
**deferring** 136:4
**defined** 80:13
**definitely**
165:24
**definition** 28:25
**definitions** 29:5
29:8
**degree** 92:2
97:19 221:23
237:5
**delegation**
216:14
**Dem** 25:11
**Democrat**
163:19
**Democratic** 24:1
24:3 25:5,9,10
25:19 28:2
33:18 35:3
41:25 49:7

92:3,4,13
94:14 95:19
98:13 115:19
121:24 122:21
123:2 128:11
128:13 131:8
131:15,17,25
133:12,13
138:6 170:4
173:11 182:3
187:2 216:16
228:1 230:20
231:14 232:11
237:12,18
**Democratically**
232:23
**Democrats**
112:11,13
122:2,23
227:18 232:18
**demographic**
228:8
**demographics**
30:8,19 72:4
83:8,10,20
84:3 182:5
**demonstrating**
180:21
**depend** 33:1
**depending**
68:14
**depo** 14:2
**deposed** 13:19
**deposition** 1:14
9:1 14:2,11
15:4,7 26:16
28:20 177:1
189:20,22
191:1,8,13
229:22 238:7
238:20 239:6,8
239:10,11,15
240:2,3
**depositions** 11:6
**Deputy** 37:3

**descent** 28:24
**Deschutes** 3:4
**describe** 131:8
136:16 163:8
**described**
131:21 207:4
**describing**
142:24 203:21
226:18
**description** 4:9
5:1 6:1 11:16
161:13
**descriptions**
5:23 31:7
**designated**
18:14 47:5
**desire** 111:18
131:8 138:25
139:5 141:15
177:20
**desired** 237:14
**desires** 130:10
**details** 14:15
**determination**
75:15 76:1
77:9 136:20
223:10
**determine** 121:7
121:10 123:18
226:9,9
**determined**
76:12 77:21
**developing**
45:15
**deviation** 72:17
**Deylin** 2:20 7:13
10:10 189:17
**DHolt@Holtz...**
3:18
**differed** 111:5
**difference** 117:6
**differences**
174:13
**different** 32:23
45:23 53:19

56:20 58:4,4
60:9 74:14
120:7 121:3
127:23 130:22
140:24 147:8
161:9,14
162:11,13,16
162:20 163:9
163:10,13,13
163:15,23
164:6 174:8
175:8,10 186:1
191:18 203:22
209:8
**differently**
44:24
**differing** 80:14
**difficult** 38:7
109:2 129:18
**difficulty** 130:8
**digest** 85:13
**digesting** 41:24
**digital** 104:11
**Diplomate** 1:23
239:22
**directed** 16:10
**directing** 154:24
**direction** 34:4
136:22,25
137:4 154:19
159:6 180:16
214:14 228:6
239:7
**directive** 77:5
150:17
**directives** 77:3
**directly** 38:18
58:24 117:23
215:22 219:24
222:1
**director** 45:14
63:18 170:23
**disagree** 145:23
184:18 197:5
**disagreed**

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Osta Davis                                          August 19, 2022

Page 250

122:16,18,19
137:3
**disagreement**
137:15 138:2,3
145:6 146:3
**disagrees** 10:20
**disappointed**
126:23
**disclosures**
11:11
**discrepancy**
166:18,25
226:19
**discriminate**
236:25 237:8
**discrimination**
31:1,12
**discuss** 10:7
14:10 63:16
66:5,10,13
92:20 93:8,21
94:1,6 97:11
100:22 102:16
102:17 114:25
120:17 190:15
191:1,7 192:18
216:10 238:14
**discussed** 90:10
91:25 92:22,24
93:18 94:4,5
98:3 100:23
103:4 119:11
119:19 120:23
120:25 139:8,9
154:1 163:1
171:16 173:19
173:24 186:14
197:9
**discusses** 150:15
**discussing** 74:3
92:10 102:24
127:13 226:8
**discussion** 87:8
114:2 115:4
119:23 124:21

127:19 155:3
169:17 189:13
211:7 225:22
**discussions**
91:22 96:10
120:20,21
133:7 185:12
187:1 195:13
209:16
**disparities**
147:11
**disparity** 57:16
**displace** 177:20
**displaced**
177:25 199:1
**displayed** 73:13
114:13 153:18
164:18 165:17
175:4 198:4
199:7 201:12
**disposal** 85:8
**dispute** 137:10
**dist** 227:8
**distinct** 29:5,8
33:2
**distinction**
209:4
**distracted** 11:2
**district** 1:1,1
4:19 52:7,15
67:23,23 72:1
72:4,11,11,13
72:22 73:19,19
76:7,7,14
77:25 78:1
83:21 88:25
99:15 106:23
107:1,2,5,7,9
107:16,21
108:8 110:12
110:18 111:6
114:16,16,18
114:23 115:1,2
115:9 117:12
118:7,10,20,24

121:5,7,9,23
121:24,24
122:12,17,20
123:1,6,9,17
123:19 124:1,6
126:18,23
127:14,20,22
128:10,11,13
128:16 129:7
129:15,20,20
130:1,6,24
131:6,9,15,18
131:21,22,24
131:25 132:6,9
132:9,15,24
133:1,20,25
134:5 137:7,19
138:4 139:22
139:24 140:3
140:12 141:21
141:25 143:22
144:1,3,13,20
144:23 145:20
150:17,21,25
151:19 153:25
153:25 154:2,3
154:18 157:15
158:20,21,25
162:12,14,16
162:18,20
163:10,13,18
163:22,24
164:2,6 166:21
167:7 168:6,9
168:20 172:23
173:3,25
177:14,22,23
177:23 178:5
178:15,16,18
178:20,24,25
179:7,14,21
180:5,22 181:5
181:15 182:9
182:14 185:3
186:3,15 195:2

195:17 199:2
199:22,24
200:1,2,4,5,12
200:20 202:4
203:4 205:11
208:22,25,25
209:1,5,11,14
209:17,18,22
210:1 211:20
212:6 215:14
216:6,25 219:4
223:7 226:23
226:25 227:6
227:25 228:3,6
237:3,7 240:21
**districts** 27:6
32:12,14 50:19
50:21 58:11
72:7,8 74:3,22
75:23 83:8,20
88:12,16 89:1
101:7 107:24
108:13,15
111:15 112:15
115:14,16,25
116:1,5,9,17
117:8,8,18
123:7 124:10
131:20,25
132:18 137:1,5
137:11,14,17
138:10,18,23
139:10,14,17
139:21 141:7
141:13,23
142:10 143:10
143:13 151:21
160:3 167:10
172:14,17,19
181:20 186:17
186:20,20,21
186:25 187:2,7
195:1,12,15
196:7,11,16,18
197:1,8,16,18

199:19 200:14
200:17,23
204:11,15
208:7 215:22
219:3 236:1,2
236:5
**Division** 3:10
**document** 105:8
149:21 152:17
153:18 156:18
161:2,5 164:18
165:17 175:4
188:15 190:13
190:15 198:4
199:7 201:12
220:23,24
221:20 223:24
225:24 234:22
**documenting**
183:23
**documents** 15:6
15:9,15,19
17:6 26:11
188:20
**doing** 19:10
28:15 29:3
105:18 110:15
121:14 137:22
205:15 207:2,9
213:14 214:14
**dokie** 234:1
**Dom** 5:11
**Dominique** 4:12
4:14,21 5:2,9
36:21,23 37:3
38:14 55:4,9
55:10,13 56:8
56:13,17,22,25
57:3,10,13,17
70:8,15,22
82:20 84:20
85:2,6 95:3,12
101:15 126:3
150:8 194:1
195:22 196:14

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Osta Davis                                      August 19, 2022

Page 251

**dot** 19:14
**dots** 222:17
**downstream** 140:17
**Dr** 86:12 89:10
  89:21 90:3
  91:4 101:11,14
  101:19 102:5
  103:9 106:13
  106:17 107:3,7
  119:8,12 120:3
  120:14 121:16
  123:23 124:11
  124:13 130:18
  133:22 134:10
  134:16,20
  144:9 148:20
  168:4,11,21
  173:9,10,14
  175:23 211:25
  213:1,18
  219:20 220:11
  221:5 223:1,3
  223:16 226:17
  230:8 231:3,5
  231:9,14
  232:11
**draft** 4:10,11
  11:15 45:11
  55:10 99:17,20
  99:24 100:2,7
  100:25 101:3
  102:13 124:10
  150:4 166:17
  183:16 187:12
  203:3
**drafted** 40:8
  43:12 85:7
  137:24,25
**drafting** 41:23
  59:16 142:20
  149:25 150:2
  159:15 202:24
  203:1
**drag** 233:14

**draw** 57:13
  58:22 59:6,11
  59:13 67:4
  70:5,20 71:2
  71:23 76:20
  88:16,25
  145:21 148:4
  165:5 173:5
**drawing** 28:4
  58:2,14 66:18
  83:7 85:22
  88:5 106:18
  122:16 159:21
  160:3 174:8,21
  227:17 230:4
  236:5
**drawings**
  122:19
**drawn** 32:13
  88:12 110:18
  112:15 121:8
  140:17 162:20
  176:1 236:24
  237:7,13
**drew** 58:10,13
  59:20,24 70:7
  70:23 85:3,11
  89:7 114:23
  165:3 215:22
**drop** 103:24
  124:19 149:17
**dropped** 149:23
  205:25
**dry** 71:21
**DThrift-Viver...**
  2:23
**Duane** 180:18
**Duchin** 217:24
  218:2
**duly** 239:14
**duties** 41:17,18
  42:3 55:5,5
  56:19 63:7
**dyad** 80:12,15
  80:18,19 81:12

  81:13,16,21
  82:2,15,23
  119:10
**dyads** 80:11,13
  80:20,24 81:1
**dynamics** 97:25

---

**E**

**E** 2:1,1 4:8,19
  7:8 211:8
  229:16 239:1,1
**earlier** 37:6
  54:20 101:10
  111:9 211:14
  229:22 237:10
**earliest** 225:15
**early** 36:3,6
**ease** 177:15
**easier** 9:4 76:3
  233:22
**easily** 73:13
**east** 199:1
**eastern** 140:16
  216:25
**Eddie** 8:7
**Eddie@Morfi...**
  3:5
**Edge** 39:12,13
  40:11,19,25
  41:2 59:11,21
  59:24 60:1,4,8
  62:5,13 63:20
  63:22,25 65:8
  66:1,6,9,11
  207:15,20
**edges** 187:7
**edited** 167:16
**edits** 161:24
**Educational**
  2:21 7:15
**EDWARDO** 3:3
**effect** 12:10
  99:22 151:11
**effective** 239:23
**effects** 32:13

  140:17
**efforts** 147:3
**EHerrera@M...**
  2:23
**eight** 183:7
  204:19
**either** 34:8
  57:10 75:3
  123:12 132:4
  137:24 148:12
  184:3 206:5,6
  207:19
**elaborate** 28:9
  72:25 93:2
  115:4 119:25
**elect** 25:3 50:20
  50:22 88:13
  111:17 112:23
  121:6,9 122:12
  123:17,19
  124:2,6 126:18
  129:22
**elected** 112:11
  123:2
**electing** 122:23
  122:23
**election** 60:9,10
  73:20 84:15
  115:15,17,23
  116:4 117:13
**elections** 5:19
  31:13 35:25
  117:12 133:19
  172:5 229:24
**electoral** 72:1,25
  73:10 74:2,14
  75:5,21 79:23
  132:23,25
  164:1 236:8
**element** 36:10
**eliminate** 111:25
**email** 4:10,14,16
  4:20,23 5:15
  5:17,22 19:5,8
  19:11,12,16,20

  21:6 54:9
  78:13 100:7,9
  103:17 104:9
  105:15,22
  106:6,21,22
  114:15 124:15
  124:25 125:1
  134:23 135:21
  145:2,2 149:7
  149:10,13,15
  149:22 152:11
  152:25 153:7
  153:11,13
  155:9,25
  156:12,16
  157:14,17,18
  157:20,21
  160:18,21
  161:1,5,7,21
  161:22 164:10
  164:22,24,25
  165:4 166:19
  166:24 167:18
  167:20 168:1
  169:25 170:2
  170:18 171:22
  173:8,10
  175:10,13,22
  176:15 177:4,6
  177:7,13 179:8
  179:14 180:7
  182:8 187:14
  187:16,16,22
  187:23 188:3,3
  197:20 198:1
  198:11,13,13
  198:15 201:7
  201:14,15,21
  202:3 213:17
  214:1,3,6
  215:2 216:3,20
  217:16 219:16
  220:19 224:1,2
  224:4,21
  225:16,18,23

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

226:7,12 227:4
emailing 155:18
emails 4:12,18
  4:22 5:2,4,9,12
  15:21 16:3
  17:11 18:2,5
  18:12 19:2
  20:1 21:7 47:8
  103:16 104:12
  104:19 156:14
  156:21 170:10
  170:12 206:2,5
  206:12
employed 23:17
  27:17 37:12,17
  63:24 65:15
employee 37:1,8
  239:12,12
employees 36:9
employer 33:17
employment
  38:25
encompasses
  109:22
encouraging
  195:22 196:14
ended 39:6
  195:19
engage 111:18
  219:25
engaged 185:11
engagement
  35:25
engages 26:21
ensure 90:20
  91:19
ensuring 112:22
entail 27:4 187:3
entailed 44:3
entire 45:20
  68:18 69:16
entirety 16:4
  50:17 174:20
  216:19
entitled 13:4

157:13
entity 192:1
environment
  12:8
equal 72:7 89:1
equity 111:15
Erica 3:9 8:9
  189:7 211:11
Erica.Frankli...
  3:13
Ernest 2:20 7:25
  8:2 104:24
  105:3
essentially
  199:18 200:12
  234:20
estimate 13:5,9
  25:12 33:23,23
  34:8 46:10,12
  66:17 67:9
  68:9 69:2,3,7
  69:10,15,17,25
  70:1 118:12
estimates 67:11
  67:20 68:2,7
  68:17,24
  182:10
estimation 40:3
  41:7 158:17
  167:9
et 1:3 2:6 18:16
  240:20,20
ethnic 32:23
  33:2,7 83:13
  83:23 132:25
ethnicities
  228:10
evening 238:17
event 47:16
events 5:8 47:25
  62:11 183:11
  183:23 220:9
eventually 227:8
  227:11,17
exact 27:14 46:9

62:10 141:8
exactly 51:12
  125:22 132:17
  162:12 178:1
examination
  1:14 4:1 143:5
  239:10,14,17
examine 133:18
examined 239:7
example 12:18
  83:23 118:13
examples 235:19
exceeded 77:24
  131:22
Excellent 225:25
exception 240:3
exceptions
  239:17
exchange 155:25
  180:10
exchanged
  170:10 186:5
  195:11
exchanges
  135:21
exclusive 20:24
exclusively
  38:19 40:2,8,8
  43:22 87:9
Excuse 14:10
  47:13 132:7
executive 45:14
  63:18 170:23
exhibit 103:21
  103:23 104:4,5
  114:10,10,13
  124:16,17
  145:2 149:8,9
  152:12,13,16
  154:8 155:7,8
  159:1,3,5
  160:18,18,19
  160:21 161:3
  161:10,19
  162:2,10

164:11,12,14
  169:4,22,24
  174:22,25
  175:9,13,20,22
  176:15,16,21
  180:6 182:6,22
  182:22,23
  187:18,19,20
  192:18,22,23
  197:21,24
  201:8,9 213:21
  213:25 217:10
  217:10,11
  219:15 220:15
  220:15,17
  223:20,21
  225:5,15
  228:15 233:14
  233:16 236:12
  236:16
exhibits 169:1
  225:12
existed 212:12
  215:21 223:5
existence 88:10
existing 58:8
  73:23 83:18
  99:19,21
expand 58:6
experience
  235:22
experienced
  31:1
explain 59:23
  76:22 78:20
  80:12,16
  108:14 112:7
  207:2 222:2,8
  226:3,6,15
explanation
  160:14
explicitly 117:22
exported 67:12
express 50:11,13
  117:21,24

118:22 119:6
  121:17 122:22
  123:12 128:3
  128:14 130:5
  131:3,10
  142:12 143:11
  144:19 154:25
  200:21
expressed 112:2
  117:11,22
  118:4 125:16
  128:19 129:23
  129:25 130:7
  131:7 137:3
  140:25 143:9
  151:13 179:9
expressing 52:7
  126:21 138:1
  138:22 141:12
  145:9 180:24
expressly 137:2
extends 109:21

_____

F

F 239:1
facilitator 45:13
fact 112:10
  179:20
factor 236:9
factors 107:8
  163:22
Fain 40:17 44:1
  63:2,4 79:21
  80:4,8,18
  81:22 116:22
Fain's 40:19
  44:7
fair 56:13 218:9
fairly 233:3
fall 34:9 36:3
  138:18 211:18
fallout 134:24
familiar 7:18
  11:12 31:23
  59:15 147:19

Osta Davis                                      August 19, 2022

Page 253

211:24
**familiarity** 62:5
  62:13
**familiarize**
  28:12 211:16
  223:13
**far** 41:7 43:1
  44:20 45:2
  47:13,15 48:6
  51:20 53:17,21
  55:12 56:7,18
  59:13 61:20
  62:9 63:1,4
  69:13 74:9,12
  79:7,25 80:21
  80:24 82:24
  83:1 84:18,19
  85:1,9 86:1,1
  86:22 91:16,18
  96:22 97:7
  99:5 120:16
  133:2 134:14
  134:18 147:13
  149:1 159:11
  163:17 195:13
  206:24 229:10
  235:20 237:6
**Farias** 222:23
**fashion** 113:13
**fast** 10:11
**fault** 87:14
  152:19 174:22
  196:12
**favor** 236:25
  237:8,18,19,21
  237:24
**favorable**
  232:12
**February**
  220:23
**Federal** 185:11
**feedback** 41:24
  156:2
**feel** 71:21
  113:16 116:23

168:5,20
185:25
**fell** 132:10
**fellowship** 23:21
**felt** 118:6 128:3
  168:8,9
**fewer** 96:20
  138:25 141:15
  177:20 178:4,6
**field** 38:12
  146:23
**Fifth** 2:4 3:11
**fight** 145:3,7
**figure** 104:15
  105:19 210:9
  234:1
**figures** 149:4
**figuring** 36:7
**file** 152:16,19
  160:1 172:7
  176:25 206:4
  207:20,25
**filed** 234:11
**files** 64:20
**fill-in** 56:14
**final** 40:9 61:13
  61:25 62:3
  111:11 121:2
  128:21 129:5
  185:13 195:19
  199:24 200:12
  205:10 206:3
  207:10,14
  208:2,12,15,21
  209:11,14
  227:4 235:25
**finalized** 207:22
**Financial** 67:10
  67:14
**financially**
  239:13
**find** 75:21
  176:25 198:21
  218:11,13
**findings** 218:12

