The Honorable Robert S. Lasnik

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

SUSAN SOTO PALMER, et. al.,

      *Plaintiffs*,

    v.

STEVEN HOBBS, et. al.,

      *Defendants*,

    and

JOSE TREVINO, ISMAEL CAMPOS, and ALEX YBARRA,

      *Intervenor-Defendants*.

Case No.: 3:22-cv-05035-RSL

Judge: Robert S. Lasnik

**PLAINTIFFS' TRIAL BRIEF**

1

**TABLE OF CONTENTS**

2  INTRODUCTION ........................................................................................................... 1

3  ARGUMENT ................................................................................................................. 2

4  I.   The Enacted LD 15 Has the Effect of Unlawfully Diluting the Ability of Latino Voters to Elect Their Preferred Candidates. ...................................................................... 2

5     A.   The Latino Population in the Yakima Valley Region is Sufficiently Large and Geographically Compact to Constitute a Majority in a State Legislative District (Gingles 1). ............................................................................................. 2

7     B.   Latino Voters in the Yakima Valley Region are Politically Cohesive (Gingles 2). ..... 3

8     C.   White Bloc Voting in the Yakima Valley Region Operates to Defeat Latino-Preferred Candidates (Gingles 3) .................................................................... 5

9     D.   Under the Totality of the Circumstances, LD 15 Results in Less Opportunity for Latinos in the Yakima Valley Region to Elect Candidates of Their Choice. ............. 7

11       1.   Senate Factor 1: History of Official Voting-Related Discrimination .................. 7

12       2.   Senate Factor 2: Racially Polarized Voting. ................................................. 9

13       3.   Senate Factor 3: Voting Practices or Procedures That Tend to Enhance the Opportunity for Discrimination ....................................................... 9

14       4.   Senate Factor 5: Extent to Which Latinos Bear the Effects of Discrimination .... 9

15       5.   Senate Factor 6: Use of Overt or Subtle Racial Appeals in Political Campaigns .................................................................................... 12

16       6.   Senate Factor 7: Extent to Which Latino Candidates Have Been Elected to Public Office in the Jurisdiction ............................................... 13

17       7.   Senate Factor 8: Lack of Responsiveness of Elected Officials to Needs of Latino Community ................................................................ 14

19       8.   Senate Factor 9: Tenuousness of the Policy Underlying the Current Composition of LD 15 ................................................................. 15

20       9.   Proportionality ........................................................................... 15

21     E.   The Fact That LD 15 Has a Bare Majority HCVAP Does Not Negate the District's Dilutive Effect. ..................................................................... 16

22  II.   LD 15 Was Drawn and Adopted with Intent to Dilute Latino Voting Strength While Maintaining the Façade of a Latino Opportunity District. .............................. 17

23     A.   The Commissioners' Public Map Proposals, Communications, and Advice Sought from Legal and Technical Experts Reveal That They Knew a Latino Opportunity District was Required and Could be Drawn in the Yakima Valley. ...................... 20

25       1.   Initial AGO Advice, Failure to Hire Statistical Consultant, & September Public Map Proposals ............................................................... 20

2.   Dr. Barreto Analysis, October Public Map Proposals, & Subsequent AGO Advice .................................................................................................. 22

3.   Republican Commissioners' VRA-Compliant Proposals ................................ 25

B.   The Commissioners' Conduct During Their Final Negotiations Reveal Willful Disregard for VRA Compliance and Intent to Block Latinos from Electing Candidates of Choice While Maintaining the *Façade* of a Latino Opportunity District. ........................................................................................................................ 26

C.   The Commissioners Numbered the District LD 15 Knowing That It Would Further Diminish Latino Electoral Opportunity in Off-Year Elections. ................................ 35

D.   The Commissioners Ignored Pleas of the Yakima Valley Region's Latino Residents to Adopt a District that Kept Latino Communities Together. ................... 36

E.   The Legislature Endorsed the Legislative District Plan with Knowledge that LD 15 Results in Less Opportunity for Latinos to Elect Candidates of Choice. ............. 38

F.   The Record Reveals a Number of Departures from the Ordinary Process Evidencing the Commission's Discriminatory Intent in Adopting LD 15. ............... 40

CERTIFICATE OF SERVICE ........................................................................................ 44

**INTRODUCTION**

In it a process rife with irregularities, the 2021 Washington State Redistricting Commission created and adopted LD 15, a legislative district in the Yakima Valley region that discriminates against Latinos in violation of the Voting Rights Act (VRA), 52 U.S.C. § 10301. Plaintiffs will prove at trial that LD 15 is racially discriminatory both in result and in intent.

*First*, LD 15, which has just a bare majority Hispanic citizen voting age population (HCVAP), does not provide the region's Latinos with an equal opportunity to elect candidates of choice. Plaintiffs will present expert and lay testimony establishing all three *Gingles* preconditions and that, under the totality of the circumstances, Latino voters in the Yakima Valley region have less opportunity than other voters to participate in the political process. Non-intervening Defendants do not dispute this conclusion. The State of Washington "cannot and does not intend to dispute the merits" of this claim, based on the pre-trial record, the conclusions of its own expert, and factual findings from the regions federal and state VRA cases. Dkt. # 194 at 1, 7-14. The Secretary of State takes no position. *Id.* at 1.

*Second*, Plaintiffs will prove the dilutive effect of LD 15 was *intentionally* discriminatory. The evidence will show that LD 15 was designed and surgically altered to provide the *façade* of a Latino opportunity district while in fact denying Latinos the opportunity to elect their preferred candidates. Throughout their deliberations, the Commissioners drew several iterations of LD 15, and in each successive draft made surgical tweaks aimed at decreasing Latino voter turnout and performance in the district, despite knowing that the VRA required a majority-HCVAP district with a *true* opportunity to elect. In adopting LD 15, the Commissioners dramatically departed from the established procedures for redistricting in Washington and ignored the persistent pleas of the Latino community for a true opportunity district in the Yakima Valley.

## ARGUMENT

**I.     The Enacted LD 15 Has the Effect of Unlawfully Diluting the Ability of Latino Voters to Elect Their Preferred Candidates.**

Plaintiffs will prove each element of their discriminatory results claim. To succeed on a Section 2 claim, Plaintiffs must satisfy the preconditions identified in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986), including that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group is "politically cohesive"; and (3) the majority votes "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50-51. The Court then must assess whether, under the totality of the circumstances, members of the minority group have less opportunity to participate in the electoral process and elect candidates of their choice. *Id.* at 77-79; 52 U.S.C. § 10301(b). The U.S. Supreme Court has directed that the list of non-exhaustive factors in the Senate Report on the 1982 amendments to the VRA ("Senate Factors") be considered for the totality of the circumstances analysis. *Gingles*, 478 U.S. at 35-37. "There is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)). These requirements are met here.

**A.     The Latino Population in the Yakima Valley Region is Sufficiently Large and Geographically Compact to Constitute a Majority in a State Legislative District (Gingles 1).**

Plaintiffs will show at trial that the Latino[1] population in the Yakima Valley area is sufficiently large and geographically compact to surpass 50% of the citizen voting age population

---

[1] Latino and Hispanic refer to individuals who identify as Hispanic or Latino, as defined by the U.S. Census, and the terms are used interchangeably.

("CVAP") in a state legislative district. It is undisputed that the Latino population in the state and Yakima Valley region have grown enormously in the past decade as compared to the non-Hispanic population. Dkt. # 191 (Joint Pretrial Stmt.) at ¶¶ 20-43. Furthermore, expert analysis shows that the Latino population in the area is geographically compact and concentrated. Pls. Exs. 1 at 21-27; 178 at 2-4; 214 at 3-5. A variety of district configurations, including numerous districts considered during the Commission's redistricting process and three demonstrative plans proposed by Plaintiffs, show that it is possible to draw alternative versions of a legislative district that are above 50% Hispanic CVAP (HCVAP) and comply with traditional redistricting criteria while also providing Latino voters an equal opportunity to elect a candidate of choice. Pls. Ex. 1 at 21-29. Moreover, the enacted LD 15 also contains a majority-HCVAP district, Dkt. # 191 at ¶ 97, although it does not provide Latino voters with an ability to elect candidates of their choice. The State's expert Dr. John Alford also agrees that the first *Gingles* prong is met in this case. State Ex. 601 at 4. This evidence conclusively demonstrates that Latino voters in the Yakima Valley area are sufficiently large and geographically compact to form the majority in a state legislative district.

**B.      Latino Voters in the Yakima Valley Region are Politically Cohesive (*Gingles* 2).**

To demonstrate that Latinos are politically cohesive, Plaintiffs must show that "a significant number of minority group members usually vote for the same candidates." *Gingles,* 478 U.S. at 56. This typically requires a statistical analysis of election results to determine the degree of racially polarized voting, but may be established through other, non-statistical evidence. *See, e.g., Luna v. Cty. of Kern*, 291 F. Supp. 3d 1088, 1117 (E.D. Cal. 2018).

