# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

SUSAN SOTO PALMER et al.,

        *Plaintiffs,*

    v.

STEVEN HOBBS, in his official capacity
as Secretary of State of Washington, et al.,

        *Defendants,*

    and

JOSE TREVINO et al.,

        *Intervenor-Defendants.*

Case No.: 3:22-cv-5035-RSL

INTERVENOR-DEFENDANTS'
TRIAL BRIEF[1]

---

BENANCIO GARCIA III,

        *Plaintiff,*

    v.

STEVEN HOBBS, in his official capacity
as Secretary of State of Washington, et al.,

        *Defendants.*

Case No.: 3:22-cv-5152-RSL-DGE-LJCV

PLAINTIFF'S TRIAL BRIEF[1]

---

[1] This Trial Brief is being filed concurrently in both *Soto Palmer v. Hobbs*, No. 3:22-cv-5035, and *Garcia v. Hobbs*, No. 3:22-cv-5152.

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

1

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

**INTRODUCTION**

Despite the superficial complexities in these two cases, the ultimate issues are straightforward. In *Garcia v. Hobbs*, the three-judge court must decide whether the Washington State Redistricting Commission ("Commission") violated the Equal Protection Clause of the United States Constitution when it elevated racial considerations above all traditional districting factors. In *Palmer v. Hobbs*, the district court must decide whether Washington Legislative District 15, which just elected a Latina state senator by a margin of over 35 points, violates Section 2 of the Voting Rights Act because it is drawn in a way that dilutes the voting power of the Yakima Valley's Latino population.

Regarding *Garcia*, the evidence is clear and mostly uncontested. Each of the four voting Commissioners *explicitly* considered the racial composition of the Yakima Valley, and their own words will demonstrate that race predominated over every other consideration. For this reason, they violated the Fourteenth Amendment if they cannot demonstrate that they had—during the redistricting process—a strong basis in evidence that elevating race was necessary to comply with Section 2 of the Voting Rights Act. The *Garcia* Defendants can make no such showing.

This last point—which is also fatal to the claims in *Palmer*—is now evident based on the election that has already been held in Legislative District 15, which is now composed of at least 51.5 percent Latino Citizen Voting Age Population. If (as the *Palmer* Plaintiffs allege), the Latino community cohesively votes for Democratic candidates, this majority—combined with the known White crossover Democratic votes—would mean that the Legislative District 15 should tilt strongly in favor of the Democratic candidate. Because the Republican during this election—the only election to take place under the challenged map—won by an over *35-point margin*, the

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

2

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

evidence is indisputable—Latino voters in the Yakima Valley do not vote cohesively, and no amount of expert-witness divinations can change this real-world fact.[2]

For these reasons and all those that will be introduced at trial, the *Garcia* Plaintiff has demonstrated his claim, while the *Palmer* Plaintiffs have failed to do so.

## FACTUAL BACKGROUND

Although the facts giving rise to both cases have been briefed several times, a quick overview is warranted to contextualize the remainder of this trial brief.

## I.  THE PROCESS OF LEGISLATIVE REDISTRICTING IN THE STATE OF WASHINGTON.

Article II, Section 43 of the Washington State Constitution requires formation of a redistricting commission shortly after the decennial census. WASH. CONST. art. II, § 43(1); *see also* RCW 44.05.030. The leaders of the two largest political parties in the State legislature each choose one commissioner (for a total of four). WASH. CONST. art. II, § 43(2). Those four commissioners then select a fifth member to serve as a non-voting chairperson. *Id*. After that, the Commission must draw state voting-district boundaries according to the following criteria:

(1)  Districts shall have a population as nearly equal as is practicable, excluding nonresident military personnel, based on the population reported in the federal decennial census as adjusted by RCW 44.05.140.

(2)  To the extent consistent with subsection (1) of this section the commission plan should, insofar as practical, accomplish the following:

(a)  District lines should be drawn so as to coincide with the boundaries of local political subdivisions and areas recognized as communities of interest. The number of counties and municipalities divided among more than one district should be as small as possible;

---

[2] Political scientist predictions of future voting behavior have been reliably wrong in case after case. *See, e.g.*, *Rucho v. Common Cause*, 139 S. Ct. 2484, 2503 (2019) ("[T]o allow district courts to strike down apportionment plans on the basis of their prognostications as to the outcome of future elections . . . invites 'findings' on matters as to which neither judges nor anyone else can have any confidence.") (citation omitted); *see also id.* ("In our two leading partisan gerrymandering cases themselves, the predictions of durability proved to be dramatically wrong."). Indeed, in one of the first partisan gerrymandering cases to reach the Supreme Court, Indiana Democrats insisted they could not win under the map they challenged, *see Davis v. Bandemer*, 478 U.S. 109, 132 (1985), but in the next election, Democrats tied the Indiana House, *see* Doug Richardson, Democrats Celebrate Gains in Congress, State Legislature, THE ASSOCIATED PRESS (Nov. 5, 1986); The Associated Press, Key Races State By State, At A Glance (Nov. 6, 1986, PM cycle), and in the following election, they secured a majority of the State House, *see* Anne Hazard, STATES NEWS SERVICE (Nov. 11, 1988); *see also* Rick Gladstone, Democrats Gain Strategic Victories In State Legislatures, THE ASSOCIATED PRESS (Nov. 9, 1988, PM Cycle).

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

3

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

<blockquote>

(b)    Districts should be composed of convenient, contiguous, and compact territory. Land areas may be deemed contiguous if they share a common land border or are connected by a ferry, highway, bridge, or tunnel. Areas separated by geographical boundaries or artificial barriers that prevent transportation within a district should not be deemed contiguous; and

(c)    Whenever practicable, a precinct shall be wholly within a single legislative district.

(3)    The commission's plan and any plan adopted by the supreme court under RCW 44.05.100(4) shall provide for forty-nine legislative districts.

(4)    The house of representatives shall consist of ninety-eight members, two of whom shall be elected from and run at large within each legislative district. The senate shall consist of forty-nine members, one of whom shall be elected from each legislative district.

(5)    The commission shall exercise its powers to provide fair and effective representation and to encourage electoral competition. The commission's plan shall not be drawn purposely to favor or discriminate against any political party or group.

</blockquote>

RCW § 44.05.090.

Three of the four voting Commissioners must agree to a final redistricting plan "no later than November 15th of each year ending in one." WASH. CONST. art. II, § 43(6); *see also* RCW 44.05.100. The state Legislature has only limited ability to amend the Commission's plan—any amendment may not affect more than two percent of the population of a district, and must be approved within thirty days of the next legislative session by a two-thirds supermajority in both chambers. RCW 44.05.100. Commission operations must cease by July 1, *id.* § 44.05.110, although the Legislature may reconvene the Commission if necessary, *id.* § 44.05.120.

Elections for each legislative district's sole State Senate seat are held every four years. Elections for the two State House seats, in contrast, are held every two. Accordingly, each Legislative District—including Legislative District 15—will hold at least two elections every two years, regardless of whether the year happens to be a Presidential election year.

