The Honorable Robert S. Lasnik

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**
                  **WESTERN DISTRICT OF WASHINGTON**
9                           **AT SEATTLE**

10   SUSAN SOTO PALMER, et al.                    NO. 3:22-cv-5035-RSL

11              Plaintiffs,                       STATE OF WASHINGTON'S
                                                 CLOSING TRIAL BRIEF
12        v.

13   STEVEN HOBBS, in his official capacity
     as Secretary of State of Washington, et al.,
14
                Defendants,
15
          and
16
     JOSE TREVINO, ISMAEL G. CAMPOS,
17   and State Representative ALEX YBARRA,

18              Intervenor-Defendants.

19

20

21

22

23

24

25

26

1

**TABLE OF CONTENTS**

2    I.      INTRODUCTION ................................................................................................. 1

3    II.     BACKGROUND ................................................................................................... 3

4            A.    Structure and Mandate of Redistricting Commission ................................. 3

5            B.    The Commissioners ..................................................................................... 4

6            C.    Recent Litigation, Feedback, and Research on Racially Polarized Voting
                   Informed the Redistricting Process ............................................................. 4
7
             D.    The Commissioners Proposed Initial Maps ................................................ 7
8
             E.    The Commissioners Received a Report from Dr. Barreto, and Two
9                  Commissioners Released Revised Maps ...................................................... 8

10           F.    The Commission Adopted a Negotiated Framework Based on Partisan
                   Metrics, and the Legislature Amended the Commission's Plan ............... 10
11
     III.    ARGUMENT ...................................................................................................... 13
12
             A.    In Light of the Expert Testimony and Other Evidence, the State Does Not
13                 Dispute that Legislative District 15 of the Redistricting Plan Violates
                   Section 2's Prohibition on Discriminatory Results .................................. 13
14
                   1.    To prevail on their discriminatory results claim, *Soto Palmer* plaintiffs
15                       must satisfy the three *Gingles* preconditions and establish that under the
                         totality of the circumstances, Hispanic voters are less able to participate
16                       in the political process and elect candidates of their choice than white
                         voters ............................................................................................... 13
17
                   2.    The State does not dispute that the three *Gingles* preconditions for a
18                       Section 2 claim are satisfied .......................................................... 16

19                 3.    The State does not dispute that the evidence establishes that many of the
                         Senate Factors are satisfied ........................................................... 18
20
                   4.    A finding for *Soto Palmer* Plaintiffs on their results claim would dispose
21                       of the remaining claims in this suit ............................................... 19

22           B.    *Soto Palmer* Plaintiffs Cannot Carry Their Burden to Prove That the
                   Redistricting Commission Intentionally Discriminated Against Latino Voters ...... 20
23
                   1.    There is no evidence that the Washington State Legislature intentionally
24                       discriminated against Latino voters ................................................ 21

25                 2.    There is no evidence that the Commission intentionally discriminated
                         against Latino voters ...................................................................... 23
26

C. The *Garcia* Plaintiff Cannot Prove that Legislative District 15 is a Racial Gerrymander in Violation of the Equal Protection Clause ..................................... 26

1. Race did not predominate in the Legislature's decision to amend and adopt LD 15 .............................................................................................. 27

2. Race did not predominate for the Redistricting Commission ......................... 28

3. There was ample reason to believe that Section 2 of the VRA requires the drawing of a race-conscious district in the Yakima Valley ............................ 31

IV.   PROPOSED REMEDY ................................................................................. 32

V.   CONCLUSION ............................................................................................ 35

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

# I.    INTRODUCTION[1]

Washington's 2021 redistricting process unfolded amidst a set of challenges unlike anything any prior Commission had ever faced. COVID-19 prevented the Commissioners from meeting face-to-face. The Commission's schedule was compressed on both ends. Commissioners received Census data several months late and, due to a change in the law, faced a deadline almost seven weeks earlier than prior Commissions. And, due to demographic changes in the Yakima Valley, the 2021 Commission was the first Commission in Washington history faced with the serious possibility that the Voting Rights Act (VRA) required them to draw a specific type of district.

Despite these difficulties, the Commissioners endeavored to reach a bipartisan consensus on maps. Over the course of several months, they pored over countless iterations of various maps, thousands of public comments, and endless spreadsheets, and eventually divided up our diverse, sprawling, geographically complex state into 49 individual districts of roughly 157,000 people each.

The Commissioners sought extensive public feedback throughout the redistricting process. They held 17 public outreach meetings, consulted with Washington's 29 federally recognized Indian tribes, and conducted 22 regular business meetings. Exs. ## 19, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40–42, 45, 47, 48, 50, 52, 54, 56, 57, 60, 62, 65, 67, 68, 70, 72, 73, 75, 77, 79, 81, 83, 86, 89, 92, 95, 98, 610; Tr. at 338:9–18. They received testimony from hundreds of Washingtonians and thousands of comments. *See* Ex. # 610. They met with many stakeholders, including advocates from the Yakima area. Exs. ## 42, 44, 45–46, 68–69 (public outreach meetings covering Legislative Districts 12, 13, 14, 15, 16, and 17); Ex. # 324 (stakeholder meeting with Commissioners Sims and Walkinshaw). They reviewed information related to recent VRA cases from the Yakima area. They received analyses from Dr. Matt Barreto

---

[1] This trial brief is being filed concurrently in both *Soto Palmer v. Hobbs*, No. 3:22-cv-5035, and *Garcia v. Hobbs*, No. 3:22-cv-5152. Throughout this brief, the State uses the terms "Latino" and "Hispanic" interchangeably, and, consistent with the relevant case law, uses the term "race" to refer to both race and ethnicity.

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  of the UCLA Voting Rights Project, attorneys at Davis Wright Tremaine and the Attorney

2  General's Office, and numerous other sources. Ultimately, each Commissioner independently

3  voted on a framework that preserved traditional redistricting criteria such as compactness and

4  keeping cities together, accounted for each Commissioner's goals, and sought to promote

5  competitive elections in the Yakima Valley that would give Hispanic voters a chance to elect

6  their preferred candidates.

7      The evidence adduced at trial makes clear that the Commission did not intentionally

8  discriminate against Latino voters. Consequently, even if the Court concludes that Legislative

9  District (LD) 15 violates Section 2's prohibition on discriminatory results, the *Soto Palmer*

10  Plaintiffs' secondary claim of intentional discrimination lacks merit. Likewise, the evidence

11  clearly demonstrates that ethnicity was just one of many factors the Commissioners considered

12  and did not predominate over traditional redistricting principles in decision-making on LD 15;

13  and even if it did, there was more than sufficient basis for the Commissioners to draw a

14  majority-Hispanic district in the Yakima Valley. Consequently, even if the *Garcia* Court were

15  to reach Mr. Garcia's likely moot racial gerrymandering claim,[2] that claim lacks merit as well.

16      Accordingly, the State respectfully requests that the respective Courts enter judgment in

17  favor of the State on the *Soto Palmer* Plaintiffs' discriminatory intent claim and the *Garcia*

18  Plaintiff's racial gerrymandering claim and dismiss these two claims with prejudice.

19

20

21

22

23      [2] Assuming the Court determines LD 15 violates Section 2, the three-judge panel should not reach the
constitutional claim asserted by the *Garcia* Plaintiff, consistent with the canon of constitutional avoidance. *See*
24  *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding
principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity
25  of deciding them.") (collecting cases); *e.g.*, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1035 (N.D. Ala. 2022), *order
clarified*, No. 2:21-CV-1291-AMM, 2022 WL 272637 (N.D. Ala. Jan. 26, 2022), *aff'd sub nom. Allen v. Milligan*,
26  143 S. Ct. 1487 (2023) (issuing injunction on Voting Rights Act grounds and declining to reach the constitutional
claims).

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1

## II.    BACKGROUND[3]

2

**A.    Structure and Mandate of Redistricting Commission**

3      Article II, section 43 of the Washington Constitution provides for a bipartisan

4    Washington State Redistricting Commission (Commission) for redistricting of state legislative

5    and congressional districts. The Commission consists of four voting members and one

6    non-voting member who serves as the chairperson. *See* Wash. Const. art. II, § 43(2). The voting

7    members are appointed by the legislative leaders of the two largest political parties in each house

8    of the Legislature. *Id.*

9      In addition to the Washington Constitution, state statute also sets forth requirements for

10    the Commission and the districting plans. Specifically, Wash. Rev. Code § 44.05.090 sets forth

11    the requirements for state legislative redistricting plans in Washington State. Among other

12    requirements, district lines should coincide with the boundaries or local political subdivisions

13    and maintain communities of interest, city and county splits should be kept to a minimum, and

14    districts should be comprised of contiguous and compact territory. Wash. Rev. Code

15    § 44.05.090.

16      The Commission must agree, by majority vote, to a redistricting plan by November 15

17    of the relevant year, at which point the Commission transmits the plan to the Legislature.

18    Wash. Rev. Code § 44.05.100(1); Wash. Const. art. II, § 43(2). Should the Commission fail to

19    agree upon a redistricting plan, the task falls to the Supreme Court of Washington.

20    Wash. Rev. Code § 44.05.100(4). Upon submission of the plan by the Commission, the

21    Legislature has 30 days during a regular or special session to amend the plan by an affirmative

22    two-thirds vote. Wash Rev. Code § 44.05.100(2). The amendment may not include more than

23    two percent of the population of any legislative or congressional district. *Id*. The redistricting

24    plan becomes final upon the Legislature's approval of any amendment or after the expiration of

25

26    _____

[3] Throughout this brief, the State refers to exhibits filed with the Court on May 31, 2023 and listed on the agreed pretrial order filed in the *Soto Palmer* matter on May 24, 2023. *Soto Palmer*, Dkt. # 191.

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035                         3                         ATTORNEY GENERAL OF WASHINGTON
                                                                  Complex Litigation Division
                                                                  800 Fifth Avenue, Suite 2000
                                                                  Seattle, WA 98104
                                                                  (206) 464-7744

1    the 30-day window for amending the plan, whichever occurs sooner. Wash Rev. Code

2    § 44.05.100(3).

