The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

SUSAN SOTO PALMER, et. al.,

     *Plaintiffs*,

   v.

STEVEN HOBBS, et. al.,

     *Defendants*,

  and

JOSE TREVINO, ISMAEL CAMPOS, and ALEX YBARRA,

     *Intervenor-Defendants.*

Case No.: 3:22-cv-05035-RSL

Judge: Robert S. Lasnik

**PLAINTIFFS' CLOSING STATEMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I.   The Enacted LD 15 Has the Effect of Unlawfully Diluting the Ability of Latino Voters to Elect Their Preferred Candidates.................................................................. 3

    A.  The Latino Population in the Yakima Valley Region is Sufficiently Large and Geographically Compact to Constitute a Majority in a Reasonably Configured District (*Gingles* 1). ........................................................................................ 4

    B.  Latino Voters in the Yakima Valley Region are Politically Cohesive (*Gingles* 2)....... 7

    C.  White Bloc Voting in the Yakima Valley Region Operates to Defeat Latino-Preferred Candidates (*Gingles* 3)................................................................... 9

    D.  Under the Totality of the Circumstances, LD 15 Results in Less Opportunity for Latinos in the Yakima Valley Region to Elect Candidates of Their Choice. ............ 13

        1.  Senate Factor 1: History of Official Voting-Related Discrimination................ 13

        2.  Senate Factor 2: Racially Polarized Voting......................................... 16

        3.  Senate Factor 3: Voting Practices or Procedures That Tend to    Enhance the Opportunity for Discrimination ........................................................ 16

        4.  Senate Factor 5: Extent to Which Latinos Bear the Effects of Discrimination ....................................................................... 17

        5.  Senate Factor 6: Use of Overt or Subtle Racial Appeals in Political Campaigns .......................................................................... 24

        6.  Senate Factor 7: Extent to Which Latino Candidates Have Been    Elected to Public Office in the Jurisdiction ........................................................ 25

        7.  Senate Factor 8: Lack of Responsiveness of Elected Officials to the Needs of the Latino Community .................................................................. 27

        8.  Senate Factor 9: Tenuousness of the Policy Underlying the Current Composition of LD 15 .................................................................. 30

        9.  Proportionality.......................................................................... 33

    E.  LD 15 Results in Less Opportunity for Latinos to Elect Candidates of Their Choice Under the Totality of the Circumstances Despite Its Bare Majority-Hispanic Citizen Voting Age Population. ..................................................... 34

II.  Proposed Remedial Process.......................................................................... 35

CONCLUSION................................................................................................................ 36

CERTIFICATE OF SERVICE .......................................................................................... 38

## INTRODUCTION

Plaintiffs have met their burden to prove that Washington State Legislative District 15 ("LD 15") dilutes the voting power of the Latino[1] population in the Yakima Valley region[2] in violation of the Voting Rights Act (VRA), 52 U.S.C. § 10301. Neither Defendant State of Washington nor Defendant Secretary of State Hobbs disputes this. Dkt # 194 at 1, 7-14; Dkt # 195 at 1. And Intervenor-Defendants' arguments to the contrary fall flat when compared to the voluminous and largely undisputed evidence presented by Plaintiffs.

Plaintiffs have demonstrated that each of the three *Gingles* preconditions are met in the Yakima Valley region. *First*, Plaintiffs have proven, and there is no genuine dispute, that Latinos are sufficiently numerous and compact to comprise a majority in a Yakima Valley legislative district. *Second*, Plaintiffs have demonstrated through both quantitative and qualitative evidence that Latino voters in the Yakima Valley region are politically cohesive. Every expert opining on the second precondition at trial agreed. *Third*, the testimony, analysis, and opinions of three independent experts prove that white voters in the Yakima Valley region vote as a bloc to usually defeat Latino voters' candidates of choice. The region's most populous counties and cities—the counties of Yakima and Franklin and the cities of Yakima and Pasco, all of which are included in

---

[1] Latino and Hispanic refer to individuals who identify as Hispanic or Latino, as defined by the U.S. Census, and the terms are used interchangeably. Dkt. # 191, Admitted Facts, ¶ 12; Tr. Vol. 2 at 288:8-9. References to white voters herein refer to non-Hispanic white voters.

[2] For ease of reference, Plaintiffs will used the term "Yakima Valley region" as shorthand for the geographic region of Central/Eastern Washington on and around the Yakima and Columbia Rivers, including parts of Adams, Benton, Franklin, Grant, and Yakima counties. *See* Tr. Vol. 1 at 11-13; Ex. 1 at 6. These counties feature in the versions of LD 14 and 15 considered by the Commission, and in the enacted LD 15. *See* Exs. 475-86, 511-21; Dkt. # 191 at ¶ 45. Plaintiffs have also used the term "Southcentral Washington" to refer to the same general area. *See, e.g.*, Dkt. # 191 at ¶¶ 88-94.

LD 15—have changed their systems of elections based on court findings of racially polarized voting or an agreement between the parties and the courts that the factual record could support such findings. There is no question the preconditions are met in the Yakima Valley region.

In addition, the totality of the circumstances demonstrates that Latinos lack an equal opportunity to participate in the political process and elect candidates of their choice in LD 15. Even though "[t]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other," *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)), Plaintiffs have presented substantial evidence that Senate Factors 1, 2, 3, 5, 6, 7, 8, and 9 *all* indicate that LD 15 leaves Latinos less able to elect candidates of their choice.

In his report and at trial, Plaintiffs' expert witness Dr. Josué Estrada presented the well-documented history of how Latinos in the Yakima Valley region have continually faced discrimination and resulting adversity, as well as how they have organized and fought back to the best of their ability. This ongoing struggle was reflected in the testimony of Plaintiffs Faviola Lopez and Susan Soto Palmer, Senator Rebecca Saldaña, and Gabriel Portugal. Their testimony showed that while circumstances for Latinos in some parts of the United States may be improving, the "past and present reality" in the Yakima Valley region is that Latinos face significant and enduring barriers to political participation, including racially polarized voting, gaping socioeconomic disparities, an atmosphere of intimidation, outright hostility toward Latino candidates, and a troubling lack of regard by the region's legislative representatives for issues prioritized by Latinos. *Allen v. Milligan*, 143 S. Ct. 1487, 1503 (2023). Lawsuits against cities and counties in the region have made room for progress toward more representative local government in the region. And as Mr. Portugal made clear: "advocacy is what is driving those changes." Tr.

834:21-835:1. Plaintiffs now again seek redress from the legal system—a system to which Yakima Valley Latinos have so frequently had no choice but to turn—to advocate for their right under the VRA to a state legislative district that provides an equal opportunity to elect candidates of their choice. In doing so, they seek an opportunity to elect responsive representatives to whom they can turn in the future to advocate for other much-needed progress in their community.

Because Plaintiffs have proven that LD 15 has the effect of diluting the voting power of the region's Latinos in violation of Section 2, this Court need not reach Plaintiffs' claim that LD 15 was also unlawfully devised with discriminatory intent. The substantial record evidence of the 2021 Washington Redistricting Commission indicates that the Commission did not possess a legitimate policy rationale for drawing LD 15 in a manner that prevents Latinos from electing candidates of their choice. While such evidence of the map-drawers' intent is not necessary to prove a Section 2 results claim, *Milligan*, 143 S. Ct. at 1507, it is relevant to the Court's consideration of the totality of the circumstances and only adds to the voluminous and largely undisputed record proving that the State's current legislative redistricting plan violates Section 2.

## ARGUMENT

**I.     The Enacted LD 15 Has the Effect of Unlawfully Diluting the Ability of Latino Voters to Elect Their Preferred Candidates.**

Plaintiffs have proven every element of a Section 2 claim. First, they have satisfied each of the *Gingles* preconditions, including that: (1) the Latino population in the Yakima Valley region is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district"; (2) Latinos in the Yakima Valley region are "politically cohesive"; and (3) the white voting majority in the Yakima Valley region votes "sufficiently as a bloc to enable it…to defeat" Latino-preferred candidates. *Id.* at 1503.

In addition, Plaintiffs have proven that, under the totality of the circumstances, "the political process is not 'equally open'" to Latino voters in the Yakima Valley region. *Id.* The "searching, practical inquiry" required by Section 2 reveals that, although Latinos form a slim majority of voting-age citizens in LD 15, the district as enacted does not provide Latinos "a real…opportunity" to elect their preferred candidates. *Perez v. Abbott*, 253 F. Supp. 3d 864, 879 (W.D. Tex. 2017) (citing *LULAC v. Perry*, 548 U.S. 399, 428 (2006)). Given the region's "past and present reality, political and otherwise," the enacted LD 15 instead operates to "minimize or cancel out [Latino] voting strength" in the Yakima Valley. *Milligan*, 143 S. Ct. at 1507. The district therefore denies Latinos an equal opportunity "to participate in the political process and to elect representatives of their choice" in violation of Section 2. 52 U.S.C. § 10301.

