The Honorable Robert S. Lasnik
The Honorable David G. Estudillo
The Honorable Lawrence VanDyke

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| SUSAN SOTO PALMER et al., | |
| *Plaintiffs,* | |
| v. | |
| STEVEN HOBBS, in his official capacity as Secretary of State of Washington, et al., | Case No.: 3:22-cv-5035-RSL |
| *Defendants,* | INTERVENOR-DEFENDANTS' WRITTEN CLOSING ARGUMENT[1] |
| and | |
| JOSE TREVINO et al., | |
| *Intervenor-Defendants.* | |

| | |
|---|---|
| BENANCIO GARCIA III, | |
| *Plaintiff,* | |
| v. | Case No.: 3:22-cv-5152-RSL-DGE-LJCV |
| STEVEN HOBBS, in his official capacity as Secretary of State of Washington, et al., | PLAINTIFF'S WRITTEN CLOSING ARGUMENT[1] |
| *Defendants.* | |

---

[1] This Written Closing Argument is being filed concurrently in both *Soto Palmer v. Hobbs*, No. 3:22-cv-5035, and *Garcia v. Hobbs*, No. 3:22-cv-5152.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1

**TABLE OF CONTENTS**

2  INTRODUCTION ............................................................................................................1

3  BACKGROUND ............................................................................................................3

   ARGUMENT ..................................................................................................................6
4
   I.   At trial, Plaintiffs did not explain how a remedy map would be "substantially likely"
5        to redress their alleged harm—*i.e.*, that a Democratic-performing HCVAP-majority
         district can legally be drawn in the Yakima Valley. ...............................................6
6
   II.  Under the *Gingles* two-step analysis, LD-15 does not thwart the Hispanic vote by
7        submerging it in a larger White voting population. .................................................9

8        A.  LD-15 is already a majority Hispanic CVAP district where Hispanics have equal
             access to voting, so Hispanic voters have the opportunity to choose whatever
9            candidate they preferred if they voted as a bloc. ...........................................10

10       B.  Plaintiffs have not shown each *Gingles* precondition was met...........................12

11           1.  *Gingles* Precondition 1 – Compactness of the Minority Community..........................12

12           2.  *Gingles* Preconditions 2 and 3—Racially Polarized Voting ...........................14

13       C.  All things considered, and the preconditions notwithstanding, Plaintiffs have not
             shown sufficient evidence that Hispanic voters in the Yakima region have less
             opportunity to participate in the political process...........................................20
14
             1.  Proportionality ..............................................................................22
15
             2.  History of Official Discrimination (Senate Factor 1) ....................................23
16
             3.  Discrimination-Enhancing Electoral Practices and Candidate Slating Processes
                 (Senate Factors 3 and 4)...................................................................24
17
             4.  Socioeconomic Disparities (Senate Factor 5)..............................................24
18
             5.  Racial Appeals from Campaigns (Senate Factor 6) .........................................25
19
             6.  Minority Electoral Success in the Jurisdiction (Senate Factor 7)........................26
20
             7.  Significant Lack of Responsiveness by Elected Officials .................................27
21
   III. Plaintiffs' intentional vote dilution claim is dead. ...............................................30

   IV.  LD-15 was an unjustified and unconstitutional racial gerrymander. .......................................31
22
        A.  Race predominated because the voting Commissioners, who exclusively carried
23          out the substance of statewide redistricting, made Hispanic citizen voting age
            population the criterion that could not be compromised. ...........................................31
24
            1.  Only the Commissioners' intent is relevant..............................................32
25
            2.  The fifty-percent-plus-one HCVAP was the uncompromisable criterion for all
                four voting Commissioners.................................................................34
26

27

B.   The Commissioners never performed—nor had performed for them—any sufficient, actual VRA analysis to give them good reasons to think they would have violated the VRA had they not sorted voters by Hispanic ethnicity..........................39

V.   As remedy, the Court should order the State to adopt, through the Redistricting Commission and pursuant to existing state law, a new legally-compliant legislative district map by November 15 that maintains the same overall statewide partisan balance as the Commission's original 2021 legislative map but does not sort voters on the basis of race or ethnicity.......................................................................................43

CERTIFICATE OF SERVICE ......................................................................................50

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

iii

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

**INTRODUCTION**

This case is about map drawing. What is required by law, and what is not. What this Court can do, as regards to remedy, and what it cannot. How the State's redistricting Commissioners negotiated, and how they did not.

The Fourteenth Amendment prohibits redistricting on the basis of race, except in the extraordinary circumstance where there is good reason to believe the Voting Rights Act ("VRA") might so require. But the VRA does not require a Democratic-majority district in the Yakima Valley, nor did the Washington State Redistricting Commission ("Commission") have good reason to believe so at the time it drew its maps. This Court, under current law and the factual record created at trial, can—and should—order the Commission to redraw a map without considering race. However, this Court cannot legally require the Commission to draw a district that guarantees a certain partisan outcome. The members of the Commission ("Commissioners") negotiated in good faith to reach a reasoned compromise, using race as a *sine qua non* criterion, but they did not conspire to dilute Hispanic voting power in the Yakima Valley region.

Mr. Garcia asks for a map of Legislative District 15 ("LD-15") that does not sort Washington voters on the basis of their race or ethnicity but, instead, relies on traditional, race-neutral, districting criteria. Such a map is achievable.

Plaintiffs[2] ask for something novel—not a majority-Hispanic district, or even a majority Hispanic district by citizen voting age population ("CVAP"), which already exists in LD-15. Rather, what Plaintiffs have requested throughout this whole process is a map that would *guarantee* Democratic candidates would be elected in a different majority-minority district, as proposed by them and based on their tenuous allegation that Hispanics in the Yakima region vote cohesively for Democratic candidates—which here would mean the VRA requires that a Democrat win practically every election in LD-15. Asking for a new district where a CVAP majority-minority already exists is a novel claim. It is unclear whether VRA Section 2 jurisprudence even

---

[2] To avoid undue repetition, this brief uses the term "Plaintiffs" to refer to the *Soto Palmer* Plaintiffs only. The Plaintiff in the *Garcia* case is referred to as "Mr. Garcia" or "the *Garcia* Plaintiff."

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

1

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

applies to this claim, considering the *Gingles* preconditions are premised on the region's minority population *lacking* a majority voting-age population in a district. Here, however, Hispanics in LD-15 already represent a majority of the citizen voting age population, possess equal and easy access to the polls (complete with bilingual voting materials), and thus have the opportunity to elect a candidate of their choice by voting as a bloc. This alone should defeat the Section 2 claim.

Plaintiffs' alleged injury is that Democratic candidates cannot win in LD-15 under the version of the district enacted by the Commission ("Enacted Plan"). Their redress, then, can only be a map where Democratic candidates are assured to win. At trial, they did not show such a map can exist within the confines of the law. This Court can neither draw, nor order drawn, a Democratic-performing map that complies with the law. Even if redressability were realistic, Plaintiffs failed to satisfy each *Gingles* precondition, because of basic misunderstandings by experts of compactness and the variances in racial voting that depend on the identity of the candidates. And, above all, Plaintiffs failed to show that, looking at all the facts on the ground, Hispanic voters in the Yakima Valley region are denied an equal opportunity to participate in the political process. This Court could dismiss the *Soto Palmer* claims as non-redressable or deny them on the merits; in either event, it is impossible to draw a map that comports with both Plaintiffs' requested remedy and the law.

*Garcia* offers a cleaner case and remedy. Trial confirmed that the Commissioners used Hispanic ethnicity as the essential condition of their negotiations over LD-15. Race was the uncompromisable criterion—explicitly and admittedly so. The Commissioners did not conduct any serious analysis on their own, or through experts retained by the Commission as an entity, to determine if such race-sorting was reasonably required by the VRA. The Democratic expert brought in by the Senate Democratic Caucus to advise the Democratic Commissioners provided only an anemic and conclusory PowerPoint presentation that came nowhere near the stringent evidentiary threshold required to satisfy a strong basis in evidence, as demanded by Fourteenth Amendment under the relevant strict scrutiny standard. Plaintiff Garcia respectfully requests that

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1  a special session of the Legislature reconvene the Commission for the purpose of redrawing the

2  Yakima area legislative districts without sorting Hispanics on the basis of their ethnicity.

3  ## BACKGROUND

4        Although the basic facts of this case have been described in depth and needs no repetition

5  here, some confusion arose during trial with respect to several factual matters—namely, the

6  geographic scope, meaning and application of "Yakima," and the process by which the

7  Commission submits its final maps to the Legislature and how such maps may be amended.

8  Additionally, the United States Supreme Court's opinion in *Allen v. Milligan*, 599 U.S. ___, 143

9  S. Ct. 1487 (2023), was issued shortly after the trial concluded and prompts a preliminary aside.

10        First, the Parties need to define their terms. Both the State and Plaintiffs used "Yakima" to

11  mean different things at different times to support their legal conclusions. For example, the State

12  suggested that *Montes v. City Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014), found racially

13  polarized voting in "Yakima," and therefore could put the Commissioners on notice that *Gingles*

14  preconditions were met for VRA districting purposes in "Yakima." *See* Trial Tr. 499:16-18 (Fain:

15  The State asking if *Montes* found racially polarized voting in "Yakima"). But those are not the

16  same Yakimas. Semantics matter here—there is the *City* of Yakima (at issue in and limiting the

17  scope of *Montes*), there is Yakima *County*, and there is the greater Yakima *region* at issue in these

18  cases (periodically called by the other parties "Southcentral Washington" or the "Five-County

19  Area," of which the Yakima *Valley* forms a part). It is the last—and largest—of these that is the

20  locus of this litigation. The questions about the legislative district in "Yakima" are about the whole

21  five-county area in Southcentral Washington, which includes the Yakima Valley and regions

22  beyond (like Othello and the Tri-Cities). The U.S. Census Bureau estimates the City of Yakima

23  has approximately 97,000 residents, whereas the Yakima County alone—just one part of the five-

24  county area—boasts an estimated 257,000 inhabitants, making it bizarre and misleading to conflate

25  the two. *See Quick Facts*, U.S. Census Bureau, Yakima city, Washington,

26  https://www.census.gov/quickfacts/fact/table/yakimacitywashington/PST045222 (last accessed

27  July 12, 2023); *Quick Facts,* U.S. Census Bureau, Yakima County, Washington,

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

3

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1   https://www.census.gov/quickfacts/yakimacountywashington (last accessed July 12, 2023);

2   Throughout this brief, we will be careful to delineate which is which.

3          Second, under Washington law, the Commission is the exclusive body responsible for

4   redistricting. *See* WASH. CONST. art. II, § 43(11) ("Legislative and congressional districts may not

5   be changed or established except pursuant to [article II, section 43 of the Washington

6   Constitution]."). The Legislature's authority is quite limited with respect to redistricting: "Upon

7   approval of a redistricting plan," the Commission "shall submit the plan to the legislature," which

8   may only amend the Commission's plan within the first thirty days of the next regular or special

9   legislative session by "an affirmative vote in each house of two-thirds of the members elected or

10  appointed thereto." RCW 44.05.100(1)–(2); *see also* WASH. CONST. art. II, § 43(7). Amendment

11  or no amendment, the map becomes law at the end of the thirty days. *See* WASH. CONST. art. II, §

12  43(7); RCW 44.05.100(3). The Legislature's authority to amend the Commission's plan is

13  circumscribed, as any change "may not include more than two percent of the population of any

14  legislative . . . district." RCW 44.05.100(2).

15         In 2022, the Legislature only amended LD-15 by adding seven census blocks and removing

16  two, with no net population change to the Commission-approved map. *See* H. Con. Res. 4407,

17  67th Leg., Reg. Sess., at 2:35–36, 71:9–77:26 (Wash. 2022) ("HCR 4407"). The adjustments made

18  to other districts were similarly minor, with the gross population change across all 49 legislative

19  districts totaling just 980 people. *See id.* at 2:5–4:4. During the legislative debate on the measure

20  amending the Enacted Plan, House Majority Leader Pat Sullivan described the changes as:

21         technical in nature and really important that we get that done. . . . As a legislature,
       we really have two options in this redistricting process. If we do nothing, then the
22     maps come into being without our vote. But they come into being without those
       changes that were recommended by the county commissioners. By making these—
23     by adopting this resolution, we adopt the maps as well as the changes that were
       suggested by the county commissioners, which are important to get done.
24

25  Trial Ex. 1065, at 3:19. Likewise, Senate Majority Leader Andy Billig said the measure:

26         is not an approval of the redistricting map and the redistricting plans; it's not an
       endorsement of that plan. The Legislature does not have the power to approve, or
27     endorse, the redistricting plan that the Redistricting Commission approved. What
       we do have the power to do is to make minor changes. And that brings us to what

---

*PALMER* INTERVENOR-DEFENDANTS'                    4        **Chalmers, Adams, Backer & Kaufman, LLC**
AND *GARCIA* PLAINTIFF'S                                     701 Fifth Avenue, Suite 4200
WRITTEN CLOSING ARGUMENT                                     Seattle, Washington 98104
Nos. 3:22-cv-5035 & 3:22-cv-5152                            PHONE: (206) 207-3920

1
2

> this resolution does. This resolution makes over 70 small changes to the redistricting plan. They're minor, mostly technical changes. Almost all of them were recommend by the county auditors, who are the local elections officials. And they help to make the maps work better.

3
4
5
6

Trial Ex. 126, at 0:55. These modest technical amendments by the Legislature in 2022 are typical of the Legislature's historic approach to exercising its limited amendatory authority—in 2012, for example, the Legislature's revisions to the 2011 Commission's legislative plan resulted in a gross population change of 472. *See* H. Con. Res. 4409, 62nd Leg., Reg. Sess., at 2:1–4:4 (Wash 2012).

7
8
9
10
11
12
13
14

Lastly, the day after trial ended, the Supreme Court handed down *Allen v. Milligan*, 599 U.S. ___. The Court did not alter Section 2's *Gingles* factors jurisprudence, instead reaffirming the old standard. *Milligan*, slip op. at 15–16. *Milligan*'s conclusions regarding Alabama's congressional redistricting by its own express terms have nothing to add here. That's because the "application of the *Gingles* factors is 'peculiarly dependent upon the facts of each case.'" *Id.*, slip op. at 11 (citing *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986)). Section 2 determinations must each be their own, and this Court is free—in fact, required—to make its own "intensely local appraisal." *Id.* (quoting *Gingles*, 478 U.S. at 79).

