1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SUSAN SOTO PALMER, *et al.*,

               Plaintiffs,

     v.

STEVEN HOBBS, *et al.*,

               Defendants,

      And

JOSE TREVINO, *et al.*,

               Intervenor-Defendants.

CASE NO. 3:22-cv-05035-RSL

MEMORANDUM OF DECISION

       Plaintiffs, five registered Latino[1] voters in Legislative Districts 14 and 15 in the

Yakima Valley region of Washington State,[2] brought suit seeking to stop the Secretary of

State from conducting elections under a redistricting plan adopted by the Washington State

Legislature on February 8, 2022. Plaintiffs argue that the redistricting plan cracks the

Latino vote and is therefore invalid under Section 2 of the Voting Rights Act of 1965

---

[1] Latino refers to individuals who identify as Hispanic or Latino, as defined by the U.S. Census. References to white voters herein refer to non-Hispanic white voters.

[2] The Court uses the terms "Yakima Valley region" as a shorthand for the geographic region on and around the Yakima and Columbia Rivers, including parts of Adams, Benton, Franklin, Grant, and Yakima counties. These counties feature in the versions of LD 14 and 15 considered by the bipartisan commission tasked with redistricting state legislative and congressional districts in Washington.

MEMORANDUM OF DECISION - 1

("VRA"), 52 U.S.C. § 10301. "Cracking" is a type of vote dilution that involves splitting up a group of voters "among multiple districts so that they fall short of a majority in each one." *Portugal v. Franklin Cnty.*, __ Wn.3d __, 530 P.3d 994, 1001 (2023) (quoting *Gill v. Whitford*, __ U.S. __, 138 S.Ct. 1916, 1924 (2018)). Intervenors, three registered Latino voters from legislative districts whose boundaries may be impacted if plaintiffs prevail in this litigation, were permitted to intervene to oppose plaintiffs' Section 2 claim because, at the time, there were no other truly adverse parties.[3]

In a parallel litigation, Benancio Garcia III challenged legislative district ("LD") 15 as an illegal racial gerrymander that violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Garcia v. Hobbs*, C22-5152-RSL-DGE-LJCV (W.D. Wash.). Pursuant to 28 U.S.C. § 2284, a three-judge district court was empaneled to hear that claim. The trial of the Section 2 results claim asserted in *Soto Palmer* began on June 2, 2023, before the undersigned: the Court heard the testimony of Faviola Lopez, Dr. Loren Collingwood, Dr. Josue Estrada, and Senator Rebecca Saldaña on that first day. The remainder of the evidence was presented before a panel comprised of the undersigned, Chief Judge David E. Estudillo, and Circuit Judge Lawrence J.C. VanDyke between June 5th and June 7th. This Memorandum of Decision deals only with

---

[3] The State of Washington was subsequently joined as a defendant to ensure that, if plaintiffs were able to prove their claims, the Court would have the power to provide all of the relief requested, particularly the development and adoption of a VRA-compliant redistricting plan. After retaining its own voting rights expert and reviewing the evidence in the case, the State concluded that the existing legislative plan dilutes the Latino vote in the Yakima Valley region in violation of Section 2, but strenuously opposed plaintiffs' claim that it intended to crack Latino voters.

MEMORANDUM OF DECISION - 2

the Section 2 claim. A separate order will be issued in *Garcia* regarding the Equal Protection claim.

Over the course of the *Soto Palmer* trial, the Court heard live testimony from 15 witnesses, accepted the deposition testimony of another 18 witnesses, considered as substantive evidence the reports of the parties' experts, admitted 548 exhibits into evidence, and reviewed the parties' excellent closing statements. Having heard the testimony and considered the extensive record, the Court concludes that LD 15 violates Section 2's prohibition on discriminatory results. The redistricting plan for the Yakima Valley region is therefore invalid, and the Court need not decide plaintiffs' discriminatory intent claim.

**A. Redistricting Process**

Article I, § 2, of the United States Constitution requires that Members of the House of Representatives "be apportioned among the several States ... according to their respective Numbers." Each state's population is counted every ten years in a national census, and states rely on census data to apportion their congressional seats into districts. In Washington, the state constitution provides for a bipartisan commission ("the Commission") tasked with redistricting state legislative and congressional districts. Wash. Const. art. II, § 43. The Commission consists of four voting members and one non-voting member who serves as the chairperson. Wash. Const. art. II, § 43(2). The voting members are appointed by the legislative leaders of the two largest political parties in each house of the Legislature. *Id.* A state statute sets forth specific requirements for the redistricting plan:

MEMORANDUM OF DECISION - 3

(1) Districts shall have a population as nearly equal as is practicable, excluding nonresident military personnel, based on the population reported in the federal decennial census as adjusted by RCW 44.05.140.

(2) To the extent consistent with subsection (1) of this section the commission plan should, insofar as practical, accomplish the following:

> (a) District lines should be drawn so as to coincide with the boundaries of local political subdivisions and areas recognized as communities of interest. The number of counties and municipalities divided among more than one district should be as small as possible;

> (b) Districts should be composed of convenient, contiguous, and compact territory. Land areas may be deemed contiguous if they share a common land border or are connected by a ferry, highway, bridge, or tunnel. Areas separated by geographical boundaries or artificial barriers that prevent transportation within a district should not be deemed contiguous; and

> (c) Whenever practicable, a precinct shall be wholly within a single legislative district.

(3) The commission's plan and any plan adopted by the supreme court under RCW 44.05.100(4) shall provide for forty-nine legislative districts.

(4) The house of representatives shall consist of ninety-eight members, two of whom shall be elected from and run at large within each legislative district. The senate shall consist of forty-nine members, one of whom shall be elected from each legislative district.

(5) The commission shall exercise its powers to provide fair and effective representation and to encourage electoral competition. The commission's plan shall not be drawn purposely to favor or discriminate against any political party or group.

RCW 44.05.090.

