The Honorable Robert S. Lasnik

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

SUSAN SOTO PALMER et al.,

*Plaintiffs*,

v.

STEVEN HOBBS, in his official capacity as Secretary of State of Washington, et al.,

*Defendants*,

and

JOSE TREVINO et al.,

*Intervenor-Defendants*.

Case No.: 3:22-cv-5035-RSL

INTERVENOR-DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' REMEDIAL PROPOSALS

## INTRODUCTION

The Court should reject all five of Plaintiffs' proposed remedial maps. In an attempt to circumvent the constitutional requirement that *any* map enacted by Washington's independent Redistricting Commission contain bipartisan compromise, *see* Wash. Const. art. II, § 43, Plaintiffs and their politically-aligned State/Defendant counterparts attempt to obtain through this Court what the Washington Constitution affirmatively denied them—an overtly partisan legislative map, *cf. Cooper v. Harris*, 137 S. Ct. 1455, 1490 (2017) (Alito, J., concurring in the judgment in part and dissenting in part) (warning that "federal courts will be transformed into weapons of political warfare" that "invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena."). In what can only generously be called a mockery of the

INTERVENOR-DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' REMEDIAL PROPOSALS
No. 3:22-cv-5035-RSL

1

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
Phone: (206) 207-3920

Voting Rights Act ("VRA") and a condescending insult to Hispanic voters in Washington, in *all* of their five proposed remedial maps, Plaintiffs purport to cure an allegedly unlawful *dilution* of Hispanic voting strength by *further diluting* Hispanic voting strength—lowering the percentage of Hispanic citizens of voting age ("HCVAP") in the Yakima Valley VRA "opportunity" district in each and every one of their five proposals. If there were any doubt that Plaintiffs' objectives were to serve partisan aims rather than the VRA's anti-dilutive purposes, their proposed remedial maps dispel them.

Using the latest 2021 American Community Survey ("ACS") numbers from the U.S. Census Bureau, the enacted Legislative District 15 ("LD-15") contains an HCVAP of at least 52.4%. (*See* Expert Report of Sean P. Trende, Ph.D. (Trende Report), Dkt. # 251 at 16.) This majority-HCVAP district elected a Latina state senator, Nikki Torres, by a 35-point margin over her White opponent in the 2022 general election for this open seat, in the only contested legislative election hitherto held in the enacted LD-15. In a first-of-its-kind holding, the Court found that, despite containing a majority HCVAP and electing a Latina by 35 points, the enacted LD-15 did not afford an equal opportunity for Hispanic voters to elect a candidate of their choice. Because, evidently for Plaintiffs, the phrase "Hispanic Candidate of Choice" must be a synonym for "Democratic Candidate."

To those that espouse the same beliefs of Plaintiffs, the election of Nikki Torres by 35 points over a White Democratic candidate can only be explained by alleging the Hispanic voters were unlawfully denied the ability to elect their preferred candidate—either by racially discriminatory voting procedures or boundary lines. The Court's holding in this matter necessarily implies that the explanation *could not be* because Hispanic voters in Yakima knowingly participated in the franchise and elected Nikki Torres because they *actually preferred* her, or because she is a child of immigrant parents and worked in the fields and grew up in Yakima.[1] It

---

[1] *See* Ex. A, Email from Senator Nikki Torres to Washington Legislators, *A Request Regarding Redistricting* (Oct. 12, 2023, 1:03:27 PM PST). Senator Torres sent an email to all members of both Republican and Democratic Caucuses of the Washington House of Representatives and Senate. Intervenor-Defendant Representative Alex Ybarra is a member of the House Republican Caucus; as such, he received this email. It is attached hereto as Exhibit A and incorporated herein by reference.

