UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SUSAN SOTO PALMER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> STEVEN HOBBS, *et al.*, <br><br> Defendants, <br><br> and <br><br> JOSE TREVINO, *et al.*, <br><br> Intervenors. | CASE NO. 3:22-cv-05035-RSL <br><br> ORDER REGARDING REMEDY |

**BACKGROUND**

On August 10, 2023, the Court found that the boundaries of Legislative District 15 ("LD 15"), as drawn by the Redistricting Commission and enacted in February 2022 ("the enacted map"), worked in combination with the social, economic, and historical conditions in the Yakima Valley region to impair the ability of Latino voters to elect candidates of their choice on an equal basis with other voters. Dkt. # 218. The State of Washington was given an opportunity to revise and adopt the legislative district maps pursuant to the process set forth in the Washington State Constitution and statutes, but it declined to do so.

ORDER REGARDING REMEDY - 1

The parties were therefore directed to meet and confer with the goal of reaching a consensus on a remedial map. When they were not able to reach an agreement, plaintiffs presented five remedial map options for consideration by the deadline established by the Court, and the parties nominated redistricting experts who could assist the Court in the assessment and modification of the proposed remedial maps. The Court selected Karin Mac Donald from the nominees.[1]

In response to criticisms levied by intervenors, plaintiffs revised their five remedial maps to avoid incumbent displacement and/or incumbent pairing where possible. Dkt. # 254. After reviewing the ten alternative maps that had been provided, the written submissions of the parties, and the competing expert reports, and after conferring with Ms. Mac Donald, the Court developed a preference for what was called Remedial Map 3A. Dkt. # 254-1 at 31-33.[2] The Court heard oral argument regarding the remedial proposals on February 9, 2023, and informed the parties that it was leaning towards adopting Remedial Map 3A. At Intervenors' request, the Court scheduled an evidentiary hearing and invited the parties to submit supplemental expert reports focusing on any problems or concerns with Remedial Map 3A. The Court also reached out to the Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation"), soliciting their written input and participation at the March 8th evidentiary hearing. Having reviewed the submissions of the parties[3] and

---

[1] The documents provided and the instructions given to Ms. Mac Donald are set forth in Dkt. # 246.

[2] The Court and Ms. Mac Donald independently gravitated towards Remedial Map 3A as the best of the ten options presented.

[3] Although untimely submitted, the intervenors' proposed remedial map, Dkt. # 273 at 8, was considered.

ORDER REGARDING REMEDY - 2

the Yakama Nation and having heard from the parties' experts, one of the named plaintiffs, and a representative of the Yakama Nation, the Court requested that plaintiffs and intervenors each make changes to their proposed maps to address short-comings identified in the record.[4] This matter is again before the Court for the adoption of a redistricting plan that remedies the racially discriminatory vote dilution in the Yakima Valley region.

## CHOICE OF REMEDIAL MAP

The Court hereby adopts Remedial Map 3B, described in the CSV data and map submitted by plaintiffs on March 14, 2023, as exhibits to Dkt. # 288,[5] with the following adjustments to be made by the Secretary of State in implementing the map:

> (1) Reassign that portion of Census Block 530770018013012 annexed by the City of Grandview (Ordinance 2022-12, effective Aug. 29, 2022) from Legislative District ("LD") 15 to LD14;
>
> (2) Reassign that portion of Census Block 530770018012077 annexed by the City of Grandview (Ordinance 2021-13, effective Oct. 4, 2021) from LD15 to LD14;
>
> (3) Reassign that portion of Census Blocks 530770020042004 and 530770020042005 annexed by the City of Sunnyside (Ordinance 2020-06A, effective Aug. 10, 2020) from LD15 to LD14; and
>
> (4) Reassign that portion of Census Block 530770018011075 annexed by the City of Sunnyside (Ordinance 2021-06, effective June 21, 2021) from LD15 to LD14.

(hereinafter "the adopted map.")

---

[4] Through this process, Remedial Map 3A was replaced with Remedial Map 3B.

[5] The CSV data in the record identifies every census block in the State and the legislative district to which it is assigned. The data was originally submitted to the Court via email on March 13, 2024. Because the CSV file could not be uploaded into our CM/ECF system, the data had to be converted into a pdf. The Secretary of State may use the CSV file when implementing the new district boundaries.

ORDER REGARDING REMEDY - 3

The adopted map starts with, and avoids gratuitous changes to, the enacted map while remedying the Voting Rights Act violation at issue. The Latino community of interest that stretches from East Yakima, through the smaller Latino population centers along the Yakima River, to Pasco is unified in a single legislative district. Although the Latino citizen voting age population of LD 14 in the adopted map is less than that of the enacted district, the new configuration provides Latino voters with an equal opportunity to elect candidates of their choice to the state legislature, especially with the shift into an even-numbered district, which ensures that state Senate elections will fall on a presidential year when Latino voter turnout is generally higher.

The adopted map also keeps the vast majority of the lands that are of interest to the Yakama Nation together and has the highest proportion of Native American citizen voting age population when compared to the enacted map or the map proposed by intervenors.