232:7
**fine** 17:23 27:15
  104:16 114:7,8
  146:11 152:25
  169:14 178:13
  184:19 190:23
  192:15 210:22
  224:20
**finish** 10:3
**firm** 3:2,3 27:7
**first** 16:18 24:10
  34:19 37:1,7,8
  37:14,19 42:3
  51:17 55:21
  56:10 66:3
  103:18 104:24
  137:16 155:14
  156:9,21 157:6
  157:7 167:22
  176:25 180:2
  180:21 181:6
  183:15,19,21
  184:20 188:3
  210:21 211:19
  211:20 214:19
  218:1 219:7
  225:16 228:16
  231:15 235:2,7
**Fitzgibbon**
  100:3,7
**five** 46:7,8 96:18
  96:20 139:21
  190:8 204:19
  206:11 210:11
  236:22,23
**five-minute**
  210:9
**five-year** 69:8
  69:14,14
**fixing** 12:1
**floated** 220:10
**floor** 2:22 194:4
**fluctuation**
  72:10
**focus** 36:16 51:1

99:16 140:4,14
  159:21
**focused** 47:1
  111:15
**folks** 32:23
  37:22 43:9,11
  50:5 102:23
  108:24 110:1
  111:20 121:14
  142:24
**follow** 123:15
**following** 35:5
  64:2 66:22
  173:1 183:23
  216:3,14 240:3
**follows** 7:7
**followup** 9:12
  64:18
**force** 12:10
**foregoing** 239:6
  239:17 240:2
**foremost** 137:16
**foresee** 128:1
**forget** 46:9
**forgive** 39:8
  139:12 140:5
**forgot** 159:1
  213:22
**forgotten** 139:20
**form** 51:23
  52:12 57:6,20
  61:23 64:5
  65:14 67:12
  70:10 77:23
  84:8 239:7
**formal** 85:25
  123:22 156:3
**formalized**
  82:23
**formally** 35:6,14
**format** 60:2
  239:18
**formation**
  118:24
**former** 156:1

**forms** 147:5
**forth** 133:7
  186:3,18
  193:15 194:14
  222:13 228:14
**forward** 20:3
  164:24 225:16
**found** 75:17
  198:22
**foundation** 55:8
  91:2 133:16
  144:6 222:15
  232:5,15
  233:11
**four** 34:13 98:25
  100:10 115:22
  195:21 204:19
  206:11 222:10
**four-year** 117:1
**fourth** 186:1
**fracturing**
  151:20,23
  152:7
**Franklin** 3:9 4:3
  8:9,9 10:23
  29:25 57:20
  60:25 91:1
  133:2 135:1
  138:11 144:5
  169:16 188:21
  189:9 190:12
  190:22,24
  191:9,15
  192:14 210:20
  210:25 211:2,9
  211:11 212:13
  213:22 214:1
  215:5,10,24
  217:9,14 218:9
  220:14 221:1,2
  221:3,9,15,17
  221:18,25
  222:24 223:19
  223:22,24
  224:16,22,25

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Osta Davis

August 19, 2022

Page 254

225:3,7,10,14
227:11,23
228:24 229:7
238:19
**free** 185:25
**frequently** 48:23
48:24,25 53:9
82:3
**fresh** 13:18
**Friday** 1:17
192:8
**Fritts** 4:18
155:14,15
225:24 226:7,8
226:18 227:24
**front** 12:11
175:2 176:19
234:14
**fulfill** 85:24
**full** 12:18 110:2
204:16,17
239:16
**fully** 34:11
**function** 59:2
**Fund** 2:21 7:15
**funding** 171:3
**funds** 230:19
**further** 51:5
64:21 151:19
180:6 204:18
228:25 239:7,9
239:11,14,15
**future** 227:7
**FW** 5:10,13,23
**Fwd** 4:23

─────── G ───────

**G** 1:10
**G-L-A-T-T** 32:4
**gain** 145:14
**Garcia** 15:19
**Gates** 24:2 27:1
27:7
**gather** 67:24
**general** 1:19 3:9

3:10 8:15
16:25 20:25
21:24 33:9
58:21 66:20
73:18 99:1,8,9
100:11 111:8
122:8 148:25
163:9 214:20
232:22,25
**General's** 8:11
86:18 87:3
88:3 89:9,23
212:2
**generally** 9:7,17
45:19 48:11
53:12 58:14,17
59:10 63:15
64:20 71:2
80:16 82:7
83:17 94:24
95:1,2 99:11
101:6 147:4
154:24
**Generals** 90:4
**geographic** 47:2
47:5 88:24
163:16 222:19
**geography** 30:7
187:3 236:1
**Gersten** 1:22
239:22 240:23
**getting** 11:2
28:14 30:7
224:11,23
**Gingles** 218:12
**GIS** 38:19 39:9
39:24 43:5,8
43:18,21 60:20
62:6 95:22,24
**give** 12:5 13:12
33:22 45:14
78:19 88:9
164:7 190:2
196:20 227:5
234:6 235:19

**given** 21:21 98:2
182:4 211:23
215:21 239:8
**giving** 12:18
169:20 193:12
**Glatt** 31:24 32:4
**go** 8:24 9:5
10:11 12:15
15:21 18:2,3,5
18:12 22:7,10
22:12,14 33:13
35:16 52:24
53:1 55:18
56:1 76:16
105:15 106:22
109:7,9 110:15
113:25 114:4
132:3 146:13
152:5 166:1
170:11 183:9
183:14 185:7
189:4,5,9,11
189:15 193:9
198:20 199:8
199:16 200:8
202:15 210:11
210:19,21,25
211:1,1 219:15
225:16 228:13
229:15,20
233:9 234:8
235:1,4 236:11
**goal** 72:7,20
107:10,10,13
108:8 113:12
113:14 143:12
**goals** 50:12
108:5,13
128:17 140:9
**going** 9:2,5,5,7
9:25 10:14
16:5,9 17:7
28:20 34:23
39:18 42:2
55:4 69:14

77:19 78:3
92:1 97:18
103:17 104:1,2
104:17,25
105:8,12
106:20 110:10
111:8 113:9
114:10,11
126:9 134:22
143:8 145:1
146:15 147:15
153:15 155:6
156:8 158:10
159:17 160:23
161:11,17
165:12,14
175:7,21 182:6
184:16 188:13
189:7 190:4
191:25 192:6
199:6 201:24
202:20 203:19
205:4 210:8
216:20 222:14
225:23 226:3
226:11 233:13
234:4 235:3,17
236:11
**Goldman** 2:3
8:14,15 10:21
14:22 15:23
16:1,5,7,14,17
16:22 17:1,4,7
17:13,18,21,24
18:22 19:7,22
21:1 23:1,4
26:9 28:16
29:7,15 30:3
30:21 32:19
35:1 36:5
37:10,15 40:1
40:14,24 41:15
44:15,21 45:5
47:3 49:13
51:23 52:11,21

53:23 55:7
57:6,18 58:25
60:23 61:23
64:5,14 65:14
67:5 68:5
69:18 70:10
72:14 75:7
77:2,23 79:10
81:8,17,23
83:3 84:8,23
85:4,17 86:8
87:17 88:21
89:11 90:24
92:1,12,16,21
94:7 97:18
101:8 102:21
103:19,21
104:1 105:4,7
105:11,14,17
105:20,23
106:1 108:9
113:22 115:18
116:2 117:14
119:13 120:9
121:12 123:4
123:21 124:18
125:19 126:7
127:17 128:5
128:18 129:12
130:25 132:11
133:4,15,21
144:2 145:18
145:24 146:5,9
147:15 150:9
150:20 152:3
154:4,7,10,13
156:17,20,25
157:2,6,9,16
157:22,25
158:3,7,11
159:2,17
160:23 161:11
161:17 162:8
162:17 163:4
163:11,20

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

164:3 165:18 165:22 166:1,3 166:5,9,12 169:7,9,13,15 169:19 174:3 174:24 175:7 175:16 176:2 176:17 179:15 182:16 184:7 184:13 187:8 188:12,15 189:7 190:8 191:18,21 192:5,11,22 193:3,6,9 196:2 198:7 199:10,13,15 199:25 200:3 201:22 202:9 202:12,15,20 205:13 206:8 206:23 207:23 208:17 209:3 212:8 215:4,7 215:16 218:6 220:24 221:6 221:13,16,20 222:14 227:19 229:2,13 230:16,24 231:4,10,23 232:4,14,20 233:4,8,10,19 233:24 234:3 234:10,14 235:1,11 236:6 236:20 237:5 238:2,8,11,13 **good** 7:10 8:14 8:17 34:5 139:25 166:4 229:18 238:17 **Goodman** 199:2 **gotcha** 108:18 **gotten** 34:12

**government** 27:3,10,11 111:17 **governor** 112:11 **governor's** 73:16 76:10 **grab** 225:12 **graduated** 23:19 **graphs** 102:12 **Graves** 5:5 43:20,21 44:13 74:4,5,8,14,18 74:24 75:4 78:14 79:3,17 79:22 80:17 81:16,21 82:3 82:10,16 92:23 93:3,5,9 116:22 119:11 120:2,16 121:16,21 122:2,13,14 123:11,14 131:19 133:6 137:25 138:17 139:14 140:7 145:14,14 164:25 166:20 167:21 177:8 177:11 178:14 179:5,9,13,25 180:3,7,21 181:4,12,18 186:4,14 193:15 194:8 194:12 199:23 200:5 225:21 227:14 235:22 **Graves'** 128:9 177:13 **Graves's** 178:4 **great** 7:13 8:23 9:24 10:7 104:21 105:21 118:5 141:17

158:3 201:5 236:13 **Grose** 5:4 44:11 44:14 65:22 82:13,17 177:4 177:7 203:7 204:21 205:20 207:13,18 **ground** 8:25 **grounds** 202:21 202:23 **group** 2:3 8:16 33:7 49:7,9 65:9 237:1,9 **grouped** 193:2 193:12 **groups** 33:1 47:1,10,22 48:7,10,18 49:18 50:7,8 80:23 109:24 147:8 **grown** 140:16 182:2 **growth** 228:8 **guarantees** 190:3 **guess** 13:6 22:7 32:25 39:19 51:9 73:23 76:3 80:22 109:2 137:21 158:14 161:23 171:18 183:15 185:7 195:8 200:18 204:4 209:4 215:5 219:7 237:19 237:24 **guidance** 45:14 **guide** 93:22 183:2 184:17 **guideline** 239:18

————— **H** —————

**H** 4:8 **half** 115:22 116:7 **Hall** 5:3 170:3,5 170:9 **Hampton** 194:5 **hand** 145:15 239:19 **handful** 96:15 **hang** 169:16 221:11 224:16 **happen** 13:12 60:21 128:4 **happened** 13:6 13:10 52:8 81:6 97:20 100:19 125:13 167:16 185:8 204:2 228:19 230:11 **happening** 128:1 **happens** 13:16 191:23 **happy** 210:25 233:23 **hard** 51:11 62:10 79:15 149:20 161:23 165:8 **Harless** 2:8 8:5 **Hawkins** 100:13 **Haymarket** 3:17 **HDC** 193:1,11 193:20 **head** 9:17 139:21 172:18 **heard** 31:4,6,7,8 31:10,15,18,21 31:24 32:5,8 196:22 **hearing** 41:20 122:15 197:2 **heavily** 96:23 **held** 42:8,12,14

77:5 98:4 235:23 237:22 **help** 38:4,12 93:21,22 113:12 160:11 173:4 223:13 **helped** 37:6 45:11,14 55:10 166:17 203:3 **helpful** 13:2 17:15 224:19 225:6 **helping** 36:11 **helps** 167:6 172:4 **hereunto** 239:19 **Herrera** 2:20 7:25 8:2 104:13,20 124:21 152:23 153:9 188:18 189:4 191:16 217:12 223:2 **Hi** 7:10 **high** 22:10 **higher** 110:12 168:17 179:21 **highly** 192:7 **Highway** 3:17 **hire** 38:19 120:6 120:8 **hired** 27:10 33:14 34:17 36:9,24 37:4 39:2 90:13 93:6 156:5,7 214:17,23 **hiring** 34:24 93:21,24 144:8 **Hispanic** 28:21 28:22 29:18,19 30:22 106:24 107:17 108:7 110:11 114:15 117:8,11

118:19 121:5,8 126:18 129:20 133:25 147:18 153:24,25 154:2,17 157:15 158:20 158:21,24 162:4 166:23 168:6 174:1 179:7,13 180:5 180:22 181:5 202:4 203:5 209:25 210:5 211:20 215:6 215:14 216:6 218:13,14 223:7 228:8
**Hispanics** 121:8 122:12 123:16 123:18 124:1,5 232:17
**historic** 151:20 151:22 152:1
**history** 26:19 146:16
**hit** 72:21
**Hobbs** 1:6 7:16 15:19 18:1 240:20
**hold** 24:8 41:13 181:7,9 202:7 235:23 238:6
**holder** 190:13
**holding** 119:8
**holiday** 22:1
**Holt** 3:16 4:4 8:17,18,22 10:10,13 104:11,16 152:15,20,25 153:4 189:17 190:10 210:22 211:1 224:20 224:24 225:1,4 225:8 229:4,9

229:14,17,19 230:22 231:2,7 231:13 232:3 232:10,17,24 233:7,9,13,17 233:21 234:1,6 234:13,16,17 235:2,15 236:11,15,17 236:21 237:10 238:6,9,12,18
**Holtzman** 3:16 8:18
**home** 206:1
**honestly** 152:21
**hope** 189:20
**hopes** 189:21
**hospitals** 99:15
**hosted** 214:15
**hour** 146:10 194:12
**hours** 114:8 190:8 193:19
**house** 16:21,23 16:24,25 18:20 18:25 24:3 25:9,10,19 28:2 33:18 35:3 41:25 92:4,13 94:14 95:9,19 97:25 98:4,5,8,10,12 115:19 116:9 206:1
**hovering** 166:22
**huge** 153:2
**Hughes** 3:8 8:11
**hybrid** 176:25
**hypothetical** 232:21

_____

**I**

**idea** 81:12 116:20 121:22 129:10 220:10

**identified** 11:12 47:11
**identifies** 127:10 127:11
**identify** 7:23 29:19
**identity** 109:21
**ignorance** 39:8
**II** 6:5 236:18
**illegal** 88:16
**image** 11:3
**imagine** 56:19
**impact** 215:22
**implicit** 195:9
**implicitly** 197:10
**important** 9:15 219:6,8,12 223:11 225:19
**impossible** 72:9
**impression** 135:22
**improved** 187:1
**improving** 181:7
**in-person** 186:6 186:9
**include** 29:14 66:23 83:13,14 92:7 187:12 200:19 209:17 232:2
**included** 41:18 41:20,22,23 50:6,17,19 54:16 59:5 63:20 73:16 80:8 87:8 114:18 142:24 195:2 197:17 208:21 209:11 209:14
**includes** 28:23 137:9 148:25
**including** 76:8 97:21 212:11

235:25 239:16
**inclusion** 209:21 209:25
**incomplete** 232:20
**incorporate** 106:17
**incorporated** 106:12,17 204:9
**increase** 83:23 138:6,24 141:14 180:17
**increased** 30:11 30:23
**incumbent** 177:20
**incumbents** 177:15,24 178:1,1,5,6
**independent** 34:3
**INDEX** 4:1
**Indian** 108:6 109:13 114:19
**indicate** 33:6 215:19
**indicated** 168:12 222:16 239:8
**indicates** 161:13
**indication** 179:5 180:3 181:12 215:21
**indigenous** 111:19
**individual** 48:8 76:4,6
**individually** 48:7 49:5
**individuals** 48:18 50:6,9
**influence** 116:10 164:1
**informal** 12:8
**information**

11:13 13:14 15:14,18 67:18 67:25 105:25 106:13 130:19 147:22 170:1 172:8 219:13 224:6,8 225:20
**informed** 13:4,8 212:22
**initial** 11:11 121:3
**initiated** 216:11
**initiative** 25:2
**Inn** 194:5
**inside** 209:2
**insight** 99:12
**instance** 110:17 235:7
**instruct** 16:9
**instructed** 191:25
**instructing** 92:5 97:22
**instruction** 85:19 91:15 92:21
**intact** 107:11
**intended** 232:7
**intention** 111:3 203:4 224:6 237:21
**interacted** 136:15
**interchangeably** 28:21 29:5,9 29:11,12
**interconnecte...** 151:2,8,17
**interest** 28:7,18 48:7 51:4,6 52:7 118:5,9 118:18,23 128:12 138:22 140:14,22 141:12 142:16

Osta Davis                                              August 19, 2022

Page 257

142:18,19,25
143:3,6,10
163:6 180:22
181:25 211:16
216:2
**interested** 28:8
48:10 50:7
162:19 172:19
214:22 239:13
**internally**
131:21
**interplay** 132:22
**interpret** 222:2
222:4
**interpreted**
44:24
**interrupt** 95:6
**intervene** 17:21
**intervenor** 8:19
8:21 229:19
**intervenor-def...**
1:12 3:15
10:16 189:19
210:18
**interviewed**
35:6
**introduce**
233:13
**introduced** 4:9
5:1 6:1 104:5
124:17 149:9
152:13 155:8
160:19 164:14
169:4 176:16
182:23 187:20
197:24 201:9
213:25 217:11
220:17 223:21
233:16 236:16
**invited** 231:22
232:3
**involved** 14:16
25:6,9 37:22
45:7 54:23,25
55:9 66:18

87:9 92:2
96:23 133:19
181:19 197:16
198:1 218:2
230:8 236:1
**involves** 180:9
**ISMAEL** 1:10
**issue** 93:6 189:8
191:21,22
192:16 211:19
**issued** 20:14
**issues** 93:22
191:8
**items** 5:23 45:12
63:19
**iterations** 99:20
162:11,16
163:10,13
164:6

— **J** —

**Jamie** 100:20
**January** 5:19
90:12
**jargon** 66:8
**Jayapal** 216:4,8
216:9
**Jayapal's**
216:12
**Jeanne** 1:22
239:22 240:23
**Jeanne@Lake...**
1:24 240:24
**Jessica** 2:3 8:14
14:22
**JessicaG@Su...**
2:5
**job** 5:23 20:15
23:11,12,14
26:19 27:9
28:14 33:15
34:24,25 36:1
36:6,12 37:7
39:11 41:16,18
42:2 55:5 63:7