At trial, Plaintiffs will show that Latino voters in the Yakima Valley region are politically cohesive. Plaintiffs' expert, Dr. Loren Collingwood, utilized reliable and widely accepted

statistical methods to estimate the voting preferences of Latino and white voters in 26 separate election contexts across six election cycles, ranging from 2012 to the most recent election in the enacted LD 15 in 2022. Pls. Exs. 1-2. Dr. Collingwood found that in 26 of 26 elections, Latino voters consistently and at high levels vote as a group for the same candidates. *Id*. This is the case no matter the type of election analyzed, including partisan and nonpartisan contests, general and primary elections, statewide, state legislative, or more local elections, and races with and without Spanish-surname candidates. *Id.* Replicating Dr. Collingwood's results, the State's expert Dr. Alford also concluded that the results show cohesion among Latino voters and "strong evidence of different voting patterns by Hispanic and non-Hispanic voters" in both partisan and nonpartisan elections. State Ex. 601 at 13-15. Further, an analysis conducted by Intervenors' expert Dr. Mark Owens also shows cohesion among Latino voters in the enacted LD 15 and surrounding area in 10 of the 12 elections he analyzed from 2018-2020. Int. Defs. Ex. 1001 at 9.

In addition to the expert evidence in this case, analysis presented by Dr. Barreto to the Commissioners during the 2021 redistricting process establishes a clear pattern of racial polarization in the Yakima Valley. Pls. Ex. 178, 214. Finally, numerous courts have recently found that voting in the region is racially polarized. *See, e.g.,* Dkt. # 191 at ¶¶ 119-122; *Montes v. City of Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014) ("Plaintiffs have made a strong showing that Latino voters in Yakima have 'clear political preferences that are distinct from those of the majority.'"); *Glatt v. City of Pasco,* No. 4:16-CV-05108-LRS, (E.D. Wash. 2017); *Aguilar v. Yakima County*, No. 20-2-0018019 (Kittitas Cty. Sup. Ct. July 13, 2020) (approving a settlement finding that the conditions for a violation of the Washington Voting Rights Act, including a showing of racially polarized voting, had been met in Yakima County).

Intervenor-Defendants may attempt to argue that voting is not racially polarized in the region because the divergent candidate preferences among Latino and white voters are due to partisanship rather than race. But this argument is irrelevant. The "legal concept of racially polarized voting incorporates neither causation nor intent. It means simply that the race of voters correlates with the selection of a certain candidate or candidates" and "the reasons [Latino] and white voters vote differently have no relevance to the central inquiry of § 2." *Gingles*, 478 U.S. at 51, 62-63, 74 (plurality); *see id.* at 100 (O'Connor, J., concurring) (agreeing, along with three other justices, that where statistical evidence shows minority political cohesion and assesses prospects of winning, "defendants cannot rebut this showing by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race"); *see also Gomez v. City of Watsonville*, 863 F.2d 1407, 1416 (9th Cir. 1988) (holding that courts should look "only to actual voting patterns" to determine whether voting is racially polarized and not speculate as to the reasons why); *Collins v. City of Norfolk, Va.*, 816 F.2d 932, 935 (4th Cir. 1987). Simply put, the evidence here shows that voting preferences of Latino voters differ from those of white voters in the Yakima Valley area; the reasons *why* that may be the case are beside the point.

C.      **White Bloc Voting in the Yakima Valley Region Operates to Defeat Latino-Preferred Candidates (*Gingles* 3).**

Under the third *Gingles* prong, the court inquires whether "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . —to defeat the minority's preferred candidate." *Gingle*s, 478 U.S. at 51. Majority bloc voting is proven with historical election data. *Id.* at 46.

Plaintiffs will show at trial that white bloc voting in the Yakima Valley region usually defeats Latino-preferred candidates for state legislative and other offices. Dr. Collingwood will

1   testify that in 24 of 26 elections analyzed, he found "very clear patterns of RPV between Anglo

2   and Latino voters" and that white voters vote as a bloc against Latino-preferred candidates in the

3   Yakima County region. Pls. Ex. 1 at 1, 17; Pls. Ex. 2. In every single local contest Dr. Collingwood

4   analyzed, including the November 2022 election in the new LD 15, other state legislative races,

5   and County Commission races, white voters defeated the Latino-preferred candidate. Pls. Ex. 1 at

6   18-19; Pls. Ex. 2. Further analysis by the State's expert Dr. Alford also found that Latino voters

7   give around a 7 percent advantage to Democratic candidates with a Spanish-surname, whereas

8   white voters are about 10 percent less supportive of a Democratic candidate with a Spanish

9   surname. *Id*. at 13-14.  This evidence shows a "consistent increase in the level of polarization when

10   the Democratic candidate has a Spanish-surname." *Id*. at 14.

11          Moreover, Dr. Collingwood also conducted a performance analysis of ten recent statewide

12   elections in Washington, to examine whether Latino-preferred candidates would win in the

13   Enacted LD 15, along with Plaintiffs' three demonstrative maps. Pls. Ex. 1 at 18-25. Dr.

14   Collingwood will testify at trial that this performance analysis demonstrates that Latino-preferred

15   candidates would lose in seven out of ten elections in the Enacted LD 15 due to white bloc voting.

16   *Id*. at 24-25. However, the Latino-preferred candidate would win ten out of ten or nine out of ten

17   elections in Plaintiffs' three demonstrative maps. *Id*. This is strong evidence that LD 15 as enacted

18   does not provide an equal opportunity to elect, and that "under another configuration minority

19   voters ha[ve] better electoral prospects." *LULAC v. Perry*, 548 U.S. 399, 495 (2006).

20          Intervenor-Defendants may argue that the most recent senate election in LD 15 in

21   November 2022, featuring winning candidate Nikki Torres (R) versus Lindsey Keesling (D),

22   demonstrates that racially polarized voting is not present. Not so. Dr. Collingwood analyzed this

23   election using multiple reliable statistical methodologies that account for actual voter turnout and

concluded that the Latino-preferred candidate lost due to white bloc voting. Pls. Ex. 2. But even if this were not the case—it is—a single election cannot outweigh at least a decade of white majority bloc voting defeating Latino candidates of choice. *NAACP v. McCrory*, 831 F.3d 204, 232 (4th Cir. 2016) ("First, as the Supreme Court has explained, courts should not place much evidentiary weight on any one election."). Moreover, the November 2022 election in LD 15 falls under the well-established doctrine of "special circumstances," under which courts discount the probative value of elections taking place during the pendency of VRA litigation. *Gingles*, 478 U.S. at 76 (noting that such elections can "work[] a one-time advantage…in the form of unusual organized political support by white leaders concerned to forestall single-member districting") (citation omitted). In addition, designated testimony as well as testimony at trial will show that Sen. Torres ran unopposed in the primary election, and that Ms. Keesling was not considered a serious challenger. Hall Dep. at 247:23-248:13, 249:6-250:3; 255:15-256:25.

In sum, the evidence in this case demonstrates that white voters in the Yakima Valley vote as a bloc to usually defeat the candidate of choice of Latino voters. Plaintiffs will therefore satisfy all three *Gingles* preconditions.

### D.   Under the Totality of the Circumstances, LD 15 Results in Less Opportunity for Latinos in the Yakima Valley Region to Elect Candidates of Their Choice.

Plaintiffs will show that, under the totality of the circumstances, Latino voters have less opportunity than other members of the electorate to participate in the political process and to elect representatives of choice in LD 15.

### 1.    Senate Factor 1: History of Official Voting-Related Discrimination

At trial, Plaintiffs will show that there is a long history of official voting-related discrimination against Latinos in Washington State and in the Yakima Valley region. Plaintiffs'

expert, Dr. Josué Estrada, found that throughout the 1950s and 1960s, including after the passage of the Voting Rights Act of 1965, English literacy tests were unequally and unfairly administered to Latinos in the Yakima Valley region with the effect of disenfranchising Latino voters. Pls. Ex. 4 at 22-31.

Additionally, at-large systems of election have historically and through present day worked to dilute the voting power of Yakima Valley Latinos, as evidenced by multiple court cases involving the application of the federal and Washington Voting Rights Acts in the cities of Yakima and Pasco as well as Yakima and Franklin counties. *See id.* at 31-39. In each of these cases, the court either found that the jurisdiction's at-large system of election diluted Latino voting power, *see Montes v. City of Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014), or the parties and court agreed that the record supported such a finding, *see Glatt v. City of Pasco*, No. 4:16-CV-05108 (E.D. Wash. Jan. 27, 2020); *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019 (Kittitas Cty. Sup. Ct. July 13, 2020); *Portugal et al. v. Franklin County et al.*, No. 21-2-50210-11 (Franklin Cty. Sup. Ct. May 5, 2021). In *Portugal*, Franklin County was recently ordered to transition to single-member district elections after the state superior court found the existence of racially polarized voting and ordered a remedy under the Washington Voting Rights Act.