## II. THE 2021 REDISTRICTING CYCLE.

The four individuals comprising the most recent Commission were April Sims (appointed by House Democratic leadership), Brady Piñero Walkinshaw (appoints by Senate Democratic

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

4

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

leadership), Joe Fain (appointed by Senate Republican leadership), and Paul Graves (appointed by House Republican leadership). *Palmer* ECF No. 191, ¶¶ 70–71. Those four chose Sarah Augustine as the nonvoting chairwoman. *Palmer* ECF No. 191, ¶ 72. On September 21, 2021, each voting Commissioner released a proposed legislative district map. *Palmer* ECF No. 191, ¶ 74. Not one contained a district with a majority Hispanic Citizen Voting Age Population in or around the Yakima Valley. *Palmer* ECF No. 191, ¶ 75–78, 87.

The evidence at trial will show that, on October 19, 2021, the Washington State Senate Democratic Caucus circulated a presentation by Dr. Matt Barreto, *Palmer* ECF No. 191, ¶ 95–96, a professor of political science at UCLA and a frequently-hired consultant/analyst for the Democratic National Committee and other Democratic Party-aligned organizations.[3] Dr. Barreto's presentation included an analysis of two Washington State races (neither of which were primaries or included Hispanic candidates). *Garcia* ECF No. 45-17. Dr. Barreto's presentation included no analysis as to whether partisan preference, rather than race, drove the results of the few elections that he did consider. *Garcia* ECF No. 45-17. He nonetheless offered his ipse dixit legal conclusion that the Voting Rights Act required the creation of a majority HCVAP district in the Yakima Valley. *Garcia* ECF No. 45-17. A subsequent legal analysis commissioned by the Washington State Republican Party concluded the opposite. *Garcia* ECF No. 45-16.

Two things became evident from that point on. All the Commissioners elevated race while negotiating over the lines for Legislative District 15, while none believed that the Voting Rights Act required the boundaries they eventually approved for Legislative District 15. Regarding their respective decisions to prioritize race, the evidence will show (among other things) that:

---

[3] According to Federal Election Commission reporting, companies owned by Dr. Barreto received the following amount from the following entities:

- Democratic Senatorial Campaign Committee:                $73,966.00
- Democratic National Committee:                          $1,189,809.00
- Democratic Congressional Campaign Committee:            $322,038.00
- Biden for President:                                    $250,850.00
- Hillary for America:                                    $226,000.00

*See* fec.gov/disbursements (under "Recipient Name," search for "Latino Decisions" (2015-2020) and "BSP Research" (2020-2023) (last visited May 31, 2023).

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

5

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

- Commissioner Walkinshaw made "mission critical" his goal of ensuring that "Latinos as voters" would be "able to elect Latinos to office." *Garcia* ECF No. 45-4, at 64:4-14; 137:12-138:04.

- Commissioner Sims instructed her staff "to achieve a majority Hispanic district in the 15th," *Garcia* ECF No. 45-3, at 76:10-1, but then used the racial composition of the Yakima Valley as a bargaining chip for political gain in districts throughout the State, *id.* at 99:10-14; 100:02-04; 174:10-175:9.

- Commissioner Fain, mirroring Commissioner Sims's political maneuvering, prioritized the creation of a majority HCVAP in the Yakima Valley in exchange for partisan competitiveness in other voting districts. *Garcia* ECF No. 45-7, at 158:9-12; 162:6-12.

- Commissioner Graves agreed that the Commission as a whole was looking to draw[] the 15th itself to be a majority eligible voter Hispanic district." *Garcia* ECF No. 45-2, at 172:04-12.

As one Democrat staffer who participated in Commission deliberations observed, "[i]t was clear to me in the final days that at least two commissioners were dead set on drawing a district that was 50.1 Latino in the Yakima Valley, and that they were not going to be moved off that position." *Garcia* ECF No. 45-2, at 75:01-04.

Despite the focus on race from start to finish, at least three of the Commissioners did not believe they had complied with Section 2 of the Voting Rights Act (two of whom thought so because they did not believe that Section 2 of the Voting Rights Act required the creation of a majority HCVAP district in the Yakima Valley, *see, e.g.*, *Garcia* ECF No. 45-2, at 122:01-11; *Garcia* ECF No. 45-7, at 193:13-19). None seemed to fully understand what compliance with Section 2 might require. *See, e.g.*, *Garcia* ECF No. 45-3, at 56:24-57:08, 113:20-21; *Garcia* ECF No. 45-3, at 110:01-14; 122:01-11. At no point can it be said that the Commission as a whole (or even three, the number required for the Commission to take action) believed either that the Voting Rights Act required the creation of a majority-HCVAP district in the Yakima Valley or that they had in fact created a Section 2-compliant majority-HCVAP district in the Yakima Valley. *Garcia* ECF No. 45-5, at 51:18-20. Specifically, the evidence will show (among other things) that:

- Commissioner Sims found the Voting Rights Act to be "really complicated," and she never understood it "in terms of all the depends [sic] and the nuance of it." *Garcia* ECF No. 45-3, at 56:24-57:08; 113:20-21.

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

6

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

- Commissioner Graves was never "fully convinced that" a majority-HCVAP district in the Yakima Valley "was required," but he had trouble "glean[ing] general principles from the way courts have treated" application of the Voting Rights Act and the 14th Amendment. *Garcia* ECF No. 45-3, at 110:01-14; 122:01-11.

- At one point, Commissioner Fain thought the Voting Rights Act may have required a majority-HCVAP district in the Yakima Valley, but his focus was on "figur[ing] out how to get towards a successful vote," and he "didn't feel that arguing over the legality of this issue [of racially polarized voting] would be something that would move us forward to a successful vote." *Garcia* ECF No. 45-7, at 138:12-139:2.

- Commissioner Walkinshaw's staff believed that "he was not willing to fight very hard for an opportunity district." *Garcia* ECF No. 45-5, at 51:18-20.

The disagreement among the Commissioners as to what Section 2 of the Voting Rights Act requires bears emphasizing. Article II, Section 43(6) of the Washington Constitution makes plain that the Commission may act *only* with the concurrence of three voting Commissioners. *Accord* RCW 44.05.100; *see also Palmer* ECF No. 191 ¶ 62. This of course comports with the logical and "almost universally accepted common-law rule" that only a majority of members of a collective body is empowered to act for the body. *FTC v. Flotill Prods.,* 389 U.S. 179, 183 (1967). Thus, if only two of the Commissioners thought that the Voting Rights Act required creation of a majority-HCVAP, their belief cannot be attributed to the Commission as a whole.