3    **B.    The Commissioners**

4            For the 2021 redistricting cycle, the four voting Commissioners were  April Sims

5    (appointed by the House Democratic Caucus), Brady Piñero Walkinshaw (appointed by the

6    Senate Democratic Caucus), Paul Graves (appointed by the House Republican Caucus), and

7    Joe Fain (appointed by the Senate Republican Caucus). Dkt. # 191 (Joint Pretrial Statement)

8    at p. 11. Each of the four Commissioners are dedicated public servants, who viewed their work

9    on the Commission as an opportunity to further serve the State. Tr. at 256:1–21; 311:22–312:21;

10   431:8–22, 478:11–479:7; 677:20–678:5; 752:23–753:24. As the Court heard, each of the

11   Commissioners was committed to complying with the law—both Washington's law governing

12   the redistricting process and the federal Voting Rights Act. *Infra* Section II.D. Each

13   Commissioner was also committed to promoting their own particular priorities. *Id*. But at the

14   same time, each Commissioner also recognized this was—by design—a negotiated process, and

15   everyone would have to compromise to reach an agreement. Tr. at 251:4–253:2, 278:3–19;

16   345:7–12 (Commissioner Walkinshaw explaining his proposal "would be negotiated" because

17   he was "one of four"); 435:11-25; 766:19–767:11.

18   **C.    Recent Litigation, Feedback, and Research on Racially Polarized Voting Informed
         the Redistricting Process**
19

20           The 2021 redistricting process unfolded against a backdrop of litigation exposing the

21   presence of racially polarized voting in the Yakima Valley.

22           In *Montes v. City of Yakima*, Judge Thomas Rice concluded that Yakima's at-large voting

23   system for city council elections violated Section 2 of the VRA. 40 F. Supp. 3d 1377 (E.D. Wash.

24   2014) (Ex. # 602). Judge Rice reviewed evidence regarding the three *Gingles* factors and

25   concluded that each was satisfied with respect to Latino voters in the City of Yakima. *Id.* at

26   1390–1407. Most significant, for the Redistricting Commission's purposes, was his analysis of

the second and third *Gingles* factors—which ask whether "the minority group is 'politically cohesive[,]'" and whether the "'white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'" *Id.* at 1387 (quoting *Thornburg v. Gingles,* 478 U.S. 30, 51 (1986)). On the second *Gingles* factor, Judge Rice reviewed statistical analysis examining ten recent elections and concluded that plaintiffs had "made a strong showing that Latino voters in Yakima have clear political preferences that are distinct from those of the majority, and that a significant number of them usually vote for the same candidates." *Id.* at 1405 (quotations omitted). On the third *Gingles* factor, Judge Rice looked at both statistical and historical evidence, concluding "that the non-Latino majority in Yakima routinely suffocates the voting preferences of the Latino minority." *Id.* at 1407.

Additionally, several weeks before the Commissioners publicly released their proposed maps, Yakima County settled a case under the Washington Voting Rights Act, *Aguilar. v. Yakima County*, No. 20-2-0018019 (Kittitas Cnty. Super. Ct.), which likewise challenged an at-large voting system for diluting the votes of Hispanic voters. Exs. ## 605, 606 (Declaration of Annabelle Harless, Order Approving Settlement and Entering Judgment, *Aguilar v. Yakima County*, No. 20-2-0018019 (Kittitas Cnty. Sup. Ct. Oct. 29, 2021)). In August 2021, the parties entered a settlement agreement, which the court approved in October 2021, after finding that "[t]here is sufficient evidence from which the Court could find that the at-large system of electing Yakima County Commissioners violates the Washington Voting Rights Act." Ex. # 606 at p. 1.[4]

The Commissioners were well aware of these cases, and the implications they had for their own work. Commissioner Graves testified that the lawsuits meant that the Commission "better spend some time thinking about Section 2, and what it might mean in the Yakima

---

[4] Similarly, in *Glatt v. City of Pasco*, a challenge to Pasco's at-large voting system, the court entered a consent decree in which the parties stipulated to each *Gingles* factor. *See* Ex. # 603, at pp. 6–8, (Partial Consent Decree ¶¶ 15–22, *Glatt v. City of Pasco*, No. 4:16-CV-05108-LRS (E.D. Wash. Sep. 2, 2016), Dkt. # 16; *see also* Ex. # 604 at p. 29 (Mem. Op. and Order, *Glatt*, No. 4:16-CV-05108-LRS (Jan. 27, 2017), Dkt. # 40 ("It has been stipulated and this court has found that voting in Pasco evidences racial polarization.")). None of the Commissioners recalled at trial being aware of *Glatt*, however.

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Valley." Tr. at 758:18–759:3. Commissioner Fain understood *Montes* to mean that Section 2 might apply to legislative maps in the Yakima area. Tr. at 499:19–22. Commissioner Walkinshaw was aware of VRA lawsuits in the Yakima Valley and stated publicly that it was his priority to create a VRA-compliant district in the Yakima Valley. Ex. # 183 (Oct. 21, 2021 Walkinshaw press release identifying VRA lawsuits brought against Yakima and Pasco); Tr. at 342:19–25, 343:9–11. And finally, Commissioner Sims testified that because "there had already been lawsuits filed and won, that stated that there should be majority Latino districts created at the local level in Yakima Valley," she "believe[d] that based on that, [the Commission] needed to do the same thing at the state level." Tr. at 262:20–23.

Commissioner Sims also received guidance from a house staffer—and attorney—named Alec Osenbach, who explained that "previous court cases" in the Yakima area "definitely" answered the question of whether there was racially polarized voting in the region. According to Mr. Osenbach, these prior cases showed that "the VRA requires that [the Commission] draw a majority Latinx district." Tr. at 267:2–269:8; Ex. # 167.[5] To similar effect, Commissioner Walkinshaw was advised by a member of his team, Adam Hall, Senior Policy Counsel for the Senate Democratic Caucus, that the racially polarized voting findings in *Montes* and *Aguilar* meant "there is a strong chance our commission will likely be **required to** draw [a majority-minority district] under federal law and the failure to do so will result in a lawsuit striking down that map." Ex. # 163.

Commissioner Sims also reviewed research regarding the potential need to create a Hispanic opportunity district in the Yakima Valley. Commissioner Sims reviewed a report from MGG Redistricting Lab that "f[ou]nd that Yakima has a clear pattern of racial polarization, with strong *Gingles* 2 and 3 findings." The report noted "strong cohesion between Hispanic and native voters in their support of Hispanic candidates, while white voters block these candidates of

---

[5] As discussed below, Mr. Osenbach further advised Commissioner Sims that it was not clear whether a district had to lean a certain way politically to satisfy the VRA. Ex. # 167; Tr. at 269:9–270:5.

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   choice for the minority coalition from ever reaching office." Tr. at 262:2–264:18; Exs. ## 130,

2   131. Commissioner Sims also considered a 2013 presentation from Dr. Matt Barreto in which

3   he analyzed numerous elections in the Yakima area and found racially polarized voting between

4   white and Hispanic voters. Tr. at 265:5–266:22; Ex. # 132.

5       So coming into the process, there was already ample reason for the Commissioners to

6   believe they might need to create a majority-Hispanic district in the Yakima Valley. And against

7   that background, the evidence shows that each Commissioner did their best to comply with the

8   VRA, insofar as they understood it, while also promoting traditional redistricting criteria and, of

9   course, seeking partisan advantage for the side that had nominated them.

10  **D.      The Commissioners Proposed Initial Maps**

11      Amidst the challenges associated with the COVID-19 pandemic, the 2021

12  Commissioners got a late start in drawing maps due to a lengthy delay in their receipt of data

13  from the U.S. Census Bureau. Tr. at 682:3–7 (Commissioner Graves stating "[W]e didn't get our

14  data from the Census Bureau until August 2021," so "we didn't have the raw material that we

15  needed to start drawing maps" until then); Dkt. # 191 ¶ 21.[6]

16      Nonetheless, on September 21, 2021, each of the four voting Commissioners publicly

17  released a proposed legislative map. These maps were notable primarily because they

18  demonstrated each Commissioner's priorities for redistricting. Commissioner Sims explained

19  that her priorities were "to comply with the law, and the requirements under the Constitution

20  regarding how districts were drawn," and that she "wanted to draw maps that reflected the

21  political realities of our state, that increased civic engagement and voter participation, [and] that

22  respected communities of interest[] and tribal sovereignty." Tr. at 257:2–12. Commissioner

23  Walkinshaw was "guided by a principle of keeping communities together." He sought to

---

[6] On the back end too, the Commissioners had an earlier deadline than prior Commissions to approve maps (November 15 as opposed to December 31), which was imposed by a recent constitutional amendment. *See* Wash. Const. art. II, § 43(6); Amend. 108, 2016 Senate Joint Resolution No. 8210, https://lawfilesext.leg.wa.gov/biennium/2015-16/Pdf/Bills/Senate%20Passed%20Legislature/8210.PL.pdf (approved Nov. 8, 2016).

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035                    7                    ATTORNEY GENERAL OF WASHINGTON
                                                        Complex Litigation Division
                                                        800 Fifth Avenue, Suite 2000
                                                        Seattle, WA 98104
                                                        (206) 464-7744

"divid[e] as few communities as possible," promote "community interest[s], minimize[] city and county split[s], . . . create[] the most opportunity for communities to have fair representation of their choosing," "respect[] the needs of tribal nations," and preserve "transportation corridors in communities that are economically and geographically connected." Tr. at 339:13–340:20; Ex. # 144. Commissioner Fain prioritized partisan competitiveness and keeping communities of interest together, with an emphasis on school districts and tribes. Tr. at 482:12–21; 486:5–487:3. He also sought to increase the number of majority-minority district in Washington and comply with all statutory and constitutional requirements. Tr. at 486:1–4; 479:14–480:23; *see also* Ex. # 607; Ex. # 302. Commissioner Graves' priorities included "trying to encourage electoral competition" and keeping communities of interest together. Tr. at 756:3–19; *see also* Tr. at 755:2–18 (Commissioner Graves explaining that he always sought to comply with statutory and constitutional requirements).