> **A.    The Latino Population in the Yakima Valley Region is Sufficiently Large and Geographically Compact to Constitute a Majority in a Reasonably Configured District (*Gingles* 1).**

There is no reasonable dispute that Latinos are sufficiently numerous and compact to comprise a majority in a Yakima Valley legislative district. As the Supreme Court recently clarified, this precondition simply aids in showing that the minority community has the potential to elect its preferred candidates in some reasonably configured district. *Milligan*, 143 S. Ct. at 1503. A district is reasonably configured "if it comports with traditional redistricting criteria, such as being contiguous and reasonably compact." *Id.* at 1503. To satisfy *Gingles* 1, a plaintiff need only "adduce[] . . . one illustrative map that comport[s]" with this standard. *Id.* at 1512.

Here, as in *Milligan*, the record includes several alternative district configurations that have a majority-Hispanic citizen voting age population (HCVAP) and that comply with traditional

redistricting criteria while also providing Latino voters an equal opportunity to elect a candidate of choice. Exs. 1 at 21-29; 178 at 37-38; 214 at 18; 515-16.

Plaintiffs' expert Dr. Loren Collingwood presented three demonstration plans that include a majority-HCVAP district in the Yakima Valley region. Tr. 51:3-12, 53:20-22; Ex. 1 at 21-27. Analyzing the plans for adherence to traditional redistricting criteria, Dr. Collingwood found that all three demonstrative maps met the criteria similarly or better than the enacted LD 15. Tr. 51:17-52:19; Ex. 1 at 26 (Table 4). All are within the acceptable population deviation. Tr. 52:20-53:3. They split no more or fewer counties and precincts than the Enacted Plan. Tr. 54:12-24. And the three plans perform similarly or better than LD 15 on measures of compactness, with Polsby-Popper and Reock scores well within the standard for reasonable maps. Tr. 53:23-54:11; Ex. 1 at 26. Dr. Collingwood's performance analysis also showed that the three plans would provide Latino voters a fair opportunity to elect their preferred candidates. Tr. 55:25- 57:2; Ex. 1 at 25 (Figure 11). Dr. Collingwood concluded that he "d[id]n't think anybody could dispute" that the population of Latino voters in the Yakima Valley region is sufficiently large and compact to form a majority in a district. Tr. 54:25-55:4. Dr. Mark Owens, Intervenor-Defendants' expert, stated that he had no opinion about whether LD 15 was compact. Tr. 599:10-15.

Expert and lay witness testimony at trial established that the Latino community in the region is geographically concentrated. Gabriel Portugal, the current president of the Tri-Cities League of United Latin American Citizens (LULAC) council, testified that, based on his experience living and working in Yakima, Toppenish, and Pasco, and his knowledge of the communities between them, there are large Latino populations in communities all along the corridor from Yakima to Pasco. Tr. 849:3-16, 831:6-16. He also noted that Latino communities in Yakima and Pasco and the cities between them "have a lot of things in common," Tr. 831:5-24,

testifying that "all those towns have a lot of working folks that provide labor for the farms and the dairies." Tr. 849:6-16; *see also* Tr. 661:15-662:3; Ex. 214 at 2-4.

The State's expert, Dr. John Alford, resoundingly agreed with Dr. Collingwood, testifying that "[t]he first *Gingles* prong is met here." Tr. 852:15, 856:25-857:2; Ex. 601 at 4. Regarding compactness, Dr. Alford testified that Plaintiffs' demonstrative plans are "among the more compact demonstration districts [he's] seen" in 30 years. Tr. 857:11-14; *see also* 852:22-853:4. He noted that the Plaintiffs' demonstration plans lack "tentacles" and "narrow connectors" that "feature very common[ly] in irregular demonstration districts." *Cf. Milligan*, 143 S. Ct. at 1504.

The numerous Yakima Valley district configurations considered by the Commission further show it is easy to draw a reasonably configured majority-HCVAP district in the Yakima Valley that allows Latino voters to elect candidates of their choice. *See* Ex. 1 at 28 (Table 5) (analyzing various Commissioner drafts and proposals); Tr. 82:5-24 (testimony of Dr. Collingwood). The enacted LD 15 itself contains a majority-HCVAP district, Dkt. # 191 at ¶ 97, although it does not provide Latino voters with an ability to elect candidates of their choice.

Among the majority-HCVAP configurations considered by the Commission were also four proposals by Dr. Matthew Barreto. Exs. 178 at 37-38; 214 at 18. Dr. Barreto is one of the nation's leading experts on Latino voting patterns, and was a longtime professor at the University of Washington familiar with the Yakima Valley region. Tr. 611:6-612:4. He was asked during the redistricting process to assess the need for a majority-Latino district in the Yakima Valley. Tr. 620:1-621:1. Dr. Barreto concluded that *Gingles* 1 is met, finding the question "not even close." Tr. 647:9-16; 623:17-624:4; *see also* 618:16-619:19 (testifying that the *Gingles* preconditions were also met in the Yakima Valley in 2011). Dr. Barreto's alternative Yakima Valley districts included an option that excluded parts of the Yakama Nation Reservation, Ex. 178 at 18, and three options

that were wholly inclusive of the Yakama Reservation. Exs. 178 at 18; 214 at 37-38; Tr. 634:24-635:7. While the State's communities-of-interest goals must ultimately give way to federal VRA compliance, *see Milligan*, 143 S. Ct. at 1505, these maps, along with Plaintiffs' demonstratives, show that an opportunity district unifying Latino communities in the Yakima Valley region can largely accommodate such goals. Tr. 672:12-19.

Plaintiffs have more than met their burden to prove Latino voters in the Yakima Valley region are sufficiently large and geographically compact to be the majority in a reasonably configured state legislative district. *Gingles* 1 is satisfied.

**B.    Latino Voters in the Yakima Valley Region are Politically Cohesive (*Gingles* 2).**

*Gingles* 2 is also satisfied. To demonstrate that Latinos are politically cohesive, a plaintiff must show that "a significant number of minority group members usually vote for the same candidates." *Gingles,* 478 U.S. at 56. This often involves a statistical analysis of election results to determine the degree of racially polarized voting, but can also be supported by other, non-statistical evidence. *See, e.g., Luna v. Cty. of Kern*, 291 F. Supp. 3d 1088, 1117 (E.D. Cal. 2018).

At trial, every quantitative expert agreed that Latino voters in the Yakima Valley region are politically cohesive. Dr. Collingwood utilized the reliable and widely accepted ecological inference method to estimate the voting preferences of Latino and white voters in 26 separate election contexts across six election cycles, ranging from 2012 to the most recent election in the enacted LD 15 in 2022. Exs. 1 at 7-8; 2 at 1; Tr. 57:18-59:12, 61:6-62:9, 63:16-21; 65:7-66:8. He found that Latinos voted cohesively as a group for the same candidates in all 26 elections he analyzed. Exs. 1 at 14-15; 2 at 1. This pattern held true in partisan and nonpartisan contests; general and primary elections; statewide, state legislative, and local elections; and in races with and

without Spanish-surname candidates. *Id.* Latinos also voted cohesively in the 2022 Senate election for enacted LD 15, preferring Lindsey Keesling (D) over Nikki Torres (R), a Latina candidate. Tr. 77:2-17. Based on these results, Dr. Collingwood opined that there is a "high" level of cohesion among Latino voters in the Yakima Valley, and that Latinos in the region consistently vote as a "strong block[]." Tr. 66:9-24, 71:21-72:1.

Replicating Dr. Collingwood's results, the State's expert Dr. Alford also concluded that Latinos are politically cohesive in this region, with "strong evidence of different voting patterns by Hispanic and non-Hispanic voters" in both partisan and nonpartisan elections. Ex. 601 at 13-15; *see* Tr. 853:5-14, 855:1-3. Likewise, an analysis conducted by Dr. Owens also showed cohesion among Latino voters in the enacted LD 15 in 10 of the 11 elections he analyzed from 2018-2020. Ex. 1001 at 9; Tr. 583:5-588:24, 588:25-589:2. Dr. Barreto's application of ecological inference led him to the same conclusion, finding the rate of Latino cohesion consistently "around the 70 percent range" in support of Democratic candidates in the 12 partisan elections he analyzed from 2012 to 2020. Tr. 632:10-19; Ex. 214 at 7-15. The statistical evidence overwhelmingly proves that Latinos in the Yakima Valley region are politically cohesive.

Qualitative evidence in the record confirms the conclusion that Latinos in the Yakima Valley consistently prefer the same candidates. *See Sanchez v. Bond*, 875 F.2d 1488, 1494 (10th Cir. 1989) ("The experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive."). The primary drawer of LD 15, Anton Grose, testified he was "certainly aware" of "strong Hispanic support for Democratic candidates and strong white support for Republican candidates" in the Yakima Valley region. Tr. 380:16-23; 393:25-394:1. He testified that he would have had to "close

[his] eyes" not to see the clear pattern of strong cohesive Latino support for Democratic candidates while drawing districts in the Yakima Valley area. Tr. 381:8-15; 375:1-377:8.