15
16
17
18
19
20
21
22

Washington is not Alabama, Yakima is not Mobile, and *Soto Palmer* is not *Milligan*. *Milligan* makes no changes to the legal standards binding this Court, and *Milligan*'s "intensely local" *Gingles* preconditions findings are limited to its unique circumstances, like all Section 2 claims. *Milligan* is merely about Alabama's suggested race-neutral benchmark theory. *Id.*, slip op. at 15 ("The heart of these cases is not about the law as it exists. It is about Alabama's attempt to remake our §2 jurisprudence anew. The centerpiece of the State's effort is what it calls the 'race-neutral benchmark.'"). That concept has no relevance to this case, as no party has proffered any argument about a "race-neutral benchmark" for redistricting in the Yakima region.

23
24
25
26

Nonetheless, *Milligan* does reaffirm the baselines for the preconditions, including that "compactness" refers to the compactness of the minority community. *Id.*, slip op. at 10. But most importantly, the *Milligan* Court reminds the judiciary of what these claims are all about—whether the minority community has equal access to the political process. *Id.*, slip op. at 5.

27

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

5

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1

**ARGUMENT**

2

I.   **At trial, Plaintiffs did not explain how a remedy map would be "substantially likely"
to redress their alleged harm—*i.e.*, that a Democratic-performing HCVAP-majority
district can legally be drawn in the Yakima Valley.**

3

4

As noted above, Plaintiffs are claiming an injury that Hispanic voters in the Yakima Valley

5

region cannot elect a Democrat, their purported candidate of choice. While Plaintiffs avoid saying

6

so explicitly—doing so would highlight a significant legal shortcoming of their claims—this can

7

be readily inferred from their experts' reports. *See, e.g.*, Trial Ex. 1, at 14–15 figs. 3–4 (analyzing

8

Latino-preferred candidates in nine races, each of which candidate ran as a Democrat); Trial Ex.

9

2, at 4 fig. 1 (estimating the Democratic candidate in LD-15 state senate race was Latino-

10

preferred).

11

In this Circuit, to establish Article III redressability, plaintiffs must show that the relief

12

they seek is *both* (1) substantially likely to redress their injuries and (2) within the district court's

13

power to award. *See Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). In redistricting

14

cases, a district court's "remedial authority" in ordering a remedial map is limited to ensuring

15

plaintiffs are relieved of the "injuries the plaintiffs established" from legislative districts. *See North*

16

*Carolina v. Covington*, 585 U.S. ___, 138 S. Ct. 2548, 2554 (2018) (per curiam). As such, Plaintiffs

17

must show evidence that it would be "likely, as opposed to merely speculative," that a remedy map

18

would redress their harm—meaning, elect the Democratic candidates they allege Latino voters

19

prefer—and that this Court can legally do so. *E.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl.*

20

*Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Haaland v. Brackeen*, 599 U. S. ___, slip op. at

21

32 (2023) ("It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the

22

judgment, not the opinion, that demonstrates redressability.").

23

At trial, Plaintiffs failed to show the Court that their requested remedy was possible. *See,*

24

*e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "the Plaintiff bears the

25

burden" to establish redressability at all "successive stages of the litigation," including "by the

26

evidence adduced at trial"). Here, trial did not show how to craft a remedy that elects Democratic

27

candidates in the Yakima region—based on the 2022 results—without breaking apart the Yakama

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

6

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

Nation, packing Hispanic Democratic voters from other districts, and making those districts less competitive, including in districts with large Hispanic communities, possibly violating both federal and Washington law. *See United States v. Texas*, 599 U.S. ___, slip op. at 22 (2023) (Gorsuch, J., concurring) ("[T]he remedy that would ordinarily have the best chance of redressing the States' harms is a forbidden one in this case."). And to the extent that Plaintiffs' claim is naught more than a request that this Court craft partisan judicial relief, that request—VRA dressing notwithstanding—is not justiciable in federal court. *See Rucho v. Common Cause*, 588 U.S. ___, 139 S. Ct. 2484 (2019).

Plaintiffs did not establish at trial just how many more Democratic-leaning voters would need to be packed into LD-15 to allow it to perform for Democratic candidates. After all, the Commissioners originally thought LD-15 in the Enacted Plan would lean Republican by only a few percentage points. *See, e.g.*, Trial Tr. 476:17–477:1, 747:16–23. Commissioner Sims even testified that she considered LD-15 "a swing district" that Republicans "would [not] necessarily win" and could "flip" with "enough organizing." Trial Tr. 279:6–23. Yet in the 2022 general election state senate race—the only contested legislative election to have occurred in the LD-15 enacted district—the Republican candidate defeated her Democratic opponent by thirty-five points. *See* Trial Ex. 1055. Despite this election taking place almost concurrently with the drafting of expert reports in *Soto Palmer*, not a single expert for Plaintiffs examined if, in light of the 2022 general election, a Democratic-performing district could even be drawn in the Yakima Valley. *See, e.g.*, Trial Ex. 2.

Furthermore, Plaintiffs' expert Dr. Collingwood explained that he had no idea if it was even possible to draw a majority-Hispanic district that both performs for Democrats and keeps the Yakama Nation intact. *See* Trial Tr. 89:11–17. Any remedy map ordered by this Court would likely break up the Yakama Nation, causing community of interest problems—not to mention overturning the express desires of the Yakama Nation, *see, e.g.*, Trial Tr. 87:7–20, that the Commission incorporated into the Enacted Plan following its first-ever formal tribal consultation policy, *see, e.g.*, Trial Tr. 338:9–21, 756:12–19.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1    Relatedly, both of Dr. Barreto's "VRA Compliant" maps, *see* Trial Ex. 179, at 22–23,

2    Plaintiffs' three "demonstrative plans" analyzed by Dr. Collingwood, *see* Trial Ex. 1, at 22–24

3    figs. 8–10, and the remedial map sought by Plaintiffs in conjunction with their motion for

4    preliminary injunction, (*see Soto Palmer* Dkt. # 54-1 at 3), were based on older, now-obsolete

5    electoral estimates. At trial, Plaintiffs failed to update their alternative maps with the new electoral

6    results from 2022, calling into question whether any of their proposed maps would come even

7    close to electing a Democrat. It was their burden to do so, and their silence on the matter renders

8    their requested relief merely speculative at best and completely unattainable at worst.

9    To be fair, the 2022 election put Plaintiffs in a tough spot. They were left with two options

10   at trial: (1) stay silent on the 2022 election, leaving to speculation whether any of their proposed

11   maps would still elect a Democratic candidate; or (2) provide supplements and remove all doubt

12   that their proposed remedial maps could not perform for Democratic candidates. Plaintiffs chose

13   the former.

14   Several witnesses were queried extensively about Dave's Redistricting at trial. The Court,

15   using what we now know from the 2022 state senate election, could use that website to attempt to

16   create its own remedial map (since the Plaintiffs' various maps do not do the trick) based on

17   Plaintiffs' request for a majority-Hispanic CVAP district in the greater Yakima region that reliably

18   elects Democrats. The result would be an ugly, spindly, vortex-shaped district, stealing minority

19   populations with little in common[3] from neighboring districts and packing them into the new

20   district. If a 52 or 53 percent HCVAP district cannot come close to electing a Democrat,[4] it would

21   require a massive influx of Hispanic voters to raise the HCVAP high enough to elect a Democrat.

22   This would result in bizarre shapes, partisan imbalance, racial sorting, and more in violation of the

23

24   [3] Indeed, even aside from the question—discussed *infra* Part II.B.1—of what Hispanic voters in urban Yakima, agrarian Othello, suburban Pasco and the small towns along the Yakima River have in common with each other, all

25   six demonstrative maps produced by Plaintiffs would draw some or all of the Yakama Indian Reservation into a majority HCVAP district, without any analysis of what Native American voters have in common with Hispanic voters

26   other than an apparent tendency to prefer Democratic candidates.

     [4] The Enacted Plan was originally calculated to have a 51.5% HCVAP, but many agree it's likely more than that today.

27   *See, e.g.*, Trial Tr. 279:24–280:16.

*PALMER* INTERVENOR-DEFENDANTS'          8          **Chalmers, Adams, Backer & Kaufman, LLC**
AND *GARCIA* PLAINTIFF'S                               701 Fifth Avenue, Suite 4200
WRITTEN CLOSING ARGUMENT                              Seattle, Washington 98104
Nos. 3:22-cv-5035 & 3:22-cv-5152                      PHONE: (206) 207-3920

1  Fourteenth Amendment and the Washington Constitution. A "redress" to one violation that

2  violates other laws is no redress at all.

3      After the 2022 election (when the Republican candidate defeated the Democratic candidate

4  by 35 points in the only contested election to be held in the new LD-15) and after trial (where

5  Plaintiffs failed to present any necessary evidence), this Court cannot look at Plaintiffs' proposed

6  or demonstrative maps and conclude that any of them is "reasonably likely" to elect a Democrat.

7  Therefore, this Court does not have the ability to give judicial relief to Plaintiffs.

8      The *Garcia* prayer for relief creates a helpful contrast. The remedial map for Mr. Garcia's

9  claim would simply order the map drawers to create legislative districts without ethnic thresholds

10  as the predominant criterion. The Article III harm alleged by Mr. Garcia was that he and others

11  were racially sorted, and a remedial map could be drawn that does not resort to racial sorting. Such

12  a map could be drawn quite easily to respect partisan competitiveness in accordance with the

13  Washington Constitution, traditional redistricting criteria like maintaining communities of interest

14  (including Yakama Nation), and the VRA. Any map doing what Plaintiffs demand could not

15  satisfy all (or even any) of those criteria.[5]

16  **II.    Under the *Gingles* two-step analysis, LD-15 does not thwart the Hispanic vote by submerging it in a larger White voting population.**

17

18      To prevail on their effects claim, Plaintiffs must satisfy all three *Gingles* preconditions: (1)

19  the minority group must be sufficiently large and geographically compact to constitute a majority

20  in a reasonably configured district; (2) the minority group must be able to show that it is politically

21  cohesive; and (3) the minority must be able to demonstrate that the white majority votes

22  sufficiently as a bloc to enable it to defeat the minority's preferred candidate. *E.g.*, *Milligan*, slip

23

24  _____

25  [5] It should be noted that the inability of Plaintiffs to produce an adequate remedial map has been found by the Eleventh Circuit to be a part of the merits "*Gingles* threshold inquiry whether [the district court] can fashion a permissible remedy in the particular context of the challenged system." *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir. 1994). The Ninth Circuit acknowledged *Nipper* but neither rejected nor adopted its *Gingles* no-remedy approach, *see Earl Old Person v. Brown*, 312 F.3d 1036, 1050-51 (9th Cir. 2002), leaving this Court free to hold that the impossibility of a remedy here defeats Plaintiffs' claim either jurisdictionally or on the *Gingles* merits.

26

27

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

9

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

op. at 10. Should the Plaintiffs demonstrate all three, they must also show, under the totality of the circumstances, that the political process is not equally open to minority voters. *Id.*

**A.    LD-15 is already a majority Hispanic CVAP district where Hispanics have equal access to voting, so Hispanic voters have the opportunity to choose whatever candidate they preferred if they voted as a bloc.**

Before proceeding to the *Gingles* preconditions, the Court may simply hold that, as a matter of sound logic, Hispanic voters have equal opportunity to participate in the democratic process and elect candidates as they choose because LD-15 is already majority Hispanic by CVAP. It is at best unclear how the *Gingles* preconditions apply to a district like LD-15. Each *Gingles* precondition refers to the "minority" group, based on the implicit assumption that the minority group in question lacks a majority of the voting population—hence the group's lack of opportunity to elect a candidate of choice and the need for a remedy under Section 2 of the VRA. *See id.* But here, white voters in LD-15 are in the minority. Plaintiffs therefore are turning *Gingles* jurisprudence on its head; and were the Court to accept their claims, virtually all the case law built around the majority/minority distinction would need to be reworked.

Plaintiffs aver LD-15's majority-minority CVAP is merely a "façade," but the façade district discussed in the sole Supreme Court case they cite raised concerns because the district at issue in that case was majority *HVAP*, but not majority HCVAP. *See LULAC v. Perry*, 548 U.S. 399, 429, 441 (2006). There, the Supreme Court found the Latino district to be a "façade" because the State intentionally drew the district to have a nominal Latino *voting-age majority* "without a *citizen* voting-age majority." *Id.* at 441 (emphasis added). That is not the case here. Rather, the Commission did draw a Hispanic *citizen* voting-age majority district in LD-15. The whole point underlying *Perry*'s "façade" holding is that an HCVAP-majority district was missing. Consequently, Plaintiffs' whole façade theory falls apart.

Also, the Supreme Court has elsewhere stated that the Section 2 showings "are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a *larger white* voting population." *Growe v. Emison*, 507 U.S. 25, 40 (1993) (emphasis added); *see also Cooper v. Harris*, 581 U.S. 285, 302 (2017) (quoting *Growe*'s "larger white voting

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

population" language). Again, that's not the case here; the Hispanic voting population (that is, the CVAP) is the larger voting population in LD-15.

As at least one circuit court has reasoned, as long as a minority group has "equal access to the polls and in fact represent[s] a majority of those eligible to vote in a majority of the election districts relevant to the governmental body at issue, the rights afforded by the . . . Voting Rights Acts are satisfied." *Smith v. Brunswick Cty.*, 984 F.2d 1393, 1402 (4th Cir. 1993); *see also Perry*, 548 U.S. at 428 ("[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success") (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994)).

Following the logic of that approach—and with no contrary imperative from the Ninth Circuit—this Court should hold that, because LD-15 is a majority Hispanic CVAP district, the district's Hispanic population does not have "less opportunity to participate in the political process, and to elect representatives of [its] choice." *Earl Old Person v. Brown*, 312 F.3d 1066, 1041 (9th Cir. 2002). "Though it may be possible for a citizen voting-age majority to lack real electoral opportunity," *Perry*, 548 U.S. at 428, that is not the case here. Witnesses at trial presented no evidence that Hispanics lack "equal access to the polls," *Smith*, 984 F.2d at 1402. On the contrary, Mses. Lopez and Soto Palmer and Mr. Portugal all testified as to the ease of registering to vote, receiving their (bilingual) election materials by mail, and casting their ballot. *See* Trial Tr. 37:24–38:11 (Lopez); 299:4–300:14; (Soto Palmer); 840:18–21 (Portugal: Voting in Washington is "very easy for me"). Indeed, voting has become so easy in Washington because the Legislature has enacted multiple laws to increase voter participation,[6] which counts in the State's and Intervenor-Defendants' favor. *See, e.g.*, *McConchie v. Scholz*, 577 F. Supp. 3d 842, 862–63 (N.D. Ill. 2021)

---

[6] The examples are too voluminous to list compressively. *See, e.g.*, Wash. Laws of 2023, ch. 466 (automatically registering to vote any person who applies for, renews or updates an enhanced driver's license or state ID card); Wash. Laws of 2023, ch. 363 (permitting online voter registration using only the last four digits of a registrant's social security number); Wash. Laws of 2020, ch. 208 (permitting pre-registration by 16 and 17 year olds); Wash. Laws of 2019, ch. 161 (requiring all ballot-return envelopes to include prepaid postage); Wash. Laws of 2019, ch. 6 (permitting voters to register using tribal ID cards and/or tribally-designated buildings as their address); Wash. Laws of 2018, ch. 112 (permitting same-day voter registration); Wash. Laws of 2018, ch. 110 (authorizing automatic voter registration for clients of state agencies that provide services to persons with disabilities); Wash. Laws of 2011, ch. 10, § 35 (requiring counties to automatically issue a mail-in ballot to each registered voter every election); Wash. Laws of 2007, ch. 157, § 1 (permitting online voter registration for holders of a driver's license or state ID card); Wash. Laws of 1993, ch. 6, § 3 (permitting any voter to vote by mail).