MEMORANDUM OF DECISION - 4

The Commission must agree, by majority vote, to a redistricting plan by November 15 of the relevant year, [4] at which point the Commission transmits the plan to the Legislature. RCW 44.05.100(1); Wash. Const. art. II, § 43(2). If the Commission fails to agree upon a redistricting plan within the time allowed, the task falls to the state Supreme Court. RCW 44.05.100(4). Following submission of the plan by the Commission, the Legislature has 30 days during a regular or special session to amend the plan by an affirmative two-thirds vote, but the amendment may not include more than two percent of the population of any legislative or congressional district. RCW 44.05.100(2). The redistricting plan becomes final upon the Legislature's approval of any amendment or after the expiration of the 30-day window for amending the plan, whichever occurs sooner. RCW 44.05.100(3).

The redistricting plan as enacted in February 2022 contains a legislative district in the Yakima Valley region, LD 15, that has a Hispanic citizen voting age population

---

[4] Though not relevant to the results analysis which ultimately resolves this case, the evidence at trial showed that the Commission faced and overcame a set of challenges unlike anything any prior Commission had ever faced. Not only did the COVID-19 pandemic prevent the Commissioners from meeting face-to-face, but the Commission's schedule was compressed by several months as a result of a delay in receiving the census data and a statutory change in the deadline for submission of the redistricting plan to the Legislature. In addition, the Commission was the first in Washington history to address the serious possibility that the VRA imposed redistricting requirements that had to be accommodated along with the traditional redistricting criteria laid out in Washington's constitution and statutes.

In addressing these challenges, the Commissioners pored over countless iterations of various maps and spreadsheets, held 17 public outreach meetings, consulted with Washington's 29 federally-recognized tribes, conducted 22 regular business meetings, reviewed VRA litigation from the Yakima Valley region, obtained VRA analyses, and considered thousands of public comments. Throughout the process, the Commissioners endeavored to reach a bipartisan consensus on maps which not only divided up a diverse and geographically complex state into 49 reasonably compact districts of roughly 157,000, but also promoted competitiveness in elections. The Court commends the Commissioners for their diligence, determination, and commitment to the various legal requirements that guided their deliberations, particularly the requirement that the redistricting "plan shall not be drawn purposely to favor or discriminate against any political party or group." Wash. Const. art. II, § 43(5); *see also* RCW 44.05.090(5).

MEMORANDUM OF DECISION - 5

("HCVAP") of approximately 51.5%. Plaintiffs argue that, although Latinos form a slim majority of voting-age citizens in LD 15, the district nevertheless fails to afford Latinos equal opportunity to elect candidates of their choice given the totality of the circumstances, including voter turnout, the degree of racial polarized voting in the area, a history of voter suppression and discrimination, and socio-economic disparities that chill Latino political activity. Plaintiffs request that the redistricting map of the Yakima Valley region be invalidated under Section 2 of the VRA and redrawn to include a majority-HCVAP district in which Latinos have a real opportunity to elect candidates of their choice.

## B. Three-Part *Gingles* Framework

The Supreme Court evaluates claims brought under Section 2 using the so-called *Gingles* framework developed in *Thornburg v. Gingles*, 478 U.S. 30 (1986).[5] To prove a violation of Section 2, plaintiffs must satisfy three "preconditions." *Id*. at 50. First, the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. __, 142 S.Ct. 1245, 1248 (2022) (per curiam) (citing *Gingles*, 478 U.S. at 46–51). A district is reasonably configured if it comports with traditional districting criteria. *See Milligan*, 143 S.Ct. at 1503 (citing *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015)). "Second, the minority group must be able to show

---

[5] While voting rights advocates and many legal scholars feared that the Supreme Court would alter, if not invalidate, the existing analytical framework for Section 2 cases when it decided *Allen v. Milligan* in June 2023, the majority instead "decline[d] to recast our § 2 case law" and reaffirmed the *Gingles* inquiry "that has been the baseline of our § 2 jurisprudence for nearly forty years." 599 U.S. __, 143 S.Ct. 1487, 1507, 1508 (2023) (internal quotation marks and citation omitted).

MEMORANDUM OF DECISION - 6

that it is politically cohesive," such that it could, in fact, elect a representative of its choice. *Gingles*, 478 U.S. at 51. The first two preconditions "are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe v. Emison*, 507 U.S. 25, 40 (1993). Third, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. "[T]he 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40.

If a plaintiff fails to establish the three preconditions "there neither has been a wrong nor can be a remedy." *Id.* at 40–41. If, however, a plaintiff demonstrates the three preconditions, he or she must also show that under the "totality of circumstances" the political process is not "equally open" to minority voters in that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301. Factors to be considered when evaluating the totality of circumstances include:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large  election districts, majority vote requirements, anti-single shot

MEMORANDUM OF DECISION - 7

provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction[;]

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37 (the "Senate Factors") (quoting S. Rep. 97-417, 28–29, 1982 U.S.C.C.A.N. 177, 206–07).

       In applying Section 2, the Court must keep in mind the ill the statute is designed to redress. In 1986 and again in 2023, the Supreme Court explained that "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Id*. at 47; *see also Milligan*, 143 S.Ct. at 1503. Where an electoral structure, such as the boundary lines of a legislative district,

MEMORANDUM OF DECISION - 8

1    "operates to minimize or cancel out" minority voters' "ability to elect their preferred

2    candidates," relief under Section 2 may be available. *Gingles*, 478 U.S. at 48; *Milligan*,

3    143 S.Ct. at 1503. "Such a risk is greatest 'where minority and majority voters consistently

4    prefer different candidates' and where minority voters are submerged in a majority voting

5    population that 'regularly defeat[s]' their choices." *Milligan*, 143 S.Ct. at 1503 (quoting

6    *Gingles*, 478 U.S. at 48). Before courts can find a violation of Section 2, they must conduct

7    "an intensely local appraisal" of the electoral structure at issue, as well as a "searching