| INTERVENOR-DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' REMEDIAL PROPOSALS No. 3:22-cv-5035-RSL | 2 | **Chalmers, Adams, Backer & Kaufman, LLC**<br>701 Fifth Avenue, Suite 4200<br>Seattle, Washington 98104<br>Phone: (206) 207-3920 |

could not be explained by her giving birth to her first child as a teen and dropping out of high school, then fighting to get her GED, undergraduate and graduate degrees, and becoming a community leader. Her election cannot be explained by—despite all odds against her—her picking herself up by the bootstraps as a single mother and providing for her family. Her election could not be explained by the Hispanic voters in Yakima seeing themselves in her—the hopes and dreams of what their children could accomplish through dedication and hard work. No, based on Plaintiffs' legal arguments, Nikki Torres was only elected because the system was rigged through unlawful vote dilution.

Despite Plaintiffs' best efforts arguing otherwise, the VRA does not mandate the creation of Democratic districts wherever there is concentration of minority population. *See, e.g.*, *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) ("The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if [minority] voters are likely to favor that party's candidates."). Plaintiffs' proposed maps remove Hispanic voters from the Yakima "remedial" district and acceptance of any of Plaintiffs' five remedial proposals would compound that error by replacing them with Native American and White Democrats. The Court should reject Plaintiffs' five remedial proposals and call them what they are: a backdoor to elect more Democratic candidates regardless of demographics through exploiting and inverting the VRA—by challenging putative dilution of the Hispanic vote and then "remedying" that alleged dilution with *additional dilution*.

## ARGUMENT

### A. Plaintiffs' Remedial Proposals Fail for Legal Reasons.

The purpose of this Response is not to re-hash all of the reasons Plaintiffs' remedial maps are unnecessary. Intervenor-Defendants' legal position is simple—this Court should reject Plaintiffs' remedial maps because Plaintiffs failed to meet the required legal burden that is a prerequisite to a court requiring a minority "opportunity" district. *See generally Thornburg v. Gingles*, 478 U.S. 30 (1986). Intervenor-Defendants have discussed the myriad of reasons Plaintiffs' claims fall short—both in pre-and-post trial briefing—and incorporate those arguments

INTERVENOR-DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' REMEDIAL PROPOSALS
No. 3:22-cv-5035-RSL

3

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
Phone: (206) 207-3920

by reference herein. (*See* Intervenor-Defs.' Tr. Br., Dkt. # 197; Intervenor-Defs.' Written Closing Argument, Dkt. # 215.)

However, it is worth noting that Plaintiffs still fail to show that the Court adopting any of their remedial maps would actually remedy their alleged injury—that enacted LD-15 does not provide Hispanic voters an equal opportunity to elect their candidate of choice. Said differently, Plaintiffs have failed to show that Nikki Torres would *not* be reelected to the state senate if she moved into one of their proposed remedial districts.

At trial, Plaintiffs contended that Nikki Torres's victory in the only contested endogenous election in enacted LD-15 was more evidence of racially-polarized voting. *See, e.g.*, Trial Tr. 76:1-76:20. Yet now at the remedial phase, Plaintiffs' experts fail to show that Nikki Torres would not still be elected in any of their remedial districts, even if her share of the Hispanic vote was as small as their experts contended at trial. *See, e.g.*, Trial Ex. 2 at 4.

The Redistricting Commission reached a compromise that LD-15 would be a majority HCVAP district, but would lean Republican. *See, e.g.*, Trial Tr. 476:17-477:1, 747:16-23, 279:6-23. Despite drawing a district that all head-to-head partisan metrics showing that Republicans enjoyed only a 2-point advantage (*see, e.g.*, Trende Report, Dkt. # 251 at 33), Senator Torres defeated the Democratic candidate by a whopping 35 points. This margin of victory would be more than sufficient to overcome the roughly 12- to 15-point Democratic advantage in Plaintiffs' proposed remedial districts. (*See* Trende Report, Dkt. # 251 at 33, 55.) Yet Plaintiffs' remedial experts fail to explain or account for this "Nikki Torres Effect," much less show if it is even possible to draw a district in the Yakima region that would not again elect Republican Nikki Torres. Thus, their claim should be dismissed for lack of standing. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "the Plaintiff bears the burden" to establish redressability at all "successive stages of the litigation"); *see also* Trial Tr. 89:11-17 (Plaintiffs' expert Dr. Collingwood explained that he had no idea if it was even possible to draw a majority-Hispanic district that both performs for Democratic candidates and keeps the Yakama Nation intact).