Finally, the adopted map is consistent with the other state law and traditional redistricting criteria. It has a negligible total population deviation from the target population of 157,251. LD 14 and the surrounding districts of the adopted map are reasonably shaped and compact, and the districts consist of contiguous territory that is traversable and minimizes county, city, and precinct splits.[6] Plaintiffs' expert, Dr. Kassra

---

[6] With the able (and much appreciated) assistance of the Secretary of State's staff and the Yakama Nation, plaintiffs have made a number of small boundary adjustments to ensure that areas of land are not "trapped" between county boundaries, congressional districts, legislative districts, county council or commissioner districts, and city or town limits and that three parcels identified as MV-72, 1026, and 1025 are included in LD 14.

ORDER REGARDING REMEDY - 4

Oskooii, drew the adopted map without reference to political or partisan criteria, seeking only to rectify the dilution of Latino voters that is at the center of this case.

**INTERVENORS' OBJECTIONS**

Intervenors object to the adopted map on a number of grounds, primarily (1) that LD 14 does not include all off-Reservation trust land, associated Yakama communities of interest, and traditional hunting and fishing lands of the Yakama Nation, (2) that the adopted map requires boundary adjustments for too many districts, and (3) that it disrupts the political lean of Washington's legislative districts outside of LD 14.

1. **Yakama Nation**

The first issue appears to be a non-starter. As described at the evidentiary hearing, the lands in which the Yakama Nation has an interest expand across much of the central part of the State: all of those lands cannot possibly be included in a single legislative district. The adopted map does, however, preserve the integrity of the Reservation and all off-Reservation trust lands designated by the U.S. Census. It also increases the Native American citizen voting age population of LD 14, thereby increasing the communities' electoral opportunities. While the White Salmon River basin and a portion of Klickitat County south of the Reservation are excluded, significant portions of the Yakima, Klickitat, and Columbia watersheds are included in LD 14. The area that was shifted to LD 17 has a significant population (approximately 15,750) and its exclusion from LD 14 was essential to satisfying the statutory requirement of population parity. Importantly, the Native American population in that area is only 662, with a white population of over

12,200. To retain this area in LD 14 of the adopted map would not only overpopulate the district in violation of the equal population criterion, but would also skew the demographics and perpetuate the vote dilution at issue in this lawsuit.

### 2. Scope of Boundary Adjustments

Intervenors argue that the adopted map disrupts too many districts and that population shifts in thirteen legislative districts are not needed to remedy the Voting Rights Act violation at issue. In doing so, they overstate the magnitude of the shifts, they fail to explain why the changes are of any real import, and they offer no viable alternative that would both remedy the Voting Rights Act violation found by the Court and comport with traditional redistricting criteria.

### a. Magnitude of Population Shifts

Intervenors' expert, Dr. Sean Trende, presents figures and maps showing the number of individuals and the size of the geographic areas moving from one district to another under the adopted map. Dkt. # 273 at 12-13. The percentage of individuals shifted out of and into LD 8, LD 13, LD 14, LD 15, and LD 16 are significant, with core population retention percentages ranging from 47.8% to 80.4%. Dkt. # 254-1 at 45; Dkt. # 273 at 13. But shifts of that magnitude are necessary to unite the Latino community of interest in the region.[7] Despite these significant movements and the ripple effect they cause, the adopted plan impacts only 5.5% of the State's population overall.

---

[7] As discussed below, intervenors' proposed map (Dkt. # 289) does not accomplish this fundamental goal of the remedial process. The only other map Dr. Trende regards as suitably limited in its geographic scope, Remedial Map

ORDER REGARDING REMEDY - 6

With regards to Dr. Trende's map, Dkt. # 273 at 12, its large, red splotches, while striking, are misleading as a representation of population movement. The red portions represent acreage which, as anyone familiar with central Washington knows, is often a poor substitute for population. Depending on the population density, an area representing the same number of people (approximately 15,600) could be represented by a small red dot or a large red block. A more apt representation of the magnitude of the population shift would compare apples to apples (total population of the district compared to the population shifted), as reflected in Dr. Oskooii's core retention figures.

b.  **Importance of Population Shifts**

Intervenors presume that the consistency of legislative boundaries over time is a goal of redistricting and/or this remedial process. Dkt. # 273 at 9 n.3 and 14 n.4. It is not. The constitutional and statutory requirements for legislative districts do not compel the Redistricting Commission to consider, much less safeguard, existing boundaries. Moreover, the boundaries at issue were put in place for the 2022 election cycle: there is no evidence or reason to presume that the population within any particular legislative district has developed a familiarity with or an affinity for the recently-enacted borders.

Under Washington law, population parity is a primary consideration in the redistricting process, with other traditional redistricting criteria (such as keeping precincts and communities of interest together) accomplished only "[t]o the extent consistent with"

---

5A, fails to respect the Yakama Nation community of interest and involves shifts in LD 13, LD 14, LD 15, and LD 16 that have core population retention percentages ranging from 51.3% to 90%.