66:22,25 126:1
146:16 155:17
155:23 165:12
**jobs** 23:19
**Joe** 100:3,7
**John** 3:17
**join** 49:23
**joining** 8:13,21
42:7
**JOSE** 1:10
**Jr** 33:14 34:18
**judge** 12:4,11
192:7,8
**judgment**
128:21,25
**jury** 12:4,11
**Justice** 49:9,12
50:2,24 52:6
53:4,15,21
141:1 171:14
172:12 173:24
174:2,7,14
175:23,24
176:10
**justifiable** 76:25
**Justin** 60:18
61:13,14,17,21
62:7,9 64:2,8
64:11,25 66:4
66:13 71:12
207:20,21,24

— **K** —

**K&L** 24:2 27:1
27:7
**Kamau** 5:3
170:19 171:12
**Katie** 171:22,23
172:11
**keep** 34:23
151:4 155:6
**keeping** 108:5
112:16 139:8
**Kennewick** 3:4
**Kent** 137:9

**kept** 77:21
109:16
**Kilduff** 5:10,11
24:14 25:3
188:4,5
**kind** 21:23
26:23 27:1
39:22 58:21
77:16 80:16
165:22 172:6
183:1 203:21
224:24
**King** 22:1 33:14
34:18 51:1
137:9 138:23
141:13 199:1
239:3
**know** 7:20 9:16
9:24 10:2 13:3
13:5,7,10
15:24 16:12
18:17,19,24
20:24 30:8,10
30:13,14,16,19
30:24 32:11
38:21 39:6,10
39:22 40:12,23
43:1,4,7,12,14
43:17,21 44:13
44:20 45:3
46:17 47:6,15
47:23 48:6
50:2,17 51:20
53:17,21 54:1
55:12 56:7,18
57:21 59:13,20
60:21,21 61:20
62:3,9 63:1,4
67:24 71:21
74:7,10,12,16
74:17,23 75:2
75:8,10,15,17
77:15 78:8
79:5,8,12,19
79:25,25 80:7

80:21 81:10,12
81:15,20 82:24
83:2,5 84:1,18
84:19,25 85:1
85:9 86:1,22
90:20,22 92:25
93:18 94:10,13
96:22 97:1,7
99:8,23 100:1
100:6 101:3,5
103:13 104:15
108:1,3 114:7
114:9 116:4,7
119:10 120:11
120:13,17
123:24 124:4,9
124:12 125:18
127:8,9 130:22
133:10,23
134:2,7,15,18
135:9 136:11
137:10 138:3
140:2,20 141:8
143:24 144:7
144:12 147:13
147:16,24
148:12 149:1
151:22 152:1
152:22 154:13
154:17 155:12
155:17,23
156:5 158:15
158:24 161:9
161:23 162:1,4
162:11,15
163:2,17
166:25 167:25
168:8 169:9
170:20 171:1,2
171:23 172:6
177:16,22
178:9,22 179:8
179:9 180:12
184:5,10,19
185:1,4 186:9

Osta Davis                                        August 19, 2022

Page 258

186:18 188:5
193:23 194:3
194:19 195:13
197:15 199:22
204:5 206:14
206:21,24
207:17 208:14
208:20 211:12
217:20 218:4,8
227:21 229:11
231:18 233:17
234:3,9 236:17
238:3,4
**knowing** 57:15
**knowledge** 26:7
97:3,4 134:1
148:22 195:5
227:13 228:22
232:17 233:3
240:3
**known** 7:15
**Kurt** 4:18
155:14,15
225:24 226:7,8
226:18 227:24

— **L** —

**L** 2:3
**L-O-W-R-Y**
16:13
**L-O-W-Y** 16:14
**lab** 214:18
**Labs** 214:18
218:3
**lack** 55:8 91:1
133:16 135:5,7
144:5 222:15
232:5,15
233:11
**LAKESIDE**
1:22 240:23
**lambasted** 128:2
**land** 109:19,21
**laptop** 204:22
**large** 77:7 88:11

88:19 108:24
109:3
**largely** 235:6
**larger** 138:5
**Lasnik** 192:7,8
**lasted** 55:22
**lasting** 134:25
135:5
**late** 49:3,23
224:23
**latest** 4:10 165:1
175:25 176:9
**Latino** 28:21
29:1,19 30:17
113:1 118:6,19
130:2 132:6,8
133:19,20,20
133:24 134:4,4
142:15 143:15
147:18 150:17
150:21 151:3,8
178:19 209:18
209:21 212:6
222:5,19
226:20
**Latino/Hispanic**
30:10
**Latinos** 31:2
122:2,22
147:14 148:25
**Latinx** 216:25
**laughing** 198:5
**law** 2:3 3:2,3
8:16 12:11
27:7 123:15
**lawsuit** 7:18
13:25 15:19
21:5 25:23
31:8,11
**lawsuits** 212:19
**lawyer** 12:2,2
16:8,22 92:3
169:10
**lawyers** 92:7,10
92:11,12,13,14

92:14
**LD** 4:21 5:16
226:23 227:16
**lead** 118:7,9,24
223:6
**leader** 5:7
100:21 183:17
183:25 231:6
**leaders** 173:9
**leadership** 53:18
193:22,24
**leading** 195:8
197:6 201:20
**leads** 50:5
235:20
**lean** 131:20,24
131:25
**leaned** 227:17
**leaning** 133:12
133:13 231:8
**learn** 147:7
**learned** 147:10
147:11
**learning** 211:24
**leave** 55:17,19
55:20 56:2,9
56:12,14,16,18
57:9 70:16
81:9 118:15
192:11 230:13
**lecturing** 126:1
127:5
**led** 65:7 66:4
223:9
**Leeper** 2:8 8:4
**left** 192:15 223:2
229:13 238:5
**legal** 2:7,9,21
7:14 8:4,5,6
32:19 85:15,23
86:3,6,14 88:4
88:21 89:6,19
92:16 97:21
130:8 133:2
145:11 181:13

181:14,23
212:8 215:7,16
235:11 236:6
237:6
**legally** 145:10
145:16,17,21
**legislative** 11:8
19:11 20:4,5
23:24 24:10
25:10 58:11
67:23 74:21
75:13,16,23
76:4,6,14
77:25 92:14
112:15 137:6
138:10 139:21
140:2 152:8
166:21 182:9
185:3 186:3,21
195:2 196:25
197:16,18
199:19 204:11
204:15,23
205:11 206:3,6
206:15 208:7
208:21 209:14
209:17 215:23
218:25 226:23
235:8
**legislator** 24:11
24:15 27:25
**legislators** 25:12
76:6 100:4
101:7 177:21
**legislators'**
99:11
**legislature** 16:2
16:8,21 18:14
18:20 20:21,25
24:4,6,9,18
25:4 27:20
37:4,5,23 92:3
92:11 99:18,24
100:1 112:12
112:16 237:12

**Legislatures**
90:8 214:16
**let's** 9:14 33:13
58:10 91:19
113:25 117:19
136:17 146:13
149:6,6 157:12
159:21 188:18
189:9,15
210:11 219:15
220:14 222:7
223:19 227:4
**Letter** 6:3
**letting** 125:25
**level** 73:15
215:23
**Liaison** 95:16
**License** 239:23
**likelihood**
168:15
**liking** 116:20
**limit** 72:12,12
**line** 124:23
149:11 156:10
164:19,20
191:11 240:5
**lines** 120:6
205:3
**link** 59:5,7
85:14 103:24
105:1,3,9,13
105:15 106:5
106:20 153:16
153:16 156:9
157:3,3 201:25
217:16 220:19
**linked** 114:15
161:4
**Lisa** 5:22,22
207:6
**list** 23:18 77:15
116:4 138:9
139:14
**listed** 42:17
240:4

Osta Davis                                                      August 19, 2022

Page 259

litigation 3:10 7:17 11:5 13:23 18:1,7,9 18:10 21:10 31:15
litigation-spec... 17:14
little 28:9 33:13 34:22,24 50:1 57:24 62:25 117:20 141:10 146:15 160:10 163:1 171:1 227:6
live 157:3
load 106:21
local 49:7
localized 142:25
located 137:8
long 196:12 201:13 211:12 225:4
look 12:3 39:10 46:17 60:11 71:25 72:25 73:2,3,5,9,18 73:22 76:17,23 76:23 83:7,16 83:17 84:3,10 85:12 93:1 104:25 105:2 116:4 122:17 127:22 155:10 155:12 157:12 160:10 163:23 164:15 165:13 165:14,20 166:10 178:8 182:8,8 187:2 188:1 190:15 198:3 200:9 202:2,3 208:25 219:4 227:4 234:5 236:21
looked 36:4

56:20 72:1,3 76:5,10 79:6 83:11 133:22 143:7 160:25 162:11,14
looking 28:8 66:19 83:8 127:20 136:23 144:15 155:6 159:1,11 160:5 160:21 167:1 179:13 208:6 208:24 209:1 214:23 217:16 220:20 222:24
looks 75:22 167:1 190:14 220:22
Los 2:16,22
losing 125:6
lot 17:15 25:15 99:8 140:14,21 151:17 155:6 190:4 234:2
loud 9:16
lower 147:18 148:3 170:18 210:5 224:1
Lowry 16:2
Lowry's 16:11
Lowy 16:8,10,20
lunch 9:25 110:1 110:4,6,7 113:21
Luther 22:1 33:14 34:18,18

—————————
M
—————————
M 1:22 7:8 211:8 229:16 239:22 240:23
M-A-C-B-A-I-N 96:8
M-O-O-N 218:1
MacBain 95:7

96:6,7,9,10,13 96:23 97:1,4,7 97:10,15,20
main 127:7 199:4 207:11
maintain 133:11 190:24
major 187:5
majority 5:6 32:24 33:7 48:16 100:21 108:6 109:22 112:13 114:16 117:8,11 118:20 129:19 130:2,2 132:7 132:8 133:20 133:20,25 134:5 138:23 141:7,13,19,21 141:24 142:10 143:10,13 144:13,20,23 150:17 153:24 154:2,17 157:15 178:19 179:7,13 180:4 180:22 181:5 183:1,17,24 208:24 209:18 209:18,21 210:1 211:20 215:5,14 216:6 216:25 223:7,7
makeup 132:25 226:23 236:2
making 36:21 57:25 73:9 106:2 194:13 205:2,19,20 207:14 223:10
MALDEF 2:19 2:21 7:15 8:2
man 63:24
managed 23:24

management 67:10,14 68:9 68:17,23
manner 213:16 239:10
map 4:16,19,24 5:5,13,15,16 11:15 39:13,16 40:10 52:9 58:10,22 59:7 59:18 61:12,25 62:2,3,7 64:18 64:22 69:1 70:4,5,7,9,11 70:12,14,14,16 70:19,20,23,24 71:1,10,15,23 71:24 73:13 76:3 78:5,8,10 85:14 86:7,14 99:19,21,21,22 100:7 106:9,18 107:16,24 108:1,5 110:10 110:25 111:4 111:11,22 114:14,15 115:5 126:6,13 128:12 133:14 138:10 144:1,2 144:3 148:15 150:16 153:19 153:21,23,24 154:2 157:2,4 157:11,13,19 157:21 158:15 158:20,25 159:9,21 160:6 160:21,24 161:9,9,13,16 161:19,20,21 161:23,25 162:1,5,6,9 164:10 165:3,5 165:10,15,19

166:16,17 167:8,11,16,17 167:19 174:2,7 174:14,22 175:5,8,10,12 175:14,17,25 176:9 180:4,10 182:8 195:19 198:3,8,18 199:6,25 200:11,12 201:25 202:1,2 202:3,8,19,21 202:24 203:1,3 203:8,16,17,19 204:16,17,23 205:4,8 206:3 207:14 208:2,7 208:12,15,21 232:12
mapmaker 36:18 63:2
mapmaking 28:15 39:18 40:7 41:6 45:3 45:7 57:11,11 57:17 66:18 116:10
mapping 22:19 22:21 36:16 40:4 43:10,23 44:4 67:12,13 76:3
maps 11:8,8,10 28:4,9,11 36:22 39:11,22 40:8,10,21,22 41:1,4,23,24 43:13 51:14,17 51:20 52:1,17 55:11 57:14,22 57:25 58:3,7,8 58:13,14,20 59:1,6,11,14 59:20,23 60:1

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Osta Davis                                                        August 19, 2022

Page 260

60:14,17,18,22
61:2,10,11,13
61:14,17,20,21
62:8,24 63:5
64:11 66:18,19
66:19,19,24
67:4 72:2
76:20 81:7
83:8,16,18
84:11,21,22
85:2,7,10,23
88:5 89:6,21
90:16,18,23
91:5,7,11,19
99:17,24 100:2
100:25 101:3
102:13 103:11
103:14 110:21
118:13 120:18
121:2,4 124:12
127:23 128:21
129:2,4,5
132:9,12,13
136:19,21
137:24 138:2
138:24 139:1
141:14,16
142:17,20
143:16,19,22
148:4,6,9
151:25 152:2,8
155:6 159:15
159:18 161:16
173:2,4,5,6,7
174:8,15,16,21
178:9 185:13
186:3 187:12
193:24 195:4,4
195:6,11
201:21 202:22
205:11,14
206:6,14,15,19
206:22 207:5
207:10,22,25
229:25 230:4

231:15 234:20
235:16,25
237:11,12,15
**marathon**
  210:16
**march** 164:9
  214:3 215:12
  219:16 224:2
**mark** 104:1,3
  124:16 152:11
  159:4 160:18
  169:22 176:15
  182:22 197:21
  225:4
**marked** 155:7
**Marshall** 3:17
**Martin** 22:1
  33:14 34:18,18
**material** 103:4
  215:25
**materials** 232:8
**Matt** 4:13 5:3,21
  43:12,14,17
  54:16 65:25
  110:17,22
  111:1,7 114:22
  114:25 119:12
  125:5,14 126:3
  126:5,24 127:2
  128:2 130:22
  131:7 134:23
  135:15 136:7
  145:1,2,22
  149:1 168:14
  173:9 219:17
  230:8
**maximum** 72:17
  72:17,21
**McLean** 5:22
  207:6
**mean** 17:21
  22:24 32:18
  33:4 42:6,7,10
  42:15 60:6
  61:4 72:6 73:1

77:24 83:10,22
88:20,24 93:3
95:2,24 98:1
99:21 106:10
106:11,25,25
112:8 113:14
117:7 125:24
128:10 129:15
140:11 141:21
142:21 144:20
144:24 145:8
157:10 174:19
177:18 181:9
199:25 214:9
218:19 221:14
221:19,22
226:22,24
228:20 237:20
237:24
**means** 106:14
  127:16 131:18
  151:22 152:1
  177:16,19
  178:19 197:11
  204:4 238:1,3
**meant** 42:11
  44:11 106:12
  107:2 131:14
  175:13
**media** 47:10
**medical** 55:17
  55:19,20 56:2
  57:9 70:16
**medication**
  12:19
**meet** 14:3 35:21
  48:7,18 49:15
  49:17 53:6,9
  53:22 82:3
  94:22 98:21
  99:1 101:24
  108:21 109:12
  109:24 113:15
  171:6 173:9
  185:22 216:15

**meeting** 5:3
  47:18,20 65:4
  78:17,24 79:1
  79:3,22 86:13
  86:17,19,23
  87:12,16,21
  88:2 89:8,9,22
  90:3 94:24
  95:4,23 98:20
  100:20 101:13
  101:17,24
  102:1,4,6,18
  102:19,20,24
  102:24,25
  103:2 108:20
  109:7,10,14,16
  110:3,9 119:8
  119:18 120:1
  125:5,8,14
  126:2,10 129:8
  131:4,12,13
  134:22,24
  135:16,22
  146:4 173:13
  173:16 175:22
  185:11 194:13
  212:3 216:4,7
  216:9,11,14,18
  231:18,19,22
**meetings** 13:24
  18:10 21:5,10
  26:14 34:8
  36:13 41:19,19
  41:22 42:4,8,9
  42:11,14,15,16
  42:17,21 45:11
  45:12,22,24
  46:3,10,14,23
  46:25 47:7
  48:9,12,14,17
  49:11 50:18
  53:14 54:2,7,9
  62:20,21 63:9
  63:12,14,16,19
  63:20 82:8,11

82:15 95:21
99:2,6,9,10
100:22 131:12
135:20 170:9
171:10,11,12
171:17,18
186:6
**Melissa** 38:22
**member** 5:7
  37:14 38:10
  64:10
**members** 41:25
  44:14 49:9
  63:5 84:20,21
  86:22 98:4,5,8
  98:10,12,22
  99:17,24 100:1
  108:12 110:5
  136:8,10,13
  171:13,21
  173:9 175:24
  176:10 216:16
  216:16
**members'** 25:18
**memo** 5:6,10,10
  93:5,10,12,13
  93:14 120:11
  182:25 183:4
  183:15,16,19
  183:21 185:7
  185:25 187:22
  188:1 191:14
  192:21 203:20
  203:21
**memorandum**
  183:23,25
  184:2,12
**memory** 129:16
  139:25 166:17
  179:11 196:18
**mention** 112:25
  219:17
**mentioned**
  17:10 24:23
  25:22 33:13

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

34:17 37:6 44:10 47:22 53:5 54:20 60:12 63:8 64:24 72:24 73:25 75:10 76:1,17 83:7 84:2 88:18 89:16 93:16 103:9 107:6 108:4 112:21 116:8 127:12 139:12 141:5 146:16 180:20 196:7 199:17 200:13 212:1 229:22 230:9 231:13

**mentioning** 136:17 143:9

**mentions** 173:10 178:14 203:24

**Merged** 5:16 202:1

**message** 186:6

**messages** 20:8 20:11,20 21:11 21:18 186:8

**messaging** 20:20

**met** 35:19 49:4,7 49:8,10,19 86:12 94:15 100:10,14 101:1,4,11,14 108:22 173:10

**metric** 74:6,7,10 74:25 78:4,6,9 79:23 80:2 225:21

**metrics** 11:9 226:8

**Mexican** 2:21 7:14

**Meyers** 4:12,14 4:21 5:2,9,11

36:21,23 37:3 38:14 55:4,9 55:13 56:8,13 56:17,22,25 57:3,10,13,17 70:8,15,22 82:20 84:20 85:2,6 95:3,12 101:15 126:3 150:8 194:1 195:22 196:14 203:2