Finally, local jurisdictions in the Yakima Valley region have historically failed to provide bilingual information and election materials to the detriment of Latino voters. *See* Pls. Ex. 4 at 39-43. After originally providing bilingual ballots from 1976-1982, Yakima County ceased providing those materials until 2002 when the Department of Justice mandated that they be provided. *Id.* at 40-41. In 2004, the Department of Justice sued Yakima County for nonetheless failing to adequately provide bilingual voting materials and election assistance in violation of Section 203 of the VRA; the lawsuit was settled when Yakima County, while not admitting liability, agreed to

undertake several steps to ensure compliance with Section 203. *Id.* Plaintiffs will thus establish that there is an extensive history of voting-related discrimination against Latinos in the Yakima Valley region.

### 2. Senate Factor 2: Racially Polarized Voting

As discussed in Part I.B and C, *supra*, elections in the Yakima Valley region feature high levels of racially polarized voting. This factor will weigh heavily in Plaintiffs' favor.

### 3. Senate Factor 3: Voting Practices or Procedures That Tend to Enhance the Opportunity for Discrimination

Plaintiffs will establish at trial that holding elections in off-years and signature matching procedures tend to enhance the opportunity for discrimination against Latino voters in the Yakima Valley region. As discussed below, *see infra* Part I.E, the placement of LD 15's senate election in non-presidential election years disproportionately impacts Latinos. Dr. Estrada found that Latino voters in the region, whose turnout is already lower than other voters in presidential-year elections, have demonstrated even lower voter turnout in off-year elections, Ex. 4 at 43-44, which exacerbates the disadvantage of their depressed voting registration, *see id.* at 43-45; *see also* Pls. Ex. 1 at 29-32. Dr. Estrada also found that Latino voters in Washington disproportionately have their ballots rejected for signature mismatch compared to other voters, with Spanish-surnamed voters in Franklin and Yakima counties respectively 3.9 and 7.5 times more likely than other voters to have their ballot rejected. Pls. Ex. 4 at 45-46. This factor weighs in Plaintiffs' favor.

### 4. Senate Factor 5: Extent to Which Latinos Bear the Effects of Discrimination

At trial, Plaintiffs will show that Latinos in the Yakima Valley region continue to bear the effects of discrimination and are at a disadvantage relative to white residents in areas that bear on voting, including education, housing, socioeconomic status and employment, health, and criminal

justice. Pls. Ex. 4 at 46-63. Dr. Estrada will present unrebutted findings of Latino discrimination these in these areas.

Washington and the Yakima Valley region have a history of segregation and discrimination in the education system, Pls. Ex. 4 at 47-50, the impact of which continues into present day when there remain stark disparities between the region's Latino and white residents' rates of high school graduation and attainment of bachelor's or higher degrees, *id.* at 50-51.

Latinos in the region also bear the effects of discrimination in housing. Despite years of reliance on Latino farmworkers, housing for those workers in the Yakima Valley region is poor in both quantity and quality, with white residents resisting the building of adequate housing. *Id*. at 51-54. Dr. Estrada will present evidence regarding the poor housing conditions for Latino farmworkers gathered by the Washington State Human Rights Commission in 2007 which resulted in the state agency announcing that it was "increasingly concerned about race and national origin discrimination against farmworkers in the area of housing." *Id*. at 53. Dr. Estrada will also present evidence that housing is not just an issue for Latino farmworkers, but for most Latinos in the region, with Latinos having significantly lower homeownership rates than white residents. *Id.* at 55-56.

Dr. Estrada will also present evidence that Latinos in the region have disproportionately low household incomes, *id*. at 56-57; high poverty levels, *id*., and higher unemployment rates, *id*. at 57-58, when compared to white residents. He will also present findings that Yakima Valley region Latinos continue to bear the effects of discrimination in health: Latinos in the region are uninsured at significantly higher rates than white residents, *id*. at 59, and tend to seek emergency rather than preventative healthcare, *id*. at 58-59. Dr. Estrada will testify that Latinos in the region were disproportionately impacted by the COVID-19 pandemic, largely because agricultural

employers resisted on-site testing when it was offered or recommended by health officers, ultimately leading to protests by Latino agricultural workers. *See id*. at 59-60.

Latinos in the region also bear the effects of discrimination, past and continuing, in the criminal justice system. For example, Latinos are incarcerated at higher rates compared to their share of the population, *id*. at 60-61, and are significantly more likely than white residents to be killed by law enforcement (e.g., 1.9 times more likely in Franklin County and 2.5 times more likely in Yakima County), *id*. at 62.

Finally, in addition to depressed levels of voter registration and turnout for Latino voters, *see* Pls. Exs. 1 at 29-32; 4 at 43-45, Latino voters have also experienced recent voter suppression in the region. Benancio Garcia, the plaintiff in the *Garcia* case, was a candidate in the 2022 primary race for Washington's Fourth congressional district. Garcia Dep. at 67:1-9. Mr. Garcia was the only Latino candidate in that race. *Id.* at 68:3-18. Mr. Garcia testified that the Washington State Republican Party suppressed the Latino vote in that election. He testified that he had recorded a message, in both English and Spanish, designed to "help us get our vote out" for a phonebank targeting "every registered 4th District Latino Republican." *Id*. at 75:2-79:7; 90:12-91:13. The state Republican Party, however, discarded Mr. Garcia's targeted messages and instead used an English-only general messages from the party. *Id*. Mr. Garcia also testified that the state Republican Party had specific funding to hire organizers to register Latino voters in the Yakima Valley, including the City of Yakima and Wenatchee, but declined to do so. *Id.* Based on this

personal experience, Mr. Garcia concluded that the Party's actions "greatly affected th[e] election, the outcome, and suppressed the Latino vote." *Id.*[2]

With ample evidence that Latinos in the region bear the effects of discrimination in education, housing, employment and socioeconomic status, health, and criminal justice, Senate Factor 5 plainly weighs in Plaintiffs' favor.

### 5.   Senate Factor 6: Use of Overt or Subtle Racial Appeals in Political Campaigns

Plaintiffs will demonstrate that candidates and elected officials in LD 15, and in the jurisdictions within its boundaries, have made both overt and subtle racial appeals during campaigns and while in office. Dr. Estrada will present examples of such appeals, including an instance in which the previous state Senator from LD 15, Senator Jim Honeyford, referred to racial minorities as "colored" and "coloreds," remarking that "the poor people are most likely to commit crimes, and, uh, colored [sic] most likely to be poor" during a legislative hearing, *id.* at 67-68, as well as multiple instances of Franklin and Yakima County officials running for election using and/or reposting content using the terms "illegal" and "illegals" and promoting disproven allegations that non-citizens are voting in elections, *id.* at 63-66.

Latino candidates in the region have also experienced racial animosity while campaigning. *See id.* at 66-67. For example, Intervenor-Defendant Jose Trevino, the Republican Mayor of Granger—a city in the Lower Yakima Valley with an 88.4% Latino population—attributed his 2015 loss in the Granger mayoral race to a rumor spread during the campaign that he "was going

---

[2] Mr. Garcia's testimony likewise rebuts his counsels' advocacy on behalf of Intervenor-Defendants, who argue that partisanship, not racial discrimination, is at play. Even within the state Republican Party, Mr. Garcia has testified that white Republicans are favored over Latino Republicans.

to fire all the white people in the city" and attributed his loss in multiple other races, including for Yakima County Commission, to negative coverage in the Yakima Herald-Republic, saying that he was the "only [candidate] they picked on" because "it was easier to pick on the Republican Mexican than anyone else." Pls. Ex. 140 at 72:22-73:12; 86:1-12; 87:3-88:21; 88:16-21; 100:7-101:4. At trial, Plaintiff Susan Soto Palmer will testify to her own experiences of racial hostility both when volunteering for other Latino candidates and when campaigning for office herself. This evidence will show that this factor weighs in Plaintiffs' favor.

### 6. Senate Factor 7: Extent to Which Latino Candidates Have Been Elected to Public Office in the Jurisdiction

Plaintiffs will demonstrate that despite many Latino candidates running for state legislative and county-level office in central Washington (including in the Yakima Valley region), these Latino candidates have consistently not been elected. In the history of the state, just three Latinos have been elected to represent any of the twelve state legislative seats in the region (two representatives and one senator each for LDs 13, 14, 15, and 16). The first, Mary Skinner, was elected as the Senator for LD 14 (which includes parts of Clark, Klickitat, Skamania, and Yakima Counties) in elections she ran in from 1994 until 2006. Dkt. # 191 at ¶ 111; Pls. Ex. 4 at 69. Since Senator Skinner left office, Latino candidates including Susan Soto Palmer in 2016 and Noah Ramirez in 2018 have run for the seat but lost to white opponents. Pls. Ex. 4 at 69. The second Latino candidate to have been elected in the region is Representative Alejandro "Alex" Ybarra, who was appointed to represent LD 13 in 2018. *Id.* at 69-70; Ybarra Dep. at 55:2-16. Representative Ybarra testified that it was helpful to have been appointed to the office when he ran for reelection because "[m]ore people knew [his] name," an advantage which he said he thought "helps all incumbents." Ybarra Dep. at 55:17-56:2.