As a result, Legislative District 15 now has at least an HCVAP of 51.5 percent, according to data from the 2020 American Community Survey—a slight majority-minority district. *Palmer* ECF No. 191, ¶ 85. Legislative District 15's boundaries look nothing like the previous boundaries of the district. The shape is strained and noncompact. *Garcia* ECF No. 45-23. Its northwest and southeast corners are narrow slivers of land that reach into the cities of Yakima and Pasco respectively, where a substantial majority of the district's population resides. *Id*. It also extends north to Mattawa and northeast to Othello. *Id*. It stretches into parts of five counties, yet it contains no single whole county. *Id*. Its western and eastern sections are divided by the Yakima Firing Center, Rattlesnake Hills, the Hanford Nuclear Site, and the Columbia River. *Garcia Id.* Despite these geographic boundaries, Legislative District 15 does not follow major thoroughfares. *Id*. To travel just from Sunnyside to Pasco via Interstate 82 and Interstate 182 would require crossing

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

7

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

through both Legislative Districts 16 and 8 before reentering Legislative District 15. *Id*. Communities like Yakima, Pasco, Grandview, Moxee, and Union Gap are split, while Pasco, Othello, Mattawa, and the Hanford Nuclear Site are paired for the first time in the State's history. *Id*.

## PROCEDURAL HISTORY

On January 19, 2022, the *Palmer* Plaintiffs brought a two-count Section 2 complaint against Washington Secretary of State Steven Hobbs, Speaker of the Washington State House of Representatives Laurie Jinkins, and Majority Leader of the Washington State Senate Andy Billig. *Palmer* ECF No. 1. Count I alleged that Legislative District 15 was a "façade" majority-HCVAP district that perpetuated dilution of the Hispanic Vote in the Yakima Valley. *Palmer* ECF No. 70 ¶¶ 272–80. Count II alleged that the Commission intended to dilute the Hispanic Vote in the Yakima Valley by creating a "façade" majority-HCVAP district. *Palmer* ECF No. 70 ¶¶ 281–82. No party moved for summary judgment in *Palmer*, but since the beginning of this case, the *Palmer* Plaintiffs have amended their complaint, *Palmer* ECF No. 70, three individuals intervened as Defendants, *Palmer* ECF No. 69, the State of Washington was added as a necessary party, *Palmer* ECF No. 68. Judge Robert S. Lasnik is the sole judge presiding over this case.

On March 15, 2022, Plaintiff Benancio Garcia III brought a separate action against Washington Secretary of State Steven Hobbs and the State of Washington. *Garcia* ECF No. 1. Plaintiff Garcia's one-count complaint alleged that the Commission violated the Equal Protection Clause of the Fourteenth Amendment by allowing race to predominate when it drew the boundaries for Legislative District 15. *Garcia* ECF No. 14 ¶¶ 72–77. Plaintiff Garcia's constitutional challenged triggered 28 U.S.C. § 2284, which resulted in assignment of this case to a three-judge panel (Ninth Circuit Judge VanDyke, and District Court Judges Lasnik and Estudillo). *Garcia* ECF No. 18. Plaintiff Garcia moved for summary judgment on March 8, 2023, *Garcia* ECF No. 45, which the three-judge court denied on April 21, 2023, *Garcia* ECF No. 56. In its order, the Court concluded that "reasonable minds could disagree on whether the Commission subordinated

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

8

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

traditional race-neutral districting principles to racial considerations when drawing Legislative District 15." *Garcia* ECF No. 56, at 11.

The Court has scheduled a joint bench trial starting on June 5, 2023. *Garcia* ECF No. 27.

## ISSUES BEFORE THE COURT

1.     Whether the Commission allowed race to predominate when it drew the boundaries for Legislative District 15.

2.     If so, whether the Commission's decision to elevate race over all other traditional redistricting factors was justified by a strong basis in evidence, existing and known to the Commission at the time, that doing so was necessary to comply with Section 2 of the Voting Rights Act.

3.     If Section 2 of the Voting Rights Act did in fact require the Commission to create a majority-HCVAP district in the Yakima Valley, whether the majority-HCVAP District 15 violates Section 2.

## SUMMARY OF THE *GARCIA* PLAINTIFF'S/*PALMER* INTERVENORS' ARGUMENT AND PROFFER

Given the overlapping analyses between the two consolidated cases, Plaintiff Garcia and the *Palmer* Intervenors respectfully suggest that, in the interest of efficiency and analytical soundness, the Court should address first the racial-gerrymandering claim brought by Plaintiff Garcia. If the Court agrees with this approach, then, first, it must decide whether the State of Washington "'separat[ed] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). For this question, Plaintiff Garcia bears the burden of demonstrating that "race was the predominant factor motivating the [State's] decision to place a significant number of voters within or without a particular district," *id.* at 187 (quoting *Miller*, 580 U.S. at 187). And the evidence will show that *every member* of the Commission *explicitly* elevated race and subordinated

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

other traditional redistricting criteria while they worked to draw the boundaries for Legislative District 15.

Because the Commission elevated race above all other traditional redistricting factors, the State violated the Fourteenth Amendment's Equal Protection Clause unless it can demonstrate that its practice was the least restrictive means of addressing a compelling governmental interest. *Id*. at 193 (quoting *Miller*, 580 U.S. at 920). On this issue, the State bears the burden, and for present purposes, the only way the State can carry its burden is by demonstrating that, during the redistricting process, the Commission had a "strong basis in evidence" (i.e., "*good reasons* to believe") that its decision to sort Washington citizens by their race was necessary to "satisfy the Voting Rights Act." *Id*. at 194 (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)) (emphasis in *Ala. Legis. Black Caucus*). Critically, "[w]hat matters is 'the actual considerations that provided the essential basis for the lines drawn, not post hoc justifications the [legislative body] in theory could have used but in reality did not.'" *Lee v. City of Los Angeles*, 908 F.3d 1175, 1183 (9th Cir. 2018) (quoting *Bethune-Hill*, 580 U.S. at 190). The evidence will show that the Commission lacked the requisite "strong basis in evidence" to conclude that the Voting Rights Act required Legislative District 15 to be drawn the way it appeared in the enacted plan. If the Court agrees with Plaintiff Garcia that the Commission lacked the necessary "strong basis in evidence," then Plaintiff Garcia's racial-gerrymander claim must succeed, and the *Palmer* Plaintiffs' Section 2 claim must fail.

If, and only if, the Court rejects Plaintiff Garcia's racial-gerrymander claim, then it can address the *Palmer* Plaintiffs' arguments that Legislative District 15 contravenes Section 2 of the Voting Rights Act because (1) it is merely a "façade" majority-HCVAP district that has the effect of diluting the Latino vote in the Yakima Valley, and (2) the Commission intentionally drew Legislative District 15 to prevent the Latino community in Yakima County from electing the candidate of its choice. The evidence will demonstrate, however, that the *Palmer* Plaintiffs cannot carry their burden for either claim. Their effects claim fails at the threshold because courts around the country have limited façade-district claims to cases in which a minority community's voting

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

10

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

age population exceeds 50 percent but its *citizen* voting age population falls below 50 percent. Here, though, the Latino citizen voting age population exceeds 50 percent, which dooms their argument that Legislative District 15 is a façade Section 2 district. *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 441 (2006) ("The policy becomes even more suspect when considered in light of evidence suggesting that the State intentionally drew District 23 to have a nominal Latino voting-age majority (*without a citizen voting-age majority*) for political reasons. . . . This use of race to create the facade of a Latino district also weighs in favor of appellants' claim.") (emphasis added).