Each Commissioner also prioritized complying with the Voting Rights Act, though as trial made clear, they each differed in their understanding of what that meant. Tr. at 343:9–11 (Walkinshaw); Ex. # 200 (Sims); Tr. at 757:24–758:1 (Graves); Tr. at 434:16–435:1 (Fain); *infra* Section II.E. (discussing Commissioners' understandings of what the VRA required in the Yakima Valley).

And finally, befitting a bipartisan negotiation, the Commissioners sought to gain (or at least not lose) partisan advantage through the negotiations. As Commissioner Graves put it, "the exact negotiations [the Commissioners] were having across the entire map" consisted of "'Hey, can we get more partisan performance here, in exchange for more partisan performance there?' That was kind of the meat and potatoes of [their] negotiation." Tr. at 707:20–23.

**E.  The Commissioners Received a Report from Dr. Barreto, and Two Commissioners Released Revised Maps**

Shortly after the Commissioners released their proposed maps, the Senate Democratic Caucus retained Dr. Matt Barreto of the UCLA Voting Rights Project to evaluate the existence

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    of racially polarized voting in the Yakima Valley and assess the public maps' compliance with

2    the VRA. Ex. # 179. Each Commissioner testified about reviewing or reading about Dr. Barreto's

3    report. In his analysis, Dr. Barreto concluded that there was "clear" evidence "of racially

4    polarized voting" in the Yakima Valley. *Id.* at p. 16. Dr. Barreto explained that to comply with

5    the VRA, the Commission needed to include a district with a majority-Hispanic citizen voting

6    age population (CVAP) that allowed Latino voters to elect candidates of their choice.

7            After reviewing the Barreto report, Commissioners Sims and Walkinshaw released new

8    proposed maps designed to better comply with the VRA by increasing the Hispanic CVAP, while

9    also improving on the previous maps in other respects. *See* Exs. ## 196, 197; *see also* Tr. at

10   272:17–273:13; Ex. # 200; Ex. # 195. Thus, Commissioner Walkinshaw explained that his map

11   not only "undoubtedly complie[d] with federal law," it also "reduce[d] the number of split cities

12   and counties, in accordance with our state's redistricting statute," "keeps communities together,

13   [and] responds to public feedback." Ex. # 195. And Commissioner Sims stated that her newly

14   proposed map was a "continued commitment . . . to the needs of underrepresented communities"

15   and would "creat[e] a majority Latino district based on citizen voting age population and unites

16   the Yakama Nation." Ex. # 200. Meanwhile, Commissioners Fain and Graves obtained a legal

17   opinion from lawyers at Davis Wright Tremaine LLP, who opined that a majority-minority

18   district in the Yakima Valley was not necessary and that the consideration of race could amount

19   to illegal gerrymandering. Ex. # 225. Commissioner Graves was the one who reached out to

20   Davis Wright because he wanted "a legal analysis of [the Barreto] report, and what it would

21   mean for what we had to do, or were allowed to do, with the districts in the Yakima Valley."

22   Tr. at 697:14–16.[7] His takeaway from the memo combined with the Barreto report "is there is a

23

24          [7] Commissioner Graves also sought advice from the Washington Attorney General's Office following the
     release of the Barreto report "to get as clear an understanding as [he] could, of what Section–2 actually required."

25   Tr. at 761:10–14. That advice was shared with the entire Commission. Ex. # 508. Among other questions,
     Commissioner Graves asked whether the VRA required the creation of a lean-Democratic district and was told

26   "[t]he Commission is not required under the VRA to choose a map that favors one political party over another as a
     standalone factor." *Id.* at p. 5.

1    lot of uncertainty here, a lot of vagueness about both what the law allows or requires, what data

2    we need to be looking at, and how it would actually apply to a particular district." Tr. at

3    727:8–14. For Commissioner Fain, the Davis Wright memo was a data point in his efforts to

4    ensure compliance with the Voting Rights Act and Fourteenth Amendment, Tr. at 501:18–23,

5    and while he found it persuasive, he did not view the memo as "dispositive." Tr. at 464:2–5.

6         Ultimately, the four commissioners reached three, or possibly four, different conclusions

7    about what the VRA required in the Yakima Valley. Commissioner Fain believed that Section 2

8    did not require a majority-Hispanic CVAP district. Tr. at 497:17–25. Commissioner Graves was

9    "entirely uncertain" about "whether the VRA required a majority-Hispanic district," but did not

10    believe the VRA required the Yakima Valley district to favor one party over the other.

11    Tr. at 743:5–12; 760:7–11. Commissioner Sims believed the VRA required the Commission "to

12    draw a majority CVAP district in the 15th" that was "competitive," which is what the

13    Commission ultimately accomplished, but did not believe the district was required to lean

14    Democratic. Tr. at 260:10–24; 281:6–9. And although no party clearly asked Commissioner

15    Walkinshaw about his views, he publicly stated that Section 2 required "a majority-Hispanic

16    district in the Yakima Valley" with "the demonstrated ability to allow Latino voters to elect their

17    candidates of choice to the Washington State Legislature." Ex. # 195. No evidence at trial

18    suggests that any Commissioner held their view in anything but good faith. To the contrary,

19    Commissioner Graves explicitly testified "that [his] fellow commissioners, who thought there

20    was a requirement to draw a majority Hispanic CVAP district . . . held that view in good faith,

21    because there is a good-faith argument that it does require such a district." Tr. at 759:23–760:2.

22   **F.**     **The Commission Adopted a Negotiated Framework Based on Partisan Metrics, and the Legislature Amended the Commission's Plan**

23         As the deadline approached, the Commissioners negotiated extensively in an effort to

24    reach bipartisan compromise, with Commissioners Sims and Graves primarily tasked with

25

26

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  negotiating the legislative districts. Tr. at 246:22–24.[8] While each Commissioner remained

2  committed to their overarching goals, the sticking points, including with respect to LD 15,

3  primarily centered on partisan performance. Tr. at 702:12–704:19. While ethnicity was certainly

4  an important consideration in the negotiations over LD 15, it was just one factor in the

5  negotiations. Commissioner Graves, for example, said that he viewed ethnicity as an important

6  consideration in negotiating LD 15—perhaps "on par with" partisan performance—but he also

7  testified that he would not, and did not, vote for any version of LD 15 that violated the traditional

8  redistricting criteria laid out in statute and Washington's constitution. Tr. at 756:20–757:18.

9  Commissioner Sims testified that ethnic demographics were just one element she considered,

10  along with "[t]otal population, geography, communities of interest, cities and towns, natural

11  borders, highways," and partisan performance. Tr. at 282:4–21; *see also* Tr. at 286:6–25

12  (explaining that voter ethnicity was a factor, but not the most important one). And Commissioner

13  Walkinshaw testified that the negotiations were shaped by "a lot of different pieces," with the

14  primary concerns being partisan competitiveness, creating a Hispanic CVAP majority,

15  "unif[ying] city and county lines, [and] unifying . . . the ancestral lands of the Yakama all the

16  way down to the Columbia River." Tr. at 333:1–14.

17         Following a chaotic final day and evening of negotiations, the Commissioners ultimately

18  voted to approve a legislative redistricting plan just before midnight. The agreed-upon plan

19  consisted of a framework based primarily on partisan metrics. Tr. at 225:20–226:22; 326:11–21;

20  495:10–16; 714:9–715:8. Staffers then converted that framework into the final map for

21  submission to the Legislature. On November 16, the Commission transmitted the final map to

22  the Legislature. Ex. # 123. In the final map, LD 15 is 73 percent Hispanic and, according to

23

24        [8] Consistent with prior Commissions—and to save time given the late receipt of Census data and the new, earlier deadline for adopting decennial redistricting plans—the Commissioners negotiated in two-person dyads. *See, e.g.*, Tr. at 689:12–19 ("We got our data that we had to use for these maps, in August of that year. We had a November 15th deadline, to get things done. And so for the sake of time, more than anything else, and based on the precedent of our past Commissions, we chose to negotiate in what we called 'diads,' with these one-on-one meetings, with the goal of having maps that could be available for all the commissioners to review and discuss; and hopefully if we could get there, to vote on.")

25

26

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   estimates based on the 2020 American Community Survey, approximately 51.5 percent Hispanic

2   by Hispanic CVAP. Ex. # 520; Dkt. # 191 ¶ 85.

3         As contemplated by the Commission's design, the plan agreed to by the Commissioners

4   "reflected a bipartisan compromise. Tr. at 326:24. Nonetheless, the Commissioners broadly

5   agreed that the map reflected their values and complied with Washington's statutory and

6   constitutional redistricting criteria. *See, e.g.*, Tr. at 278:3–8; 495:23–496:14; 764:16–25. Each

7   Commissioner who was asked the question testified that they believed LD 15 complies with the

8   Voting Rights Act, albeit for different reasons. Commissioner Sims testified that "based on all

9   of the information I had at the time, I knew that we needed to draw a majority CVAP district in

10  the 15th, and that we needed to make it competitive. And I think that's what we ultimately did."

11  Tr. at 281:6–9; *see also* Tr. at 285:14–16. She testified in detail to her belief that LD 15 as

12  adopted by the Commission genuinely gave Hispanic voters an opportunity to elect candidates

13  of their choice, and that the District, as adopted, was trending in the direction of Hispanic-

14  preferred candidates. Tr. at 278:20–280:23. Commissioner Fain likewise believed that LD 15

15  complied with the VRA, although unlike Commissioner Sims, his belief was based on his

16  conclusion that the VRA did not require any particular type of district in the Yakima Valley.