Mr. Portugal, a longtime community leader in the Pasco area, testified that Latinos in the region tend to prefer Democrats "because they think that they best represent . . . Latino concerns." Tr. 828:13-15; *see also* 847:22-23. Mr. Portugal also stated that Latinos throughout the region, from Pasco to Yakima, share experiences that likely explain their cohesive political preferences, including shared economic circumstances from providing labor to the region's agricultural industries (dairies, orchards, and hops), shared religion and places of worship, and shared housing conditions. Tr. 830:11-831:24, 832:11-13, 848:5-7, 849:14-16; *see also* 838:21 ("We're all sort of in the same boat."). Plaintiffs' expert Dr. Josué Estrada also testified that Latinos in Central Washington have shared histories, migration patterns, working conditions, and political movements, which further supports a finding of Latino cohesion in the Yakima Valley region. Ex. 4 at 10-21. Plaintiffs have plainly satisfied *Gingles* 2.

## C.   White Bloc Voting in the Yakima Valley Region Operates to Defeat Latino-Preferred Candidates (*Gingles* 3).

Under *Gingles* 3, the court inquires whether "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances…—to defeat the minority's preferred candidate." *Gingle*s, 478 U.S. at 51. Block voting is demonstrated by statistical analysis of historical election data. *Id.* at 46; *Milligan*, 143 S. Ct. at 1503.[3]

---

[3] Multiple courts have already recently found that voting in the Yakima Valley region is racially polarized. *See* Dkt. # 191 at ¶¶ 119-122; *Montes v. City of Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014); *Glatt v. City of Pasco,* No. 4:16-CV-05108-LRS, (E.D. Wash. 2017); *Aguilar v. Yakima County*, No. 20-2-0018019 (Kittitas Cty. Sup. Ct. July 13, 2020).

1       The evidence proves that white bloc voting in the Yakima Valley region usually results in

2   the defeat of Latino-preferred candidates for state legislative and other offices. Using multiple

3   statistical methods to validate his results, Dr. Collingwood found that the Yakima Valley region

4   features a "very sustained pattern of polarized voting" between Latino and white voters. Tr. 68:11-

5   69:3. In 24 of 26 elections he analyzed, Dr. Collingwood found levels of racially polarized voting

6   between Latino and white voters "at the 70- to 80-percent level, on either side of the racial or

7   ethnic divide" and that white voters bloc voted to defeat the Latino-preferred candidates. Tr. 66:15-

8   16; Ex. 1 at 1, 17; Ex. 2 at 1. Indeed, white voters defeated the Latino-preferred candidate in every

9   state legislative contest, every local contest, and every statewide partisan contest Dr. Collingwood

10  analyzed. Ex. 1 at 7-8; Ex. 2. The Latino-preferred candidate also "lost every single time" in the

11  state legislative and local contests Dr. Collingwood analyzed that featured a Spanish-surnamed

12  candidate. Tr. 72:6-16; Ex. 1 at 19 (Table 3). Dr. Alford's analysis confirms these results, finding

13  that white voters cohesively vote to block Latino-preferred candidates in partisan contests (which

14  is the type of contest held for LD 15). Tr. 853:15-20, 867:20-23. He also found that "white

15  opposition to Latino-preferred candidates was...elevated when the Latino-preferred candidate was

16  Hispanic" indicating "a real ethnic effect on voting in this area." Tr. 853:21-854:15.[4]

17      Dr. Collingwood also conducted a performance analysis of ten recent statewide elections,

18  to examine whether Latino-preferred candidates would lose in LD 15, as compared to Plaintiffs'

19  demonstrative plans. Ex. 1 at 18-25; Tr. 72:17-73:13. His analysis showed that Latino-preferred

---

[4] This evidence refutes Intervenor-Defendants' claim that divergent candidate preferences between Latino and white voters are due to partisanship rather than race. In any event, it is irrelevant as a matter of law *why* Latinos prefer different candidates than white voters; all that matters for purposes of *Gingles* 2 and 3 is that they vote for different candidates. *See Gingles*, 478 U.S. at 51, 62-63, 74 (plurality); *id.* at 100 (O'Connor, J., concurring); *Gomez v. City of Watsonville*, 863 F.2d 1407, 1416 (9th Cir. 1988); *Collins v. City of Norfolk*, Va., 816 F.2d 932, 935 (4th Cir. 1987).

candidates would lose in seven out of ten elections (70%) in Enacted LD 15 due to white bloc voting. *Id.* In the Plaintiffs' three demonstrative plans, however, the converse is true: Latino-preferred candidates would win in nine or ten out of ten elections analyzed. *Id.* This was, for Dr. Collingwood, "strong evidence of white bloc voting" in satisfaction of *Gingles* 3. Ex. 1 at 25.

Intervenors claim that the election of Latina candidate Nikki Torres to LD 15 means voting is no longer racially polarized in the Yakima Valley region. This is wrong. Dr. Collingwood found that voting in the Torres-Keesling contest *was* in fact racially polarized, at levels consistent with his findings of racially polarized voting in past elections. Tr. 76:10-20; Ex. 2. Relying on multiple reliable statistical methods that account for actual voter turnout in the 2022 election, *see* Ex. 2 at 6, Dr. Collingwood testified that Latinos voted cohesively not for Sen. Torres but for Ms. Keesling, the *losing* candidate in that race, while white voters cohesively preferred the winner. Tr. 76:21-78:22. Dr. Barreto's analysis led him to the same conclusion. Tr. 639:24-641:2; Ex. 417.

The Torres-Keesling race confirms the pattern of outcomes in the region's state legislative races: Latino-preferred candidates lose, while white-preferred candidates win. And even if this were not the case, the 2022 election in LD 15 is subject to the "special circumstances" doctrine, under which courts discount the probative value of elections that take place during the pendency of VRA litigation. *Gingles*, 478 U.S. at 76 (finding such elections can "work[] a one-time advantage . . . in the form of unusual organized political support by white leaders"). The trial record also shows that the 2022 election in LD15 was exceptionally one-sided: Ms. Keesling, a write-in candidate in the primary, spent only $4,000 in the general election, less than 5 percent of what Sen. Torres, who ran unopposed in the primary election, spent on her campaign. Tr. 604:6-605:13 (testimony of Dr. Owens), 641:8-642:2 (testimony of Dr. Barreto); Dkt. # 191-8 (Dep. of Adam Hall) at 247:23-248:13, 249:6-250:3; 255:15-256:25.

The Court should not afford any weight to Dr. Owens's testimony regarding RPV. Dr. Owens did not actually assess RPV in this case, but rather only analyzed Latino vote cohesion using ecological regression, a decades old methodology that no other expert saw fit to rely upon alone. Indeed, he has never in his career used ecological inference. Tr. 577:21-25. In his report, he examined only the level of Latino support for candidates in a limited set of races from 2018 to 2020 using a method of ecological regression that is outdated and less sensitive to the behavior of actual voters than the ecological inference and BISG methods used by Drs. Collingwood and Barreto. Tr. 78:23-80:8 (Dr. Collingwood explaining shortcomings of Dr. Owens's analysis), 535:13-21, 595:1-3, 642:10-646:7 (Dr. Barreto explaining BISG). He did no analysis of white voting patterns, and for this reason offered no opinion as to *Gingles* 3 at his deposition. At trial, Dr. Owens tried to reverse course by opining that *Gingles* 3 was not met based *solely* on his cursory analysis of the November 2022 LD 15 election, a single race marked by special circumstances. Tr. 579:10-13. At the same time, he admitted he had no reason to doubt that white voters overwhelm the preferences of Hispanic voters. Tr. 601:4-11. Dr. Owens also displayed a remarkable lack of care in understanding Washington's basic voting rules and electoral context. Tr. 566:25-570:14. Compared to the clear and robust findings of RPV and white bloc voting by Drs. Collingwood, Barreto, and Alford—who bring decades of experience in making such assessments—Dr. Owens's limited analysis and unsupported opinions merit far less weight, if any. Exs. 531, 601; Tr. 609:19-616:2 (testimony of Dr. Barreto).

The trial record proves that white voters in the Yakima Valley vote as a bloc to usually defeat the candidate of choice of Latino voters. Plaintiffs have therefore satisfied all three *Gingles* preconditions.

**D.**    **Under the Totality of the Circumstances, LD 15 Results in Less Opportunity for Latinos in the Yakima Valley Region to Elect Candidates of Their Choice.**

Through the record and trial testimony of both experts and lay witnesses, Plaintiffs have demonstrated that, under the totality of the circumstances, Latino voters have less opportunity than other members of the electorate to participate in the political process and to elect representatives of choice in LD 15. To this end, Senate Factors 1, 2, 3, 5, 6, 7, 8, and 9 all weigh in favor of the Plaintiffs.

Much of the evidence regarding the Senate Factors was presented by Dr. Josué Estrada, who was qualified by the court and is extremely familiar with the Yakima Valley area. No party presented any controverting expert analysis on any of the Senate Factors considered by Dr. Estrada. Furthermore, Defendant State of Washington admitted it has "no basis to dispute that the evidence at trial [would] demonstrate . . . that, under the totality of the circumstances, Hispanic voters in LD 15 are less able to participate in the political process and elect candidates of their choice then white voters." Dkt. # 194 at 13-14.