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

11

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

(three-judge court) (weighing against the plaintiffs that "[t]he General Assembly has enacted a string of laws designed to increase voting access over the past two decades, and those measures apply across the state."); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. ___, 141 S. Ct. 2321, 2339 (2021) (explaining that, in Section 2 cases, "courts must consider the opportunities provided by a State's entire system of voting" because Section 2 refers to the "collective concept of a State's 'political processes' and its 'political process' as a whole").

It is a mathematical tautology that Hispanics in LD-15 have the voting opportunity to turn out to vote as a cohesive bloc to elect any candidate they so choose.[7]

### B.      Plaintiffs have not shown each *Gingles* precondition was met.

The mistakes and insufficiencies of the evidence presented by Plaintiffs and their experts go to the hearts of the *Gingles* preconditions—compactness and racially polarized voting. Incomplete and inaccurate analysis by Dr. Collingwood yielded incorrect results. Dr. Alford's expert report provided a more holistic analysis, noting the partisan polarization in the greater Yakima region (although he retreated from his report during trial). But the actual data from the only real-life election contested in LD-15 shows Dr. Owens' report was the most correct.

### 1.      *Gingles* Precondition 1 – Compactness of the Minority Community

The first *Gingles* precondition ("*Gingles* I") requires the plaintiff to show that the "minority group" is "sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Milligan*, slip op. at 15 (quoting *Wisconsin Legis. v. Wisc. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam) (alterations in original)). This matters because the diverse Hispanic population spread across the greater Yakima region is not compact in the manner required by *Gingles* I: "[T]he compactness inquiry considers 'the compactness of the minority population, not . . . the compactness of the contested district.'" *Perry*, 548 U.S. at 402 (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996)). In addition, for the purposes of the compactness inquiry,

---

[7] To the extent Plaintiffs insinuate that there was low turnout due to some kind of voter suppression, those issues should be challenged under the *Anderson-Burdick* doctrine, *see Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992), not used here as an end-run around Section 2's requirements for vote-dilution plaintiffs.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

12

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

[A] State may not "assum[e] from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls." In the absence of this prohibited assumption, there is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first Gingles condition contemplates.

*Id.* at 433 (quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995) (internal citations omitted)).

Yet not one expert in this case looked at the compactness of the minority community, other than Dr. Owens. Dr. Collingwood never even examined if doing so were possible. Trial Tr. 110:9–14 (Collingwood). Dr. Alford admitted he only found the demonstrative district to be compact "in appearance" but "without [conducting any] sort of extensive analysis." Trial Tr. 857:3–14. But he misapplied the *Gingles* I requirements by looking "to the compactness of the [demonstrative] district itself, as opposed to the compactness of the Latino community within it." Trial Tr. 858:14–19. Dr. Barreto's presentation, discussed *infra* Part IV.B, did not contain any analysis on the compactness of the Hispanic population in the greater Yakima region, on communities of interest, or of any traditional districting principles.

Only Dr. Owens correctly examined compactness with the proper legal definition in mind. Trial Tr. 518:1–521:15. Indeed, while there are substantial Hispanic communities in the cities of Yakima, Othello and Pasco, these cities form a rough triangle with fifty to eighty miles between each. As a result, the enacted LD-15 features odd-shaped protrusions reaching out like fingers to encircle the Hispanic enclaves in Yakima and Pasco on the exact opposite ends of the district. This is not compact in the manner *Gingles* I requires. *Cf. Perry*, 548 U.S. at 434–35 (concluding that communities 300 miles apart in a *congressional district*[8] were not reasonably compact, emphasizing the distinction between the compactness of a district's outer boundaries and the Section 2 compactness inquiry). The limited evidence of compactness offered by Plaintiffs is basic and conclusory. *See* Trial Ex. 4 (Dr. Estrada: identifying "a common language and cultural traditions such as Cinco de Mayo celebrations" as evidence of "shared interests among the Latino communities in the Yakima Valley and Pasco areas"); Trial Tr. 830:4–16 (Portugal: "Yakima and

---

[8] For scale, under the Enacted Plan, Washington's congressional districts contain a population of approximately 770,152 people; its legislative districts contain a population of approximately 157,200. Trial Tr. 736:10–17.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

13

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

Pasco have similar interests" because "eventually they're going to be close"). On the other hand, several witnesses testified to a few of the many differences between Yakima and Pasco, including their geographic distance, their separate community groups (like chambers of commerce and LULAC chapters), and their unique political issues (like Hanford). *See* Trial Tr. 470:2–4, 471:14–472:12 (Fain); 734:4–735:13 (Graves); 844:23–845:11 (Portugal).

Finally, the finding of compactness in *Montes*, 40 F. Supp. 3d 1377, undercuts a finding of compactness here instead of supporting it. There, the minority community in the *City* of Yakima was compact because the majority of Hispanic voters in the city were in a small radius, surrounded by natural barriers. *See id.* at 1393 (noting a "substantial majority of the City of Yakima's Latino population lives in an area east of 16th avenue" comprising "one-third of the City's entire geographic area (9.78 square miles out of 28 square miles total)"). That is not the case here, where "the Hispanic populations [are] at the far edges of the district." Trial Tr. 521:13–15 (Owens).

Plaintiffs have failed to establish that the compactness precondition of *Gingles* can be satisfied. Their experts either neglected to examine the question at all—or answered the wrong question—and they provided no reasoned analysis of what Latino voters in Yakima and Pasco, not to mention Othello and the small towns along the Yakima River like Granger and Mabton, have in common with each other besides race.

## 2. *Gingles* Preconditions 2 and 3—Racially Polarized Voting

The second and third *Gingles* preconditions involve racially polarized voting—essentially, the political cohesiveness of whites and Hispanics, which exists when a "minority group has expressed *clear* political preferences that are distinct from those of the majority." *Gomez v. Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988) (emphasis added). The second and third preconditions often run together because they concern the political cohesion among the relevant minority communities and the racially polarized voting ("RPV") within those communities. *See LULAC v. Abbott*, 2022 U.S. Dist. LEXIS 224928, at *10–12 (W.D. Tex. Dec. 14, 2022) (three-judge district court). The ultimate question is whether a minority group votes cohesively, with white voters overwhelming the choices of minority voters. *See id.*

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

14

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

But Section 2 is "a balm for racial minorities, not political ones." *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992). This flows from the text of Section 2 itself:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color.*

52 U.S.C. § 10301(a) (emphasis added). Failures of a minority group to elect representatives of its choice that are caused by partisanship, instead of race, provide no grounds for relief under the VRA:

> Courts must undertake the additional inquiry into the reasons for, or causes of, these electoral losses in order to determine whether they were the product of "partisan politics" *or* "racial vote dilution," "political defeat" *or* "built-in bias." It is only upon concluding that a minority group's failure to prevail at the polls, that is, their failure to attract the support of white voters, was the "result" or "function" of "racial vote dilution" or "built-in bias," that a court may find that minority plaintiffs have suffered "a denial or abridgement of the right . . . to vote on account of race or color."

*LULAC v. Clements*, 999 F.2d 831, 853–54 (5th Cir. 1993) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 160 (1971)) (emphasis in original); *see also Baird*, 976 F.2d at 361 (the VRA "does not guarantee that nominees of the Democratic Party will be elected, even if [minority] voters are likely to favor that party's candidates.").

Assuming these preconditions do apply in some manner, courts typically find cohesion in a minority coalition when the various minority groups have electoral variances of less than ten percent. *See, e.g.*, *Perry*, 548 U.S. at 427; *Clements*, 999 F.2d at 864-65. Because "[p]olitical cohesiveness must be proven with statistical evidence of historical voting patterns," *Montes*, 40 F. Supp. 3d at 1401, resolution depends on the experts, their reports, and their trial testimony.

Here, the Court determined Dr. Owens, Dr. Alford and Dr. Collingwood were all experts for the purposes of the *Gingles* analyses. And when all elections are looked at—as both Drs. Owens and Alford did—it is clear that partisanship drove voting—as both Drs. Owens and Alford concluded. Dr. Owens' analytical framework for predicting electoral polarization does not conflict with, but rather builds upon, the findings of Dr. Collingwood, who chose to look only at elections

tending to show racially polarized voting and ignored elections that did not. The robustness of Dr. Owens' framework was demonstrated in the actual 2022 election in LD-15, which correctly predicted little-to-no polarization in a contest involving a Hispanic Republican.

a.   *The State relies on an incorrect reading of the fractured* Gingles *opinions.*

The State told this Court that *Gingles* "makes clear" that "[i]t is the difference between the choices made by [minority voters] and whites—not the reasons for that difference—that results in [minority voters] having less opportunity than whites to elect their preferred representatives." (State of Washington's Trial Br., *Soto Palmer* Dkt. # 194 at 11). Indeed, the State cites *Gingles* at "478 U.S. at 63" to bolster this proposition. *Id.* But the State is wrong. That quote, and that portion of the *Gingles* opinions—despite the State's misattribution of it to the majority in *Gingles*—is actually Justice Brennan's plurality opinion, which is non-precedential and non-controlling. *See generally Gingles*, 478 U.S. 30 (Parts I, II, III-A, III-B IV-A, and V constituted the opinion of the court, but Part III.C was joined only by Justices Marshall, Blackmun, and Stevens); *see also Reed v. Town of Babylon*, 914 F. Supp. 843, 876 (E.D.N.Y. 1996) ("Justice Brennan's holding with respect to the third precondition, however, did not have the support of a majority of the Justices."); *Clements*, 999 F.2d at 856 ("Both Justice White and Justice O'Connor were united in their fidelity to [the] distinction between vote dilution and partisan politics and in their opposition to Justice Brennan's attempt to expunge this teaching from the bloc voting inquiry.").

Regardless, Intervenor-Defendants are not requesting an inquiry into the subjective or individualized "intent" of minority or white voters, but rather into whether the *aggregate cause* of voting differences is the political identity of the *candidates*. *See* Trial Tr. 861:7–21 (Alford: "We have no measure of the partisanship of voters. But there is a partisan signal, with a candidate."). Due to some positional flip-flopping, the State now disagrees on this particular point with its own expert, Dr. Alford, who identified "a general pattern of partisan, rather than ethnic, polarization." Trial Ex. 601, at 13. The nature of this polarization is meaningless according to the State, although the sole authority it cites for this proposition is not the precedential or controlling opinion of the

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

16

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

Supreme Court. Nonetheless, Dr. Alford found strong evidence of different voting patterns by Hispanic and non-Hispanic voters relative to the party affiliation of a candidate, regardless of whether the Democratic candidate has a Spanish surname or not. *Id.*

                b.    *Dr. Owens' analytical framework reveals voting polarization is due to partisanship, not race.*

While Dr. Collingwood found that Hispanic voters exhibited cohesiveness in most of the elections he examined, Trial Tr. 65:20–24, by analyzing *all* recent elections, rather than hand-selecting which races to study, *cf.* Trial Tr. 105:5–106:3 (Collingwood: confirming he chose which elections to include in his report), Dr. Owens' revealed a critical insight into the existence (or lack) of racially-polarized voting in LD-15. Dr. Owens' conclusion wasn't that racially-polarized voting *never* exists; rather, that it *only* exists under a very particular set of election circumstances— specifically, partisan races between a White Democrat and a White Republican. *See* Trial Tr. 538:22–539:5. This is not inconsistent with the conclusions of Dr. Collingwood or Dr. Alford.

But Dr. Owens' key finding is that that whenever there is an election where those conditions *don't* exist, racially-polarized voting patterns either reverse themselves or disappear entirely:

- In partisan races between two candidates from the same party (a phenomenon that can readily occur in Washington's "Top Two" primary system), Dr. Owens' analysis shows that the Hispanic vote is split evenly. Trial Tr. 539:7–14; *see also* Trial Ex. 1001, at 9 tbl. 1; *but cf.* Trial Tr. 69:19–70:15 (Owens: noting that Dr. Collingwood's reports did not include the 2020 lieutenant governor race involving two candidates from the same party).

- When a partisan race involves a White Democrat and Hispanic Republican, Hispanic voters were much less supportive of the Democratic candidate. Trial Tr. 539:22–540:2; *see also* Trial Ex. 1001, at 9, tbl. 1; *accord* Trial Tr. 69:19–70:15 (Collingwood: reporting that racially polarized voting was not found in his analysis of an election of this type).

- For nonpartisan races, Dr. Owens reported that Hispanic voters were less cohesive. Trial Tr. 541:22–542:15; *accord* Trial Tr. 69:19–70:24 (Collingwood); 861:22–863:25 (Alford:

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

17

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1    reporting his findings that in nonpartisan elections, Hispanic voters are "slightly less
2    cohesive" and white voters show "essentially no evidence of cohesion at all."); *see*
3    *generally* Trial Tr. 864:6–13 (Alford: explaining that nonpartisan elections are probative
4    for polarized voting analysis because it shows whether minority or Anglo reaction to a
5    minority-preferred candidate is "a function of the party of those candidates, versus the
6    ethnicity of those candidates").

7    When trying to distinguish between correlation and causation, this pattern points to partisanship
8    as the driver of polarization, not race itself. *See* Trial Tr. 546:13–16 (Owens: "It most often is
9    going to be the partisanship of the candidates" that is driving the Hispanic vote, not race.).