8    practical evaluation of the 'past and present reality.'" *Milligan*, 143 S.Ct. at 1503 (quoting

9    *Gingles*, 478 U.S. at 79).[6]

### C. Numerosity and Geographic Compactness

        It is undisputed that Latino voters in the Yakima Valley region are numerous

enough that they could have a realistic chance of electing their preferred candidates if a

legislative district were drawn with that goal in mind. Plaintiffs have shown that such a

district could be reasonably configured. Dr. Loren Collingwood, plaintiffs' expert on the

statistical and demographic analysis of political data, presented three proposed maps that

perform similarly or better than the enacted map when evaluated for compactness and

_____

        [6] In writing the majority opinion in *Milligan*, Chief Justice Roberts provides the historical context out of which the Voting Rights Act arose, starting from the end of the Civil War and going through the 1982 amendments to the statute. The primer chronicles the "parchment promise" of the Fifteenth Amendment, the unchecked proliferation of literacy tests, poll taxes, and "good-morals" requirements, the statutory effort to "banish the blight of racial discrimination in voting," the judiciary's narrow interpretation of the original VRA, and the corrective amendment proposed by Senator Bob Dole that reinvigorated the fight against electoral schemes that have a disparate impact on minorities even if there was no discriminatory intent. 143 S.Ct. at 1498–1501 (citation omitted). The summary is a forceful reminder that ferreting out racial discrimination in voting does not merely involve ensuring that minority voters can register to vote and go to the polls without hindrance, but also requires an evaluation of facially neutral electoral practices that have the effect of keeping minority voters from the polls and/or their preferred candidates from office.

MEMORANDUM OF DECISION - 9

adherence to traditional redistricting criteria. The Commissioners and Dr. Matthew

Barreto, an expert on Latino voting patterns with whom some of the Commissioners

consulted, also created maps that would unify Latino communities in the Yakima Valley

region in a single legislative district without the kind of "'tentacles, appendages, bizarre

shapes, or any other obvious irregularities that would make it difficult to find' them

sufficiently compact." *Milligan*, 143 S.Ct. at 1504 (quoting *Singleton v. Merrill*, 582 F.

Supp.3d 924, 1011 (N.D. Ala. 2022)). The State's redistricting and voting rights expert,

Dr. John Alford, testified that plaintiffs' examples are "among the more compact

demonstration districts [he's] seen" in thirty years. Tr. 857:11-14.

Intervenors take issue with the length and breadth of the demonstrative districts,

arguing that because Yakima is 80+ miles away from Pasco, the Latino populations of

those cities are "farflung segments of a racial group with disparate interests." Dkt. # 215 at

16 (quoting *LULAC v. Perry*, 548 U.S. 399, 433 (2006)). But the evidence in the case

shows that Yakima and Pasco are geographically connected by other, smaller, Latino

population centers and that the community as a whole largely shares a rural, agricultural

environment, performs similar jobs in similar industries, has common concerns regarding

housing and labor protections, uses the same languages, participates in the same religious

and cultural practices, and has significant immigrant populations. The Court finds that

Latinos in the Yakima Valley region form a community of interest based on more than just

race. While the community is by no means uniform or monolithic, its members share many

of the same experiences and concerns regardless of whether they live in Yakima, Pasco, or along the highways and rivers in between.[7]

Plaintiffs have the burden under the first *Gingles* precondition to "adduce[] at least one illustrative map" that shows a reasonably configured district in which Latino voters have an equal opportunity to elect their preferred representatives. *Milligan*, 143 S.Ct. at 1512. They have done so.

**D. Political Cohesiveness**

The second *Gingles* precondition focuses on whether the Latino community in the relevant area is politically cohesive, such that it would rally around a preferred candidate. *Milligan*, 143 S.Ct. at 1503. Each of the experts who addressed this issue, including Intervenors' expert, testified that Latino voters overwhelmingly favored the same candidate in the vast majority of the elections studied. The one exception to this unanimous opinion was the 2022 State Senate race pitting a Latina Republican against a white Democrat. With regards to that election, Dr. Owens' analysis showed a 52/48 split in the Latino vote, which he interpreted as a lack of cohesion. Dr. Collingwood, on the other hand, calculated that between 60-68% of the Latino vote went to the white Democrat, a showing of moderate cohesion that was consistent with the overall pattern of racially polarized voting.[8] Despite this one point of disagreement in the expert testimony, the

---

[7] Intervenors' political science expert, Dr. Mark Owens, raised the issue of disparate and therefore distinct Latino populations but acknowledged at trial that he does not know anything about the communities in the Yakima Valley region other than what the maps and data show.

[8] Dr. Owens also identified the 2020 Superintendent of Public Institutions race as something of an anomaly, noting that the Latino vote in the Yakima Valley region did not coalesce around the Democratic candidate, but rather around

MEMORANDUM OF DECISION - 11

statistical evidence shows that Latino voter cohesion is stable in the 70% range across election types and election cycles over the last decade.

### E. Impact of the Majority Vote

The third *Gingles* precondition focuses on whether the challenged district boundaries allow the non-Hispanic white majority to thwart the cohesive minority vote. *Milligan*, 143 S.Ct. at 1503. In order to have a chance at succeeding on their Section 2 claim, plaintiffs must show not only that the relevant minority and majority communities are politically cohesive, but also that they are in opposition such that the majority overwhelms the choice of the minority. Dr. Collingwood concluded, and Dr. Alford confirmed, that white voters in the Yakima Valley region vote cohesively to block the Latino-preferred candidates in the majority of elections (approximately 70%). Intervenors do not dispute the data or the opinions offered by Drs. Collingwood and Alford, but argue that because the margins by which the white-preferred candidates win are, in some instances, quite small, relief is unavailable under Section 2. Plaintiffs have shown "that the white majority votes sufficient as a bloc to enable it – in the absence of special circumstances, such as the minority candidate running unopposed . . . – usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. A defeat is a defeat,

---

his Republican opponent. The question under the second *Gingles* precondition is whether Latino voters in the relevant area exhibit sufficient political cohesiveness to elect their preferred candidate – of any party or no party – if given the chance. As Dr. Barreto explained, a Latino preferred candidate is not necessarily the same thing as a Democratic candidate. In southern Florida, for example, an opportunity district for Latinos would have to perform well for Republicans rather than for Democrats. The evidence in this case shows that Latino voters have cohesively preferred a particular candidate in almost every election in the last decade, but that their preference can vary based on the ethnicity of the candidates and/or the policies they champion.