INTERVENOR-DEFENDANTS'  
RESPONSE IN OPPOSITION TO  
PLAINTIFFS' REMEDIAL PROPOSALS  
No. 3:22-cv-5035-RSL

4

**Chalmers, Adams, Backer & Kaufman, LLC**  
701 Fifth Avenue, Suite 4200  
Seattle, Washington 98104  
Phone: (206) 207-3920

**B.     Plaintiffs' Remedial Proposals Fail for Practical Reasons.**

The Court's Memorandum of Decision in this case addresses Hispanic Voting strength in the Yakima Valley. (*See* Dkt. # 218.) Notwithstanding the limited geographical scope of the Court's ruling, Plaintiffs decided to swing for the fences to see just how far they can exploit the Court's ruling to benefit State Democrats. While one cannot fault Plaintiffs for lack of ambition, their fealty to geography and traditional redistricting principles is another matter. Although it would be impossible to detail every instance in Plaintiffs' proposed remedial maps where they try to gain a partisan advantage outside of the Court's decision regarding a Yakima Valley district, what follows are some illustrative examples that shows their recommendations cannot be trusted.

**1.     "Curing" Hispanic Vote Dilution by Further Diluting the Hispanic Population.**

Plaintiffs' proposed remedial districts rest on something of a paradox: while purporting to remedy dilution of Hispanic voting strength, every single one of the proposals actually dilutes Hispanic voting strength *further*. The table below compares the HCVAP proportion of enacted LD-15 to the estimated HCVAP proportion of each of the remedial districts in Plaintiffs' Proposals 1 through 5:

| Map | District | HCVAP (2021 ACS) |
|---|---|---|
| Enacted Plan | LD-15 | 52.6% |
| Plaintiffs' Proposal 1 and 2 | LD-14 | 51.7% |
| Plaintiffs' Proposal 3 and 4 | LD-14 | 50.2% |
| Plaintiffs' Proposal 5 | LD-14 | 46.9% |

(*See* Trende Report, Dkt. # 251 at 67.) By claiming that their five proposals—each of which *lowers* the HCVAP in the relevant district—will "remedy the VRA violation for Latino voters in the Yakima Valley region and provide all voters in the region equal electoral opportunity" (Dkt. # 245 at 1-2), Plaintiffs are proposing to replace Hispanic Republican voters with White Democratic voters, impliedly insisting that Hispanic voters can only elect their candidates of choice with the help of more White Democrats.

INTERVENOR-DEFENDANTS'  
RESPONSE IN OPPOSITION TO  
PLAINTIFFS' REMEDIAL PROPOSALS  
No. 3:22-cv-5035-RSL

5

**Chalmers, Adams, Backer & Kaufman, LLC**  
701 Fifth Avenue, Suite 4200  
Seattle, Washington 98104  
Phone: (206) 207-3920

As independent-minded Latino voters, Intervenors Trevino, Ybarra and Campos categorically reject this approach by Plaintiffs, which makes a mockery of the VRA. The VRA cannot possibly demand further dilution to remedy the alleged dilution, and Plaintiffs have not cited a single case in which a court has *ever* accepted such a remedy-dilution-with-more-dilution proposal.

**2.  Cascading Changes to Districts Outside the Scope of the Court's Order.**

Although Plaintiffs only alleged the Enacted Plan violated the VRA with respect to *one* legislative district in South Central Washington, Plaintiffs' Remedial Proposals 1 through 4 would adjust the boundaries for 20 percent or more of the state's legislative districts, across not just South Central Washington but Western Washington, North Central Washington and Eastern Washington too, affecting the *majority* of Washington counties and moving upwards of half a million Washingtonians into new legislative districts. (*See* Trende Report, Dkt. # 251 at 6-15, 41-50.)