ORDER REGARDING REMEDY - 7

population parity. RCW 44.05.090(1) and (2). Thus, when making a change in the center of the state to unify a particular community of interest – in this case, by moving over 100,000 individuals into LD 14 – a nearly identical number of individuals must move out of LD 14 and into neighboring districts which must, in turn, lose some portion of their population to their neighbors. Where population parity is paramount, making a substantial change in the population of one legislative district is like dropping a stone into the middle of a lake: the ripple effect reaches beyond the immediate area in a way that is neither unexpected nor necessarily problematic.

      The ripple in the adopted map appears to be a normal redistricting occurrence, especially common when one centrally-located district must be redrawn. The majority of the 100,000+ individuals moved into LD 14 are offset by a swap with LD 15, but Dr. Oskooii still had to lower LD 14's population by approximately 15,600 individuals to meet the population parity requirement. These 15,600 persons are what caused the ripple effect, and Dr. Oskooii was diligent in moving this population through the neighboring districts while adhering to state law, traditional redistricting criteria, and public input. As has been made abundantly clear throughout the trial and the remedial process, there is no perfect map. Redistricting is a system of constraints where the various criteria often pull the map maker in different directions. His or her choices are further restricted by the requirements of the Voting Rights Act. The question for the Court is, as between the maps generated by the Commission, plaintiffs, and intervenors, which is most consistent with the applicable, and sometimes competing, legal demands.

ORDER REGARDING REMEDY - 8

### c. Viable Alternatives

For the reasons discussed above, the Court approves of the choices Dr. Oskooii made when generating the adopted map. The downside to this particular map is that it affects thirteen legislative districts to some extent. Dr. Trende, in contrast, focuses his map-making efforts on creating smaller shifts in population that emulate the boundaries of the enacted map to the greatest extent possible. This focus is not compelled by governing law. And, more importantly, achieving static boundaries comes at a cost: intervenors' final map (Dkt. # 289), fails to unify the Latino community of interest that was identified at trial (*see* Dkt. # 218 at 10-11) and described by Caty Padilla during the evidentiary hearing. It also retains an artifact of the enacted map that cuts off a bit of the Yakama Reservation in Union Gap from the remainder. Both of these problems are resolved in the adopted map. Intervenors' map cannot be considered proof that limited disruption is achievable where it fails to satisfy mandatory state and federal requirements.

### 3. Political Lean

Intervenors argue that the adopted map is somehow faulty because it impacts "the political lean of Washington's legislative districts beyond those found in the Yakima River valley." Dkt. # 273 at 17. State law required the Redistricting Commission to "exercise its powers to provide fair and effective representation and to encourage electoral competition. The [C]ommission's plan shall not be drawn purposely to favor or discriminate against any political party or group." RCW 44.05.090(5). Neither Dr. Oskooii nor the undersigned has any interest in the partisan performance of the adopted map: the map was not drawn or

ORDER REGARDING REMEDY - 9

adopted to favor or discriminate against either political party, but rather to unite the Latino community of interest in the Yakima Valley region. Dr. Trende does not explain what aspect of state or federal law is at stake here, but his data suggests that the adopted map generally increases the competitiveness of the impacted districts, in keeping with the dictates of RCW 44.05.090(5). *See* Dkt. # 273 at 18. The one glaring exception is LD 14, which is made substantially more Democratic than its LD 15 predecessor given the requirement of creating a Latino opportunity district. Dr. Trende acknowledges that this shift cannot be avoided. Overall, the adopted map retains the slight Republican bias of the enacted map. The Court finds that the adopted map does not meaningfully shift the partisan balance of the State and that it was not drawn (or adopted) purposely to favor one political party over the other.

## Conclusion

The task of fashioning a remedy for a Voting Rights Act violation is not one that falls within the Court's normal duties. It is only because the State declined to reconvene the Redistricting Commission – with its expertise, staff, and ability to solicit public comments – that the Court was compelled to step in. Nevertheless, with the comprehensive and extensive presentations from the parties, the participation of the Yakama Nation, and the able assistance of Ms. Mac Donald, the Court is confident that the adopted map best achieves the many goals of the remedial process.

//

The Secretary of State is hereby ORDERED to conduct future elections according to Remedial Map 3B (Dkt. # 288), with the following adjustments:

(1) Reassign that portion of Census Block 530770018013012 annexed by the City of Grandview (Ordinance 2022-12, effective Aug. 29, 2022) from Legislative District ("LD") 15 to LD14;

(2) Reassign that portion of Census Block 530770018012077 annexed by the City of Grandview (Ordinance 2021-13, effective Oct. 4, 2021) from LD15 to LD14;

(3) Reassign that portion of Census Blocks 530770020042004 and 530770020042005 annexed by the City of Sunnyside (Ordinance 2020-06A, effective Aug. 10, 2020) from LD15 to LD14; and

(4) Reassign that portion of Census Block 530770018011075 annexed by the City of Sunnyside (Ordinance 2021-06, effective June 21, 2021) from LD15 to LD14.

Dated this 15th day of March, 2024.

Robert S. Lasnik
United States District Judge

ORDER REGARDING REMEDY - 11