**MGGG** 5:19 214:18 217:17 218:3

**mid** 34:16 39:2,4 55:10 227:24

**middle** 10:4,4 187:15 218:10

**midnight** 201:14 204:3,6

**midterm** 116:1

**mind** 10:11 13:18 17:9 77:17 105:14 107:8 112:12 137:16 157:25 169:10 186:20 188:13 189:17 199:5,10 223:1 236:12

**mindful** 9:3,13

**mine** 234:4

**minimum** 25:2

**minority** 88:13 88:18 138:23 141:7,13,21 142:10 143:10 143:13 144:13 144:20,23 147:8 167:23 218:16

**minute** 238:4

**minutes** 49:23 183:9 189:10

189:21 190:7,8 210:11,23 229:11 238:10

**misheard** 110:11 139:13

**mispronounci...** 170:20

**misremember...** 141:7

**missed** 110:10 166:14

**misspoke** 190:19

**misstates** 37:10 37:15 79:10 108:9 116:2 117:14 123:4 127:17 160:24 161:18 162:8

**misstating** 17:12 139:13 140:5

**misunderstood** 130:4

**mixed** 225:13

**moment** 13:13 142:14 183:12 190:22 224:16 224:18 225:11 228:12

**Montes** 31:21

**month** 13:10 51:7 53:11

**months** 197:6

**Moon** 217:24 218:1

**Morfin** 3:2,3,3 8:7

**morning** 7:10 8:14,17 173:11 173:11,13 184:21,22,24 185:4 205:24 207:3,11

**motions** 239:17

**motivated** 79:17

**move** 175:20

220:14 221:2 224:24 227:23

**moved** 228:1

**moving** 165:25 221:25

**Mulji** 2:9 8:6

**multi-county** 209:5

**multicounty** 208:25

**multiple** 49:18 67:4,6 82:6 84:2 151:21 172:24 200:13 200:17,22 202:22 209:2,5

**municipalities** 77:5

———————
**N**
———————

**N** 2:1 7:8,8 211:8,8 229:16 229:16

**name** 7:13 8:9 8:17 16:12,13 16:18 18:17 20:22 24:13 38:21,22 43:15 44:5,8 54:20 55:2 63:7 94:11 96:5 101:16 104:6 124:22 126:9 149:10 153:10 156:10 164:19 170:20 211:10 218:1,2 229:18

**named** 54:24 239:6

**names** 54:13,19

**narrative** 185:8 187:11 205:23

**Nation** 107:11 107:15 108:20 108:21 109:16

109:21 151:1

**National** 90:8 214:16

**Native** 218:14

**naturally** 56:21 72:8 73:12

**nature** 23:6 120:13 149:19

**NCSL** 214:16

**near** 227:7

**nearly** 40:2,8,8

**necessarily** 16:3 32:25 41:2 57:21 78:2 79:6 92:25 93:24 108:11 121:23 126:20 129:21 137:21 146:3 149:14 187:11 205:15

**necessary** 128:10 212:5 235:9

**need** 9:25 114:6 114:9 116:4 123:2 157:16 159:4 191:9 198:20 225:11 233:21

**needed** 86:14 121:2,2,4 130:1 180:4 223:6

**needs** 123:6

**negotiate** 80:11 80:18,19 130:8 145:10 181:22

**negotiating** 80:24 145:15 229:25

**negotiation** 100:24 127:22 127:25 145:13 235:9,15,20

**negotiations**

Osta Davis

August 19, 2022

Page 262

55:11 126:21 128:1,4,17 131:19 133:7 145:14 181:17 181:25 184:21 184:22,25 185:2,4,12,14 185:15 197:6 199:17 204:10
**neither** 92:24 93:18 195:6
**never** 123:14 152:17
**new** 4:21 61:12 70:1,1
**night** 26:1 147:23
**Nodded** 10:6 25:24 42:5 65:23 67:15 113:22
**nodding** 9:17
**non-commissi...** 37:19
**non-district** 138:19,20
**non-Latinos** 148:25
**non-white** 141:24
**nonpartisan** 17:4 27:23 41:1,22 44:22 44:24 59:25,25 60:12,16 62:22 63:9 220:11
**nonprofit** 26:21
**normal** 33:25
**northwest** 2:10 49:8
**notable** 99:14
**noted** 239:11
**notice** 238:7
**noticed** 233:1
**noting** 211:22

**November** 6:3,4 39:4,7 55:10 61:13 62:25 113:15 157:13 157:17,19,19 157:21 158:16 160:22 161:2 161:16,21,22 161:24 162:6,7 164:9 165:1,15 166:19 173:12 173:14 175:13 176:10 177:4 184:23,24 185:5,9 197:20 203:24 204:21 205:24 226:12 227:5
**number** 4:9 5:1 6:1 25:6,10 45:22 46:9 50:4 55:22 60:10 63:17 72:2,23 76:8 77:6 102:12,12 110:1,4 115:9 138:17 142:9 142:12 154:17 159:1 162:4 163:22 171:5 171:18 177:20 193:6 195:9 197:7 213:23
**numbered** 115:9 115:14,16,24 116:1
**numbering** 115:1 116:9,16 117:18 118:19 163:16
**numbers** 159:12 167:24 168:12 188:20 195:2 196:25 197:4 197:11

**O**

**O** 7:8 211:8 229:16
**O'Neil** 4:23 5:7 5:12 54:15 65:20 97:8 101:14 126:3 136:14,15,17 182:25 183:16 183:21 184:2,5 184:11 192:21 193:1,16 194:1 194:16 195:21 196:22 198:12 203:21 204:19 205:24 206:6 206:13,16,19 206:25
**O'Neil's** 195:3
**O-H-A-D** 16:19
**oath** 7:5 12:9
**oaths** 239:5
**object** 9:6 10:18 17:7 77:23 147:15 157:17 159:17 160:23 161:11,17 175:7 202:20 202:23 206:23 215:4 222:14 234:5
**objecting** 10:15
**objection** 9:7 10:15 15:23 16:1 18:22 19:7,22 21:1 23:4 26:9 28:16 29:7,15 30:3,21 32:19 35:1 36:5 37:10,15 40:1 40:14,24 41:15 44:15,21 45:5 47:3 49:13 51:23 52:11,11

53:23 55:7 57:6,18,20 58:25 60:23,25 61:23 64:5,14 65:14 67:5 68:5 69:18 70:10 72:14 75:7 77:2 79:10 81:8,17 81:23 83:3 84:8,23 85:4 87:17 88:21 90:24 91:1 92:10 94:7 101:8 102:21 108:9 115:18 116:2 117:14 119:13 120:9 121:12 123:4 123:21 125:19 126:7 127:17 128:5,18 129:12 130:25 133:2,4,15,21 135:1 138:11 144:5 145:18 145:24 146:5 150:9 152:3 162:17 163:4 163:11,20 164:3 169:20 174:3 176:2 179:15 182:16 184:7,13 187:8 196:2 200:3 201:22 205:13 206:8 207:23 208:17 209:3 212:8 215:7,16 218:6 220:24 221:6,20 227:19 230:16 230:24 231:4 231:10,23 232:4,14,20

233:8,10 235:11 236:6 237:5 238:2
**objections** 10:13 239:9,17
**objective** 230:23
**objects** 225:2
**observations** 128:2
**observed** 22:1
**obtaining** 232:12
**obvious** 57:16
**obviously** 192:5
**occasionally** 20:22 156:2
**occur** 205:22
**occurred** 36:14 40:4 81:9 212:19
**occurring** 84:25 137:6
**October** 51:22 51:24 52:1,17 55:24,25 61:11 62:6 70:13,20 71:2 75:1 78:10 101:18 101:20 104:18 115:6 118:17 127:23 132:9 132:13 134:24 149:7 153:6,7 153:22,23,24 176:6
**October-ish** 51:9
**odd** 115:16,25
**offer** 185:25 187:6
**offered** 195:23
**offers** 186:2,5,24 187:5 193:12 193:14 194:13 194:20,21,24

Osta Davis                                                    August 19, 2022

Page 263

| | | | | |
|---|---|---|---|---|
| **office** 1:19 8:7 | 26:23 27:1,9 | 68:16,22 69:2 | 109:24 110:4 | 155:2,14,24 |
| 8:11 67:10,14 | 27:13,21,23,25 | 69:7,10,13,24 | 110:10,15,19 | 156:3,8,15 |
| 86:18 87:3 | 28:3,8,19 29:3 | 70:4,9,19,22 | 110:25 111:8 | 157:12,16,18 |
| 88:3 89:9,23 | 29:10,14,17,19 | 70:24 71:5,9 | 112:4,21 113:3 | 157:22 158:20 |
| 212:2 218:16 | 29:24 30:1,6 | 71:13,19 72:16 | 113:9,16,19 | 159:11,19 |
| **officer** 18:15 | 30:16,19 31:1 | 72:20,24 73:7 | 114:21,25 | 160:10,17 |
| 21:15 | 31:10,24 32:2 | 73:18,25 74:5 | 115:7,11,16,21 | 161:15 162:1,4 |
| **officer's** 18:17 | 32:8 33:4,9,17 | 74:9,12,17 | 115:24 116:6,8 | 162:15,21,25 |
| **official** 1:6 | 33:19,22 34:14 | 75:2,10,15,25 | 116:15,24 | 163:8 164:7,17 |
| 33:15 95:17 | 34:17,22 35:4 | 76:12,17,22 | 117:10,19,24 | 164:24 165:6 |
| 230:15 | 35:8,12,17,21 | 77:16,20 78:3 | 118:2,8,16,18 | 166:2,9,12,18 |
| **OFM** 67:10 68:9 | 35:23 36:20,23 | 78:9,17,19,22 | 118:22 119:1,3 | 167:6,6,12,15 |
| 68:16,23 | 37:1,6,13,18 | 78:25 79:4,7 | 119:10,20,22 | 167:20 168:5 |
| **Oftentimes** | 37:21 38:2,17 | 79:16,19 80:4 | 120:12,15 | 168:24 169:1 |
| 142:23 | 38:25 39:3,8 | 80:12,15,20 | 121:15 122:4,7 | 169:12,21 |
| **oh** 16:6,15 24:4 | 39:18 41:3,13 | 81:4,6,10,15 | 122:10,22 | 170:8,11,15,18 |
| 26:18 27:1 | 42:2,13,23 | 81:20 82:1,8 | 123:1,16 124:4 | 171:1,10,16,20 |
| 63:15 95:11 | 43:1,4,17,20 | 82:10,15,21,23 | 124:12 125:1 | 171:22 172:9 |
| 108:18 125:3 | 43:24 44:7,10 | 83:1,6,15 84:1 | 126:5,11 127:8 | 172:15,19,22 |
| 130:4 152:19 | 44:13,18 45:19 | 84:16,18 85:1 | 127:12 129:6 | 173:8,16 174:6 |
| 156:23 157:10 | 46:2,12,15,18 | 85:9,15 86:1 | 129:10,14 | 176:8,13,23 |
| 164:13 169:12 | 46:20 47:12,20 | 86:11,13,19,22 | 130:4 131:14 | 177:6,13 178:3 |
| 175:18 183:19 | 47:22 48:3,6 | 87:2,5,7,11,19 | 131:24 132:19 | 178:11,13,22 |
| 193:9 196:10 | 48:11,18 49:1 | 87:23 88:7,15 | 133:10,23 | 179:8,12,19 |
| 202:11,14 | 49:15,22,24 | 88:18 89:14,25 | 134:2,12,14,18 | 180:6,19 181:9 |
| 206:10 221:13 | 50:8,11,21 | 90:6,9,13,15 | 134:22 135:12 | 181:17 182:6 |
| **Ohad** 16:2 | 51:2,10,19,22 | 91:6,10,14,16 | 136:6 137:10 | 182:21 183:6,9 |
| **okay** 7:13,20,22 | 52:5,14,22 | 91:22,25 92:15 | 137:14,18 | 183:15,19 |
| 8:23 11:18,21 | 53:12,17 54:4 | 93:8,16,24 | 138:9 139:2,6 | 184:5,10,16 |
| 12:14,22,25 | 54:10,17 55:1 | 94:15,22 95:11 | 139:12,17,25 | 185:1,7,21,24 |
| 13:21,23,25 | 55:4,18,23 | 95:20 96:4,7,9 | 141:5 142:2,6 | 186:13,24 |
| 14:2,6,8,13,15 | 56:1,5,12,16 | 96:22 97:10,14 | 142:9,14,21 | 187:13 188:11 |
| 14:19,23 15:11 | 56:21 57:3,8 | 98:1,5,12,15 | 143:5,8,18 | 188:14 189:2 |
| 15:13,17 16:16 | 57:16,22,23 | 98:21 99:1,8 | 144:10,12,16 | 190:9 191:12 |
| 16:20 18:5,9 | 58:16,20 59:4 | 99:23 100:1,6 | 145:1 146:2,2 | 192:2,17 |
| 18:19 19:1,12 | 59:13,17,23 | 100:10,25 | 146:8 147:1,7 | 193:23 194:2,7 |
| 20:2,6,10,17 | 60:3,12,19,21 | 101:6,10 102:2 | 147:19,24 | 194:11,23 |
| 20:24 21:4,9 | 61:4,7,9,14,20 | 102:4,8,14,23 | 148:4,8,12,21 | 195:3,13,18,21 |
| 21:14,17,20 | 62:1,8,12,16 | 103:7,9,13,16 | 148:23 149:6 | 196:20,21 |
| 22:2,7,10,12 | 63:4,8,15 64:1 | 104:23 105:11 | 149:13,16 | 197:15,19 |
| 22:14,16,23 | 64:7,10,17,21 | 106:2,4,8,14 | 150:3,7,13,25 | 198:17,20 |
| 23:11,14,16,18 | 64:24 65:7,10 | 106:16,20 | 151:7,14,19 | 199:3,22 200:7 |
| 24:5,8,13,17 | 65:12,19 66:1 | 107:4,16,20 | 152:1,10,21 | 200:21,25 |
| 24:23 25:22 | 66:5,17 67:1 | 108:1,4,18 | 153:9,10,17,21 | 201:5,7,17,20 |
| 26:2,6,8,14,18 | 67:18,24 68:8 | 109:1,4,12,15 | 154:10,21 | 201:24 202:7 |

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Osta Davis                                                    August 19, 2022

Page 264

202:25 203:4,7
203:10,19
204:5,17 205:1
205:23 206:18
206:21 207:2,9
208:1,11,14,24
209:13,16,20
210:3,15 211:3
211:4,19 212:5
212:22 213:20
215:1,24
216:17,20
217:8 218:9
219:6,15 220:1
220:13 221:9
221:25 222:7
222:12,24
223:11,15,19
225:3,14,23
226:11,22
227:4,23 228:7
228:12,13,24
230:2,8,14,22
231:2,13,21
232:17 233:13
233:17 234:10
234:14,16,19
234:25 236:3
236:11,15,20
236:21 237:10
238:6,11,17
**Okie** 234:1
**Oklahoma**
224:14
**once** 36:1,15
40:9 48:24,25
53:11 68:21
94:18 155:12
191:8 192:16
207:16
**one-for-one**
181:15,19
182:3
**OneAmerica**
216:21,24

217:3
**ones** 18:13 33:20
84:14 115:10
**open** 13:24
18:10 21:5,10
42:18 46:25
86:17,19 88:1
89:8,21 103:25
105:1 106:4,20
153:15 156:8
157:23 158:8
165:12 198:2
199:6 201:24
212:3 234:2,4
234:8,15
236:20
**opening** 156:15
236:13
**opinion** 26:8
88:23 118:22
118:25 121:16
121:17 122:1
122:22 123:12
128:23 145:13
145:16,17
179:6,17,20,24
179:25 180:1,2
180:20,23,24
180:24 181:2,4
186:1 212:10
212:14 228:3
237:2,7
**opinions** 92:22
93:3,9 98:3
237:21
**opportunity**
11:22 112:23
169:20 239:8
**opposed** 10:18
**options** 160:9
**ORAL** 1:14
**order** 6:2 13:5,9
156:24 191:6
227:18 234:10
234:19

**organization**
171:25 172:3
231:8
**organizations**
53:19 172:5
**organize** 111:16
**original** 190:25
**Osenbach** 94:12
94:13,16,22
97:21
**Osta** 1:15 2:2
4:2,10,12,16
4:18,21 5:2,9
5:13,15,18 7:4
7:10,11,12
17:10 104:3,6
106:6 114:6
204:22 210:16
240:2,20
**Osta.Davis@...**
19:13
**Othello** 208:21
209:25 210:4
**outburst** 127:2
**outcome** 126:24
239:13
**outreach** 45:15
45:16,17,19,22
45:24 46:2,10
46:23,25 47:7
47:16
**outset** 81:1
**outside** 42:15
65:12,16
102:18,19,25
134:3 168:14
**overlays** 200:8
**owns** 192:1

──────────
**P**
──────────
**P** 2:1,1
**p.m** 1:17 114:3,3
146:12,12
189:14,14
196:22 197:20

198:12 210:13
210:13 223:2
226:12 227:5
238:20
**Pacific** 1:19
**pack** 112:20
**page** 2:25 4:2,25
5:25 8:25
156:21,22
157:6,7,11
161:3 186:2
193:1,4 196:21
196:21 203:20
203:23 204:18
205:23 221:10
221:14 222:1,7
222:8,10
225:16,23,24
234:14,25
240:5
**pages** 183:7
**Palmer** 1:3 2:6
7:16 18:1
240:20
**panel** 35:22,23
**paragraph**
218:10 235:3
**part** 63:6 82:1
82:15 87:14
108:4 112:15
118:18 150:15
163:6 165:19
167:7 170:18
171:14 172:12
175:9 185:23
186:12 197:10
201:21 205:6
217:16 219:12
220:19 225:22
**participants** 7:3
**participate** 45:3
203:7 231:22
**particular** 55:13
58:5 60:13
68:10 98:15

136:18 155:23
185:1 218:13
236:1
**particularly**
74:16 139:4
152:7 170:24
174:12 214:12
229:24
**particulars**
55:18 56:1
**parties** 7:22
10:17 80:14
191:19 239:9
239:12
**partisan** 180:9
180:13 181:16
181:20 228:6
229:23 231:3,6
236:2,4
**partisanship**
196:25 197:4,7
197:11 230:3
**partners** 171:5
**party** 13:25
180:16 236:25
237:8,12,18,23
239:11
**Pasco** 30:20,20
31:25 174:16
174:18 175:5
**pass** 136:21
192:18
**passed** 234:20
**passion** 145:5
**paste** 158:9
**path** 152:16,19
227:8
**pattern** 218:11
**patterns** 223:14
237:16
**Paul** 5:5 44:9
62:4,13,16,24
63:1 65:20
207:13,18,19
227:5,13