The third and final Latino to have been elected to state legislative office in the region is Nikki Torres, a Latina whose election to LD 15's senate seat came amidst the "special circumstances" following the filing of this lawsuit and who was not the Latino-preferred candidate. *See supra* Part I.C. No other Latino candidates have ever been elected to state legislative office in LD 15 despite multiple attempts including state senate bids by Gabriel Muñoz in 2014, Dkt. # 191 ¶ 102, and by Evangelina Aguilar in 2018, *id.* ¶ 105, as well as bids for state representative by Pablo Gonzalez in 2012, *id.* ¶ 101, and Teodora Martinez Chavez in 2014, *id.* ¶ 103.

Lack of success for Latino candidates is similar in elections for county office. Latinos in Yakima County make up 51% of the population, but just one Latino candidate, who left office in 2006, has ever been elected to the Board of County Commissioners. *See* Pls. Ex. 4 at 69. In Franklin County, where Latinos make up 54.1% of the population, not a single Latino has ever been elected to the County Board of Commissioners. *Id*. at 70. With only two Latinos ever elected to state legislative office from the region absent special circumstances and a dearth of Latinos elected to County positions in the region, this factor weighs in favor of the Plaintiffs.

### 7. Senate Factor 8: Lack of Responsiveness of Elected Officials to Needs of Latino Community

Plaintiffs will present evidence at trial that the state legislators representing the Yakima Valley region have been unresponsive to the needs of the region's Latino community. Dr. Estrada compared the legislative priorities named by Washington group Latino Civic Alliance for the 2022 Latino Legislative Day to the voting records of state legislators from the region. Pls. Ex. 4 at 71-77. Dr. Estrada found that the region's legislators tended to vote against the bills supported by the Latino community. *Id.* For example, the Senators from LDs 14, 15, and 16 uniformly opposed SB 5597, an update to the Washington Voting Rights Act, which, in addition to being a bill promoted

by the Latino Civic Alliance, had the backing of 93 organizations across 20 counties including Latino groups like Casa Latina, the Commission on Hispanic Affairs, El Centro de la Raza, Radio KDNA, and the Tri-Cities League of United Latin American Citizens. *Id.* at 74-75. At trial, Plaintiffs and lay witnesses will testify to their own experiences of office holders, including state legislators, demonstrating a lack of responsiveness to the needs of the region's Latino community.

### 8.    Senate Factor 9: Tenuousness of the Policy Underlying the Current Composition of LD 15

The policy underlying the current composition of LD 15 is tenuous. As Dr. Collingwood's analysis demonstrates, it is possible to draw alternative versions of LD 15 which would comply with traditional redistricting criteria while allowing the Latino community an equal opportunity to elect candidates of choice. *See infra* Part I.A. The Commission also considered various maps that would have met its criteria and provided the Latino community an equal opportunity to elect candidate of choice.

To the extent Intervenors or the State would defend the current composition of LD 15 by stating it was necessary to preserve the Yakama Nation community of interest, that argument fails. As the Commissioners saw in multiple draft maps considered or proposed during the redistricting process, it is possible to keep the Yakama Nation whole in one legislative district while still providing Yakima region Latinos their equal opportunity to elect candidates of choice and complying with traditional redistricting criteria. *See, e.g.,* Pls. Ex. 150, 197, 198.

### 9.    Proportionality

Plaintiffs will also present evidence regarding the additional factor of "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area." *LULAC v. Perry*, 548 U.S. 399, 426 (2006). Latino

residents make up 8.7% of the state's CVAP according to the latest ACS 1-year estimates, but Latinos form an effective majority of voters in *none* of the Washington Legislative Districts and a bare majority in only one district, or 2% of the 49 districts. Pls. Ex. 521; U.S. Census Bureau, Citizen Voting Age Population by Selected Characteristics, http://bitly.ws/Gj3A. Therefore, the number of districts in which Latinos form a majority of voters is less than Latinos' share of Washington state's CVAP. This lack of proportionality is indicative of Latino voters' reduced opportunity to participate in the political process. *See Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).

### E. The Fact That LD 15 Has a Bare Majority HCVAP Does Not Negate the District's Dilutive Effect.

LD 15 has a HCVAP of 51.5%, Dkt. # 191 at ¶ 97, a bare majority, but, as demonstrated above, it does not provide Latinos equal opportunity to elect candidates of their choice. *See supra* Part I.A-D. Where the data show that the State has used race to create a nominal Latino-majority district that will not functionally perform for Latino voters—and where, as here, alternative options that would perform are possible—the state has unlawfully diluted Latinos' voting strength "to create the *façade* of a Latino district." *LULAC v. Perry*, 548 U.S. 399, 441 (2006); *Perez v. Abbott*, 253 F. Supp. 3d 864, 884-85 (W.D. Tex. May 2, 2017).

Several choices made by the 2021 Washington Redistricting Commission in the configuration of LD 15 illustrate why the district fails to provide Latinos with equal opportunity to elect, despite being majority HCVAP. For example, Latino turnout is lower than white turnout, and the Commission's choice to number the district LD 15 rather than LD 14 puts state senate seats up for election in off-years (i.e., non-presidential years) when the gap between Latino-white turnout is most extreme. *See infra* Part II.C; *supra* Part I.D.4. The districts low Latino performance

is also affected by the choice to exclude some Latino communities and exclude others. Pls. Ex. 1 at 31. LD 15 excludes heavily Hispanic communities in the Lower Yakima Valley like Wapato, Toppenish, and Mabton, which have a large number of registered Latino voters and a smaller white electorate on Election Day. *Id.* Instead, the district reaches north and east to include Mattawa and Othello which have more registered Latino voters than white voters, but due to turnout differentials in off-years, contain precincts with disproportionately white electorates on Election Day. *Id.*

The evidence will show that LD 15, despite being nominally majority-HCVAP, results in less opportunity for Latino voters to elect candidates of their choice in violation of Section 2.

## II.   LD 15 Was Drawn and Adopted with Intent to Dilute Latino Voting Strength While Maintaining the *Façade* of a Latino Opportunity District.

Section 2 also prohibits any amount of discriminatory intent in the design of legislative districts. *See N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 225-26 (4th Cir. 2016) ("Challengers need not show that discriminatory purpose was the 'sole[]' or even a 'primary' motive for the legislation, just that it was '*a* motivating factor.'" (emphasis in original)).[3] In particular, the intentional manipulation of HCVAP levels "not done to provide or protect Latino

---

[3] The standard for Plaintiffs to prove intentional vote dilution is different from the standard Mr. Garcia must meet to prove racial predominance in the drawing of LD 15. Mr. Garcia must prove that race predominated—regardless of whether that racial predominance was well- or ill-motivated. *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 291 (2017). By contrast, the *Soto Palmer* Plaintiffs' intentional discrimination claim requires proof that a purpose of the mapdrawing was to dilute Latino voting strength, but does not require a showing that this discriminatory purpose was the predominant one. *See, e.g.*, *Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977) (holding that intentional discrimination is unlawful if it is "a motivating factor"); *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) ("[R]acial discrimination need only be one purpose, and not even a primary purpose" to be unlawful).

voter opportunity but rather to create the *façade* of a Latino [opportunity] district" is unlawful discrimination under Section 2. *Perez v. Abbott*, 253 F. Supp. 3d 864, 884-85 (W.D. Tex. 2017).[4]

A *façade* is precisely how LD 15 was drawn. Plaintiffs will prove that the Commissioners intentionally manipulated the boundaries of LD 15 to include *just* over 50% HCVAP to conceal the fact that the district would not functionally perform to elect Latino candidates of choice. The Commissioners also intentionally numbered the majority-HCVAP district "15" rather than "14" knowing it would put state senators up for election in off-years when the Latino-white turnout gap is at its widest, further cementing the district's non-performance.

The Commissioners made these choices despite knowing that the VRA required them to draw a majority-HCVAP district in the Yakima Valley that provides Latinos an *actual* opportunity to elect their preferred candidates. Every Commissioner was provided expert statistical analysis of several past elections finding that voting in the Yakima Valley is racially polarized and that Latino-preferred candidates are routinely defeated by white-preferred candidates. The numerous maps drafted, proposed, and publicly shared by the Commission reveal that the Commissioners also knew it was possible to draw an actual Latino opportunity district. Instead of doing so, the Commissioners—primarily Paul Graves and his legislative caucus staffer Anton Grose—engaged in a conscious effort to *minimize* Latino voting opportunity while retaining the barest of a HCVAP

---

[4] Racial animus is *not* the standard for an intentional vote dilution claim. As Judge Kozinski explained in his concurring opinion in *Garza v. County of Los Angeles*, a homeowner who harbors "no ill feelings toward minorities" but who joins a pact not to sell his home to minorities in order to avoid lower property values in the neighborhood "has engaged in racial and ethnic discrimination. Your personal feelings don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood." 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring).

majority because doing so, they thought, would make it harder for Latino voters to challenge the district's racial vote dilution in court.