And on the merits of the *Palmer* Plaintiffs' Section 2 claims, the evidence will dispel any notion that the HCVAP-majority Legislative District 15 violates Section 2. Even assuming that the Latino population in the Yakima Valley is large and geographically compact enough to draw a reasonably-configured legislative district, *legally* significant *racially* polarized voting does not exist in Yakima County. After extensive expert discovery, it has become evident that voting polarization (to the extent it exists at all in the Yakima Valley) is driven by partisan preferences, not by race. And Section 2 of the Voting Rights Act only applies when, e.g., "Democrats lose because they are [B]lack, not where [B]lacks lose because they are Democrats," *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc),[4] and the evidence will demonstrate that any purported voting polarization in the Yakima Valley is driven by the latter and not by the former. And in any event, "[a] general finding regarding the existence of any racially polarized voting, no matter the level, is not enough." *Covington v. North Carolina*, 316 F.R.D. 117, 167 (M.D.N.C. 2016) (three-judge court). Instead, "the third *Gingles* inquiry is concerned only with 'legally significant racially polarized voting,' which occurs when

---

[4] 52 U.S.C. § 10301 (which is Section 2 of the VRA) provides at Section (a): "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b)." (emphasis added). This language, as analyzed by the Fifth Circuit in *Clements*, makes clear that race must be the cause of any purported vote dilution, and not simply a factor that correlates with political party preferences. 999 F.2d at 864. *Clements* makes clear that Section 2 does not protect political parties. *Id.*

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

11

Nos. 3:22-cv-5035 & 3:22-cv-5152

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

the 'majority [group] votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'") *Id.* at 170 (quoting *Gingles*, 478 U.S. at 51, 55–56).

Finally, because there is no evidence whatsoever that the Commission intended to dilute the vote of the Latino Community in the Yakima Valley, the *Palmer* Plaintiffs' intent claim necessarily fails.

## ARGUMENT

### I. RACE PREDOMINATED WHILE THE COMMISSION ESTABLISHED LEGISLATIVE DISTRICT 15'S BOUNDARIES (PLAINTIFF GARCIA'S RACIAL-GERRYMANDERING CLAIM).

The Supreme Court has long held that "all laws" classifying "citizens on the basis of race, including racially gerrymandered districting schemes, are constitutionally suspect and must be strictly scrutinized." *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (citing *Shaw v. Hunt*, 517 U.S. 899, 904 (1996)); *Miller*, 515 U.S. at 904–05. For his *Shaw* claim, Plaintiff Garcia bears the initial burden of demonstrating "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a district." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller*, 515 U.S. at 916).

Where, as here, "racial classifications are explicit, no inquiry into legislative purpose is necessary." *Cromartie I*, 526 U.S. at 546 (citing *Shaw v. Reno*, 509 U.S. 630, 642 (1993)). "[I]f race for its own sake is the overriding reason for choosing one map over others, race still may predominate." *Bethune-Hill*, 580 U.S. at 190. Similarly, "'[r]ace may predominate even when a reapportionment plan respects traditional principles' . . . if '[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Id.* at 189 (quoting *Shaw II*, 517 U.S. at 907) (alteration in original). And, importantly, the ultimate motive for sorting based on race is irrelevant; this "inquiry is satisfied" if the Commission "place[d] a significant number of voters within or without a district predominantly because of their race, regardless of their ultimate objective in taking that step." *Cooper*, 581 U.S. at 308 n.7. If the some of the Commissioners "use[d] race as their predominant districting criterion with the end goal of advancing their partisan interests—

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

12

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

perhaps thinking that a proposed district is more 'sellable' as a race-based VRA compliance measure than as a political gerrymander and will accomplish much the same thing—their action still triggers strict scrutiny." *Id.*

The Court will hear from all four voting Commissioners, which will establish that all were "dead set" on creating a HCVAP-majority district in the Yakima Valley. Some, like Commissioner Walkinshaw, wanted to establish the HCVAP-majority district for purposes of maximizing Latino political power, irrespective of whether the Voting Rights Act compelled him to do so. *Garcia* ECF No. 45-4, at 64:4-14; 137:12-138:04. Others set a racial target and used it as a bargaining chip to maximize political power elsewhere. *Garcia* ECF No. 45-3, at 56:24-57:08; 113:20-21. Either way, here, as was the case in *Cooper*, "[u]ncontested evidence in the record shows that the State's mapmakers . . . purposefully established a racial target"—that Latinos "should make up no less than a majority of the [citizen] voting-age population." 581 U.S. at 299. This triggers strict scrutiny.

II.     **THE COMMISSION DID NOT HAVE A SUFFICIENT BASIS IN EVIDENCE—STRONG OR OTHERWISE—TO BELIEVE THAT SECTION 2 REQUIRED IT TO ELEVATE CONSIDERATIONS OF RACE BEYOND OTHER TRADITIONAL REDISTRICTING PRINCIPLES (PLAINTIFF GARCIA'S CONSTITUTIONAL CLAIM/*PALMER* PLAINTIFFS' SECTION 2 EFFECTS CLAIM).**

Having established that race predominated the Commission's decision to draw Legislative District 15, the burden shifts to the State to demonstrate that "it had 'a strong basis in evidence' for concluding that the" Voting Rights Act "required its action." *Cooper*, 581 U.S. at 292 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 278). Put differently, "the State must establish that it had 'good reasons' to think that it would transgress the Act if it did not draw race-based district lines." *Id.* (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 278). And this requires the State to show that the Commission, at the time it drew and approved Legislative District 15, "actual[ly] consider[ed]" whether the Voting Rights Act required creation of an HCVAP-minority district in the Yakima Valley, and actually had a "strong basis in evidence" for concluding that "all the *Gingles*

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

precondition were met." *Cooper*, 581 U.S. at 301–02 (quoting *Bush v. Vera*, 517 U.S. 952, 978 (1996) (plurality opinion). The *Gingles* preconditions, in turn, are as follows:[5]

(1)   the Latino population in the Yakima Valley "is sufficiently large and geographically compact to constitute a majority in a single-member district";

(2)   the Latino population in the Yakima Valley is "politically cohesive"; and

(3)   the "white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate."

*See Old Person v. Cooney*, 230 F.3d 1113, 1120 (9th Cir. 2000) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)).