17  Tr. at 497:17–25. Even so, like Commissioner Sims, Commissioner Fain believed that the LD 15

18  he voted on gave either party the opportunity to win elections. Tr. at 496:17–497:8. Finally,

19  Commissioner Graves testified that he understood the VRA to give the Commission "discretion"

20  in how to draw a map, and that "the way we drew it is one of those ways that you can draw it,

21  where it's compliant with Section 2." Tr. at 745:25–746:6. Although he was unsure whether the

22  VRA *required* the creation of a majority-Hispanic district, he nonetheless believed that LD 15

23  gave Hispanic voters an opportunity to elect candidates of their chose because "a majority of the

24  eligible voters are Hispanic." Tr. at 775:10–14. Like Commissioner Fain, Commissioner Graves

25  did not believe the VRA required LD 15 to lean Democratic. Tr. at 760:7–11. And like

26  Commissioner Sims, Commissioner Graves testified to his belief that LD 15 was more Hispanic

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

than it appeared based on the data available to the Commission, and that it was likely to become even more Hispanic over time, further cementing Hispanic voters' opportunities to elect their candidates of choice. Tr. at 765:6–24.

Upon transmission, the Legislature exercised its statutory prerogative to amend the Plan and, in so doing, made changes to LD 15 without altering its demographic make-up. On February 8, 2022, the Legislature passed House Concurrent Resolution 4407 (HCR 4407), adopting an amended redistricting plan. H.R. Con. Res. 4407, 67th Leg., Reg. Sess. (Wash. 2022) (enacted). Upon passage, the Legislature's amended redistricting plan became State law. Wash. Rev. Code § 44.05.100.

## III.   ARGUMENT

**A.   In Light of the Expert Testimony and Other Evidence, the State Does Not Dispute that Legislative District 15 of the Redistricting Plan Violates Section 2's Prohibition on Discriminatory Results**

Given the conclusions of the State's expert, the other record evidence, and factual findings in relevant federal and state VRA cases in Eastern Washington, the State of Washington cannot and does not dispute that *Soto Palmer* Plaintiffs have satisfied the three *Gingles* preconditions for pursuing a claim under Section 2 of the VRA based on discriminatory results. Based on the same evidence, the State cannot and does not dispute that the totality of the evidence test likewise favors the *Soto Palmer* Plaintiffs' discriminatory results claim.

**1.   To prevail on their discriminatory results claim, *Soto Palmer* plaintiffs must satisfy the three *Gingles* preconditions and establish that under the totality of the circumstances, Hispanic voters are less able to participate in the political process and elect candidates of their choice than white voters**

"A violation of § 2 occurs when, based upon the totality of the circumstances, the challenged electoral process is 'not equally open to participation by members of a [racial

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    minority group] in that its members have less opportunity than other members of the electorate

2    to participate in the political process and to elect representatives of their choice.'" *Montes v. City*

3    *of Yakima*, 40 F. Supp. 3d 1377, 1387 (E.D. Wash. 2014) (quoting 42 U.S.C. § 1973(b)

4    (emphasis omitted)). "The essence of a § 2 claim is that a certain electoral law, practice, or

5    structure interacts with social and historical conditions to cause an inequality in the opportunities

6    enjoyed by [minority] and [majority] voters to elect their preferred representatives."

7    *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). "That occurs where an 'electoral structure

8    operates to minimize or cancel out' minority voters' 'ability to elect their preferred candidates.'"

9    *Allen v. Milligan*, ---U.S.---, 143 S. Ct. 1487, 1503 (2023) (quoting *Gingles*, 478 U.S. at 48).

10    This "risk is greatest where minority and majority voters consistently prefer different candidates

11    and where minority voters are submerged in a majority voting population that regularly defeats

12    their choices." *Id.* (cleaned up).

13        *Soto Palmer* Plaintiffs' vote dilution claim requires them to establish three "necessary

14    preconditions"—known as the *Gingles* factors—to show that "a bloc voting majority [will]

15    *usually* be able to defeat candidates supported by a politically cohesive, geographically insular

16    minority group." *Gingles*, 478 U.S. at 49, 50 (emphasis in original). *First*, they must show that

17    Hispanic voters in the Yakima area are "sufficiently large and geographically compact to

18    constitute a majority in a single-member [voting] district." *Id.* at 50. *Second*, they must show

19    that Hispanic voters are "politically cohesive," *id.* at 51, *i.e.*, that they have "expressed clear

20    political preferences that are distinct from those of the majority," *Gomez v. City of Watsonville*,

21    863 F.2d 1407, 1415 (9th Cir. 1988). *Third*, they must "demonstrate that the white majority votes

22    sufficiently as a bloc to enable it . . . usually to defeat [Hispanic voters'] preferred candidate."

23    *Gingles*, 478 U.S. at 51. To prove a discriminatory results claim under Section 2, *Soto Palmer*

24    Plaintiffs need not establish that the maps were intentionally drawn to discriminate against

25    Hispanic voters. *See, e.g.*, *Smith v. Salt River Project Agr. Imp. & Power Dist.*, 109 F.3d 586,

26    594 (9th Cir.1997). Nor do *Soto Palmer* Plaintiffs need to show that white and Hispanic voters

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

voted differently *because* of race (as opposed to partisanship). Rather, as *Gingles* makes clear, "[i]t is the *difference* between the choices made by [minority voters] and whites—not the reasons for that difference—that results in [minority voters] having less opportunity than whites to elect their preferred representatives." 478 U.S. at 63. "Consequently, . . .  under the 'results test' of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." *Id.*

If the Court concludes the *Soto Palmer* Plaintiffs have established each *Gingles* precondition, the Plaintiffs would then need to "prove that, under 'the totality of [the] circumstances,' [Hispanic] voters have less opportunity than [white voters] to participate in the political process and to elect representatives of their choice." *Montes*, 40 F. Supp. 3d at 1387 (quoting 42 U.S.C. § 1973(b)). This analysis rests on seven non-exclusive factors called the "Senate Factors," which originated in a 1982 report by the Senate Judiciary Committee. *Id.* at 1387–88 (citing *Gingles*, 478 U.S. at 44–45). These factors are:

(1) The history of voting-related discrimination in the jurisdiction;

(2) The extent to which voting in the elections of the jurisdiction is racially polarized;

(3) The extent to which the jurisdiction has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

(4) The exclusion of members of the minority group from candidate slating processes;

(5) The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6) The use of overt or subtle racial appeals in political campaigns; and

(7) The extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 1388 (citing *Gingles*, 478 U.S. at 44–45). "When relevant to the particular claim being asserted, a court may also consider the extent to which elected officials have been responsive to

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

the particularized needs of the minority group, and the policy underlying the challenged voting practice or procedures." *Id.* (citing *Gingles*, 478 U.S. at 45).

> **2.**     **The State does not dispute that the three *Gingles* preconditions for a Section 2 claim are satisfied**

Based on the evidence adduced at trial, the State has no basis to dispute that each of the three *Gingles* preconditions is met. In particular, the report of the State's expert, Dr. John Alford, provides ample support for this conclusion. Ex. # 601 (Expert Report of Dr. John Alford). In his report, Dr. Alford concludes that the first *Gingles* precondition "seems to be met here as evidenced by the fact that the Hispanic Citizen Voting Age Population (HCVAP) exceeds 50%, both in the current LD 15 as enacted, and in the alternative demonstrative configurations" propounded by *Soto Palmer* Plaintiffs. *Id.* at p. 4. He further notes that these districts are compact both in terms of their "visual appearance" and "by the summary indicators for compactness" highlighted by *Soto Palmer* Plaintiffs' expert, Dr. Loren Collingwood. *Id.*; *see also* Tr. at 852:25–853:4 (Dr Alford: "Q: Is it your testimony that the districts we're talking about in this case, are more compact and contiguous than most of the demonstration districts you've seen in the VRA cases you've done? A: Yes. Certainly more than most demonstration districts.").

Under the second *Gingles* precondition, Dr. Alford concludes that Hispanic "voter cohesion is stable in the 70 percent range across election types, suggesting consistent moderate cohesion." Ex. # 601 at pp. 17–18. And under the third *Gingles* factor, Dr. Alford concludes that "non-Hispanic White voters demonstrate cohesive opposition to" Hispanic-preferred candidates in partisan elections, and that this "opposition is modestly elevated when those [Hispanic-preferred] candidates are also Hispanic," although he also notes that "in contests without a party cue, non-Hispanic White voters do not exhibit cohesive opposition to Hispanic candidates." *Id.* at p. 18. Finally, in examining electoral performance, Dr. Alford concludes "that candidates preferred by Hispanic voters can prevail in enacted Legislative District 15, albeit not as often as they would fail to be elected." *Id.* In short, Dr. Alford concludes that for partisan elections,

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    racially polarized voting exists such that white voters in LD 15 will generally vote as a bloc to

2    defeat the candidates preferred by Hispanic voters. But, he writes, "[g]iven the highly

3    competitive partisan balance" in the current district, "it seems likely that a very modest change

4    could shift the district to one equally likely to elect the Hispanic candidate of choice." *Id.*

5         Dr. Alford's conclusions are corroborated by other expert testimony. His results are

6    broadly consistent with those of *Soto Palmer* Plaintiffs' *Gingles* expert, Dr. Loren Collingwood.

7    *See generally* Ex. # 001. They are also largely consistent with the conclusions of Intervenor-

8    Defendants' expert, Dr. Mark Owens. Dr. Owens' expert report focuses only on the second and

9    third *Gingles* factors.[9] Ex. # 1001. Dr. Owens opines that Hispanic voters in LD **13** (i.e., *not*

10   LD 15) do not vote cohesively, and he appears to agree with Dr. Alford (and Dr. Collingwood,

11   for that matter) that non-partisan elections do not clearly exhibit racially polarized voting.