**1.**    **Senate Factor 1: History of Official Voting-Related Discrimination**

Plaintiffs have shown that there is a long history of official voting-related discrimination against Latinos in Washington State and in the Yakima Valley region, including English literacy tests, failure to provide bilingual election materials, and at-large systems of election. These forms of discrimination have a current and lasting impact on Latino voters in the region, who have repeatedly had to rely on litigation and legal assistance to vindicate their fundamental right to vote. *See, e.g.*, Tr. 131:3-17 (testimony of Dr. Estrada regarding a 1960s lawsuit challenging the use of English literacy tests); Tr. 292:6-23 (testimony of Susan Soto Palmer regarding her 2021 challenge to the at-large system of election for Yakima County Commissioners in *Aguilar v. Yakima County*);

Tr. 836:16-837:19 (testimony of Gabriel Portugal regarding his role as a plaintiff in two cases challenging the at-large system of election for Franklin County Commissioners); Tr. 133:3-15 (testimony of Dr. Estrada regarding a 2004 Department of Justice lawsuit challenging Yakima County's failure to comply with Section 203's requirement that the County provide bilingual ballots and assistance).

First, Dr. Estrada found that English literacy tests were unequally and unfairly administered to Latinos in the Yakima Valley region with the effect of disenfranchising Latino voters, including after the passage of the Voting Rights Act of 1965. Tr. 130:13-131:22;  Ex. 4 at 22-31. Yakima County continued to use literacy tests until the extension of the VRA in 1970. Tr. 131:18-22; Ex. 4 at 31.

Voting discrimination in the region did not stop in the 1970s. Local jurisdictions in the Yakima Valley region, including both Yakima and Franklin County, have historically failed to provide bilingual information and election materials to the detriment of Latino voters. Tr. 132:22-133:15; Ex. 4 at 39-43. The result has been that, even when there have been policy changes which theoretically ought to increase access to the ballot for the region's Latinos, Yakima Valley region voters whose primary language is Spanish have often failed to benefit. Ex. 4 at 39-40.

After being "designated by the Director of the Census as a jurisdiction subject to the requirement of Section 203 for persons of Spanish heritage" in 1976, Yakima County provided bilingual ballots until 1982. *Id.* at 40. However, Yakima County then ceased providing those materials for twenty years, until 2002, when the Department of Justice intervened and mandated their provision. *Id*. at 40-41. In 2004, the Department of Justice sued Yakima County for failing to adequately provide bilingual voting materials and election assistance in violation of Section 203 of the VRA; the lawsuit was settled when the County, while not admitting liability, agreed to

undertake several steps to ensure compliance with Section 203. *Id.* at 41-42; Tr. 133:11-15. Similarly, Mr. Portugal testified that "[i]t was not easy" to get to the point where bilingual ballots were provided to Franklin County residents, citing how it was necessary to seek the assistance of an attorney after Franklin County Commissioners rejected requests to provide election materials in Spanish as well as English. Tr. 839:16-840:7.

Second, at-large systems of election have historically and through the present day worked systematically and effectively to dilute the voting power of Yakima Valley Latinos. Both Drs. Josué Estrada and Matthew Barreto testified at trial regarding the dilutive effect of at-large elections in the region. Tr. 131:23-132:21 (testimony of Dr. Estrada); 621:8-20 (testimony of Dr. Barreto). Dr. Barreto testified that at-large systems of election "are diluted" and make it harder for minorities to gain representation. Tr. 621:8-20. The racially discriminatory effect of these systems of election is evidenced by multiple court cases challenging at-large elections in the region at both the city and county level under the federal and Washington Voting Rights Acts. *See* Tr. 131:23-132:21 (testimony of Dr. Estrada); Ex. 4 at 31-39. In each of the cases, either the court found that the jurisdiction's at-large system of election diluted Latino voting power, *see Montes v. City of Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014), or the parties and court agreed that the record supported such a finding, *see Glatt v. City of Pasco*, No. 4:16-CV-05108 (E.D. Wash. Jan. 27, 2020); *Aguilar et al. v. Yakima County et al.*, No. 20-2-0018019 (Kittitas Cty. Sup. Ct. July 13, 2020); *Portugal et al. v. Franklin County et al.*, No. 21-2-50210-11 (Franklin Cty. Sup. Ct. May 5, 2021).

This evidence establishes a clear history of official voting-related discrimination in the Yakima Valley region, including a history of using dilutive at-large systems of election. This factor accordingly weighs in favor of the Plaintiffs.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### 2.     Senate Factor 2: Racially Polarized Voting

As discussed in Part I.B-C, elections in the Yakima Valley region feature high levels of racially polarized voting. This factor weighs heavily in Plaintiffs' favor.

### 3.     Senate Factor 3: Voting Practices or Procedures That Tend to Enhance the Opportunity for Discrimination

Plaintiffs have established that holding elections in off-years, electing representatives at-large in multimember districts, and signature matching are voting procedures which tend to enhance the opportunity for discrimination against Latino voters in the Yakima Valley region.

First, the placement of LD 15's senate election in non-presidential (off) election years disproportionately impacts Latino voters. Drs. Collingwood and Estrada both found that Latino voters in the region, whose turnout is already lower than other voters in presidential-year elections, have even lower voter turnout in off-year elections, which exacerbates the disadvantage of their depressed voting registration. *See* Tr. 73:14-75:25 (testimony of Dr. Collingwood) ("In midterm election years, white voters have a turnout gap advantage. In presidential, that gap starts to narrow. And so that could be potentially conclusive for who wins an election. It could potentially explain why, even though you have a 50.02 or a 50.04 Latino district, the Latino-preferred candidate is still losing."); 134:12-135:4 (testimony of Dr. Estrada) ("[I]n elections where…the Latino turnout is already low…compounded with low voter registration rates…this just adds to that effect of lower voter turnout."); Ex. 1 at 29-32;  Ex. 4 at 43-45. At trial, Dr. Barreto also testified about the turnout discrepancies for Latino voters between presidential and non-presidential election years. Tr. 670:18-671:7.

In addition, the State's system of electing two state house representatives at-large in a multimember district also tends to enhance LD 15's dilutive effect on Latino voting power. As Dr.

Barreto indicated, this nested multimember house district system is both unusual and makes it "more difficult to gain representation." Tr. 62:2-20 (testifying that it would be "better to have two subdistricts"). The Supreme Court "has long recognized that multimember and at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'" *Gingles*, 478 U.S. at 47 (internal citations omitted).

Finally, Latino voters in Washington disproportionately have their ballots rejected for signature mismatch compared to other voters, with Spanish-surnamed voters in Franklin and Yakima counties respectively 3.9 and 7.5 times more likely than other voters to have their ballot rejected.  Ex. 4 at 45-46; Tr. 135:5-12 (testimony of Dr. Estrada). While Defendants Secretary of State Hobbs and State of Washington questioned Dr. Estrada about the source reporting this disparity, neither Defendants nor Intervenor-Defendants questioned the validity of the disparate signature rejection rates presented in Dr. Estrada's report and testimony. Tr. 150:17-152:5, 155:6-24. These disparities indicate that signature matching tends to enhance the opportunity for discrimination against Latinos in the region. To the extent the Court declines to reach the issue or decides that disparate signature rejection is not a voting practice or procedure that tends to enhance the opportunity of discrimination, the totality of the evidence would still lead Dr. Estrada to the conclusion that there is a lack of equal opportunity for Latino voters. Tr. 152:12-25.

### 4.    Senate Factor 5: Extent to Which Latinos Bear the Effects of Discrimination

Plaintiffs have shown through historical and present-day evidence that Latinos in the Yakima Valley region continue to bear the effects of discrimination and are at a disadvantage relative to white residents in areas that impact voting, including education, housing, socioeconomic status and employment, health, and criminal justice.  Ex. 4 at 46-63; Tr. 135:13-141:5. Dr. Estrada

presented unrebutted findings of discrimination against Latinos in these areas. Additionally, lay witnesses testified, and the record supports, that lower Latino voter turnout and registration rates in the region stem directly from language access issues, discouragement from persistent defeats due to white bloc voting, fear of retribution from employers, and voter suppression.

### i.   Education

Washington and the Yakima Valley region have a history of segregation and discrimination in the education system, as demonstrated by Dr. Estrada's archival research. Tr. 136:1-137:4; Ex. 4 at 47-50. The impact of the history of discrimination in the education system continues into the present day. Dr. Estrada testified that Spanish-speaking parents in Washington continue to have difficulties receiving bilingual services and communicating with teachers and administrators about their children's educations. Tr. 137:5-14; Ex. 4 at 49-50. Further, there remain undeniable disparities between Latino and white residents' rates of high school graduation and attainment of bachelor's or higher degrees in Adams, Benton, Franklin, Grant, and Yakima Counties.  Ex. 4 at 50-51; Tr. 137:15-25. While the degree of the disparities varies by county, in *every* instance Latinos have lower rates of high school graduation and lower rates of graduate degree attainment than their white counterparts. *Id*. This evidence demonstrates that Latinos continue to bear the effects of discrimination in education.