10    But even if this Court were to take all of Dr. Collingwood's framing and election choices
11    as correct, the Plaintiffs still cannot show the second and third *Gingles* preconditions are satisfied.
12    In the ten partisan elections analyzed by Dr. Collingwood, he finds that the Hispanic-preferred
13    candidate would be defeated by the White-preferred candidate "seven out of ten times." Trial Tr.
14    72:23–73:3; *see also* Trial Ex. 1, at 37. And two of those seven "are very close[,]" according to
15    Dr. Alford's analysis. Trial Ex. 601, at 16.[9] Thus, Plaintiffs have only shown, at most, that the
16    "preferred candidates" would be likely defeated in just half of the elections.[10] That hardly rises to
17    the level of "legally significant racially polarized voting" required by *Gingles*, 478 U.S. at 56, nor
18    does the VRA require that a minority group's candidate of choice always win. *See Bartlett v.*
19    *Strickland*, 556 U.S. 1, 29 (2009) ("[T]he VRA was passed to guarantee minority voters a fair
20    game, not a killing." (citing *Johnson*, 512 U.S. at 1016–17)).

21
22
23
24    [9] Those outcomes would easily fall within the margin of error, if Dr. Collingwood had included such a metric in his report.

25    [10] As Dr. Alford also observed, small changes in the quality of the candidate or the policy platform could swing those
26    reconstructed elections. *See* Trial Ex. 601; *see also* Trial Tr. 37:7–10 (Lopez: agreeing with the Court that "the Latino community would split" in an election where the "key issue" was abortion); Trial Tr. 279:17–23 (Sims: denying that she thought "Republicans would necessarily win LD 15," calling it "a true swing district" that "with enough
27    organizing" could flip).

c.   *The sole contested legislative election held in the new LD-15 offers the most probative value for this Court.*

Lastly, but most importantly, elections have already begun taking place within the new LD-15 boundary lines. An actual election, by its very nature, is more probative than ones reconstructed by any party's expert. *See, e.g.*, *Milligan*, slip op. at 28 n.8 ("[C]ourts should exercise caution before treating results produced by algorithms as all but dispositive of a §2 claim."). In the only contested legislative election held in LD-15, Nikki Torres—a Latina Republican—received sixty-eight percent of the vote, winning by thirty-five points. *See* Trial Ex. 1055.

Both Drs. Collingwood and Owens supplemented their reports based on this election. *See* Trial Exs. 2, 1002a, 1002b. Although Dr. Collingwood concluded that Democrat Lindsey Keeling was Hispanic voters' candidate of choice, his estimated level of Hispanic support for Ms. Keeling varied between 60 and 68 percent. *See* Trial Ex. 2, at 4 fig. 1. Dr. Owens, on the other hand, found that the Hispanic voters "were split, and not cohesive," with the Democratic candidate receiving "an estimated 52 percent support" from Hispanic voters compared to 48 percent for Nikki Torres. Trial Tr. 548:22–549:14; *see also* Trial Ex. 1002b at 3 tbl. 1.

The differences in each estimate stems from the ecological inference method each expert used to produce the estimate, and how that methodology incorporates voter turnout into the statistical model. Dr. Collingwood's approach involved taking the extra step of trying to predict turnout by using CVAP estimates to generate an intermediate estimate that sums up "each voter's estimated probability[11] of being white, and Hispanic, then divide[s] by the total number of voters." Trial Ex. 2, at 6; *see also* Trial Tr. 114:9–115:10. Dr. Owens, however, relied on actual "precinct election returns," meaning turnout was already implicit in the model he used. Trial Tr. 561:17–562:12.

Dr. Owens has the stronger argument here, as the analytical framework he presented in his first report, *see* Trial Ex. 1001, at 18, most accurately predicted the outcome of this state senate election. In addition, Dr. Collingwood's critique of Dr. Owen's methodology—that Dr. Owens

---

[11] Despite his report indicating that his methodology relies on a "probability" to produce an "estimate," Trial Ex. 2, at 3, Dr. Collingwood averred at trial that these numbers "don't produce a confidence interval," Trial Tr. 113:18–20.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

19

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1    used "Goodman's Regression," which "does not bound the model between 0-100, so it is possible

2    to get non-sensical values like negative voting and 130%," Trial Ex. 2, at 5—is inapplicable in this

3    case, as Dr. Owen's model produced estimates well within the 0–100 percent range.

4          Finally, if Hispanic voters were voting more cohesively than not, the Democratic candidate

5    would have won. Even if Dr. Collingwood's most extreme estimate of Hispanic voters' support

6    for Ms. Keesling (68 percent[12]) were accurate, that falls below Dr. Alford's 75 percent "non-

7    arbitrary dividing line between things that are more cohesive than not, and things that are less

8    cohesive than not." Trial Tr. 863:10–13. Any cohesion over 75 percent would imply an implausibly

9    low turnout rate for Hispanic Democrats. The 2022 election results were no surprise—they fit

10   perfectly within Dr. Owens' analytical framework described in his report submitted a week before

11   the election, which he built from looking at *all* relevant elections, not just those that fit his

12   presuppositions. Simply put, the facts on the ground support Dr. Owens' conclusions.

13   **C.    All things considered, and the preconditions notwithstanding, Plaintiffs have
         not shown sufficient evidence that Hispanic voters in the Yakima region have
14       less opportunity to participate in the political process.**

15         Regardless of the *Gingles* preconditions, the entire purpose of a Section 2 analysis is to

16   determine whether, under the "totality of the circumstances," Hispanic voters in the greater

17   Yakima region have less or equal opportunity to participate in the political process. *Earl Old*

18   *Person*, 312 F.3d at 1041 (applying the seven factors identified in the Senate Judiciary Committee

19   Majority Report accompanying the 1982 bill amending Section 2). This is no afterthought—

20   although it might be the "unusual" case where a claim satisfying the three *Gingles* preconditions

21   fails to establish a violation of Section 2 under the totality of the circumstances, it is by no means

22   unheard of. *E.g.*, *Clark v. Calhoun Cty.*, 88 F.3d 1393, 1402 (5th Cir. 1996) ("[T]his is not that

23   'unusual case' in which the three Gingles preconditions are satisfied but the totality of

24   circumstances fail to show a Section(s) 2 violation."); *NAACP v. City of Niagara Falls*, 65 F.3d

25

26   _____
     [12] While the actual confidence intervals for Dr. Collingwood's two estimates of Ms. Keeling's estimates share of the
     Latino vote are not reported, *see also supra* notes 9 and 11, they do not appear to be overlapping in the graph presented.
27   *See* Ex. 2, at 4 fig. 1. This suggests at least one estimate presented may be statistically flawed.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

20

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1002, 1020 (2d Cir. 1995) (affirming district court's judgment that, "while there was substantial evidence of racially polarized voting dating back to elections in 1969, many of the other Senate Report factors weighed against a finding that the at-large system 'operates to minimize or cancel out [the minority group's] ability to elect their preferred candidates'" (quoting *Gingles*, 478 U.S. at 48)). The totality of the circumstances inquiry is no "empty formalism" and can be "powerful indeed." *Clark*, 88 F.3d at 1397. The Ninth Circuit has approved a district court's finding of no Section 2 liability when the *Gingles* preconditions were nonetheless met. *See Earl Old Person*, 312 F.3d at 1051.

Accordingly, this Court must look for the "crucial" proof of "causal connection between the challenged voting practice and a prohibited discriminatory result." *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997). Put otherwise, a Section 2 challenge "based purely on a showing of some relevant statistical disparity between minorities and whites," without any evidence that the challenged rule causes that disparity between races, will be rejected. *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (en banc); *see also NAACP v. Fordice*, 252 F.3d 361, 367 (5th Cir. 2011) ("Absent an indication that these facts actually hamper the ability of minorities to participate, they are, however, insufficient to support a finding that minorities suffer from unequal access to Mississippi's political process.") (cleaned up); *Clements*, 999 F.2d at 866 ("Texas' long history of discrimination [is] insufficient to support the district court's 'finding' that minorities do not enjoy equal access to the political process absent some indication that these effects of past discrimination actually hamper the ability of minorities to participate."); *Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1561 (11th Cir. 1987) ("[A] history of official discrimination did exist in Carroll County but . . . the plaintiffs failed to establish there was a lack of ability of blacks to participate in the political process.").

As to the factors themselves, the list truly is "non-exhaustive." *Id.* Courts accordingly examine seriously all pertinent information. *See, e.g.*, *McConchie*, 577 F. Supp. 3d at 862–63 (carefully considering state ballot access and increased voting access). Recent progress, like

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

21

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1    modern legislative efforts to remedy past harms to a minority group and empower their footholds

2    in the political community, *see supra* note 6, should count towards political opportunity.

3          In the end, this Court must make its own intensely local appraisal of the factual record with

4    respect to voting in Washington state and the greater Yakima region. Unfortunately, Plaintiffs'

5    expert Dr. Estrada presented little evidence to aid the Court in this analysis, performing no local

6    analysis of his own, instead relying on work done by others. *Compare, e.g.*, Trial Tr. 135:8–9

7    ("[I]n my research that I conducted, I found that Latino ballots are rejected in places like Yakima

8    County.") *with* 151:14–152:5 (admitting he "looked at" an article but did not "personally conduct

9    independent analysis of ballot signature rejection rates").

10         Were this Court to reach the totality of the circumstances analysis, it should hold that

11   Plaintiffs have not carried their burden to show that, all else considered, Hispanic voters are not

12   able to participate equally in the political processes in the greater Yakima region.

### 1.    Proportionality

14         Proportionality, which the VRA does not require and the existence of which does not itself

15   automatically doom a Section 2 claim, is preliminary in nature. *See, e.g.*, *Perry*, 548 U.S. at 436;

16   *Bartlett*, 556 U.S. at 30. Nonetheless, it remains obviously probative because "no violation of § 2

17   can be found . . . where, in spite of continuing discrimination and racial bloc voting, minority

18   voters form effective voting majorities in a number of districts roughly proportional to the minority

19   voters' respective shares in the voting-age population." *Johnson*, 512 U.S. at 1000. This inquiry

20   looks at the percentage of total districts that are Hispanic "opportunity districts" compared with

21   the Hispanic share of the citizen voting-age population. *See Perry*, 548 U.S. at 436. Thirty-one of

22   Washington's forty-nine legislative districts are represented by at least one legislator with the same

23   partisan preference as the candidates that Plaintiffs identify as "Latino preferred," meaning 63

24   percent of Washington legislative districts fit the strict definition of opportunity district, *see*

25   *Bartlett*, 566 U.S. at 13, far exceeding Washington's Hispanic CVAP proportion of 8.1 percent,

26   *see* United States Census Bureau, *Citizen Voting Age Population by Race and Ethnicity*,

27   https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html   (last

visited July 12, 2023). Moreover, there are at least 14 members of the Legislature who identify as Hispanic or Latino, Trial Tr. 196:23-197:11, representing 9.5 percent of all legislators, also surpassing the state Hispanic CVAP percentage. So, statewide, proportionality exists already and in no way requires the creation of another Democratic-majority district.

## 2.   History of Official Discrimination (Senate Factor 1)

Plaintiffs failed to show that a history of official discrimination "resulted in Latinos having less opportunity to participate in the political process and to elect representatives of their choice." *Gonzalez*, 677 F.3d at 407; *see also Gingles*, 478 U.S. at 36–37; *Fordice*, 252 F.3d at 367; *Clements*, 999 F.2d at 866; *Stallings*, 829 F.2d at 1561. To be sure, Plaintiffs, through Dr. Estrada, pointed to a litany of past miscarriages of justice earlier in Washington's imperfect history. But they never showed how those harms, many of which are decades old, work to deny Hispanics equal opportunity to participate in the political process today. Indeed, Plaintiffs and Dr. Estrada ignored the many steps taken by the State to ameliorate those sins. *See, e.g.*, Trial Tr. 158:24–160:2 (Estrada: "not sure" that the Washington State Legislature's near-unanimous approval of funding research about restrictive covenants would apply to Senate Factor 8); 161:9–162 (Estrada: "not aware" that the Legislature appropriated $3.5 million to KDNA Spanish-language radio—which "provide[s] critical services to the Latino community"—the last five years, and that GOP legislators from Legislative Districts 14 and 15 were responsible for these earmarks in the state operating budget).

In this century, Plaintiffs pointed only to the *Montes*, 40 F. Supp. 3d 1377, decision and a 2004 consent agreement between Yakima County and the Department of Justice. But the *Montes* case has limited applicability to this analysis, *see infra* at p. 42, and the near twenty-year-old consent decree was by its nature an agreement by Yakima County to improve Latino registration and voting, which it has. *See generally* Trial Tr. 38:3–11, 299:17–300:15, 839:6–840:20 (Lopez, Soto Palmer and Portugal testifying to the ease of registering to vote and casting a ballot). If anything, those changes, combined with the many recent strides by the State to encourage minority political participation, *see, e.g.*, Washington Voting Rights Act of 2018, Wash. Laws of 2018, ch.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

23

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

113; *supra* note 6, show just how much official forms of discrimination have been eradicated. Indeed, other courts have found such progress can help atone for historic injustices. *See, e.g.*, *Butts v. City of New York*, 779 F.2d 141, 150 (2d Cir. 1985) ("[M]itigating factors [like steps to encourage minoirity voting, mail registration, and a registration task force] further diminish the force of this showing [of past discrimination]."); *Aldasoro v. Kennerson*, 922 F. Supp. 339, 363–64 (S.D. Cal. 1995) ("[N]umerous laws enacted by the California Legislature in the last 30 years to improve minority voting participation and to liberalize the political process create an election environment free of discrimination touching the right to vote.") (cleaned up); *Romero v. City of Pomona*, 665 F. Supp. 853, 861 (C.D. Cal. 1987) ("[E]vidence regarding any history of past discrimination in California and in the City of Pomona touching upon the right of minorities to . . . participate in the political process have been mitigated by intensive efforts of the California Legislature to improve minority participate and to liberalize the political process.").

At trial, Plaintiffs never came close to showing a causal nexus between their examples of past discrimination and Hispanic political participation today.

### 3.   Discrimination-Enhancing Electoral Practices and Candidate Slating Processes (Senate Factors 3 and 4)

No evidence suggests that Washington or the political subdivisions in the greater Yakima region use voting practices or procedures to discriminate against Hispanic voters. *See Gingles*, 478 U.S. at 37. On the contrary, the evidence was overwhelming that, for Hispanic voters, voting is smooth and easy throughout the State and in the Yakima Valley. *See* Trial Tr. 38:3–11, 299:17–300:15, 839:6–840:20 (Lopez, Soto Palmer and Portugal testifying to the ease of registering to vote and casting a ballot); *see also supra* note 6 (recently-enacted voting legislation cited).