MEMORANDUM OF DECISION - 12

regardless of the vote count. Intervenors provide no support for the assertion that losses by a small margin are somehow excluded from the tally when determining whether there is legally significant bloc voting or whether the majority "usually" votes to defeat the minority's preferred candidate. White bloc voting is "legally significant" when white voters "normally . . . defeat the combined strength of minority support plus white 'crossover' votes." *Gingles*, 478 at 56. Such is the case here.[9]

Finally Intervenors argue that because the Latino community in the Yakima Valley region generally prefers Democratic candidates, its choices are partisan and, therefore, the community's losses at the polls are not "on account of race or color" as required for a successful claim under Section 2(a). While the Court will certainly have to determine whether the totality of the circumstances in the Yakima Valley region shows that Latino voters have less opportunity than white voters to elect representatives of their choice on account of their ethnicity (as opposed to their partisan preferences), that question does not inform the political cohesiveness or bloc voting analyses. *See Milligan*, 143 S.Ct. at 1503 (describing the second and third *Gingles* preconditions without reference to the cause of the bloc voting); *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring) (finding that defendants cannot rebut statistical evidence of divergent racial voting patterns by offering evidence that the patterns may be explained by causes other than race, although the

---

[9] Although small margins of defeat do not impact the cohesiveness and/or bloc voting analyses, the closeness of the elections is not irrelevant. As Dr. Alford suggests, it goes to the extent of the map alterations that may be necessary to remedy the Section 2 violation. It does not, however, go to whether there is or is not a Section 2 violation in the first place.

MEMORANDUM OF DECISION - 13

evidence may be relevant to the overall voter dilution inquiry); *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (noting that *Gingles* establishes preconditions, but they are not necessarily dispositive if other circumstances, such as political or personal affiliations of the different racial groups with different candidates, explain the election losses); *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 359, 361 (7th Cir. 1992) (assuming that plaintiffs can prove the three *Gingles* preconditions before considering as part of the totality of the circumstances whether electoral losses had more to do with party than with race); *but see LULAC v. Clements*, 999 F.2d 831, 856 (5th Cir. 1993) (finding that a white majority that votes sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate is legally significant under the third *Gingles* precondition only if based on the race of the candidate).

### F. Totality of the Circumstances

"[A] plaintiff who demonstrates the three preconditions must also show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Milligan*, 143 S.Ct. at 1503 (quoting *Gingles*, 478 U.S. at 45–46). Proof that the contested electoral practice – here, the drawing of the boundaries of LD 15 – was adopted with an intent to discriminate against Latino voters is not required. Rather, the correct question "is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Gingles*, 478 U.S. at 44 (quoting S. Rep. 97-417 at 28, 1982 U.S.C.C.A.N. at 206). In enacting Section 2, Congress recognized that "voting practices and procedures

that have discriminatory results perpetuate the effects of past purposeful discrimination." *Gingles*, 478 U.S. at 44 n.9 (quoting S. Rep. 97-417 at 40, 1982 U.S.C.C.A.N. at 218). The Court "must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors,'" *i.e.*, the Senate Factors, *Gingles*, 478 U.S. at 44 (quoting S. Rep. 97–417, at 27, 1982 U.S.C.C.A.N. at 205), in order to determine whether the structure or practice is causally connected to the observed statistical disparities between Latino and white voters in the Yakima Valley region, *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012)). "[T]here is no requirement that any particular number of [the Senate Factors] be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97–417 at 29, 1982 U.S.C.C.A.N. at 209) (internal quotation marks omitted).

### 1. History of Official Discrimination

The first Senate Factor requires an evaluation of the history of official discrimination in the state or political subdivision that impacted the right of Latinos to register, to vote, or otherwise to participate in the democratic process. Plaintiffs provided ample historical evidence of discriminatory English literacy tests, English-only election materials, and at-large systems of election that prevented or suppressed Latino voting. In addition, plaintiffs identified official election practices and procedures that have prevented Latino voters in the Yakima Valley region from electing candidates of their choice as recently as the last few years. *See Aguilar v. Yakima Cnty.*, No. 20-2-0018019 (Kittitas Cnty. Super. Ct.); *Glatt v. City of Pasco*, 4:16-cv-05108-LRS (E.D. Wash.); *Montes v. City*

*of Yakima*, 40 F. Supp.3d 1377 (E.D. Wash. 2014). *See also Portugal*, 530 P.3d at 1006.

While progress has been made towards making registration and voting more accessible to

all Washington voters, those advances have been hard won, following decades of

community organizing and multiple lawsuits designed to undo a half century of blatant

anti-Latino discrimination.

Intervenors do not dispute this evidence, but argue that plaintiffs have failed to

show that the "litany of past miscarriages of justice . . . work to deny Hispanics equal

opportunity to participate in the political process today." Dkt. # 215 at 26. The Court

disagrees. State Senator Rebecca Saldaña explained that historic barriers to voting have

continuing effects on the Latino population. Seemingly small, everyday municipal

decisions, like which neighborhoods would get sidewalks, as well as larger decisions about

who could vote, were for decades decided by people who owned property.

> And so the people that are renters, the people that are living in labor camps,
> would not be allowed to have a say in those circumstances. So there's a bias
> towards land ownership, historically, and how lines are drawn, who gets to
> vote, who gets to have a say in their democracy. If you don't feel like you
> can even have a say about sidewalks, it creates a barrier for you to actually
> believe that your vote would matter, even if you could vote.