The following table shows how many legislative districts would be altered, how many counties affected and how many Washington residents moved to new districts in each of Plaintiffs' Remedial Proposals 1 through 4:

| Plaintiffs' Proposal | Districts Changed | Counties Affected | Population Moved |
|---|---|---|---|
| Proposal 1 | 14 | 28 | 574,251 |
| Proposal 2 | 11 | 21 | 506,922 |
| Proposal 3 | 13 | 28 | 531,551 |
| Proposal 4 | 10 | 21 | 476,440 |

(*See id.*)

Many of the redrawn districts in Plaintiffs' proposed remedial maps belie even a cursory understanding of Washington geography. As anyone flying into Washington can readily observe, the state is bisected by a rugged mountain range. While one district must transverse the Cascade Mountains in order to obtain an equal population across legislative districts as required by law, *see* Wash. Const. art. II, § 43(5), since statehood there has only ever been one such district, and always the district containing Skamania and Klickitat Counties, *see* Ex. B, Trial Ex. 1061 at 180-97. The

INTERVENOR-DEFENDANTS'
RESPONSE IN OPPOSITION TO
PLAINTIFFS' REMEDIAL PROPOSALS
No. 3:22-cv-5035-RSL

6

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
Phone: (206) 207-3920

Enacted Plan represents the first-ever legislative map with a trans-Cascade district outside Southwest Washington. There are practical realities for this—most of the Cascade Mountains lie within federally-protected National Parks or National Forests, which would create a "population desert" between the western and eastern portions of a trans-Cascade district, needlessly expanding the geographic size of such a district. And as any Washingtonian knows, there are only a few highway passes that connect Western and Eastern Washington, which are often challenging and time-consuming to cross in winter months (and in some cases, like Chinook Pass through Highway 410, closed entirely[2]), making such a district difficult to represent effectively. Despite this reality, Plaintiffs' Proposals 1 through 4 needlessly create multiple trans-Cascade districts. In addition to maintaining most of the Enacted Plan's boundaries for Legislative District 12 (stretching from Wenatchee to Monroe), Proposals 1 through 4 extend Legislative District 17 from Vancouver all the way east to Goldendale, creating a second trans-Cascade district. (*See* Dkt. # 245-1 at 5-9.) And Proposals 2 and 4 extend Legislative District 13 from Moses Lake and Ephrata all the way to Enumclaw (over Chinook Pass, which is typically closed for six months per year), creating a three trans-Cascade districts in those maps. (*See* id. at 7, 9.)

### 3.     Hispanic Populations That Are Far-Flung and Distant From One Another.

Dr. Trende's expert report points out that the Hispanic population in Plaintiffs' proposed remedial districts are far-flung and distant from one another, thereby violating *Gingles*'s mandate that the minority populations must be compact. *See LULAC v. Perry*, 548 U.S. 399, 433 (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996) ("The first Gingles condition refers to the compactness of the minority population, not to the compactness of the contested district.")).

Dr. Trende shows that, in their Proposals 1 and 2, Plaintiffs' remedial district is drawn in a way that captures nearly all the high-HCVAP neighborhoods in both Yakima and Pasco (two cities that are themselves 85 miles apart) while avoiding nearly all the White neighborhoods in

---

[2] *See, e.g.*, Press Release, Washington State Department of Transportation, SR 410/Chinook Pass and SR 123 Cayuse Pass Close for the Season (Nov. 14, 2023), https://wsdot.wa.gov/about/news/2023/sr-410-chinook-pass-and-sr-123-cayuse-pass-close-season ("Typically, SR 410 Chinook Pass and SR 123 Cayuse Pass reopen in late May . . . .").