Osta Davis                                    August 19, 2022

Page 265

**pause** 169:18 203:14
**PDF** 162:2 225:8
**Pedersen** 100:20
**Pediatrician** 14:20
**Pellicciotti** 225:19
**penalty** 11:24
**pending** 166:6
**people** 26:21 28:23 38:15,18 42:15 47:2 50:4 53:14,16 53:17 54:18 65:9 108:23 109:2 146:19 146:23 151:10 151:12,15 203:22
**perceive** 113:6 136:2
**perceived** 99:13 135:6 226:18
**percent** 40:3 66:22,24 92:25 106:23,24 110:12 131:23 132:1 153:25 154:3 158:21 162:6 166:23 166:24 168:7 168:10,17,21 178:17,24 179:1 180:11 182:10 194:3 202:5 203:5,5 225:19 227:2,3
**percentage** 33:23,24 66:17 66:20 179:21 222:4,5,19
**perception** 122:14 123:14 135:4

**perfect** 196:18
**performance** 72:2,25 73:2,3 73:5,10 74:2 74:15,21 76:7 76:14 79:23 131:22 132:17 132:23,25 133:8 138:6 163:14,23 164:1,4 180:10 180:13,15,17 181:7,16,20 186:15,16 187:2,11 197:13 204:10 208:6 222:21 229:23
**performs** 212:6
**periodically** 16:2
**perjury** 11:25
**person** 7:25 14:3 43:11 44:2 45:25 54:24 65:2 78:14 100:7 109:7,9 114:22 148:17 185:11 194:18 194:20
**personal** 19:20 20:14,16,17 21:6 28:7,17 41:10 135:22 136:4,6,11,16 145:12 211:16 212:10,13 230:19
**personally** 29:4 61:24 62:8 72:12 78:23 116:10 176:8 193:21
**perspective** 127:25

**pertains** 88:5
**phone** 14:3 20:14,16,17,19 20:22 21:11
**phrased** 209:8
**physical** 11:23 70:11
**piece** 202:13
**pin** 51:11
**PL** 160:1
**place** 211:4
**plaintiffs** 1:4 2:6 2:13,19 3:2 7:16
**plaintiffs'** 8:1 12:2
**plan** 5:11 56:7 85:16 198:18 236:24
**planned** 56:2,4
**platform** 28:12 39:13,16 40:3 41:6 59:2
**platforms** 20:18 39:23 40:12
**play** 112:14 138:18 226:23
**played** 211:14
**playing** 28:10
**please** 9:9,20 10:20 13:16 97:23 103:19 152:15 216:8 221:9 223:20 226:15
**PLLC** 3:3
**PM** 5:16
**point** 9:24 35:15 125:14 167:22 174:9 180:9,13 181:6,17 183:10 186:1 193:1,8,14 195:21 196:22 197:7 203:23

204:18 206:9 207:4 214:19 215:1,11 219:21 220:12 228:7
**pointed** 32:16 50:24 213:1,19
**pointing** 224:13
**points** 50:18 197:9
**polarization** 218:12
**polarized** 32:17 32:18,22 88:11 107:21,23 123:8 143:21 143:25 208:11 208:15 212:11 212:16,18,23 213:5 214:13 215:20 218:23 221:23 223:4
**Policy** 27:22 170:3
**political** 80:14 111:23,24 112:7 133:8 138:6 163:14 163:23 164:4 186:15 187:10 197:12 208:6 232:13 235:6 236:25 237:8 237:16,23
**politics** 22:17,24
**poorly** 209:8
**population** 30:10,16,22 67:11,20 68:2 68:9,16,17,23 71:25 72:5,8 72:10,18,21 77:25 83:22,23 84:5,6 88:11 88:18 89:1

107:18 121:5 140:15 141:24 141:25 142:2,3 142:5,6,7 144:15,16,17 150:18,22 159:12 160:7 160:12 163:14 200:18 222:6 222:17,19 226:10,20 227:1 228:9
**population-wise** 78:1
**populations** 147:18
**posed** 219:1
**position** 23:22 27:23 35:8,9 41:13 60:19 95:15 190:25 192:3
**positions** 24:8
**possible** 4:11 88:25 107:12 165:18 200:19 219:14
**post** 41:1 51:25 61:2 71:12
**posted** 51:14,17 51:20 61:21 70:4,19 108:2 127:24 132:14 152:16 176:5
**posting** 36:12 71:8
**postings** 37:7
**potential** 63:18
**potentially** 125:25 180:4 194:1
**practice** 20:3 27:12
**pre-conditions** 123:8 212:11

Osta Davis                                              August 19, 2022

Page 266

precinct 175:19
  222:18,20
precincts 163:15
  167:3,7
prefer 7:11
preferences
  234:7
preferred 40:19
preparation
  15:6 239:18
prepare 14:2,5
  15:4 26:15
  183:25 184:6
  184:11 202:8
prepared 11:22
  12:22 70:15
  183:22 184:3
  239:18
preparing 41:19
  202:18
presence 32:17
  215:19 218:22
present 49:21
  65:8 79:21
  87:12,16,20,21
  94:25 95:2,4,5
  97:20 99:5
  119:20 120:20
  121:18 123:9
  125:5 126:2
  131:4 173:13
  185:21 186:11
  194:4,7 196:1
  196:3
presentation
  78:19 86:25
  87:7 88:1
  101:19,20
  102:9,16,17
  106:13,18
  107:3 108:11
  119:12 123:23
  130:18 168:4
  168:12 226:17
  231:13

presented 100:6
  119:8 130:7,19
  172:16
presenters
  214:17
presenting
  102:7 178:24
preserve 9:6
preset 60:10
  73:12 85:8
president
  112:11
presidential
  73:15,17,20
  115:14,25
  116:21 117:13
  208:9
press 47:8 207:3
  207:8
presumably
  204:20
presume 47:23
  109:6
pretty 200:4
  216:24
prevent 12:17
previous 13:15
  13:17 22:4
  31:15 139:1
  141:16 151:25
previously
  111:21 125:24
  183:8 195:11
  213:18
primarily 20:20
  26:24 27:5
  33:21,22 38:6
  38:9 40:19
  43:12 47:4
  49:2,20 51:1
  54:15 55:9
  59:1 62:22
  63:17 65:2
  67:11 70:23
  74:3 80:17

83:11 99:16
  100:24 102:6
  115:19 118:14
  122:19 131:13
  133:8 136:15
  170:14 182:3
  186:15 187:4
primary 36:17
  39:11,13,16
  41:6 63:2
  80:24 140:19
  160:2,4
principle 237:4
printout 5:21
  105:2 165:8
  176:24
prior 28:3 29:21
  31:18 71:8
  75:2 79:1 80:1
  80:5 147:24
  205:8 212:20
  214:16
priorities 77:6
  111:10,14
  113:3,6,9,11
  113:16 117:17
  117:18,20,21
  117:23 118:2
  118:18 130:10
  133:11 138:19
  138:20 141:6
  150:13 171:4
  230:6,7 235:23
  235:24
prioritizing
  126:18
priority 107:15
  112:17,22
  113:1 116:13
  138:9,10
  139:14 140:6
  140:11 150:19
  150:20 151:4
  162:18,21,22
  162:25 163:2

private 50:6
privilege 9:10
  85:19 190:13
  190:18,21
  191:14,21,24
  192:1,3
privileged
  105:25 169:25
  190:14 192:3
probably 10:1
  34:13 54:8
  210:23,24
  211:2 229:11
  238:9
proceedings 7:2
  169:18
process 9:4 10:8
  26:22 31:14
  32:9 34:24
  39:21,22,25
  45:4 50:14
  57:24 58:3
  62:17 67:13
  68:18 69:25
  76:24 80:21
  81:2 96:24
  97:2,5,8,11
  98:3 110:16
  111:10,19,20
  113:4,7,10,17
  143:19 148:5
  155:18 170:6
  171:8 183:3
  205:22 210:4
  223:17 224:11
  230:9 235:15
  235:17
processes 11:9
  40:7
produce 17:6
  136:20
produced 58:7
  73:12 120:14
  188:15,20,24
  190:19,20

191:3
production
  15:14,18
  149:19 161:5
  190:21 192:4
Professor
  217:24
program 40:22
  59:11,21,24
  60:4,8
progressive
  172:5
Project 2:13,15
  8:3
promise 169:1
prompted
  214:20
proof 31:12
Prop 5:14 198:9
proportion
  112:16
proportional
  112:14
proposal 4:19
  4:23 5:5,13
  150:16 157:13
  158:13,16
  165:1 178:4,23
  180:25 182:6
  182:11,14
  187:12
proposals
  172:13 195:5,7
  195:9,10,14
  196:4,6,14
  204:23
proposals' 205:3
proposed 102:13
  121:4 126:6
  150:25 173:4
  173:25 174:14
  175:25 176:9
  178:16,25
  179:21,22
  180:8

Osta Davis                                                      August 19, 2022

**protective** 191:6
**provide** 20:21
    170:12 172:4,7
    172:9 219:13
**provided** 64:2
    85:13 133:22
    156:2 172:13
    192:14 231:14
**provides** 25:17
    59:3
**providing** 92:16
    97:21 99:20
**pry** 14:15
**public** 2:16
    13:24 18:10,15
    21:5,10,14
    40:22 41:19,20
    41:25 42:4,9
    42:16 45:15,16
    45:17,19,22,24
    46:2,10,23,25
    47:6,16 48:7
    50:18 51:14,14
    51:17,20 52:1
    62:20 71:8
    86:17,19,22
    88:1 89:8,22
    110:21 140:14
    140:22,24
    141:2 142:23
    142:24 143:1,2
    151:2,7 163:6
    191:3 205:21
    212:3 232:7
**publicly** 61:2
    70:4 78:11
    102:3 108:2
    132:14 176:5
**publish** 41:4
**published**
    217:20 231:15
**pull** 18:12 99:19
    104:20 105:12
    114:10,11
    158:10 175:1

187:13
**pulled** 175:14
**purely** 146:21
**purposely**
    236:24 237:8
**purposes** 10:13
    28:20 227:7
**pursuant** 183:22
    239:4,18
**pursuing** 136:4
**pushed** 121:22
**pushing** 52:6,15
**put** 90:7 104:12
    108:8 120:2
    125:4 152:14
    155:11 164:13
    165:19 175:3
    183:20 188:21
    201:10,11
    220:1,19
**putting** 119:5
    187:24 224:17

---

**Q**

**qualifications**
    239:10
**question** 9:8,9
    9:11,18,19,21
    10:3,17 13:1,4
    13:7 34:5
    79:19 85:18,19
    86:9 87:14,25
    89:11,15 92:18
    103:1 105:5
    114:12 120:15
    130:12,16
    154:5,14,16
    155:14 156:18
    166:6 183:15
    191:23 209:8,9
    215:9 219:1
    225:25 226:5
    238:5
**questioning**
    17:22 191:11

**questions** 9:2,5
    9:12 12:22
    38:13 103:5,7
    103:17 104:3
    150:3 155:11
    166:14 169:6
    169:13 170:1
    184:17 188:1
    189:21,23
    190:2 191:5,6
    191:14 208:2
    210:10,16,17
    210:18,21,23
    228:15,25
    229:3,10,21
    235:7 239:16
**quick** 211:12
**quickly** 200:9
**quite** 37:23
    127:22 130:7
**quote** 128:16
    165:1 168:8
    186:18

---

**R**

**R** 2:1 5:13,14
    198:9,17,18
    239:1
**R.W** 3:8
**race** 22:25 23:2
    23:2,5 33:1
    73:6,8 74:1,1
    74:14,19,20,24
    75:5,12,22
    76:10,13 78:4
    78:4,23 79:8
    79:23 88:17
    127:9 147:12
    197:14 208:8
    208:10 229:24
    230:3
**races** 73:9,11,14
    73:16,16 75:13
    75:16 76:5
    217:5 218:24

218:25 228:9
**racial** 32:23
    33:2,7 66:10
    66:14 83:13
    218:11
**racially** 32:17
    32:18,22 88:11
    107:21,23
    123:8 143:21
    143:25 208:11
    208:14 212:11
    212:16,18,23
    213:4 215:20
    218:23 221:23
    223:4
**radar** 220:2
    224:7,9
**raise** 219:20
**raised** 127:21
**raises** 235:3,6
**raising** 220:5
**ran** 123:25
    208:14
**rapidly** 228:4
**rate** 147:17
    210:5
**rates** 143:16,19
    147:8,12,14,20
    147:25 148:2,6
    148:9,24
**RCW** 239:4
**RDR** 1:22
    239:22 240:23
**re-post** 152:16
**reach** 168:18
**reached** 47:11
    74:18
**reaching** 218:16
**read** 7:21 16:3
    25:22,25 26:2
    32:13 104:10
    130:13,14,16
    141:9 155:13
    160:14 183:6
    216:2 235:4

236:22 240:2
**reading** 26:15
    101:22 147:22
    216:3
**ready** 114:4
    210:14
**real** 10:11
**reality** 111:23
    112:7
**really** 117:5
    200:9
**reason** 9:19 10:2
    55:13,16 61:18
    79:7,8 85:18
    91:6 98:19
    114:21 149:18
    184:11 206:18
    206:21 209:10
    209:13 240:5
**reasons** 223:15
**Rebalanced**
    5:14 198:10
**recall** 15:22 18:9
    21:8 25:25
    26:4 29:16
    31:18 32:1,15
    34:14 36:23
    38:25 41:9
    45:7 46:5
    47:20 48:22
    49:4,11,14
    50:16,17 51:7
    52:5,8,13,14
    52:18 53:9,20
    54:10 55:1,19
    58:19 59:16
    61:6,10,19
    64:6,7,16,19
    64:25 65:8,17
    65:24 66:4,11
    66:12,16 67:7
    69:2,9,19,20
    69:22,24 70:2
    71:9 73:14
    75:24,25 77:8

Osta Davis

August 19, 2022

Page 268

78:9,12,13
81:4 84:14,16
85:25 86:2,11
86:13,16,25
87:2,5,7,11,15
87:18,23 88:3
88:7 90:11
94:15,21 96:2
97:14 99:5,20
100:17,20
101:17,20,22
102:4,8,10,10
102:22,24
103:5,8 104:9
106:5,16 107:7
108:19 111:6
116:19,20
117:22 118:2,4
118:8,14,25
120:23 121:20
121:25 122:6
122:18 125:1
126:4,20,24
127:3 128:7
129:6 131:16
132:5,6,8,17
137:5,6,14,18
138:13,22
139:6,11,17
141:12 142:13
143:2 144:10
144:21,22
145:6,9 149:13
149:14,25
150:2,5 151:7
151:10,12
153:13,19
154:21 155:1
156:12 159:8
160:9 161:6,15
163:21 164:22
165:3 166:5,16
170:16 171:11
171:12,16
172:17,22

173:4,6 174:1
174:6,11,13
177:3,6,9
180:19,23
181:2 185:6
186:17 194:23
196:4 197:2
198:22,24
199:1 200:24
201:19 202:8
202:18,24
203:6,8,18
204:24 206:12
209:12,15,16
209:20,24
211:19,22,24
213:11,14
218:17 220:8
228:7,11
**receipt** 66:23
**receive** 18:2,5
  20:11 60:2
  71:15 85:15
  171:3 183:24
  206:4
**received** 11:13
  20:1,22 34:12
  34:14 36:15
  64:20 66:21
  67:1 68:21
  69:11 187:16
  206:2
**receiving** 86:16
  125:1 164:22
  177:3,6,9
  194:19 196:4
**receptive** 122:15
**recipient** 124:23
**recognize** 214:1
  217:18 223:24
**recollection**
  19:19,25 40:7
  42:25 48:2
  50:25 57:7
  76:5 93:7,12

95:3 98:2
119:7 121:1,21
128:8 129:1
142:4 148:18
159:6 162:19
172:11 179:4
179:17 181:3
181:11,21
185:10 187:9
194:15,25
196:17 200:4
203:2 207:7,19
213:17 214:11
220:9
**recommend**
  192:7
**reconcile** 204:23
**reconciliation**
  205:22
**reconciliations**
  207:14
**reconciling**
  205:14
**record** 9:4,7,15
  10:11,14 12:16
  52:24 53:2
  113:24 114:1,2
  114:5 146:14
  169:17 188:25
  189:4,6,9,12
  189:13,16
  210:11,15
  211:7 238:15
  239:9
**recorded** 11:19
**records** 15:22
  15:25 17:5,8
  17:11,16 18:3
  18:6,15,15
  21:5,9,14
  191:4
**recurring** 53:6
**redistricting** 5:8
  5:10,11 6:3,6
  10:8 11:13

13:22 18:6
19:1,3,6,9,10
19:17,18,21
20:6,7,12,19
21:7,21 22:4
24:7,19,20
28:3,11 29:21
30:12 31:14,19
32:9 33:16
35:9 36:10,13
36:14 37:22
38:20 39:17
40:2,6,9,18
41:5,7,10,14
42:12,14,18
44:25 45:21
49:9,12,19,24
50:1,14,23
51:3 52:6 53:4
53:15,21 55:6
55:14 56:10
58:3,7 59:2,6
59:14 60:10
62:17,21 63:9
63:19 65:18
68:25 69:25
71:3 73:4,11
80:21 81:2
83:12 84:2
85:7,16 96:11
96:14,24 97:2
97:5,8,11,15
98:6 103:24
105:1 106:5
111:10 113:4,7
113:10,17
114:14 140:25
148:5 153:16
155:15,16,18
156:2,9,16
165:14 166:21
170:3,5 171:8
171:14,19
172:10,12
173:24 174:2,7

174:14 175:2
175:23,24
176:10 183:2
184:22 201:25
210:3 211:15
212:20 214:7
214:12,15,21
216:5,10
219:25 224:14
224:14 228:2
230:9 235:3,6
**Redistricting's**
  160:14
**redrawing** 107:6
  107:9,16 108:5
**redrew** 107:2,4
**reduce** 77:4
**reduced** 239:7
**reelection** 101:6
**refer** 17:8 29:24
  136:10 198:18
  217:17
**reference** 17:14
  67:13 126:12
  151:24 227:13
**referenced**
  123:23 152:6
  214:18
**referencing**
  112:10 128:8
  168:11
**referring** 29:11
  29:25 42:17
  93:10,11
  116:25 136:7,8
  154:7 159:2
  167:25 175:11
  178:15 180:12
  193:21 220:3
**reflect** 27:11
  112:12 205:8
**reflected** 74:21
  111:23 237:15
**regarding** 6:2
  10:17 18:6,10