The Commissioners' intent to dilute Latino voting strength while maintaining a *façade* is evident in the circumstances surrounding the enactment of the legislative plan, including the challenged district's discriminatory impact, historical background, the specific sequence of events leading to its adoption, the administrative and legislative history, including contemporaneous statements of key decision makers, and procedural and substantive departures from the ordinary decision-making process. *Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

The discriminatory impact of LD 15 plainly supports a finding of discriminatory intent. As discussed in Part I, the testimony of experts and lay witnesses and a wealth of documentary evidence will prove that LD 15 *results* in less opportunity for Latino voters to elect candidates of choice in the Yakima Valley region. For instance, the performance analysis conducted by Dr. Loren Collingwood shows that the Latino-preferred candidate in LD 15 would lose to white-preferred in 70% of election contests he analyzed. Pls. Ex. 1 at 2. The State also concedes LD 15's discriminatory impact based on the conclusions of its own expert, Dr. John Alford, and factual findings from relevant voting rights cases in the region. Dkt. # 191 at 2. LD 15 does not perform to allow Latino voters the opportunity to elect candidates of their choice.

This brief focuses on highlighting some of the key evidence of discriminatory intent in the record of emails, text messages, meeting minutes, videos, maps, and testimony documenting the historical background of and the sequence of events leading up to the legislative plan's adoption—from the development of public map proposals through October 2021 to the Commissioners' private negotiations and adoption of LD 15 in November 2021 to the Legislature's subsequent

endorsement of the map in February 2022. This section will also highlight some of the procedural and substantive departures evidencing the Commissioners' discriminatory intent. Together with the evidence presented at trial, the totality of these facts will prove that it was the intent and design of the adopted LD 15 that it not provide Latino citizens an equal opportunity to elect candidates of their choice.

> **A.** **The Commissioners' Public Map Proposals, Communications, and Advice Sought from Legal and Technical Experts Reveal That They Knew a Latino Opportunity District was Required and Could be Drawn in the Yakima Valley.**

The sequence of events from the Commissioners' deliberations up to the final weeks of negotiations prove that the Commissioners knew of their obligation to draw a Latino opportunity district under the VRA. The Commissioners were made aware of their VRA obligations by the state Attorney General's Office (AGO), legislative caucus staff, statistical experts like Dr. Matt Barreto, and members of the public, among others. The numerous maps they drafted, proposed (publicly or privately), or considered show they knew such a district could be drawn in the Yakima Valley.

> **1.** **Initial AGO Advice, Failure to Hire Statistical Consultant, & September Public Map Proposals**

On June 21, 2021, the Commission held a meeting in which the Commission's non-voting Chair Sarah Augustine emphasized the State's "commit[ment] to educating the Commission about the Voting Rights Act before [it began] the process of drawing maps." Pls. Ex. 55 at 3:50. At that meeting, Brian Sutherland, an AGO attorney, provided an "overview of the Federal Voting Rights Act and minority vote dilution as it relates to redistricting." Pls. Ex. 54 at 3. Mr. Sutherland informed the Commission of the requirements under *Thornburg v. Gingles* "and explained how to determine if there is evidence of a *Gingles* district or racially polarized voting." *Id.* Commissioners

Sims, Graves, and Fain all asked questions about the VRA's legal requirements. *Id.* In the discussion, Mr. Sutherland highlighted the importance of consulting a statistical expert to assess levels of RPV and to identify minority preferred candidates so that the Commissioners could draw an opportunity district where required. Pls. Ex. 55 at 39:12-45:07; Pls. Ex. 130 at 11-12.

After Mr. Sutherland's presentation, Ms. Augustine instructed the Commission's Executive Director Lisa McLean to scope out potential statistical consultants. McLean Dep. 87:11-12 ("Sarah called me, I think, after we finished the meeting and said, We need to get a voting rights consultant."), 92:13-14 ("We had money. I knew we had the money."). Ms. McLean identified Dr. Barreto from her own research as someone highly qualified, experienced, and familiar with Washington State. *Id.* at 93:12-24. Commissioner Graves proposed Dr. Thomas Brunell. *Id.* at 95:9-20. Despite having options, however, the Commission never advertised for or sought the services of a VRA consultant. *Id.* at 95:21-24. On August 17, Ms. Augustine texted Ms. McLean: "It looks like there is no support for a VRA consultant of any kind. I think it's time to give it up." Pls. Ex. 404.

After receiving Census data in late August but without the benefit of VRA statistical analysis, the four voting Commissioners began working on their first public legislative map proposals, which they released on September 21. Pls. Exs. 511-14. Not one of the proposals included a majority HCVAP district in the Yakima Valley. Pls. Ex. 1 at 28 (map chart). The Graves and Fain proposals cracked Latino communities of the Yakima Valley region into three and four districts respectively, diminishing Latinos' political power even more than the legislative districts enacted in 2012. *Compare* Pls. Exs. 511-12 *with* Pls. Ex. 523; *see also* Pls. Ex. 163. None of the Yakima Valley districts in the Graves and Fain proposals would have given Latinos an opportunity to elect candidates of choice, and none had an HCVAP exceeding 35% according to the 2019 5-

Year ACS Estimates.[5] Pls. Ex. 1 at 28 (map chart). Only Commissioner Walkinshaw's proposal numbered his HCVAP district as LD 14. *Id.*

### 2. Dr. Barreto Analysis, October Public Map Proposals, & Subsequent AGO Advice

In late September or early October, the Senate Democratic Caucus retained Dr. Barreto to conduct the statistical analysis that the AGO had recommended the Commission do in June. Pls. Ex. 170; O'Neil Dep. 97:17-20. On October 15, Dr. Barreto presented his analysis to Commissioners Walkinshaw and Sims, which showed "crystal clear" evidence of RPV in the Yakima Valley region. Pls. Ex. 177 (briefing invitation); Pls. Ex. 178 at 31 (analysis). His analysis produced ecological inference results for 12 prior election contests from 2012 to 2020, all showing significant polarization between Latino and white voters. Pls. Ex. 178 at 18-30. He referenced the state and federal voting rights cases in the region—of which every Commissioner was already aware—in which state and federal courts had also found significant levels of RPV. He also clearly identified which candidates were Latino voters' candidates of choice: in every contest he analyzed, Latino voters preferred the Democratic candidate while white voters preferred the Republican candidate. *Id.* at 31. Finally, Dr. Barreto provided four alternative maps that would give Latino voters a "meaningful opportunity to elect candidates of choice." *Id.* at 8, 35-38.

On October 21, Commissioner Walkinshaw released an abridged version of Dr. Barreto's analysis to the public, along with a statement sharing his renewed understanding of the VRA's requirements in the Yakima Valley, announcing his and Commissioner Sim's intention to draw

---

[5] The 2019 5-Year ACS Estimates were the most recent HCVAP estimates available to the Commissioners during their map-drawing process. The Census Bureau did not release the 2020 5-Year ACS estimates until March 2022, after the redistricting process had concluded. *See* Bradlee Dep. at 174:2-4. Unless otherwise stated, all HCVAP percentages reported in this section are from the 2019 5-Year estimates.

new districts in the Yakima Valley given Dr. Barreto's analysis and recent public feedback, and

encouraging Republican Commissioners to do the same. Pls. Exs. 179 (public analysis), 183

(release). The release explained that the VRA requires "a majority-Hispanic district based on

Citizen Voting Age Population (not total or voting age population) *that also has a demonstrated*

*ability to allow Latino voters to elect candidates of their choice*." Pls. Ex. 183 (emphasis added).

Describing VRA compliance as "mission critical," the release explained that the Commissioners

had "heard repeatedly . . . from the public that Latino communities must be kept together and

allowed to elect candidates of their choice. Dr. Barreto's analysis confirms that not only is this

possible, but it is required under federal law." *Id.*

On October 25, Commissioners Walkinshaw and Sims released new public legislative map

proposals, both of which included a new LD 14, shown below, with a 2019 HCVAP of 51.6% and

that would perform to elect Latino-preferred candidates. Pls. Exs. 515-16; Pls. Ex. 1 at 28.

*Map 1: Walkinshaw and Sims Oct. 25 Public Proposal*



In a Twitter post announcing the new proposal, Commissioner Sims tweeted her

understanding of the VRA and its applicability to the Yakima Valley region in clear terms:

> The VRA represents protections to ensure that discrimination has no place in our democracy. Recent analysis highlights the presence of racially polarized voting in the Yakima Valley region and provides the Commission with a clear directive: *Draw a district that allows the Latino community in the Yakima Valley to elect their candidate of choice*. My map responds to this directive by creating a majority Latino district based on citizen voting age population and unites the Yakama Nation.

Pls. Ex. 200 (emphasis added). In his public release Commissioner Walkinshaw stated:

> Now that we have this information, we as commissioners should not consider legislative district maps that don't comply with the VRA. It is irresponsible to the historically underrepresented communities in the Yakima Valley to entertain any proposals that undermine their rights under federal law. . . .