The evidence will show that none of the Commissioners had a "strong basis in evidence" for concluding that *any* of the *Gingles* preconditions were met as they were drawing Legislative District 15. The Court will hear from all four. Two (Fain and Graves) never believed that the Voting Rights Act required creation of an HCVAP-majority district in Yakima Valley. *Garcia* ECF No. 45-2, at 122:01-11; *Garcia* ECF No. 45-7, at 193:13-19. At least two (Sims and Graves) expressly admitted that they did not know what the Voting Rights Act required. *Garcia* ECF No. 45-3, at 56:24-57:08; 113:20-21; *Garcia* ECF No. 45-3, at 110:01-14; 122:01-11. Three (Walkinshaw, Fain, and Graves) concluded that, if the Voting Rights Act did require the creation of an HCVAP-majority district in Yakima Valley, Legislative District 15 did not satisfy Section 2's strictures. *Garcia* ECF No. 45-8, at 278:15-16; *Garcia* ECF No. 45-7, at 138:12-139:2; *Garcia* ECF No. 45-6, at 92:18-24. Critically, *not one* undertook any analysis to determine whether the *Gingles* preconditions were met, and the only analyses before the Commissioners at all (the Barreto Report and the legal analysis submitted in response to it) were commissioned, respectively, by the partisan officials (which obviously raises the specter of political bias) and came to opposite conclusions.

_____

[5] As we have previously noted, *see Palmer* ECF No. 97, the Supreme Court is expected to issue its opinions in two Alabama cases before the end of June 2023, which may impact the *Gingles* test or its application. *See Merrill v. Milligan*, No. 21-1086, *Merrill v. Caster*, No. 21-1087. Should that happen, counsel would likely seek the opportunity to brief the impact of those cases on the *Palmer* Plaintiffs Section 2 claims.

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

14

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

The Commission's failure to rely upon any evidence—strong or otherwise—that the Voting Rights Act necessitated an HCVAP-majority district in the Yakima Valley while it was completing its redistricting task compels a finding that the Commission violated the Fourteenth Amendment's Equal Protection Clause when it created Legislative District 15.

III.    **BECAUSE "THE POLITICAL PROCESSES . . . ARE EQUALLY OPEN TO PARTICIPATION BY" THE LATINO COMMUNITY IN THE YAKIMA VALLEY, LEGISLATIVE DISTRICT 15 DOES NOT VIOLATE SECTION 2 OF THE VOTING RIGHTS ACT (PLAINTIFF GARCIA'S CONSTITUTIONAL CLAIM/*PALMER* PLAINTIFFS' SECTION 2 EFFECTS CLAIM).**

Had the Commissioners actually considered what the Voting Rights Act required, they would have been compelled to conclude that Section 2 *does not* justify creation of an HCVAP-majority district in Yakima Valley. This fact underscores that Plaintiff Garcia should prevail on his Fourteenth Amendment racial-gerrymander claim. It also dooms the *Palmer* Plaintiffs' Section 2 claim. Even assuming that the Latino population in the Yakima Valley "is sufficiently large and geographically compact to constitute a majority in a single-member district" (*Gingles* precondition 1), the Latino population in the Yakima Valley is not politically cohesive and the White community in the Yakima Valley does not vote as a bloc to defeat Latino-preferred candidates (*Gingles* preconditions 2 and 3). And even if the *Palmer* Plaintiffs could satisfy all three *Gingles* preconditions, they cannot demonstrate that, based on the totality of the circumstances, the Latino population in the Yakima Valley has been "denied an equal opportunity to participate in the political process and to elect representatives of their choice." *Old Person*, 230 F.3d at 1120.

A.    **The Latino population in the Yakima Valley is not politically cohesive (*Gingles* Precondition 2).**

The VRA requires *Gingles* Precondition 2 because without evidence of political cohesion, it "cannot be said that the [electoral scheme] thwarts distinctive minority group interests." *Clements*, 986 F.2d at 744. Political cohesiveness exists when a "minority group has expressed clear political preferences that are distinct from those of the majority." *Gomez v. Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988). Courts typically find cohesion in a minority coalition when the

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

various minority groups have electoral variances of less than 10 percent. *See Clements*, 999 F.2d at 864–65; *LULAC v. Perry*, 548 U.S. at 427. Because "[p]olitical cohesiveness must be proven with statistical evidence of historical voting patterns," *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1401 (E.D. Wash. 2014), resolution of this issue will turn largely on a contest between the *Palmer* Plaintiffs' and the Defendants' experts.

Although much of this litigation has focused on dueling expert testimony, the fact remains that "[e]ven the most sophisticated districting maps cannot reliably account for some of the reasons voters prefer one candidate over another, or why their preferences may change." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2503 (2019). Here though, the Court does not need to look to their respective "prognostications as to the outcome of future elections." *Id.* The Court can, and should, look instead to the actual electoral results from Legislative District 15's 2022 State Senate race. If, as the *Palmer* Plaintiffs would have it, the Latino population in the Yakima Valley votes cohesively for Democratic candidates, one would expect that their citizen voting-age majority in Legislative District 15, when pitted against the alleged Republican-favoring White voters in the district, would tilt heavily towards the Democratic candidate. Instead, the election swung toward the Republican, who won by over a *35-point margin*. The math is what it is—and the math demonstrates that this landslide victory for a Republican candidate resulted from *non-cohesive* Latino voting. The Court can, and should, end the *Palmer* Plaintiffs' vote-dilution claim on this basis alone.

Even if the Court takes up the *Palmer* Plaintiffs' argument on their own terms, the *Palmer* Plaintiffs will not be able to carry their burden of demonstrating a Section 2 vote-dilution claim. The three racially polarized voting experts (Dr. Loren Collingwood for the *Palmer* Plaintiffs, Dr. John Alford for the State, and Dr. Mark Owens for the *Palmer* Intervenors) largely agree with each other as to the raw polarization data regarding election preferences in Yakima County. They disagree, however, on the conclusions that can be discerned from that data. Dr. Collingwood opines that there are "very clear patterns of [racially polarized voting] between Anglo and Latino voters in 23 out of 25 (92%) contests." Ex. 1 at 1; *Palmer* ECF No. 191, at 37. Dr. Alford, in contrast, opines that Latino voting cohesion is "moderate." Ex. 601 at 18; *Palmer* ECF No. 191, at 37. And

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

16

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

Dr. Owens has not found that "the Hispanic community shows sufficient cohesion for one party," because Hispanic voters in the Yakima Valley are "more politically independent than other groups of voters," which "mirrors national trends." Ex. 1001 at 2; *Palmer* ECF No. 191, at 37.

The evidence will show that Dr. Owens' position is correct, especially given data from elections that have now occurred under Legislative District 15. In the 2022 State Senate race, per Dr. Owens, Hispanic voters split 50-50 within the margin of error for the White Democratic candidate (Lindsey Keesling) and for the Hispanic Republican candidate (Nikki Torres). Ex. 1002a at 2. Whereas Dr. Collingwood opines that the Latino population in the Yakima Valley is polarized toward the Democratic party, actual data from an election in Legislative District 15 is an "example of reduced support for the Democratic candidate among both Hispanic voters and non-Hispanic White voters." In other words, the evidence will demonstrate that (1) the Latino population in the Yakima Valley is not politically cohesive, (2) to the extent it ever was, it is becoming less so, and (3) partisan preferences—not race—are driving voting behavior among the Latino population in the Yakima Valley.