12   Nonetheless, Dr. Owens agrees that "election returns and demographic information indicate

13   there is a consistent trend in the preference for a Democratic candidate among Hispanic voters

14   within [District] 15." Ex. # 1001 at p. 11; *see also id.* at p. 9 (table showing Hispanic voter

15   cohesion in District 15), 18 ("The data show the political loyalty of Hispanic voters favors the

16   Democratic Party[.]"). Moreover, Dr. Owens does not challenge *Soto Palmer* Plaintiffs'

17   contention (and Dr. Alford's conclusion) that white voters, voting as a bloc, tend to overwhelm

18   Hispanic voters' preferences in LD 15. Tr. at 600:15–601:11

19        Despite his general agreement with Dr. Alford and Dr. Collingwood, Dr. Owens argues

20   that voters' "choice is based on partisanship instead of racial identity," Ex. # 1001 at p. 18, and

21   he does not "find evidence that opposition to candidates increase as a result of the race of the

22   candidate." *Id.* at p. 2. This conclusion does not negate the evidence of a discriminatory result

23   under Section 2. Again, "[i]t is the *difference* between the choices made by [minority voters] and

24   whites—not the reasons for that difference—that results in [minority voters] having less

25   opportunity than whites to elect their preferred representatives." *Gingles*, 478 U.S. at 63.

26   _____
     [9] Dr. Owens does not opine that LD 15 is non-compact. Tr. at 599:11–15.

1    "Consequently, . . . under the 'results test' of § 2, only the correlation between race of voter and

2    selection of certain candidates, not the causes of the correlation, matters." *Id.*

3          As detailed above, Dr. Alford's conclusions also find support in the recent cases

4    addressing racially polarized voting in the Yakima Valley. *See* Ex. # 602 (*Montes*,

5    40 F. Supp. 3d at 1390–1407); Ex. # 603 at pp. 6–8 (Partial Consent Decree ¶¶ 15–22, *Glatt*,

6    No. 4:16-CV-05108-LRS, Dkt. # 16); *see also* Ex. # 604 (Mem. Op. and Order at 29, *Glatt*,

7    No. 4:16-CV-05108-LRS, Dkt. # 40) ("It has been stipulated and this court has found that voting

8    in Pasco evidences racial polarization."); Exs. ## 605, 606 (*Aguilar v. Yakima County* settlement

9    documents finding racially polarized voting in Yakima County). While *Montes*, *Glatt*, and

10   *Aguilar* addressed slightly different geographic areas than the area encompassed by LD 15, the

11   findings of racial polarization in those three cases lend support to Dr. Alford's conclusions of

12   racially polarized voting in the Yakima Valley area under the second and third *Gingles* factors.

> **3.     The State does not dispute that the evidence establishes that many of the Senate Factors are satisfied**

13

14         As *Gingles* makes clear, "the most important Senate . . . [F]actors bearing on § 2

15   challenges . . . are the extent to which minority group members have been elected to public office

16   in the jurisdiction and the extent to which voting in the elections of the state or political

17   subdivision is racially polarized," factors that are largely incorporated into the precondition

18   analysis. *Gingles*, 478 U.S. at 51 n.15 (quotation omitted).[10] Thus, "it will be only the very

19   unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but

20   still have failed to establish a violation of § 2 under the totality of circumstances." *Jenkins v. Red

21   Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993).

22         Here, the State does not dispute that the expert testimony and other evidence demonstrate

23   that Hispanic voters in the Yakima Valley area are less able than white voters to elect

24

---

25   [10] The *Gingles* Court went on: "If present, the other [Senate F]actors, such as the lingering effects of past discrimination, the use of appeals to racial bias in election campaigns, and the use of electoral devices which enhance

26   the dilutive effects of multimember districts when substantial white bloc voting exists . . . are supportive of, but *not essential to,* a minority voter's claim." *Gingles*, 478 U.S. at 51 n.15 (emphasis in original).

STATE OF WASHINGTON'S                              18                ATTORNEY GENERAL OF WASHINGTON
CLOSING TRIAL BRIEF                                                         Complex Litigation Division
NO. 3:22-CV-5035                                                              800 Fifth Avenue, Suite 2000
                                                                                 Seattle, WA 98104
                                                                                  (206) 464-7744

representatives of their choice. Dr. Alford's performance analysis underscores this differential, indicating that while LD 15 is highly competitive, "[t]he preferred candidate of Spanish-surnamed voters prevails in three of the ten contests." Ex. # 601 at p. 16.

Furthermore, successful Section 2 and Washington Voting Rights Act lawsuits in Yakima, Yakima County, and Pasco provide compelling evidence that, historically, Hispanic voters in and around the Yakima Valley have been prevented from electing the candidates of their choice. *Montes*, 40 F. Supp. 3d at 1409–15; Partial Consent Decree, *Glatt*, No. 4:16-CV-05108-LRS, Dkt. # 16; *Aguilar*, No. 20-2-0018019. A recent history of Section 2 violations is itself highly significant. But *Montes* also includes detailed findings under the Senate Factors. The Court there pointed to historical voting-related discrimination (most notably a 2004 lawsuit against Yakima County for failing to provide Spanish-language voting materials), evidence of racially polarized voting, significant statistical evidence of socio-economic disparities between whites and Hispanics in Yakima, and the lack of electoral success of Hispanic candidates in Yakima to conclude that the Senate Factors "weigh firmly" in favor of Section 2 liability. *Montes*, 40 F. Supp. 3d at 1414. The State cannot dispute that these factors point in the same direction here. *See* Ex. # 004 (Expert Report of Dr. Josué Estrada).[11]

In summary, the State has no basis to dispute that the evidence at trial demonstrates that the *Soto Palmer* Plaintiffs have satisfied the three *Gingles* preconditions for a Section 2 vote dilution claim and that, under the totality of the circumstances, Hispanic voters in LD 15 are less able to participate in the political process and elect candidates of their choice than white voters.

> **4.     A finding for *Soto Palmer* Plaintiffs on their results claim would dispose of the remaining claims in this suit**

Should the *Soto Palmer* Court find that Plaintiffs have carried their burden on the results claim, the respective courts need not address the remaining two claims. *First*, a finding in their

---

[11] This is not to say that the State agrees with or adopts the conclusions of *Soto Palmer* Plaintiffs' Senate Factors Expert, Dr. Josué Estrada, but merely that many of the facts that were dispositive in *Montes* are essentially undisputed here.

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  favor on the results claim would provide complete relief to the *Soto Palmer* Plaintiffs. This

2  renders their intent claim pure surplus that the Court need not waste time and energy addressing.

3  *Second*, a finding that LD 15 violates the VRA and must be redrawn moots Mr. Garcia's racial

4  gerrymandering claim attacking the same district. Simply put, if the Court finds LD 15 invalid

5  under the VRA and orders it redrawn, there will no longer be a district for Mr. Garcia to

6  challenge. *See Growe v. Emison*, 507 U.S. 25, 39 (1993); *Johnson v. Mortham*, 926 F. Supp.

7  1460, 1470 (N.D. Fla. 1996). Addressing Mr. Garcia's constitutional claim would also run afoul

8  of the "'fundamental and longstanding principle of judicial restraint'" requiring [courts] to

9  "'avoid reaching constitutional questions in advance of the necessity of deciding them.'"

10  *United States v. Lamont*, 330 F.3d 1249, 1251 (9th Cir. 2003) (quoting *Lyng v. Nw. Indian*

11  *Cemetery Prot. Ass'n,* 485 U.S. 439, 445 (1988)).

12      Consequently, if this Court finds for *Soto Palmer* Plaintiffs on their results claim, it

13  should decline to address the remaining claims.

14  **B.    *Soto Palmer* Plaintiffs Cannot Carry Their Burden to Prove That the Redistricting**
       **Commission Intentionally Discriminated Against Latino Voters**

15

16      In the event this Court elects to reach *Soto Palmer* Plaintiffs' intentional discrimination

17  claim, the evidence shows Plaintiffs fall far short of proving that claim.

18      *Soto Palmer* Plaintiffs face a daunting burden of proof. To prevail on their intentional

19  discrimination claim, they must overcome "the presumption of good faith that must be accorded

20  legislative enactments." *Miller v. Johnson*, 515 U.S. 900, 916 (1995)*.* This requires them to prove

21  that "a discriminatory purpose has been a motivating factor in the decision" to adopt LD 15.

22  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265–66 (1977); *see*

23  *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) (applying *Arlington Heights*

24  framework to discriminatory intent claim under Section 2 of the VRA). "'Discriminatory

25  purpose' . . . implies more than intent as volition or intent as awareness of consequences . . . ***It***

26  ***implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least***

*in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable [minority] group*." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added) (internal citation omitted); *accord Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (relying on *Feeney* in considering a discriminatory intent claim under Section 2 and recognizing that "[l]egislators' awareness of a disparate impact on a protected group is not enough: the law must be passed *because of* that disparate impact"); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (similar); *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("Proving the motivation behind official action is often a problematic undertaking."). *Soto Palmer* Plaintiffs have not met their burden to prove discriminatory purpose under this demanding standard.

As a threshold matter, a critical decision maker for purposes of this analysis is the Legislature, and the *Soto Palmer* Plaintiffs have offered no evidence of the Legislature's intent. And even if it were appropriate to focus solely on the Commission, the evidence at trial revealed no discriminatory motives on the part of the Commissioners. In fact, the evidence showed that each of the Commissioners intended—and endeavored—to comply with the VRA.

### 1. There is no evidence that the Washington State Legislature intentionally discriminated against Latino voters

As an initial matter, the Redistricting Plan at issue in this litigation is not the plan passed by the Commission. Instead, the operative version of the Redistricting Plan is an amended version of the Commission's plan—adopted not by the Commission but by the Washington State Legislature. *See* H.R. Con. Res. 4407 (Ex. # 127). Notably, in exercising its statutory prerogative to adopt an amended plan under Wash. Rev. Code § 44.05.100, the Legislature made multiple changes to LD 15 but elected to keep the demographic composition essentially the same. H.R. Con. Res. 4407 at 71–77. This suggests that the Legislature affirmatively decided to maintain the demographics proposed by the Commission. *See Am. Cas. Co. of Reading, Penn. v. Nordic Leasing, Inc.*, 42 F.3d 725, 732 (2d Cir. 1994) ("Where sections of a statute have been

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  amended but certain provisions have been left unchanged, we must generally assume that the

2  [L]egislature intended to leave the untouched provisions' original meaning intact.").