### ii.   Housing, Socioeconomic Status, and Employment

Latinos in the region also bear the effects of discrimination in housing. Despite years of reliance on Latino farmworkers, housing for those workers in the Yakima Valley region is poor in both quantity and quality, with white residents frequently resisting the building of adequate housing.  Ex. 4 at 51-54; Tr. 138:1-21. Dr. Estrada's report and testimony included evidence regarding the poor housing conditions for Latino farmworkers gathered by the Washington State

Human Rights Commission in 2007 which resulted in the Commission announcing that it was "increasingly concerned about race and national origin discrimination against farmworkers in the area of housing." Ex. 4 at 53; Tr. 138:11-21. Dr. Estrada also presented evidence that Latinos across the entire region have significantly lower homeownership rates than white residents, for example with only 12.2% of Latino residents in Benton County owning their homes compared with 87.1% of white residents.[5] Ex. 4 at 55-56; Tr. 138:22-139:9. Dr. Estrada traced these particular disparities not just to past and present discrimination against Latino farmworkers, but also to the region's history of racially restrictive covenants. Tr. 139:4-9; Ex. 4 at 16. Dr. Estrada also demonstrated that Latinos in the five-county area have disproportionately low household incomes, Ex. 4 at 56-57; high poverty levels, *id.*; and high unemployment rates, *id*. at 57-58, when compared to white residents. *See also* Tr. 139:10-21.

     *iii.*   *Health*

     Latinos in the Yakima Valley region continue to bear the effects of discrimination in health. Latinos are uninsured at significantly higher rates than white residents and local healthcare providers catering to the Latino community, such as the Yakima Valley Farm Workers Clinic, report that Latinos tend to seek emergency rather than preventative healthcare. Tr. 139:22-140:13; Ex. 4 at 58-59. Latinos were also disproportionately impacted by the COVID-19 pandemic with Washington's Latinos making up only 13% of the state's population at the time, but almost half of the state's COVID-19 cases. Tr. 140:14-18; Ex. 4 at 59. This disproportionate impact was in part

---

[5] Out of the counties considered, Benton County has the starkest disparity between Latino and white homeownership. This contrasts with its high school graduation rates which, while still presenting a significant disparity between Latino and white residents, were the least stark of the counties considered. The disparity need not be the same in each county and in every area of life for the overarching conclusion to remain that Latino residents in the region all bear the effects of discrimination in ways that their white counterparts do not.

because agricultural employers, who have predominantly Latino employees, resisted on-site testing when it was offered or recommended by health officers; this refusal ultimately led to COVID-19 outbreaks in agricultural warehouses and protests by Latino agricultural workers. Tr. 140:19-141:5; Ex. 4 at 59-60. The impact of the COVID-19 pandemic, along with persistent inequalities in healthcare access, demonstrate that Latinos in the region continue to bear the effects of discrimination on their health.

### iv. *Criminal Justice*

Latinos in the region also bear the effects of discrimination, past and present, in the criminal justice system. Washington's Latinos are incarcerated at higher rates compared to their share of the population including in Adams, Franklin, Grant, and Yakima counties. Ex. 4 at 60-61. The higher rates of incarceration are consistent with findings that Latinos "are more likely to receive a standard sentence than any of the five sentencing alternatives" and are "more likely to be subject to high discretion searches." *Id.* at 61. Latinos are also significantly more likely than white residents to be killed by law enforcement—e.g., 1.9 times more likely in Franklin County and 2.5 times more likely in Yakima County. Ex. 4 at 62; Tr. 141:6-142:3. The 2015 killing of Antonio Zambrano-Montes by Pasco police is one high-profile example of such incidents. Ex. 4 at 61; *see* Ex. 4 at 62; Tr. 824:9-24 (Mr. Portugal testifying that the police chief refused to begin an inquest into the killing despite calls for an investigation). This evidence demonstrates that the region's Latino population continues to bear the effects of discrimination in criminal justice.

### v. *Voter Participation*

Latino voters have depressed levels of voter registration and turnout in the Yakima Valley region. Ex. 1 at 29-32; Ex. 4 at 43-45. Despite Intervenor-Defendants' arguments to the contrary, Plaintiffs need not establish causation under Senate Factor 5. *See, e.g.*, *Luna*, 291 F. Supp. 3d at

1137 (citing *LULAC, Council No. 4434 v. Clements*, 986 F.2d 728, 750 (5th Cir. 1993)) ("Under this [] factor, plaintiffs must demonstrate both depressed political participation and socioeconomic inequality, but need not prove any causal nexus between the two.").

Plaintiffs have nonetheless presented substantial evidence that the lower levels of voter registration and turnout are not merely the result of a lack of political interest or effort. Indeed, witnesses at trial testified to participating in efforts to increase political awareness and participation in the region's Latino community. *See, e.g.*, Tr. 824:25-825:9, 836:8-15 (testimony of Gabriel Portugal regarding LULAC's efforts to educate the Latino community on candidates and initiatives as well as their civil rights); 288:15-289:6 (testimony of Susan Soto Palmer regarding her involvement in community organizations including "to promote voters' rights and get voters registered"). The trial and written record reflect the reality that Latinos voters continue to face barriers to political participation not experienced by their white counterparts.

Sen. Saldaña and Mr. Portugal testified that language access continues to create a barrier to political participation by Latinos. Tr. 182:8-16 (testimony of Rebecca Saldaña) ("these are barriers that make it harder for Latino voters to be able to believe that their vote counts, have access to vote, and let alone, to be able to have someone that fully represents their interests, their perspectives, their experiences"); Tr. 840:18-841:14 (testimony of Gabriel Portugal) ("Latinos that lack the language, lack the knowledge, and again have the extra fear of, maybe I should not be involved in this. So, yeah, they shy away.").

Ms. Soto Palmer, Ms. Lopez, and Sen. Saldaña testified that depressed voter turnout among the Latino community is also in part because discouragement from persistent experiences of discrimination and the inability to fairly elect candidates that represent their needs. *See, e.g.*, Tr. 296:2-8 (testimony of Susan Soto Palmer that, through her experiences campaigning in the region,

she "learned that the Latino Hispanic community has felt that there has not been a person that they align with, to represent them on the ballot, for such a long time, that they just end up throwing away their ballots."); Tr. 26:6-25 (testimony of Faviola Lopez); Tr. 181:9-22 (testimony of Rebecca Saldaña) ("If you don't feel like you can even have a say about sidewalks, it creates a barrier for you to actually believe that your vote would matter, even if you could vote.").

Plaintiff Soto Palmer, Sen. Rebecca Saldaña, and Mr. Portugal testified that Latinos in the region fear retribution from their employers if they were to vote for their preferred candidates and against the candidates preferred by their employers. Tr. 296:9-17, 307:12-18 (testimony of Susan Soto Palmer that "[she] also learned, from several households, that for the Latino and Hispanic communities, that there are some that feel that . . . their jobs would be in jeopardy, if they voted for a Latino-preferred candidate. They would lose benefits. A lot of the Latino Hispanic families work in the same industries together. And some of them told [her] that they felt that they would lose their jobs, and their family might also lose their jobs, so they don't vote."); 199:5-14 (testimony of Rebecca Saldaña that "I've gone to labor camps. I just went to meet with asparagus workers, right after session . . . They fear. They live in fear. And they want a job. They want to be able to have any income they can. And they are not going to risk that, if they don't think that -- if they do do something and speak out, that there's going to be someone to have their back."); 835:11-19 (testimony of Gabriel Portugal that "sometimes they have fear, because they work at an area where they're not supposed to be talking about politics, especially about some – either political party. And they know that their job may be in jeopardy if they get too vocal, or start talking about, you know, political issues or candidates. So Latinos tend to shy away, in sort of like a self-preservation.").

Latino voters have also experienced recent voter suppression in the region. Benancio Garcia, the plaintiff in the *Garcia* case, was a candidate in the 2022 primary race for Washington's Fourth congressional district. Dkt. # 191-7 (Dep. of Benancio Garcia) at 67:1-9. Mr. Garcia was the only Latino candidate in that race. *Id.* at 68:3-18. Mr. Garcia testified that the Washington State Republican Party suppressed the Latino vote in that election. He testified that he had recorded a message, in both English and Spanish, designed to "help us get our vote out" for a phonebank targeting "every registered 4th District Latino Republican." *Id.* at 75:2-79:7; 90:12-91:13. The state Republican Party, however, discarded Mr. Garcia's targeted messages and instead used English-only general messages from the party. *Id.* Mr. Garcia also testified that the state Republican Party had specific funding to hire organizers to register Latino voters in the Yakima Valley, including the Cities of Yakima and Wenatchee, but declined to do so. *Id.* Based on this personal experience, Mr. Garcia concluded that the Party's actions "greatly affected th[e] election, the outcome, and suppressed the Latino vote." *Id.*

The evidence at trial establishing the ongoing effects of voting discrimination, language access issues, voter discouragement after persistent defeats, fear of retribution from employers, and voter suppression together show the political process is not equally open to Latino voters in the Yakima Valley region. With ample evidence that Latinos in the region bear the effects of discrimination in education, housing, employment and socioeconomic status, health, and criminal justice, and that Latinos have resulting lower rates of voter registration and turnout, Senate Factor 5 weighs heavily in Plaintiffs' favor.