Finally, and relatedly, Plaintiffs presented no evidence regarding candidate slating process (Senate Factor 4), which Washington does not utilize.

### 4.   Socioeconomic Disparities (Senate Factor 5)

Plaintiffs' expert Dr. Estrada presented charts of socioeconomic disparities between Hispanics and whites but failed to show how any such disparities "hinder [Hispanics'] ability to

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

24

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1  participate effectively in the political process." *See Gingles*, 478 U.S. at 37. Again, a causal nexus

2  is required, *see id.*; *Gonzalez*, 677 F.3d at 407; *Fordice*, 252 F.3d at 367; *Clements*, 999 F.2d at

3  866; *Stallings*, 829 F.2d at 1561, and again Plaintiffs failed to establish one. For example, the

4  parties do not dispute that education disparities exist in the greater Yakima region. *See* Trial Ex.

5  4, at 51. But no expert testimony "connect[ed] the dots" as to how those problems negatively affect

6  Yakima Hispanics' ability to participate in the political process and elect their candidates of choice.

7  *McConchie*, 577 F. Supp. 3d at 863; *see also Gingles*, 478 U.S. at 36–37; *Gonzalez*, 677 F.3d at

8  407; *Fordice*, 252 F.3d at 367; *Clements*, 999 F.2d at 866; *Stallings*, 829 F.2d at 1561.

9  **5.  Racial Appeals from Campaigns (Senate Factor 6)**

10  Political campaigns in the greater Yakima region have not "been characterized by overt or

11  subtle racial appeals." *Gingles*, 478 U.S. at 37. None of the isolated but lamentable experiences

12  Plaintiffs presented involved *political campaigns* using overt racial appeals to solicit votes, but

13  rather were racially-charged comments made by members of the general public. *See, e.g.*, Trial Tr.

14  293:24–25 (Soto Palmer: relaying out-of-court statement by voter that "I'm not voting for

15  [Hispanic candidate Munoz], I'm racist."). Those vignettes, however distressing, are not legally

16  relevant. At no point did Plaintiffs adduce any firsthand testimony supporting this factor. For

17  example, Ms. Soto Palmer could not testify to hearing any racial appeals from candidates. *See* Trial

18  Tr. 301:6–7. The sole example connected to an actual campaign was one candidate's Facebook

19  post opposing illegal immigration. *See* Trial Tr. 143:5–17 (Estrada). Illegal immigration has been

20  a hotly-debated political topic for decades, and a political candidate's opinions on the issue is

21  hardly a "racial appeal" of the type contemplated by Senate Factor 6.

22  To find this factor in favor of the Plaintiffs would be to adopt their kook-empowering

23  approach. *See* Trial Tr. 164:24–165:1 (The Court: "if some kook yells something at a candidate,

24  just a voter or citizen, that's not the same as an elected official or another candidate?"). Elevating

25  those types of remarks is not the purpose of this factor.

26

27

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

25

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1

### 6.    Minority Electoral Success in the Jurisdiction (Senate Factor 7)

2      This factor looks at "the extent to which members of the minority group have been elected

3  to public office *in the jurisdiction*." *Gingles*, 478 U.S. at 37 (emphasis added). Dr. Estrada

4  misunderstood this, looking only specifically at legislative races in the historic 15th Legislative

5  District (but still not the only contested election to take place in the newly-enacted LD-15). Trial

6  Tr. 167:21–168:18. But all races "in the jurisdiction" are probative. And in this case, since

7  Plaintiffs rely on populations spread throughout the greater Yakima region to support their *Gingles*

8  I contention, it follows that this is the "jurisdiction" in which the success of minority candidates

9  should be judged. Yet Plaintiffs not only ignored Hispanic electoral success in this region; they

10  downplayed and dismissed it at trial.

11      For example, Representative Mary Skinner, from Legislative District 14,[13] was "born in

12  California to migrant-worker parents and raised in the Yakima Valley" and became "[t]he first

13  Latino legislator from the Yakima Valley." Trial Ex. 1066. She was first elected in 1994 and served

14  seven terms until retiring in 2009. *See id.*; Trial Ex. 1061, at 51. Legislative District 13 is currently

15  represented in the State House by Intervenor Alex Ybarra, who is Latino. Under the Commission's

16  enacted redistricting plan, he represents 30,700 individuals in Yakima County, 8,293 of whom

17  identify as Hispanic or Latino. Wash. State Redistricting Comm'n, *2022 Washington State Map*

18  *Book*, at 55–56, available at https://www.redistricting.wa.gov/district-maps-handouts. Moreover,

19  numerous cities in Yakima County have Hispanic mayors and city councilmembers. *See, e.g.*, Trial

20  Tr. 166:4–15; (Pls' Reply in Supp. of Mot. for Prelim. Inj., *Soto Palmer* Dkt. # 54 at 10 n.7).

21      Dr. Estrada's report lists a handful of Latino candidates who were not elected but fails to

22  examine whether factors other than the candidates' race might explain why they were

23  unsuccessful. *See* Trial Ex. 4, at 69–70. For example, Ms. Soto Palmer's loss in her 2016 campaign

24  for State Representative in Legislative District 14—which is cited as an example in Dr. Estrada's

25  report, *id.* at 69—may more reasonably be attributed to her campaign's lack of infrastructure,

26  _____

27  [13] Legislative District 14, as it existed from 1994 through 2008 when Rep. Skinner was running for and serving as State Representative, included much of the City of Yakima and Yakima County, and overlapped with the newly-enacted LD-15. *See, e.g.*, Trial Ex. 1061, at 186, 188.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

26

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

rather than her ethnicity, *see* Trial Tr. 301:14–302:24 (Soto Palmer: failing to recall much of a campaign strategy in terms of advertisements, knocking doors, and fundraising).

And Dr. Estrada, even while looking at legislative races, refused to concede at trial that Sen. Torres's 2022 victory was probative at all. Trial Tr. 168:11–18. This was typical of his pattern of ignoring or downplaying outcomes that did not fit Plaintiffs' narrative that Latino candidates never win. *See, e.g.*, Trial Tr. 165:21–166:3 (disregarding city races because they have large Latino majorities); 166:16–167:1 (demonstrating a lack of awareness of the Latino composition of the mayors and city councils of multiple key cities in the jurisdiction, despite being retained to provide an expert opinion on this factor).

To the extent that Plaintiffs and their witnesses begrudgingly acknowledged that a Latina was elected to the State Senate in the first and only contested election in the newly-enacted LD-15, they seemingly attempted to discredit and discount her as a Hispanic elected official because of their policy disagreements with her. *See, e.g.*, Trial Tr. 846:9–848:16 (Portugal: Sen. Torres does not represent the interests of the Latino community in LD-15 because she was elected as a Republican). The ethnic insinuation here is repugnant and, thankfully, has no basis in our federal law.[14] No court, for obvious reasons, has created such an exception to the minority success Senate factor. Nor does this factor refer to "preferred candidates" of the minority group, which is the standard is for the *Gingles* preconditions, not Senate Factor 7. *Cf. Perry*, 548 U.S. at 425.

Despite Plaintiffs' attempt to argue otherwise, Hispanic candidates have been elected to both legislative and local offices in the jurisdiction in question. The new LD-15 State Senator is Latina and there are numerous Hispanic mayors and city councilmembers throughout LD-15.

### 7.     Significant Lack of Responsiveness by Elected Officials

Plaintiffs did not show a "significant lack of responsiveness on the part of elected officials," another factor with "probative value." *See Gingles*, 478 U.S. at 37. Rather than showing serious

---

[14] The difficulty for various Plaintiffs' witnesses in describing exactly who counts as "Hispanic" is no surprise, considering that, as the Supreme Court recently noted, the racial category "Hispanic" is "arbitrary or undefined," and cultural norms continue evolving. *See Students for Fair Admissions, Inc. v. Harvard*, 600 U. S. ___, slip op. at 25 (2023) (citing M. Lopez, J. Krogstad, & J. Passel, Pew Research Center, *Who is Hispanic?* (Sept. 15, 2022)).

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

problems, Plaintiffs did not present any evidence supporting this factor beyond basic ideological disagreements over policy, *see, e.g.*, Trial Tr. 290:8–16 (Soto Palmer: disagreeing with Sen. King on the Washington State Voting Rights Act, which ultimately passed); Ex. 4, at 71–77 (concluding that elected officials in the Yakima region are "not responding to the concerns of the Latino community" based exclusively on the voting scorecard of a single self-organized, self-selected advocacy group), or vague and conclusory testimony, *see, e.g.*, Trial Tr. 291:22–23 (Soto Palmer: "I do not feel that they were responsive to our needs and our fear for safety").[15]

Belying Plaintiffs' non-responsiveness arguments—and the assertion by one witness that when elected officials *were* being responsive, it was only part of a "show[,]" exemplary of "elected officials [who] say one thing, then do another." Trial Tr. 826:6–20 (Portugal)—is a robust record of responsiveness by the Republican legislators representing the Yakima region. In fact, Yakima-area legislators have demonstrated particular responsiveness with respect to many of the very policies that Plaintiffs own witnesses highlighted as uniquely important to the needs of the Latino community in the Yakima Valley:

- Dr. Estrada testified how research by the University of Washington and Eastern Washington University found the use of "racially restrictive covenants" to be an example of the "history of segregation of Central Washington." Trial Tr. 127:13–128:9. In 2021, the Legislature, by a nearly unanimous vote, passed a bill requiring the University of Washington and Eastern Washington University to review property deeds for racially-restrictive covenants and creating a process for property owners to remove such unlawful covenants from their own property records. *See* Wash. Laws of 2021, ch. 256.

---

[15] Ms. Soto Palmer claimed she did not know anyone who voted for Sen. Torres, Trial Tr. 305:19–22, an improbability given that approximately half of Hispanic voters in LD-15 cast their ballots for Sen. Torres, *see* Trial Ex. 1002b, at 3 tbl. 1. Someone who does not know a single member of a massive portion of the Hispanic population has limited probative testimony as to that population's needs. Likewise, little probative help comes from witnesses like Sen. Rebecca Saldaña, who (1) doesn't represent the Yakima area, *cf.* Trial Tr. 170:21–25; (2) has never lived in the Yakima Valley region, Trial Tr. 201:5–7; (3) testified mostly hearsay about what other people think about Sen. Torres and a former state senator, *e.g.*, Trial Tr. 173:2–3 ("neighbors and folks feeling very worried"); and (4) made tenuous points about "responsiveness" that she (and by implication, not Sen. Torres) was the only elected official who actually cared about Hispanics in the Yakima Valley, Trial Tr. 201:14–17. Nothing was gained by her personal views towards Republican elected officials nor through the hypothetical hearsay of the voters she said made statements to her.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

28

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

- Dr. Estrada also testified how community institutions like KDNA, a Spanish-language radio station out of Granger, were formed in response to racial discrimination and inequality. Trial Tr. 129:6–12. During its past five sessions, the Legislature has appropriated over $4 million to KDNA from the state operating budget—earmarks that were requested by legislators from Legislative Districts 14 and 15. *See* Wash. Laws of 2023, ch. 475, § 129(50)(a) (appropriating $750,000 to KDNA in the 2023–25 biennial budget); Wash. Laws of 2022, ch. 297, § 128(191) (appropriating $500,000 to KDNA in the 2023 supplemental budget for a Spanish-language radio campaign aimed at reducing gang violence in Yakima County); Wash. Laws of 2021, ch. 334, § 222(44)–(46) (appropriating $2 million to KDNA in the 2021-23 biennial budget for "Spanish language public radio media campaign[s]" aimed at providing COVID-19 education and "preventing opioid use disorders"); Wash. Laws of 2019, ch. 415, § 221(8) (appropriating $800,000 to KDNA in the 2019–21 biennial budget for a Spanish-language radio campaign "aimed at preventing opioid use disorders").

- Ms. Soto Palmer testified that she "volunteered with the Yakima County Dream team," a group that was "pushing for the Dream Act in the State of Washington." Trial Tr. 288:24–289:2. But even she was not "surprise[d]" to learn that all three legislators who were then representing her in Legislative District 14 had voted in favor of the Dream Act, and acknowledged that their support "could be" considered "evidence . . . of listening to folks in [the] community, and taking various viewpoints into account". Trial Tr. 304:2–15; *see generally* The REAL Hope Act, Wash. Laws of 2014, ch. 1 (making undocumented students eligible for state college financial aid programs).

*       *       *

As explained previously, *Milligan*, 599 U.S. ___, has little to add in these cases. Washington is not Alabama, and Yakima is not Mobile. But the inapplicability is so stark that it merits accentuation. In *Milligan*, the Supreme Court affirmed the district court's factual findings under the totality-of-the-circumstances prong:

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

29

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

[T]he District Court concluded that plaintiffs had carried their burden at the totality of circumstances stage. The Court observed that elections in Alabama were racially polarized; that "Black Alabamians enjoy virtually zero success in statewide elections"; that political campaigns in Alabama had been "characterized by overt or subtle racial appeals"; and that "Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented.

599 U.S. ___, slip op. at 14 (quoting district court decision below).

The elements noted by the district court in that case fail here. Hispanic candidates enjoy electoral success in statewide and Yakima elections; political campaigns in Washington and Yakima are not characterized by racial appeals; and Washington's incidents of voting-related discrimination have been thankfully relegated to the trash heap of history. To the extent this Court looks to *Milligan* to assist its decision-making here, it should examine seriously the differences between the totality of circumstances factors in that case and those in this one.

### III.   Plaintiffs' intentional vote dilution claim is dead.

Plaintiffs' contention that the Commissioners intentionally diluted Hispanic votes in the greater Yakima region has been unsubstantiated throughout discovery, but trial underscored the absurdity of the claim. It is a difficult claim to make. *See Brnovich*, 141 S. Ct. at 2349–50 (district courts analyzing discriminatory purpose under Section 2 should look for evidence that the lawmaking body "as a whole was imbued with racial motives."). It is the intent of the Commissioners that matters, *see* discussion *infra* Part IV.A.1, and Plaintiffs gave no evidence of intent by the Commissioners to dilute Hispanic vote in the Yakima region. Evidence at trial gave shape to what really happened—all four Commissioners negotiated in good faith to make a politically-competitive statewide map that included a majority-minority district in the Yakima Valley. *See, e.g.*, Trial Tr. 252:24–253:9, 282:13–18 (Sims); 326:22-24 (Walkinshaw); 474:10–13 (Fain); 745:7–12 (Graves). This was not a "façade," it was reality.