Trial Tr. at 181. This problem is compounded by the significant percentage of the

community that is ineligible to vote because of their immigration status or who face

literacy and language barriers that prevent full access to the electoral process. "[A]ll of

these are barriers that make it harder for Latino voters to be able to believe that their vote

counts [or that they] have access to vote." Trial Tr. at 182. In addition, both Senator

MEMORANDUM OF DECISION - 16

Saldaña and plaintiff Susan Soto Palmer testified that the historic and continuing lack of candidates and representatives who truly represent Latino voters – those who are aligned with their interests, their perspectives, and their experiences – continues to suppress the community's voter turnout. Trial Tr. at 182 and 296. There is ample evidence to support the conclusion that Latino voters in the Yakima Valley region faced official discrimination that impacted and continues to impact their rights to participate in the democratic process.

### 2. Extent of Racially Polarized Voting

As discussed above, voting in the Yakima Valley region is racially polarized. The Intervenors do not separately address Senate Factor 2, which the Supreme Court has indicated is one of the most important of the factors bearing on the Section 2 analysis.

### 3. Voting Practices That May Enhance the Opportunity for Discrimination

Three of the experts who testified at trial opined that there are voting practices, separate and apart from the drawing of LD 15's boundaries, that may hinder Latino voters' ability to fully participate in the electoral process in the Yakima Valley region. First, LD 15 holds its senate election in a non-presidential (off) election year. Drs. Collingwood, Estrada, and Barreto opined that Latino voter turnout is at its lowest in off-year elections, enlarging the turnout gap between Latino and white voters in the area. Second, Dr. Barreto indicated that Washington uses at-large, nested districts to elect state house representatives, a system that may further dilute minority voting strength. *See Gingles*, 478 U.S. at 47. Third, Dr. Estrada testified that the ballots of Latino voters in Yakima and

Franklin Counties are rejected at a disproportionally high rate during the signature verification process, a procedure that is currently being challenged in the United States District Court for the Eastern District of Washington in *Reyes v. Chilton*, No. 4:21-cv-05075-MKD.

Intervenors generally ignore this testimony and the experts' reports, baldly asserting that there is "no evidence" of other voting practices or procedures that discriminate against Latino voters in the Yakima Valley region. Dkt. # 215 at 27. The State, for its part, challenges only the signature verification argument. It appears that Dr. Estrada's opinion that Latino voters are disproportionately impacted by the process is based entirely on an article published on Crosscut.com which summarized two other articles from a non-profit organization called Investigate West. While it may be that experts in the fields of history and Latino voter suppression would rely on facts asserted in secondary articles when developing their opinions, the Court need not decide the admissibility of this opinion under Fed. R. Ev. 703. Even without considering the possibility that the State's signature verification process, as implemented in Yakima and Franklin Counties, suppresses the Latino vote, plaintiffs have produced unrebutted evidence of other electoral practices that may enhance the opportunity for discrimination against the minority group.

### 4. Access to Candidate Slating Process

There is no evidence that there is a candidate slating process or that members of the minority group have been denied access to that process.

1

2

### 5. Continuing Effects of Discrimination

3

Senate Factor 5 evaluates "the extent to which members of the minority group in the

4

state or political subdivision bear the effects of discrimination in such areas as education,

5

employment and health, which hinder their ability to participate effectively in the political

6

process." *Gingles*, 478 U.S. at 37. Intervenors do not dispute plaintiffs' evidence of

7

significant socioeconomic disparities between Latino and white residents of the Yakima

8

Valley region, but they assert that there is no evidence of a causal connection between

9

these disparities and Latino political participation. The assertion is belied by the record.

10

Dr. Estrada opined that decades of discrimination against Latinos in the area has had

11

lingering effects, as evidenced by present-day disparities with regard to income,

12

unemployment, poverty, voter participation, education, housing, health, and criminal

13

justice. He also opined that the observed disparities hinder and limit the ability of Latino

14

voters to participate fully in the electoral process. Trial Tr. at 142 ("And all these barriers

15

compounded, they limit, they hinder Latinos' ability to participate in the political process.

16

If an individual is already struggling to find a job, if they don't have a bachelor's degree,

17

can't find employment, maybe are also having to deal with finding child care, registering

18

to vote, voting is not necessarily one of their priorities."); *see also* Trial Tr. at 182 (Senator

19

Saldaña noting that the language and educational barriers Latino voters face makes it hard

20

for them to access the vote); Trial Tr. at 834-86 (Mr. Portugal describing the need for

21

decades of advocacy work to educate Latino voters about the legal and electoral processes

22

and to help them navigate through the systems). In addition, there is evidence that the

23

24

25

26

MEMORANDUM OF DECISION - 19

unequal power structure between white land owners and Latino agricultural workers

suppresses the Latino community's participation in the electoral process out of a concern

that they could jeopardize their jobs and, in some cases, their homes if they get involved in

politics or vote against their employers' wishes. Senate Factor 5 weighs heavily in

plaintiffs' favor.

### 6. Overt or Subtle Racial Appeals in Political Campaigns

Assertions that "non-citizens" are voting in and affecting the outcome of elections,

that white voters will soon be outnumbered and disenfranchised, and that the Democratic

Party is promoting immigration as a means of winning elections are all race-based appeals

that have been put forward by candidates in the Yakima Valley region during the past

decade. Plaintiffs have also provided evidence that a candidate campaigned against the

Fourteenth Amendment's guarantee that "[a]ll persons born or naturalized in the United

States . . . are citizens of the United States," a part of U.S. law since 1868. Political

messages such as this that avoid naming race directly but manipulate racial concepts and

stereotypes to invoke negative reactions in and garner support from the audience are

commonly referred to as dog-whistles. The impact of these appeals is heightened by the

speakers' tendencies to equate "immigrant" or "non-citizen" with the derogatory term

"illegal" and then use those terms to describe the entire Latino community without regard

to actual facts regarding citizenship and/or immigration status.