those cities. (*See* Trende Report, Dkt. # 251 at 26-27.) Likewise, the boundaries of District 14 in these two maps encompass nearly all the majority-Hispanic voting districts along the Yakima River while avoiding nearly all the majority-White voting districts. (*See id.* at 28.) Dr. Trende's dot density maps also graphically show how the Hispanic population of District 14 in Proposals 1 and 2 is dispersed throughout Yakima, Pasco and the Yakima River Valley connecting the two (*see id.* at 29-32), leading him to conclude that "the district stitched together discrete clusters of minority groups to achieve the 50% + 1 threshold," rather than there being "a compact minority population at the core of the district." (*Id.* at 21-22.)

Given the minimal differences between Plaintiffs' remedial district in Proposals 3 and 4 (compared to their remedial district in Proposals 1 and 2) with respect to precincts in the Yakima, Pasco and the Yakima River Valley areas, Dr. Trende also concludes that "the same analysis from Maps 1 and 2 applies" with respect to the remedial district in Proposals 3 and 4. (*Id.* at 54.)

**4.     Playing Political Games with Political Performance of Legislative Districts.**

"The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if [minority] voters are likely to favor that party's candidates." *Baird*, 976 F.2d at 361. Intervenor-Defendants have continually argued that Plaintiffs' VRA claims were an attempt "to obtain in court what they could not achieve in the political arena"—or in this case, through Washington's bipartisan redistricting process. *Cooper*, 137 S. Ct. at 1490 (Alito, J., concurring in the judgment in part and dissenting in part) (*see also, e.g.*, Dkt. # 215 at 51). Plaintiffs' proposed remedial maps show that Intervenor-Defendants' fears were well founded.

In addition to shifting the partisan tilt of the challenged district (enacted LD-15) from an average of -1.8% Democratic to +12.5% Democratic (using "Total Vote, 2016-2020" metric) in the remedial districts of their Proposals 1 and 2, and +12.0% Democratic in Proposals 3 and 4 (*see* Trende Report at 33, 55), Plaintiffs' proposals make several other partisan changes that are both unnecessary and one-sided. For example, under Plaintiffs' Proposals 1 and 2, "District 12, which always voted for the Republican candidate under the Enacted Map, is transformed into a district where the Republican candidate sometimes loses, and frequently has close calls." (*Id.* at 33.) Under

INTERVENOR-DEFENDANTS'  
RESPONSE IN OPPOSITION TO  
PLAINTIFFS' REMEDIAL PROPOSALS  
No. 3:22-cv-5035-RSL

8

**Chalmers, Adams, Backer & Kaufman, LLC**  
701 Fifth Avenue, Suite 4200  
Seattle, Washington 98104  
Phone: (206) 207-3920

Proposals 3 and 4, "District 12 is made more Democratic, and is turned from a district carried by former President Donald Trump into one carried by President Joe Biden." (*Id.* at 55.) "More dramatically, District 17 moves from a district where . . . the Republican has won by 0.9% on average to one where the Democrat has won by 1.4% on average" using the "DRA elections" metric. (*Id.* at 34.) Likewise, under Proposals 3 and 4, District 17 "is made even more Democratic." (*Id.* at 55.) Both Districts 12 and 17 "are presently represented by Republicans" in the state senate and both state house seats in each district. (*Id.* at 34.) But, as Dr. Trende points out, such partisan changes to districts beyond the remedial district "could have been avoided rather easily," through slightly different adjustments by the map-drawer. (*Id.* at 34-35.)

Even more troubling, Dr. Trende's analysis concludes that there are no countervailing partisan shifts in Plaintiffs' proposed maps that might "make a Democratic incumbent appreciably more vulnerable." (*Id.* at 34.) In other words, not only are Plaintiffs seeking "to obtain in court" an additional Democratic legislative district in the Yakima area that their political allies "could not achieve" at the Redistricting Commission, *Cooper*, 137 S. Ct. at 1490 (Alito, J., concurring in the judgment in part and dissenting in part), but they are now using the remedial process to seek to turn two other legislative districts—one in North Central Washington and one in Southwest Washington—into majority-Democratic districts. If successful, this would result in six additional Democratic state representatives and three additional Democratic state senators (in addition to the two additional Democratic state representatives and additional Democratic state senator elected from the remedial district in each of Plaintiffs' remedial proposals).