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Osta Davis                                    August 19, 2022

Page 269

19:2 92:23
93:6 94:3,9
128:25 133:7
142:4 143:3
151:2,7 160:24
161:18 162:9
165:1 171:4
173:8 181:6
182:19 187:10
195:14,17
196:7,15 206:3
209:20,24
214:12 235:25
**regards** 21:9
172:13 181:20
194:25 200:2
**region** 29:22,24
30:2,9 31:2,16
47:16 51:4,6
58:5 100:15
102:15 118:5
126:15 137:12
140:4,22 163:7
172:20,23
173:25 181:14
185:3 195:14
199:9,19 200:2
212:12 217:7
**regions** 45:23
47:2,5
**register** 146:19
146:24
**Registered** 1:23
239:22
**registration**
26:25 146:17
146:22 147:3,5
147:8,12,14,17
147:20,25
148:6,9,14,24
149:3 217:4
**regroup** 238:10
**regular** 53:6
57:4 63:8
**regularly** 82:11

**reject** 196:15
**relate** 237:16
**related** 15:15,19
21:7 22:19,21
22:23,25 32:12
44:4 75:12,16
75:22 107:10
128:21 133:18
180:18 197:13
208:7 218:23
**relates** 31:12
163:24 216:5
**relation** 15:24
21:4 141:23
**relationship**
135:9
**relative** 73:5
228:9 239:11
239:12
**relayed** 193:16
194:17,21
**release** 40:21
52:9 67:18,19
67:20 68:2
81:7 102:7
110:20 173:2
**released** 51:14
52:16 61:12
68:14 70:12,14
71:1 78:10
93:5 101:19,25
102:3 108:2
115:6,10
120:11 132:14
**releases** 47:8
**relevant** 219:13
**relied** 67:19
**remember** 13:9
13:14 21:15,23
23:9,10 27:14
35:24 44:5,7
54:18 62:10
63:7 66:3 67:9
69:13 78:16
80:3,6 83:14

91:13,18,21,22
93:14,23,24
94:2,8,24 95:4
95:20 97:17
100:4,5 101:16
102:6 103:1,7
107:10 109:14
110:7,7,9
111:14 119:18
119:22,25
122:25 125:11
125:14 126:10
127:7 129:9
139:2 141:2
143:14 144:8
144:11 147:22
151:13,14,15
151:16 154:23
154:24 172:24
173:1,19
174:16 176:12
181:3 183:11
186:13 198:15
201:15,18
208:6 211:17
216:9,17
**remembering**
139:25
**remote** 104:24
177:1 224:19
225:2
**Renton** 139:4
**reoccurring**
49:20
**reopen** 175:15
191:7,13
**repeat** 87:25
89:15 215:9
226:4
**rephrase** 13:2
61:15 78:7
**replacement**
56:14
**report** 38:6
56:22,25

101:21,22,25
107:7 168:22
216:21 217:15
217:17,18,21
217:22 218:4
219:9 220:18
222:25 223:12
**reported** 1:22
38:18 56:24
164:5 240:23
**reporter** 1:23
9:14 12:9,14
32:3 112:5
113:24 130:13
141:11 155:3
164:11 169:3
169:23 176:22
187:18 189:1,5
190:7 197:22
201:4,8 203:13
213:24 217:25
220:16 227:10
233:15 236:14
239:4,22
**reporting** 1:22
56:23 240:23
**represent** 7:24
7:25 8:10,16
149:21 161:3
187:21 191:18
217:14 234:19
**representation**
112:14 237:17
237:21
**representative**
1:11 65:7 66:9
98:17 100:2
199:2
**representatives**
53:18 111:17
171:6
**represented**
53:14 180:15
190:14
**representing**

7:16 14:21
49:16
**Republican**
100:13 133:12
133:13 163:19
178:23 179:20
180:17 181:7
196:24 197:3
198:18 227:7
227:17 231:7,8
231:21
**Republicans**
79:13 180:11
232:8,18
**request** 15:25
17:14 21:5,9
32:3 58:14
64:18 183:22
183:24 191:4,5
217:25 224:5
227:10
**requested** 60:1
60:16 184:11
231:18
**requesting**
170:16 224:4
**requests** 15:14
15:18 17:6,8
17:15 18:2,5
172:24
**require** 121:23
215:5,14
228:18
**required** 41:2
68:25 78:2
130:6,23 131:5
145:11,16,17
145:21 179:6
205:15
**requirement**
181:23
**requirements**
85:16,23 86:3
86:7,14 87:23
88:4 89:3,6,20

Osta Davis

August 19, 2022

Page 270

90:1 91:8
130:9,21
145:12 228:17
**requires** 236:4
**research** 214:14
214:21 215:18
219:22
**researching**
214:6,9,11
228:17
**resembled** 200:5
**Reservation**
107:11 108:6
109:13,22
114:19 151:1
**Reservations**
143:7
**reserve** 189:24
191:7,22
238:14,16
**reserved** 238:21
**residents** 143:2
**Residing** 239:24
**resolve** 166:18
191:8,14
**resolved** 192:6
192:16
**resource** 223:17
**resources** 36:11
38:12 230:20
**respect** 135:7
**respected** 88:25
111:24
**respective** 38:11
65:3,16
**respond** 20:4
122:13 127:1
203:17
**responding** 10:3
127:3
**responds** 150:16
151:1 225:24
**response** 13:15
13:17 17:5
191:3

**responses** 9:15
11:18
**responsibility**
181:13,14
219:13
**responsive**
143:1
**rest** 111:4
130:12 140:18
**restate** 215:9
**restated** 203:25
204:4
**result** 85:19
**results** 60:9,10
76:4,6 116:5
180:18
**résumé** 35:2
**retain** 111:4
**retained** 14:25
14:25 230:12
230:20,22
231:5,8 232:11
**retaining** 220:11
**retention** 18:16
**return** 192:20
211:13
**returned** 55:23
55:25 56:16
57:1,9 206:1
**revealed** 127:24
**review** 11:22
15:6 206:3
239:8
**reviewing** 228:7
**REYES** 2:15
**right** 13:17
17:17 18:1
30:7 37:13,18
37:24 46:18
51:6,22 52:24
53:1 54:21
58:17,24 63:10
68:16 73:14,25
82:13 104:15
105:19 113:23

114:16,19,23
115:21 117:4
132:16 139:15
142:7 146:17
155:5 157:11
158:21 160:5,5
160:6 164:9,15
165:14 169:2
175:18 176:19
182:21 187:25
191:7,17 193:9
203:20 205:23
220:15,22
234:8
**rights** 2:13,15
8:3 31:16 87:8
87:10,24 88:4
89:3,5,18,20
90:2,10,18,23
91:8,11,20,23
92:20,23 93:4
93:10 94:3,9
97:12 106:14
120:17 121:18
121:22 122:5,8
123:3,7 125:9
126:22 128:9
129:18 145:4,8
150:15 170:13
182:15,20
211:23 219:2,4
228:17 238:14
238:16
**Roger** 199:2
**role** 25:16 36:10
38:8 39:10
44:3 45:9
95:16 136:3
185:14,15
**roles** 36:12
41:13
**room** 7:22 71:22
109:3 193:2,12
194:4 201:17
207:12,13

226:22 227:6
**roughly** 49:7
89:1 148:2
195:10
**round** 30:11
110:21 228:1
**Ruble** 95:14
**rule** 88:25
**rules** 8:25
**run** 123:22
134:11 208:2
208:11
**running** 34:12
49:3 133:25
134:4 224:11

―――――――――
**S**
―――――――――
**S** 2:1 4:8
**safe** 122:21
131:8,14,17,20
131:21 133:12
133:12
**Sarah** 5:22
220:3 224:2
**Sarah's** 220:1
**saved** 202:22
**saw** 44:2
**saying** 17:9
92:11,12 112:9
121:25 122:25
140:6 151:10
151:16 226:15
**says** 9:9 12:15
125:6 145:3
150:14,15,25
151:19 177:13
178:18 180:8
180:12 182:9
186:2 202:3
218:11 227:5
235:6
**scheduled** 45:20
98:20 173:17
173:17
**scheduling** 5:3

47:25 49:3
173:8 216:13
**school** 22:10,11
27:6 67:23
**scratch** 150:2,4
221:11
**screen** 21:17
104:25 114:12
149:23 155:4
158:6 160:16
164:17 165:12
165:13,19
167:2 168:25
175:3 198:3
201:1,2,11
203:12,15,19
226:16 233:20
233:22 234:5
**scrolling** 199:11
**SDC** 5:7 193:1
193:11
**seal** 191:6
**search** 18:15
**searches** 15:13
15:17 21:6,11
36:12
**seat** 116:20,21
116:24 117:1,7
122:21
**SeaTac** 23:15,23
25:2 147:4
**seated** 110:8
**seats** 115:13,14
115:20,22,23
117:2,2 133:12
133:12,13,13
**Seattle** 2:4 3:11
77:11 147:3
239:24
**sec** 202:7 234:6
**second** 24:17
38:14 161:3
164:8 169:16
173:2 192:25
193:7 194:4

Osta Davis                                              August 19, 2022

196:20 203:14
220:19 221:14
222:1 225:24
**Secretary** 1:6
**section** 6:6
   153:11 236:18
   236:23
**sections** 150:14
**see** 9:14 50:14
   73:12 91:11
   104:17 111:11
   149:6 158:6
   163:21 183:11
   188:18 195:4,6
   198:9 199:11
   205:21 214:7
   216:22 219:18
   224:12 226:1
   226:13 233:24
**seeing** 105:21,24
   162:19 166:20
   202:6,13
**seen** 175:25
   176:4 183:4
   195:9 202:21
   234:17
**segues** 213:20
**select** 110:1,4
**senate** 5:6 18:21
   24:1 25:5,6,11
   97:25 98:4,22
   108:13,15,17
   115:13,22
   116:13,21,24
   117:1,7,12
   170:4 183:1,17
   183:24 230:20
**Senator** 100:13
   100:13,20
**senators** 25:13
   25:18 100:11
   100:17 101:1,4
**send** 19:2 20:11
   21:14,18 39:24
   40:10 58:11,15

58:17 59:1,7
60:14 61:14,18
61:24 62:8
64:11,12,18,19
149:10 165:15
176:9,20,23
177:2 198:13
206:6,18,22
207:16,17
224:1
**sending** 58:23
   104:9 106:5
   111:1,1 149:13
   149:14 153:13
   156:12 161:6
   167:18 198:15
   201:15,20
   206:12 215:24
   216:1 226:17
**sends** 16:3
**Senior** 95:16
   170:3
**sense** 9:22,23
   11:7 32:16
   37:25 38:2
   58:21 68:13
   73:18 75:1
   78:7 111:8
   129:16 131:7
   145:11,13
   152:7 187:11
   193:20 212:10
   215:20 216:2
   218:24 220:2
   222:16 226:16
   226:25,25
   230:5
**sent** 21:15,16
   35:2 47:9
   60:18,22 61:11
   61:13,20 62:2
   62:3,7 71:16
   84:21 111:7
   149:7 153:22
   153:23 156:14

158:16,18
160:22 161:1
161:20,21,23
162:1,5,6
164:25 167:10
171:22 175:9
177:7,10
182:13 183:16
187:16 188:4
198:12 200:6
201:14 202:3
203:16 206:14
207:1,18,19
213:17 214:3
215:2 216:3
219:16
**sentence** 183:19
   183:21 194:16
   204:25 205:1
   227:24 235:2,4
   236:22
**sentences** 205:1
**sentiment**
   121:25 151:13
**sentiments**
   140:25
**separately** 10:18
**Sepe** 3:8 8:12
**September**
   51:15,20 52:9
   55:21,24 70:5
   70:16 81:7
   118:13 121:3
**serve** 113:11
**served** 17:18
   45:11,13
**session** 217:23
**sessions** 41:20
**set** 7:3 38:5,8
   51:17 67:2,3
   69:8,15 70:1
   77:3 84:4
   156:21 230:6,7
   239:19
**sets** 67:4,6,7

84:2,7,11
**settled** 212:20
**seven** 34:11
   174:24 204:19
**shading** 66:11
   66:14
**shaking** 9:16
**share** 71:5,13
   100:25 104:24
   104:25 114:12
   140:9 149:24
   158:6 161:2
   164:17 165:13
   175:3 198:3
   201:11 213:4
   213:12 233:21
**shared** 56:19
   71:10,11 100:2
   101:3 117:18
   124:10,12
   161:4 213:15
**sharing** 203:19
   212:14 233:19
**Sharon** 98:18
**sheet** 170:19
   240:1
**shift** 180:9,13,15
   180:17 233:5,5
   233:7,12
**shifted** 83:21,22
**shifting** 182:4
**shifts** 233:1
**short** 227:18
**shortly** 8:13
   33:14
**shot** 155:4
   160:16 168:25
   201:1,3 203:12
   203:15
**shots** 21:17
**shotting** 165:12
   226:16
**show** 98:20
   99:17
**showed** 99:23

**showing** 105:14
   158:9 222:21
**shows** 166:22
   167:21,22
   168:19 202:4
   222:18
**side** 160:6
   193:13
**sign** 11:24 239:8
**signature**
   238:16,21
   240:18
**significance**
   218:21,22
**significant**
   14:14,16,19
**significantly**
   30:11,13
   140:16 167:23
   168:16,16
   174:7
**signing** 146:19
   146:23 239:9
**similar** 25:20
   33:8 108:13,15
   133:11 140:9
   211:2
**similarly** 30:23
   44:22 85:6,12
   172:11
**Simone** 2:8 8:4
**Simple** 9:11
**simply** 13:8
**Sims** 4:10,12,14
   4:16,18,20,22
   5:2,5,9,15,17
   33:21 34:1,7
   35:7,13,14,17
   36:11,18 38:17
   38:20 41:18
   42:4 43:8
   47:23 48:1,6
   48:19,20 49:5
   49:6,16,17,20
   51:13 52:3,16

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Osta Davis                                                    August 19, 2022

Page 272

53:5 56:9,23 56:24 57:1,2 58:1,12,15,16 58:24 59:8,13 59:20 61:12 64:12 70:5,15 70:19 71:1,16 72:16 74:8,14 74:17,23 75:3 75:4,21 78:11 78:15 79:1,2 79:22 80:17 81:15,21 82:2 82:16 85:10,12 86:5 87:21 91:16,18,23 92:19 93:9,17 94:5 95:25 96:1 97:2 99:3 99:4,5,23 100:6,14 101:3 101:15 108:2 109:9 111:2,9 112:9,17,21 115:6,9 116:15 117:10,16,24 118:3,8,22 119:4,11 120:16 121:1 122:10,15 123:25 125:15 125:23 126:17 126:20 127:1,9 127:12,21 128:14,19,24 129:8,17,23,25 130:5,7,17 131:4 132:14 133:6 134:15 134:18 135:5 135:10,14 138:9,17,22 139:13 140:7 141:12,18 142:9,25 143:9

144:12 145:3,7 145:9 150:1,7 150:19 151:4 153:6 154:20 159:7,9 164:25 165:4 167:10 167:17 168:8 168:19 175:14 175:25 176:5,9 177:8 178:22 179:10,22 180:19,23 181:11,18,21 182:7,13,18 185:16,21 186:4,13 193:16 194:8 194:13 195:22 195:24 196:4 196:15,23 199:23 200:21 201:14,18 203:16 205:17 205:18 206:14 206:22 213:8 213:16 214:4 215:25 216:10 219:8,14,16,21 223:12 225:22 226:18 235:23 237:14
**Sims'** 141:5 173:1 179:23 181:4 237:11
**Sims's** 48:3 150:16 166:19 166:24 167:20 182:11
**single** 69:8,15,21
**situation** 25:20 86:2 127:4 179:24 181:15 229:12
**six** 34:10 204:19
**size** 222:17

**skim** 183:12
**skip** 222:7
**SLeeper@Ca...** 2:11
**slide** 102:7 221:10,11,12 221:13,18,25 222:1,3,10 226:17
**slides** 5:21 119:9 222:8,9
**slight** 72:10 195:12
**slightly** 56:20
**small** 96:15
**smaller** 10:1
**social** 47:9
**software** 39:12 39:13 40:5 63:21,23 66:6 66:7,11,14,15 207:15
**solely** 196:25 197:3
**soliciting** 45:22
**solid** 168:5,9,20 180:2
**somewhat** 12:8
**Sonni** 2:14 8:2
**Sonni@UCL...** 2:17
**soon** 105:19 113:21
**sophisticated** 60:4,6 228:19 228:22
**sorry** 11:2 19:3 20:10 22:24 26:19 27:7 28:13 31:10 33:12 34:22 40:21 42:13 45:16 47:12,24 49:10,24 50:12 51:5,19,24

53:12 57:4 59:19 60:15 61:15 66:14 67:2 70:13,24 71:14 75:10,20 76:16 78:7 79:20 81:11 84:1 86:3,5 87:14 89:4,17 89:18 90:16,21 92:9 94:4 95:1 95:6,12 96:4 98:12 103:23 104:15 107:5 107:20 108:14 108:19 109:6 110:10 114:21 120:15 130:4 132:7,19,20,23 136:12 140:10 141:6,19 142:16 145:1 145:17 148:23 149:16 154:11 154:13,15 155:5 157:1 160:4 162:22 164:7 165:2,11 166:5,11,12,14 168:18 174:22 175:12,21 176:24 180:1 182:12 183:20 187:17,23 188:9,25 190:11 192:24 193:3 194:20 196:10,20 201:6 202:11 202:16 206:9 206:10 207:4 209:8 210:6 222:13 228:13 229:4,7,9
**sort** 38:2 39:19

57:16 58:23 71:23 72:12 76:24 80:15 111:8 163:9 181:13 186:24 211:15
**Soto** 1:3 2:6 7:16 18:1 240:20
**sounds** 31:23
**south** 2:4,22 28:24 51:1 137:9
**spaced** 108:24
**sparked** 216:5
**speak** 10:20 38:7 96:13 97:10 98:5 184:2 231:25
**Speaker** 95:10 95:11
**Speaker's** 96:5 188:10
**speaking** 9:13
**speaks** 220:25 221:21
**special** 8:15 20:21,24
**Specialist** 27:3 27:10,12
**specific** 16:21 18:13 24:11 27:25 31:4 33:20 43:11 47:1 50:23 58:20 72:23 73:8,9 75:5 76:2 84:4 91:15 126:6,13 127:20 129:9 138:19,21 139:2 141:18 141:18 148:17 149:18 151:10 151:12,15 154:23 159:9