Pls. Ex. 195.

On October 28, 2021, the AGO sent the Commissioners an email memorandum apparently confirming the need to draw a Latino opportunity district. Pls. Ex. 204. The content of the email is redacted, but Ali O'Neil, a Senate Democratic Caucus staffer who reviewed it, explained that the AGO's analysis "largely finds that if the Barreto analysis is correct, there is sufficient legal need for a VRA district." *Id.* Adam Hall, a policy attorney with the Senate Democratic Caucus, testified that he had reviewed the AGO's advice and believed it reflected his understanding that the VRA required a Latino opportunity district in the Yakima Valley. Hall Dep. at 49:21-50:24; 96:5-14. 131:19-23; 49:22-50:8; *see also* Pls. Ex. 163.[6]

At the Commission's November 1 public meeting, the Commissioners acknowledged that a VRA district in the Yakima Valley would be a focus of their attention as they entered the so-called negotiation phase. Commissioner Walkinshaw shared that he had "spoken with each Commissioner individually" about the VRA. Pls. Ex. 92 at 2. He committed to "share the full data

---

[6] The AGO's office provided the Commissioners with another lengthy email memorandum on October 30, which the Commission and a third-party witness produced to Plaintiffs, unredacted, and which Plaintiffs disclosed to the parties as a proposed exhibit (Plaintiffs' Exhibit 508). The State seeks to shield this information from the Court on grounds of attorney-client privilege.

and analysis done by Dr. Barreto with Commissioners, staff, and the public." *Id.*; *see also* Pls. Ex. 213 (sharing full Barreto analysis). Commissioner Fain and Sims acknowledged there were "robust conversations about the Voting Rights Act district in eastern Washington." Ex. 92 at 2. Commissioner Graves noted that the process was entering the negotiation phase and "assured the public that a final agreement will only be made in an open public meeting." *Id.*

### 3. Republican Commissioners' VRA-Compliant Proposals

After reviewing Dr. Barreto's analysis and the AGO memorandum, Commissioners Graves and Fain did not release updated public map proposals. But they were plainly aware of their obligation to draw a Latino opportunity district because both Commissioners privately proposed "dem leaning" districts that would have performed to elect Latino candidates of choice. Pls. Ex. 207. On November 3, Commissioner Graves offered April Sims a map called "GravesLD 14 (2)," which included an LD 14 resembling the district proposed by Sims and Walkinshaw on Oct. 25. Pls. Exs. 224, 221, 475. Commissioner Graves' proposed district had a 2019 HCVAP of 50.6% and would have elected the Latino-preferred Democratic candidates in 8 of 8 recent statewide elections. Pls. Ex. 1 at 28 (map chart).

*Map 2: "GravesLD 14 (2)" – Nov. 3*



Five days later, Commissioner Fain also offered the Democratic Commissioners a VRA-compliant proposal called "Fain V2," which included an LD 15 that was 50.6% 2019 HCVAP and would have elected the Latino-preferred Democratic candidates in 7 of 8 statewide elections. Pls. Exs. 1 at 28 (map chart), 244, 476. By this time, all four voting Commissioners knew of their obligation to Yakima Valley Latinos under the VRA and how to fulfill that obligation.

**B.      The Commissioners' Conduct During Their Final Negotiations Reveal Willful Disregard for VRA Compliance and Intent to Block Latinos from Electing Candidates of Choice While Maintaining the *Façade* of a Latino Opportunity District.**

After the release of public proposals on October 24, all four Commissioners, with assistance of their legislative caucus staff, began negotiations regarding the Yakima Valley district, at times referring to that district as LD 14 (as was preferred by Commissioners Walkinshaw and Sims) and LD 15 (as was preferred by Commissioners Graves and Fain).

The evidence from these negotiations shows that Commissioners Graves and Fain wanted to draw a Republican-leaning district in the Yakima Valley that did not perform to elect Latino candidates of choice but was still nominally majority-HCVAP—an intention that ultimately came to be reflected in the final enacted plan. Their intent to conceal a known VRA violation is apparent from notes taken by legislative staff, maps Commissioner Graves began proposing from November 7 onward, and the surgical alterations he and his staff made to the Yakima Valley district up to the adoption of the final map. *See* Ex. 487.

Ali O'Neil, the legislative staffer who assisted Commissioner Walkinshaw during the negotiations, recorded the following observations about a meeting she attended with Commissioners Graves and Walkinshaw on November 15:

> Brady told graves that his priority was a VRA compliant district, but that he would not negotiate a VRA district for anything else in the map and that he might be willing to vote for a district that was not compliant. He asked for the republicans to draw the district the way they wanted, and for it to be the 14th district. Graves insisted that he wanted to make it majority Hispanic by CVAP, but that it would be a Republican district, and that he wanted to do this to be able to protect against any lawsuit. He said repeatedly that this was the best thing to do to not lose a lawsuit.

Pls. Ex. 388 at 5 (O'Neil Timeline of Redistricting Commission Events); O'Neil Dep. at 240:3-10; 240:24-241:15; 241:20-242:3 (authenticating Pls. Ex. 388 and confirming it reflected her recollection of the meeting between Walkinshaw and Graves).

The progression of Commissioner Graves's proposed plans corroborates Ms. O'Neil's account of his approach to the Yakima Valley district. On November 7, Commissioner Graves and Senate Republican Caucus staffer Anton Grose drafted a map, "New leg proposal," Pls. Exs. 240-42, which Graves shared with April Sims during a meeting on November 8. Pls. Ex. 243. The Nov. 7 proposal substantially reconfigured LD 14 as compared to any previous proposal and is the first to appear in the record that reflects the configuration of LD 15 as ultimately enacted. *Compare* Pls. Ex. 517 (Nov. 7 proposal) *with* Pls. Ex. 521 (enacted). In this reworked LD 14, Commissioner Graves jettisoned the heavily Latino communities of Toppenish, Wapato, and Mabton in the Lower

Yakima Valley and pulled into the district whiter areas in the north and east, reducing the prospects for Latinos to elect candidates of choice. Pls. Ex. 521; Pls. Ex. 1 at 31-32. The district maintained a 2019 HCVAP of 50.9% but would have elected Latino-preferred candidates in only 5 of 8 recent statewide elections, fewer than Graves' previous (likely VRA-compliant) proposal. Pls. Ex. 1 at 28 (map chart).

*Map 3: Graves "New leg proposal" – Nov. 7*



At this time and as the negotiations progressed, Commissioners Graves and Fain jointly decided not to agree to a VRA-compliant district in the Yakima Valley unless the Democratic Commissioners paid a price in exchange. For example, before sharing the Nov. 7 proposal above, Commissioner Graves asked Fain for any notes on what price the Democratic Commissioners would pay for a VRA-compliant district:

Pls. Ex. 243. Commissioner Fain responded by instructing his legislative caucus staffer, Paul

Campos, to "join forces" with Graves's legislative caucus liaison, Anton Grose, to advance the

Commissioners' shared purpose of using Latino opportunity to elect in the Yakima Valley as a

bargaining chip. *Id.*

On November 11, Commissioner Graves shared another proposal that Republican caucus

staffers Mr. Campos and Mr. Grose had developed together the prior evening. Pls. Exs. 274, 277.

That map, "Graves1110LD," was similar to the Nov. 7 proposal but with key surgical changes to

reduce HCVAP and increase Republican performance. Indeed, in his email introducing this

proposal to Commissioner Sims, Commissioner Graves noted that "[t]he 14th here is ever so

slightly more Republican here than your last proposal, but is still firmly swing. It is majority

Hispanic CVAP." Pls. Ex. 277. Also, laying bare his willingness to use Latino voters as a

bargaining chip, he emphasized that this map had to be in exchange for greater Republican

performance in other districts. *Id.* ("I will be interested to hear from you what you think is a fair

price for this 14th.").

An illustration of the changes made from the Nov. 7 proposal to Graves1110LD is on page

2 of Plaintiffs' Exhibit 487 and reproduced below for convenience. Areas shaded gray are those

that remained between the two proposals, red shows precincts removed, and green shows precincts added. These surgical alterations—including two split precincts in the City of Yakima—resulted in 2019 HCVAP dropping from 50.9% to 50.3%, weakening Latinos' ability to elect candidates of choice. *See* Pls. Ex. 487 at 5; Pls. Ex. 1 at 28 (map chart).



**Graves November 7 Map v. Graves November 11 Map**



**Yakima Close-Up**

Commissioner Graves made similar surgical tweaks to his next proposal on November 12, with similar effect. Pls. Ex. 487. In that proposal, called "Graves Draft Nov 12 (1)," Commissioner

Graves changed the number of the district from LD 14 to LD 15, which he claimed was for "ease of incumbents" in his email introducing the proposal to Commissioner Sims. Pls. Ex. 304; Pls. Ex. 480. By "incumbents" Commissioner Graves meant Republican incumbents who regularly failed to be responsive to the needs of the Latino community. *See supra* Part I.D.7. The changes from the Nov. 11 proposal to this one, shown below, reduced 2019 HCVAP from 50.3% to 50.2%. Pls. Ex. 487 at 5. While the HCVAP fell by just 0.1%, the careful tinkering substantially reduced performance for Latino-preferred candidates—dropping from five to two the number of recent statewide elections where the Hispanic-preferred candidates would have won, with one race a tie. Pls. Ex. 1 at 28 (map chart).