**B.    The White population in the Yakima Valley does not vote sufficiently as a bloc so as to usually defeat the Latino population's preferred candidate.**

Similarly, the evidence will show that White bloc voting in the Yakima Valley is not routinely defeating the Latino population's candidates of choice. On this ground, the Court need not rely only on expert opinions. *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993). It may look for itself at election results and circumstances of elections. *Id*. And when statistical evidence is used to establish White bloc voting, the most probative elections are those in which a minority *candidate* runs against a White *candidate*. *Id*.

This is true because failures of a minority group to elect representatives of its choice that are caused by "partisan politics" instead of race provide no grounds for relief under the Voting Rights Act. Section 2 is "a balm for racial minorities, not political ones." *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) (citation omitted). Critically, the Voting Rights Act "*does not* guarantee that nominees of the Democratic Party will be elected, even if

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

[Latino] voters are likely to favor that party's candidates." *Id.* Rather, Section 2 is implicated only where Democratic candidates lose because they are Latino, not where Latino candidates lose because they are Democrats. *See Clements,* 999 F.2d at 854.

In other words, the elections that matter for purposes of racially polarized voting are those where minority *candidates* are defeated because of their minority status. *Citizens for a Better Gretna v. Gretna*, 834 F. 2d 496, 503–04 (5th Cir. 1987). Precedent and logic make this clear. "[I]mplicit in the *Gingles* holding is the notion that [minority] preference is determined from elections which offer the choice of a [minority] candidate." *Id.* Without examining races featuring a minority candidate, it is impossible to know "the extent that candidates preferred by black voters are consistently defeated because of their substantive political positions," which makes them "casualties of interest group politics, not racial considerations." *Clements,* 999 F.2d at 879. Were it otherwise, the Voting Rights Act would be expanded far beyond rectifying "denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*," *Earl Old Person v. Brown*, 312 F.3d 1036, 1040 (9th Cir. 2002), and instead would devolve into a tool wielded to augment partisan political power.

The evidence will demonstrate beyond any reasonable dispute that divergent voting patterns in the Yakima Valley are caused by partisan preference and are not "on account of race." As an initial matter, the only contested Legislative District 15 election to occur so far under the new legislative boundaries resulted in the election of a Latino candidate over a white candidate. Dr. Alford is the clearest on this point. His expert report examines virtually the same data as Dr. Collingwood, but, given the ways in which the Yakima Valley Latino population votes when a Latino-surname candidate appears on the ballot, Dr. Alford identifies "a general pattern of partisan, rather than ethnic, polarization." Ex. 601 at 13; *Palmer* ECF No. 191, at 37. In other words, the overall results suggest strong evidence of different voting patterns by Hispanic and non-Hispanic voters *relative to the party affiliation of a candidate*, regardless of whether the Democratic candidate has a Spanish surname or not." *Id.* (emphasis added). Dr. Owens agrees: "If voters in a district always give the same support for nominees of one party, regardless of race, then we do not

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

18

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

observe a negative effect of a candidate's race on their likelihood to win an election." Ex. 1001 at 3; *Palmer* ECF No. 191, at 37. This fact alone establishes that the *Palmer* Plaintiffs cannot carry their burden of establishing a Section 2 violation.

Even if the Court accepts Dr. Collingwood's opinions, the *Palmer* Plaintiffs still lose. Dr. Collingwood opines that, in seven out of ten elections in Legislative District 15, the Latino-preferred candidate would be defeated by the White-preferred candidate. Ex. 1; *Palmer* ECF No. 191, at 37. That, however, only tells part of the story. Two other contests "are very close." Ex. 601 at 16; *Palmer* ECF No. 191, at 37. Given that five out of ten elections in Legislative District 15 could come out differently with a shift of "less than a percentage point," it stands to reason that "enacted Legislative District 15 is a highly competitive district that can elect Hispanic candidates of choice," even though it "tilts slightly Republican overall, and will likely elect a Republican more often than a Democrat." *Id*. This is particularly true "given the growing Latino political power in the district." *LULAC v. Perry*, 548 U.S. at 442. And this conclusion forecloses the *Palmer* Plaintiffs' *Gingles* precondition 3 argument.

**C.  The totality of the circumstances does not demonstrate that the Latino population in the Yakima Valley are suffering electoral impairment.**

Even if the *Palmer* Plaintiffs could satisfy all three of the *Gingles* preconditions (and they cannot), they nonetheless will fail under "the totality of the circumstances," because *Palmer* Plaintiffs cannot prove that the Latino population in the Yakima Valley "has had less opportunity to participate in the political process, and to elect representatives of their choice." *Earl Old Person*, 312 F.3d at 1041. "Such an evaluation . . . to be guided by the factors identified in the Senate Judiciary Committee Majority Report, which accompanied the bill amending section 2 in 1982." *Id*.

Before progressing to the Senate Factors, the *Palmer* Plaintiffs must overcome the fact that Legislative District 15 is already majority HCVAP. In their view, the slight majority is a façade, but despite their assertions to the contrary, the sparse caselaw regarding purported façade districts is less beneficial to them than they have asserted. Legislative District 15 is not just a majority

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

19

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

Hispanic voting age population district. Instead, it's a majority Hispanic *citizen* voting age population district. This difference is crucial; the façade district discussed in the sole Supreme Court case cited by the *Palmer* Plaintiffs raised concerns because the district at issue in that case was majority HVAP but not majority HCVAP:

> Latinos, to be sure, are a bare majority of the voting-age population in new District 23, but only in a hollow sense, for the parties agree that the relevant numbers must include citizenship. This approach fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates.
>
> . . . .
>
> The policy becomes even more suspect when considered in light of evidence suggesting that the State intentionally drew District 23 to have a nominal Latino voting-age majority (without a citizen voting-age majority) for political reasons. . . . This use of race to create the facade of a Latino district also weighs in favor of appellants' claim.

*LULAC v. Perry*, 548 U.S. at 429, 441. Leaving open the possibility that creation of a majority Hispanic *citizen* voting age population district forecloses Section 2 relief is in accord with other Supreme Court precedent, which noted that "the 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive minority vote by *submerging it in a larger white voting population*." *Growe v. Emison*, 507 U.S. 25, 40 (1993) (emphasis added). "Unless these points are established, there neither has been a wrong nor can be a remedy." *Id*. at 40–41; *see also Cooper*, 581 U.S. at 302 ("Those three showings, we have explained, are needed to establish that 'the minority [group] has the potential to elect a representative of its own choice' in a possible district, but that racially polarized voting prevents it from doing so in the district as actually drawn because it is '*submerg[ed] in a larger white voting population*.'") (quoting *Growe*, 507 U.S. at 40) (emphasis added).