3       Despite the Legislature's deciding role in enacting the Redistricting Plan at issue, the

4  *Soto Palmer* Plaintiffs focused exclusively on the intent of the Commission and failed to offer

5  *any* evidence as to the Legislature's intent, let alone evidence that any legislator intended to

6  discriminate. Indeed, Senator Saldaña testified that Senate Democratic leadership explicitly

7  decided *not* to substantively amend the map proposed by the Commission, and there was no

8  evidence whatsoever that this decision was driven by an intent to discriminate. Tr. at 191:17–

9  193:4. Absent a showing that the Legislature intentionally discriminated against Latino voters in

10  amending the Commission's plan and adopting the operative Redistricting Plan, *Soto Palmer*

11  Plaintiffs' intentional discrimination claim must fail. *Cf.* Ord. Den. Pltf.'s Mot. Summ. J.

12  at 11 n. 2, *Garcia,* No. 2:22-cv-5152, Dkt. # 56 ("The decision making at issue in this case

13  encompasses the various steps and bodies through which the legislative power of redistricting is

14  accomplished under Washington law, not simply the representative body itself . . . . Both the

15  Commission and the Legislature are therefore 'part of the legislative process' and it is their

16  combined efforts which must be evaluated for compliance with the Equal Protection Clause.")

17  (citing *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 805–07 (2015)).

18       *Soto Palmer* Plaintiffs may argue in their brief that the Legislature's authority to amend

19  the Commission's proposed plan is narrow, but the Legislature is empowered to shift district

20  populations by up to two percent—over 3,000 people in a district. Wash. Rev. Code § 44.05.100.

21  This is a considerable shift in a district as closely split as LD 15. *See* Ex. # 601 at pp. 16–17

22  ("[E]nacted Legislative District 15 is a highly competitive district that can elect Hispanic

23  candidates of choice[], but that tilts slightly Republican overall . . . . However, the margin is

24  small, and suggests that a very modest shift in the Democrat makeup of the district . . . could

25  result in a district that would be expected to elect the Hispanic candidate of choice as often as

26  not.").

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

2.      **There is no evidence that the Commission intentionally discriminated against Latino voters**

Even if it were appropriate to focus exclusively on the intent of the Commission, *Soto Palmer* Plaintiffs' intentional discrimination claim would fail.

As discussed above, the evidence shows that each Commissioner sincerely intended to comply with the VRA. *Supra* Section 2.D. Each Commissioner who was asked testified that they believed the version of LD 15 they voted on in fact complied with the VRA as they understood it. *Supra* Section 2.F. Moreover, at least three Commissioners expressly testified to their belief that enacted LD 15 gave Hispanic voters the opportunity to elect their candidates of choice. *Id. Soto Palmer* Plaintiffs offer no evidence to undermine the sincerity or credibility of the Commissioners.

*Soto Palmer* Plaintiffs' primary contention seems to be that the Commissioners supposedly *knew* they needed to create a district that was not only majority-Hispanic by CVAP but that also leaned Democratic, and that their failure to adopt such a district demonstrates intent. Even if such an awareness were sufficient to establish discriminatory intent—which it is not, *see Feeney*, 442 U.S. at 279—no Commissioner testified that they understood they were required to create a Democratic-leaning district. Commissioner Sims, for example, testified that she believed that to comply with the VRA, LD 15 had to be majority-Hispanic by CVAP and be at least competitive, but she did not believe the district had to lean Democratic. Tr. at 274:65–275:10. This was consistent with advice she had received not only from House Democratic Caucus counsel Alec Osenbach, but from attorneys advising the Commission from the Attorney General's Office as well. Tr. at 275:11–15; Exs. ## 167, Tr. at 275:16—276:12; 508 at p. 3. Commissioner Graves explained his own understanding in similar terms, testifying: "for as murky and complicated as Section 2 of the Voting Rights Act is, I firmly believe it does not contain any requirement that one party just gets to win. I think it's about the ability of racial minorities to be involved in their elections in a fair way, and not a partisan rule." Tr. at

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  726:5–10. And to Commissioner Graves' understanding, LD 15 did just that. Tr. at 775:10–14

2  ("Q: So do you think Hispanic citizens in the Yakima Valley should be able to form a majority

3  and elect candidates of choice? A: Yes. That's why I voted for a district where a majority of the

4  eligible voters are Hispanic."); *see also* Tr. at 497:23–25 (Commissioner Fain testifying that he

5  did not believe the VRA required a lean-Democratic district).

6        *Soto Palmer* Plaintiffs also attempt to ascribe discriminatory intent to the Commission's

7  decision to number the Hispanic Opportunity District LD 15 rather than LD 14, but absolutely

8  no evidence at trial showed, suggested, or even hinted that the Commission numbered the district

9  LD 15 to suppress turnout among Hispanic voters. Tr. at 763:7–10 (Commissioner Graves: "Was

10  race or ethnicity, the race or ethnicity of voters, a factor at all in the decision, in your decision to

11  shift it from LD 14 to LD 15? A: No. . . ."); Tr. at 502:14–17 (Commissioner Fain: "Do you

12  recall any conversations about how numbering the district 14 versus 15, might affect Latino

13  turnout for electoral performance? A: No."); *see also* Tr. at 504:8–25 (discussing Ex. # 135).

14  Indeed, the entire predicate of Plaintiffs' claim is that Hispanic turnout between presidential and

15  midterm elections declines more than White turnout does, but there is no evidence the

16  Commission was even aware of this. *See, e.g.*, Tr. at 341:19–342:1. To the contrary, the evidence

17  shows that, consistent with the Commission's practice throughout the State, LD 15 was

18  numbered LD 15 because the majority of voters in the newly drawn district and the incumbents

19  had previously been in LD 15. Tr. at 710:15–711:2, 763:6–14.

20        Plaintiffs have also suggested that the Republican Commissioners' opposition to hiring

21  a VRA consultant is somehow evidence of discriminatory intent. But at trial, both

22  Commissioners Fain and Graves testified that their opposition was based on the belief that it

23  would be impossible to find a truly neutral consultant, and that hiring any consultant would result

24  in dueling consultants and not help the parties reach agreement. Tr. at 436:1–9, 500:4–18,

25  686:25–687:11.

26

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1      Plaintiffs further point to a small number of map-drawing choices as evidence of

2    discriminatory intent, but the evidence again fails to support the inferences they draw from it.

3    For example, they try to conjure evidence of intent from the fact that Toppenish and Wapato

4    were placed in LD 14 and thus split from other heavily-Latino cities in LD 15, but Toppenish

5    and Wapato are both on the Yakama Reservation and were kept in LD 14 to keep the Nation

6    intact. Tr. at 417:7–10 (Anton Grose: "Q: Wapato and Toppenish are both on the Yakima

7    Reservation? A: Correct. Q: That explains why they're in 14, not 15, correct? A: Correct.").

8    Plaintiffs similarly try to squint and see intent based on some changes made by Commissioner

9    Graves towards the end of the negotiations. But there is no evidence that any changes were

10   actually made with an intent to discriminate against Hispanic voters. *See* Tr. at 773:22–774:9.

11   Indeed, Commissioner Graves' staff member, Anton Grose, testified that Commissioner Graves

12   never told him to draw a district to reduce the Hispanic population. Tr. at 421:5–8. And, of

13   course, regardless of any changes, the testimony of the Commissioners is that they believed

14   enacted LD 15 complied with the Voting Rights Act.

15       Finally, *Soto Palmer* Plaintiffs point to purported procedural irregularities in the 2021

16   redistricting process in an attempt to prove discriminatory intent. The problem with this

17   argument is twofold. *First*, the evidence shows that the elements of the process that Plaintiffs

18   point to, like failing to reach an agreement until the last minute and negotiating in two-person

19   dyads, are not *irregular*, but are in fact consistent with how prior Commissions operated. Tr. at

20   422:19–423:13; 720:21–721:2; Ex. # 611. *Second*, none of the alleged irregularities actually

21   evinces discriminatory intent on the part of the Commissioners. For example, many of the

22   so-called irregularities in the 2021 redistricting process were attributable to the COVID-19

23   pandemic, which created formidable—and unprecedented—obstacles for in-person meetings

24   and negotiations. Similarly, the 2021 Commission was under unprecedented time pressure due

25   to receiving Census data later than prior Commissions, and to having an earlier deadline than

26

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    prior Commissions (November 15 as opposed to December 31) that was imposed by a recent

2    constitutional amendment. *See, e.g.*, Tr. at 331:24–332:6, 767:8–11.

3         Despite these unprecedented pressures, the Commissioners worked hard to carve our

4    sprawling, diverse, complicated State into 49 sensible districts of roughly equal population. They

5    might have "run out of time," Tr. at 331:24, but that's not evidence, let alone proof, that the

6    Commission or Legislature intentionally discriminated against Hispanic voters.

7    **C.    The *Garcia* Plaintiff Cannot Prove that Legislative District 15 is a Racial
          Gerrymander in Violation of the Equal Protection Clause**

8         Should the *Garcia* Court choose to reach *Garcia* Plaintiff's racial gerrymandering claim,

9    Plaintiff has plainly failed to carry his burden on that claim.

10        As a plaintiff alleging racial gerrymandering, the *Garcia* Plaintiff "faces an

11   extraordinarily high burden." *Cano v. Davis*, 211 F. Supp. 2d 1208, 1215 (C.D. Cal. 2002);

12   *accord Easley v. Cromartie*, 532 U.S. 234, 241 (2001). To determine whether a legislative

13   districting plan is an illegal racial gerrymander under the Fourteenth Amendment, courts conduct

14   a "two-step analysis." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). "*First*, the plaintiff must

15   prove that race was the predominant factor motivating the legislature's decision to place a

16   significant number of voters within or without a particular district." *Id*. (cleaned up; emphasis

17   added). To make this showing, the plaintiff must demonstrate that the Legislature "subordinated

18   other factors—compactness, respect for political subdivisions, partisan advantage, what have

19   you—to racial considerations." *Id*. (cleaned up). Because the legislative body enjoys a

20   presumption of good faith, the burden lies with the challenger to prove that race predominated.