1

2

### 5.    Senate Factor 6: Use of Overt or Subtle Racial Appeals in Political Campaigns

Candidates and elected officials in LD 15 have made both overt and subtle racial appeals during campaigns and while in office. Dr. Estrada presented numerous examples of such appeals, including an instance in which Sen. Jim Honeyford (LD 15), referred to racial minorities as "colored" and "coloreds," remarking that "the poor people are most likely to commit crimes, and, uh, colored [sic] most likely to be poor" during a legislative hearing.  Ex. 4 at 67-68; Tr. 143:18-144:5. Dr. Estrada also provided multiple instances of Franklin and Yakima County officials running for election posting content using the offensive terms "illegal" and "illegals" and promoting disproven allegations that non-citizens are voting in elections. Ex. 4 at 63-66 (providing examples of racial appeals at the county level); Tr. 143:3-17.

Latino candidates in the region have also experienced racial animosity while campaigning. *See* Ex. 4 at 66-67. For example, Ms. Soto Palmer testified about the racial animosity that she experienced while campaigning for Gabriel Muñoz, a Latino candidate for LD 15's Senate seat. Tr. 292:25-294:4. Ms. Soto Palmer then faced challenges when she herself ran in 2016 for state representative in LD 14 and in 2018 for the Yakima County Commission. Ms. Soto Palmer testified that she "went door-to-door canvassing," "did phone banking" as well as "voicemail and text messages," "attended parades and went to some events." Tr. 294:22-295:1. However, "[b]ecause of the prior experiences, it was hard for [her] to campaign in areas that were predominantly white, because [she] feared for [her] safety." Tr. 295:2-7. Ms. Soto Palmer lost both of her elections to her white opponents. Tr. 295:8-12; 295:21-296:1.

Additionally, Intervenor-Defendant Jose Trevino, the Republican Mayor of Granger—a city in the Lower Yakima Valley with an 88.4% Latino population—attributed his loss in the 2015

Granger mayoral race to a rumor spread during the campaign that he "was going to fire all the white people in the city" and attributed his loss in multiple other races, including for Yakima County Commission, to negative coverage in the Yakima Herald-Republic, saying that he was the "only [candidate] they picked on" because "it was easier to pick on the Republican Mexican than anyone else."  Ex. 140 at 72:22-73:12, 86:1-12, 87:3-88:21, 88:16-21, 100:7-101:4.

Candidates and elected officials in the Yakima Valley region use overt and subtle racial appeals in campaigns and while in office. This factor weighs heavily in Plaintiffs' favor.

**6.  Senate Factor 7: Extent to Which Latino Candidates Have Been Elected to Public Office in the Jurisdiction**

Plaintiffs have demonstrated that, despite many Latino candidates running for state legislative and county-level office in the Yakima Valley region and throughout Central Washington, these Latino candidates have consistently not been elected. Tr. 144:15-146:5; Ex. 4 at 69-71.

In the history of the state, just three Latinos, "a very, very small number, compared to the population," have been elected to any of the twelve state legislative seats across LDs 13, 14, 15, and 16. Tr. 144:19-145:12; Ex. 4 at 69-70. In 1994, Mary Skinner was elected as Senator for LD 14, which at the time included parts of the state not at issue here. Dkt. # 191 ¶ 111; Ex. 4 at 69. Since Senator Skinner left office, numerous Latino candidates like Ms. Soto Palmer in 2016 and Noah Ramirez in 2018 have run for the seat but lost to white opponents.  Ex. 4 at 69; Tr. 294:11-295:12 (testimony of Susan Soto Palmer). The second Latino candidate to have been elected in the region is Representative Alejandro "Alex" Ybarra, who was appointed to represent LD 13 in 2018. Ex. 4 at 69-70; Dkt. # 191-15 (Dep. of Alex Ybarra) at 55:2-16. Representative Ybarra testified that he benefitted from his appointment when he ran for reelection because "[m]ore people knew

[his] name," an advantage which he admitted "helps all incumbents." Dkt. # 191-15 at 55:17-56:2. Other Latino candidates have recently lost their bids for election in LD 13.  Ex. 1 at 7.

The third and final Latino candidate to have been elected to state legislative office in the region is Nikki Torres, whose election to LD 15's senate seat came amidst "special circumstances" following the filing of this lawsuit and who was not the Latino-preferred candidate. *See supra* Part I.C. No other Latino candidates have ever been elected to state legislative office in LD 15 despite multiple attempts, including state senate bids by Gabriel Muñoz in 2014, Dkt. # 191 ¶ 102, and Evangelina Aguilar in 2018, *id.* ¶ 105, as well as state house bids by Pablo Gonzalez in 2012, *id.* ¶ 101, and Teodora Martinez Chavez in 2014, *id.* ¶ 103.

Latino candidates have experienced a similar lack of success in elections for county office. Latinos in Yakima County make up 51% of the population, but just one Latino candidate, who left office in 2006, has ever been elected to the Board of County Commissioners. *See* Ex. 4 at 69. In Franklin County, where Latinos make up 54.1% of the population, not a single Latino has ever been elected to the County Board of Commissioners. *Id*. at 70.

Intervenor-Defendants suggest Dr. Estrada should have included city-level races in his assessment of this factor. That makes little sense. As Dr. Estrada stated, "it made more sense to compare the geographies of the legislative districts to the county districts, rather than look at those smaller communities" where there are "large, significant sizeable Latino majorities." Tr. 145:25-146:5, 165:19-166:3, 167:1-6. Furthermore, the existence of politically cohesive Latinos at the local level in the Yakima Valley region—including those in the very communities that were cracked to dilute Latino voting strength in the current LD 15—are the reason why it is possible to draw a performing, majority-Latino state legislative district.

With only two Latinos ever elected to state legislative office from the region absent special circumstances and a dearth of Latinos elected to county positions in the region, this factor weighs in favor of the Plaintiffs.

### 7. Senate Factor 8: Lack of Responsiveness of Elected Officials to the Needs of the Latino Community

Plaintiffs have presented substantial evidence that the state legislators representing the Yakima Valley region have been unresponsive to the needs of the Latino community.

Dr. Estrada analyzed recent responsiveness based on a comparison of the legislative priorities of Washington's Latino Civic Alliance for the 2022 Latino Legislative Day to the voting records of state legislators from the region. Tr. 146:6-147:8; Ex. 4 at 71-77. Dr. Estrada found that the region's legislators tend to vote against the bills supported by the Latino community. *Id.* For example, the Senators from LDs 14, 15, and 16 uniformly opposed SB 5597, an update to the Washington Voting Rights Act (WVRA), which, in addition to being a bill promoted by the Latino Civic Alliance, had the backing of 93 organizations across 20 counties including Latino groups like Casa Latina, the Commission on Hispanic Affairs, El Centro de la Raza, Radio KDNA, and the Tri-Cities LULAC. Ex. 4 at 74-75; Tr. 146:23-147:8.

The testimony of lay witnesses corroborated Dr. Estrada's findings. For example, Mr. Portugal, one of the founders of the Latino Civic Alliance, testified that based on his experience with the Latino Civic Alliance and the Washington Commission on Hispanic Affairs, "the pattern that [they] hear from all the eastern side – Wenatchee, Yakima, Othello, Moses Lake, Pasco, Sunnyside, Granger, all the way to Yakima, and even Ellensburg" was "the concern that the legislators do not listen to the Latino concerns." Tr. 822:24-823:1, 826:6-20. Plaintiffs Lopez and Soto Palmer both testified to the frustrating lack of responsiveness from legislators in response to

advocacy for issues important to Latinos. *See, e.g.*, Tr. 35:24-36:3, 24:13-25:5 (testimony of Faviola Lopez that "I think if you look at our representatives, they don't look like or reflect the community that they serve. And they voted against a lot of, not only issues, but resources that would help our community as well."); 290:6-8, 291:3-23 (testimony of Susan Soto Palmer).