And although the racial sorting was not ultimately justified, *see infra* Part IV, not a single person working on the draft maps intended to dilute Hispanic voting power. On the contrary—at trial, all four Commissioners averred, some with great passion, that they had no such intent, and three specified that they were happy to try to empower and be responsive to Hispanic voters, not

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

30

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

harm them. *See, e.g.*, Trial Tr. 285:9–12 (Sims); 346:6-12 (Walkinshaw); 507:17–508:1 (Fain); 771:9–22 (Graves: "It's not only wrong, it's pretty insulting. I told you my story earlier, of my experience talking with people about Hispanics in the Yakima Valley. It's one of the reasons why I was not dragged kicking and screaming to turn the 15th into a district that was majority Hispanic. I thought it would be a really useful thing for Hispanic voters there, to be able to choose somebody who they wanted as their representative. And the fact that in the very first election we've had under that map, the Hispanic candidate received two-thirds of the vote, made me pretty proud, and stood to me as pretty strong evidence that not only did we not intend – I certainly did not intend to discriminate against Hispanics, but this district could actually be a really helpful, useful one for Hispanics in the Yakima Valley."). Either all four Commissioners perjured themselves, or this unserious claim is dead. *See also Milligan*, slip op. at 3 (Kavanaugh, J., concurring) ("[A]s this Court has long recognized—and as all Members of this Court today agree—the text of §2 establishes an effects test, not an intent test.") (internal cross-references omitted).

## IV.   LD-15 was an unjustified and unconstitutional racial gerrymander.

Good faith attempts at VRA compliance "cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application" of federal law. *Covington v. North Carolina*, 316 F.R.D. 117, 166 (M.D.N.C. 2016) (three-judge court), *summarily aff'd*, 581 U.S. 1015 (2017) (quoting *Miller*, 515 U.S. at 921). The trial revealed that the Commission—the only body whose intent is relevant in Washington—districted LD-15 primarily on the basis of Hispanic ethnicity and were not justified in doing so.

### A.   Race predominated because the voting Commissioners, who exclusively carried out the substance of statewide redistricting, made Hispanic citizen voting age population the criterion that could not be compromised.

Laws—including redistricting laws—sorting citizens because of their race or ethnicity are constitutionally suspect and deserve strict scrutiny. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (citing *Shaw v. Hunt*, 517 U.S. 899, 904 (1996)). Plaintiff Garcia brings a *Shaw* claim, for which he must show race was the "predominant factor" motivating the primary line-drawers' decision to place a significant number of voters within a specific district. *Cooper*, 581 U.S. at 291.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

31

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

He has done so. It is the Commissioners' intent that controls, and the Hispanic 50-percent-plus-one CVAP was their uncompromisable criterion in negotiating and adopting LD-15.

### 1.   Only the Commissioners' intent is relevant.

Precedent to analyzing predominance is the straightforward question of which map-drawers should have their intent scrutinized—the Commissioners who exclusively carried out the substance of redistricting or the Legislature that made a small number of technical amendments to that map? This Court has already surmised that it is "right" that "the Commission's intent is the one that should be determinative in legal challenges" to the maps. Trial Tr. 195:21–196:3. This is based on sound reasoning in light of Washington's redistricting procedures and Supreme Court precedent. The Commissioners—assisted by their respective primary staffers—substantially carried out redistricting for the State of Washington, and only their intent is relevant here.

In Washington, the Legislature has delegated its redistricting powers to the Commission through a voter-approved state constitutional amendment. *See* WASH. CONST. art. II, § 43, as amended by WASH. CONST. amend. 74, S.J. Res. 103, 48th Leg., Reg. Sess. (Wash. 1983) (enacted, approved by voters Nov. 8, 1983); *see generally* T. Thomas Singer, *Reappraising Reapportionment*, 22 GONZ. L. REV. 527 (1986-87). Under state law, "[l]egislative and congressional districts may not be changed or established except pursuant to" article II, section 43 of the state constitution. WASH. CONST. art. II, § 43(11) (emphasis added). As the Court summarized during trial, the Legislature then has "[l]imited authority" to amend with "[t]echnical things." Trial Tr. 202:21; 203:8.[16] In 2022, the Legislature only amended LD-15 by adding seven census blocks and removing two, with no net population change to the Commission-approved map.

---

[16] *See also* RCW 44.05.100(2)-(3) ("(2) After submission of the plan by the commission, the legislature shall have the next *thirty days* during any regular or special session to amend the commission's plan. If the legislature amends the commission's plan the legislature's amendment must be approved by an affirmative vote in *each* house of *two-thirds* of the members elected or appointed thereto, and may not include more than *two percent* of the population of any legislative or congressional district. (3) The plan approved by the commission, with any amendment approved by the legislature, shall be final upon approval of such amendment or after expiration of the time provided for legislative amendment by subsection (2) of this section whichever occurs first, and shall constitute the districting law applicable to this state for legislative and congressional elections, beginning with the next elections held in the year ending in two." (emphasis added)).

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

32

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1    *See* H. Con. Res. 4407, 67th Leg., Reg. Sess., at 2:35-36, 71:9–77:26 (Wash. 2022); *see also*

2    discussion *supra* pp. 4–5.

3         This process is analogous to the facts in *Covington*, 316 F.R.D. at 125–29. In that case, the

4    North Carolina House and Senate districts were created primarily by two Chairs, assisted by a

5    map-drawing expert. *Id.* at 126–28. The drawn maps, however, became law only once passed by

6    the full House and Senate—both making "modest revisions." *Id.* at 127. The three-judge court,

7    analyzing predominance and race-sorting intent, did not consider any argument that the full

8    Legislature's passing the plan somehow purged the map of any racial taint.

9         In other words, there can be no "map laundering," where the Commission's

10   unconstitutional race-predominating map is washed clean through the Legislature's limited

11   amendatory process. *See id.* at 128 ("[B]ecause those maps were the work of [the map-drawer],

12   who was in turn directed only by the two Redistricting Chairs, it is clear that three individuals

13   substantially carried out North Carolina's 2011 statewide redistricting.").

14        Under this sensible standard, the racial gerrymandering predominance inquiry asks who

15   "substantially carried out" the challenged redistricting. It is their intent that must be examined; if

16   their work is merely adopted by the Legislature with minor changes, which is exactly what

17   happened here, those legislative adjustments are disregarded in the racial gerrymandering

18   predominance inquiry. The *Covington* court's approach also avoids the egregious and absurd

19   possibility that one body (like a legislature) could immunize the truly racist Fourteenth

20   Amendment violations of another body (like an independent commission or legislative committee)

21   by simply rubber-stamping the violative redistricting plan with a few minor technical, non-

22   substantive changes. Were the Legislature's intent relevant, such a racist map could pass

23   constitutional muster, an outcome that cannot be right.

24        In *Covington*, the Supreme Court "affirmed the District Court's ruling on the merits of the

25   plaintiffs' racial-gerrymandering claims," *North Carolina v. Covington*, 581 U.S. 486, 487 n.*

26   (2017), giving the District Court's decision in *Covington* the weight of Supreme Court precedent

27   with respect to racial gerrymandering analysis. *See Ill. State Bd. of Elections v. Socialist Workers*

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

33

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

*Party*, 440 U.S. 173, 182 (1979) ("[T]he precedential effect of a summary affirmance" by the Supreme Court extends to "'the precise issues presented.'") (quoting *Mandel v. Bradley*, 432 U.S. 173, 176 (1977)).

Throughout the *Garcia* trial, the Commissioners and their staff testified that maps were substantially crafted by the four Commissioners, assisted by respective staffers. *See, e.g.*, Trial Tr. 351:16-352:11 (Grose); 779:5-780:3 (O'Neil: "[I] assisted in the drawing and proposing of maps and researching those maps, and the data along with those maps."). In particular, Commissioners Sims and Graves performed the brunt of the negotiation and drawing of the legislative map, including LD-15, with assistance in the actual generation of the maps by their staffers Osta Davis and Anton Grose. *See* Trial Tr. 394:16-395:5 (Grose); Dep. Designation of Osta Davis, *Soto Palmer* Dkt. # 205-2 at 74:3-8, 80:15-19, 82:1-14. Their testimonies, then, are not only the most probative but also the most legally relevant for the predominance inquiry. And conversely, the Legislature's amendments to the Commission's final legislative map through HCR 4407 were technical, perfunctory and non-substantive. *See* discussion *supra* pp. 4-5. Therefore, under the *Covington* district court's Supreme-Court-affirmed "substantially carried out" test, this Court's predominance analysis should look at the intent of the Commissioners—particularly Commissioners Sims and Graves—not the Legislature.

### 2.   The fifty-percent-plus-one HCVAP was the uncompromisable criterion for all four voting Commissioners.

Democratic and Republican Commissioners alike testified that they recognized the gravity, difficulty, and importance of their task at hand, and engaged in good faith in the constitutionally-required bipartisan process to come to a reasonable compromise. *See Covington*, 316 F.R.D. at 129 (Racial predominance by no means signifies "that the legislature acted in bad faith or with discriminatory intent in its redistricting."). Unfortunately, that reasoned compromise gave primacy to one factor in particular—race. And ultimately, the motive for racial sorting is irrelevant; the "inquiry is satisfied" if the Commission "place[d] a significant number of voters within or without

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

34

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1   a district predominantly because of their race, regardless of their ultimate objective in taking that
2   step." *Cooper*, 581 U.S. at 308 n.7.

3       Racial predominance exists when race was the criterion for the government that "could not
4   be compromised." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017) (quoting
5   *Shaw*, 517 U.S. at 907) (alteration in original). If the Commissioners "use[d] race as their
6   predominant districting criterion with the end goal of advancing their partisan interests" by
7   capitalizing on a more "sellable" VRA compliant district, that "still triggers strict scrutiny." *See*
8   *Cooper*, 581 U.S. at 308 n.7.

9       Here, again, *Covington* is instructive, laying out various probative examples of
10  predominance that existed in the North Carolina maps as they exist here: Drafts denoting certain
11  house districts as "VRA districts," 316 F.R.D. at 127; Chairs instructing the map-drawer to draw
12  all VRA districts to reach a "50%-plus-one" minority VAP threshold, *id.* at 130; drawing the VRA
13  district before the other districts, *id.* at 131; describing race-based criteria as "primary," and
14  uncompromisable, *id.* at 134–35; and using a policy of prioritizing "mechanical racial targets . . .
15  above all other districting criteria (save one-person, one-vote)," *id.* at 135 (quoting *Ala. Legis.*
16  *Black Caucus v. Alabama*, 575 U.S. 254, 267 (2015)).

17      The Commissioners' final map made a Hispanic majority CVAP in LD-15 a *sine qua non*
18  requirement for their respective votes in favor of the maps. In other words, but for a majority
19  Hispanic CVAP in the district, the map would not have passed. The Democratic Commissioners
20  wanted the ethnic threshold for its own merit; the Republican Commissioners wanted the ethnic
21  threshold to win the Democratic Commissioners' votes. All four wanted it and voted for it, and
22  none believed the final map would have passed but-for LD-15 meeting that threshold.

23      <u>Sims</u>: Commissioner Sims testified that creating a majority Hispanic CVAP district in LD-
24  15 was "a priority" for her. Trial Tr. 253:16–19. She noted that the Commission's final "agreement
25  entailed a majority Latino CVAP district in the 15th Legislative District," Trial Tr. 227:16–19, and
26  believed that the Commissioners "weren't going to reach an agreement on LD 15, unless" it
27  contained a majority HCVAP, Trial Tr. 253:13–23.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

35

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

<u>Walkinshaw</u>: Commissioner Walkinshaw recalled, when asked by the Court whether there were "discussion about racial situations" alongside competitiveness, that there was, alongside "a lot of different pieces." Trial Tr. 333:3–14. He could not "recall all the specifics of" the Commission's agreement with respect to LD-15, other than that "it reflected a bipartisan compromise." Commissioner Graves believed the Commission would "need to draw a major [sic] Hispanic CVAP district in the 15th LD" in order "to secure [Walkinshaw's] vote for the final plan." Trial Tr. 739:19–740:2.

<u>Fain</u>: Commissioner Fain testified he would support a majority HCVAP district in LD-15 to get to an agreement that furthered his statewide goals. Fain, like the other Commissioners, was incentivized by the deadline to find a compromise. Trial Tr. 457:18–21. He had specific goals for the Senate legislative districts, namely "statutory compliance on population size, and an increased sense of competitiveness." Trial Tr. 438:13–16. Aware of the goals of all the Commissioners, Fain looked at racial composition during negotiations, focusing on both statewide competitiveness and race in LD-15.[17] Trial Tr. 438:4–10, 472:13–23. He testified Hispanic CVAP was "more widely discussed" in Yakima Valley than in other areas, Trial Tr. 510:19–511:3, and that racial composition for LD-15 was a "very important component of that negotiation[]"—more important in LD-15 than in any other district. Trial Tr. 511:4–9.

For Commissioner Fain, VRA maps were "not incompatible" with his own personal priorities. Trial Tr. 437:9–14. Pursuant to his own goals and willingness to support a VRA district, Fain was willing to vote for a majority HCVAP district because "I was very interested in getting agreement, that furthered the priorities that I had." Trial Tr. 438:13–16. And so it was; Fain considered it "[c]ertainly" true that increasing Hispanic CVAP was important to secure the final vote." Trial Tr. 474:10–13.

---

[17] It is true and attested at trial that overall partisan competitiveness was a factor for the statewide map. But it was the ethnic composition of LD-15 that drove the negotiation for that part of the statewide map. In other words, partisan competitiveness might have been the uncompromisable districting criterion for the Commissioners for the statewide map, but ethnic composition was the uncompromisable criterion for LD-15. It predominated.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

36

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

<u>Graves</u>: Commissioner Graves testified that he was happy to give the Democrats a majority HCVAP district, and his testimony bore out that he viewed the VRA compliance as making the map as a whole—including Graves' partisan goals—more "sellable" to the Democratic Commissioners. A majority HCVAP in LD-15 was "something we were negotiating toward, that it would be a district where a majority of the eligible voters would be Hispanic." Trial Tr. 703:8–11. During their deliberations, Graves concluded that a majority HCVAP LD-15 was necessary to win the votes of Sims and Walkinshaw. Trial Tr. 742:11–14; 740:13–18. Graves himself had his own specific goals of partisan balance, but he felt a "strong internal motivation" to make concessions, considering the impending deadline. Trial Tr. 723:19-724:1. When it came to where to give concessions, Graves noted that LD-15 stood apart as the only potential majority-minority district getting special attention in the State. Trial Tr. 744:2–9. He also testified that during their negotiations, "[t]he two predominant [metrics] we were discussing were the racial composition of the [LD-15] district, and its partisan performance." Trial Tr. 736:18–737:2. And that HCVAP "probably" was the "primary one we were focusing on." Trial Tr. 738:3–9. And in the time crunch leading up to the Commission's deadline, the Commissioners indeed agreed to make LD-15 at least fifty percent HCVAP. Trial Tr. 703:25–704:8.