Intervenors take the position that illegal immigration is a fair topic for political

debate, and it is. But the Senate Factors are designed to guide the determination of whether

MEMORANDUM OF DECISION - 20

"the political processes leading to nomination or election in the . . . political subdivision are not equally open to participation by members of" the Latino community. *Gingles*, 478 U.S. at 36 (quoting Section 2). If candidates are making race an issue on the campaign trail – especially in a way that demonizes the minority community and stokes fear and/or anger in the majority – the possibility of inequality in electoral opportunities increases. As recognized by the Senate when enacting Section 2, such appeals are clearly a circumstance that should be considered.

### 7. Success of Latino Candidates

This Senate Factor evaluates the extent to which members of the minority group have been elected to public office in the jurisdiction, a calculation made more difficult in this case by the fact that the boundaries of the "jurisdiction" have moved over time. The parties agree, however, that in the history of Washington State, only three Latinos were elected to the state Legislature from legislative districts that included parts of the Yakima Valley region. That is a "very, very small number" compared to the number of representatives elected over time and considering the large Latino population in the area. Trial Tr. at 145 (Dr. Estrada testifying). Even when the boundaries of the "jurisdiction" are reduced to county lines, Latino candidates have not fared well in countywide elections: as of the time of trial, only one Latino had ever been elected to the three-member Board of

Yakima County Commissioners, and no Latino had ever been elected to the Franklin County Board of Commissioners.[10]

The Court finds two other facts in the record to be relevant when evaluating the electoral success of Latino candidates in the Yakima Valley region. First, State Senator Nikki Torres, one of the three Latino candidates elected to the state legislature, was elected from LD 15 under the challenged map. Her election is a welcome sign that the race-based bloc voting that prevails in the Yakima Valley region is not insurmountable. The other factor is not so hopeful, however. Plaintiff Soto Palmer testified to experiencing blatant and explicit racial animosity while campaigning for a Latino candidate in LD 15. Her testimony suggests not only the existence of white voter antipathy toward Latino candidates, but also that Latino candidates may be at a disadvantage in their efforts to participate in the political process if, as Ms. Soto Palmer did, they fear to campaign in areas that are predominately white because of safety concerns.

### 8. Responsiveness of Elected Officials

Senate Factor 8 considers whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of Latinos in the Yakima Valley region. Members of the Latino community in the area testified that their statewide representatives have not supported their community events (such as May Day and

---

[10] Intervenors criticize Dr. Estrada for disregarding municipal elections, but the Section 2 claim is based on allegations that the boundaries of LD 15 were drawn in such a way that it cracked the Latino vote, a practice that is virtually impossible in a single polity with defined borders and a sizeable majority. That Latino candidates are successful in municipal elections where they make up a significant majority of an electorate that cannot be cracked has little relevance to the Section 2 claim asserted here.

MEMORANDUM OF DECISION - 22

Citizenship Day), have failed to support legislation that is important to the community (such as the Washington Voting Rights Act, healthcare funding for undocumented individuals, and the Dream Act), do not support unions and farmworker rights, and were dismissive of safety concerns that arose following the anti-Latino rhetoric of the 2016 presidential election. Ms. Lopez and Ms. Soto Palmer have concluded that their representatives in the Legislature simply do not care about Latinos and often vote against the statutes and resources that would help them.

Senator Saldaña, who represents LD 37 on the west side of the state, considers herself a "very unique voice" in the Legislature, one that she uses to help her fellow legislators understand how their work impacts the people of Washington. Trial Tr. 173. When she first went to Olympia as a student advocating for farmworker housing, she realized that the then-senator from LD 15 was not supportive of or advocating for the issues she was hearing were important to the Yakima Valley Latino community, things like farmworker housing, education, dual-language education, access to healthcare, access to counsel, and access to state IDs. Senator Saldaña testified that Latinos from around the state, including the Yakima Valley, seek meetings with her, rather than their own representatives, to discuss issues that are important to them.

Plaintiffs also presented expert testimony on this point. Dr. Estrada compared the 2022 legislative priorities of Washington's Latino Civic Alliance ("LCA") to the voting records of the legislators from the Yakima Valley region. LCA sent the list of bills the community supported to the legislators ahead of the Legislative Day held in February

2022. The voting records of elected officials in LD 14, LD 15, and LD 16 on these bills are set forth in Trial Exhibit 4 at 75-76. Of the forty-eight votes cast, only eight of them were in favor of legislation that LCA supported.

The Intervenors point out that the Washington State Legislature has required an investigation into racially-restrictive covenants, has funded a Spanish-language radio station in the Yakima Valley, and has enacted a law making undocumented students eligible for state college financial aid programs. Even if one assumes that the elected officials from the Yakima Valley region voted for these successful initiatives, Intervenors do not acknowledge the years of community effort it took to bring the bills to the floor or that these three initiatives reflect only a few of the bills that the Latino community supports.

### 9. Justification for Challenged Electoral Practice

The ninth Senate Factor asks whether the reasons given for the redrawn boundaries of LD 15 are tenuous. They are not. The four voting members of the redistricting Commission testified at trial that they each cared deeply about doing their jobs in a fair and principled manner and tried to comply with the law as they understood it to the best of their abilities. The boundaries that were drawn by the bipartisan and independent commission reflected a difficult balance of many competing factors and could be justified in any number of rational, nondiscriminatory ways.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### 10. Proportionality

Section 2(b) specifies that courts can consider the extent to which members of a protected class have been elected to office in the jurisdiction (an evaluation performed under Senate Factor 7), but expressly rejects any right "to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b). The Supreme Court recently made clear that application of the *Gingles* preconditions, in particular the geographically compact and reasonably configured requirements of the first precondition, will guard against any sort of proportionality requirement. *Milligan*, 143 S.Ct. at 1518.