**5.    Playing More Political Games with Incumbent Legislators.**

The Supreme Court has acknowledged that traditional redistricting principles include "preserving the cores of prior districts and avoiding contests between incumbent[s]." *Karcher v. Daggett*, 462 U.S. 725, 740 (1983). Yet Plaintiffs' five remedial proposals would wreak havoc on incumbents far removed from enacted LD-15. According to Dr. Trende's analysis, each of Plaintiffs' map proposals would imperil numerous current Republican legislators by moving them into Democratic districts or pitting them against other Republican incumbents. (*See* Trende Report,

Dkt. # 251 at 38-40, 59-60, 66; *see also* Dkt. # 248 at 2-4.) In contrast, not a single incumbent Democratic legislator is moved into a new district, placed in a safely Republican district or paired against an incumbent Democrat. (*See id*.) The table below summarizes these effects:

| Legislator | LD | Party | Chamber | Proposal | Change(s) |
|---|---|---|---|---|---|
| Stephanie Barnard | 8 | R | House | 1, 2, 3, 4 | Moved to LD-16 with Reps. Klicker & Rude |
| Brad Hawkins | 12 | R | Senate | 1, 3 | Moved to LD-7 with Sen. Short |
| Curtis King | 14 | R | Senate | 1, 2, 3, 4 | Moved to LD-5 which is not on ballot until 2026 |
| Chris Corry | 14 | R | House | 1, 2, 3, 4, 5 | Moved to LD-15 with Reps. Chandler & Sandlin (Maps 1-4); moved to LD-13 with Reps. Dent & Ybarra (Map 5) |
| Gina Mosbrucker | 14 | R | House | 1, 2, 3, 4, 5 | Moved to LD-17 with Reps. Harris & Waters (Maps 1-4); moved to LD-16 with Reps. Klicker & Rude (Map 5) |
| Nikki Torres | 15 | R | Senate | 1, 2, 3, 4 | Moved to LD-16 with Sen. Dozier |
| Bruce Chandler | 15 | R | House | 5 | Moved to safely Dem. LD-14 |
| Bryan Sandlin | 15 | R | House | 5 | Moved to safely Dem. LD-14 |
| Phil Fortunato | 31 | R | Senate | 1, 3 | Moved to safely Dem. LD-5 |
| Drew Stokesbary | 31 | R | House | 1 | Moved to safely Dem. LD-5 |

(*See id.*)

Many of these shifts appear gratuitous and intentional. In Plaintiffs' Proposals 1 through 4, Senator Curtis King is drawn out of his current district by less than one mile, as is Representative Gina Mosbrucker in Proposals 3 and 4. Representative Chris Corry is left 1.5 miles outside of his current district in Proposals 1 through 4, and just *one-third* of a mile away in Proposals 5. Even more egregiously in Proposal 5, LD-15 Representative Bruce Chandler is moved into a neighboring district by a mere *500 feet*. His seatmate, Representative Bryan Sandlin, is treated similarly, ending up only one-half of a mile outside his current district, despite living in an extremely sparsely populated area on the north slope of the Yakima River Valley. Lastly, in Plaintiffs' Proposal 1, House Minority Leader Drew Stokesbary (who is also, as Plaintiffs have

INTERVENOR-DEFENDANTS'
RESPONSE IN OPPOSITION TO
PLAINTIFFS' REMEDIAL PROPOSALS
No. 3:22-cv-5035-RSL

10

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
Phone: (206) 207-3920

1  pointed out, undersigned counsel, *see* Dkt. # 64 at 3) sees his *neighborhood* in South Auburn split
2  in half, with his residence ending up one-half mile outside his current district. (*See also* Trende
3  Report, Dkt. # 251 at 39-40.)