Osta Davis                                        August 19, 2022

Page 273

172:25 173:23 183:10 186:17 196:7 224:5
**specifically** 11:8 35:9,12 39:1 46:24 47:21,23 74:5 106:16 111:6 112:25 126:14 138:7 155:1 197:13 217:5 228:11
**specifics** 194:23
**specify** 132:11
**speculation** 18:23 21:2 30:4 40:15 44:16 45:6 53:24 55:8 60:24,25 64:15 68:6 84:24 85:5 90:25 119:14 120:10 121:13 125:20 126:8 131:1 133:16 145:25 147:16 152:4 161:12 174:4 176:3 179:16 182:17 184:8 184:14 208:18 218:7 220:25 221:7 222:15 227:20 230:17 230:25 231:11 231:24 232:5 232:15 233:11
**spell** 16:11 43:14
**spent** 28:10
**split** 72:3 76:24 77:1,7,9,10,19 77:22 139:3,3 139:5,9
**splits** 77:4 138:25 141:15

**splitting** 76:18 78:2 112:1 200:16,22
**spoke** 35:22
**spring** 2:22 87:6
**SS** 239:2
**stable** 80:20
**staff** 5:7 29:13 35:3,6 36:14 37:3,14 38:10 38:12 40:19 41:1,21,21,23 42:3,20 44:2 44:14,19,25 45:1 54:8,11 55:11 60:1,13 60:16 62:22 63:5,9 64:10 65:2,13,15 84:19,21 95:5 95:6,7,8,13 96:5 110:8 124:5 127:4 133:24 134:3 135:8,14,24 136:2,8,10,13 137:3,11,18,24 137:24,25 138:7 143:11 143:25 144:23 148:13 156:2 185:11,15 193:2,11,20 206:3 207:12 231:20 232:1
**staffer** 62:2,3 155:16
**staffers** 71:5,9 213:13
**staffing** 41:18 42:6
**staffs** 135:12,13 231:15,22
**stages** 36:6
**stamp** 149:20

**standing** 125:15 127:5
**stapled** 149:21 187:22
**start** 9:1 36:3 50:25 56:8 58:2,5,6 68:22 158:14 225:15
**started** 21:22,25 23:20,21 31:14 32:8 36:1,1 37:8 52:6,7,15 56:10
**starting** 31:19 218:10 235:3
**starts** 180:8 227:8
**state** 1:6,7,11 3:7 6:2 8:10 10:16,23 11:11 16:2 23:24 24:1 25:4,6 27:20 45:23 58:11 67:16 73:5,8,25 74:19,20 75:11 76:8,12 78:3 78:22 90:8 109:23 111:10 111:23,24 112:8,10 115:13 117:1 122:8 131:22 140:18 147:6 170:4 180:15 182:1,4 188:16 188:24 190:19 192:15 197:13 210:19,20 211:11 214:16 214:25 215:23 219:23 223:5 229:24 232:19 235:17 237:15 239:2,5

**stated** 87:23 107:15 113:3 214:6 237:10
**statement** 4:14 123:12 140:21 149:24 150:1,5 150:14,23 152:24 153:6 179:12 193:22 195:3 217:2 230:2 232:10 235:10,21
**statements** 193:24
**STATES** 1:1
**statewide** 76:4 112:13
**statistical** 59:3
**statistics** 158:10 160:5
**statute** 77:4
**stay** 211:4 214:24
**stays** 227:7
**steady** 233:3
**stenographica...** 239:6
**steps** 90:15,17 90:20,22 91:6
**STEVEN** 1:6
**stint** 24:17
**stipend** 23:22
**stood** 185:4
**stop** 16:7 68:20 203:19
**stories** 31:4
**strategies** 100:24
**Street** 2:10,22
**strictly** 112:18
**strike** 39:19 46:24 49:25 84:18 86:4 90:21 91:17 108:19 132:23

136:12 182:12 221:4
**strokes** 88:6,8,9
**strong** 118:25 125:16 128:9 128:10,13 131:7 138:1 163:6 182:3 215:19 216:25 218:12,13
**strongly** 111:14 121:24 235:23
**structure** 80:24
**study** 22:16
**stuff** 200:8 214:7
**Stultz** 171:22,23 172:11
**subcategories** 132:2
**Subject** 92:21
**submit** 34:24 61:10
**submitted** 61:9 61:15,17 85:11 86:14 153:22 173:2 208:3,16
**subpoena** 190:20
**subsection** 236:21,23
**substance** 170:11
**sudden** 202:9
**suffice** 10:17
**suggest** 17:13 78:22,25
**Suite** 2:4,10 3:4 3:11
**summarizing** 93:13
**Summit** 2:3 8:16
**support** 25:17 38:9 217:5 218:14

Osta Davis                                                   August 19, 2022

Page 274

| | | | | |
|---|---|---|---|---|
| **supported** 25:16 27:5 | **tables** 85:13 | 132:12 136:6 226:7 | 181:16 216:13 217:4 227:3 | **theory** 23:5 |
| **suppress** 112:19 | **Tacoma** 1:20 7:1 77:13 | **talks** 90:2 227:24 | 232:1 | **thereof** 239:13 |
| **Supreme** 6:2,3 207:5 208:3,16 234:11,20 235:21 | **take** 9:25 10:1 12:14 19:3 21:17 33:9,12 42:23 47:14,24 | **team** 43:9 54:15 63:7 71:11,14 71:17 108:12 108:16 124:11 | **testified** 7:6 114:22 175:8 175:16 | **thing** 26:18 83:6 93:16 160:10 199:5 225:12 **things** 5:18 13:5 13:9 21:11 |
| **sure** 15:16 20:21 21:3 30:7 52:21 62:6 93:19 95:17 106:3 113:2 115:5 116:5 137:13 139:23 141:11 153:2 153:14 156:14 157:2,25 162:12 170:25 178:1,9 186:8 187:23 210:23 223:16 | 52:19 53:12 57:23 60:15 70:13,24 71:14 71:19 76:19 81:11 89:18 90:15,17 91:6 104:25 113:21 114:7 118:7 120:1 132:20 141:19 142:14 142:16 146:10 155:10 157:12 159:22 165:13 166:10 183:9 183:12 188:13 | 124:13 135:6 136:14 138:1 148:20 216:12 216:13 **teams** 39:11 **technical** 66:8 **technically** 65:16 **techniques** 221:23 **tell** 7:5 9:20 13:1 13:16 21:22 23:8 24:24 26:20 28:6 | **testify** 12:20 239:14 **testifying** 12:10 142:24 **testimony** 12:5 37:11,16 79:11 108:10 116:3 117:15 123:5 127:18 143:1 151:2,7 160:24 161:18 162:9 239:16 **text** 20:8,11,20 21:11,18 34:8 186:6,8 | 23:5 37:7 50:13 63:17 111:11 137:22 198:21,22,24 224:24 229:21 **think** 17:18 28:17 46:7 83:13 92:22 96:16 109:19 114:7 122:19 125:24 128:6 140:15 174:16 188:12,18 190:4,14,24 |
| **surname** 102:11 103:10,14 | 189:2 198:3 200:9 224:18 234:4 | 50:1 80:10 91:10,18,25 120:25 125:8 | **thank** 10:22,24 53:2 58:17 105:3,11,17 | 191:9 212:5 213:20 219:6,7 221:10 223:11 |
| **surnames** 103:10 | **takeaway** 223:3 **takeaways** 109:15 110:5,9 228:17 | 131:14 165:8 171:1 172:3 179:3 197:11 216:7 222:8 | 124:18 130:15 141:17 146:14 154:10 157:9 158:7 164:12 | 225:12 228:12 232:3 **thinking** 66:18 66:23 192:10 215:1,11,13 |
| **surprised** 134:19 | **taken** 21:20 155:4,12 | **telling** 85:18 **ten** 46:12,14,18 | 166:1,9,12 167:15 169:15 | **third** 193:14 218:10 235:2 |
| **surprising** 162:13 | 160:16 168:25 201:1 203:15 | 53:16 94:20 96:16 99:13 | 169:19,21 189:12 190:10 | **thirsty** 71:22 **thoroughly** 26:7 |
| **Survey** 67:9 159:13 | 239:6,17 **talk** 8:1 34:25 | 182:2 228:4,23 **tend** 71:25 | 192:17 199:15 202:15 203:14 | **thought** 76:24 123:1 129:17 |
| **SUSAN** 1:3 **swap** 211:5 | 57:24 58:20 97:1,4,7 98:16 | 232:18,22 **term** 28:22 30:1 | 210:11,16 211:10 217:12 | 180:4 181:11 181:12 193:3 |
| **swing** 227:9,12 227:18 | 98:17 100:11 100:14 101:6 | 42:11 129:6 **terms** 28:21 | 217:13 223:22 223:23 228:25 | 219:12 **thoughts** 178:23 |
| **switch** 222:13 **switched** 154:18 | 216:21 235:4 **talked** 10:14 | 45:14 57:22 116:22 122:16 | 234:8 238:12 238:16,19 | **thread** 188:4 224:1 |
| **sworn** 239:14 **sworn/affirmed** 7:5 | 64:8 80:22,23 97:17,24 | 130:20 131:20 136:3 147:11 | **thanked** 119:7 **Thanks** 11:1 | **three** 34:13 98:25 100:10 |
| **system** 80:15 | **talking** 9:3 38:15 53:4 | 160:2 163:9 167:1 173:23 | 105:20 149:6 153:4 238:18 **theirs** 107:15 | 180:9,13 195:12 196:15 |

---

**T**

---

**T** 4:8 7:8 211:8 229:16 239:1,1

Osta Davis

August 19, 2022

Page 275

196:17,19
204:10,15,19
206:10 221:11
221:13
**Thrift-Viveros**
2:20 4:3 7:9,13
8:20,23,24
10:12,25 11:4
15:24 16:11,16
16:18,24 17:2
17:5,10,17,20
17:23,25 18:24
19:8,24 21:4
23:2,5,8 26:11
28:19 29:10,17
30:6,24 32:4
32:21 35:4
36:17 37:13,18
40:12,20 41:3
41:16 44:18
45:2,8 47:6
49:15 51:24
52:14,19,22
53:1,3 54:1
55:12 57:8,22
59:4 61:4 62:1
64:7,17 65:19
67:7 68:8
69:20 70:12
72:16 75:8
77:8 79:14
81:10,20 82:1
83:6 84:10
85:1,9,21
86:11 87:19
89:2,12,14
91:3 92:9,15
92:18 93:2
94:10 98:1
101:10 102:23
103:20,22
104:2,6,14,18
104:21,23
105:6,10,12,16
105:18,21,24

106:2,4 108:14
113:20,23,25
114:4,6 115:21
116:6 117:19
119:16 120:12
121:15 123:11
123:24 124:15
124:19,22
125:3,22
126:11 128:7
128:23 129:14
130:14 131:3
132:13 133:10
133:18,23
135:3 138:13
141:9,17 144:3
144:7 145:22
146:2,8,11,13
146:15 147:19
149:16,25
150:11,21
152:10,14,18
152:21,24
153:3,5,10,15
154:6,9,11,15
154:16 155:5,9
156:19,23
157:1,4,7,10
157:12,18,23
158:2,4,8,12
158:14 159:4,8
159:19,20
160:17,20
161:1,6,15,20
162:15,21
163:8,17,25
164:7,12
165:11,20,24
166:2,4,7,10
166:13 169:5,8
169:12,14,21
169:24 170:2
174:6,25 175:1
175:5,12,18,21
176:6,14,18,23

177:3 179:19
182:21,24
184:10,16
187:13,15,19
187:21,25
188:14,17,19
188:23 189:2
189:11,15
190:1,9,11,17
190:23 191:2
191:12,20
192:2,9,13,17
192:20,23,25
193:5,7,11
196:6 197:19
197:23,25
198:5,8,11
199:12,14,16
200:1,7 201:2
201:5,10,13,24
202:11,14,16
202:18,25
203:11 205:16
206:10,24
208:1,20 209:7
210:8,14 211:5
217:13 223:23
**throw** 236:12
**ties** 100:15
**time** 10:15 24:10
28:10 33:12,23
34:2,3,23
49:18 57:8
69:16,21,22,24
95:7 98:20
103:1 109:14
127:19 139:22
145:4 152:8
158:1 167:17
180:21 189:24
190:3,5,6
192:14,15
194:12 195:10
195:16,23
201:18,20

204:13,20,21
205:7,9,12,17
207:3 211:10
211:22 215:2
215:11 218:19
219:21 221:1,3
223:16 227:22
229:1,5,11
232:9 239:10
239:17
**timeframe** 211:3
**timeline** 5:7
183:23 220:9
**timelines** 100:23
**timely** 113:13
**times** 24:9 34:13
49:18 58:4,6
61:10 82:6
94:15,20 96:15
96:16,18,20
109:12 113:2
**tinkering** 187:7
**title** 27:9,11,16
27:21 33:15
95:17 155:17
155:23 158:9
165:15 170:25
198:6,8 225:8
**titled** 153:21
157:20 158:15
174:23 201:25
**today** 5:3 10:7
12:6,9,18,23
26:12 190:16
191:10 211:14
**told** 112:22
117:25 118:8
154:21 206:4
**tomorrow** 153:1
**tool** 41:8,9 66:11
66:14 102:11
160:2,4
**tools** 59:16 85:8
228:22
**top** 104:7 124:25

139:20 172:18
177:4 221:16
**topics** 99:9
100:11
**Toppenish**
209:10,17
210:6,6
**tossup** 132:3
**total** 84:5
106:24 141:23
141:25 142:2,2
142:5,6 144:15
160:12 200:18
**tough** 16:17
**trade** 181:15,19
182:4
**traded** 186:3,18
193:15
**tradeoffs** 235:24
**training** 85:15
85:20,22,25
**transcribed**
239:8,16
**transcript** 11:21
239:16,18
**transmittal**
207:5,10
**treasurer** 74:19
75:11 180:15
208:8 229:24
**Treasurer's**
73:6,8 74:1,20
76:9,13 78:3
78:22 131:22
197:14
**trends** 111:24
**TREVINO** 1:10
**trial** 12:3
**tribal** 95:16
108:22,23
109:13 110:2,5
111:18 143:7
151:3,8
**tried** 106:16
**true** 89:12

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING   (833) 365-3376

Osta Davis                                                   August 19, 2022

Page 276

239:16 240:3
**Trump** 73:21
**truncated**
  202:12
**truth** 7:5,6,6
  239:14,15,15
**try** 9:20 13:2
  72:20 111:25
  165:24 211:12
  214:24
**trying** 38:2
  104:14 110:13
  149:17 215:10
  224:8 237:3
**Tuesday** 22:3
  203:23
**turn** 11:3 217:9
  221:9 223:19
  225:14 229:5
  234:25
**turned** 36:16
**turnout** 143:16
  143:18 210:5
**tutorial** 63:24
  64:3,8 65:1,6,7
  65:8 66:5,10
  66:13,15
**tutorials** 63:20
  63:22 64:4,24
  66:1
**tweaks** 195:12
**twenty** 99:22
**Twenty-eight**
  196:9
**two** 24:9 46:11
  49:17 64:4,6
  80:13,23 84:12
  114:8 115:20
  116:7 117:3
  151:5 161:16
  196:22 204:18
  204:23 205:1,3
  206:10 207:4
  219:17
**two-page** 105:7

**type** 120:13
**typewritten**
  239:7
**typical** 36:2,4
**typos** 12:2

———————
**U**
———————
**UCLA** 2:13,15
  8:3
**ultimate** 223:1
**Um-hmm** 49:22
  63:1 77:12,14
  79:14 88:1
  112:3 116:12
  120:12 127:1
  130:11 181:24
**unassigned**
  167:2
**uncertain**
  116:22 200:18
**uncomfortable**
  127:4
**undercount**
  168:13
**undercounts**
  167:23
**undersigned**
  239:4 240:2
**understand** 9:19
  11:18 12:12,25
  13:1 38:4 45:8
  88:20 129:15
  167:19 179:14
  182:7,11,12
  195:18 204:4
  209:4 215:10
  221:10,12,18
  222:25 229:5
  237:19,24
**understanding**
  18:25 28:22,23
  28:25 29:2,9
  29:18 30:1,22
  32:12,22 33:6
  35:2,15 38:7,9

39:1 40:6,16
40:25 43:3,10
43:22 44:23
45:10 46:9,13
47:4,8,17 50:3
50:10 54:22
59:15 60:8
61:1 63:3
64:23 66:7
67:22 68:7
69:5 74:11
75:11 79:2
85:6 87:4
88:10,23 89:3
89:5,7,17 90:1
91:4 100:8
109:20 112:17
117:16 123:6,9
124:10 127:11
127:15 130:18
130:20,23
131:17 133:8
136:18 138:5
141:22 145:19
146:1 147:17
148:2 152:6
156:7 160:1,12
168:24 171:3
172:7 176:4
177:19,25
178:3,19
180:14 182:13
184:20 185:2
186:5 189:18
191:3,24
194:11 195:1
196:13,19
197:12,17
199:21 204:2
204:12 207:21
207:24 212:20
212:23 215:18
217:3,22 219:3
220:8 223:4
224:10 227:16

227:21,25
228:5,21
230:18 231:19
232:6,22,25
233:2,5 236:3
236:8 237:14
237:20
**understood** 9:21
  17:12 42:20
  45:2 112:8
  140:13,15
  144:20 181:19
  192:5
**undo** 151:20
**unexpected** 56:3
**unintentionally**
  19:25
**unit** 222:17,20
**UNITED** 1:1
**unites** 151:1
**universities**
  99:15
**University**
  100:16
**unquote** 168:9
**upcoming** 63:19
**update** 98:3
**updated** 4:16,23
  106:8 150:16
  153:5 157:14
**upload** 39:11,23
  40:10 60:9,14
  61:1 111:3
  169:6 176:18
**uploaded** 59:24
  73:4 160:1
  207:24
**uploading**
  207:14
**upper** 145:15
**upshot** 220:7
**USDC** 240:21
**use** 19:5,9,16,21
  20:14,18,18,25
  28:21 29:4