Graves November 11 Map v. Graves November 12 Map

**Yakima Close-Up**



The final map (if we can say it was adopted having been only finalized many hours after last-minute adoption vote on an undisclosed "framework") reflects several more surgical alterations that dropped 2019 HCVAP in LD 15 even further—from 50.2% to 50.*02*%. Pls. Ex. 487. These tweaks, shown below, ultimately moved only about 500 people, but the individuals removed were from areas that are 63.4% 2019 HCVAP and the individuals added were from areas that are 75.7% 2019 white CVAP. Pls. Ex. 487 at 7.

**Graves November 12 Map v. Enacted Map**



**Yakima Close Up**



The racially discriminatory motivation in these tweaks becomes ever more apparent upon inspection of the removed portion of Precinct 143 in the City of Yakima, which is shown in closer view below. Pls. Ex. 487 at 7. Here, Commissioner Graves and his staff chose to split *a single precinct* to remove *only* those blocks with a majority-HCVAP and retain the whiter blocks—in a district Commissioner Graves *insisted* should be majority-HCVAP. This granular targeting of Latinos had the effect of reducing Latino opportunity to elect candidates of choice, shifting the one election in which there was a tie in the Nov. 12 proposal to a loss of the Latino-preferred candidates. Pls. Ex. 1 at 28 (map chart).

1
2
3
4
5
6
7
8
9
10
11
12
13



Split of Yakima County Precinct 143 in Enacted Plan

Removed Census Blocks (69.2% Hispanic CVAP)

Retained Census Blocks (56.9% White CVAP)

14
15
16
17
18
19
20
21
22
23
24
25
26

To recap, during the final negotiations, Commissioners Graves and Fain engaged in a piecewise dismantling of a performing Latino opportunity district, first by making relatively big changes like removing entire majority-HCVAP towns in the Lower Yakima Valley (e.g., Toppenish, Wapato, and Mabton), and then in each subsequent iteration, scouring the district boundaries for pockets of Latinos to exclude in favor of Republican white voters—all of this to reduce Latino-preferred candidates' chances of success without ending up under 50% HCVAP with the (hopefully misguided) aim to prevent Latino voters from correcting the VRA violation in court. This series of events is precisely the type of conduct that led a three-judge district court to conclude that the Texas legislature intentionally discriminated against minorities in the drawing of Dallas/Fort-Worth congressional districts in 2011. *See Perez v. Abbott*, 253 F. Supp. 3d 864, 954

(W.D. Tex. 2017) (explaining that "the map looked as though mapdrawers started out with the district they wanted to avoid, and then carved it up into pieces").

Testimony will also show that on the final day of negotiations, both Democratic Commissioners effectively handed over the pen to the Republican Commissioners to draw most of the districts in eastern Washington, including the Yakima Valley districts, despite knowing that their preferred district denied Latinos an opportunity to elect candidates of their choice, a result Commissioner Walkinshaw described as supposedly "mission critical" to avoid.

The record of events during the Commission's negotiations, and throughout the entirety of their deliberations, will prove that LD 15 was drawn and adopted with discriminatory intent.

### C.    The Commissioners Numbered the District LD 15 Knowing That It Would Further Diminish Latino Electoral Opportunity in Off-Year Elections.

At trial, Plaintiffs' experts Drs. Collingwood and Estrada will show that the Commission's decision whether to number the district LD 15 or LD 14 impacted whether Latino voters can elect a candidate of choice in off-years because the already large Latino-white turnout gap is even wider in off-years as compared to presidential years. Pls. Ex. 1 at 29-32; Pls. Ex. 4 at 43-44. The Commissioners and their staff were aware of this effect.

As early as June 2021, texts between Commissioner Fain and Commissioner Sims acknowledged the turnout difference that would occur depending on the labeling of the Yakima Valley district. Pls. Ex. 135. In the leadup to the release of the Commissioners' first public map proposals in September 2021, Ali O'Neil sent to Commissioner Walkinshaw a PowerPoint presentation prepared by the Senate Democratic Caucus that noted that numbering the Hispanic-majority district in the Yakima Valley LD 14 instead of LD 15 "align[ed] this district's election with the presidential year allowing for more fair and effective representation of the state's largest

Hispanic community by increasing voter participation." Pls. Ex. 150. Discussions about the numbering of this district continued in an email from Osta Davis to Commissioner Sims on October 22, 2021, Pls. Ex. 190, and the significance of the turnout difference was emphasized in emails from Adam Hall to Commissioner Walkinshaw in this same time period. Pls. Ex. 163. Commissioner Sims also mentioned the turnout difference that would result from the district's numbering in a text message to Commissioner Walkinshaw on November 11. Pls. Ex. 288.

As the final deadline approached, Adam Hall forwarded to Commissioner Walkinshaw on November 13, an email from Matt Barreto that explained even more explicitly that the district needed to be numbered LD 14 "to keep the Senate seat up in Presidential years when turnout is higher" for the Latino community. Pls. Ex. 303. That same day, Paul Campos discussed the impact of switching the numbering of LD 14 and LD 15 in an email to Commissioner Fain, Pls. Ex. 307, and Paul Graves sent a new map proposal to April Sims and staff noting in an email that he had "made the CVAP district the 15th rather than the 14th for ease of incumbents." Pls. Ex. 304.

Throughout the process, all four Commissioners were aware of the impact of labeling the Yakima Valley district LD 15 instead of LD 14, and it was a point of discussion from the early summer until the final days of negotiations. Ultimately, by numbering the district at issue LD 15, the Commission made yet another choice to weaken the ability of Latinos in the Yakima Valley to elect candidates of choice.

### D.      The Commissioners Ignored Pleas of the Yakima Valley Region's Latino Residents to Adopt a District that Kept Latino Communities Together.

Public comment submissions and testimony were an important part of the 2021 redistricting process, heavily stressed by the Commissioners and in official Commission

communications. *See e.g.*, Pls. Ex. 362. But when it came to the legislative district in the Yakima Valley, this public input was ultimately ignored.

Throughout the summer and into the fall, community members submitted written comments and oral testimony stressing the need to create a VRA-compliant district in the Yakima Valley that would give the Latino community the opportunity to elect candidates of choice. Commenters urged the Commission to adopt a VRA-compliant district, Pls. Ex. 94, requested the unification of Yakima and Pasco, *Id.*, praised the VRA-compliant maps that Commissioners Sims and Walkinshaw released on October 25, Pls. Ex. 97, and requested that the Commission use the "knowledge, the skills, and the responsibility" it had to protect the Latino community in the Yakima Valley and ensure voters could elect a candidate of choice. Pls. Ex. 252. Despite these, and countless other public comments, the Commission's final enacted plan disregarded these appeals.

The community coalition Redistricting Justice for Washington (RJW) sent an email to all the Commissioners on October 22, 2021, reiterating the position that many of its members had testified about throughout the process, that the creation of a Voting Rights Act-compliant district in the Yakima Valley was a "crucial" top priority. Pls. Ex. 189. The group followed up with an email to Commissioner Sims and Commissioner Walkinshaw on November 14, urging the Commission to adopt a map with a Yakima Valley district that "performs for the Latino communit[y]" and imploring Commissioners Sims and Walkinshaw to oppose any map proposal that did not do so. Pls. Ex. 328. The group further made its preferences for a *performing* district clear: if forced to choose between a narrow majority CVAP Latino district that consistently enabled Latinos to elect candidates of choice, and a district with a larger Latino majority where

the ability to elect candidates of choice was in question, RJW made clear the coalition's preference for the former. *Id.* But these entreaties went unheeded.

On the evening of November 15, with negotiations still underway in the countdown to the final deadline, community leader and former Yakima City Council Member Dulce Gutierrez submitted to the Commission the final version of a petition she had circulated further urging the Commission to adopt a VRA-compliant district in the Yakima Valley that would empower Latino voters to elect candidates of choice. Pls. Ex. 342. Despite the detailed proposals and rationales in the petition, the Commission ignored this request and its over 100 signatories. From the beginning of the redistricting process to its final hours, the Latino community in the Yakima Valley implored the Commission to follow the law and proposed multiple specific ways the Commission could have done so. The Commission ignored these pleas.