Caselaw from other circuits is in accord. Although the Second Circuit noted that "the law allows plaintiffs to challenge legislatively created bare majority-minority districts on the ground that they do not present the 'real electoral opportunity' protected by Section 2," *Pope v. Cty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012) (citing *LULAC v. Perry*, 548 U.S. at 429, 441), "the parties" in that case "argue[d] by reference to VAP," so the Second Circuit did "not here consider

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

20

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

the alternative possibility of employing citizen voting-age population ('CVAP') in evaluating a Section 2 claim," *Id.* at 573 n.6. For its part, the Fourth Circuit has held that so long as a minority group has "equal access to the polls and in fact represent[s] a majority of those eligible to vote in a majority of the election districts relevant to the governmental body at issue, the rights afforded by the . . . Voting Rights Acts are satisfied." *Smith v. Brunswick Cty.*, 984 F.2d 1393, 1402 (4th Cir. 1993).

Given *Cooper*, *Growe*, and *Smith*, the Court can (and should) hold that, because Legislative District 15 is a majority Hispanic *citizen* voting age population district, it cannot be said that the Latino population in Legislative District 15 has "less opportunity to participate in the political process, and to elect representatives of [its] choice." *Earl Old Person*, 312 F.3d at 1041. At a minimum, though, this fact makes it more difficult for the *Palmer* Plaintiffs to demonstrate that the Senate Factors tilt the Section 2 scale in their favor. And despite the sordid history set out by the *Palmer* Plaintiffs' totality-of-the-circumstances expert (Dr. Josué Q. Estrada), the evidence will demonstrate that none of their scattershot criticisms of Washington's historical treatment of minority communities has any effect on voting patterns in the Yakima Valley.

### 1. Proportionality of opportunity districts

When analyzing the "totality of the circumstances" and before applying the Senate Factors, the Supreme Court "proceed[s] first to the proportionality inquiry." *LULAC v. Perry*, 548 U.S. at 436. To be certain, the Voting Rights Acts does not require proportionality, and its proportionality "does not act as a 'safe harbor,'" standing alone, against a Section 2 claim. *Bartlett v. Strickland*, 556 U.S. 1, 30 (2009) (cleaned up). Proportionality, however, remains relevant as one of many factors in the totality if the circumstances analysis, since logic dictates that "no violation of § 2 can be found . . . where, in spite of continuing discrimination and racial bloc voting, minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population." *De Grandy*, 512 U.S. at 1000.

The proportionality inquiry compares "the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population. *LULAC v. Perry*,

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

21

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

548 U.S. at 436 (emphasis added); *see also Bartlett*, 556 U.S. at 30 ("[A] § 2 complaint must look to an entire districting plan (normally, statewide), alleging that the challenged plan creates an insufficient number of minority-opportunity districts in the territory as a whole." (emphasis added)). An opportunity district is one where "minority voters make up less than a majority of the voting-age population [but] the minority population . . . is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 13.

The *Palmer* Plaintiffs have no evidence demonstrating that the Enacted Plan lacks Latino opportunity districts across the State. Thirty-one of the State's forty-nine legislative districts are represented by at least one legislator with the same partisan preference as the candidates that Plaintiffs identify as "Latino preferred." Thus, sixty-three percent of Washington's legislative districts are arguably "opportunity districts," which far exceeds the state's Latino CVAP proportion.

### 2. History of discrimination (Senate Factor 1)

The first Senate Factor examines the "history of official discrimination . . . that touched the right of the members of the minority group to . . . participate in the democratic process," *Gingles*, 478 U.S. at 36–37. To resolve this factor in favor of the *Palmer* Plaintiffs, they must demonstrate not only instances of discrimination, but how it has hampered their political participation. *See, e.g.*, *NAACP v. Fordice*, 252 F.3d 361, 367 (5th Cir. 2001) ("Absent an indication that these facts actually hamper the ability of minorities to participate, they are, however, insufficient to support a finding that minorities suffer from unequal access to Mississippi's political process." (cleaned up)); *Clements*, 999 F.2d at 866 ("Texas' long history of discrimination [is] insufficient to support the district court's 'finding' that minorities do not enjoy equal access to the political process absent some indication that these effects of past discrimination actually hamper the ability of minorities to participate."); *Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1561 (11th Cir. 1987) ("[A] history of official discrimination did exist in Carroll County but . . . the plaintiffs failed to establish there was a lack of ability of blacks to participate in the political process."); *Wesley v.*

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

*Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986) ("Evidence of past discrimination cannot, in the manner of original sin, condemn action that is not in itself unlawful." (cleaned up).

The evidence will show that the *Palmer* Plaintiffs are unable to make this connection.

### 3. Racially polarized voting (Senate Factor 2)

As discussed above, the *Palmer* Plaintiffs will not be able to demonstrate *legally* sufficient *racially* polarized voting because, among other reasons, voting patterns are driven by partisanship, not by race.

### 4. Discrimination-enhancing practices (Senate Factor 3)

The third Senate Factor concerns "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37. The *Palmer* Plaintiffs have offered just one example of such a "voting practice or procedure" by claiming—quite incorrectly—that "[i]n Washington state legislative elections, even-numbered districts are up for election in presidential election years" and "odd-numbered legislative districts are up for election in non-presidential years." *See Palmer* ECF No. 38, at 14. This is false and has been since the first anniversary of statehood. *See* An Act to Prescribe the Number of Senators and Members of the House of Representatives, §§ 6-7, 1890 Wash. Sess. Laws 3, 12.

Elections for state representatives are held every two years, meaning voters in all odd-numbered legislative districts elect two state representatives in presidential and non-presidential election years. And while elections for state senator are held every four years, even- and odd-numbered districts are staggered evenly between presidential and non-presidential election years, with thirteen odd-numbered districts electing state senators during presidential election years and twelve odd-numbered districts electing state senators in non-presidential election years. *See* An Act Relating to Reapportionment and Redistricting, ch. 288, § 63, 1981 Wash. Sess. Laws 1180, 1213. Since the *Palmer* Plaintiffs' only example of this factor is demonstrably false, it cuts decidedly against their favor.

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

### 5. Candidate slating process (Senate Factor 4)

The fourth Senate Factor asks, "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37. Washington does not utilize a candidate-slating process for legislative elections, nor do the *Palmer* Plaintiffs allege that it does. Because there is no candidate-slating process in Washington, there can be no Latino exclusion from such process, and this factor weighs against the *Palmer* Plaintiffs.

### 6. Effects of socioeconomic disparities (Senate Factor 5)

The fifth Senate Factor calls for an evaluation of "the extent to which members of the minority group bear the effects of discrimination in such areas as education, employment and health," but only insofar as those factors "*hinder their ability to participate effectively in the political process.*" *Gingles*, 478 U.S. at 37 (emphasis added). Similar to the burden required for resolving the first Senate Factor, most courts require "some kind of nexus not only between a history of discrimination and lowered socioeconomic status, but also between depressed socioeconomic status and the ability to participate in the political process." *Katz*, supra, at 703; *see, e.g.*, *Fordice*, 252 F.3d at 368 ("Absent an indication that [such disparities] actually hamper the ability of minorities to participate, they are . . . insufficient to support a finding that minorities suffer from unequal access to [the] political process."); *cf. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1027–28 (9th Cir. 2020) (determining "that the effects of discrimination 'hinder' minorities' ability to participate effectively in the political process" (internal citation omitted)); *Old Person*, 230 F.3d at 1129 (observing that a minority group's "lower socioeconomic status" hindered its "ability to participate fully in the political process").