21   *Lee v. City of Los Angeles*, 908 F.3d 1175, 1183 (9th Cir. 2018). "*Second*, if racial considerations

22   predominated over others, the design of the district must withstand strict scrutiny." *Cooper*,

23   581 U.S. at 292. At this stage in the inquiry, the burden "shifts to the State" to establish that "its

24   race-based sorting of voters serves a compelling interest and is narrowly tailored to that end."

25   *Id*. (cleaned up; emphasis added). Courts have long considered compliance with the VRA to be

26

1   a compelling interest. *Id.* To satisfy the narrowing tailoring requirement, a State invoking the

2   VRA must prove "that it had 'a strong basis in evidence' for concluding that the statute required

3   its action." *Id.* (cleaned up).

4          The evidence at trial soundly defeats the *Garcia* Plaintiff's racial gerrymandering claim.

5   As a threshold matter, and as the Court has already held, it is critical to inquire whether race

6   predominated for the Legislature—not merely the Commission. The *Garcia* Plaintiff has not

7   offered *any* evidence that "race was the predominant factor motivating the legislature's decision"

8   to amend and adopt the Commission's redistricting plan. *Cooper*, 581 U.S. at 291. Nor has he

9   made the requisite showing for the Commission, as the evidence shows that race was among a

10  "mix of decision making factors" the Commission considered. *Chen v. City of Houston*, 206 F.3d

11  504, 514 (5th Cir. 2000). While the Court need not reach this inquiry, the evidence further

12  demonstrates that the State had a "strong basis in evidence" to believe that the VRA required the

13  consideration of race in the Yakima Valley. *Cooper*, 581 U.S. at 292.

14      **1.    Race did not predominate in the Legislature's decision to amend and adopt
              LD 15**

15         Despite the *Garcia* Plaintiff's exclusive focus on the Commission, it was the Legislature,

16  not the Commission, which adopted the operative Redistricting Plan. Accordingly, the

17  Legislature's intent is central. *Prejean v. Foster* is instructive on this point. 227 F.3d 504 (5th

18  Cir. 2000). That case concerned judicial subdistricts drawn by a judicial candidate, Judge Turner,

19  and then adopted—without modification—by the Louisiana legislature. The district court

20  granted summary judgment against plaintiffs' gerrymandering claim, relying on an affidavit

21  from Judge Turner "averr[ing] that race did not predominate over traditional districting

22  principles. *Id.* at 510. The Fifth Circuit reversed, however, finding that "Judge Turner's affidavit

23  describing his intent in drawing the subdistricts" cannot be "taken as conclusive proof of the

24  legislature's intent." *Id.* As the court explained, "[t]he fact that the legislature adopted Judge

25  Turner's districting plan without modification might support an *inference* that racial

26

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  considerations did not predominate[,] . . . however, the district court was required to view the

2  evidence and all inferences therefrom in the light most favorable to the non-movants." *Id*

3  (emphasis added). Here, as in *Prejean*, any evidence of the Commissioners' intent may at best

4  support *inferences* about the Legislature's intent—although any inference is weaker here because

5  the Legislature *amended* the Commission's proposed plan. *See supra*, Section III.B.1; *cf.*

6  *Lee*, 908 F.3d at 1184 (racial considerations did not necessarily predominate in redistricting

7  process despite the predominance of these considerations for the City Council President and a

8  single Commissioner because these two individuals "were only two people in a process that

9  incorporated multiple layers of decisions and alterations from the entire Commission, as well as

10 the City Council").

11     Plaintiff's response, that the Legislature's authority to amend the Commission's plan is

12 limited, does not render the Legislature's intent irrelevant. Limited though its authority may have

13 been, the Legislature affirmatively voted in favor of adopting the Commission's plan, rather than

14 letting it become law automatically. Moreover, the Legislature's power to change LD 15 by up

15 to two percent of its total population (Wash. Rev. Code § 44.05.100(2)) was sufficient to address

16 Plaintiff's concerns with respect to the 51.5 percent Hispanic makeup of the district.

17          **2.    Race did not predominate for the Redistricting Commission**

18     Even if the Commissioners' intent were controlling, the evidence shows that race did not

19 predominate in the Commissioners' decision-making process. Instead, the Commissioners'

20 decisions rested heavily on traditional redistricting principles and partisan metrics—concerns

21 that do not implicate the Fourteenth Amendment. *See Miller*, 515 U.S. at 916 ("Where

22 [traditional race-neutral districting principles] or other race-neutral considerations are the basis

23 for redistricting legislation, and are not subordinated to race, a State can defeat a claim that a

24 district has been gerrymandered on racial lines.") (cleaned up); *see, e.g.*, *Lee v. City of*

25 *Los Angeles*, 88 F. Supp. 3d 1140, 1153 (C.D. Cal. 2015) (rejecting claim where challenged

26 district boundaries "promoted traditional redistricting criteria").

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

The Commissioners' testimony shows that throughout the redistricting process, they applied a range of traditional restricting principles, from maintaining communities of interest to respecting county and city lines to drawing compact districts to unifying school districts to preserving tribal sovereignty. *Supra*, Section II.D. When it came to the actual negotiations, those were driven primarily by partisan concerns. *Supra*, Sections II.D, II.F. Indeed, Commissioner Graves described partisan horse-trading—"'Hey, can we get more partisan performance here, in exchange for more partisan performance there?'" as "the meat and potatoes of [the Commissioners'] negotiation." Tr. at 707:20–23. Given the VRA concerns, voter ethnicity was clearly an important consideration in the negotiations over LD 15, but it was just one factor, and it did not predominate or subordinate other factors. For Commissioner Graves, ethnicity was "on par with" partisan performance, but he certainly did not sacrifice any traditional redistricting criteria to achieve a majority-Hispanic district. Tr. at 756:20–757:18. For Commissioner Sims, voter ethnicity was just one element she looked at, along with "[t]otal population, geography, communities of interest, cities and towns, natural borders, highways," and partisan performance. Tr. at 282:4–21; *see also* Tr. at 286:6–25 (explaining that voter ethnicity was a factor, but not the most important one). For Commissioner Walkinshaw, LD 15 was shaped by "a lot of different pieces," with the primary concerns being partisan competitiveness, creating a Hispanic CVAP majority, "unif[ying] city and county lines, [and] unifying . . . the ancestral lands of the Yakama all the way down to the Columbia River." Tr. at 333:6–14. And Commissioner Fain was largely indifferent to the racial or ethnic makeup of districts, so long as the overall map increased competition statewide. Tr. at 490:24–494:7;[12] *see also* Tr. at 414:6–18 (staffer Anton Grose testifying that when he and Osta Davis drew the final legislative map, they were prioritizing statutory factors while also meeting the Commissioners' agreed-upon partisan metrics and ensuring the district was majority Hispanic). The Commissioners' consideration of

---

[12] Indeed, when he voted on the framework that ultimately became the Commission's plan, Commissioner Fain understood the framework to incorporate particular partisan metrics, but does not recall racial or ethnic metrics being part of the framework. Tr. at 495:10–16

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    voter ethnicity alongside traditional redistricting criteria and partisan concerns does not run afoul

2    of the 14th Amendment. *See Easley*, 532 U.S. at 253 (finding no evidence of racial predominance

3    in a legislator's statement that a map provided "geographic, racial and partisan balance" because

4    at worst "the phrase shows that the legislature considered race, along with other partisan and

5    geographic considerations").

6           The *Garcia* Plaintiff may urge this Court to infer racial predominance from the shape of

7    the district itself, but the evidence shows that the district is not the sort of "bizarrely shaped and

8    far from compact" district that might give rise to an inference of gerrymandering. *Bush v. Vera*,

9    517 U.S. 952, 954 (1996). To the contrary, the evidence shows that LD 15 is compact, adheres

10   to Washington's statutory redistricting guidelines, and is no more oddly shaped than other

11   districts adopted by the Commission and enacted by the Legislature. *See Garcia*, Dkt. # 56 at

12   p. 12 ("The shape of Legislative District 15 is not less compact and contiguous than many others

13   in the final map[.]"); *compare* Tr. at 415:16–417:18 (noting that LD 15's borders largely keep

14   cities and the Yakama Nation intact), *with* Tr. at 417:19–418:19 (noting community splits in

15   LD 31).

16          Nor may Plaintiff demonstrate racial predominance based on the bare fact that LD 15

17   incorporates allegedly disparate communities in Yakima and Pasco. First, as Professors Estrada

18   and Barreto explain, these communities have a lot in common, notwithstanding their geographic

19   distance or the fact that they have different newspapers. Ex. # 4 at p. 7, 11–21; Tr. at 663:13–24.

20   Moreover, as Commissioner Fain explained it, the grouping together of communities with

21   somewhat disparate interests is inevitable because "when you draw a circle that has to have so

22   many people inside of it, sometimes you draw people in." Tr. at 506:22–24; *see also* Tr. at

23   505:3–507:16 (noting that the 2011 legislative maps split Pasco between multiple, fairly far-

24   flung districts); Tr. at 409:9–12 (Anton Grose: "Q: Is it fair to say that as districts moved further

25   away from Puget Sound, and further away from Spokane, they tended to get a little more

26   sprawling? A: They do.").

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

In short, *Garcia* Plaintiff has not carried his burden to prove that the Commission or Legislature "subordinated other factors . . . to racial considerations[,]" *Cooper*, 581 U.S. at 291.

### 3.     There was ample reason to believe that Section 2 of the VRA requires the drawing of a race-conscious district in the Yakima Valley

Although the Court need not reach the second prong of this inquiry in light of the clear evidence that race did not predominate, the evidence firmly establishes that the State had a "strong basis in evidence" to draw a race-conscious district in order to comply with the VRA. *Cooper*, 581 U.S. at 292.