For example, both Ms. Lopez and Ms. Soto Palmer advocated for the initial passage of the WVRA in 2018 but failed to get support for the bill from their representatives. Sen. Rebecca Saldaña, who was the prime sponsor of the WVRA, testified that the legislation was aimed at ending electoral discrimination, including the protection of Latino voting rights. Tr. 182:17-184:3. Both Plaintiffs testified that they had each met with Sen. Curtis King to advocate for the passage of the Act, highlighting the importance of the bill to their Latino communities. Tr. 290:6-291:2 (testimony of Susan Soto Palmer); 25:8-22, 27:5-22 (testimony of Faviola Lopez). Neither felt that Senator King was responsive to their advocacy, with Ms. Lopez saying, "we felt like they weren't really listening to our stories," Tr. 27:17-22, and Ms. Soto Palmer describing him as "dismissive" of her concerns and unsupportive of the bill despite admittedly not having read it, Tr. 290:16-24. Senator King ultimately voted against the WVRA, *id.*, as did *all* the representatives from the region.[6]

Sen. Saldaña testified that in her interactions with Eastern Washington's farmworkers and residents from the Yakima Valley region as a state legislator, she observed that former LD 15 Senator Jim Honeyford's representation was "very different from what [she] was hearing from

---

[6] Wash. State Legislature, SB 6002 (2018), https://app.leg.wa.gov/billsummary/?billNumber=6002&year=2018 (showing nay roll call votes of Sens. Warnick (LD 13), King (LD 14), Honeyford (LD 15), and Walsh (LD 16), and Reps. Dent (LD 13), Manweller (LD 13), Johnson (LD 14), McCabe (LD 14), Chandler (LD 15), Taylor (LD 15), Jenkin (LD 16), and Nealey (LD 16)).

residents of that area, of what they needed and wanted, and how he was voting at the time." Tr. 175:3-6, 174:4-176:19. She testified that Latino residents from the Yakima Valley region seek her out over their own representatives; when she asks if these individuals have tried reaching out to their own representatives, she hears that "[e]ither they don't feel comfortable or they tried and they don't feel like they got it." Tr. 176:5-7; *see also* 201:13-17 (testifying that she "find[s] it very frustrating that [she], who ha[s] no direct connection with the Yakima Valley, [is] often the only person that's advocating for policies that support and benefit the people of the Yakima Valley"). Mr. Portugal also testified overhearing then-Senator Honeyford call a prominent Latino farmworker organizer a "son of a bitch." Tr. 828:17-829:23. He testified that "Senator Honeyford is not friendly to a lot of our farmworkers." *Id*.

Finally, the 2021 Redistricting Commission itself was unresponsive to the advocacy of the Latino community for a district that respects Latino communities of interest and that would provide an equal opportunity to elect their candidates of choice. Tr. 29:22-35:19 (testimony of Faviola Lopez) ("We were requesting for the Latinx population in Yakima's voting power, not to be broken up, like it has been in the past."); Tr. 296:19-297:19 (testimony of Susan Soto Palmer); Tr. 186:13-187:4 (testimony of Rebecca Saldaña). The 2021 advocacy for a Yakima Valley district in which Latinos could elect their candidates of choice was a continuation of advocacy that began last decade. Dr. Matthew Barreto testified that "there [was] no question" the conditions were in place then to draw such a district, but he found "there wasn't the political appetite in 2011, to draw that legislative district." Tr. 618:25-619:19. This factor weighs in favor of the Plaintiffs.

8.      **Senate Factor 9: Tenuousness of the Policy Underlying the Current Composition of LD 15**

The last factor—whether the justifications for the legislative districts in the Yakima Valley region are "tenuous," *Gingles*, 478 U.S. at 45—also weighs in Plaintiffs' favor. Evidence of a tenuous rationale for a district's composition "may . . . indicate that [the district] produces a discriminatory result." *Luna*, 291 F. Supp. 3d at 1141 (citing *LULAC, Council No. 4434 v. Clements*, 986 F.2d 728, 753 (5th Cir. 1992)). At the same time, "[t]he existence of a legitimate policy rationale . . . does not preclude a finding of vote dilution," especially where, as here, the weight of the evidence shows the district results in less opportunity for a minority group. *Id.*

As an initial matter, the State agrees that LD 15 violates Section 2's prohibition on discriminatory results and has offered no compelling reason why the district's current discriminatory composition should be maintained. Dkt. # 194 at 10-17. Dr. Collingwood's analysis of various demonstration plans shows it was possible for the Commission to draw a district in the Yakima Valley region that affords Latinos equal opportunity to elect candidates of their choice while satisfying traditional redistricting criteria. Ex. 1 at 21-29. The Commission considered many district configurations in the Yakima Valley region during the redistricting process that would have met its goals while ensuring Latino electoral opportunity. *See id.* at 28-29; *infra* Part I.A.

To the extent any party would defend the current composition of LD 15 by claiming it is necessary to respect the Yakama Nation community of interest, that argument fails. The Commissioners considered or proposed map iterations that would have performed to elect Latino candidates of choice while keeping in one district the entirety of the Yakama Nation Reservation

where tribal communities live, and in some cases, much of the off-reservation trust lands.[7] *See,*
*e.g.*, Ex. 1 at 28; Exs. 150 at 16, 156, 514 (Walkinshaw 9.21 Proposal); Exs. 197-98, 515-16
(Walkinshaw & Sims 10.25 Proposals); Ex. 518 (Walkinshaw 11.13 Proposal); *see also* Ex. 1 at
28. No Commissioner or staff testified that the Nation's interests could not be accommodated while
respecting the repeated public testimony from Latinos in the Yakima Valley asking to keep their
community whole. *See* Exs. 94, 97, 189, 252, 342 (public comments); *supra* Part I.D.7. Even if
the Commission's goals with respect to the Yakama Nation were difficult to reconcile fully with a
Section 2-compliant map, those goals must cede to federal law. *See Milligan*, 143 S. Ct. at 1505
(considering competing maps where "there would be a split community of interest in both").

The State has also contended that Commissioners drew LD 15 the way they did in order to
comply with Section 2. Dkt. # 194 at 18. The record belies this assertion, and even if were true,
mere intent to comply with the VRA is not a valid justification for maintaining a legislative
redistricting plan that has the effect of denying Latinos a fair opportunity to elect their preferred
candidates. *Milligan*, 143 S. Ct. at 1507 ("[Section] 2 turns on the presence of discriminatory
effects, not discriminatory intent."). Commissioners Sims and Walkinshaw, for their part,
understood that Section 2 required them to draw a district in the Yakima Valley that performed to
elect Latino voters' candidates of choice. Tr. 237:28-238:3 (testimony of April Sims testifying as
to the this "clear directive"), 315:4-10 (testimony of Brady Walkinshaw); Exs. 179, 183, 200, 195.
The Commission, however, did not adopt any of their legislative district proposals that would have

---

[7] Unlike the Yakama Reservation, the off-reservation trust lands are unpopulated. *Compare*
Yakama Nation Reservation, Census Reporter (2021), https://censusreporter.org/profiles/2
5200US4690R-yakama-nation-reservation/ *with* Yakama Nation Off-Reservation Trust Land,
Census Reporter (2021), https://censusreporter.org/profiles/25400US4690T-yakama-nation-off-
reservation-trust-land/.

afforded Latino voters an equal opportunity to elect. In fact, the Commission never really adopted a legislative map at all, missing their November 15 deadline to do so. Tr. 222:24-223:11 (testimony of April Sims), 321:1-22 (testimony of Brady Walkinshaw), 742:15-25 (testimony of Paul Graves); Ex. 530 at 5 (OPMA Consent Decree).

The district that ultimately came to be LD 15 was conceived and drawn by Commissioner Graves and his staffer, Anton Grose. Exs. 240-243, 517 (Graves Nov. 7 proposal); Ex. 521 (Enacted Plan). Commissioner Graves was wholly unconcerned with complying with Section 2's clear directive to draw a Latino opportunity district in the Yakima Valley region. According to contemporaneous notes and chat messages sent by one of Commissioner Walkinshaw's staffers, Ali O'Neil, during and shortly after a November 15 meeting between Commissioners Graves and Walkinshaw, Commissioner Graves insisted that LD 15 perform to elect Republicans rather than Latino voters' candidates of choice. Ex. 388 at 5 (O'Neil Timeline of Redistricting Commission Events); Exs. 352, 346 (chat messages); Tr. 785:21-786:6, 791:17-793:21, 793:22-794:15 (testimony of Ali O'Neil); *see also* 790:23-791:3 ("we knew, and heard, that the Republican commissioners did not want to draw a district that was Democratic performing, and, therefore, allowing Latino voters to elect a candidate of their choice").

Working at Commissioner Graves's direction, Mr. Grose drew various iterations of LD 15 in Dave's Redistricting App (DRA), which enabled him to see in real time how changes to the district would impact the Latino share of eligible voters and the district's likelihood of electing Latino-preferred candidates, which he understood to be Democratic candidates. Tr. 369:1-4, 380:13-23, 384:4-21, 391:16-19 (testimony of Anton Grose). In each iteration of the map from November 7 to the Enacted Plan, Mr. Grose shifted precincts in and out of LD 15 in a way that consistently chipped away at the district's HCVAP and reduced the district's likelihood of

performing to elect Latino candidates of choice. Tr.396:9-397:21 (testimony at Anton Grose); Ex. 487 (identifying changes between iterations); Ex. 1 at 28. This systematic and intentional weakening of Latino electoral performance in LD 15 in the final days of the Commission's redistricting process flatly contradicts any claim that the district was drawn to comply with Section 2.[8] In short, the policies motivating the configuration of LD 15 as enacted are tenuous.