Anton Grose, the staffer for Commissioner Graves "often would draft the maps" Graves requested for his negotiations. Trial Tr. 394:1. In making the maps, Mr. Grose was "very cognizant of the racial composition for the map." Trial Tr. 395:6–11. When the Court asked Mr. Grose if he was "designing the map to hit a certain racial minimum number[,]"he replied that, while not trying to hit a precise percentage number, "we'd be cognizant" because "we thought that a Hispanic majority CVAP district would likely be necessary, to get the votes of all four commissioners." Trial Tr. 395:11–14. Mr. Grose looked at the racial composition in Yakima Valley "[b]ecause that was something Commissioner Graves was looking for." Trial Tr. 395:24–25. In his view, this was because "that would be a requirement, to get all four commissioners to vote on that final version of a map. Essentially that was needed to pass a final map." Trial Tr. 396:1–6.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

37

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

Most revealing, Commissioners and staff representing all four legislative caucuses testified that the Enacted Plan, adopted on November 15, 2021 moments before the midnight deadline, was actually an unwritten, handshake "framework." *See, e.g.*, Trial Tr. 320:13–19 (Walkinshaw). This framework was "an agreement upon the partisanship numbers in . . . four [or] five districts." Trial Tr. 799:9–20 (O'Neil). The framework included "a combination of relative political performances in certain areas," Trial Tr. 450:2–4 (Fain), and "a set of criteria . . . around geographic principles . . . like the Lummi Nation, and the Nooksack Tribe," Trial Tr. 324:12–18 (Walkinshaw). The "final Hispanic CVAP [percentage] for Legislative District 15 [was] one of the components of this framework," but this was the *only* district whose racial composition was stipulated in the framework—a clear indication that racial considerations predominated in LD-15, even if they did not in the rest of the Enacted Plan. Trial Tr. 743:13–744:4.

Commissioner Graves best summarized the feeling that all Commissioners conveyed at trial: "Very hard . . . to see three of the voting commissioners voting for a map that did not have a majority Hispanic CVAP district in the Yakima Valley." Trial Tr. 745:10–12; *see also* Trial Tr. 362:18–21 (Grose: "As time went on, it became apparent that a Yakima Valley district that was majority Hispanic, by citizens of voting age population, that that would be a requirement to get support from both Republicans and Democrats."). That made race the one "criterion that . . . could not be compromised" in LD-15, meaning it "predominated." *See Bethune-Hill*, 580 U.S. at 189. This was not "in bad faith or with discriminatory intent in its redistricting." *Covington*, 316 F.R.D. at 129. Indeed, the Commissioners reached a reasoned, good faith compromise to create a politically competitive statewide map, all four attempting in their own way to follow Washington and federal law. But for the 50%-plus-one HCVAP in LD-15, however, that map would never have been approved. This racial threshold was the one factor above all that could not be compromised, without which the map would have failed.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

**B.** **The Commissioners never performed—nor had performed for them—any sufficient, actual VRA analysis to give them good reasons to think they would have violated the VRA had they not sorted voters by Hispanic ethnicity.**

Race predominated, so the State had to show at trial that the Commissioners "had 'a strong basis in evidence' for concluding that the" VRA "required [the] action" they took. *Cooper*, 581 U.S. at 292 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 278). The evidence presented at trial did not establish that the Commissioners had "'good reasons' to think" they would transgress the VRA if they did not draw race-based district lines. *Id.*

Plaintiff Garcia notes that resolution of *Soto Palmer* is not a prerequisite to resolution of his constitutional claim because the relevant "standard does not require the State to show" that the Commission's "action was 'actually . . . necessary' to avoid a statutory violation," but only that the Commission had "good reasons to believe," at the time it drew the maps, that "it must use race in order to satisfy the [VRA], 'even if a court does not find that the actions were necessary for statutory compliance." *Bethune-Hill*, 580 U.S. at 194 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 278). In other words, the proper analysis is not whether the VRA demands a certain type of a district, but whether the map-drawers "had good reasons to believe" the VRA required such. *Id.* Even if this Court finds that LD-15 as presently configured violates the VRA, *but see* discussion *supra* Part II, Plaintiff Garcia can still prevail on his Fourteenth Amendment claim unless the State has demonstrated that the Commission had "good reasons to believe" it needed to elevate racial considerations in order to comply with the VRA.

Here, the State failed to show at trial that (1) the Commissioners "actually" analyzed the *Gingles* preconditions sufficiently before drawing the map; and (2) there was a strong basis that those preconditions were satisfied. *See Cooper*, 581 U.S. at 301–02. On the contrary, the trial demonstrated that the map-drawers did not actually consider whether the VRA required the creation of an HCVAP-minority district in the greater Yakima region, meaning they did not have "'good reasons' for thinking the [VRA] demanded such steps." *Id.* at 301. Thus, the Commission lacked a strong basis in evidence for concluding all three *Gingles* preconditions were met.

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

39

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

As the trial did establish, racially-polarized voting, compactness, and other VRA analyses are intricate and intensive—hence why *Gingles* litigation includes testifying experts that create long and detailed reports. Casual or summary reports on racially-polarized voting, therefore, are not sufficient. *See Covington*, 316 F.R.D. 117 (finding "two racial polarization reports" provided by experts with PhDs were insufficient "to establish a strong basis in evidence"). Nor can a PowerPoint presentation summarizing findings and making broad conclusions—as the Barreto "report" frequently cited by the Plaintiffs and Democratic Commissioners turned out to be—create a strong basis in evidence. *See* Trial Exs. 178–179; *see also* Trial Tr. 235:17–236:1 (Sims); 459:2–12 (Fain: saw Barreto presentation but was not sure of which version). This presentation could not itself be used as an expert report in this or any other Section 2 litigation and is therefore *per se* insufficient to give the Commissioners "good reason" to believe that a VRA district was required. (Nor could Counsel for Plaintiff Garcia cross-examine Dr. Barreto as an expert witness with respect to the *Gingles* preconditions because he did not release the methodology or data used in preparing his slide deck. *Cf.* Fed. R. Civ. P. 26(a)(2).) Lastly, because "[a] group that wants a State to create a district with a particular design may come to have an overly expansive understanding of what § 2 demands . . . one group's demands alone cannot be enough" to give the Commission "good reasons to believe" that predominating race was "necessary to satisfy § 2 of the Voting Rights Act." *Abbott v. Perez*, 138 S. Ct. 2305, 2334 (2018) (quoting *Bethune-Hill*, 580 U.S. at 194); *cf.* Trial Tr. 461:11–22 (Fain: Dr. Barreto "appeared to be" advocating "to push districts in a more Democratic direction."); Trial Tr. 724:25-726:10 (Graves: "I read [Dr. Barreto's] report" to be him "advocating for a particular partisan outcome" and thought "he might be having an overly expansive reading of what the VRA required.").

Dr. Barreto's presentation was flawed in other ways. He did not conduct a full "*Gingles* I" analysis in his presentation (nor apparently did he intend to). No analysis was performed on the compactness of the Hispanic population in the greater Yakima region, on communities of interest, or of any traditional districting principles. In *Milligan*, the Supreme Court's *Gingles* I analysis focused on the unified and geographically-compact population in Alabama's "Black Belt." 599

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

40

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1    U.S. ___, slip op. at 13. Dr. Barreto, while focusing on a five-county region surrounding Yakima,

2    failed to make any showing that the Hispanic communities in that (large) area were geographically

3    close or shared a cultural connection beyond race alone. *See* Trial Tr. 663:7-664:5. His analysis

4    was especially anemic compared, for example, to the intricate spatial analysis on compactness

5    conducted in *Montes*, 40 F. Supp. 3d at 1394–1401 (a case the State is partial towards). One would

6    expect at least such an intensive spatial analysis for the whole of the greater Yakima area to make

7    any compelling conclusions on compactness, but there was none. And there is no indication—

8    whether from the slide deck itself or from Dr. Barreto's testimony at trial—that the "VRA

9    Compliant" districts depicted in his slide deck even contained a population remotely close to the

10   157,200 population target for legislative districts or could be lawfully adopted by the Commission

11   under Washington law without significant revision. The Commissioners thus had no basis, let

12   alone a strong one, to believe Latinos in that area were sufficiently compact.

13        Dr. Barreto's "*Gingles* II" analysis, meanwhile, did not look at any races beyond White

14   Democrat versus White Republican races, did not look at any primaries, did not look at nonpartisan

15   general elections with minority candidates, and did not look at general elections with two

16   candidates from the same party. *See* Trial Exs. 178–179. This mirrored Dr. Collingwood's self-

17   fulfilling prophecy approach of only looking at elections that support a preformed narrative. *See*

18   discussion *supra* Part II.B.2. Yet despite these manifest flaws, the State wrongly contends that the

19   Commissioners could rely on this supposed "compelling evidence" from Dr. Barreto to conclude

20   racially polarized voting existed in the Yakima Valley region. (*Soto Palmer* Dkt. # 194 at 27.)

21        The Commissioners did not hire their own expert to analyze VRA compliance, *see, e.g.*,

22   Trial Tr. 249:2–6 (Sims); *see also* (Dep. Designation of Lisa McLean, *Soto Palmer* Dkt. # 205-1

23   at 96:7–9) (confirming that the Commission ultimately did not hire a consultant to conduct a VRA

24   analysis), even though the Commission "probably" had the funding to do so, Trial Tr. 729:5–8

25   (Graves); *see also* 462:6–8 (Fain: affirming the Commission had the power to hire a nonpartisan

26   expert). In the absence of a sufficient outside expert's analysis, the individual Commissioners did

27   not perform *Gingles* analyses on their own. *See, e.g.*, Trial Tr. 462:1–5 (Fain); 249:2–9 (Sims); *see*

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

41

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

*also* Trial Tr. 359:18–361:11 (Grose: "Other than what was in the Barreto report" no analysis was completed by Commissioner Graves, Sims, or their staff regarding the size, distribution or political cohesion of Latino's in the Yakima Valley region). The Democratic Commissioners relied on Dr. Barreto for everything. Trial Tr. 250:17–20 (Sims); 235:17–236:1 (Sims: thought Barreto was correct that VRA required "above 50 percent Latino voting age population"); *see also* Trial Ex. 174 (Dr. Barreto email to Senate Democratic Caucus staffer: "To be Section 2 compliant, it has to be over 50.1% CVAP.") Meanwhile, the Republican Commissioners, worried about Dr. Barreto's established partisan leanings, did not rely on Dr. Barreto at all, but looked to a brief legal memo prepared for them by the law firm Davis Wright Tremaine. *See* Trial Tr. 462:9–22 (Fain); 726:11–727:3 (Graves). The analysis contained in this memorandum was "predominantly legal, rather than factual," and was not based on "factual research regarding demographic trends, voting behavior, election results, or the other factual assertions in the [Dr. Barreto] Assessment." Trial Ex. 225.

At trial, much was made of the existence of previous litigation in the region that the Commissioners knew of, such as *Montes v. Yakima*, 40 F. Supp. 3d 1377. But these lawsuits—brought against cities and counties that comprised only a small subset of the greater Yakima area—cannot have put the Commissioners on notice about racially polarized voting or compactness for the entire region. *Montes*, for example, addressed at-large elections for the Yakima City Council, not state legislative races; the compactness of the Latino population in the *City* of Yakima, not the entire greater Yakima region; and voting patterns in the *city*, not the whole region. So it makes no sense to hold that such inapposite cases could provide a "strong basis in evidence" for the Commissioners to think the *Gingles* preconditions were settled for the entire Yakima area.

The result of all this—a conclusory slide deck from a single non-retained partisan expert presented to only half the Commissioners, a legal memorandum delivered to the other half of the Commissioners, a smattering of litigation challenging different voting systems in different jurisdictions, and the absence of any formal VRA analysis conducted in-house or by outside experts—was rank uncertainty about the requirements of the VRA among Commissioners, far from the "goods reasons" and "sound basis" that strict scrutiny requires. Commissioner Sims

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

42

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

"didn't get a whole lot of clarity about whether [the Commission] had to create, to comply with the VRA, a district with a particular Democratic lean," Trial Tr. 269:23–270:2, and her staffer was not aware of any racially polarized voting analysis performed with respect to the final map, Dep. (Dkt. # 205-2 at 208:11–19) (Designation of Osta Davis, *Soto Palmer*). Ali O'Neil, a staffer for Commissioner Walkinshaw, testified that Commissioner Walkinshaw "would vote for maps that [he] knew were not VRA-compliant." Trial Tr. 791:7–16. Commissioner Fain found the Davis Wright Tremaine memo—which concluded that "§ 2 [of the VRA] does not require the creation of the majority-minority district advocated by [Dr. Barreto's] Assessment," Trial Ex. 225, at 1— to be "persuasive, as another data point and another point of view in that discussion . . . but not dispositive," Trial Tr. 462:25–464:5. Commissioner Graves testified the requirements of the VRA were "still unclear to [him]," that he felt there was "a lot of uncertainty [and] vagueness about both what the law allows or requires . . . and how it would actually apply to a particular district," and that his only "clear understanding" of what the VRA requires "was that it's uncertain." Trial Tr. 683:21–22, 727:8–14, 730:1–6. His staffer, Anton Grose, didn't feel there was enough compactness of those populations" to require a majority Hispanic CVAP. Trial Tr. 364:8–365:6. None of this is sufficient to create "a strong basis in evidence" for the second and third *Gingles* preconditions. *See Covington*, 316 F.R.D. at 168 (holding the map-drawers lacked a "strong basis in evidence for the third Gingles precondition" because they did not actually assess the effect of white bloc voting and "misconstrued what the third Gingles factor requires").

**V.   As remedy, the Court should order the State to adopt, through the Redistricting Commission and pursuant to existing state law, a new legally-compliant legislative district map by November 15 that maintains the same overall statewide partisan balance as the Commission's original 2021 legislative map but does not sort voters on the basis of race or ethnicity.**

"Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'" *Miller*, 515 U.S. at 915 (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)). That's why "[t]he [Supreme] Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every

effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (citing *Connor v. Finch*, 431 U.S. 407, 414-15 (1977); *Chapman*, 420 U.S. at 27; *Gaffney v. Cummings*, 412 U.S. 735, 749 (1973); *Burns v. Richardson*, 384 U.S. 73, 84-85 (1966)). "When a federal court declares an existing apportionment scheme unconstitutional, it is therefore appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. at 540; *see also Reynolds v. Sims*, 377 U.S. 533, 586 (1964) ("[L]egislative reapportionment is primarily a matter for legislative consideration and determination, and . . . judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.").