Other Supreme Court cases evaluate proportionality in a different way, however, comparing the percentage of districts in which the minority has an equal opportunity to elect candidates of its choice with the minority's share of the CVAP. It is, after all, possible that despite having shown racial bloc voting and continuing impacts of discrimination, a minority group may nevertheless hold the power to elect candidates of its choice in numbers that mirror its share of the voting population, thereby preventing a finding of voter dilution. *See Johnson v. De Grandy*, 512 U.S. 997, 1006 (1994). In *De Grandy*, the Supreme Court acknowledged the district court's *Gingles* analysis and conclusions in favor of the minority population, but found that the Hispanics of Dade County, Florida, nevertheless enjoyed equal political opportunity where they constituted 50% of the voting-age population and would make up supermajorities in 9 of the 18 new legislative districts in the county. In those circumstances, the Court could "not see how

these district lines, apparently providing political effectiveness in proportion to voting-age numbers, deny equal political opportunity." *De Grandy*, 512 U.S. at 1014. The Supreme Court subsequently held that the proportionality check should look at equality of opportunity across the entire state as part of the analysis of whether the redistricting at issue dilutes the voting strength of minority voters in a particular legislative district. *LULAC v. Perry*, 548 U.S. 399, 437 (2006).[11]

The proportionality inquiry supports plaintiffs' claim for relief under Section 2 even if evaluated on a statewide basis. Although Latino voters make up between 8 and 9% of Washington's CVAP, they hold a bare majority in only one legislative district out of 49, or 2%. Given the low voter turnout rate among Latino voters in the bare-majority district, Latinos do not have an effective majority anywhere in the State. They do not, therefore, enjoy roughly proportional opportunity in Washington.

Intervenors argue that the proportionality inquiry must focus on how many legislative districts are represented by at least one Democrat, whom Latino voters are presumed to prefer. From that number, Intervenors calculate that 63% of Washington's legislative districts are Latino "opportunity districts" as defined in *Bartlett v. Strickland*,

---

[11] The Court notes that the record in *Perry* showed "the presence of racially polarized voting – and the possible submergence of minority votes – throughout Texas," and it therefore made "sense to use the entire State in assessing proportionality." 548 U.S. at 438. There is nothing in the record to suggest the presence of racially polarized voting throughout Washington, and almost all of the testimony and evidence at trial focused on the totality of the circumstances in the Yakima Valley region. A statewide assessment of proportionality seems particularly inappropriate here where the interests and representation of Latinos in the rural and agricultural Yakima Valley region may diverge significantly from those who live in the more urban King and Pierce Counties. Applying a statewide proportionality check in these circumstances "would ratify 'an unexplored premise of highly suspect validity: that in any given voting jurisdiction ..., the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class.'" *Perry*, 548 U.S. at 436 (quoting *De Grandy*, 512 U.S. at 1019).

MEMORANDUM OF DECISION - 26

556 U.S. 1, 13 (2009). The cited discussion defines "majority-minority districts," "influence districts," and "crossover districts," however, and ultimately concludes that a district in which minority voters have the potential to elect representatives of their own choice – the key to the Section 2 analysis – qualifies as a majority-minority district. *Bartlett*, 556 U.S. at 15. As discussed in *Perry*, then, the proper inquiry is "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area." 548 U.S. at 426. *See also Old Person v. Cooney*, 230 F.3d 1113, 1129 (9th Cir. 2000) (describing "proportionality" as "the relation of the number of majority-Indian voting districts to the American Indians' share of the relevant population). The fact that Democrats are elected to statewide offices by other voters in other parts of the state is not relevant to the proportionality evaluation.[12]

Regardless, the Court finds that, in the circumstances of this case, the proportionality check does not overcome the other evidence of Latino vote dilution in LD 15. The totality of the circumstances factors "are not to be applied woodenly," *Old Person*, 230 F.3d at 1129, and "the degree of probative value assigned to proportionality may vary with other facts," *De Grandy*, 512 U.S. at 1020. In this case, the distinct history of and economic/social conditions facing Latino voters in the Yakima Valley region make it particularly inappropriate to trade off their rights in favor of opportunity or representation enjoyed by others across the state. The intensely local appraisal set forth in the preceding

---

[12] Intervenors also suggest that a comparison of the statewide Latino CVAP with the number of Latino members of the state Legislature is the appropriate way to evaluate proportionality. No case law supports this evaluative method.

MEMORANDUM OF DECISION - 27

sections shows that the enactment of LD 15 has diluted the Latino vote in the Yakima

Valley region in violation of plaintiffs' rights under Section 2. "[B]ecause the right to an

undiluted vote does not belong to the minority as a group, but rather to its individual

members," the wrong plaintiffs have suffered is remediable under Section 2. *Perry*, 548

U.S. at 437.

\*  \*  \*

The question in this case is whether the state has engaged in line-drawing which, in

combination with the social and historical conditions in the Yakima Valley region, impairs

the ability of Latino voters in that area to elect their candidate of choice on an equal basis

with other voters. The answer is yes. The three *Gingles* preconditions are satisfied, and

Senate Factors 1, 2, 3, 5, 6, 7, and 8 all support the conclusion that the bare majority of

Latino voters in LD 15 fails to afford them equal opportunity to elect their preferred

candidates. While a detailed evaluation of the situation in the Yakima Valley region

suggests that things are moving in the right direction thanks to aggressive advocacy, voter

registration, and litigation efforts that have brought at least some electoral improvements

in the area,[13] it remains the case that the candidates preferred by Latino voters in LD 15

usually go down in defeat given the racially polarized voting patterns in the area.

---

[13] As Ms. Soto Palmer eloquently put it in response to the Court's questioning:

> So I agree with you, there is progress being made. But I believe that many in my community would
> like to get to a day where we don't have to advocate so hard for the Latino and Hispanic
> communities to be able to fairly and equitably elect someone of their preference, so that we can
> work on other things that will benefit all of us, such as healthcare for all, and other things that are
> really important, like income inequality, and so forth. . . . So it is my hope that every little step of
> the way, anything I can do to help us get there, that is why I'm here.