4  **6.    Ignoring the Commission's First-Ever Tribal Consultation Policy.**

5  For the first time in the history of the Redistricting Commission, it adopted a formal tribal
6  consultation policy. *See* Ex. C, Trial Ex. 1060; *see also* Washington State Redistricting
7  Commission, 2021 Redistricting Commission Tribal Consultation Policy (Apr. 12, 2021),
8  *available at* https://rdcext.blob.core.windows.net/public/Communications_and_Outreach/Tribal
9  Consultation/Tribal Consultation Policy - Adopted.pdf. Pursuant to this policy, the Commission
10 engaged in formal, government-to-government discussions with the Yakama Nation. *See, e.g.*, Ex.
11 E at 2, Email from Lisa McLean, Executive Director, Washing State Redistricting Commission, to
12 Redistricting Commissioners (Aug. 6, 2021, 11:21:49 AM PDT). In the course of these
13 discussions, the Yakama Nation "urge[d] the Redistricting Commission to reject any legislative
14 map that divides the Yakama Reservation into separate representative districts[,]" and to "reject
15 any legislative mapping that demonstrably 'cracks' the indigenous voting population located south
16 of the Yakama Reservation in Klickitat and Skamania Counties[,]" where "many enrolled
17 members reside on off-Reservation trust parcels, at traditional family homesteads, or in
18 communities near the usual and accustom[ed] fishing sites along the Columbia River." Ex. D at 5,
19 Letter from Delano Saluskin, Chairman, Yakama Nation Tribal Council, to Sarah Augustine,
20 Chair, Washington State 2021 Redistricting Commission (Jun. 3, 2021). At a tribal consultation
21 meeting with the Redistricting Commission on August 4, 2021, the Yakama Nation presented a
22 slide deck which included a request that the "2021 Redistricting Maps Should Provide For Single
23 Representation Between The Yakima & Columbia R[ivers]." Ex. E at 22, Presentation by Yakama
24 Nation Tribal Council to Washington State Redistricting Commission (Aug. 4, 2021). In a letter
25 to the Commission during their final negotiations, the Yakama Nation indicated they "specifically
26 favor[ed] elements of Commissioner Graves' proposed Legislative District 14," including those
27 that "incorporate[d] Yakama members living in established tribal communities off-Reservation

and on federal trust property along the Columbia River" and "include[d] critical natural resource management areas for the protection of adjacent forests and rivers." Ex. F at 7-8, Letter from Delano Saluskin, Chairman, Yakama Nation Tribal Council, to Sarah Augustine, Chair, Washington State 2021 Redistricting Commission (Nov. 4, 2021). Notably, consistent with the Yakama Nation's formal request, Commissioner Graves' proposed map of District 14 extended from the Yakima to Columbia River. *See* Ex. G.

None of Plaintiffs' maps extend the same government-to-government courtesy to the Yakama Nation as Commissioner Graves, and eventually the Commission. District 14 in Plaintiffs' Proposals 1, 2 and 5 only extend to the southern border of the Yakama Reservation, not all the way to the Columbia River at White Salmon as in the Enacted Plan (and LD-14 does not reach any part of the Columbia River in their Proposal 5). (*See* Dkt. # 245-1.) In Proposals 3 and 4, District 14 extends further down the Columbia River (though still not all the way to White Salmon like the Enacted Plan), but District 17 protrudes from Clark County east to Goldendale, bisecting much of the Yakama Nation's usual and accustomed hunting and fishing grounds and placing several off-Reservation trust parcels and traditional family homesteads in a separate legislative district from the Yakama Reservation. (*See id.*)