38:12 39:21,23
41:5,10 67:3
68:9,16,17
69:8,15 74:10
74:13,14,18
75:4 78:4
79:23 80:2
159:15,25
160:8 183:1
226:8 230:19
**useful** 223:10
**user-friendly**
  41:8
**uses** 29:18
**usually** 9:6 82:8
**utilize** 74:1
  83:15 84:4,7
**utilized** 75:12
  102:11 228:23

———————
**V**
———————
**v** 1:5 7:16 15:19
  18:1 31:21,24
  32:5 240:20
**V4** 4:11
**V5** 4:17 153:21
**vague** 15:23
  16:1 19:7 23:4
  26:9 28:16
  29:15 40:24
  41:15 44:21
  49:13 51:23
  52:12 65:14
  69:18 70:10
  72:14 77:23
  81:8 101:8
  115:18 123:21
  128:5,18
  129:12 133:5
  133:21 135:1
  145:18 146:5
  159:18 162:17
  163:11,20
  164:3 179:15
  200:3 201:22

Osta Davis                                                    August 19, 2022

Page 277

205:13 206:8 207:23 231:4
**vaguely** 13:10 97:16 129:16 161:8 177:12 181:1
**Valley** 29:22,24 30:2,9,17 31:2 31:15 47:16 51:4,6 52:15 102:15 109:25 112:25 118:5 125:10 126:15 128:22,25 137:12 139:24 140:4 143:3,6 145:20 147:20 148:1 150:23 151:3 172:20 172:23 173:3 173:22 181:13 185:3 195:14 195:17 199:8 199:19 200:2 211:20 212:7 212:24 213:5 215:3,6,15 217:6 223:8 232:24
**Values** 4:15 150:14
**Vanderwerf** 38:22
**VAP** 106:24
**variance** 71:25 72:5,9,13,18 72:21
**varied** 34:9 58:9 82:6
**various** 73:2,7 221:22
**vary** 147:12
**vehemently** 137:3
**verbal** 9:15

**verbally** 213:16
**verified** 207:25
**verify** 61:1,5 160:13
**version** 106:9,10 106:12 115:6 126:22 127:16 157:14 158:18 173:3 176:5 198:17
**versions** 162:14 162:20 163:21
**versus** 33:24 69:14,15 161:21 178:25 226:19
**video** 11:3
**view** 145:3 156:20 183:16
**viewed** 145:19
**viewing** 136:3
**views** 213:4,12
**violation** 129:18
**Virginia** 3:17
**virtually** 42:8
**vision** 136:19
**vocal** 139:5
**Vogel** 3:16 8:18
**voice** 111:16
**voices** 111:19
**vote** 32:24 73:19 73:20,21 112:13 146:19 146:24 163:19 204:13 222:5 232:18,22
**voted** 204:6
**voter** 26:24 143:15 146:17 146:21 147:3,5 147:8,12,17,20 147:25 148:6,8 148:14,24 149:3 172:7 217:4

**voters** 32:25 143:19 147:14 148:3 212:6 218:14,15
**voters'** 112:13
**votes** 33:7 112:20
**voting** 2:13,15 8:3 31:16,16 32:17,18,23 33:2 84:6 87:8 87:9,24 88:4 88:11 89:3,5 89:18,20 90:1 90:10,18,23 91:8,11,20,23 92:20,23 93:4 93:10 94:3,9 97:11 106:14 107:18,21,23 120:17 121:5 121:18,22 122:4,7 123:3 123:7,8 125:9 126:22 128:9 128:12 129:18 142:3,7 143:21 143:25 144:16 144:17 145:4,7 147:13 150:15 150:18,22 159:12 160:7 163:14 170:13 182:15,20 203:25 208:11 208:15 211:23 212:11,16,18 212:23 213:5 214:13 215:20 218:23 219:2,4 221:24 223:5 223:14 226:9 226:20 227:1 228:17 237:15
**VRA** 106:8,10

106:14,23,25 107:10 127:13 128:16 129:7 129:15 130:1,6 130:23 131:5 133:1 145:19 215:2,13

— W —

**W-A** 19:15
**w/new** 4:19
**WA** 4:19 19:14
**wage** 25:2
**wait** 106:21
**waiting** 203:13
**waived** 190:18 190:21 192:4 239:9
**Waknin** 2:14 8:2
**walk** 34:22,23 36:2 39:24 42:2 110:16 205:21 230:11 235:19
**Walkinshaw** 4:23 43:9 51:13 52:3,16 54:2,4,14 79:21 80:1,7 80:19 97:5 110:22 115:8 118:4 119:5 128:20 129:2 132:15 134:10 134:14,19 135:10 136:9 137:2,11,19,23 144:8 170:14 193:17 194:18 195:6 196:23 205:25 206:4,7 206:13,15,19 206:25 230:10 230:13,18

232:1
**Walkinshaw's** 54:11 71:11,14 71:17 108:12 108:16 111:5 117:17,20 118:9,23 124:5 128:24 135:6,7 135:14,24 136:2,21,25 138:1 230:14 231:20
**want** 13:6 14:15 30:6 39:22 57:24 58:21 92:9 94:5 111:11 112:19 123:15,17 145:10 153:2 163:2 166:18 181:22 183:1,9 189:5 192:6 200:7,8 203:11 211:6,13 224:20 225:12 228:13,14 229:20 238:5
**wanted** 26:18 50:14 109:16 111:22,25 117:11 118:6 132:25 136:19 136:20 138:5 139:3,14 142:10 166:7 180:3 183:10 191:10 199:14 223:17 224:12
**wanting** 163:21 219:3
**Wapato** 209:13 209:21 210:5
**Washington** 1:1 1:7,7,20 2:4,10 3:4,7,10,11 6:2

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Osta Davis

August 19, 2022

Page 278

6:2,5 7:1 8:10
22:8 23:22
26:20 49:8
100:15 111:23
112:8,10 122:8
123:10 140:16
140:17 170:24
171:2,7,13,17
171:19 208:3
214:24 217:1
219:23 223:5
232:19 235:17
236:3,18
237:15 239:2,4
239:5,18,23,24
240:21
**Washington's**
11:11
**Washingtonians**
237:22
**wasn't** 20:10
37:17 57:16
65:17 83:1
112:18 126:17
156:3 162:13
223:16 229:7
**watch** 105:15
**watered** 126:22
127:14,15
128:15,16
129:6,15
**way** 13:2 28:12
33:8 57:15
79:18 83:19
92:25 93:19
111:20 113:13
121:8 123:12
132:4 135:23
136:1 142:21
174:11 185:11
**ways** 116:12
141:10
**we'll** 9:12,25
13:17 52:24
53:1 58:20

104:23 124:16
160:18 182:22
189:11 191:22
192:18 197:20
210:9 229:14
235:4 238:6,7
238:10
**we're** 8:25 9:25
10:7,21,25
11:6 12:8 13:4
77:19 155:6
188:13 202:13
210:15 213:23
213:24 238:13
238:14
**we've** 21:20
159:11
**webinar** 90:7,11
**website** 41:2
42:18 46:17
51:14 61:3
**Wednesday** 26:5
**week** 34:11,13
48:24,25 82:6
153:23 154:12
**weekly** 41:22
44:2 62:21
63:13
**weeks** 55:22
197:6 204:9
**weight** 120:2
181:8,10
**Wenatchee**
100:15
**went** 22:11 53:3
56:9,12 102:7
114:8
**weren't** 139:23
146:3 232:3
**West** 3:4
**western** 1:1
140:15 240:21
**WHEREOF**
239:19
**white** 32:24

127:4 147:14
148:3 218:15
**Whitman** 22:15
**wholly** 200:20
**Win** 172:1
**Win/** 171:25
**Win/Win** 172:4
**windows** 234:2
**witness** 2:2 8:16
10:16 16:6,15
175:8,16
191:22,23,24
218:1 233:24
239:6,7,9,14
239:19 240:20
**witness's** 17:19
**witnessed**
235:16,20,22
**woman** 63:6
**wondering**
146:9 226:6
**word** 61:7 83:9
**wording** 129:9
**words** 9:16 29:4
129:7 141:8
222:2
**work** 14:19
18:19,20 19:2
19:3,9,10,21
20:7,7,12,19
22:4 26:24
27:1 28:3,4
29:3,22 31:19
32:9 33:19,24
34:6 36:6 37:5
37:19,19 38:10
38:23 47:25
54:4 55:6,14
57:11,25 61:2
62:16,24 66:18
80:15 95:18
119:5 139:15
147:2,7 150:7
170:5 171:4
172:10 211:25

212:25 213:18
217:5 219:23
219:24 223:18
224:13 225:25
**worked** 21:21
23:15,23 24:1
24:2,3,4,6,10
24:19,23,24
25:1,3,5,8,13
25:16 28:11
33:21,25 35:17
37:4,23 38:3
38:19 39:4
43:2 54:7,14
62:23 63:5
94:2 110:22
116:8 123:25
135:23 146:16
146:21 149:2
170:14 214:17
**working** 19:1,6
19:17 20:6
21:22,25 23:20
24:7 27:19,25
28:2 33:11
34:2,3 36:1
38:1 41:20
55:5 56:8,17
57:9 65:3,17
65:18 115:19
135:15 147:4
150:5 153:19
166:16 193:21
193:23 201:21
204:22 205:14
**works** 7:12
94:13
**workshop** 85:22
**workweek** 33:25
34:6
**wouldn't** 57:21
58:19 92:25
112:19 117:5
121:23 137:21
157:25 182:4

194:3
**wrap** 190:2
**writes** 166:24
183:22 193:1
194:17 195:21
196:22 204:19
205:25
**writing** 213:16
**written** 15:3
31:7 83:1
112:18 184:18
204:1
**wrong** 156:24
**wrongs** 151:20
151:22 152:1
**wrote** 106:8,23
157:14 167:21
168:19 198:17
198:20 205:2
**Wylie** 98:18

---
**X**
---
**X** 4:8 7:8 211:8
222:5,18
229:16

---
**Y**
---
**Y** 222:4,21
**Yakama** 107:11
107:14 108:6
108:20,21
109:13,21
114:18 151:1
**Yakima** 5:20
29:22,24,25
30:1,9,17 31:2
31:15,21 32:5
47:16 51:4,6
52:8,15 102:15
109:25 112:25
118:5 125:10
126:14 128:22
128:25 137:12
139:8,23 140:4
143:3,6 145:20

Osta Davis

August 19, 2022

Page 279

147:20,25
150:22 151:3
172:20,23
173:3,22
174:17,18,19
175:6 181:13
185:3 195:14
195:17 199:8
199:19 200:2
200:10,13,16
200:19,22
211:20 212:6
212:23 213:5
215:3,6,15
217:6 218:11
223:8 232:24
**YBARRA** 1:11
**yeah** 8:1 9:14
  12:25 13:3
  17:20 20:10
  23:18,21 26:18
  28:19 32:22
  33:24 39:19
  46:19,20 56:6
  58:2 62:12
  66:9 73:25
  89:4,16 96:21
  97:24 102:19
  103:3,22 104:3
  104:14 106:22
  113:23 115:5
  117:19 119:2
  120:15 125:3
  133:9 134:23
  140:4 146:11
  152:20 154:15
  155:22 157:4,8
  158:2 164:13
  165:9 168:16
  169:25 175:10
  175:14 178:11
  183:19 184:16
  188:14,17,23
  188:24 190:1
  190:23 191:20

192:9 196:13
198:2 202:16
209:7 221:15
224:22,25
234:7
**year** 34:20 68:10
  68:12 69:3,8
  69:21 70:1
  115:17 116:21
  155:21
**years** 68:14
  99:13 115:17
  115:20,22,25
  116:1,7 117:3
  117:13 182:2
  228:5,23 233:2
**young** 26:21

**Z**

**zero** 72:9
**Zoom** 2:8,8,9,14
  2:15 3:3,8,8,16
  7:3,22 8:3,12
  14:3 42:7 46:1
  78:14,16 156:8
  176:19 188:22

**0**

**1**

**1** 4:10 104:4,5
  114:10,13
  154:8 159:5
**1:00** 204:20
**1:24** 114:3
**10** 5:6 139:21
  140:2,3 157:13
  182:22,23
  192:22,23
**10/19/21** 4:10,11
**10/22/21** 4:12,17
  153:21
**10/25/21** 4:14,16
**10:00** 207:3,7
**10:21** 52:25
**10:31** 52:25

**10:48** 198:12
**100** 92:25 194:3
**1000** 2:4
**104** 4:10
**10th** 157:19
  158:19 161:25
**11** 5:9 187:18,19
  187:20
**11/10/21** 4:19
  157:20 158:12
  158:15
**11/12** 4:24
  165:16 174:23
**11/12/21** 4:22
**11/13/21** 5:4
**11/14** 5:16 202:1
**11/14/21** 5:2
**11/15/21** 5:9,10
  5:12,15
**11/2/21** 4:18
**11/21/21** 5:6
**11/4/21** 4:20
**11:00** 197:20
**11:22** 201:13
  203:16
**1101** 2:10
**11th** 2:22
**12** 5:12 175:13
  197:22,23,24
**12:20** 113:20
**12:22** 114:3
**124** 4:12
**1250** 1:19
**12th** 165:1,15
  166:19 176:10
**13** 5:15 201:8,9
**13th** 177:4
**14** 5:17 115:10
  154:3,18
  158:21 178:5
  199:13 213:24
  213:25 219:15
  237:3,7
**14/15** 139:23
**149** 4:14

**14th** 2:10 4:21
  4:21 173:12,14
  177:14,23
  180:8 226:23
**15** 5:19 6:3
  49:23 114:16
  115:2 153:25
  154:18 164:9
  178:6 184:23
  185:5,9 202:4
  203:4 208:22
  209:11,14,17
  217:10,11
  227:16 229:13
**152** 4:16
**15405** 3:17
**155** 4:18
**15th** 113:15
  166:21 177:14
  177:23 178:15
  182:9 184:24
  197:20
**16** 5:21 220:15
  220:17
**160** 4:20
**164** 4:22
**169** 5:2
**16th** 203:24
  204:21 205:24
**17** 5:22 139:22
  223:21 228:15
**176** 5:4
**18** 6:2 233:15,16
**182** 5:6
**187** 5:9
**19** 1:17 6:5 7:1
  236:14,16
  240:22
**197** 5:12
**19th** 101:20
  104:18 153:23
  153:24

**2**

**2** 4:11,12 124:16

124:17 145:2
159:5 186:2
218:12 222:1
225:23 239:23
**2:27** 146:12
**2:40** 146:12
**20** 46:12,16,18
  53:16 189:21
  210:23 229:11
  238:9
**2000** 3:11
**20005** 2:10
**2001** 155:16
  214:3
**201** 5:15
**2011** 58:7
  138:24 141:14
  152:9
**2013** 25:1
  220:23
**2014** 25:3
**2016** 25:5
**20169-2706** 3:17
**2018** 25:8 35:22
**2019** 69:5
  159:12,12
  166:23 167:23
  168:12 178:16
  182:10 202:4
  226:19 227:1
**2020** 5:19 25:8
  28:4 68:15
  69:6 73:5,8,20
  73:25 74:18
  75:11 78:3,22
  160:7,12 168:5
  168:9,15,20
  208:8,9 211:18
  229:24
**2021** 6:4,4 21:21
  34:21 90:12
  99:22 153:23
  224:2 234:11
**2022** 1:17 7:1
  239:20 240:22

Soto Palmer, et al. v. Hobbs, et al.
LAKESIDE REPORTING  (833) 365-3376

Osta Davis

August 19, 2022

Page 280

**2023** 239:23
**21** 6:4 157:13
**211** 4:3
**213** 5:17
**217** 5:19
**220** 5:21
**223** 5:22
**229** 4:4
**22nd** 134:24
**233** 6:2
**236** 6:5
**25th** 149:7 153:7
 153:22 214:3
 224:2
**2711** 1:22
 239:23 240:23
**28** 139:22
 186:21 195:2
 196:10 197:18
**28th** 239:20
**29** 190:8
**2nd** 157:17,19
 157:21 158:16
 158:18,19
 160:22 161:2
 161:16,21,24
 161:25 162:6
 226:12 227:5

**3**

**3** 4:14 149:8,9
 152:16 159:5
 193:1,4 218:12
 221:10 234:25
**3/25/21** 5:17,22
**3:22-cv-05035...**
 1:7 240:21
**3:29** 187:16
**3:30** 173:17
**30** 139:22
 189:21 210:23
 229:11
**308-14-135**
 239:18
**315** 2:4

**3250** 2:16
**329** 190:7
**35** 139:22
**36** 180:11
**365-3376** 1:23
 240:24
**3rd** 234:11

**4**

**4** 4:16 152:12,13
 159:3,5 196:21
 222:7,8,10
**4:10** 189:14
**4:14** 189:14
 226:12
**4:18** 192:8
**4:50** 227:5
**4:55** 210:13
**4:58** 210:13
**40** 66:22
**400** 2:10
**42** 139:21
**43** 6:6 236:18,23
**44** 139:21
 186:23 195:2
 196:8 197:18
**47** 139:22
 186:21 195:2
 196:8 197:18
**47.8** 166:23
**47th** 137:6,15,16
 137:19 138:3
 180:10
**48.2** 225:19
**49** 196:11
**49.2** 166:24
 182:10 202:5
 203:5
**4th** 161:22 162:7

**5**

**5** 4:18 155:7,8
 160:21 161:10
 161:19 162:10
 203:20,23

 225:15
**5.28.010** 239:4
**5:20** 223:2
**5:50** 1:17 238:20
**50** 46:12 110:12
 132:1 162:5
 168:7,10,17,21
 178:17,24
 179:1 203:5
 227:2,3
**50.0** 158:21
**51.3** 162:6
**51.6** 154:3
**51.7** 106:23
 153:25
**53** 132:1
**54.9** 132:1
**55** 98:9,21
 131:23
**56** 98:11
**58** 196:8

**6**

**6** 4:20 160:18,19
 162:2 204:18
 220:23
**6:00** 193:19
**6:30** 194:8
**634** 2:22

**7**

**7** 4:3,22 164:11
 164:12,14
 174:25 175:9
 175:13 182:6
**7:30** 5:16 193:19
 194:9 202:1
**7325** 3:4
**76.34** 106:24

**8**

**8** 5:2 169:3,4,5
 169:23,24
 205:23
**8:45** 196:22
**800** 3:11

**833** 1:23 240:24

**9**

**9** 5:4 176:15,16
 176:21 180:6
**9:10** 1:17 7:2
**90** 66:24
**90014** 2:22
**90095** 2:16
**98104** 3:11
**98104-2682** 2:4
**99** 40:3
**99336** 3:4