E.   **The Legislature Endorsed the Legislative District Plan with Knowledge that LD 15 Results in Less Opportunity for Latinos to Elect Candidates of Choice.**

The Commissioners' intent—not the intent of the Legislature—controls for purposes of Plaintiffs' intentional vote dilution claim, because the State delegates primary map-drawing authority to the four voting Commissioners. *See* Pl. Ex. 509 (Washington Constitution); Pls. Ex. 510 (RCW 44.05). After the adoption of a redistricting plan by the Commission, the Legislature has an opportunity to make only small changes to the plan. *Id.* Indeed, each of the census blocks added and removed in LD 15 in House Concurrent Resolution 4407 (HCR 4407), had zero population. Dkt. # 191 at ¶ 82; Pls. Ex. 488. The Legislature understood the narrow and non-substantive nature of its role in the redistricting process. The floor debate over HCR 4407 opened with the Democratic and Republican leaders in the State Senate both stressing that the bill before the legislature was simply about making minor technical changes to the map, *not* about approval

or disapproval of the map, something the Legislature lacks the power to do. Pls. Ex. 126 at 1:56-6:25 (remarks of Sens. Billig and Braun); *see also* Dkt. # 191 at ¶ 83-84.

To the extent the intent of the legislature *does* matter for Section 2 liability, the legislature was on notice that the Commission was required to draw a VRA-compliant district in the Yakima Valley and did not do so. In this way, the legislature was complicit in violating the VRA. During debate over passage of HCR 4407, Sen. Rebecca Saldaña stated her concern that the new map violated the federal VRA. Pls. Ex. 126 at 9:55-10:10. And even as Senate Majority Leader Andy Billig urged a vote for the bill, he acknowledged that concerns persisted about whether the newly drawn Yakima Valley district complied with the VRA. *Id.* at 3:47-3:53. Both Senators Billig and Saldaña had communicated these concerns about VRA compliance to Commissioner Walkinshaw earlier in the redistricting process. Hall Dep at 85:14-86:23. Sen. Saldaña also communicated her concerns about the necessity of a VRA-compliant district in the Yakima Valley to Commissioner Walkinshaw around the time she authored an op-ed on the subject. Hall Dep. at 87:7-87:24. Sen. Pederson too had been made aware of concerns about VRA compliance in the Yakima Valley. Hall Dep at 138:24-139:14.

Immediately following the Commission's adoption of the Enacted Plan, Sen. Billig exchanged a series of text messages with Commissioner Walkinshaw on November 15 and 16, 2021 in which Sen. Billig suggested that Commissioner Walkinshaw issue a statement that would "buy[] time to figure out what we say about the VRA district," Pls. Ex. 369, and in response to Commissioner Walkinshaw's report about the "big problem" of the transmittal of the maps to the Court without his authorization, Sen. Billig inquired whether Commissioner Walkinshaw would be issuing his "VRA concern." Pls. Ex. 370. As Sen. Billig stated in a November 16, 2021 *Statesman-Review* article, Washingtonians expressed their desire throughout the process for a map

that "creates a majority Latino legislative district in Yakima as the federal Voting Rights Act requires." Pls. Ex. 368. Legislative leaders heard these pleas but ultimately took no actions to remedy the violation, evidencing significant substantive departures from the expected process. *Arlington Heights*, 429 U.S. at 266-68.

### F. The Record Reveals a Number of Departures from the Ordinary Process Evidencing the Commission's Discriminatory Intent in Adopting LD 15.

The record of the Commission's process and testimony at trial will reveal a number of departures from the ordinary process, supporting Plaintiffs' claim of intentional discrimination. *See Arlington Heights*, 429 U.S. at 266-68. Several examples of procedural irregularity are apparent from the documentary record.

*First*, unlike the 2011 Commission, which worked systematically to draw one area of the state before moving onto the next, the 2021 Commission had no plan or procedure to guide how the Commissioners would work together to draw legislative districts. McLean Dep. at 63:18-66:10.

*Second*, in order to circumvent the purpose of the state's Open Public Meetings Act (OPMA), RCW 42.30, which requires any meeting of at least three Commissioners to take place in a noticed public meeting, the Commission devised a scheme to negotiate in so called "dyads," in lieu of providing regular updates in public meetings. Commissioners Graves and Sims took primary responsibility for the legislative districts, and Commissioners Walkinshaw and Fain primarily worked on the congressional districts. Pls. Ex. 102 at 17:1-7. The State (and the Commissioners) may argue that such an arrangement enabled the Commissioners to comply with the OPMA. But numerous email communications and text messages in the record show members of dyad pairs forwarding communications to other Commissioners rather than updating them in on the progress of dyad negotiations in the public's view. *See, e.g.*, Pls. Exs. 244; 304. At the

November 1 Commission meeting, Commissioner Graves acknowledged that much of the body's deliberation was happening in private. Pls. Ex. 92 at 2. In the 15 days preceding its deadline, the Commission met publicly only three times, on November 1, 8, and 15. This represented a significant departure from the conduct of the 2011 Commission, which met in public every day for the last six days of its deliberations. *See* Pls. Exs. 524-529. Furthermore, the Commission's behind-closed-doors "serial meetings" and negotiations led to a lawsuit and court finding that the Commission violated the OMPA. Pls. Ex. 530 at 9:15-10:1. The suit resulted in a consent decree requiring the Commissioners to personally pay fines, complete open government training, and requires future Commissions to adopt a final redistricting plan in public. *Id.* at 12:4-6; 10:15-21; 10:21-11:18.

*Third,* the Commission's closed-door deliberations in the final days are emblematic of the body's overall disregard for transparency and procedure. In the days preceding November 15 and certainly by November 14, all four voting Commissioners, the Chair, and some staff had converged in Federal Way and were meeting and negotiating in person with their legislative caucus staff. This was never made clear to the public at the Commission's November 15 meeting, which took place on Zoom from about 7 p.m. that evening to just after midnight on November 16. Pls. Ex. 100. The Commissioners ultimately attended only a small fraction of this "public" meeting. *Id.* Chair Augustine described that meeting as "chaotic" in part because it was unclear to her and the public what exactly the Commissioners were doing during the time they should have been deliberating in public view. Augustine Dep. at 120:2-121:4. The legislative map the Commissioners adopted on November 15 was not shared with the Commission's executive staff or the public. McLean Dep. at 129:17-130:19. The 2011 Commission, by contrast, examined and adopted the final map in a public meeting where public comment was available. Pls. Ex. 529. The Commissioners have

acknowledged that the legislative district plan they adopted around midnight on November 15 had not been fully drawn, Pls. Exs. 101-02, and tweaks were continuing to be made to the legislative districts well into the early morning of November 16 and likely up to the time when the map was transmitted to the State Supreme Court on the evening of November 16. Pls. Ex. 389 (memorandum of Ali O'Neil).

*Fourth,* after "adoption" of the plan, the Commissioners continued with procedural irregularities. For example, the Commissioners misinformed the public of their actions in congratulatory press conference they scheduled. They presented misleading, if not outright false, statements to the Washington Supreme Court in an effort to secure its approval of the plan only drawn and finalized after the constitutional deadline. Once that approval was secured, Commissioner Graves continued to work to raise capital to support defending the adopted plan from the federal VRA claims he knew were certain to be levied. These steps included "lighting the fire" to cause the intervention in the *Soto Palmer* case as well as the filing of *Garcia* lawsuit—a lawsuit he was instrumental in developing, but which he testified he believed *had no merit*.  There can no more severe procedural departure than a redistricting plan author scheming to trigger the filing of claims, one in support of his plan and one in opposition to it.

 These irregularities, among others to be elicited in trial testimony, will demonstrate that the 2021 Commission's process was marked by significant irregularities and departures from the expected process.

Dated: May 31, 2023

By: _/s/ Edwardo Morfin_

Chad W. Dunn*
Sonni Waknin*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
Chad@uclavrp.org
Sonni@uclavrp.org

Mark P. Gaber*
Simone Leeper*
Aseem Mulji*
Benjamin Phillips*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org
sleeper@campaignlegal.org
amulji@campaignlegal.org
bphillips@campaignlegal.org

 *Admitted pro hac vice

_Counsel for Plaintiffs_

Edwardo Morfin
WSBA No. 47831
Morfin Law Firm, PLLC
2602 N. Proctor Street, Suite 205
Tacoma, WA 98407
Telephone: 509-380-9999

Annabelle E. Harless*
Campaign Legal Center
55 W. Monroe St., Ste. 1925
Chicago, IL 60603
aharless@campaignlegal.org

Thomas A. Saenz*
Ernest Herrera*
Leticia M. Saucedo*
Erika Cervantes*
Mexican American Legal Defense
 and Educational Fund
643 S. Spring St., 11th Fl.
Los Angeles, CA 90014
Telephone: (213) 629-2512
tsaenz@maldef.org
eherrera@maldef.org
lsaucedo@maldef.org
ecervantes@maldef.org

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I certify that all counsel of record were served a copy of the foregoing this 31st day of May, 2023 via the Court's CM/ECF system.

*/s/ Edwardo Morfin*

Edwardo Morfin
WSBA No. 47831
Morfin Law Firm, PLLC
2602 N. Proctor Street, Suite 205
Tacoma, WA 98407
Telephone: 509-380-9999

PLAINTIFFS' TRIAL BRIEF                    44