At no point have the *Palmer* Plaintiffs even alleged such a causal connection or any other nexus between the cited socioeconomic disparities and low political participation. They are thus unable to use this Senate Factor to help their case.

### 7. Racial appeals in campaigns (Senate Factor 6)

The sixth Senate Factor asks whether political campaigns in the jurisdiction "have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. The stories cited by the

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

24

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

*Palmer* Plaintiffs almost all involve individual voters, not the campaign appeals contemplated by *Gingles* and this Senate Factor. The sole example from a political campaign was a candidate's Facebook post opposing illegal immigration. *Id*. at 19. But opposing illegal immigration is hardly a "racial appeal." Moreover, In a 2014 Section 2 case, the district court, "[h]aving reviewed the record," was "not persuaded that political campaigns in Yakima have been characterized by racial 'appeals' to the voting base." *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1413 (E.D. Wash. 2014). Because the *Palmer* Plaintiffs fail to cite any "racial appeals" in political campaigns, this factor does not resolve in their favor.

### 8.   Minority electoral success (Senate Factor 7)

The seventh and final enumerated Senate Factor is "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37. Plaintiffs claim that "no Latino candidate has ever been elected to the Washington legislature from the Yakima Valley region." *Palmer* ECF No. 38, at 10. They are wrong. As discussed above, the winner of the 2022 State Senate race for Legislative District 15 is Hispanic. Little more need be said regarding this Senate Factor.

More, however, can be shown. Representative Mary Skinner, from Legislative District 14, was "born in California to migrant-worker parents and raised in the Yakima Valley" and became "[t]he first Latino legislator from the Yakima Valley." Pat Muir, Yakima Legislator Mary Skinner Dies, The Seattle Times, Feb. 7, 2009, available at https://www.seattletimes.com/seattle-news/yakima-legislator-mary-skinner-dies/. Representative Skinner was elected to the State House seven times, winning every election she ran in from 1994 until 2006. *See id*.; Members of the Legislature, supra, at 51. In addition, Legislative District 13 is currently represented in the State House by Intervenor Alex Ybarra, who is Latino. Under the Enacted Plan, he represents 30,702 individuals in Yakima County, of whom 8,303 identify as Hispanic or Latino. Wash. State Redistricting Comm'n, 2021 Report to the Legislature, at 69 (Nov. 22, 2021), *available at* https://indd.adobe.com/view/717c7700-23fc-468b-bfe0-22650328637a. Almost every city in Yakima County currently has Latino mayors and/or city councilmembers, including Grandview,

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

Granger, Mabton, Toppenish, Wapato, Yakima and Zillah. Even Plaintiffs acknowledge this is evidence of "a growing ability" for these communities "to exercise their political strength." (Dkt. # 54 at 10 n.7.).

### 9. Responsiveness and tenuousness (additional Senate Factors)

On top of the seven "typical" Senate Factors, two "additional factors" with "probative value" in Section 2 cases are "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" and whether the challenged practice is "tenuous." *Gingles*, 478 U.S. at 37. The evidence will demonstrate that the *Palmer* Plaintiffs have not, and cannot, demonstrate any such lack.

### 10. Special factors in Ninth Circuit election cases

The Ninth Circuit considers other factors in election cases, including whether an injunction would "affect the state's election processes or machinery," whether a challenged law "newly criminalizes activity associated with voting," whether an "injunction would disrupt long standing state procedures," and whether the court had time to give "careful and thorough consideration" to the issues. *Feldman*, 843 F.3d at 367–70 (9th Cir. 2016). But none of these factors favor the *Palmer* Plaintiffs.

## IV. NO EVIDENCE WHATSOEVER SUPPORTS THE ARGUMENT THAT THE COMMISSION INTENDED TO DILUTE THE VOTE OF THE LATINO COMMUNITY IN THE YAKIMA VALLEY (*PALMER* PLAINTIFFS' SECTION 2 INTENTIONAL DISCRIMINATION CLAIM).

The evidence at trial, including that offered by each of the four Commissioners, will demonstrate conclusively the *Palmer* Plaintiffs' intentional-discrimination claim has no basis whatsoever. As discussed *supra*, all four of the Commissioners agreed to create a majority-HCVAP district in the Yakima Valley without any strong evidence establishing that they had do to do, and two of the four expressed their desire to *maximize* Latino voting strength in the Yakima Valley. And, indeed, in the sole contested election held so far in Legislative District 15, the victor was Latina.

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

26

Nos. 3:22-cv-5035 & 3:22-cv-5152

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

## CONCLUSION

For the foregoing reasons, and based on the evidence that the Court will receive at trial, the Court should issue final judgment for Plaintiff Garcia on his Fourteenth Amendment claim and issue final judgment against the *Palmer* Plaintiffs on their two Voting Rights Act claims.

DATED this 31st day of May, 2023.

Respectfully submitted,

*s/ Andrew R. Stokesbary*
Andrew R. Stokesbary, WSBA No. 46097
CHALMERS, ADAMS, BACKER & KAUFMAN, LLC
701 Fifth Avenue, Suite 4200
Seattle, WA 98104
T: (206) 207-3920
dstokesbary@chalmersadams.com

Jason B. Torchinsky (admitted pro hac vice)
Phillip M. Gordon (admitted pro hac vice)
Caleb Acker (admitted pro hac vice)
Andrew Pardue (admitted pro hac vice[6])
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
T: (540) 341-8808
jtorchinsky@holtzmanvogel.com
pgordon@holtzmanvogel.com
apardue@holtzmanvogel.com

Dallin B. Holt (admitted pro hac vice)
Brennan A.R. Bowen (admitted pro hac vice[6])
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
Esplanade Tower IV
2575 East Camelback Rd
Suite 860
Phoenix, AZ 85016
T: (540) 341-8808
dholt@holtzmanvogel.com
bbowen@holtzmanvogel.com

*Counsel for* Soto Palmer *Intervenor-Defendants and* Garcia *Plaintiff*

---

[6] Admitted *pro hac vice* in *Soto Palmer v. Hobbs* only

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

27

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

# CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing document with the Clerk of the Court of the United States District Court for the Western District of Washington through the Court's CM/ECF System, which will serve a copy of this document upon all counsel of record.

DATED this 31st day of May, 2023.

Respectfully submitted,

*s/ Andrew R. Stokesbary*
Andrew R. Stokesbary, WSBA No. 46097

*PALMER* INTERVENORS' TRIAL BRIEF
AND *GARCIA* PLAINTIFF'S TRIAL BRIEF

Nos. 3:22-cv-5035 & 3:22-cv-5152

28

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920