Recent litigation involving the same geographical area provided ample reason to believe that the VRA required a majority-minority district in the Yakima Valley. The *Montes* and *Aguilar* cases demonstrate racially polarized voting in approximately the same geographical area. *See supra*, Section II.C. Each of the Commissioners was aware of these lawsuits and their significance. *Id.* By themselves, these lawsuits supplied "a strong basis in evidence for concluding" that the VRA required a majority-minority district in the Yakima Valley. *See Cooper*, 581 U.S. at 292.

On top of this evidence, the Commissioners received Dr. Barreto's analysis of racially polarized voting in the Yakima Valley. Exs. ## 177, 179. That analysis provided compelling evidence that the *Gingles* preconditions were satisfied with respect to Hispanic voters in the Yakima Valley. *Id.* Dr. Barreto's conclusions aligned with the outcomes of previous lawsuits involving the Yakima Valley region, as well as independent research by the Democratic Commissioners and their staffers. *Supra*, Section II.C. Expert analysis in this litigation further substantiates Dr. Barreto's findings, further demonstrating the soundness of the Commissioners' reliance. *Supra*, Section III.A.2.

The Barreto report—coupled with the outcomes of previous lawsuits, the results of the legislative staffers' research, and the expert findings—provided "a strong basis in evidence for concluding" that the VRA required a majority-minority district in the Yakima Valley.

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  *See Cooper*, 581 U.S. at 292. Indeed, two Commissioners believed the evidence clearly

2  established the need for a majority-Hispanic district to comply with the VRA, and a third

3  believed it was an open question. *Supra*, Section II.E. Against this backdrop, any commissioner's

4  subjective belief that the VRA did not require such a district is immaterial.

5       Mr. Garcia may argue that the Commissioners' failure to perform an independent

6  analysis of the *Gingles* preconditions negates any defense based on Section 2 of the VRA. That

7  argument lacks merit. There was no need to reinvent the wheel to conclude the VRA required a

8  Latino opportunity district in the Yakima Valley. The Commissioners were aware of *Montes* and

9  *Aguilar* and had received Dr. Barreto's analysis. *See supra*, Sections II.C., II.E. Armed with this

10  knowledge, each Commissioner could evaluate specific maps using demographic and

11  performance data preloaded in their mapping software. Furthermore, expert analysis in this

12  litigation shows that each *Gingles* factor is met with respect to the Yakima Valley. *See supra*,

13  Section III.A.2. In other words, the Commission's supposed failure to perform its own *Gingles*

14  analysis did not prevent the Commission from getting it right. By the same token, the

15  Commission's decision not to hire consultants to perform a racially polarized voting analysis for

16  the Commission at large was of no moment when there was already ample evidence before the

17  Commission that racially polarized voting had occurred in the Yakima Valley.

18          **IV.    PROPOSED REMEDY**

19       If either Court determines that LD 15 violates Section 2 of the Voting Rights Act or the

20  Equal Protection Clause of the U.S. Constitution, the Court should give the Legislature the

21  opportunity to reconvene the Redistricting Commission so that the Commission can redraw

22  LD 15 (and make any related, necessary changes) and the Legislature may modify and enact that

23  map. If the Redistricting Commission is somehow unable to redraw a legislative district map in

24  a timely fashion (detailed below), the State requests the Court enter a remedial map by March 1,

25  2024, after receiving briefing on any party's proposed remedial maps. March 25, 2024, is the

26

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    latest date a finalized legislative district map may be transmitted to counties without significantly

2    disrupting the 2024 election cycle. *See* Dkt. # 191 ¶ 124 (Joint Pretrial Statement).

3           The Supreme Court has made clear that if a court finds that a redistricting plan violates

4    federal law, the plan should go back to the State's designated map-drawing entity, here the

5    Redistricting Commission and then the Legislature. Washington has a "sovereign interest in

6    implementing its redistricting plan." *Bush v. Vera*, 517 U.S. 952, 978 (1996). And the Supreme

7    Court "has repeatedly held that redistricting and reapportioning legislative bodies is a legislative

8    task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*,

9    437 U.S. 535, 539–40 (1978) (opinion of White, J.) (collecting cases). Upon a court's finding

10   that the "existing apportionment scheme" violates federal law, it is "appropriate, whenever

11   practicable, to afford a reasonable opportunity for the legislature to meet [applicable federal

12   legal] requirements by adopting a substitute measure rather than for the federal court to devise

13   and order into effect its own plan." *Id.* at 540; *see also Shaw v. Hunt*, 517 U.S. 899, 917 n.9

14   (1996) (following a determination that a redistricting plan violates Section 2 of the VRA,

15   "[s]tates retain broad discretion in drawing districts to comply with the mandate of § 2"); *League

16   of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 415–16 (2006) ("Quite apart from the risk

17   of acting without a legislature's expertise, and quite apart from the difficulties a court faces in

18   drawing a map that is fair and rational, the obligation placed upon the [judiciary with redrawing

19   maps] is unwelcome because drawing lines for congressional districts is one of the most

20   significant acts a State can perform to ensure citizen participation in republican

21   self-governance. . . . As the Constitution vests redistricting responsibilities foremost in the

22   legislatures of the States and in Congress, a lawful, legislatively enacted plan should be

23   preferable to one drawn by the courts."). Given the ample time that remains before a remedial

24   map would need to be in place for the 2024 election cycle, the State respectfully requests the

25   Court afford the Legislature and the Commission the opportunity to draw and enact that remedial

26   map.

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

33

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1         Under Washington law, to adopt new maps, the Legislature would first need to vote to

2   reconvene the Redistricting Commission. *See* Wash Const. art. II, § 43(8) ("The legislature shall

3   enact laws providing for the reconvening of a commission for the purpose of modifying a

4   districting law adopted under this section. Such reconvening requires a two-thirds vote of the

5   legislators elected or appointed to each house of the legislature."); Wash. Rev. Code § 44.05.120

6   ("If a commission has ceased to exist, the legislature may, upon an affirmative vote in each house

7   of two-thirds of the members . . . adopt legislation reconvening the commission for the purpose

8   of modifying the redistricting plan."); *see also* Wash Const. art. II, § 43(11)

9   ("Legislative . . . districts may not be changed . . . except pursuant to this section."). In order for

10  such a vote to take place in a timely fashion, the Governor or Legislature would first need to call

11  a special legislative session for that purpose. Wash. Const. art II, sec. 12. State law gives the

12  reconvened Commission 60 days after the effective date of the legislation reconvening it to draw

13  and approve a modified plan, then gives the Legislature 30 days to make any amendments, after

14  which it would become effective. Wash. Rev. Code § 44.05.120(4)–(5). The State suggests that

15  the Court allow the Legislature, through a special session, to reconvene the Commission any

16  time before November 9, 2023, to allow the Commission 60 days to redraw and approve a new

17  map before the Legislature's 2024 Regular Session begins on Monday, January 8, 2024.[13] The

18  Legislature would then have until February 7, 2024, to amend and enact a modified plan; if it

19  did not take action by that date, the plan would become effective by operation of law.

20        If the Commission were somehow unable to complete the task by January 8, 2024, the

21  State respectfully requests the Court enter a remedial map by March 1, 2024, following briefing

22  from the parties on their proposed maps. Giving the Commission and Legislature the opportunity

23  to redraw the map in the first instance would ensure that the Court does not "intrude upon state

24  policy any more than necessary." *White v. Weiser*, 412 U.S. 783, 795 (1973) (quoting

25

26      [13] Overview of the Legislative Process, https://leg.wa.gov/legislature/Pages/Overview.aspx; Wash. Const. art. II, § 1 2.

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

*Whitcomb v. Chavis*, 403 U.S. 124, 160 (1971)). However, "judicial relief becomes appropriate . . . when a legislature fails to re[district] according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Upham v. Seamon*, 456 U.S. 37, 41 (1982) (per curiam) (quoting *White*, 412 U.S. at 794–95).[14] The State proposes that should this scenario come to pass, the parties' briefs not only address the changes necessary to address the infirmities with the previously enacted map but also explain how the proposed maps still reflect the views of the public and comport with the State's laws for redistricting and traditional redistricting criteria.

## V.    CONCLUSION

The State of Washington cannot dispute that *Soto Palmer* Plaintiffs have satisfied the three *Gingles* preconditions for pursuing a discriminatory results claim under Section 2 of the VRA and that the totality of the evidence test likewise supports the *Soto Palmer* Plaintiffs' discriminatory results claim. However, the evidence adduced at trial supports judgments in favor of the State on *Soto Palmer* Plaintiffs' discriminatory intent claim and *Garcia* Plaintiff's racial gerrymandering claim. Accordingly, the respective Courts should deny the *Soto Palmer* Plaintiffs and *Garcia* Plaintiff any relief associated with these claims and dismiss the intentional discrimination and racial gerrymandering claims with prejudice.

DATED this 12th day of July, 2023.

ROBERT W. FERGUSON
Attorney General

*/s/ Andrew R. W. Hughes*
ANDREW R.W. HUGHES, WSBA #49515
ERICA R. FRANKLIN, WSBA #43477
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104

---

[14] "When faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." *Abrams v. Johnson*, 521 U.S. 74, 79 (1997) (citing *Upham v. Seamon*, 456 U.S. 37, 43 (1982)).

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

35

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

(206) 464-7744
andrew.hughes@atg.wa.gov
erica.franklin@atg.wa.gov

CRISTINA SEPE, WSBA #53609
Deputy Solicitor General
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
cristina.sepe@atg.wa.gov

*Attorneys for Defendant State of Washington*

STATE OF WASHINGTON'S
CLOSING TRIAL BRIEF
NO. 3:22-CV-5035

36

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1

## DECLARATION OF SERVICE

2     I hereby declare that on this day I caused the foregoing document to be electronically

3 filed with the Clerk of the Court using the Court's CM/ECF System which will serve a copy of

4 this document upon all counsel of record.

5     DATED this 12th day of July, 2023 at Seattle, Washington

6                                                  */s/ Andrew R. W. Hughes*
                                                   ANDREW R. W. HUGHES, WSBA #49515
7                                                  Assistant Attorney General

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26