### 9. Proportionality

Proportionality is not a required showing under Section 2, which contains "a robust disclaimer" against such a showing. *Milligan*, 143 S. Ct. at 1500. However, it can be relevant to consider "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area." *LULAC v. Perry*, 548 U.S. 399, 426 (2006). Here, Latinos are 8.7% of the state's CVAP according to the latest ACS 1-year estimates, but Latinos form an *effective* majority of voters in *none* of the legislative districts and a bare majority in only one district, or 2% of the 49 districts. Ex. 521; U.S. Census Bureau, Citizen Voting Age Population by Selected Characteristics, http://bitly.ws/Gj3A. Thus, the number of districts in which Latinos form a majority of voters is less than their share of eligible voters. This lack of proportionality is indicative of Latino voters' reduced opportunity to participate in the political process. *See Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).[9]

---

[8] As Plaintiffs state at the outset, *supra* p. 3, the Court need not decide Plaintiffs' discriminatory intent claim because LD 15, under the totality of the circumstances, has the effect of diluting Latino voting power. However, Plaintiffs note that similar evidence of a map-drawer's tinkering to reduce Latino electoral opportunity in a district led a three-judge district court to conclude that the Texas legislature intentionally discriminated against minorities in violation of Section 2. *See Perez v. Abbott*, 253 F. Supp. 864, 954 (W.D. Tex. 2017).

[9] Intervenors claim that Latinos are somehow disproportionately represented in Washington because the share of Democrats in the Legislature exceeds Latinos' share of the eligible voting population. Dkt. # 197 at 21-22. This makes no sense. Nor is it the relevant benchmark under

**E.  LD 15 Results in Less Opportunity for Latinos to Elect Candidates of Their Choice Under the Totality of the Circumstances Despite Its Bare Majority-Hispanic Citizen Voting Age Population.**

Although Latinos form a slim majority of voting-age citizens in LD 15, the district as enacted nevertheless fails to afford Latinos equal opportunity to elect candidates of their choice in violation of Section 2.

In *LULAC v. Perry*, the Supreme Court recognized that it is "possible for a citizen voting-age majority to lack real electoral opportunity." *LULAC v. Perry*, 548 U.S. 399, 428 (2006). Lower courts have accordingly recognized that "the majority-minority status of a district does not preclude a § 2 claim" because such a district can nevertheless deny minority voters equal opportunity to elect candidates of choice under the totality of the circumstances. *Perez v. Abbott*, 253 F. Supp. 3d 864, 880 (W.D. Tex. 2017) (holding that a 58.5% HCVAP district was "not in fact a Latino opportunity district"); *see also Moore v. Leflore Cnty. Bd. Of Election Comm'rs*, 502 F.2d 621, 624 (5th Cir. 1974) (affirming rejection of a plan in which all five districts were bare majority-African American and a "history of fear and civil rights repression resulted in minimal political activity for African Americans"). As the three-judge district court in *Perez* explained, "demographics alone do not demonstrate opportunity; the degree of racially polarized voting and turnout will affect whether a HCVAP-majority district provides opportunity, such that a searching, practical inquiry is required." *Perez at* 253 F. Supp. 3d at 880. Such an inquiry also includes a district's "performance on exogenous election indices." *Id.* at 887.

---

*LULAC v. Perry*, 548 U.S. at 436, which "compares the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population." The Enacted Plan contains no majority-HCVAP district in which Latinos have an opportunity to elect candidates of their choice, and thus contains no Latino opportunity districts.

As the totality of the evidence has shown, voting in the Yakima Valley region is highly racially polarized. *Supra* Part I.B-C. The testimony of multiple experts and fact witnesses also demonstrates that Latinos lag far behind in turnout, owing to the region's long history of voter suppression, extreme socio-economic disparities that bear on the ability to participate, and continuing hostility and intimidation in Latino workplaces that chill their political activity. *Supra* Part I.D.4.v. The Commission's fracturing of Latino communities in the Lower Yakima Valley and exclusion from LD 15 of cities in which Latinos are politically active, such as Wapato and Toppenish, also "has the foreseeable effect of depressing Latino turnout." *See Perez*, 253 F. Supp. at 887 (finding fracturing of a county in which Latinos were politically active and cohesive "magnif[ied]" turnout gap); *see* Ex. 1 at 31-32; Tr. 83:4-8 (testimony of Dr. Collingwood); 378:11-25 (testimony of Anton Grose). Dr. Collingwood's uncontested performance analysis confirms that Latinos lack any "realistic chance" to elect a preferred candidate in the district. Tr. 97:8-18, 98:5-13; *supra* Part I.C. Given this "past and present reality," *Milligan*, 143 S. Ct. at 1503, the bare HCVAP majority in LD 15 as currently configured fails to afford Latino voters equal opportunity to elect candidates of their choice.

In sum, Plaintiffs have proven that LD 15, under the totality of the circumstances, denies Latino voters an equal opportunity to elect candidates of their choice in violation of Section 2.

## II. Proposed Remedial Process

The districts in the Yakima Valley region must be redrawn to afford Latino voters an equal opportunity to elect candidates of their choice. In shaping a remedial map under Section 2, a court should "exercise its traditional equitable powers to fashion the relief so that it *completely* remedies the prior dilution of minority voting strength and *fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *Ketchum v. Byrne*, 740 F.2d 1398,

1412 (7th Cir. 1984) (quoting S. Rep. No. 97-417, at 31) (emphasis added); *see also U.S. v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1438 (11th Cir. 1988); *McDaniels v. Mehfoud*, 702 F. Supp. 588, 596 (E.D. Va. 1988). An appropriate remedy "restructure[s] the districting system to eradicate, to the maximum extent possible *by that means*, the dilution proximately caused by that system." *McGhee v. Granville Cnty., N.C.*, 860 F.2d 110, 118 (4th Cir. 1988) (emphasis in original). While the legislature has the first opportunity to propose such a remedy, if it fails to respond, or responds with a proposal that fails to fully remedy the violation, the district court should "exercise its discretion in fashioning a 'near optimal' plan." *Id.* at 115.

In this case, the remedial process must proceed swiftly to ensure ample time for the Secretary of State to administer the new map and adequately educate the public about new district boundaries. *See* Dkt. # 191 ¶ 124. As such, Plaintiffs propose that the Court order that the State's "political apparatus" shall have 30 days to submit a proposed remedial legislative district map, along with any briefing and supporting expert materials. Dkt. # 68 at 3 (Order of Joinder). The remaining parties should be permitted 20 days thereafter to file responsive briefing, any alternative proposals, and supporting expert materials. Reply briefs should be filed no later than 10 days after the responses. If the Court sees fit, a remedial hearing may be held to present arguments and any necessary expert testimony regarding the proposed remedial maps. Should the State fail to propose a remedy that fully affords equal opportunity for Latino citizens to participate and to elect candidates of their choice, Plaintiffs propose that the Court select from among the parties' alternative remedial submissions.

## CONCLUSION

Latino voters in the Yakima Valley have been denied their most fundamental and foundational right to an undiluted vote for decades. Plaintiffs have established that the current LD

15 dilutes the voting strength of Latino voters in the area, denying them the opportunity to participate in the political process and have a say in the matters that impact their daily lives. The evidence at trial overwhelmingly established the continuing and cumulative impact that decades of discrimination and vote dilution have had on the Latino population. This Court should find that LD 15 as enacted violates Section 2 of the Voting Rights Act and should be redrawn to remedy that violation.

Dated: July 12, 2023

By: */s/ Edwardo Morfin*

Chad W. Dunn*
Sonni Waknin*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
Chad@uclavrp.org
Sonni@uclavrp.org

Mark P. Gaber*
Simone Leeper*
Aseem Mulji*
Benjamin Phillips*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org
sleeper@campaignlegal.org
amulji@campaignlegal.org
bphillips@campaignlegal.org

  *Admitted pro hac vice

*Counsel for Plaintiffs*

Edwardo Morfin
WSBA No. 47831
Morfin Law Firm, PLLC
2602 N. Proctor Street, Suite 205
Tacoma, WA 98407
Telephone: 509-380-9999

Annabelle E. Harless*
Campaign Legal Center
55 W. Monroe St., Ste. 1925
Chicago, IL 60603
aharless@campaignlegal.org

Thomas A. Saenz*
Ernest Herrera*
Leticia M. Saucedo*
Erika Cervantes*
Mexican American Legal Defense
 and Educational Fund
643 S. Spring St., 11th Fl.
Los Angeles, CA 90014
Telephone: (213) 629-2512
tsaenz@maldef.org
eherrera@maldef.org
lsaucedo@maldef.org
ecervantes@maldef.org

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### CERTIFICATE OF SERVICE

I certify that all counsel of record were served a copy of the foregoing this 12th day of July, 2023 via the Court's CM/ECF system.

*/s/ Edwardo Morfin*

Edwardo Morfin
WSBA No. 47831
Morfin Law Firm, PLLC
2602 N. Proctor Street, Suite 205
Tacoma, WA 98407
Telephone: 509-380-9999