This deference to state legislatures to devise a substitute redistricting map applies both to apportionment plans that are found unconstitutional, and to plans that violate Section 2 of the VRA. *See, e.g.*, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1032-33 (N.D. Ala. 2022) (per curiam), *aff'd*, *Allen v. Milligan*, 599 U.S. ___. "Following a determination that a redistricting plan violates Section Two [of the Voting Rights Act], '[s]tates retain broad discretion in drawing districts to comply with the mandate of § 2.'" *Id.* (quoting *Shaw*, 517 U.S. at 917 n.9). States need not rely on a plaintiff's remedial plan, nor must they "draw the precise compact district that a court would impose in a successful § 2 challenge." *Bush*, 517 U.S. at 978 (cleaned up). Instead, "States retain a flexibility that federal courts enforcing § 2 lack, both insofar as they may avoid strict scrutiny altogether by respecting their own traditional districting principles, and insofar as deference is due to their reasonable fears of, and to their reasonable efforts to avoid, § 2 liability." *Id.*

Also, while the relevant caselaw refers generally to "the legislature" as the proper body to redraw defective maps, "[f]or redistricting purposes, . . . 'the Legislature' d[oes] not mean the representative body alone." *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 805 (2015) (citing *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916)). Indeed, "redistricting 'involves lawmaking in its essential features and most important aspect'" and such

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

44

Chalmers, Adams, Backer & Kaufman, LLC
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

lawmaking "must be in accordance with the method which the State has prescribed for legislative enactments. *Id.* at 807 (quoting *Smiley v. Holm*, 285 U.S. 355, 366-67 (1932)). In Washington, the Legislature has delegated its redistricting powers to the Commission through a voter-approved state constitutional amendment. *See* WASH. CONST. art. II, § 43, as amended by WASH. CONST. amend. 74, S.J. Res. 103, 48th Leg., Reg. Sess. (Wash. 1983) (enacted, approved by voters Nov. 8, 1983). Under state law, "[l]egislative and congressional districts may not be changed or established except pursuant to" article II, section 43 of the state constitution. WASH. CONST. art. II, § 43(11) (emphasis added). And while the Commission ceased to exist on July 1, 2022, *see* RCW 44.05.110(2), "the legislature may . . . adopt legislation reconvening the commission for the purpose of modifying the redistricting plan," RCW 44.05.120(1); *see also* WASH. CONST. art. II, § 43(8).[18] If the Commission is reconvened, it "shall complete the modification to the redistricting plan as soon as possible, but no later than sixty days after the effective date of the legislation reconvening the commission." RCW 44.05.120(4). The process for modifying a redistricting plan generally follows the same pattern as ordinary decennial redistricting. "At least three of the voting members shall approve the modification to the redistricting plan." *Id.* "Following approval of a modification to the redistricting plan by the commission, the legislature has the next thirty days during any regular or special session to amend the commission's modification. Any amendment by the legislature must be approved by an affirmative vote in each house of two-thirds of the members elected or appointed thereto." RCW 44.05.120(5). "The commission's modification to the redistricting plan, with any amendments approved by the legislature" shall constitute the new redistricting plan. RCW 44.05.120(6).

Washington law provides a clear, unambiguous method for amending legislative district maps outside of the standard decennial reapportionment cycle. And caselaw is likewise unambiguous in holding that states should have the first opportunity to enact a remedial legislative

---

[18] Although the Legislature's next regular session is not scheduled to begin until January 8, 2024, "[s]pecial legislative sessions may be convened" by either "proclamation of the governor" or "resolution of the legislature." WASH. CONST. art. II, § 12(2); *see also* Joint Rules of the Senate and the House of Representatives, H. Con. Res. 4401, 68th Leg., Reg. Sess., Rule 29 (Wash. 2023).

1    apportionment scheme if the original plan is found to violate the Constitution or the VRA, and that

2    states need not rely on a plaintiff's remedial or demonstrative maps when doing so. Therefore, in

3    order to avoid "intrud[ing] upon state policy any more than necessary," *White v. Weiser*, 412 U.S.

4    783, 795 (1973) (quoting *Whitcomb v. Chavis*, 403 U.S. at 160), if the Plaintiffs prevail on either

5    of their claims under the VRA, or if Mr. Garcia prevails on his claim under the Fourteenth

6    Amendment, this Court should order any remedial maps be enacted by the State of Washington

7    through the Commission, as reconstituted pursuant to Washington law.

8           If Mr. Garcia's Fourteenth Amendment challenge is upheld, the Court should order that

9    the remedial map be drawn by the reconstituted Commission in a race-neutral manner. By drawing

10   a new legislative district map in a constitutionally-compliant and race-neutral manner, the

11   Commission might conduct a proper VRA analysis, the results of which would result in more

12   defensible boundaries for Yakima area legislative districts under the VRA. In either event, it is for

13   the State (through the Commission) to address the constitutional violation in the first instance, not

14   for the Plaintiffs to show that an already unconstitutional map may have possibly complied with

15   the VRA when it was enacted.

16          For any remedial map that is ordered—whether in *Garcia*, *Soto Palmer* or both—the Court

17   should require the new map be approved by the Commission by November 15, 2023. This deadline

18   provides a sufficient window of time for a special session of the Legislature to be convened, so

19   that the Legislature can in turn "reconven[e] the [redistricting] commission for the purpose of

20   modifying the redistricting plan," which modification must be completed "no later than sixty days

21   after the effective date of the legislation reconvening the commission." RCW 44.05.120. A

22   November 15 deadline for the reconvened Commission's modified plan is consistent with deadline

23   under state law for ordinary decennial redistricting. *Cf.* WASH. CONST. art. II, sec. 43(6); RCW

24   44.05.100(1). Such a deadline provides the Legislature with the opportunity to make any necessary

25   adjustments to the map produced by the Commission during the first 30 days of the 2024 regular

26   legislative session (or any earlier special session that may be called), as is also consistent with state

27   law. *Compare* RCW 44.05.120(5)-(6) *with* RCW 44.05.100(2)-(3). And this timeline easily allows

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

46

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

1   for the new legislative district map to be in place before the 2024 legislative elections, with ample

2   cushion for the Secretary of State and county election administrators to make any required

3   adjustments to precinct boundaries and other back-end systems.[19]

4        Finally, because legislative "reapportionment is primarily the duty and responsibility of the

5   State," *Chapman*, 420 U.S. at 27 (citing *Reynolds v. Sims*, 377 U.S. at 586; *Md. Comm. for Fair*

6   *Representation v. Tawes*, 377 U.S. 656, 676 (1964)), and because state law forbids redistricting

7   from "purposely . . . favor[ing] or discriminat[ing] against any political party," WASH. CONST. art.

8   II, § 43(5); RCW 44.05.090(5), then any order by this Court for a new legislative map should

9   require that such remedial map keep intact the overall partisan balance of the Enacted Plan. At

10  trial, Commissioners from both parties testified that partisan outcomes were a key goal of their

11  negotiations, and that partisan metrics were an integral component of the negotiation process. *See,*

12  *e.g.*, Trial Tr. 226:25–227:9 (Sims) 411:3–9 (Grose); 443:22–24, 456:3–10 (Fain: "I was very

13  interested in making as many districts in the state more politically competitive, across party

14  lines."); 721:20–722:15 (Graves: "[M]y top priority was trying to draw more competitive

15  districts."). These Commissioners testified they would not agree to unfavorable partisan changes

16  in one district without obtaining a favorable partisan change in a different district. *See, e.g.*, Trial

17  Tr. 252:13-23 (Sims); 387:7-388:1 (Grose: "Everything is always a negotiation, all the time.");

18  447:3-10 (Fain); 703:7-22, 707:15-23 (Graves). Indeed, the final map produced by the

19  Commission only came about because, at the eleventh hour, Commissioners were able to consent

20  to a "framework" that primarily consisted of agreed-to partisan performance targets for various

21  legislative districts. *See, e.g.*, Trial Tr. 228:20–229:5, 230:7–14 (Sims); 449:23–450:7, 495:7–22

22  (Fain); 743:13–744:9 (Graves); 799:12–20 (O'Neil: "It was an agreement upon . . . the partisanship

23  numbers in . . . four, five districts."). And a partisan performance target proved necessary to

24

25  [19] With respect to the 2022 election cycle, the Secretary of State indicated—which the Plaintiffs did not challenge—
    that legislative district boundaries would need to be finalized by March 28. (*See* Dkt. # 66 at 7; Dkt. # 50 at 14.)
26  According to the Secretary of State, "[i]n order to implement any new state legislative maps from the 2024 election
    cycle without disrupting Washington's elections, new maps must be finalized no later than March 25." (*See* Dkt. # 178
27  at 2.)

*PALMER* INTERVENOR-DEFENDANTS'
AND *GARCIA* PLAINTIFF'S
WRITTEN CLOSING ARGUMENT
Nos. 3:22-cv-5035 & 3:22-cv-5152

47

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
PHONE: (206) 207-3920

achieve compromise with respect to LD-15 itself—with Republican Commissioners assenting to drawing LD-15 as a majority HCVAP district in exchange for Democratic Commissioners agreeing to drawing it as a Republican-leaning district. *See, e.g.*, Trial Tr. 252:24–253:9, 282:13–18 (Sims); 326:22–24 (Walkinshaw); 474:10–13 (Fain); 745:7–12 (Graves).

Thus, if the Court finds that LD-15 must be modified, it should require that any changes to the partisan composition of that district be offset by partisan changes to other legislative districts in the modified statewide legislative plan. As the Washington State Supreme Court recognized following the 2021 process, "[r]edistricting raises largely political questions best addressed in the first instance by commissioners appointed by the legislative caucuses where negotiation and compromise is necessary for agreement." *In re Order Regarding the Wash. State Redistricting Comm'n's Letter to the Supreme Court on Nov. 16, 2021*, 504 P.3d 795, 796 (Wash. 2021) (mem.). To *ex post* alter the partisan makeup of only a single legislative district would vitiate the "negotiation and compromise" that the Commissioners found "necessary for agreement," *id.*, and would violate the state law proscription against redistricting changes that "favor or discriminate against any political party," WASH. CONST. art. I, § 43(5); RCW 44.05.090(5). It would invite a moral hazard for future redistricting commissioners to attempt to achieve their desired partisan aims by cynically trading away at the commission that which they expected to regain in the courts.[20] And most concerningly, it would undermine the entire bipartisan and collaborative spirit of the Commission, a feature that sets Washington's redistricting process apart from the vast majority of other states where partisan gerrymandering runs rampant. *See, e.g.*, Nicholas Stephanopoulos, *Reforming Redistricting: Why Popular Initiatives to Establish Redistricting Commissions Succeed or Fail*, 23 J.L. & POL. 331, 333 (2007) ("[O]n the basis of political theory and empirical evidence, . . . the bipartisan commission is, on the whole, well-designed to prevent gerrymandering and improve redistricting.")

---

[20] Indeed, it appears at least one Commissioner was prepared to engage in such cynical gamesmanship, by voting for a map he believed to be illegal and expecting the courts to award his caucus an additional seat in subsequent litigation. *See* Trial Tr. 791:7–16; *cf. Cooper*, 581 U.S. at 335 (Alito, J., concurring in part and dissenting in part) (warning of "losers in the redistricting process [who] seek to obtain in court what they could not achieve in the political arena").

1      For these reasons, if the Court finds in favor of the Plaintiffs in either case, it should order

2  the State to adopt, through the Redistricting Commission and pursuant to existing state law, a new

3  legally-compliant legislative district map by November 15, 2023, that maintains the same overall

4  statewide partisan balance as the Commission's original Enacted Plan.

5      DATED this 12th day of July, 2023.

6                                          Respectfully submitted,

7                                          s/ Andrew R. Stokesbary
                                           Andrew R. Stokesbary, WSBA No. 46097
8                                          CHALMERS, ADAMS, BACKER & KAUFMAN, LLC
                                           701 Fifth Avenue, Suite 4200
9                                          Seattle, WA 98104
                                           T: (206) 207-3920
10                                         dstokesbary@chalmersadams.com

11                                         Jason B. Torchinsky (admitted pro hac vice)
                                           Phillip M. Gordon (admitted pro hac vice)
12                                         Caleb Acker (admitted pro hac vice)
                                           Andrew Pardue (admitted pro hac vice[21])
13                                         HOLTZMAN VOGEL BARAN
                                           TORCHINSKY & JOSEFIAK PLLC
14                                         15405 John Marshall Hwy
                                           Haymarket, VA 20169
15                                         T: (540) 341-8808
                                           jtorchinsky@holtzmanvogel.com
16                                         pgordon@holtzmanvogel.com
                                           apardue@holtzmanvogel.com
17

18                                         Dallin B. Holt (admitted pro hac vice)
                                           Brennan A.R. Bowen (admitted pro hac vice[21])
19                                         HOLTZMAN VOGEL BARAN
                                           TORCHINSKY & JOSEFIAK PLLC
20                                         Esplanade Tower IV
                                           2575 East Camelback Rd
21                                         Suite 860
                                           Phoenix, AZ 85016
22                                         T: (540) 341-8808
                                           dholt@holtzmanvogel.com
23                                         bbowen@holtzmanvogel.com
24

25                                         Counsel for Soto Palmer Intervenor-Defendants
                                           and Garcia Plaintiff
26

27  [21] Admitted pro hac vice in Soto Palmer v. Hobbs only

PALMER INTERVENOR-DEFENDANTS'              49        Chalmers, Adams, Backer & Kaufman, LLC
AND GARCIA PLAINTIFF'S                                701 Fifth Avenue, Suite 4200
WRITTEN CLOSING ARGUMENT                             Seattle, Washington 98104
Nos. 3:22-cv-5035 & 3:22-cv-5152                     PHONE: (206) 207-3920

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on this day I electronically filed the foregoing document with the Clerk

3   of the Court of the United States District Court for the Western District of Washington through the

4   Court's CM/ECF System, which will serve a copy of this document upon all counsel of record.

5        DATED this 12th day of July, 2023.

6                                               Respectfully submitted,

7                                               _s/ Andrew R. Stokesbary_____

8                                               Andrew R. Stokesbary, WSBA No. 46097

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27