MEMORANDUM OF DECISION - 28

Intervenors make two additional arguments that are not squarely addressed through application of the *Gingles* analysis. The first is that the analysis is inapplicable where the challenged district already contains a majority Latino CVAP, and the Court should "simply hold that, as a matter of sound logic, Hispanic voters have equal opportunity to participate in the democratic process and elect candidates as they choose." Dkt. # 215 at 13. The Supreme Court has recognized, however, that "it may be possible for a citizen voting-age majority to lack real electoral opportunity," *Perry*, 548 U.S at 428, and the evidence shows that that is the case here. A majority Latino CVAP of slightly more than 50% is insufficient to provide equal electoral opportunity where past discrimination, current social/economic conditions, and a sense of hopelessness keep Latino voters from the polls in numbers significantly greater than white voters. Plaintiffs have shown that a geographically and reasonably configured district could be drawn in which the Latino CVAP constitutes an effective majority that would actually enable Latinos to have a fair and equal opportunity to obtain representatives of their choice. That is the purpose of Section 2, and creating a bare, ineffective majority in the Yakima Valley region does not immunize the redistricting plan from its mandates.

---

Trial Tr. at 307-08. Mr. Portugal similarly pointed out that while incremental improvement in political representation is possible, it will not come without continued effort on the part of the community:

> I think with advocacy and being able to continue organizing, and not give up, because it's a lot of things that we still have, in a lot of areas that are affecting our community, to get to the point where we can have some great representation. So, yes, [things can slowly improve] – they will continue, but we need to – we cannot let the foot off the gas . . . .

Trial Tr. at 842.

MEMORANDUM OF DECISION - 29

Intervenors' second argument is that plaintiffs have not been denied an equal opportunity to elect candidates of their choice because of their race or color, but rather because they prefer candidates from the Democratic Party, which, as a matter of partisan politics, is a losing proposition in the Yakima Valley region. Party labels help identify candidates that favor a certain bundle of policy prescriptions and choices, and the Democratic platform is apparently better aligned with the economic and social preferences of Latinos in the Yakima Valley region than is the Republican platform. Intervenors are essentially arguing that Latino voters should change the things they care about and embrace Republican policies (at least some of the time) if they hope to enjoy electoral success.[14] But Section 2 prohibits electoral laws, practices, or structures that operate to minimize or cancel out minority voters' ability to elect their preferred candidates: the focus of the analysis is the impact of electoral practices on a minority, not discriminatory intent towards the minority. *Milligan*, 143 S.Ct. at 1503; *Gingles*, 478 at 47-48 and 87. There is no indication in Section 2 or the Supreme Court's decisions that a minority waives its statutory protections simply because its needs and interests align with one partisan party over another.

Intervenors make much of the fact that Justice Brennan was joined by only three other justices when opining that "[i]t is the difference between the choices made by blacks and white – not the reasons for that difference – that results in blacks having less

---

[14] As noted above in n.8, there is evidence in the record that Latino voters in the Yakima Valley region did coalesce around a Republican candidate in the 2020 Superintendent of Public Institutions race. Intervenors do not acknowledge this divergence from the normal pattern, nor do they explain how it would impact their partisanship argument.

MEMORANDUM OF DECISION - 30

opportunity than whites to elect their preferred representatives." *Gingles*, 478 U.S. at 63.

But Justice O'Connor disagreed with Justice Brennan on this point only because she could

imagine a very specific situation in which the reason for the divergence between white and

minority voters could be relevant to evaluating a claim for voter dilution. Such would be

the case, she explained, if the "candidate preferred by the minority group in a particular

election was rejected by white voters for reasons other than those which made the

candidate the preferred choice of the minority group." *Gingles*, 478 U.S. at 100. In that

situation, the oddity that made the candidate unpalatable to the white majority would

presumably not apply to another minority-preferred candidate who might then "be able to

attract greater white support in future elections," reducing any inference of systemic vote

dilution. *Gingles*, 478 U.S. at 100. There is no evidence that Latino-preferred candidates in

the Yakima Valley region are rejected by white voters for any reason other than the

policy/platform reasons which made those candidates the preferred choice, and there is no

reason to suspect that future elections will see more white support for candidates who

support unions, farmworker rights, expanded healthcare, education, and housing options,

*etc*. Especially in light of the evidence showing significant past discrimination against

Latinos, on-going impacts of that discrimination, racial appeals in campaigns, and a lack of

responsiveness on the part of elected officials, plaintiffs have shown inequality in electoral

opportunities in the Yakima Valley region: they prefer candidates who are responsive to

the needs of the Latino community whereas their white neighbors do not. The fact that the

candidates identify with certain partisan labels does not detract from this finding.

MEMORANDUM OF DECISION - 31

For all of the foregoing reasons, the Court finds that the boundaries of LD 15, in combination with the social, economic, and historical conditions in the Yakima Valley region, results in an inequality in the electoral opportunities enjoyed by white and Latino voters in the area. The Clerk of Court is directed to enter judgment in plaintiffs' favor on their Section 2 claim. The State of Washington will be given an opportunity to adopt revised legislative district maps for the Yakima Valley region pursuant to the process set forth in the Washington State Constitution and state statutes, with the caveat that the revised maps must be fully adopted and enacted by February 7, 2024.

The parties shall file a joint status report on January 8, 2024, notifying the Court whether a reconvened Commission was able to redraw and transmit to the Legislature a revised map by that date. If the Commission was unable to do so, the parties shall present proposed maps (jointly or separately) with supporting memoranda and exhibits for the Court's consideration on or before January 15, 2024. Regardless whether the State or the Court adopts the new redistricting plan, it will be transmitted to the Secretary of State on or before March 25, 2024, so that it will be in effect for the 2024 elections.

Dated this 10th day of August, 2023.

*Robert S. Lasnik*

Robert S. Lasnik
United States District Judge

MEMORANDUM OF DECISION - 32