**7.     Ignoring the Commission's Extensive Public Comments.**

While Plaintiffs' map-making misadventures are too numerous to catalogue comprehensively, Intervenor-Defendant Alex Ybarra is uniquely impacted by one such example. In Plaintiffs' Proposals 2 and 4, Legislative District 13, which Rep. Ybarra represents in the State House, is extended westward across the Cascade Mountains all the way to Enumclaw. (*See* Dkt. # 245-1.) In addition to the obvious logistical challenges of representing a district crossing Chinook Pass, *see supra* note 2, this configuration is somewhat similar to the configure by Commissioner Paul Graves, *see* Ex. G, which received swift and severely negative feedback. Not only does this configuration of District 13 exemplify Plaintiffs' ignorance of Washington's geography and other traditional redistricting principles, it also illustrates their disregard for the Commission's

INTERVENOR-DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' REMEDIAL PROPOSALS
No. 3:22-cv-5035-RSL

12

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
Phone: (206) 207-3920

bipartisan, good-faith negotiating process that included tremendous efforts to incorporate public feedback and produce maps receptive to the needs of Washington.

## CONCLUSION

For the foregoing reasons, the Court should reject *all* of Plaintiffs' remedial proposals, which purport to "remedy" voter dilution through additional dilution. Here, the proposed cure is not merely worse than the disease—it is, quite literally, more of the alleged disease itself. And despite the narrow holding of the Court regarding LD-15, Plaintiffs are now attempting to use the remedial process to further trample the constitutionally-mandated work of the Redistricting Commission and score political wins (outside the scope of the Court's holding) through this Court and distortions of the VRA, as opposed to engaging in the required bipartisan process so clearly outlined in the Washington Constitution.

*    *    *

INTERVENOR-DEFENDANTS'
RESPONSE IN OPPOSITION TO
PLAINTIFFS' REMEDIAL PROPOSALS
No. 3:22-cv-5035-RSL

13

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
Phone: (206) 207-3920

DATED this 22nd day of December, 2023.

Respectfully submitted,

*s/ Andrew R. Stokesbary*
Andrew R. Stokesbary, WSBA No. 46097
CHALMERS, ADAMS, BACKER & KAUFMAN, LLC
701 Fifth Avenue, Suite 4200
Seattle, WA 98104
T: (206) 813-9322
dstokesbary@chalmersadams.com

Jason B. Torchinsky (admitted pro hac vice)
Phillip M Gordon (admitted pro hac vice)
Andrew B. Pardue (admitted pro hac vice)
Caleb Acker (admitted pro hac vice)
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
T: (540) 341-8808
jtorchinsky@holtzmanvogel.com
pgordon@holtzmanvogel.com
apardue@holtzmanvogel.com
cacker@holtzmanvogel.com

Dallin B. Holt (admitted pro hac vice)
Brennan A.R. Bowen (admitted pro hac vice)
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
Esplanade Tower IV
2575 East Camelback Rd
Suite 860
Phoenix, AZ 85016
T: (540) 341-8808
dholt@holtzmanvogel.com
bbowen@holtzmanvogel.com

*Counsel for Intervenor-Defendants*

I certify that this memorandum contains 4,193 words, in compliance with the Local Civil Rules.

INTERVENOR-DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' REMEDIAL PROPOSALS
No. 3:22-cv-5035-RSL

14

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
Phone: (206) 207-3920

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing document with the Clerk of the Court of the United States District Court for the Western District of Washington through the Court's CM/ECF System, which will serve a copy of this document upon all counsel of record.

DATED this 22nd day of December, 2023.

        Respectfully submitted,

        *s/ Andrew R. Stokesbary*
        Andrew R. Stokesbary, WSBA No. 46097

        *Counsel for Intervenor-Defendants*

INTERVENOR-DEFENDANTS'
RESPONSE IN OPPOSITION TO
PLAINTIFFS' REMEDIAL PROPOSALS
No. 3:22-cv-5035-RSL

15

**Chalmers, Adams, Backer & Kaufman, LLC**
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
Phone: (206) 207-3920